ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                 :
UNITED STATES OF AMERICA                         :    **SEALED INDICTMENT**
                                                 :
                      - v. -                      :    23 Cr.
                                                 :
DARRYL COHEN,                                    :
BRIAN GILDER,                                    :
CHARLES BRISCOE, and                             :
CALVIN DARDEN, JR.,                              :    23 CRIM 134
                                                 :
                      Defendants.                 :
                                                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

The Grand Jury charges:

## Overview of the COHEN and GILDER Scheme

1.     At all relevant times, DARRYL COHEN, the defendant, was a financial advisor at
a financial services institution ("Financial Institution-1") and was registered as an investment
advisor, associated with Financial Institution-1, with the Financial Industry Regulatory Authority
("FINRA"). At all relevant times, BRIAN GILDER, the defendant, was an independent financial
planner.

2.     From at least in or about 2017 through in or about 2020, DARRYL COHEN, the
defendant, orchestrated a scheme to defraud three different professional basketball player clients
("Athlete-1," "Athlete-2," and "Athlete-3," respectively) of a total of over $5 million by taking
advantage of his advisory and fiduciary relationships with those clients. As part of that scheme,
COHEN conspired with BRIAN GILDER, the defendant, whom COHEN introduced to his clients
and encouraged his clients to bring on as a financial planner, and who assisted in tax preparation
for Athletes-1, -2, and -3. Specifically, (a) COHEN and GILDER fraudulently induced Athletes-1,

-2, and -3 to purchase viatical life insurance policies at massive markups, from which COHEN and

GILDER secretly profited; (b) COHEN fraudulently diverted from the accounts of Athletes-2

and -3 approximately $500,000 in purported donations to a non-profit organization, without the

knowledge of Athletes-2 and -3, a large portion of which was used to build athletic training

facilities in COHEN's backyard; and (c) COHEN and GILDER misappropriated money from

Athlete-2 and used those funds to repay another client of COHEN's, a former professional baseball

player ("Athlete-4"), who was threatening to sue COHEN as a result of issues arising from that

client's past investments.

## The Life Insurance Investments

3.       "Viatical life settlements" are life insurance policies sold by an insured person to a

buyer.  Typically, the buyer, or investor, in a viatical life insurance policy will pay the insured a

lump sum and then assume responsibility for the payment of the premiums on the policy.  In

exchange, the investor typically receives any life insurance payout when the insured dies.

### *Victim Athlete-1*

4.       In or about 2017, DARRYL COHEN and BRIAN GILDER, the defendants,

convinced Athlete-1, a professional basketball player client, to purchase a viatical life insurance

policy ("Policy-1").

5.       BRIAN GILDER, the defendant, arranged for a purported law firm ("Law Firm-1")

to purchase Policy-1 from an insurance brokerage for approximately $465,300.

6.       DARRYL COHEN and BRIAN GILDER, the defendants, induced Athlete-1 to

enter into a contract to purchase Policy-1 from Law Firm-1 for approximately $1,500,000

("Contract-1").  Athlete-1 entered into Contract-1 on behalf of a limited liability company that

Athlete-1 controlled.

2

7.    BRIAN GILDER, the defendant, exercised a substantial degree of control over Law Firm-1. Although GILDER does not currently hold himself out as a lawyer, GILDER was once listed as a partner at Law Firm-1. Law Firm-1 had at least two bank accounts in its name, including a client trust account (the "Law Firm-1 Client Trust Account"); at all relevant times, GILDER was a signatory on both bank accounts, including the Law Firm-1 Client Trust Account. Additionally, GILDER operated his financial planning business out of Law Firm-1's offices.

8.    DARRYL COHEN and BRIAN GILDER, the defendants, did not disclose GILDER's connection to Law Firm-1 to Athlete-1. The name "GILDER" is not in the name of Law Firm-1, GILDER did not sign Contract-1 on behalf of Law Firm-1, and the typed signature block of Contract-1 did not contain the name "GILDER." Athlete-1 did not understand that he was purchasing Policy-1 from a law firm connected to COHEN or GILDER, that the money he paid would go to benefit COHEN and GILDER, that Law Firm-1 was buying Policy-1 from an insurance brokerage only with the assurance that Athlete-1 would then buy Policy-1 from Law Firm-1, or that Policy-1 was being sold to Athelte-1 at a massive markup from the price Law Firm-1 had paid for it.

9.    Because DARRYL COHEN and BRIAN GILDER, the defendants, served as Athlete-1's investment advisor and independent financial planner, respectively, Athlete-1 trusted their advice to buy Policy-1. Athlete-1 did not understand that COHEN and GILDER were receiving proceeds from Athlete-1's purchase of Policy-1.

10.    Law Firm-1 entered into Contract-1 with Athlete-1 on or about October 4, 2017. Contract-1 represented that Law Firm-1 was "in the process of owning [Policy-1]." Law Firm-1 entered into a separate contract to buy Policy-1 from a broker of life settlement policies ("Broker-1") for approximately $465,300 on or about November 9, 2017. In other words, by the

3

time Law Firm-1 had entered into an agreement to buy Policy-1 for approximately $465,300, it already had an agreement in place to sell Policy-1 to Athlete-1 for approximately $1,500,000, or 322% higher than the purchase price, at a 222% profit to COHEN and GILDER of approximately $1,034,700.

*Victim Athlete-2*

11.     In or about 2019 and 2020, DARRYL COHEN and BRIAN GILDER, the defendants, convinced Athlete-2, another professional basketball player client, to purchase a different viatical life insurance policy ("Policy-2").

12.     BRIAN GILDER, the defendant, arranged for Law Firm-1 to purchase Policy-2 from Broker-1 for approximately $621,420.

13.     DARRYL COHEN and BRIAN GILDER, the defendants, induced Athlete-2 to enter into a contract to purchase Policy-2 from Law Firm-1 for approximately $2,550,000 ("Contract-2").

14.     DARRYL COHEN and BRIAN GILDER, the defendants, did not disclose GILDER's connection to Law Firm-1 to Athlete-2.  GILDER did not sign Contract-2 on behalf of Law Firm-1, and the typed signature block of Contract-2 did not contain the name "GILDER." Athlete-2 did not understand that he was purchasing Policy-2 from a law firm connected to COHEN or GILDER, that the money he paid would go to benefit COHEN and GILDER, that Law Firm-1 was buying Policy-2 from an insurance brokerage only with the assurance that Athlete-2 would then buy Policy-2 from Law Firm-1, nor that Policy-2 was being sold to him at a massive markup from the price Law Firm-1 had paid for it.

15.     Because DARRYL COHEN and BRIAN GILDER, the defendants, served as Athlete-2's investment advisor and independent financial planner, respectively, Athlete-2 trusted

4

their advice to buy Policy-2. Athlete-2 did not understand that COHEN and GILDER were receiving proceeds from Athlete-2's purchase of Policy-2.

16.     While Law Firm-1 did not enter into Contract-2 with Athlete-2 until on or about April 13, 2020, Athlete-2 had agreed to purchase Policy-2 by in or about early November 2019. Law Firm-1 entered into a separate contract to buy Policy-2 from Broker-1 on or about December 5, 2019. In other words, by the time Law Firm-1 had entered into an agreement to buy Policy-2 for approximately $621,420, it already had an agreement in place to sell Policy-2 to Athlete-2 for approximately 410% higher than the purchase price at $2,550,000, at an approximately 310% profit to COHEN and GILDER of approximately $1,928,580.

*Victim Athlete-3*

17.     In or about June and July 2020, DARRYL COHEN and BRIAN GILDER, the defendants, convinced Athlete-3, a third professional basketball player client, to purchase a viatical life insurance policy ("Policy-3").

18.     BRIAN GILDER, the defendant, arranged for Law Firm-1 to purchase Policy-3 from Broker-1 for approximately $608,765.

19.     DARRYL COHEN and BRIAN GILDER, the defendants, induced Athlete-3 to enter into a contract to purchase Policy-3 from Law Firm-1 for approximately $2,100,000 ("Contract-3").

20.     DARRYL COHEN and BRIAN GILDER, the defendants, did not disclose GILDER's connection to Law Firm-1 to Athlete-3. GILDER did not sign Contract-3 on behalf of Law Firm-1, and the typed signature block of Contract-3 did not contain the name "GILDER." Athlete-3 did not understand that he was purchasing Policy-3 from a law firm connected to COHEN or GILDER, that the money he paid would go to benefit COHEN and GILDER, that Law

5

Firm-1 was buying Policy-3 from an insurance brokerage only with the assurance that Athlete-3 would then buy Policy-3 from Law Firm-1, nor that Policy-3 was being sold to him at a massive markup from the price Law Firm-1 had paid for it.

21.     Because DARRYL COHEN and BRIAN GILDER, the defendants, served as Athlete-3's investment advisor and independent financial planner, respectively, Athlete-3 trusted their advice to buy Policy-3, and Athlete-3 did not closely scrutinize Contract-3. Athlete-3 did not understand that COHEN and GILDER were receiving proceeds from Athlete-3's purchase of Policy-3.

22.     While Contract-3 is undated, Athlete-3 made the first payment to Law Firm-1 to buy Policy-3 on or about June 18, 2020. Law Firm-1 entered into a separate contract to buy Policy-3 from Broker-1 on or about September 16, 2020. In other words, by the time Law Firm-1 had entered into an agreement to buy Policy-3 for approximately $608,765, it already had an agreement in place to sell Policy-3 to Athlete-3 for approximately 344% higher than the purchase price at $2,100,000, at a 244% profit to COHEN and GILDER of approximately $1,491,235.

*Use of the Misappropriated Funds*

23.     In total, Athletes-1, -2, and -3 paid approximately $6,150,000 to Law Firm-1 in connection with the purchase of the viatical life insurance policies described above. Those payments were made from accounts held by Athletes-1, -2, and -3 (or by limited liability companies they controlled) at Financial Institution-1; all of these accounts were managed by DARRYL COHEN, the defendant, in his capacity as an investment advisor for Athletes-1, -2, and -3 at Financial Institution-1. All of these payments were made to an escrow account or to the Law Firm-1 Client Trust Account. Ultimately, the approximately $4,454,515 that Law Firm-1 realized

6

in profits from the sale of the policies to Athletes-1, -2, and -3 was transferred to the Law Firm-1 Client Trust Account.

24.     After Law Firm-1 received those funds into the Law Firm-1 Client Trust Account, DARRYL COHEN and BRIAN GILDER, the defendants, used a substantial portion of the stolen funds to benefit themselves. In particular: (a) GILDER used approximately $257,479 of the funds to pay off a mortgage owed by GILDER; (b) COHEN used approximately $178,462 of the funds to renovate COHEN's house and perform work on his pool; (c) COHEN used approximately $67,500 of the funds to pay off COHEN's credit card bill; and (d) COHEN transferred approximately $200,000 of the funds to an individual with whom COHEN was in a romantic relationship.

### The Fraudulent Non-Profit Transfers

25.     In or about October 2017, a basketball-related non-profit ("Non-Profit-1") was incorporated with the stated purpose to "use a grassroots basketball program to teach leadership and life skills to youth from all backgrounds." Non-Profit-1 appears to have used a single bank account (the "Non-Profit-1 Bank Account") as its operating account. The Non-Profit-1 Bank Account was opened by an individual associated with Non-Profit-1 on or about October 29, 2017, and it was closed on or about May 3, 2022.

26.     Between in or about October 2017 and in or about September 2019, DARRYL COHEN, the defendant, directed 14 transfers from Athlete-2's account at Financial Institution-1 to Non-Profit-1, for a total of $480,000 in purported "donations."

27.     In or about October 2019, DARRYL COHEN, the defendant, directed that a $20,000 purported "donation" from Athlete-3's account at Financial Institution-1 be transferred to Non-Profit-1.

28.    Financial Institution-1's records reflect that Athletes-2 and -3 verbally authorized the transfers and that, on or about February 18, 2019, Athlete-2 signed a document purporting to permit transfers to Non-Profit-1 based on verbal authorization alone.  In truth and in fact, however, Athletes-2 and -3 never authorized any such transfers.

29.    Non-Profit-1 appears not to have received donations from any sources other than Athletes-2 and -3.  Indeed, the funds from Athletes-2 and -3, along with a loan from the Small Business Administration received by Non-Profit-1, constitute approximately 96% of the total funds that Non-Profit-1 received into the Non-Profit-1 Bank Account during the time that account was open.  Of these funds, DARRYL COHEN, the defendant, used approximately $238,000 to build athletic training facilities in the backyard of his home.

30.    In or about October 2020, Athlete-2 confronted DARRYL COHEN, the defendant, about the donations from Athlete-2's account to Non-Profit-1, expressing surprise that he had donated so much money to Non-Profit-1.  In a text message, COHEN told Athlete-2, in substance and in part: "Helped a lot of future prospects and a lot of underprivileged kids."  COHEN did not disclose to Athlete-2 that COHEN had, in fact, used a substantial portion of Athlete-2's donations to build an athletic training facility in COHEN's backyard.

**Misappropriation of Athlete-2's Funds to Repay Athlete-4**

31.    From at least in or about 2018 through at least in or about 2020, Athlete-4, a former professional baseball player and client of DARRYL COHEN, the defendant, expressed concern to COHEN about investments and loans that COHEN made on Athlete-4's behalf.  In or about May 2020, those complaints culminated in Athlete-4 filing a complaint against COHEN with the FINRA.  Among the investments and loans about which Athlete-4 asserted complaints were: (a) a loan of approximately $200,000 made by Athlete-4, based on COHEN's recommendation, in or

about July 2016, to a limited liability company affiliated with an athletic trainer who promotes himself as a trainer of celebrities and professional athletes (the "LLC Loan"); and (b) loans totaling approximately $75,000 made by Athlete-4, based on COHEN's recommendation, between in or about September 2017 and in or about December 2017, to a sports agent and the agency with which that agent was associated (the "Agent Loans").

32.    In or about September 2018, Athlete-4 was irate at DARRYL COHEN, the defendant, because Athlete-4 had not received the principal and interest back from the LLC Loan. For example, on or about September 6, 2018, another Financial Institution-1 employee wrote to COHEN, stating, in substance and in part, "[Athlete-4] said he tried calling you – said that he is expecting 50k back today from the loan he's owed and the rest should come soon," and "[Athlete-4] is pissed!!"

33.    In or about September 2018, DARRYL COHEN, the defendant, caused a $250,000 check to be issued from Athlete-2's account at Financial Institution-1 to a second law firm ("Law Firm-2"). While Athlete-2 signed a document authorizing the issuance of the check, Athlete-2 was not aware that $250,000 would be transferred from his account for the benefit of Athlete-4. Rather, Athlete-2 trusted COHEN to act in his best interest.

34.    Within two weeks of Athlete-2's funds being transferred to Law Firm-2, Law Firm-2 transferred approximately $235,000 of those funds to Athlete-4's account at Financial Institution-1, as repayment to Athlete-4 in full for the LLC Loan.

35.    Although DARRYL COHEN and BRIAN GILDER, the defendants, had misappropriated Athlete-2's money to repay the LLC Loan, they still needed to devise a means to repay the Agent Loans. They did so though the use of a sports agency that Athlete-2 created, in consultation with COHEN and GILDER, the defendants, and with CHARLES BRISCOE

("Agency-1"). COHEN and Athlete-2 had discussed the possibility of Athlete-2 operating Agency-1 when Athlete-2's professional sports career ended. At the time of its formation in or about 2019, GILDER was named as Chief Executive Officer ("CEO") of Agency-1. GILDER was also a signatory on Agency-1's bank accounts, including Agency-1's principal operating account (the "Agency-1 Bank Account"), which was opened on or about March 11, 2019 and closed in or about September 2021. BRISCOE served as the lead sports agent for Agency-1.

36. Acting on the advice of, and in consultation with, DARRYL COHEN, the defendant, Athlete-2 provided almost all of the funding for Agency-1. Between in and about March 2019 and in and about September 2020, Athlete-2 transferred approximately $865,000 from his accounts at Financial Institution-1 to Agency-1. Athlete-2's transfers constituted approximately 77% of the total funds that Agency-1 received into the Agency-1 Bank Account during the life of that account. Athlete-2 was not represented by Agency-1, and his payments to Agency-1 reflected what he understood to be the start-up costs for Agency-1. Athlete-2 understood from discussions with COHEN and BRIAN GILDER, the defendant, as well as with CHARLES BRISCOE, that he informally controlled Agency-1 and would eventually take over running Agency-1.

37. Between in or about November 2019 and in or about May 2020, Agency-1 transferred approximately $93,125 from Agency-1 to Athlete-4. BRIAN GILDER, the defendant, authorized these payments to Athlete-4 as the CEO of Agency-1, and did so at the direction of DARRYL COHEN, the defendant. For example:

a. On or about January 21, 2020, COHEN messaged GILDER, "wire [Athlete-4] 11k from [Agency-1]." That same day, Agency-1 wired $11,000 to Athlete-4.

10

      b.      On or about February 18, 2020, COHEN messaged GILDER, "Can you wire 10k to [Athlete-4] ASAP please." That same day, Agency-1 wired $10,000 to Athlete-4.

      c.      On or about April 22, 2020, COHEN messaged GILDER, "Send 5k to [Athlete-4] please." The next day, Agency-1 wired $5,000 to Athlete-4.

38.      Agency-1 did not have any business relationship with Athlete-4, did not owe Athlete-4 any money, and had no legitimate reason to make payments to Athlete-4.

39.      In their communications with one another, DARRYL COHEN and BRIAN GILDER, the defendants, were clear that the purpose of the transfers from Agency-1 to Athlete-4 was to repay Athlete-4 for the Agent Loans and to attempt to assuage Athlete-4 in an effort to prevent litigation. For example:

      a.      On or about February 19, 2020, COHEN messaged GILDER, "We gotta send [Athlete-4] more to get rid of him."

      b.      On or about May 5, 2020, GILDER messaged COHEN, "[Athlete-4's] attorney wanted to know how much was left on the loan? 76k has been paid. The original amount, interest rate on the loan?"

      c.      On or about May 7, 2020, GILDER messaged COHEN, "Basically [Athlete-4] loan $75,000 interest at 10% for 30 months comes to $18,125 total would be $93,135 [Agency-1] paid back $76k so far. Total due $17,125?? Does that sound right ?"

40.      On or about May 8, 2020, Agency-1 made a final payment to Athlete-4 of approximately $17,125.

41.      At no point did Athlete-2 approve using any of the funds that he had transferred to Agency-1 to pay Athlete-4, nor did he become aware of these payments until substantially after they had been made.

42. All wires transferred into bank accounts at Financial Institution-1 passed through a correspondent bank in the Southern District of New York, including the wires used to pay Athlete-4 for the Agent Loan and the LLC Loan.

### Overview of the BRISCOE and DARDEN JR. Scheme

43. CHARLES BRISCOE, the defendant, was at all relevant times an agent certified by and registered with the National Basketball Association Players Association. CALVIN DARDEN, JR., the defendant, was an associate of BRISCOE's and a purported businessman. From at least in or about 2019 through in or about 2021, CHARLES BRISCOE and CALVIN DARDEN, JR. orchestrated a scheme to defraud Athlete-2 and another professional basketball player ("Athlete-5"), both of whom were clients of DARRYL COHEN, the defendant, of a total of approximately $8 million, by inducing Athletes-2 and -5 to transfer money to accounts that BRISCOE and DARDEN, JR. controlled based on fraudulent documents and false representations. Specifically, BRISCOE and DARDEN, JR.: (a) fraudulently induced Athlete-2 to transfer approximately $1 million to BRISCOE, purportedly to fund a loan to a potential athlete client of Agency-1 ("Athlete-6"); and (b) fraudulently induced Athlete-5 to transfer approximately $7 million to DARDEN, JR., purportedly to purchase a professional women's basketball team ("Team-1"). In truth and in fact, BRISCOE and DARDEN, JR. used these funds for their personal benefit.

### The Purported Athlete-6 Loan

44. As described above, in consultation with DARRYL COHEN, who was Athlete-2's financial advisor at the time, Athlete-2 funded Agency-1 with the plan that Athlete-2 would formally assume control of Agency-1 once Athlete-2's playing career ended. CHARLES BRISCOE, the defendant, served as the lead agent for Agency-1.

12

45.     In or about November 2019, CHARLES BRISCOE, the defendant, informed Athlete-2 that Athlete-6, a highly touted athlete preparing for a professional basketball draft, had signed with BRISCOE and Agency-1. BRISCOE further informed Athlete-2 that Athlete-6 needed approximately $1,000,000 as a loan to pay living and training expenses, in preparation for the National Basketball Association's upcoming draft.

46.     CHARLES BRISCOE, the defendant, subsequently sent to Athlete-2 a player-agent contract purportedly signed by Athlete-6, agreeing that BRISCOE was to serve as Athlete-6's agent (the "Athlete-6 Contract"). The Athlete-6 Contract was purportedly electronically signed by Athlete-6 and Athlete-6's mother through an electronic signature company. In truth and in fact, and as BRISCOE well knew, Athlete-6 never signed the Athlete-6 Contract that BRISCOE provided to Athlete-2. BRISCOE had forged the electronic signatures of both Athlete-6 and Athlete-6's mother on the Athlete-6 Contract. Indeed, Athlete-6 never had any conversations with BRISCOE, nor with CALVIN DARDEN, JR., the defendant, about signing with BRISCOE or Agency-1, or receiving a $1,000,000 loan.

47.     On or about November 20, 2019, and without knowledge that CHARLES BRISCOE, the defendant had forged the signatures of Athlete-6 and Athlere-6's mother on the Athlete-6 Contract, Athlete-2 transferred approximately $1,000,000 to a bank account (the "Briscoe Account") that BRISCOE controlled; DARRYL COHEN, acting as Athlete-2's financial advisor, assisted in facilitating that transfer. Based on BRISCOE's representations, Athlete-2 understood that these funds would be used to make a loan to Athlete-6. In truth and in fact, none of the funds were ever transferred to Athlete-6 or used for Athlete-6's benefit. Instead, BRISCOE immediately used approximately $306,642 of the funds transferred by Athlete-2 to pay off a debt that BRISCOE had personally incurred. BRISCOE also transferred approximately $544,000 from

13

the Briscoe Account to a bank account (the "Darden Account") controlled by CALVIN DARDEN, JR., the defendant, held at a bank located in the Southern District of New York.

48.     CHARLES BRISCOE and CALVIN DARDEN, JR., the defendants, papered the transfer from Athlete-2 with the following fraudulent documentation: (a) a promissory note in which an entity controlled by BRISCOE agreed to repay $1,050,000 to Athlete-2; and (b) a promissory note in which an entity controlled by DARDEN in turn agreed to repay $1,050,000 to the entity controlled by BRISCOE.

49.     Between in or about December 2020 until in or about February 2021, Athlete-2 communicated with CHARLES BRISCOE and CALVIN DARDEN, JR., the defendants, in an attempt to recoup the funds he believed had been loaned to Athlete-6. During this period, both BRISCOE and DARDEN, JR. purported at various times to be working on ensuring Athlete-2 was repaid by Athlete-6, despite the fact that Athlete-6 had never, in fact, received any of Athlete-2's funds.

50.     Athlete-2 was never repaid any of the approximately $1,000,000 that Athlete-2 sent to CHARLES BRISCOE, the defendant, and intended as a loan to Athlete-6.

**The Scam Professional Basketball Team Purchase**

51.     In or about late 2019 or early 2020, CHARLES BRISCOE, the defendant, was introduced to Athlete-5. Athlete-5 retained BRISCOE as his agent in or about the spring of 2020. BRISCOE also introduced Athlete-5 to DARRYL COHEN, who became Athlete-5's financial advisor.

52.     In or about the spring of 2020, Athlete-5 began discussing with CHARLES BRISCOE, the defendant, the possibility of purchasing Team-1. In connection with discussions about the purchase of Team-1 by Athlete-5, BRISCOE introduced Athlete-5 to CALVIN

14

DARDEN, JR., the defendant. In or about the spring or summer of 2020, Athlete-5 took part in a video call (the "Video Call") involving BRISCOE, DARDEN, JR., and a relative of DARDEN, JR.'s ("Relative-1"). Relative-1 is a former corporate executive who serves or has served on the boards of multiple public companies. Because Athlete-5's professional basketball league prohibited current players from purchasing Team-1, BRISCOE, DARDEN, JR., and Relative-1 discussed with Athlete-5 an arrangement in which Athlete-5 would indirectly purchase Team-1 through a company ("Company-1") purportedly controlled by Relative-1, whereby BRISCOE and DARDEN, JR. would facilitate the purchase and play a role in the operation of Team-1. Because DARRYL COHEN was Athlete-5's financial advisor at the time, at least one representative of Athlete-5 also communicated with COHEN about Athlete-5's planned purchase of Team-1.

53. Subsequent to the Video Call, CHARLES BRISCOE, the defendant, provided Athlete-5 with a slide deck outlining a "vision plan" for the purchase of Team-1 by Company-1. The "vision plan" claimed, among other things, that Company-1 was led by Relative-1 and was advised by a board including several prominent individuals in sports, entertainment, and corporate America. In truth and in fact, and as BRISCOE and CALVIN DARDEN, JR., the defendant, well knew, at least two of those individuals never served as advisors to Company-1.

54. On or about November 11, 2020, Athlete-5 signed a $7 million promissory note with Company-1, and between in or about November 2020 and in or about December 2020, Athlete-5 caused $7 million to be transferred to the Darden Account. Based on representations made by CHARLES BRISCOE and CALVIN DARDEN, JR., the defendants, Athlete-5 understood that these payments were in order for Athlete-5 to purchase and become the full owner of Team-1.

15

55. In truth and in fact, none of the money Athlete-5 sent to the Darden Account went toward the purchase of Team-1, and Athete-5 did not become an owner of Team-1. Instead, from approximately November 2020 until approximately December 2021, CALVIN DARDEN, JR., the defendant, transferred more than approximately $1 million of the funds to BRISCOE. In addition, DARDEN, JR. retained a substantial portion of the funds for himself and his relatives, sending more than $500,000 to a relative and more than $400,000 to a cryptocurrency exchange for his benefit. DARDEN, JR. also used some of the funds to pay for luxury goods for himself, including approximately $880,000 to luxury car companies, more than $300,000 to art galleries, and more than $100,000 to purchase a piano, among other things. DARDEN, JR. also spent in excess of approximately $1 million in connection with purchasing and making improvements to a residence, including, among other things, the addition of a koi pond.

56. After transferring the funds described above, Athlete-5 believed he had purchased Team-1. Athlete-5 attempted to communicate with CHARLES BRISCOE and CALVIN DARDEN, JR., the defendants, about his purported ownership of Team-1, but Athlete-5 never received documents confirming that the sale of Team-1 had been finalized. Eventually, Athlete-5 learned that Team-1 had, in fact, been sold to others. Athlete-5 was never repaid any of the approximately $7 million that he sent to DARDEN, JR., intended to fund the purchase of Team-1.

## COUNT ONE
### (Conspiracy to Commit Wire Fraud)

The Grand Jury further charges:

57. The allegations contained in paragraphs 1 through 56 of this Indictment are repeated and realleged as if fully set forth herein.

58. From in or about 2017 through in or about 2020, in the Southern District of New York and elsewhere, DARRYL COHEN and BRIAN GILDER, the defendants, and others known

16

and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

59.     It was a part and an object of the conspiracy that DARRYL COHEN and BRIAN GILDER, the defendants, and others known and unknown, knowingly having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, COHEN, GILDER, and others, taking advantage of the advisory relationships COHEN and GILDER had with Athletes-1, -2, and -3, agreed to engage in a scheme to defraud Athletes-1, -2, and -3 of over $5 million.

(Title 18, United States Code, Section 1349.)

## COUNT TWO
### (Wire Fraud)

The Grand Jury further charges:

60.     The allegations contained in paragraphs 1 through 56 of this Indictment are repeated and realleged as if fully set forth herein.

61.     From in or about 2017 through in or about 2020, in the Southern District of New York and elsewhere, DARRYL COHEN and BRIAN GILDER, the defendants, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, for the purpose of executing such scheme and artifice, transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce writings, signs, signals, pictures, and sounds,

17

to wit, COHEN, GILDER, and others, relying on the advisory relationships COHEN and GILDER had with Athletes-1, -2, and -3, engaged in a scheme to defraud Athletes-1, -2, and -3 of over $5 million.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT THREE
### (Investment Advisor Fraud)

The Grand Jury further charges:

62.     The allegations contained in paragraphs 1 through 56 of this Indictment are repeated and realleged as if fully set forth herein.

63.     From in or about 2017 through in or about 2020, in the Southern District of New York and elsewhere, DARRYL COHEN, the defendant, acting as an investment advisor with respect to clients and prospective clients of Financial Institution-1, willfully, and knowingly, by the use of the mails and means and instrumentalities of interstate commerce, directly and indirectly, did: (a) employ devices, schemes, and artifices to defraud clients and prospective clients; (b) engage in transactions, practices, and courses of business which operated as a fraud and deceit upon clients and prospective clients; and (c) engage in acts, practices, and courses of business that were fraudulent, deceptive, and manipulative, to wit, COHEN, in violation of his fiduciary duties to his clients, Athletes-1, -2, and -3, engaged in a scheme to defraud Athletes-1, -2, and -3 of over $5 million by taking advantage of his advisory relationships with those clients.

(Title 15, United States Code, Sections 80b-6 and 80b-17.)

18

## COUNT FOUR
### (Conspiracy to Commit Wire Fraud)

The Grand Jury further charges:

64.    The allegations contained in paragraphs 1 through 56 and paragraphs 51 through 62 of this Indictment are repeated and realleged as if fully set forth herein.

65.    Between in or about 2019 and in or about 2021, in the Southern District of New York and elsewhere, CHARLES BRISCOE and CALVIN DARDEN, JR., the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

66.    It was a part and an object of the conspiracy that CHARLES BRISCOE and CALVIN DARDEN, JR., the defendants, and others known and unknown, knowingly having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, BRISCOE and DARDEN, JR. agreed to fraudulently induce Athletes-2 and -6 to wire a total of approximately $8,000,000 based on misrepresentations about how their money would be used.

(Title 18, United States Code, Section 1349.)

## COUNT FIVE
## (Wire Fraud)

The Grand Jury further charges:

67.    The allegations contained in paragraphs 1 through 56 and paragraphs 51 through 62 of this Indictment are repeated and realleged as if fully set forth herein.

68.    Between in or about 2019 and in or about 2021, in the Southern District of New York and elsewhere, CHARLES BRISCOE and CALVIN DARDEN, JR., the defendants, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, for the purpose of executing such scheme and artifice, transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce writings, signs, signals, pictures, and sounds, to wit, BRISCOE and DARDEN, JR. fraudulently induced Athletes-2 and -6 to wire a total of approximately $8,000,000 based on misrepresentations about how their money would be used and, ultimately, used that money for their personal benefit.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT SIX
## (Aggravated Identity Theft)

The Grand Jury further charges:

69.    The allegations contained in paragraphs 1 through 56 and paragraphs 63 through 67 of this Indictment are repeated and realleged as if fully set forth herein

70.    In or about November 2019, in the Southern District of New York and elsewhere, CHARLES BRISCOE, the defendant, knowingly transferred, possessed, and used, without lawful authority, a means of identification of another person, during and in relation to a felony violation enumerated in Title 18, United States Code, Section 1028A(c), to wit, BRISCOE used and

20

transferred the names of Athlete-6 and Athlete-6's mother during and in relation to the wire fraud conspiracy and wire fraud offenses charged in Counts Four and Five of this Indictment.

(Title 18, United States Code, Sections 1028A(a)(1),
1028A(b), and 2.)

## FORFEITURE ALLEGATIONS

71.    As a result of committing the wire fraud offenses alleged in Counts One and Two of this Indictment, DARRYL COHEN and BRIAN GILDER, the defendants, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses that the defendants personally obtained.

72.    As a result of committing the investment advisor fraud alleged in Count Three of the Indictment, DARRYL COHEN, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28 United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense.

73.    As a result of committing the wire fraud offenses alleged in Counts Four and Five of this Indictment, CHARLES BRISCOE, and CALVIN DARDEN, JR., the defendants, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but

not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses that the defendants personally obtained.

### Substitute Assets Provision

74.    If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

> (a) cannot be located upon the exercise of due diligence;
>
> (b) has been transferred or sold to, or deposited with, a third person;
>
> (c) has been placed beyond the jurisdiction of the Court;
>
> (d) has been substantially diminished in value; or
>
> (e) has been commingled with other property which cannot be subdivided without

difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendants up to the value of the above forfeitable property.

(Title 18, United States Code, Section 981;
Title 21, United States Code, Sections 853; and
Title 28, United States Code, Section 2461.)


FOREPERSON
3-13-23


DAMIAN WILLIAMS
United States Attorney


03/13/2023
(CA)

SEALED INDICTMENT Filed
W/ Arrest Warrants

KII PARKER
USAJ

22