O9PBDAR1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          23 Cr. 134 (VSB)

5    CALVIN DARDEN, JR.,

6                                          Trial
               Defendant.
7    ------------------------------x

8                                          New York, N.Y.
9                                          September 25, 2024
                                           10:00 a.m.
10

11   Before:

12                   HON. VERNON S. BRODERICK,

13                                         District Judge
                                           -and Jury-
14                        APPEARANCES

15   DAMIAN WILLIAMS
          United States Attorney for the
16        Southern District of New York
     KEVIN MEAD
17   STEPHEN J. RITCHIN
     WILLIAM C. KINDER
18   BRANDON C. THOMPSON
          Assistant United States Attorneys
19

     DONALDSON CHILLIEST & MCDANIEL LLP
20   BY:  XAVIER R. DONALDSON
          -and-
21   ANTHONY RICCO
     STEVEN Z. LEGON
22   ERICA A. REED
          Attorneys for Defendant
23

     Also Present:
24   Alexander Ross, Paralegal
     Arjun Ahuja, Paralegal
25   Melissa Baccari, FBI Special Agent

O9PBDAR1

```
1              (Trial continued; jury not present)
2              THE COURT:  Let me ask, I understand Ms. Reed is here,
3     so I will introduce you to the jury initially.  Are there any
4     things we should take up before the jury is brought out?  And
5     I'm not suggesting that -- I know you were checking on the
6     witness.  Is there anything we should take up at this stage?
7              MR. MEAD:  Not from the government's perspective, your
8     Honor.
9              THE COURT:  From the defense?
10             MR. DONALDSON:  No, your Honor.  Thank you.
11             THE COURT:  Is the witness here or are we just waiting
12    for the witness to arrive?
13             MR. THOMPSON:  The witness is here, your Honor.
14             THE COURT:  Okay.  So why don't we wait one minute and
15    I'll make sure -- I think they're all here, but we'll then
16    proceed.
17             MR. MEAD:  Do you want him on the stand now, your
18    Honor?
19             THE COURT:  Yeah, I think that makes sense, if he's
20    here if that's not too much trouble.  We're going to take five
21    minutes.  I'll just get Mr. Brock settled and then we'll get
22    the jury.  Okay.  Thank you.  We're going to bring the jury.
23    Thank you.
24             (Continued on next page)
25
```

O9PBDAR1                          Brock - Cross

1          (Jury present)

2          THE COURT:  So, ladies and gentlemen.  Good morning.

3    You know I neglected to mention yesterday that there will be a

4    light breakfast every morning for you.  And so it's not just

5    this morning.  It's not just the first morning, but it will

6    continue throughout the trial.  I know some of you have a long

7    distance to travel, and you may arrive here a little early.

8    Feel free to have breakfast and relax.

9          Next before we continue with the testimony of

10   Mr. Brock, Erica Reed who is apart of the defense team is here,

11   so that's Ms. Reed.  All right.  We can proceed with the

12   testimony of Mr. Brock.

13          MR. THOMPSON:  Thank you, your Honor.  Nothing further

14   for this witness.

15          THE COURT:  All right.  Cross-examination.

16   JOHN BROCK,

17        called as a witness by the Government,

18        having been previously duly sworn, testified as follows:

19   CROSS-EXAMINATION

20   BY MR. DONALDSON:

21   Q.  Good morning, sir.

22   A.  Good morning.

23   Q.  How are you?

24   A.  I'm fine.  Thank you.

25   Q.  I want to ask you a few questions, and if you could speak

O9PBDAR1                         Brock – Cross

1  so that the last person back here in the jury can hear you then
2  we'll know that everyone can hear you.  All right?
3  A.  Okay.
4  Q.  Now, you testified yesterday that you were COO of a company
5  in London for seven years.  Is that right?
6  A.  That is correct.  Chief operating officer of Cadbury
7  Schweppes.
8  Q.  What was that company?
9  A.  Cadbury Schweppes.
10 Q.  And as chief operating officer of Schweppes what were your
11 responsibilities?
12 A.  I oversaw the running of our business both chocolates and
13 confectionery on a global basis.
14 Q.  On a daily basis what were you doing?
15 A.  I did everything from traveling around the world.  It's
16 truly a global business, drinks and confectionery, to sitting
17 in budget meetings, to making presentations to the board of
18 directors that met ten times a year.  I reported to the chief
19 executive officer of the company, but those were my broad
20 responsibilities.
21      It was basically ensuring that the operations of the
22 business were in such a way that we achieved the maximum
23 success we could.
24 Q.  When you say ensuring the operations of the business to
25 achieve the maximum success, you were ensuring that things were

O9PBDAR1                        Brock - Cross

1    done properly.  Would that be fair to say?

2    A.  Yes.

3    Q.  And when you say you were doing -- you said the budget.

4    What were you doing with the budget?

5    A.  I did budgeting, forecasting.

6    Q.  When you say you did budgeting, what do you mean by did

7    budgeting?

8    A.  I would be involved in a meeting where say the business

9    unit heading running North America and his chief financial

10   officer would make a presentation to me on what the budget for

11   the following year was going to look like, what volume sales

12   were going to likely be, what the sales prices were going to

13   be, what the margins were going to be, and would make a

14   presentation to say as chief operating officer, did I accept

15   that as the budget for the following year.

16   Q.  And you did that for seven years?

17   A.  Yes, sir.

18   Q.  And you also said you attended ten board meetings a year,

19   right?

20   A.  Correct.

21   Q.  And in these board meetings board members would also make

22   presentations, no?

23   A.  Generally speaking in corporate board meetings, the

24   management team, of which I was a member, the corporate chief

25   operating officer would make a presentation, not the board.  We

O9PBDAR1                        Brock – Cross

would make a presentation to the board.  And the concept, the

way USA and UK corporations work is the board is an advisory

group, a fiduciarily responsible group; but one that listens to

presentations from management, opines and then ultimately

approves.

Q.  So then you are experienced with making presentations

related to members to board members; would that be fair to say?

A.  Yes.

Q.  And you were CEO in Brussels for how long?

A.  Three years.

Q.  And what was your responsibilities as a CEO in Brussels?

A.  I was chief operating officer of InBev.  I had many of the

same responsibilities as chief operating officer at Cadbury

Schweppes.  The biggest difference was, I was the CEO instead

of the COO, and so that entails a greater degree of

responsibilities.  I had individuals like the CFO reporting to

me the head of human resources, head of public affairs, so it's

a bigger broader set of responsibilities. But it's essentially

a similar job.  The big difference is it is the senior most

job.

        You asked about responsibilities.  The other key

responsibility I had was to investigate, study, and ultimately

do if it made sense acquisitions or divestitures.  While I was

there, we actually acquired the business in Brazil, and so

Interbrew and InBev combined a forum InBev.

O9PBDAR1                    Brock – Cross

1    Q.  And then you became the CEO of Coca Cola?

2    A.  Coca Cola Enterprises in Georgia.

3    Q.  How long were you in that position?

4    A.  Ten years.

5    Q.  What years were that?

6    A.  2006 to 2016.

7    Q.  And then after that what were you doing?

8    A.  The last six months of that, I was actually CEO of Coca

9    Cola European partners.  We engaged in a major transaction six

10   months before I retired.  We combine the European business of

11   Coca Cola enterprises with the bottling business of Coke in

12   Germany, as well as a family owned Coca Cola bottling business

13   in Spain and Portugal.  Together that formed Coca Cola European

14   Partners, and I became CEO of that subsequently to CCE.

15   Q.  So from 2016 to 2020, what were you doing?

16   A.  Retired.

17   Q.  Not running any business?

18   A.  That depends how you define running businesses.

19   Q.  I'll change the question.

20   A.  I'm not running any major corporations, no.

21   Q.  But you were still involved in advising businesses between

22   2016-2021, correct?

23   A.  I have a number of different businesses primarily with my

24   children, three grown children.  And we've engaged in startups

25   and tech startups and east sports activities and so forth, so

1   no full-time jobs.

2   Q.  Right. We'll get back to the east sports part. Let me get

3   back to my question.

4          You were advising businesses between 2016 and 2021,

5   correct?

6   A.  Correct.

7   Q.  Including in those businesses that you were advising were

8   your son's business, your children's businesses, correct?

9   A.  Yes.

10  Q.  You were also advising your wife business of owning the

11  Dream, correct?

12  A.  Yes.

13  Q.  When did you start advising your wife's business related to

14  the Dream, what year?

15  A.  2010.

16  Q.  Between 2010 and 2021, you served in an advisory capacity

17  of the Atlanta Dream; would that be fair to say?

18  A.  I would call it an unofficial advisory capacity.  I was her

19  husband, and I had 40 years of experience in the consumer

20  products business, so it would only be natural for her to run

21  certain key decisions about me.

22  Q.  We'll talk about the natural part of that.

23         You were an advisor for your wife in her ownership of

24  the Dream; that's correct, right?

25  A.  Yes.

O9PBDAR1                          Brock - Cross

1   Q.  You're saying it's unofficial but you advised --

2          THE COURT:  No.  No.  No. Questions, not comments.

3   Q.  At some point in time in 2020 your wife decided to sell the

4   Dream, correct?

5   A.  Yes, although I think it was largely at the end of 2019

6   that she and her partner decided to sell the Dream right at the

7   end of 2019.

8   Q.  So between December 2019 and January of 2020, your wife

9   decided to sell the team, correct?

10  A.  My wife and her partner decided to sell the Dream.

11  Q.  And the partner being Senator Loeffler?

12  A.  Correct.

13  Q.  And you then served as the point person with the WNBA to

14  facilitate that sale, correct?

15  A.  Correct.

16  Q.  And pursuant to being the point person, you had a meeting

17  in January of 2020 with Ms. Engelbert who was the commissioner,

18  correct?

19  A.  Yes.

20  Q.  And the purpose of this meeting was to discuss the sale of

21  the Dream, correct?

22  A.  Yes.

23  Q.  And you also wanted to know the rules related to selling

24  the Dream, correct?

25  A.  Yes.

O9PBDAR1                          Brock - Cross

1   Q.  And so you and Ms. Engelbert spoke about those rules,

2   correct?

3   A.  Yes.

4   Q.  You also spoke to someone named Mr. Dershowitz, correct?

5   A.  Yes.

6   Q.  Mr. Dershowitz was the general counsel for the WNBA,

7   correct?

8   A.  Yes.

9   Q.  When you had this meeting in January of 2020, you not only

10  spoke with Ms. Engelbert, but you also spoke to Mr. Dershowitz

11  about the rules and regulations related to selling the Dream,

12  correct?

13  A.  Yes.

14  Q.  It was important that you didn't violate any of those rules

15  during the process of selling the Dream, correct?

16  A.  Yes.

17  Q.  Now, would it be fair to say that during January 2020 when

18  you were -- when you and your wife and Ms. Loeffler, Senator

19  Loeffler were trying to sale the Dream, it was a high profile

20  type situation, right?

21  A.  Could you define what you mean by "high profile?"

22  Q.  Well, at that time the Atlanta Dream was in the news

23  related to Senator Loeffler, correct?

24  A.  In January of 2020, I'm not sure I could comment on how

25  much public news there was about Senator Loeffler and the

O9PBDAR1                           Brock - Cross

1    Dream.

2    Q.  So then would it be fair to say then in December of 2019 or

3    January of 2020, selling of the Dream had nothing to do with

4    any negative press associated with Senator Loeffler, correct?

5    A.  That is correct.  Just to be clear, the decision to sell

6    the Dream was because of Senator Loeffler's appointment which

7    took place in the second half of 2019.  And she and her

8    partner, my wife, mutually decided it would be in their best

9    interest, and frankly Senator Loeffler's best interest as a

10   senator who would be in office in January to sell the Dream.

11   Q.  A second reason for why you all wanted to sell the Dream

12   was because the Dream was not making any money, correct?

13   A.  Yes.

14   Q.  It was not a profitable organization, correct?

15   A.  Correct.

16   Q.  And so you and your wife and Senator Loeffler wanted to

17   sell the Dream in order to unload a business that was not

18   making any money, correct?

19   A.  Not sure I'd use the word "unload."

20   Q.  You wanted to sell the Dream because it wasn't making any

21   money, correct?

22   A.  Yes.

23   Q.  And the purpose of selling the Dream at that time was to

24   maximize some profit from the sale, correct?

25   A.  Yes.  Again, I'd be careful to use --

O9PBDAR1                          Brock – Cross

1    Q.  That's a yes or no.

2            THE COURT:  Let the witness finish the answer.  Then

3    if you have an application, I'll hear it.  Go ahead.

4    A.  Just be careful about using the word "profit."  We were not

5    intending to maximize profit.  We simply wanted to sell the

6    Dream at the highest possible price.

7    Q.  You wanted to sell the Dream at the highest monetary price,

8    correct?

9    A.  Yes.

10   Q.  You wanted to get the most money for the Dream, correct?

11   A.  Yes.

12   Q.  Not only were you involved in the process of selling the

13   Dream, but Mr. Brown was also involved in that process,

14   correct?

15   A.  Yes.

16   Q.  And Mr. Brown was serving as a legal advisor to you and the

17   Dream, correct?

18   A.  Yes.

19   Q.  Also part of that was Tammi Stollberg, correct?

20   A.  Yes.

21   Q.  And Tammi Stollberg's role was what?

22   A.  Tammi Stollberg was the chief financial officer of the

23   Atlanta Dream.

24   Q.  It would be fair to say that you, Tammi Stollberg, David

25   Brown were the ones primarily in charge of the process of

O9PBDAR1                          Brock – Cross

1   selling the Dream to a legitimate purchaser; would that be fair

2   to say?

3   A.  Yes, but there's one additional person you left out who had

4   just as important a role.

5   Q.  That would be the president of the Dream, correct?

6   A.  Call it general manager, Chris Sienko.

7   Q.  Chris Sienko?

8   A.  Correct.

9   Q.  So you, Mr. Sienko, Tammi Stollberg and Mr. Brown; would

10  that be fair to say?

11  A.  Yes.

12  Q.  And it would also be fair to say that you all had a

13  particular process that you all had created to effectuate that

14  sale, correct?

15  A.  Yes.

16  Q.  And it would be fair to say that that process evolved

17  between January of 2020 and the time that you actually sold the

18  Dream in March of 2021, correct?

19  A.  Yes.

20  Q.  Now, the first part of that process was either you would

21  speak to a potential buyer or –– strike that.

22          If a potential buyer called you related to the team,

23  then that would be the first step, you speaking to the buyer,

24  correct?

25  A.  Yes.

1    Q.  But very often the potential buyer would call the WNBA,

2    then they would direct the call to you, correct?

3    A.  Yes, although I'll qualify that and say sometimes.  I'm not

4    sure very often, sometimes.

5    Q.  And when the WNBA would refer a person to you, you would

6    still start that initial call with them related to that being

7    the first step of your process, correct?

8    A.  Yes.

9    Q.  And then after that first call -- strike that.

10           On that first call the point of it would be for you to

11   use your business experience to determine whether or not that

12   caller could be a legitimate purchaser, correct?

13   A.  Yes.

14   Q.  And that call would sometimes take 30 to 45 minutes for you

15   to vet them to see whether or not they were legitimate

16   potential purchasers, correct?

17   A.  Yes.

18   Q.  And thereafter if you determine they were a legitimate

19   potential purchaser, you would then set up a zoom call with

20   them, correct?

21   A.  That would be one of the possible next steps, yes.

22   Q.  And then you would -- after that zoom call if they appear

23   to be a potential legitimate purchaser, you would then ask them

24   to execute an NDA, correct?

25   A.  Yes, a non-disclosure agreement.

O9PBDAR1                          Brock - Cross

1    Q.   The first call, let's talk about that. You received a call

2    from Dwight Howard relating to him wanting to purchase the

3    Dream, correct?

4    A.   Yes.

5    Q.   And that was in July of 2020, correct?

6    A.   Yes.

7    Q.   But your beginning process of selling the Dream started in

8    December 2019 or January 2020, correct?

9    A.   Yes, January of 2020 is when I had the meeting with the

10   commissioner.

11   Q.   Between January 2020 and July 2020, you did receive several

12   calls from potential buyers, correct?

13   A.   Yes.

14   Q.   And between January 2020 and July 2020, the NBA had

15   forwarded you several persons who were interested in this

16   purchase of the Dream, correct?

17   A.   Yes.

18   Q.   And then between January 1, 2020 and July 2020 had --

19   strike that.

20        Your process that started on January 2020 was

21   different from the process you used in July 2020?

22   A.   Not significantly.

23   Q.   Well, it evolved, correct?

24   A.   Yes.

25   Q.   Because you had learned more about the process, correct?

O9PBDAR1                          Brock - Cross

```
 1   A.  Yes.
 2   Q.  And you had been in contact with WNBA between January 2020
 3   and July 2020, correct?
 4   A.  Yes.
 5   Q.  And they would tell you what you needed to do related to
 6   the sale of the team, correct?
 7   A.  Not entirely correct.
 8   Q.  They would give you suggestions of what to do related to
 9   the selling of the team, correct?
10   A.  The WNBA has a process --
11            MR. DONALDSON:  I ask the witness to answer that
12   question yes or no.
13            THE WITNESS:  It can't be answered yes or no.
14            THE COURT:  That's a fine answer.  Listen to the
15   question and just answer it as best you can if you can.  Go
16   ahead.
17   Q.  Between January 2020 and July 2020, isn't it true that you
18   had several conversations with Mr. Dershowitz and Ms. Engelbert
19   about the process of selling the Dream?
20   A.  Yes.
21   Q.  Approximately how many NDAs did you send out -- did you
22   receive between January 1, 2020 and July 2020?
23   A.  Approximately eight, nine, ten, somewhere in that range.
24   Q.  So if between January 2020 and July 2020 you sent out
25   eight, say eight NDAs, that would mean you would have to have
```

1    eight prior conversations with these individuals, correct?

2    A.  Yes.

3    Q.  That would mean that you would have to are have eight

4    conversations with persons you thought were legitimate

5    purchasers, correct?

6    A.  Yes.

7    Q.  Because you wouldn't send out the NDA to persons who

8    weren't legitimate purchasers, correct?

9    A.  Yes.

10   Q.  Now, as far as your range of factors that you considered to

11   determine potential purchasers, one would be price point,

12   correct?

13   A.  No, not at that juncture because there was no negotiation

14   of price in the early conversation.

15   Q.  One would be qualifications, correct?

16   A.  Yes.

17   Q.  One would be financial wherewithal, correct?

18   A.  Yes.

19   Q.  And then you would consider what you thought was necessary

20   for a transaction of this size, correct?

21   A.  Yes.

22   Q.  And when you say transaction this size, you mean this was a

23   large transaction, correct?

24   A.  You've got to define large, but it's certainly a

25   significant transaction.

O9PBDAR1                          Brock - Cross

1  Q.  Between January 2020 and March 2021, fair to say that you

2  had 20 or 25 conversations with potential buyers before you

3  sold the team, correct?

4  A.  That number may be a little high, but 20 perhaps.

5  Q.  And you sign approximately 12 to 15 NDAs between January

6  2020 and March 2021, correct?

7  A.  Yes.

8  Q.  I want to direct your attention to Mr. Dwight Howard.  You

9  mention that your first contact with Dwight Howard was in July

10 of 2020; is that right?

11 A.  Yes.

12 Q.  Would it be fair to say that Mr. Howard actually reached

13 out to Mr. Sienko before he reached out to you?

14 A.  Yes.

15 Q.  And when he reached out -- and you know that -- well, and

16 then Mr. Sienko then contacted you, correct?

17 A.  Yes, after his conversation with Mr. Howard.

18 Q.  What was Mr. Sienko's position again?

19 A.  General manager of Atlanta Dream.

20 Q.  So Mr. Howard reached out to him directly, correct?

21 A.  Yes.

22 Q.  And based on your information he had a conversation with

23 him, correct?

24 A.  Yes.

25 Q.  And that conversation based upon your information was about

1    purchase of the Dream, correct?

2    A.  Yes.

3    Q.  And Mr. Sienko told about you that conversation, correct?

4    A.  Yes.

5    Q.  He spoke to you about that, correct?

6    A.  Yes.

7    Q.  And then at some point Mr. Howard then contacted you

8    directly, correct?

9    A.  Yes.

10   Q.  And at that point you all had this 30, 45-minute

11   conversation about his interest in the Dream, correct?

12   A.  Yes.

13   Q.  That would be a few days after Mr. Sienko talk to

14   Mr. Howard, correct?

15   A.  I think it was actually the next day.

16   Q.  Now that conversation you had with Mr. Howard was just

17   between you and Mr. Howard, correct?

18   A.  Yes.

19   Q.  And after that conversation you arranged a zoom call -- a

20   zoom call was arranged?

21   A.  A zoom call with whom?

22   Q.  A zoom call was arranged for you and Mr. Howard, correct?

23   A.  Yes.

24   Q.  And you and Mr. Howard got on a zoom call and spoke again

25   about the purchase -- about him purchasing the Dream, correct?

O9PBDAR1                         Brock - Cross

1    A.  Yes.

2    Q.  And on that zoom call you told Mr. Howard -- strike that.

3           He told you his interest in purchasing the Dream,

4    correct?

5    A.  Yes.

6    Q.  He told you about how he was from Atlanta, correct?

7    A.  Yes.

8    Q.  He told you about how his mother has season tickets,

9    correct?

10   A.  Yes.

11   Q.  And you told him that it would be great for him to have the

12   team, correct?

13   A.  Yes.

14   Q.  You told him that you thought it would be fantastic if he

15   kept the team because it was in Atlanta, correct?

16   A.  Yes.

17   Q.  And you all had a pretty good conversation; would that be

18   fair to say?

19   A.  Yes.

20   Q.  And at that point you ask him, Mr. Howard, I need you to

21   send me a NDA, correct?

22   A.  Yes.

23   Q.  Did you send -- strike that.

24           You then called Mr. Brown, correct?

25   A.  Yes.

O9PBDAR1                          Brock - Cross

1    Q.  And Mr. Brown sent him the NDA, correct?

2    A.  Yes.

3    Q.  That was the same day, correct?

4    A.  Yes.

5    Q.  And then Mr. Howard sent the NDA back to you, correct?

6    A.  Mr. Howard sent the NDA in -- candidly I don't recall if he

7    sent it to me or my attorney David Brown.

8    Q.  During that conversation, that zoom conversation between

9    you and Mr. Howard, he told you that he was leading a team of

10   people to purchase the Dream, correct?

11   A.  Yes.

12   Q.  Who did he say that team was?

13   A.  He said at that initial conversation that his agent Charles

14   Briscoe would also be very involved as part of the purchasing

15   group.

16   Q.  Right.  The only person he mention was Charles Briscoe,

17   correct?

18   A.  Correct.

19   Q.  In that zoom conversation between you and Mr. Howard he

20   told you that Charles Briscoe would be my agent, but also apart

21   of the group to purchase the Dream, correct?

22   A.  Yes.

23   Q.  The zoom call ended; would that be fair to say?

24   A.  Excuse me.

25   Q.  The zoom call ended, correct?

O9PBDAR1                              Brock – Cross

1    A.  Yes.

2    Q.  And then the next day Charles Briscoe called you, correct?

3    A.  Yes.

4    Q.  Mr. Briscoe also informed you that he wanted to be or that

5    he was representing Mr. Howard, correct?

6    A.  Yes.

7    Q.  He said he was his agent and he wanted to help with the

8    purchase of the Dream, correct?

9    A.  Yes.

10   Q.  It would be fair to say then that based upon the zoom call

11   with Mr. Howard and your years of experience as a COO, CEO and

12   an a CEO that you decided that Mr. Howard was worthy of

13   receiving an NDA, correct?

14   A.  Yes.

15   Q.  After that call with Mr. Briscoe, you ask Mr. Sienko to

16   send them a package of financials related to the Dream,

17   correct?

18   A.  Yes, once we had the NDA in hand.

19   Q.  So once you had the NDA in hand, you told or asked

20   Mr. Sienko to send Briscoe and Howard the financial package and

21   information dockets related to the Dream, correct?

22   A.  Yes.

23   Q.  And that was in fact done, correct?

24   A.  Yes.

25   Q.  At some point after that call with Briscoe, you sent an

1   email to Mr. Sienko introducing him to Charlie Briscoe,

2   correct?

3   A.  Yes.

4           MR. DONALDSON:  Can I have Government Exhibit 2101 on

5   the screen, please.  Can I have one second please, your Honor.

6   Could you scroll down to the next page, please, down to the

7   bottom.  That's it.

8   Q.  What's on the screen here is a July 9, 2020 email from you,

9   correct.  Do you see that?

10  A.  Yes.

11  Q.  In that email you're introducing -- you're saying hi,

12  Charles and Chris, correct?

13  A.  Yes.

14  Q.  And Charles is Charles Briscoe, Chris is Chris Sienko,

15  correct?

16  A.  Yes.

17  Q.  And in that email you said, Charles is Dwight Howard's

18  agent as well as the point person for their investor group

19  correct?

20  A.  Yes.

21  Q.  When you say Charles is the point person, you mean that

22  Charles is the person who is going to be speaking for the

23  investment group, correct?

24  A.  That was my understanding, yes.

25  Q.  That's what you wrote, correct?

O9PBDAR1                    Brock - Cross

1    A.  That's what he told me.

2    Q.  That's what you wrote?

3          THE COURT:  Enough.  The jury can see it's in the

4    email and they can hear the testimony.

5    Q.  You then indicated as a follow-up to the very positive zoom

6    meeting that I had with Dwight's group today, I wanted to

7    connect you two.  That "you two" being Charles and Chris

8    Sienko, correct?

9    A.  Yes.

10   Q.  As I noted on our call, Chris will be the key person in

11   getting additional information to you, Charles, as well as

12   answering any questions.

13          That's you telling Charles that Chris will be the

14   person from the Dream sending the documents to Charles,

15   correct?

16   A.  Yes.

17   Q.  And his team, correct?

18   A.  Yes.

19          MR. DONALDSON:  You can take that down, please.  Thank

20   you.  Can you put up 2102, please.  Thank you.

21   Q.  Now we have 2102 on the screen.  Do you see that?

22   A.  Yes.

23   Q.  Now that's an email from you to Cathy Engelbert, correct?

24   A.  Yes.

25   Q.  And Cathy Engelbert is the WNBA commissioner, correct?

O9PBDAR1                        Brock - Cross

1   A.  Yes.

2   Q.  And also there's an email copied -- is it Jamin Dershowitz,

3   correct?

4   A.  Yes.

5   Q.  And Jamin Dershowitz is the general counsel for the WNBA at

6   this time, correct?

7   A.  Yes.

8   Q.  And in this email the subject is introduction to Dwight

9   Howard and his investor group, correct?

10  A.  Yes.

11  Q.  So in this email you're introducing Cathy Engelbert and

12  Jamin Dershowitz to Mr. Briscoe, correct?

13  A.  I'm introducing them to Dwight Howard and his investor

14  group.

15  Q.  Dwight Howard's also on the email, correct?

16  A.  Yes.

17  Q.  And again you say at the middle of the email you say the

18  primary contact for the group will be Charles, correct?

19  A.  Yes.

20  Q.  And Charles is Charles Briscoe?

21  A.  Yes.

22  Q.  And this is July 10, 2020, correct?

23  A.  Yes.

24  Q.  Now, prior to this email of July 10, 2020, you and

25  Mr. Sienko had already had several conversations with the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O9PBDAR1                          Brock – Cross

1   Howard Group, correct?

2   A.  We had two conversations.

3   Q.  Not to pick any, but -- so in 2102 where it says, Dwight

4   has signed our NDA.  Chris Sienko and I have had several

5   conversations with this group and we have furnished important

6   business and financial documents with them.  That's you telling

7   Cathy Engelbert and Mr. Dershowitz that you have had several

8   conversations with this group, correct?

9   A.  Yes.

10  Q.  And you also indicated that you had furnished important

11  business and financial docs with them, correct?

12  A.  Yes.

13  Q.  What important business documents and financial documents

14  did you supply?

15  A.  We had developed a list of four key documents to provide to

16  potential purchasers.  One was a whole series financial

17  information.  One was a list of sponsorships.  Another one was

18  a list of season ticket holders and ticket sales and Raider

19  ticket sales, and then finally we gave a review of some of the

20  preliminary WNBA processes that would need to be followed with

21  the suggestion that they need to work those details with the

22  WNBA.

23  Q.  It would be fair to say that by July 10, 2020, you had

24  already provided Howard and Briscoe a significant amount of

25  information related to the operations of the Dream; would that

O9PBDAR1                          Brock - Cross

1    be fair to say?

2    A.  Yes.

3              MR. DONALDSON:  Can we put up 2107, please.

4    Q.  Now on July 11 you received an email from -- strike that.

5              We're looking at 2107.  I believe this is the last

6    page.  It says here, on July 10, 2020, Mr. Sienko wrote,

7    Charles, as a follow-up to our conversation attached is a

8    detailed budget.  It's fair to say you all sent a budget as

9    well, correct?

10   A.  This is one of the four key items that we sent, yes.

11   Q.  And you outline in this email several key financial points

12   related to the Dream, correct?

13   A.  Yes.

14   Q.  This is you on July 12, you sent the email to Charles,

15   correct?

16   A.  Yes.

17   Q.  In that email you say you would have an explanation over

18   the weekend related to these documents, correct?

19   A.  Yes, in response to one specific question he raised.

20   Q.  That question is related to the obligation to the league as

21   far as profitability, correct?

22   A.  Yes.

23   Q.  And you informed him that you would talk to him over the

24   weekend, correct?

25   A.  Yes.

O9PBDAR1                        Brock - Cross

1    Q.   And you in fact did have that conversation with Charles

2    Briscoe related to the profitability of the Dream, correct?

3    A.   Yes.

4    Q.   This is Mr. Briscoe sending you an email saying that they

5    wanted to see what the next steps were relating to continuing

6    the process, correct?

7    A.   Yes.

8    Q.   And just so we're clear, this is from Charlie Briscoe to

9    you, Mr. Sienko and Calvin Darden, correct?

10   A.   Yes.

11   Q.   Now, you also informed him on July 11, that you wanted to

12   make sure that he got all the information that he needed,

13   correct?

14   A.   Yes.

15   Q.   You also informed that you wanted him to begin -- or you

16   want him to get the information necessary to begin the serious

17   conversations he needed to have with the league, correct?

18   A.   Yes.

19   Q.   So in that respect you and Mr. Sienko were ensuring that,

20   the best you can, that you can provide him with all the

21   necessary information he needed to that he could have

22   conversation with a WNBA about purchasing the Dream, correct?

23   A.   Yes.

24   Q.   And on or about July 12, 2020, you, Mr. Darden, Mr. Darden,

25   Sr., Mr. Dershowitz, Ms. Engelbert and Mr. Howard participated

1   in another zoom call, correct?

2   A.  Yes.

3   Q.  And the purpose of that zoom call was for Mr. Howard and

4   the Darden Group to meet with the WNBA executives, correct?

5   A.  Yes.

6   Q.  But prior to that zoom call you had conversations with the

7   WNBA, correct?

8   A.  Yes.

9   Q.  And Mr. Dershowitz actually called you prior to that phone

10  call to flag a few issues to you, correct?

11  A.  Yes, although I don't recall the exact timing of that call,

12  but yes.

13  Q.  And the issues he wanted to flag to you was the conflict

14  that Dwight Howard would have with owning a team, correct?

15  A.  Yes.

16  Q.  Thereafter you all had this -- you, Dershowitz, Engelbert,

17  Howard, Darden, Jr. and Darden, Sr. got on a zoom call to talk

18  about the selling of the Dream, correct?

19  A.  Yes.

20  Q.  Now, if we fast forward a little bit between July 12, 2020

21  and August 5, 2020, would it be fair to say that you had

22  conversations with the WNBA related to the sale of the Dream?

23  A.  Yes.

24  Q.  Would it be fair to say that between July 12 and August 5,

25  2020, you had conversations with the WNBA about Howard's group

1    purchasing the Dream?

2    A.  Yes.

3              MR. DONALDSON:  Can I have one second, please, your

4    Honor?

5              THE COURT:  Yes.

6    Q.  Now, these conversations between you and the executives of

7    the Dream between July 12, 2020 to August 5, 2020 related to

8    Mr. Howard, talked about or discussed him being an NBA player

9    and that made a conflict, correct?

10   A.  Yes.

11   Q.  And you were trying to find ways to resolve this conflict,

12   correct?

13   A.  I was trying to understand what the conflict was and to

14   make sure that the group understood that it looked like Dwight

15   Howard would need to make a decision about whether he would be

16   an active player or not, and that that would be a key

17   determinate of whether he would be a potential buyer and owner

18   of the Dream.

19   Q.  So those conversations between July 10 or July 12, 2020 and

20   August 5, 2020 related to Dwight Howard was for you to

21   understand whether or not it was an actual conflict for him,

22   being Howard, to purchase the team, correct?

23   A.  It wasn't for me to understand it, no.  It was for the

24   league to make a decision about whether that was an issue or

25   not.  And if it was an issue, for Mr. Howard to decide did he

1    want to be a player or a potential owner.

2    Q.  Now, at some point in time in July you told the group

3    that -- the Howard Darden Group that they should provide you

4    with an executed letter of intent, correct?

5    A.  Yes.

6    Q.  And you and Mr. Brown are the ones that put together this

7    letter of intent that would be sent to any group that wanted to

8    move to the next stage, correct?

9    A.  Yes.  We provided a draft letter of intent with the idea

10   that any potential purchasing group would take that draft and

11   then put it in the right context and form that they thought was

12   appropriate for them.

13   Q.  Right.  So the initial step -- let me go back.  Sorry.

14         The NDA was step two of the process related to you

15   selling Dream to a potential purchaser; would that be fair to

16   say?

17   A.  Yes.

18   Q.  And after you got pass the NDA stage, there was the letter

19   of intent stage?

20   A.  Yes.

21   Q.  And the letter of intent was moving further along in the

22   process after the NDA stage, correct?

23   A.  Yes.

24   Q.  And sometime in July of 2020, you believe based upon your

25   business experience that the Howard Darden Group moved pass the

O9PBDAR1                          Brock - Cross

1    NDA that was prepared to receive a draft letter of intent from

2    the Dream executives, correct?

3    A.  Yes.

4    Q.  And that letter of intent was drafted -- that letter of

5    intent was drafted by Mr. Brown, correct?

6    A.  A format was drafted by Mr. Brown and given to any

7    potential purchaser.  They then had the right and obligation to

8    put it in their language to send to us.

9    Q.  Correct.  So but just so I'm clear, the template of it says

10   letter of intent was drafted by Mr. Brown, and then sent to

11   potential buyers, correct?

12   A.  Yes.

13   Q.  And then at that point the buyers would then include

14   information relevant to themselves and the Dream and send it

15   back to the Dream, correct?

16   A.  Yes.

17   Q.  And that happened in this case, correct?

18   A.  Yes.

19   Q.  You and Mr. Brown sent a letter of intent to the Howard

20   Darden Group, correct?

21   A.  Yes.

22   Q.  And then they sent the letter of intent back to you,

23   correct?

24   A.  Yes.

25   Q.  And this letter of intent from excuse me.

O9PBDAR1                          Brock - Cross

1              MR. DONALDSON:  Could you put up exhibit 41, please.

2    Q.  So Exhibit 41 is the July 31 letter of intent, correct?

3    A.  Yes.

4    Q.  And this is the letter -- this is the template of the

5    letter of intent that you and Mr. Brown sent over to the Howard

6    Darden Group, correct?

7    A.  Honestly, I don't know whether this is the template we sent

8    them or whether it is an actual letter of intent that they then

9    took and sent back to us.  I'm thinking it's probably the

10   latter.

11   Q.  You met with the prosecutors back in 2023.  You recall

12   that, correct?

13   A.  Yes.

14   Q.  And back in 2023 they asked you questions related to this

15   letter of intent, correct?

16   A.  Yes.

17   Q.  And back in 2023, did you -- do you recall telling them

18   that they -- that the letter of intent drafted by Mr. Brown and

19   sent to the Darden Group?

20   A.  I should have said what I just said to you.  Let me just

21   give you one example.

22   Q.  No.  No.

23              THE COURT:  That's okay.  Just wait until the question

24   and answer it.  Thank you.  Go ahead.

25   Q.  Before this letter of intent was sent back, the July 31,

O9PBDAR1                         Brock - Cross

1    2020 letter of intent was sent back to you, you had

2    conversations with the Howard Darden Group about the letter of

3    intent, correct?

4    A.  Yes.

5    Q.  And this particular letter of intent has an amount of $3

6    million, correct?

7    A.  Yes.

8    Q.  And that was the number that you gave to the Howard Darden

9    Group, correct?

10   A.  No.

11   Q.  That was the number they gave to you?

12   A.  Yes.

13   Q.  And that was the number that was put in the letter of

14   intent?

15   A.  Yes.

16   Q.  Also part of those conversations was whether or not you

17   would accept electronically signed documents for the letter of

18   intent, correct?

19   A.  Yes.

20   Q.  And you indicated that you would accept electronically

21   signed documents, correct?

22   A.  Yes.

23   Q.  And so thereafter you received an electronically signed

24   letter of intent somewhere in about July 31, 2020 or sometime

25   thereafter, correct?

O9PBDAR1                              Brock - Cross

1    A.  Not sometime.  It was on July 31, 2020.

2    Q.  As you're sitting here today, you remember receiving this

3    letter of intent on July 31, 2020?

4    A.  The letter is dated July 31, 2020.

5    Q.  I understand when it was dated.  My question is as you're

6    sitting here, do you recall receiving it that day or sometime

7    thereafter?

8    A.  I recall seeing this letter in late July or early August of

9    2020.

10   Q.  After you received this letter with the $3 million in it,

11   you then sent that over to the WNBA, correct?

12   A.  Yes.

13   Q.  So it would be fair to say that at that point in time the

14   $3 million price that was inside the letter of intent was

15   something that the Dream was willing to send to WNBA for

16   consideration, correct?

17   A.  Yes.

18   Q.  You didn't send it back saying that's not enough, correct?

19   A.  I sent it because it was a legitimate letter of intent.

20   Q.  My question is, did you send the letter of intent back to

21   the Darden Howard Group saying the $3 million enclosed in it is

22   insufficient?

23   A.  I did not send a letter that said that, no.

24   Q.  You did not send an email that said the $3 million is

25   insufficient, correct?

O9PBDAR1                         Brock - Cross

1   A.  No.

2   Q.  You did not make any phone calls to Mr. Darden,

3   Mr. Briscoe, Mr. Howard or anyone saying that that $3 million

4   is insufficient, correct?

5   A.  That is not correct.

6   Q.  You made a phone call?

7   A.  Yes.

8   Q.  To whom?

9   A.  I told Cal Darden, Jr. that we appreciated the letter of

10  intent.  We had sent it to the league for consideration, that I

11  seriously doubted in the clear light of the morning that $3

12  million would be sufficient to purchase the Dream.

13  Q.  So you called -- when did you make that phone call?

14  A.  Sometime in August.

15  Q.  Before August 10th?

16  A.  I don't recall.

17  Q.  And you recall that as you sit here today?

18  A.  Yes.

19  Q.  Did you write that down anywhere?

20  A.  No.

21  Q.  Did you memorialize that in the email?

22  A.  No.

23  Q.  Did you tell the government that in 2023?

24  A.  I don't recall.

25  Q.  Did you tell them that in any of your meetings in 2024?

O9PBDAR1                          Brock - Cross

1   A.  I don't recall.

2   Q.  Do you recall this is the first time you're saying that?

3   A.  No, I told my wife and Kelly as owners, and I told Kelly's

4   husband.

5   Q.  When you sent it over to the WNBA, the WNBA responded back

6   to you and Mr. Howard and Darden Group, correct?

7   A.  Yes.

8   Q.  And they wanted to set up a meeting with them, correct?

9   A.  Yes.

10  Q.  And this was based upon the letter of intent with the $3

11  million in it, correct?

12  A.  Yes.

13  Q.  So the letter of intent that had the $3 million that you're

14  now saying you told them was insufficient, they set up a

15  meeting based upon that letter of intent?

16  A.  Did you insert the word "willfully?"

17  Q.  I'm sorry. If I did, I apologize.

18          Did the WNBA set up a meeting with the Howard and

19  Darden Group after you sent them the LOI, letter of intent,

20  with the $3 million in it?

21  A.  Yes.

22  Q.  Did you tell the WNBA when they set up the meeting that

23  that was too low and we're not selling it for that price?

24  A.  I said that was not the price that the owners of the Dream

25  were seeking, and that it was lower than they were

O9PBDAR1                          Brock - Cross

1   anticipating.

2   Q.  But you continued conversations, correct?

3   A.  Yes.

4   Q.  And you continued the conversation with Mr. Howard --

5   strike that -- with Mr. Briscoe and Mr. Darden related to the

6   sale of the Dream to that group, correct?

7   A.  Yes.

8   Q.  And at no point after July 31, did you send anyone an email

9   saying that's insufficient -- well, that $3 million that you

10  put in the letter of intent was too low?

11  A.  Correct.

12              (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

O9PJDAR2                        Brock - Cross

1    BY MR. DONALDSON:

2    Q   After the WNBA sent the -- well, after you sent the letter

3    of intent to the WNBA, executives for the WNBA told you again

4    that Mr. Howard purchasing the Dream would be an uphill battle;

5    is that correct?

6    A   Yes.

7    Q   And in fact, the executives Ms. Engelbert told you were --

8    Ms. Engelbert told Mr. Briscoe that Mr. Howard owning the team

9    would be an uphill battle, correct?

10   A   Yes.

11   Q   You were also aware of Mr. Dershowitz telling Mr. Howard

12   that owning the team would be an uphill battle, correct?

13   A   Yes.

14         MR. DONALDSON:  One second, please, your Honor.

15         THE COURT:  Okay.

16   Q   Now, in the fall of 2020, Mr. Howard indicated that he was

17   going to continue playing basketball, correct?

18   A   Yes.

19   Q   But by that point, he had already been told by you and

20   executives at the WNBA that purchasing the team was not

21   happening, correct?

22   A   The WNBA had reached a point of view that he was not going

23   to be a suitable buyer unless he made a finite decision not to

24   play in the NBA in the following season.

25   Q   They also had told you that his agent couldn't purchase the

O9PJDAR2                          Brock - Cross

1    team, correct?

2    A    Could you repeat the question.

3    Q    The WNBA also informed you that not only could Mr. Howard

4    not purchase the team, but his agent could not purchase the

5    team?

6    A    Correct.

7    Q    The WNBA also told you that not only could Mr. Howard not

8    purchase the team and his agent couldn't purchase the team, but

9    he couldn't be a member of the purchasing group and then own it

10   at some later time, correct?

11   A    That is correct.

12   Q    And that all was communicated by the WNBA executives to

13   Mr. Briscoe, Mr. Howard, and yourself, correct?

14   A    Yes.

15        MR. DONALDSON:  One second, please, your Honor.

16   Q    On or about October 23, 2020, you emailed Mr. Darden and

17   Mr. Sienko related to a vision board, correct?

18   A    Could you repeat that question, please.

19   Q    On or about October 23, 2020, you emailed Mr. Darden and

20   Mr. Sienko related to a vision board, correct?

21   A    A vision plan.

22   Q    I'm sorry, vision plan.

23   A    Yes.

24        MR. DONALDSON:  Can I have Exhibit 21 just for -- not

25   for the witness, just the lawyers.  Is that possible?

O9PJDAR2                           Brock – Cross

```
 1    Q   Now, when you emailed Mr. Darden and Mr. Sienko, you were
 2    talking to them about the deck that you thought was
 3    outstanding, correct?
 4    A   Yes.  Can I see the email just to refresh my memory?
 5            Thank you.
 6            MR. DONALDSON:  Judge, may we have a quick sidebar for
 7    a second?
 8            THE COURT:  Okay.
 9            MR. DONALDSON:  It will be very quick.
10            (Continued on next page)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

O9PJDAR2                        Brock - Cross

 1              (At sidebar)

 2              MR. DONALDSON:  I'm sorry, Judge.  So 2121 is not in

 3     evidence.  2121 is not in evidence.  I can attempt to move it

 4     in.  If you all are going to object to that, let me know now.

 5     But it's a conversation between Sienko and Darden and it goes

 6     to Mr. Brock's state of mind.  Do you have any objection to

 7     2121 coming in?

 8              MR. RITCHIN:  Let us take a more careful look at it

 9     for a second, and then we'll let you know.

10              THE COURT:  You can lay the foundation and --

11              MR. RITCHIN:  I think it will just take us a few

12     seconds to look at it and give an answer.

13              THE COURT:  Sure.

14              (Continued on next page)

O9PJDAR2                          Brock - Cross

 1              (In open court; jurors present)

 2              MR. DONALDSON:  Your Honor, without objection, I

 3    believe defense is asking that defense number 2121 for defense

 4    be moved into evidence.

 5              THE COURT:  Okay.  So Government Exhibit 2121 is

 6    admitted in evidence and may be shown to the witness and the

 7    jury.

 8              (Government's Exhibit 2121 received in evidence)

 9    BY MR. DONALDSON:

10    Q    Mr. Brock, do you have 2121 in front of you?

11    A    Yes, I do.

12    Q    That's an email from you on October 23, 2020, correct?

13    A    Yes.

14    Q    And that's to Mr. Darden, Calvin Darden, CC John Brock and

15    Chris Sienko; is that correct?

16    A    Yes.

17    Q    And it's regarding the Atlanta Dream vision plan, correct?

18    A    Yes.

19    Q    And in this particular email, you're responding to an email

20    from Mr. Darden, down lower where it says, per our discussion,

21    please see attached Atlanta Dream vision plan, correct?

22    A    Yes.

23    Q    I look forward to speaking tomorrow at 11:30 to address any

24    questions and/or concerns.  Do you see that?

25    A    Yes.

O9PJDAR2                              Brock - Cross

1   Q   And you responded, Chris and I have discussed your deck and

2   think it's outstanding.  You see that?

3   A   Yes.

4   Q   So prior to you receiving this vision plan, you had had

5   discussions with Mr. Darden about the vision plan, correct?

6   A   Yes.

7   Q   And you and Mr. Sienko had then talked about this vision

8   plan, correct?

9   A   Yes.

10  Q   And you and Mr. Sienko had provided discussions to

11  Mr. Darden about what should go inside the vision plan,

12  correct?

13  A   Yes.

14  Q   And then thereafter, he sent you a vision plan, correct?

15  A   Yes.

16          MR. DONALDSON:  Take that down.

17  Q   You also in late October — October 30, 2020 — you confirmed

18  that you were going to have a call with Mr. Calvin Darden,

19  correct?

20  A   I'm not sure.  I don't recall -- what did you say?

21  October --

22  Q   30th.

23  A   -- 30th?

24          I certainly might have had a phone call with him.  I

25  don't recall a specific phone call on October 30.

1  Q   And in the fall of 2020, September, and October 2020, the

2  majority of your phone calls or conversations or communications

3  related to the Howard group was with Mr. Darden, Jr., correct?

4  A   All of my phone calls were.

5  Q   Were what?

6  A   All of my phone calls regarding a potential purchase of the

7  Atlanta Dream by the Darden Group in the fall of 2020 were with

8  Cal, Jr.

9  Q   And that was because starting in the fall 2020, that was

10  because Mr. Howard was no longer a viable purchaser, correct?

11  A   Yes.

12  Q   Mr. Howard was then out of the scene, correct?

13  A   Yes.

14  Q   This was going to be a purchase by the Darden Group,

15  correct?

16  A   Yes.

17  Q   And that was the Darden Group being Calvin Darden, Jr. and

18  Calvin Darden, Sr. and who?  Who else?

19  A   Charles Briscoe.

20  Q   Charles Briscoe is part of Darden Group?

21  A   You've got to refresh my memory.  Can you show me the

22  letter of intent again please.

23  Q   No.  That's -- I'm asking you based upon your memory right

24  now in the fall of 2020, the purchasing group relating to

25  Darden was Calvin Darden, Jr., Calvin Darden, Sr., and one

O9PJDAR2                              Brock - Cross

1   other person, correct?

2   A    No.  Calvin Darden, Jr. was not part of the purchasing

3   group.

4   Q    Thank you.  Who's part of the purchasing group?

5   A    The principal purchaser was Calvin Darden, Sr.

6   Q    And who else?

7   A    Refresh my memory.  When are you talking about

8   specifically?

9   Q    So the fall of 2020, as you indicated, Mr. Howard was no

10  longer part of the purchasing group, correct?

11  A    Correct.

12  Q    And that purchasing group consisted of Calvin Darden, Sr.

13  and Mayor Shirley Franklin, correct?

14  A    If you look at the Atlanta Dream vision plan that you just

15  talked about, which you didn't show, but which I recall well,

16  Calvin Darden, Sr. is listed as the principal investor.  And

17  other investors, to the best of my knowledge, are not named in

18  that Atlanta Dream vision plan.

19  Q    Okay.  So the -- well, we'll get to that.

20          And that's your testimony today, correct?

21  A    Yes.

22  Q    That's based upon your recollection, correct?

23  A    That's based upon my best recollection and, frankly,

24  without looking at the Atlanta Dream vision plan.

25          MR. DONALDSON:  Can I have exhibit 2124, please, just

O9PJDAR2                          Brock - Cross

1    for the attorneys, not the jury.

2    Q    In late October of 2020, now, you did or you recall saying

3    you had conversations with Mr. Calvin Darden, Jr., correct?

4    A    Yes.

5    Q    And Calvin Darden, Jr. at that time that you said was not

6    part of the purchasing group, but he was speaking for the

7    intermediary for the purchasing group, correct?

8    A    He was representing the purchasing group, yes.

9    Q    And you would have conversations with him related to the

10   purchasing group and the purchase of the dream, correct?

11   A    Yes.

12   Q    Now, during October 2020, you also asked the Darden Group

13   for a net worth statement, correct?

14   A    Yes.

15   Q    And that net worth statement was a net worth statement

16   related to who?

17   A    Just to be clear, the league, the WNBA wanted a net worth

18   statement.

19   Q    From who?

20   A    From the purchasing group and, most importantly, from the

21   primary purchaser, Calvin Darden, Sr.

22   Q    Okay.  So back in October 2020, the league wanted a net

23   worth statement from Calvin Darden, Sr. related to the purchase

24   of the Dream, correct?

25   A    Yes.

O9PJDAR2                          Brock - Cross

1   Q   And that was provided, to your knowledge, correct?

2   A   Yes.

3   Q   So to be clear, Calvin Darden, Sr. did provide a net worth

4   statement to the WNBA related to the purchase of the Dream,

5   correct?

6   A   Yes.

7   Q   And after you received this vision plan, you then forwarded

8   that to the WNBA, correct?

9   A   Yes.

10  Q   You and Mr. Sienko also in late October were continuing to

11  give the Darden Group suggestions on how to make this vision

12  plan better, correct?

13  A   Yes.

14          MR. DONALDSON:  Can I have 2130, please, just for the

15  witnesses and the lawyers.

16  Q   On November 17, you actually emailed Mr. Darden and

17  Mr. Sienko about the vision plan, correct?

18  A   Yes.

19  Q   You told Mr. Darden that there were some more -- you told

20  Mr. Darden and Mr. Sienko that there were more ideas worth

21  considering, correct?

22  A   Yes.

23  Q   And you wanted him to make his proposal stronger, correct?

24  A   Yes.

25  Q   Because you wanted the Darden Group to be successful in

O9PJDAR2                          Brock - Cross

1   purchasing the Dream, correct?

2   A    That's a qualified yes.

3   Q    And this was --

4   A    I was looking for anyone to buy the Dream, and they were a

5   legitimate buyer.

6   Q    And you then -- this was still based upon the July 31

7   letter of intent, correct?

8   A    Yes.

9   Q    There were no new letters of intent since then, correct?

10  A    Correct.

11  Q    And that letter of intent still had the $3 million in it,

12  correct.

13  A    Yes.

14  Q    So we're in November now, correct?

15  A    Yes.

16  Q    And between July 30, 2020, July 31, 2020 and November 17,

17  2020, you and Mr. Sienko are trying to help the Darden Group

18  make their vision plan better to the WNBA, correct?

19  A    Yes.

20  Q    And as you said, because you were trying to get the team

21  sold, correct?

22  A    Yes.

23  Q    And they were still based upon their $3 million in that

24  letter of intent, correct?

25  A    Yes.

O9PJDAR2                          Brock - Cross

1   Q   So there was no communication about more money for the

2   Dream past that $3 million, correct?

3   A   No, that's not correct.

4           MR. DONALDSON:  Can I have one second, please, your

5   Honor.  Can I have 2146, please.

6   Q   Now, back on December 8, 2020, you sent another email to

7   Mr. Darden related to the dream, correct?

8   A   Yes.

9   Q   And in that December 8 email to Mr. Darden, you were

10  responding to an email that Mr. Darden had sent to you earlier

11  in the day on December 8, correct?

12  A   Yes.

13  Q   And in fact, the prior day on December 7, 2020, Mr. Darden

14  had sent an email to you and Chris Sienko, correct?

15  A   Yes.

16  Q   And that related to the Atlanta Dream, correct?

17  A   Yes.

18  Q   And in that email from Mr. Darden, he informed you that the

19  vision plan reflected the changes that Mr. Sienko suggested,

20  correct?

21  A   Yes.

22  Q   And he attached that revised vision plan, correct?

23  A   Yes.

24  Q   And Mr. Darden also said that that revised vision plan

25  clarified the partnerships, speaks to the commitments of DSG's

O9PJDAR2                        Brock - Cross

1    corporate partnerships, and removed ambiguity, correct?

2    A    Yes.

3    Q    And those are the suggestions that you and Mr. Sienko made

4    to Mr. Darden regarding his vision plan, correct?

5    A    Those were some of the suggestions we made, yes.

6    Q    You, also on December 8, told Mr. Darden that you spoke to

7    Ms. Engelbert and Mr. Dershowitz concerning the Atlanta Dream

8    and the Darden Group, correct?

9    A    Yes.

10   Q    And you suggested that he forward this revised business

11   plan to the WNBA, correct?

12   A    Yes.

13           MR. DONALDSON:  One second, Judge.

14   Q    In this -- Mr. Darden also brought to your attention or --

15   that there was a concern about there being more than two groups

16   at that time that were in the running for purchasing the Dream,

17   correct?

18   A    Yes.

19   Q    And you responded to that concern, correct?

20   A    Yes.

21   Q    You, in fact, explained to Mr. Darden that there were --

22   four groups had submitted LOIs, correct?

23   A    Yes.

24   Q    Including his, correct?

25   A    Yes.

O9PJDAR2                         Brock - Cross

1  Q   You also told him that all the other groups had dropped

2  out, correct?

3  A   No.  I told him that two of the groups were looking like

4  they were going to drop out, and there were two remaining

5  serious groups.

6  Q   Did you not say on December 8, 2020 at 6:52 p.m. in an

7  email to Mr. Darden that there are four groups who have

8  submitted LOIs including yours, all others have dropped out or

9  we dropped them out?

10 A   Yes.  That's talking about all of the other groups.

11 Q   So you did say that all the other groups dropped out,

12 correct?

13 A   All of the other groups other than those four.

14 Q   You then said that one -- well, you then mentioned or start

15 describing why Mr. Darden's group had made it to the top two,

16 correct?

17 A   Correct.

18 Q   You mentioned that another group had come into the picture

19 only recently, correct?

20 A   Correct.

21 Q   What group was that?

22 A   I don't recall.

23 Q   You then said, so net there are two serious groups,

24 correct?

25 A   Yes.

O9PJDAR2                            Brock - Cross

1   Q   One of which was the Darden Group, correct?

2   A   Yes.

3   Q   And you also said that the Darden Group was the leading

4   group in your view, correct?

5   A   Correct.

6   Q   And you said that consistently, correct?

7   A   Yes.

8   Q   So 12/8/2020, you had consistently told Mr. Darden that the

9   Darden Group was the leading group in your view, correct?

10  A   Yes.

11  Q   And that was with the $3 million in the LOI, correct?

12  A   Yes.  But I certainly never said the $3 million was a

13  sufficient price.

14  Q   But you said, though, on December 8, 2020, that they were

15  the leading group, correct?

16  A   Yes.

17  Q   And that was based upon the LOI that contained the

18  $3 million, correct?

19  A   Yes.

20  Q   So with the $3 million at that point, they were one of two

21  leading groups, correct.

22  A   Yes.

23  Q   Who was the other group?

24  A   The other group was led by --

25  Q   Bakari Sellers?

O9PJDAR2                          Brock - Cross

1    A    Yes.

2    Q    But you didn't think that was a good group because you

3    didn't think that their money was legitimate, correct?

4    A    I didn't think they had the financial wherewithal to

5    purchase the Dream.

6    Q    And that's why at that time, by December 8, 2020, the

7    Darden Group was the leading group, correct?

8    A    Correct.

9    Q    With that $3 million in the LOI, correct?

10   A    Yes.

11              MR. DONALDSON:  One second, please, Judge.

12              Can we take a break?

13              THE COURT:  Sure.  Ladies and gentlemen, we'll take

14   our morning break.  It is 11:38.  We'll come get you in about

15   10, 15 minutes.  Go back, relax.  Hopefully there's still

16   coffee back there, and we'll come and get you.  Thank you very

17   much.

18              (Continued on next page)

19

20

21

22

23

24

25

O9PJDAR2                          Brock - Cross

1              (In open court; jury not present)

2              THE COURT:  Mr. Brock, you may step down.

3              (Witness temporarily excused)

4              THE COURT:  Mr. Donaldson, about how long do you think

5      you may have?

6              MR. DONALDSON:  That's why I wanted to break so I can

7      try to condense a little bit.  I told them I would be finished

8      before the lunch break, so I'm trying to condense a little bit.

9              THE COURT:  Is that still your plan?

10             MR. DONALDSON:  Yes, that is.

11             THE COURT:  Okay.  Do we have a sense in terms of --

12     actually, I'm about to ask in terms of redirect what there will

13     be.

14             MR. THOMPSON:  Very brief, your Honor.

15             THE COURT:  Okay.  And the next witness?

16             MR. MEAD:  So we next plan to call Ms. McMullin, then

17     Ms. Ashlock, then Ms. Rae, all of whom will be extremely brief

18     and all of whom have time constraints.  I think we're on track

19     to be totally fine.  I would ask if the timing changes and gets

20     worse, I would ask to -- I think right now we should be fine.

21             THE COURT:  Anything else before we take the break?

22             MR. DONALDSON:  Not from me.

23             MR. THOMPSON:  No, your Honor.

24             THE COURT:  All right.  We'll see everybody in a few

25     minutes.  Thank you very much.

O9PJDAR2                           Brock - Cross

1           (Recess)

2                THE COURT:  If we can get Mr. Brock, thank you.

3                MR. DONALDSON:  Judge, I did tell them I'm cutting

4      down, but it still might be a little longer than 45 minutes.

5                THE COURT:  Mr. Brock, if you can step up.

6                We can get the jury.

7                (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O9PJDAR2                          Brock - Cross

1              (In open court; jurors present)

2              THE COURT:  You may be seated.  Continue with the

3     cross-examination of Mr. Brock, Mr. Donaldson.

4              MR. DONALDSON:  Yes, Judge.  Thank you very much.

5     BY MR. DONALDSON:

6     Q   Good afternoon, Mr. Brock.

7     A   Good afternoon.

8     Q   So at some point in time in December, mid-December, you

9     learned that Mr. Darden, Jr. and his father was going to

10    actually meet with Mr. Sienko and someone named Nicki, correct?

11    A   Someone named?

12    Q   Nicki.

13    A   Nicki, yes.  Nicki is the coach of the Atlanta Dream.

14    Q   So around December 14, 2020, you understood that

15    Mr. Darden, Jr., his father, were going to meet with Nicki, the

16    coach, and Mr. Sienko, correct?

17    A   Yes.

18    Q   And fair to say that you, in fact, were happy that they

19    were going to have this meeting, correct?

20    A   Yes.

21    Q   And you were happy that they were going to -- "they" being

22    Mr. Darden and his father, were going to have this meeting with

23    Mr. Sienko and the coach.  You were happy about that because

24    you wanted them to meet to talk about the purchase of the

25    dream, correct?

O9PJDAR2                          Brock - Cross

1   A    Yes.

2   Q    You also wanted Mr. Darden and his father to get

3   information from Mr. Sienko so they can use it in their

4   upcoming meeting with the WNBA, correct?

5   A    Precisely when are you referring to?

6           MR. DONALDSON:  Could you put up 2149, please, just

7   for the lawyers and witness.

8   Q    So on December 14, 2020, you -- at about 4:14 p.m., you

9   emailed Mr. Darden indicating that you were pleased to hear

10  that he was going to be meeting with Chris and Nicki early this

11  week; would that be fair to say?

12  A    Yes.

13  Q    And you also indicated to Mr. Darden that you wanted him

14  to -- or his father to get any information or perspective to

15  gain to help them with their session with the league later in

16  the week, correct?

17  A    Yes.

18  Q    So it's fair to say then that at that time, on December 14,

19  2020, you were pleased that Mr. Darden and his father were

20  meeting with the general manager and the coach of the Dream so

21  that they can get information that they can use to their

22  benefit with their meeting with the WNBA later on in the week,

23  correct?

24  A    Yes.

25  Q    Because, again, at that time, December 2020, the Darden

O9PJDAR2                          Brock - Cross

1   Group — that would be Mr. Darden's father — was one of the top

2   two teams -- top two groups in your mind to purchase the Dream,

3   correct?

4   A    Yes.

5   Q    And you were helping the Darden Group with getting

6   information that you thought would be beneficial to their group

7   buying the Dream, correct?

8   A    Yes.

9   Q    On 12/14, you also asked Mr. Darden to submit another

10  letter of intent, correct?

11  A    Yes.

12  Q    Because at that point you were still — you being a

13  representative of the Dream, were still working off of the

14  July 31 letter of intent, correct?

15  A    I would say we were not really working off that LOI anymore

16  because the purchasing group had changed.  But that was the

17  only active LOI we had in our files.

18  Q    In fact, you told him on December 14, that you -- several

19  important items had changed, correct?

20  A    Correct.

21  Q    And you also said that it would be useful for you, the

22  Dream, to have a version that is totally reflective of today's

23  plans, correct?

24  A    Yes.

25  Q    And that was December 18, 2020, correct?

O9PJDAR2                         Brock - Cross

1    A    I think it was December 14, 2020.

2    Q    Thank you for that correction.

3            And just so we're clear, the July 31, 2020 LOI

4    contained --

5            MR. DONALDSON:  I'm sorry.  Can you put up 41, is the

6    LOI.

7    Q    The July 31, 2020 LOI, Government Exhibit No. 41, had as

8    the first paragraph, preamble paragraph, Dwight Howard, Calvin

9    Darden, Sr., and Charles Briscoe as purchasers, correct?

10   A    Yes LinkedIn.

11   Q    And Dream Too LLC, that would be the Dream, correct?

12   A    Yes.

13   Q    And that was in July, correct?

14   A    Yes.

15   Q    By December 14, 2020, that part would have changed,

16   correct?

17   A    Yes.

18   Q    There would be no more Howard, correct?

19   A    Yes.

20   Q    And there would be no more Briscoe, correct?

21   A    Yes.

22   Q    There would be Darden Sr., correct?

23   A    Yes.

24   Q    Now, Mr. Darden did respond to your request related to the

25   LOI, correct?

O9PJDAR2                            Brock - Cross

1     A    Yes.

2              MR. DONALDSON:  Can we put up 2150, please, just for

3     the witness.

4              Can I have one second, please, your Honor.

5              THE COURT:  Okay.

6     Q    Mr. Darden informed you that on December 14, 2020, that he

7     would, in fact, speak to their attorney about this LOI,

8     correct?

9     A    Yes.

10    Q    He also mentioned that Wednesday afternoon would work for

11    his father and him, Junior, to meet with Nicki and Chris,

12    correct?

13    A    Yes.

14    Q    And it would be fair to say then that based upon this

15    email, 12/14/2020, it's clear that Mr. Darden, Jr. is

16    communicating to you and is communicating with him and his

17    father related to the dream, correct?

18    A    Yes.

19    Q    Okay.

20              JUROR:  I don't see the email.

21              THE COURT:  Counsel is just showing the witness at

22    this stage.  Sorry about that.  Go ahead.

23              MR. DONALDSON:  Can we put up 2152, please.

24    Q    Now, on or about December 17, 2020, you had a conversation

25    with Mr. Sienko about the meeting that he had with Mr. Darden,

1    Jr. and Mr. Darden's father, correct?

2    A    Yes.

3    Q    And based upon that conversation, you understand that

4    Mr. Darden, Jr. and Mr. Darden, Sr. met in person with

5    Mr. Sienko and the coach, correct?

6    A    Yes.

7    Q    And also based upon that conversation with Mr. Sienko, the

8    meeting between Mr. Darden, Jr., Mr. Darden, Sr. and Mr. Sienko

9    was a productive meeting, correct?

10   A    Yes.

11   Q    And that meeting was about Mr. Sienko discussing with

12   Mr. Darden, Sr. his plans for the Dream, correct?

13   A    Yes.

14   Q    And that meeting was also about Mr. Sienko discussing with

15   Mr. Darden, Sr. what information Mr. Darden, Sr. might need

16   relating to his upcoming meeting with the WNBA, correct?

17   A    Yes.

18   Q    And based upon your understanding, that meeting between

19   Mr. Darden, Sr. and Mr. Sienko was a productive meeting

20   relating to the purchase of the Dream, correct?

21   A    Yes.

22   Q    So it would be fair to say that as of December 17, 2020,

23   Mr. Darden, Sr. was playing an active role in the purchase of

24   the Dream by the Darden Group, correct?

25   A    Yes.

O9PJDAR2                          Brock - Cross

1    Q    Now, on or about December 28, 2020, you sent another email

2    to Mr. Darden, Jr. requesting that letter of intent, correct?

3    A    I don't see that email.  Is that something I can see?

4    Q    I'm just asking you based upon your memory, do you recall

5    that at this point?

6    A    Yes, I don't recall whether it was specifically December

7    28, but yes.

8         MR. DONALDSON:  Could you put up 2158, please.

9    Q    So fair to say on or about December 28, 2020 you were

10   asking Mr. Darden for an LOI, correct?

11   A    Yes, it was actually, as I see here on the email,

12   December 29.

13   Q    Sorry.  December 29.  Thank you.

14        Sometime thereafter, Mr. Darden did send you or you

15   did receive an updated LOI, correct?

16   A    Yes.

17        MR. DONALDSON:  Could you put up 2159, please.

18        One second, please, your Honor.  Could you put up

19   Government Exhibit 42.  I believe it's Government Exhibit 42.

20   Q    Mr. Brock, while we work this out, sometime in

21   January 2021, you received a new updated letter of intent,

22   correct?

23   A    Yes.

24        MR. DONALDSON:  Could you put up Government

25   Exhibit 42.

O9PJDAR2                          Brock - Cross

 1              (Counsel conferred)

 2              MR. DONALDSON:  We'll take Government Exhibit 2201.

 3              MR. MEAD:  Do you want it published?

 4              MR. DONALDSON:  Yes, please.

 5    Q   Mr. Brock, on or about January 6, 2021, you received what's

 6    included in Government Exhibit 2201, the revised letter of

 7    intent, correct?

 8    A   Yes.

 9    Q   And in that email, it indicates that the letter of intent

10    reflects the new purchase price.  Do you see that?

11    A   Yes.

12    Q   And in that new purchase -- in that new LOI, the new

13    purchase price was 3,500,000, correct?

14    A   Yes.

15              MR. DONALDSON:  Could you scroll down, please.  Stop

16    right there.

17    Q   Now, also in the letter of intent, the top paragraph talks

18    about new purchasers, correct?

19    A   Yes LinkedIn.

20    Q   And those new purchasers are who?

21    A   Calvin Darden, Sr. and Shirley Franklin.

22    Q   And those two purchasers are different than the purchasers

23    from the LOI back in July, correct?

24    A   Yes.

25    Q   The letter of intent is what you send to the WNBA, correct?

O9PJDAR2                         Brock - Cross

1    A    Yes.

2    Q    And the letter of intent is a document that actually

3    reflects a potential arrangement between the Dream team and the

4    purchasers, correct?

5    A    Yes.

6    Q    And that's the official document that the Dream sends to

7    the WNBA representing who the Dream is negotiating with,

8    correct?

9    A    Yes.

10   Q    Related to the purchasers, correct?

11   A    Yes.

12   Q    And as of January 2021, that would be Calvin Darden, Sr.,

13   and Shirley Franklin, correct?

14   A    Yes.

15   Q    Now, that is different than what was in that vision plan,

16   correct?

17   A    Which vision plan are you referring to?

18   Q    The latest vision plan that you received from the Darden

19   Group, that first paragraph, it had different purchasers,

20   correct?

21   A    The last vision plan you referred to had three purchasers

22   listed, Cal Sr., Shirley Franklin, and Jennifer Baltimore.

23   This letter of intent has two purchasers listed, Calvin Sr. and

24   Shirley Franklin.

25   Q    And the letter of intent is the document between the Dream

O9PJDAR2                          Brock - Cross

1   and the actual purchasers that goes to the WNBA, correct?

2   A   Yes.

3   Q   That is the agreement that you, the purchasers, and the

4   WNBA are working off of, correct?

5   A   Yes.

6   Q   So for business purposes, official purposes, the purchasing

7   group as of January 2021, was Calvin Darden, Sr. and Shirley

8   Franklin, correct?

9   A   Yes, as outlined in a nonbinding letter of intent.

10  Q   Yes, it's a nonbinding letter of intent that shows the --

11  letter of intent shows the intent of the parties, correct?

12  A   Yes.

13  Q   And the intent of the parties -- when you say "parties," we

14  mean Darden Sr. and Shirley Franklin, correct?

15  A   Yes.

16  Q   And to be clear, that's who you, as of January 2021,

17  thought were the purchasing group for the Darden Group,

18  correct?

19  A   Yes.

20  Q   After receiving that, you then set up a Zoom call with

21  Shirley Franklin, Calvin Darden, Sr., Chris Sienko, and I

22  believe the husband of Senator Loeffler, correct?

23  A   I don't recall the specific attendees on that Zoom call,

24  but we certainly had a Zoom call, yes.

25              MR. DONALDSON:  Can you put up 2163, please, for the

O9PJDAR2                        Brock – Cross

1    witness and the attorneys.

2              THE COURT:  Mr. Donaldson, I think at times, if you're

3    moving to the left or right of the microphone, if you can speak

4    into the microphone including when you're providing

5    instructions about exhibits so that the court reporter can make

6    sure she takes that down.

7              MR. DONALDSON:  My apologies, Judge.

8              THE COURT:  That's okay.  Thank you.

9    BY MR. DONALDSON:

10   Q   So Mr. Brock, January 10, 2021, you organized a Zoom

11   meeting, correct?

12   A   Yes.

13   Q   And the attendees of that Zoom meeting was yourself,

14   Christy King Jordan, Calvin Darden, calvin@dardenterprises,

15   Jeffrey Sprecher, and Shirley Franklin, correct?

16   A   Christy King Jordan is an assistant, and she was not on the

17   Zoom call.  But all of the other people you mentioned are

18   correct.

19   Q   And prior to that Zoom call, you had a conversation with

20   Mr. Darden, Jr. about what you all were going to talk about on

21   that Zoom call, correct?

22   A   Yes.

23   Q   And just so we set the dates up, on January 8, you received

24   the new letter of intent pertaining to $3.5 million new

25   purchase price, correct?

O9PJDAR2                          Brock - Cross

1    A    Yes.

2    Q    On January 9, you had a conversation with Calvin Darden,

3    Jr. related to an upcoming January 10 Zoom call, correct?

4    A    Yes.

5    Q    And on January 9, you spoke to Mr. Darden about what you

6    and his father should speak about on that January 10 Zoom call,

7    correct?

8    A    Yes.

9    Q    And you wanted to introduce Mr. Darden, Sr., Calvin Darden,

10   Jr., and Shirley Franklin to the brother -- I'm sorry -- the

11   husband of Senator Loeffler, correct?

12   A    Correct.

13   Q    And on that call, in that conversation on January 9, you

14   spoke about several topics that you wanted to or you thought

15   would be important on the Zoom call, correct?

16   A    Yes.

17   Q    One of those topics were what were your preliminary plans

18   in managing the Dream, correct?

19   A    Yes.

20   Q    You also spoke about what's driving your keen interest in

21   purchasing the dream, correct?

22   A    Yes.

23   Q    You talked about how your ownership group would be

24   configured, correct?

25   A    Yes.

O9PJDAR2                          Brock - Cross

1   Q   You asked who would be your BOG representative, correct?

2   A   Yes.  That's board of governors representative.

3   Q   And "board of governors" meant board of governors with the

4   WNBA, correct?

5   A   Yes.

6   Q   Because the WNBA has a board of governors, correct?

7   A   Yes.

8   Q   You also talked about what items that you, the Dream, could

9   assist the Darden Group with in making sure the purchase

10  happened, correct?

11  A   Yes.

12  Q   And this was after you received the $3.5 million LOI,

13  correct?

14  A   Yes.

15  Q   You didn't mention in that conversation or email that the

16  $3.5 million was not a good enough price, correct?

17  A   That is correct.  It's not written down.

18  Q   Because that wasn't important at that time, correct?

19  A   Not so.  It's very important.  At the end of the day, I

20  explained to Cathy Engelbert in January and February of 2020

21  the two most important things in the Dream transaction were,

22  one, the price; and, two, certainty of closing.

23  Q   Great.  So the two most important things, as far as the

24  Dream were concerned, were certainty of price and to make it

25  close?

O9PJDAR2                          Brock - Cross

1    A    No.  Certainty of closing, meaning the deal is going to

2    happen.  Price, meaning the price.

3    Q    Right.

4    A    In this particular --

5              MR. DONALDSON:  Judge, there's no question --

6    A    -- we did not talk about price.

7              THE COURT:  He was just confirming the earlier

8    question.

9    Q    Okay.  So the January 9 conversation with Calvin Jr.,

10   Calvin Sr., and Shirley Franklin, for clarity, you didn't

11   mention to them that price at that time was important, correct?

12   A    That is correct.

13   Q    Okay.

14             MR. DONALDSON:  One second, Judge.

15             THE COURT:  Okay.

16   Q    You then did have this January 10 Zoom call, correct?

17   A    Yes.

18   Q    And that Zoom call again consisted of Mr. Jeffrey Sprecher,

19   correct?

20   A    Sprecher is the way you pronounce his name.  Yes.

21   Q    Jeffrey Sprecher is the husband of Senator Loeffler?

22   A    Yes.

23   Q    And that's the first time that he was actually involved in

24   the conversations between the Darden Group and the sale of the

25   Dream, correct?

O9PJDAR2                         Brock - Cross

1    A    Depends on how you define "involved" --

2    Q    Well, let me rephrase the question.

3         THE COURT:  Why don't we wait for a question, but go

4    ahead, Mr. Donaldson.

5    Q    Well, you had not, prior to January 10, 2021, organized any

6    calls between Jeffrey Sprecher and Calvin Darden, Sr. related

7    to the sale of the Dream, correct?

8    A    Correct.

9    Q    So this would be the first time, January 10, 2021, that

10   Jeffrey Sprecher was involved in a conversation or Zoom call

11   with the Darden Group related to purchasing the Dream, correct?

12   A    Correct.

13   Q    So this would be a big first step now that we have the

14   husband of one of the owners meeting with the Darden Group,

15   correct?

16   A    I would call it principally a formality, as opposed to a

17   big first step.  Mr. Sprecher knew full well that everything

18   was going on for the past year because I kept him consistently

19   involved and informed, as his wife owned 50 percent of the

20   Dream.

21   Q    So you kept him involved and informed, correct?

22   A    Yes.

23   Q    But he never actually was in on a meeting, correct?

24   A    Correct, nor on any other meetings.

25   Q    So this would make it a significant change that the husband

1   of the owner is now participating in the meetings, correct?

2   A   Yes.

3   Q   And on January 10 of that Zoom call, Shirley Franklin --

4   excuse me -- Mayor Shirley Franklin was also part of the Zoom

5   call, correct?

6   A   Yes.

7   Q   And she's part of the Zoom call because it was your

8   understanding that she was one of the owners of the group,

9   correct?  One of the owners in the Darden Group, correct?

10  A   Yes.

11  Q   Now, regarding Mayor Franklin, you actually communicated

12  with her back in November or December of 2020, correct?

13  A   Correct.

14  Q   And you called and spoke to her, correct?

15  A   Yes.

16  Q   And based upon that conversation with her, she appeared

17  excited about keeping the Dream in Atlanta, correct?

18  A   Yes.

19  Q   And hearing that Mayor Franklin was playing a role in this

20  was significant to you, correct?

21  A   Significantly positive.

22  Q   And hearing that Calvin Darden, Sr. was playing a role in

23  that was also significantly positive, correct?

24  A   Yes.

25  Q   Because you had known Calvin Darden, Sr. for ten years on

O9PJDAR2                          Brock - Cross

1   the board with you, correct?

2   A   Yes.

3   Q   After that January 10 Zoom call, you received another email

4   from Mr. Darden the following week, correct?

5   A   If you could show me, I'll confirm that it's correct.

6           MR. DONALDSON:  2166, please.  One second, please.

7   Judge.

8   Q   On or about January 18, 2021, Mr. Darden communicated to

9   you that -- a desire to show their good faith, correct?

10  A   Yes.

11  Q   And he communicated that desire to show his good faith by

12  saying they were willing to immediately transfer funds to your

13  attorney's escrow account, correct?

14  A   Yes.

15  Q   And the funds he was talking about were the funds from the

16  LOI, correct?

17          MR. THOMPSON:  Objection.

18          THE COURT:  If you could rephrase the question,

19  Mr. Donaldson.

20  Q   It's true that Mr. Darden offered to send funds to your

21  attorney's escrow account to show their good faith to purchase

22  the Dream, correct?

23  A   Correct.

24  Q   And Mr. Darden also indicated that he asked you whether it

25  was a good idea to communicate directly with the WNBA

O9PJDAR2                          Brock – Cross

1    commissioner to let them know how serious they were about

2    purchasing the Dream, correct?

3    A    Yes.

4    Q    And you indicated that that's a good idea, correct?

5    A    There are two questions, as I read your question.  The idea

6    that it's a good idea to transfer funds, I said absolutely not.

7    Q    We'll get to that.

8    A    I'm sorry.  I thought that was your question.

9    Q    No.  My question is Mr. Darden expressed to you an interest

10   in communicating directly with the WNBA commissioner about

11   their purchasing the Dream, correct?

12   A    Yes.

13   Q    And at this point in time, you're still speaking to Calvin

14   Darden, Jr., correct?

15   A    Yes.

16   Q    And that was an email sent from Mr. Darden, Jr. to you,

17   correct?

18   A    Yes.

19        MR. DONALDSON:  Can we put up 2167 just for the

20   witness.

21   Q    You actually responded to that email, correct?

22   A    Yes.

23   Q    And when you responded to the email, you responded to the

24   escrow idea, correct?

25   A    Yes.                          (Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O9PBDAR3                      Brock – Cross

BY MR. DONALDSON:

Q.  And you informed Mr. Darden that -- well, first, you
responded to sending a note to Mr. Engelbert first, right?

A.  Yes.

Q.  And you informed Mr. Darden that you think that's a good
idea, correct?

A.  Yes.

Q.  And you said you think it will be good for his dad to also
send a personal letter to Ms. Engelbert letting her know how
much he wanted to purchase the team, correct?

A.  Yes.

Q.  Regarding escrow you told them, you said let's hold off on
that for now, correct?

A.  Correct.

Q.  In fact, you said let's hold off for a few days, correct?

A.  Correct.

Q.  You didn't say, don't send it at all, right?

A.  I did not.

Q.  You said to hold off for a few days, correct?

A.  Yes.

Q.  You also indicated that that escrow idea was a great way to
demonstrate your commitment and willingness to close, correct?

A.  Yes.

Q.  But in your opinion at that time you didn't want to see
Mr. Darden, Sr. moving that kind of money around, correct?

O9PBDAR3                        Brock – Cross

1   A.  Yes.

2   Q.  Until we got a bit closer to the final deal, correct?

3   A.  Yes.

4   Q.  So you were anticipating Mr. Darden, the Darden Group

5   getting close to a final deal, correct?

6   A.  Yes.

7   Q.  And you were anticipating that based upon the LOI that you

8   just received, correct?

9   A.  Yes.

10  Q.  And the $3.5 million, correct?

11  A.  Yes.

12  Q.  So as of January 18, 2021, it's fair to say that the Darden

13  group, Calvin Darden, Sr. and Ms. Franklin were moving closer

14  to closing the purchase of the Dream, correct?

15  A.  Moving closer to executing a sale and purchase agreement

16  which would then be followed by closing; but, yes, moving in

17  the right direction.

18  Q.  Very good.  Thank you.

19          MR. DONALDSON:  One second, your Honor.

20  Q.  When we talk about Calvin Darden, Sr. you mention you were

21  on a board with him for approximately ten years, correct?

22  A.  Yes.

23  Q.  And in those ten years you all had went to board meetings

24  together, correct?

25  A.  Yes.

O9PBDAR3                    Brock - Cross

1    Q.  And you all had went on board retreats together, correct?

2    A.  Yes.

3    Q.  And you had met his wife, correct?

4    A.  Yes.

5    Q.  And you had spoken to his wife, correct?

6    A.  Yes.

7    Q.  You had spoken to him, correct, Mr. Darden, Sr., you spoke

8    to him several times, correct?

9    A.  Yes.

10   Q.  So over the course of 20 years would it be fair to say that

11   you are familiar with his voice, correct?

12   A.  You said 20 years.  It's ten years.

13   Q.  I'm sorry, 10 years.  Well, you've seen him before,

14   correct?

15   A.  Yes.

16   Q.  And you saw him on that January 10, zoom call, correct?

17   A.  Yes.

18   Q.  And you're clear that he actually in person met with

19   Mr. Sienko and the coach, correct?

20   A.  Yes.

21   A.  Let me be clear on that.

22           MR. DONALDSON:  No question out there yet, Judge.

23           THE COURT:  You want to clarify what you just said?

24           THE WITNESS:  Yes.

25           THE COURT:  Go ahead.

O9PBDAR3                    Brock - Cross

1  A.  I would assume that it was Cal, Sr. that met with the

2  coach.  I was not physically in that meeting. I have the email

3  that said they met, but I was not there, so I can't directly

4  confirm who was in that meeting.

5  Q.  You've spoke with Mr. Sienko about the meeting, correct?

6  A.  Yes.

7  Q.  Mr. Sienko told you he met with Cal Darden, Sr., correct?

8           MR. THOMPSON:  Objection.

9           THE COURT:  Overruled.

10 Q.  Based upon your conversation with Mr. Sienko, Calvin

11 Darden, Sr., met with Mr. Sienko, correct?

12 A.  Yes.

13          MR. DONALDSON:  Can I have one second, please, Judge.

14          THE COURT:  Sure.

15 Q.  Mr. Brock, I want to ask you some questions about Calvin

16 Darden, Jr. All right?

17 A.  Yes, sir.

18 Q.  When you first spoke to Calvin Darden, Jr., he informed you

19 that he had a criminal record, correct?

20 A.  I knew that he had a criminal record.

21 Q.  Understandable.  When he spoke to you, he told you that he

22 had a criminal record?

23 A.  I don't recall.

24          MR. DONALDSON:  Can we go to 3511-1, page six.  Can we

25 go to the third paragraph down where it starts with "during."

O9PBDAR3                      Brock - Cross

1    Q.  Now, in April 11, 2023, you had conversations with the

2    government, correct?

3    A.  Excuse me one minute while I read it.

4              THE COURT:  That's okay.  If you could confirm what

5    the date -- if there was a date.

6              MR. DONALDSON:  It's on the top.

7              THE COURT:  Is that date?  Do you recall having a

8    meeting on that date?

9              THE WITNESS:  Yes.

10   Q.  On April 11, 2023, you had a conversation with the

11   government related to this situation, correct?

12   A.  Yes.

13   Q.  On April 11, 2023, isn't it true that you told them that on

14   the call --

15             THE COURT:  No.  No.  No.  Are you seeking to refresh?

16   The witness said he didn't recall.

17             MR. DONALDSON:  I'm sorry, Judge.  I'll do it the

18   right way.

19   Q.  I'm asking you to review the one-page document in front of

20   you focusing on the third paragraph beginning with "during."

21   A.  Okay.

22   Q.  Does that refresh your recollection as to whether or not

23   when Mr. Darden spoke to you he made explicit references to his

24   own criminal record?

25   A.  Yes.  By rereading this, it refreshes my memory, and I did

O9PBDAR3                    Brock - Cross

1   make that statement.

2   Q.  So then it is true that Mr. Darden specifically told you

3   when he spoke to you on the phone that he has a record,

4   correct?

5   A.  That is correct.

6           MR. DONALDSON:  You can take that down, please.

7   Q.  And in fact the WNBA told you back in July of 2020 that

8   that would be an issue with Darden, Jr. playing any role in the

9   ownership group, correct?

10  A.  Yes. Just to be clear, that was Jamin Dershowitz general

11  counsel of the WNBA who made that comment.

12  Q.  Jamin Dershowitz the general counsel of the WNBA told you

13  back in July of 2020 that it would be a problem or a hurdle for

14  Mr. Darden, Jr. to play any role in the ownership group of the

15  Dream, correct?

16  A.  That is correct.

17  Q.  And in fact he made that explicitly clear on the July 12

18  zoom call that was already with you, Dershowitz, Darden, Jr.,

19  Jr., Darden, Sr., Dwight Howard and Mr. Briscoe, correct?

20  A.  I don't recall that conversation on July the 12th as part

21  of the zoom call.  It's entirely possible that he mentioned

22  that.  I don't recall that.

23  Q.  And Mr. Darden, Jr. told you that he was not going to be a

24  part of the ownership group.  He was going to be the

25  intermediary between Dream and the Darden Group, correct?

O9PBDAR3                        Brock - Cross

1    A.   That is correct.

2    Q.   And that's why you were having all those conversations with

3    him starting with -- starting approximately September 2020,

4    correct?

5    A.   Conversations with Calvin Darden, Jr., started in July of

6    2020, not September.

7    Q.   Well, conversations with Calvin Darden, Jr., started in

8    July 2020, that's correct?

9    A.   Correct.

10   Q.   Conversation with Mr. Briscoe was as also in July of 2020,

11   correct?

12   A.   Yes.

13   Q.   Conversations with Mr. Howard was also in July of 2020,

14   correct?

15   A.   Correct.

16   Q.   There were no conversations with Mr. Briscoe in September

17   of 2020, correct?

18   A.   Correct.

19   Q.   There were no conversations with Mr. Howard in September

20   2020, correct?

21   A.   Correct.

22   Q.   The only conversations that were had was with Mr. Darden in

23   September of 2020, correct?

24   A.   Correct.

25   Q.   So between September 2020 all the way through 2021 your

O9PBDAR3                          Brock - Cross

1    conversations related to Dream was with Mr. Darden, Jr. and his

2    father, correct?

3    A.   Correct.

4    Q.   Because Howard and Briscoe were no longer apart of this

5    group beginning in September, correct?

6    A.   Don't know precisely when Howard and Briscoe were no longer

7    part of the purchase group.  As you said, that letter of intent

8    was the operative letter of intent and all their names were on

9    there, but all the name were with Calvin Darden, Jr.; not with

10   Briscoe, not with Howard.  Howard did not decide not to play

11   until November.

12   Q.   Thank you.

13            THE COURT:  Let me ask, Mr. Donaldson, if you're going

14   to be moving to some other documents, it's a quarter of.  And

15   so if you have additional documents, if you have a little bit

16   more to do, does it make sense to break at this stage?

17            MR. DONALDSON:  It might make sense to break, Judge.

18   I have a little bit more.

19            THE COURT:  How much more?  In other words, if you

20   have five minutes --

21            MR. DONALDSON:  No, I have more than five minutes.

22            THE COURT:  Ladies and gentlemen, we're going to take

23   our lunch break now.  It's 12:45.  We're going to come back at

24   2:00.  Remember, don't discuss the case with one another.

25   Don't discuss it with anybody else.  If anybody tries to talk

O9PBDAR3                          Brock – Cross

1    to you about the case, tell Ms. Disla, and I'll see everybody

2    at 2:00.  Have a good lunch.  Thank you.

3            (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O9PBDAR3                        Brock - Cross

1                (Jury not present)

2                THE COURT:  Be seated.  Mr. Brock, you can step down.

3      Okay.  Mr. Donaldson, about how long do you have?  I know it's

4      more than five minutes.

5                MR. DONALDSON:  I'm thinking about 15 minutes tops.

6                THE COURT:  In terms of redirect?  Obviously there's

7      still some cross to go.

8                MR. THOMPSON:  Five to ten minutes, your Honor.

9                THE COURT:  All right.

10               MR. MEAD:  I just want to say, your Honor.  We're

11     getting to be in a little bit of a difficult spot with

12     witnesses and witnesses' travel.  We've got several people

13     flying out this afternoon.  If it is truly less than 15

14     minutes, I think we will be okay.  I'm concerned that

15     originally we heard it was going to be an hour, and it's

16     expanded a lot.  And if it was to be longer than 15 minutes, I

17     think we ask that witnesses can go out of order so we can get

18     people out of here on time.

19               MR. DONALDSON:  First of all, I didn't say it was

20     going to be an hour.  I said at least an hour.  To be honest,

21     I've been trying to, with better understanding trying to move

22     along efficiently.  I'm saying 15 more minutes. That's what I

23     think it will be.  Over the break I will try to be efficient

24     with it.  I'm moving along at the pace I thought I could.

25     That's where we are.

O9PBDAR3                    Brock - Cross

1              THE COURT:  I'd ask the parties to meet and confer

2       about that.  If it does turn out, Mr. Donaldson, that you think

3       it's going to be more than 15 minutes, then I'll hear if

4       there's an application to take witnesses out of turn so that --

5       let me ask, do you have an objection -- I don't know -- if

6       there is going to be a little bit longer just to ensure that

7       witnesses can get their flights.

8              MR. DONALDSON:  I'm sure Mr. Mead would -- that was my

9       suggestion to them earlier that I might consider doing that,

10      but I was trying to get it done by 12:45.  I suggested to them

11      I don't have a problem with that.  I'm trying to get it done in

12      15 minutes.

13             THE COURT:  When you review what you have -- look, if

14      you have more than 15 minutes, fine.  Whatever it is, it is.

15      I'm not trying to suggest you should cut things out.  The only

16      thing I'm saying is you figure it out what it's probably going

17      to be.  We can take somebody out of order.  Why don't we just

18      do that.  Obviously Mr. Brock is going to have to come back,

19      but it seems like he doesn't have that same issue in terms of

20      travel.

21             MR. DONALDSON:  I don't have a problem with that.

22             THE COURT:  Speak with the government and see what

23      makes the most sense just so we're not -- because I have no

24      idea what the cross-examination is going to be for those

25      witnesses, so talk with one another.  Present it to me.  If

O9PBDAR3                        Brock - Cross

1    there's an issue I need to resolve, I'm ready to do that.

2              MR. DONALDSON:  Very good.  Thank you.

3              MR. MEAD:  Does it make sense, your Honor, should we

4    come back at 1:50?

5              THE COURT:  Sure.  Yes, the caveat and the reason, I

6    have a board of judges meeting.  I have a brief presentation I

7    need to do.  I may see if I can do it earlier rather than

8    later.  Right now I'm fairly far down the agenda, but 1:50.

9    Let me know if there is something I need to resolve and that

10   way I will absolutely be here.  Okay.  Thank you.  We stand

11   adjourned.

12             (Recess)

13

14

15

16

17

18

19

20

21

22

23

24

25

O9PBDAR3                          Brock – Cross

1                              AFTERNOON SESSION

2                                   2:06 p.m.

3                (Jury not present)

4          THE COURT:  You may be seated.  I understand there's a

5    timing issue the parties want to discuss with me?

6          MR. MEAD:  I think this can be easier, your Honor.

7    Defense is saying 15 minutes they think.  We don't want to take

8    someone out of order for 15 minutes obviously. What I suggest

9    is the Court keep track of the time at the 15-minute mark.  Not

10   saying you cut defense counsel at the 15-minute mark, do a

11   quick sidebar, get a firm commitment they will be done.  If

12   that's a very brief period of time, treat that as binding.  If

13   it's a longer period of time, we'd probably then ask to take

14   the witnesses out of order at that point.

15         THE COURT:  Okay.  So I'll set my watch for 15

16   minutes.  And again, Mr. Donaldson, if you're not, you know,

17   that's fine.  I'll just say, can I see counsel at sidebar, and

18   then we'll figure it out from there.  Anything else before we

19   get the witness and the jury?

20         MR. DONALDSON:  No, Judge.  Again, just for the

21   record -- no, that's fair.  I'll go with that.

22         THE COURT:  Look, I think what's going on, right,

23   everyone wants to present their case in the order that they put

24   in there order of proof.  So if we can avoid it, we will avoid

25   calling folks out of turn.  By the same token, you know, you're

O9PBDAR3                    Brock - Cross

1    cross-examining, and I understand some things are going to take

2    longer or less, and that's just the way it works.  We'll play

3    it by ear.  If we need to, we'll come to sidebar and talk about

4    it and figure it out from there.

5            MR. DONALDSON:  That's fine, Judge.  I just want the

6    Court to just be clear that I'm very cognizant of that.

7            THE COURT:  Again, let me be clear, you know, you

8    should do your defense and do the cross-examination how you

9    want to do it.  Okay.  And so if it goes longer, we can deal

10   with that.  We're not talking about a situation where we're

11   bumping up against the end of trial.  We're going to lose

12   jurors or something like that, then I would have a different

13   attitude.  But right now, do you what you need to do, and don't

14   obviously make any cuts, just do what you need to do in the

15   timing and we can work with that.

16           MR. DONALDSON:  Very good.  Thank you.

17           THE COURT:  Can we get the witness and the jury.

18   let's have a seat.  It's going to be just a second.

19           (Continued on next page)

20

21

22

23

24

25

O9PBDAR3                         Brock - Cross

1              (Jury present)

2              THE COURT:  Ladies and gentlemen, I hope you had a

3    good lunch.  We're going to continue with the witness.

4    Mr. Donaldson, you may continue.

5              MR. DONALDSON:  Thank you, Judge.

6    BY MR. DONALDSON:

7    Q.  Good afternoon.

8    A.  Good afternoon.

9    Q.  Welcome back from lunch.  Thank you for coming back.

10   A.  Thank you.

11             THE COURT:  He didn't have much of a choice.

12             MR. DONALDSON:  I had to start some place.

13             THE COURT:  He was going to come back no matter what.

14             THE WITNESS:  I'm glad you said that, your Honor.

15             THE COURT:  Go ahead, Mr. Donaldson.

16   BY MR. DONALDSON:

17   Q.  You mentioned on direct and you mentioned a little bit on

18   cross about this vision plan.  Do you recall that?

19   A.  Yes.

20   Q.  And I think you said you received a vision plan from the

21   Darden Group some time in October 2020, right?

22   A.  Correct.

23   Q.  It would be fair to say that you -- well, prior to

24   receiving this vision plan, you had spoken to Mr. Sienko and

25   Mr. Darden about what could make their pitch to the WNBA

O9PBDAR3                          Brock - Cross

1   better, correct?

2   A.   Correct.

3   Q.   And you even had discussions with Mr. Sienko about how the

4   Darden Group could make their business plan more compelling;

5   would that be fair to say?

6   A.   Yes.

7   Q.   You even suggested to Mr. Sienko that -- strike that.

8         You even suggested to Mr. Darden that Mr. Sienko would

9   have some ideas to help the Darden Group become the winning

10  group; would that be fair to say?

11  A.   Yes.

12         MR. DONALDSON:  Could you put up 2135, please, for

13  witness and lawyers only.

14  Q.   Some of those conversations regarding helping Mr. Darden

15  become the winning group happened in November of 2020 as well,

16  correct?

17  A.   Yes.

18  Q.   And, in fact, on November 17, 2020, you actually emailed

19  Calvin Darden, Jr. related to your conversations with

20  Mr. Sienko and how Darden can make their group the winning

21  group, correct?

22  A.   I had conversations, as this email points out, it doesn't

23  really say in this email what it was about.  So I think it's

24  entirely possible it was about the vision plan, but there's no

25  indication about that in this email.

O9PBDAR3                        Brock - Cross

1            MR. DONALDSON:  Could you put up 2136, please.

2   Q.  Now around November 18, 2020, you had an email conversation

3   with Mr. Darden, correct?

4   A.  Yes.

5   Q.  And that was related to --

6            THE COURT:  Just to be clear, Mr. Darden junior,

7   senior?

8            MR. DONALDSON:  I'll correct that.

9   Q.  That was related to the vision board, correct?

10  A.  The vision plan.

11  Q.  The vision plan, correct?

12  A.  Yes.

13  Q.  And these conversations with -- well, your conversations

14  via email were generally with Calvin Darden, Jr., correct?

15  A.  Yes.

16  Q.  And these conversations here on this email were with Calvin

17  Darden, Jr., correct?

18  A.  Yes.

19  Q.  And you in fact on November 18, 2020 had conversations with

20  Mr. Sienko about his ideas to make the vision plan better,

21  correct?

22  A.  Yes.

23  Q.  And you actually suggested that Mr. Darden incorporate

24  Mr. Sienko's suggestions into the Darden Group business plan,

25  correct?

O9PBDAR3                        Brock - Cross

1   A.   Yes.

2   Q.   And those suggestions included credentials and

3   relationships, correct?

4   A.   Yes.

5   Q.   Your suggestion included augmenting the business plan,

6   correct?

7   A.   Included, excuse me, what?

8   Q.   Augmenting the business plan?

9   A.   Not sure how you mean the use of the word "augmenting."

10  Q.   Okay.  One second.

11          MR. DONALDSON:  Could we scroll down to page two,

12  please, of 2136.

13  Q.   Those suggestions that you ask Mr. Darden to incorporate

14  for Mr. Sienko included having a few partners ready to commit

15  within 30 days of a transaction, correct?

16  A.   Yes.

17  Q.   Showing how they will leverage influences in the market,

18  correct?

19  A.   Yes.

20  Q.   Showing how they will augment staffing, correct?

21  A.   Yes.

22  Q.   Ways to push things that will elevate the status of the

23  athletes, correct?

24  A.   Yes.

25  Q.   Showing how to expound on the Dream coalition, correct?

O9PBDAR3                    Brock - Cross

1   A.  Yes.

2   Q.  Showing how to increase advertise expenditures, correct?

3   A.  Yes.

4   Q.  Showing how to create unique events for target audience and

5   overall in arena experience, correct?

6   A.  Yes.

7   Q.  Also showing how to use a broadcast to enhance partnership

8   with other -- I guess other companies, correct?

9   A.  Yes.

10  Q.  Also suggestion was to create opportunities with alternate

11  networks such as Tyler Perry, correct?

12  A.  Just give me one second.  I'm not sure we specifically

13  mention Tyler Perry in this particular set of suggestions.  We

14  mentioned several of the people on the advisory board, but I

15  don't recall and don't see here his name.

16  Q.  You also suggested to engage influencers to make Dream the

17  cool place to be, correct?

18  A.  Yes.

19  Q.  And these were all suggestions that came from Mr. Sienko,

20  correct?

21  A.  Yes.

22  Q.  And these were suggestions that you asked Mr. Darden to

23  incorporate into his business plan, correct?

24  A.  Yes.

25  Q.  And then Mr. Darden sent you back a revised business plan

O9PBDAR3                        Brock - Cross

1  that incorporated those particular suggestions, correct?

2  A.  Yes, not necessarily all of them.  In fact, definitely not

3  all of them, but certainly some of them.

4       MR. DONALDSON:  One second please, your Honor.

5  Q.  Thereafter Mr. Darden sent you an email saying that those

6  are good suggestions, that he would in fact try to incorporate

7  those into the vision plan, correct?

8  A.  Correct.

9  Q.  In fact, he sent you -- he told you that they will begin

10  incorporating these suggestions into an addendum to the

11  business plan, much appreciated, correct?

12  A.  Yes.

13  Q.  Now, the Dream was ultimately sold to another party; is

14  that correct?

15  A.  That's correct.

16  Q.  What party was that?

17  A.  Northland Financial.

18  Q.  And you sold to them because they offered the most money,

19  correct?

20  A.  Yes.

21  Q.  Ultimately what induced that particular sale to Northland

22  was the fact that they offered more money than the Darden

23  Group, correct?

24  A.  Correct.

25  Q.  And the amount of money that they actually purchased it for

O9PBDAR3                    Brock - Cross

1  was $7 million, but 17 on the back end; is that correct?

2  A.  No, it was $7 million.  Apples to apples basis is was $7

3  million.

4  Q.  And that would be in your based upon your understanding at

5  that point twice the amount of the Darden Group, correct?

6  A.  It's exactly twice the amount.

7  Q.  And I believe you said on direct that you had done some

8  fact checking into the Northland Group, correct?

9  A.  Yes.

10  Q.  And you said fact checking meant you wanted to check out

11  who they were, correct?

12  A.  Yes.

13  Q.  You wanted to check out the people that were involved with

14  them, correct?

15  A.  Yes.

16  Q.  You wanted to check out their actual financial resources,

17  correct?

18  A.  Yes.

19  Q.  And the people that were involved with them, correct?

20  A.  Yes.

21  Q.  And you were using your wealth of business experience as

22  COO and a CEO to do that, correct?

23  A.  Yes, as well as using the league, because the league had a

24  point of view.

25          MR. DONALDSON:  One second, Judge.

O9PBDAR3                         Brock - Redirect

1    Q.  Mr. Brock, as part of your purchase, or as part of your

2    sale to -- is it the Northland Group?

3    A.  Yes.

4    Q.  Did they have to assume $10 million in debt?

5    A.  Yes.  Any purchaser --

6    Q.  I'm just asking for this particular --

7    A.  Yes, any purchaser would have to assume that.

8    Q.  So it was $7 million plus the assumed $10 million in debt?

9    A.  Yes.

10             MR. DONALDSON:  Nothing else, Judge.

11             THE COURT:  Redirect examination.

12             MR. THOMPSON:  May I proceed?

13             THE COURT:  You may.

14   REDIRECT EXAMINATION

15   BY MR. THOMPSON:

16   Q.  Mr. Brock, I want to make sure I didn't miss something.

17   Can you tell us where the WNBA's offices are?

18   A.  They're located in Manhattan, New York City in the same

19   building as the NBA's offices.

20   Q.  Did you testify that $3 million was an insufficient price

21   from your perspective for the Atlanta Dream?

22   A.  Yes.

23   Q.  Why did you continue to engage with Calvin Darden, Jr. and

24   the Darden Group after receiving their LOI with the $3 million

25   offer?

O9PBDAR3                          Brock - Redirect

1   A.   Because they were a legitimate buyer.  And even though the

2   price was not what the two owners were hoping for, it was a

3   legitimate offer that had to be considered.

4   Q.   You testified that you made suggestions to Calvin Darden,

5   Jr., about the vision plan.  Is that right?

6   A.   Yes.

7   Q.   Did you write the vision plan?

8   A.   No.

9   Q.   Did you provide the list of people listed in the advisory

10  board in the vision plan?

11  A.   No.

12  Q.   Did you provide the list of companies or corporations

13  listed in the vision plan as a sponsor of the Atlanta Dream?

14  A.   Only to the extent that Chris Sienko and I would have

15  furnished a list of current sponsors of which there are

16  probably only two on that list that were current Dream

17  sponsors.

18  Q.   Did you ever suggest that Calvin Darden, Jr., add to the

19  vision plan statements that were not true?

20  A.   No.

21          MR. THOMPSON:  Nothing further, your Honor.

22          THE COURT:  All right.  Thank you very much,

23  Mr. Brock.  You may step down.  Safe travels back home.

24          THE WITNESS:  Thank you, sir.

25          (Witness excused)

1            THE COURT:  Okay.  The government's next witness.

2            MR. MEAD:  The government calls Jennifer Michelle

3    McMullin, your Honor.

4            While the witness is coming up, the government also

5    offers into evidence pursuant to certifications Government

6    Exhibits 901A, 901B and 2510A.

7            THE COURT:  Any objection?

8            MR. DONALDSON:  No.

9            THE COURT:  Okay.  You can step up, Ms. McMullin.  If

10   I can ask you to remain standing for the moment.

11   JENNIFER MICHELLE MCMULLIN,

12        called as a witness by the Government,

13        having been duly sworn, testified as follows:

14           THE COURT:  First I'd ask you to state your name and

15   spell it for the record.

16           THE WITNESS:  Jennifer Michelle McMullin,

17   J-E-N-N-I-F-E-R, M-I-C-H-E-L-L-E, M-C-M-U-L-L-I-N.

18   DIRECT EXAMINATION

19   BY MR. MEAD:

20   Q.  Where do you work, Ms. McMullin?

21   A.  I work for Aflac.

22   Q.  What kind of company is Aflac?

23   A.  Aflac is a supplemental insurance company.

24   Q.  Does Aflac run a lot of TV advertisements?

25   A.  We do.

O9PBDAR3                          McMullin- Direct

1    Q.   What is the Aflac mascot?

2    A.   A duck.

3    Q.   What does the duck say?

4    A.   Aflac.

5         THE COURT:   I thought you were about to do "Aflac." I

6    heard it in your voice and I thought you were going to do it.

7         MR. MEAD:   I can't testify, your Honor. Only the

8    witness.

9         THE COURT:   Okay.  Go ahead.

10   Q.   What is your job title at Aflac?

11   A.   I'm a senior brand manager.

12   Q.   And what do you do in that job as a senior brand manager?

13   A.   I manage and oversee corporate sponsorships.  I also manage

14   and oversee talent partnerships.

15   Q.   When did you originally began working at Aflac?

16   A.   I originally began working at Aflac in 1998.

17   Q.   And when did start your current job as a senior brand

18   manager at Aflac?

19   A.   January of 2020.

20   Q.   What job at Aflac did you have before you started this

21   senior brand manager job in 2020?

22   A.   I was a manager in sponsorships, so that started in 2013.

23   Q.   So generally speaking what do you do in that job?

24   A.   Essentially I review sponsorship proposals.  I then

25   negotiate any sponsorship contracts.  I then work with our

1    legal department to process the contracts, and then from there

2    execute all the deliverables that are listed within these

3    agreements.

4    Q.  Does your current job at Aflac also involve sponsorships

5    relating to sports?

6    A.  Yes.

7    Q.  And what kind of sports sponsorships?

8    A.  We have sponsorships within collegiate football.  We also

9    have sponsorships within specific organizations relative to

10   football as well as collegiate basketball.

11   Q.  With regard to those sports sponsorship, what is your role?

12   A.  Can you repeat the question.

13   Q.  With regard to those sports sponsorship, what is your role?

14   A.  I pretty much manage and oversee those sponsorships and

15   make sure that all the deliverables are done that are listed

16   within the agreement.

17   Q.  Do you also have a role when sports sponsorships are under

18   consideration?

19   A.  I do.

20   Q.  Did you have a similar role at least as far back as 2020

21   with regard to these sports sponsorships?

22   A.  Yes.

23   Q.  From 2020 and onwards, has Aflac ever entered into a

24   corporate sponsorship or marketing deal with a company called

25   the Darden Sports Group?

O9PBDAR3                          McMullin- Direct

1    A.  Not to my knowledge.

2    Q.  What about Darden Enterprises?

3    A.  Not to my knowledge.

4    Q.  What about the WNBA team the Atlanta Dream?

5    A.  No.

6    Q.  What about corporate sponsorship deals with Calvin Darden,

7    Jr., or Calvin Darden, Sr.?

8    A.  Not to my knowledge.

9    Q.  From 2020 and onwards has Aflac ever had serious

10   conversations about entering into such a sponsorship or

11   marketing deal with the Darden Sports Group, Darden

12   Enterprises, the Atlanta Dream, Calvin Darden, Jr., or Calvin

13   Darden, Sr.?

14   A.  Not to my knowledge.

15   Q.  Do you think you would have known if Aflac had entered into

16   such a deal?

17             MR. DONALDSON:  Objection to the form of the question.

18             THE COURT:  If you could rephrase the question.

19   Objection sustained.

20   Q.  Based on your role at Aflac overseeing sports sponsorships,

21   do you think you would have known if Aflac entered into any

22   such sponsorship deal with one of those people or company?

23             MR. DONALDSON:  Same objection.

24             THE COURT:  I'll allow it.  Overruled.

25   Q.  You can answer.

1    A.  Yes.

2    Q.  And based on your role at Aflac -- well, why do you think

3    you would have known that?

4    A.  Well, essentially as I mention earlier as part of my

5    position I do review sponsorship proposals.  And once they're

6    negotiated, then I have to put them through Aflac legal

7    department.

8    Q.  And if there had been serious conversations about entering

9    into a sponsorship or marketing deal -- strike that.

10           Based on your role at Aflac, do you think you would

11   have known if Aflac had serious conversations about entering

12   into a sponsorship or marketing deal with any of those people

13   or companies?

14           MR. DONALDSON:  Objection, form of the question.

15           THE COURT:  I'll allow it.  Overruled.

16   A.  At some point, yes, I should have known.

17   Q.  And again why do you think you would have known that?

18   A.  Because at the end of it. When we do these sponsorships and

19   agreements, I am charged with actually executing against all

20   deliverables that are within the agreement.

21   Q.  Did you search your email for communications about any

22   corporate sponsorships or marketing deals with any of these

23   people or companies?

24   A.  Yes.

25   Q.  And did you find any evidence that these companies or

O9PBDAR3                        McMullin- Direct

1    individuals were ever in discussion with Aflac about a

2    sponsorship or marketing deal?

3    A.  No.

4           MR. MEAD:  Mr. Ross, if you could please pull up

5    Government Exhibit 2144A in evidence, please, and if you could

6    turn to page two, please.

7    Q.  Ms. McMullin, other than preparing to testify, have you

8    ever seen this document before?

9    A.  Not to my knowledge.

10   Q.  Can you read the first sentence of this document out loud.

11   A.  Darden Sports Group lead by prominent Atlanta businessmen

12   Calvin Darden, Sr., is proud to have an opportunity to become

13   the next owner of the WNBA's Atlanta Dream.

14          MR. MEAD:  Mr. Ross, can you go to page 18 of this

15   document, please.

16   Q.  Ms. McMullin can you please read the third and fourth

17   paragraphs on this page.

18   A.  DSG has had preliminary discussions with each of its

19   corporate partners in regards to marketing a sponsorship

20   investment opportunities with the new Atlanta Dream.  DSG's

21   corporate partners understand the value of women's sports and

22   are committed to investigating in and across the Dream's

23   various platforms and properties immediately upon closing of

24   DSG's proposed acquisition.  DSG's corporate partners include.

25   Q.  And do you see the logo for Aflac in the set of companies

O9PBDAR3                              McMullin - Cross

```
 1    of DSG's corporate partners?

 2    A.  Yes, I do.

 3    Q.  Can you describe where on the page the logo is?

 4    A.  Far right, second down.

 5    Q.  Is it true that Aflac was a corporate partner of the Darden

 6    Sports Group?

 7    A.  No.

 8    Q.  Is it true that Aflac was "committed to investing in and

 9    across the Dream's various platforms and properties immediately

10    upon the closing of DSG proposed acquisition?"

11    A.  Not to my knowledge.

12             MR. MEAD:  No further questions.  Thank you.

13             THE COURT:  All right.  Cross-examination.

14    CROSS-EXAMINATION

15    BY MR. RICCO:

16    Q.  Good afternoon.  Do you work alone at Aflac in your unit?

17    A.  No, I do not.

18    Q.  How many people work in your unit?

19    A.  With my team I have three.

20    Q.  Now, I notice on direct the question was posed "serious

21    discussions," and you said no, right?

22             MR. RICCO:  Can we put the exhibit back up on the

23    board, what is that 2144A.  Can we go back to the page that was

24    read into the record.

25             THE COURT:  I think it's page 18.
```

O9PBDAR3                       McMullin – Redirect

1           MR. RICCO:  Thank you very much, your Honor.

2    Q.  And I think you read from the third paragraph.  Now, that

3    doesn't talk about serious discussions either, correct?

4    A.  Correct.

5           THE COURT:  I think she said correct.

6    A.  Correct.

7    Q.  I was looking down.  My fault.  That doesn't say "serious

8    conversations," right?

9    A.  Mm hm.

10   Q.  Yes?

11   A.  Yes.

12          THE COURT:  You need to say yeah because otherwise

13   WHAT will come out is mm hm.

14          THE WITNESS:  I apologize.

15          THE COURT:  It's okay.  Go ahead.

16   Q.  It says preliminary discussions?

17   A.  Yes.

18          MR. RICCO:  Thank you.

19          THE COURT:  Do you have something?  Okay.

20   REDIRECT EXAMINATION

21   BY MR. MEAD:

22   Q.  Leave this document up, please.

23          To your knowledge, Ms. McMullin, has Aflac ever had

24   even preliminary discussions with any of the people or

25   companies we just mentioned?

O9PBDAR3                    Rae- Direct

1   A.  Not to my knowledge.

2          MR. MEAD:  No further questions.

3          THE COURT:  All right.  Thank you very much.  You may

4   step down.

5          (Witness excused)

6          THE COURT:  Okay.  The government's next witness.

7          MR. THOMPSON:  Yes, your Honor.  The government calls

8   Issa Rae.

9          THE COURT:  Ladies and gentlemen, I know that

10  Ms. Disla has tried to take credit for the cookies.  They're

11  actually my doing when you have them.

12         Ms. Rae, if you step up.  If I could ask you to remain

13  standing.  My deputy clerk Ms. Disla will administer the oath.

14  ISSA RAE,

15      called as a witness by the Government,

16      having been duly sworn, testified as follows:

17         THE COURT:  Ms. Rae if you could have a seat and state

18  your name and spell it for the record for the court reporter.

19         THE WITNESS:  Issa Rae, I-S-S-A, R-A-E.

20         THE COURT:  You may inquire.

21  DIRECT EXAMINATION

22  BY MR. THOMPSON:

23  Q.  Good afternoon, Ms. Rae.

24  A.  Good afternoon.

25  Q.  Please describe your educational background?

O9PBDAR3                          Rae- Direct

1    A.  I went to -- in terms of college, high school.  I went to

2    high school in L.A. and went to college at Stanford University.

3    Q.  What do you do professionally?

4    A.  I'm a writer, producer, actress.

5    Q.  For how long have you worked in this industry?

6    A.  Little over ten years.

7    Q.  What are some works that you been associated with over the

8    past few years?

9    A.  TV series called Insecure, a movie The photograph, Barbie

10   most recently.

11   Q.  Do you know someone named Calvin Darden, Jr.?

12   A.  I don't.

13   Q.  Have you ever spoken or communicated through any means with

14   someone named Calvin Darden, Jr.?

15   A.  No.

16   Q.  Do you know someone named Calvin Darden, Sr.?

17   A.  No.

18   Q.  Have you ever spoken or communicated through any means with

19   someone named Calvin Darden, Sr.?

20   A.  No.

21   Q.  Do you know someone named Charles Briscoe?

22   A.  I don't think so, no.

23   Q.  Have you ever spoken or communicated through any means with

24   someone named Charles Briscoe?

25   A.  No.

O9PBDAR3                        Rae- Direct

1           MR. THOMPSON:  Mr. Ross, could you please publish

2      what's Government Exhibit 2119A that's in evidence.

3      Q.  Before preparing for your testimony in this trial, have you

4      seen Government Exhibit 2119A?

5           MR. THOMPSON:  Mr. Ross, could you please scroll.

6      A.  No, I hadn't.

7           MR. THOMPSON:  Mr. Ross, could you please go to page

8      one of this exhibit.

9      Q.  What does this slide say?

10     A.  This slide says Atlanta Dream.

11          MR. THOMPSON:  Could you scroll to slide two,

12     Mr. Ross.

13     Q.  Do you see a logo at the top of this slide?

14     A.  Yes.

15     Q.  What does the logo say?

16     A.  Darden Sports Group.

17     Q.  Do you know what the Darden Sports Group is?

18     A.  I don't.

19          MR. THOMPSON:  Could you please advance to slide six,

20     Mr. Ross.

21     Q.  Directing your attention to the top of this slide, what is

22     the title of this slide?

23     A.  Advisory board.

24     Q.  This text says Darden Sports Group has assembled a

25     world-class advisory board comprised of superstar leaders

O9PBDAR3                          Rae- Direct

1    within the areas of music, television, film, professional

2    sports, business and community.  Each board member has

3    committed to using their ideas, voices, platforms, resources,

4    relationships and influence to support the Atlanta Dream and

5    various initiatives.

6            Do you see an image of yourself on this slide?

7    A.  Yes, I do.

8    Q.  Did you give anyone permission to use your image in this

9    document?

10   A.  No.  And as I told you, I hate this picture, so.

11           THE COURT:  That's the first time we've heard about

12   it.  You should see some of my pictures.  Go ahead.

13   Q.  Ms. Rae, is this photo of you available online?

14   A.  Yes.

15   Q.  Did you give anyone permission to use your name in this

16   document?

17   A.  No.

18   Q.  Did you commit to using your ideas, voice, platform,

19   resources, relationship and influence to support the Atlanta

20   Dream?

21   A.  No.

22           MR. THOMPSON:  Could you please take down this

23   exhibit, Mr. Ross.  And can you please publish Government

24   Exhibit 2144A which is in evidence.  Could you please begin

25   scrolling, Mr. Ross slowly.

O9PBDAR3                         Rae- Direct

1    Q.  Before preparing for your testimony in this trial, had you

2    seen Government Exhibit 2144A before?

3    A.  No.

4            MR. THOMPSON:  Mr. Ross, please advance to slide

5    eight.

6    Q.  The heading of this slide is advisory board.  Do you see an

7    image of yourself on this page?

8    A.  Yes.

9    Q.  Did you give anyone permission to use your name in this

10   document?

11   A.  No.

12   Q.  Did you give anyone permission to use your image in this

13   document?

14   A.  No.

15           MR. THOMPSON:  You can take down this exhibit.  Thank

16   you.  Mr. Ross.

17   Q.  Did anyone ever ask you if you would be interested in

18   serving on an advisory board associated with the Darden Sports

19   Group?

20   A.  No.

21   Q.  Did anyone ever ask you if you would be interested in on

22   serving on an advisory board associated with purchasing a WNBA

23   team the Atlanta Dream?

24   A.  No.

25   Q.  Did you ever tell anyone that you would serve on an

O9PBDAR3                        Rae- Direct

1   advisory board associated with the Darden Sports Group?

2   A.  No.

3   Q.  Did you ever tell anyone that you would serve on an

4   advisory board associated with the Atlanta Dream?

5   A.  No.

6   Q.  Did you ever agree to be involved with the Darden Sports

7   Group in any capacity?

8   A.  No.

9   Q.  Did you ever agree to be involved with the Atlanta Dream in

10  any capacity?

11  A.  No.

12          MR. THOMPSON:  Your Honor, may I have one moment?

13          THE COURT:  Yes.

14          MR. THOMPSON:  Nothing further.

15          THE COURT:  Thank you.  Cross-examination?

16          MR. DONALDSON:  No, your Honor.  Thank you.

17          THE COURT:  Thank you very much Ms. Rae. You may step

18  down.

19          (Witness excused)

20          THE COURT:  The government's next witness.

21          MR. MEAD:  Your Honor, the government calls Julianne

22  Ashlock.

23          THE COURT:  Step up, please.  If I can ask you to

24  remain standing for a moment.  My deputy clerk will administer

25  the oath.  Thank you.

1   JULIANNE ASHLOCK,

2           called as a witness by the Government,

3           having been duly sworn, testified as follows:

4                THE COURT:  If you could have a seat, and I ask that

5   you state your name and spell it for the record.

6                THE WITNESS:  It's Julianne Ashlock, J-U-L-I-A-N-N-E,

7   A-S-H-L-O-C-K.

8                THE COURT:  You may inquire.

9                MR. MEAD:  Thank you, your Honor.

10  DIRECT EXAMINATION

11  BY MR. MEAD:

12  Q.  Good afternoon, Ms. Ashlock.

13  A.  Hello.

14  Q.  Where do you work?

15  A.  I work at Docusign.

16  Q.  What is your job title at Docusign?

17  A.  I'm a senior director of product management at Docusign.

18  Q.  And what do you do in that job as a senior director of

19  product design?

20  A.  I lead a team of product managers that work with our

21  engineering, design and research teams to build the products

22  and services that Docusign offers.

23  Q.  When did you begin working at Docusign?

24  A.  It was in 2012.

25  Q.  And when did you start your current job at Docusign?

1  A.  It's been about five and a half years.

2  Q.  What jobs at Docusign did you hold before the current job?

3  A.  So I was a product marketing manager prior, so I started as

4  a product marketing manager and then was promoted throughout

5  and then transitioned to the current role that I have.

6  Q.  And so backing up for a second, what is Docusign?

7  A.  Sure.  So Docusign is a software company.  It offers a

8  variety of products and services.  We're best known for our

9  electronic signature solution.

10  Q.  And what is the electronic signature solution at a very

11  high level?

12  A.  Sure.  So it's a software solution that allows our

13  customers to access the product via a web browser.  So our

14  customers will access via the web browser.  They'll create an

15  envelope.  They'll add documents to that envelope.  They may

16  add certain text fields, tags like an initial tag or a

17  signature tag.

18          And then they'll prepare that for signature from

19  recipients.  They'll name their recipients, and then they enter

20  the recipient's email address, and then they'll send that

21  agreement for that envelope off for signature.

22  Q.  At an even higher level of generality, am I right it's a

23  way to electronically sign documents?

24  A.  Yes.  Right.

25          MR. MEAD:  Mr. Ross, could please pull up Government

O9PBDAR3                        Ashlock- Direct

1    Exhibit 2510A that's in evidence.

2    Q.  Ms. Ashlock, can you read the title of the document and the

3    kind of the green on the right side?

4    A.  Sure.  It says NBPA standard player agent contract.

5           MR. MEAD:  Mr. Ross, if you can zoom on the text in

6    the very, very top left where it says Docusign envelope.

7    Q.  Do you see that text that says Docusign envelope ID and

8    then a very long string of letters and numbers?

9    A.  Yes.

10   Q.  Are you familiar with a Docusign envelope ID?

11   A.  I am.

12   Q.  What is it?

13   A.  Yeah.  So it's a unique identifier which is typically

14   letters and numbers that make up the identifier for a Docusign

15   envelope.

16   Q.  And what is it mean that a Docusign envelope ID shows up on

17   a PDF or a document?

18   A.  So that means that it's associated with a Docusign envelope

19   kind of what I described earlier.

20          MR. MEAD:  Mr. Ross, can you go to page six of this

21   document, please.

22   Q.  Do you see that there are three signatures on this page?

23   A.  I do.

24          MR. MEAD:  If you can zoom in on the three signatures,

25   please, Mr. Ross.

1    Q.  Do you see that the bottom two signatures say Docusign by?

2    A.  Correct, yes.

3    Q.  And what -- do you recognize that kind of Docusign by and

4    the little line on the side of it?

5    A.  I do, yes.

6    Q.  And what does that mean generally?

7    A.  So this would be a graphical representation of a signer's

8    signature that was executed via the Docusign system there.

9    Q.  And do you see there's an additional string of letters and

10   numbers underneath the name of the person who signed?

11   A.  Yes.

12   Q.  What does that mean?

13   A.  So this would be the globally unique identifier for its

14   signature that is included as part of that graphical

15   representation of the signature or any signature that is

16   executed with Docusign.

17   Q.  And the top line for player agent, that does not appear to

18   be a Docusign signature, right?

19   A.  Correct.

20   Q.  And then below that it says Docusign by James Wiseman,

21   right?

22   A.  Correct.

23   Q.  And underneath that it says player, right?

24   A.  Correct.

25   Q.  And then below that it says Docusign by Donzaleigh Artis,

O9PBDAR3                        Ashlock- Direct

1    right?

2    A.  Correct.

3    Q.  And then underneath that is says parent/guardian (if

4    players under 21 years of age," right?

5    A.  Correct.

6            MR. MEAD:  Mr. Ross, can you please pull up Government

7    Exhibit 901A which is in evidence.

8            THE COURT:  So I didn't in tone the actual words.

9    901A and 901B are admitted in evidence, as is 2510A.  Go ahead.

10           (Government's Exhibits 901A, 901B, 2510A received in

11   evidence)

12   BY MR. MEAD:

13   Q.  What kind of document is Government Exhibit 901A?

14   A.  This is called a Docusign certificate of completion.

15   Q.  Are you familiar with these kind of documents from Docusign

16   from your time there?

17   A.  Yes, I am.

18           MR. MEAD:  Mr. Ross, could you please pull up --

19   Q.  Well, just generally speaking -- well, strike that.

20           MR. MEAD:  Mr. Ross, can you please pull up 901A and

21   2510A side-by-side page one of both documents.

22   Q.  On the left is the Docusign document we were just looking

23   at, right?

24   A.  Correct.

25   Q.  And on the right is the contract we were just looking at,

O9PBDAR3                          Ashlock- Direct

1    right?

2    A.   Correct.

3    Q.   Do the Docusign envelope IDs on these two documents match?

4         MR. DONALDSON:  Objection.

5         THE COURT:  Well, I'll allow it.  Objection overruled.

6    Q.   You can answer the question.

7    A.   Yes, they do.

8    Q.   And what is it -- just where in the document on the left is

9    the envelope ID?

10   A.   So the document on my left is the certificate of

11   completion, and the envelope ID appears in the top left.

12   Q.   And where does the Docusign envelope ID appear in the

13   contract on the right Government Exhibit 2510A?

14   A.   It also appears in the top left.

15   Q.   What is it mean that the Docusign envelope ID for this

16   contract matches the Docusign envelope on the Docusign

17   document?

18   A.   So the certificate of completion has the envelope ID on the

19   left. And then when it states below that the envelope ID

20   stamping is enabled, that means that the envelope ID will be

21   stamped on each page of each document that's included as part

22   of the Docusign envelope.

23        So that means that this document on the right was part

24   of the Docusign envelope that this certificate of completion

25   was generated for.

O9PBDAR3                           Ashlock- Direct

1   Q.  Got it.  Okay.  On 901A, do you see where it says subject?

2   A.  Yes.

3           MR. MEAD:  Can you zoom in on that for a second,

4   Mr. Ross.

5   Q.  And, Ms. Ashlock, can you read it?

6   A.  Yes.  It says please Docusign 2018 NBPA SPAC, effective

7   7.1.18.

8   Q.  And what does the subject line on this document mean?  Not

9   what is the actual text for the Docusign mean, what is it mean

10  when something is that subject box?

11  A.  That subject line is the line that will be included in the

12  email that is sent to the recipients of the envelope.

13          MR. MEAD:  Mr. Ross, if you could please put up

14  Government Exhibit 901A by itself, please.  And if you could

15  zoom in on the box that says signer events.  Perfect.  Thank

16  you.

17  Q.  Under signer events, do you see where it says Donzaleigh

18  Artis?

19  A.  Yes.

20  Q.  Can you read the email address written underneath that?

21  A.  It's Charles@Briscoesports.com.

22  Q.  What does it mean that that email address is listed under

23  the name Donzaleigh Artis?

24  A.  So this is the email address that was included by the

25  sender when they addressed the envelope sent for signature.

O9PBDAR3                        Ashlock- Direct

1    Q.   To who?

2    A.   To Donzaleigh Artis so that would be specified by the

3    sender of the envelope.

4    Q.   And then on the right do you recognize that Docusign by box

5    where it says Donzaleigh Artis in cursive?

6    A.   Yes.

7    Q.   Does that appear to match the Docusign box in the contract

8    we looked at?

9    A.   Yes.

10   Q.   Underneath on signer of events under Donzaleigh Artis

11   underneath Charles@Briscoesports.com, do you see where it says

12   security level?

13   A.   Yes.

14   Q.   What does it say for security level?

15   A.   It says email, account authentication, none.

16   Q.   And what does that mean?

17   A.   This means the default authentication for the recipient was

18   used on the envelope that was addressed to this recipient.

19   Q.   And what is the default for Docusign?

20   A.   The default is that the recipient authentication is email,

21   so they would have to have access to the email address that was

22   used for the recipient in order to access the envelope.

23   Q.   Would they have needed anything else to sign that document

24   other than access to the Charles -- strike that.

25           Would the recipient have needed anything else to sign

O9PBDAR3                           Ashlock– Direct

1    this document as Donzaleigh Artis other than access to the

2    Charles@Briscoesports.com email address?

3    A.  No, not in this case.

4    Q.  The box underneath that, do you see where it says James

5    Wiseman?

6    A.  Yes.

7    Q.  What's the email address listed under James Wiseman?

8    A.  It's Charles@Briscoesports.com.

9    Q.  What does it mean that that email address is listed there?

10   A.  So this was the email address that was specified by the

11   sender for the recipient James Wiseman when they addressed the

12   envelope that was sent to the recipients.

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. MEAD:

2    Q   And then do you see where it says security level underneath

3    there?

4    A   Yes.

5    Q   Is it the same security level as it was for Donzaleigh

6    Artis' signature?

7    A   Correct, this is the default authentication option.

8    Q   In order to sign this document as James Wiseman, would the

9    person who was signing it have needed anything else to prove

10   their identity other than just access to the

11   charles@briscoesports.com email address?

12   A   No, they wouldn't need any other authentication.

13          MR. MEAD:  Mr. Ross, can you please pull up Government

14   Exhibit 901B which is in evidence.

15   Q   What kind of document is this document, Government

16   Exhibit 901B?

17   A   This is an envelope history.

18   Q   And what is an envelope history?

19   A   This is another record that is created for the recipient

20   or -- sorry -- created for the envelope detailing the envelope

21   events when an envelope is created by our system, the Docusign

22   system.

23   Q   And this document and the other Docusign document we just

24   looked at, those are internal Docusign documents, right?

25   A   The Docusign certificate of completion and the Docusign

O9PJDAR4                        Ashlock - Direct

1    envelope history are internally generated by the Docusign

2    system, yes.

3    Q   Are you familiar also with these kind of envelope histories

4    from your work at Docusign?

5    A   I am.

6            MR. MEAD:  All right.  Mr. Ross, Government

7    Exhibit 901B and 2510A side by side.

8    Q   And again, does the envelope ID in Government Exhibit 901B

9    match the envelope ID in Government Exhibit 2510A?

10   A   Yes.

11   Q   And what does it mean that those envelope IDs match?

12   A   It means that they were part of the same envelope.

13           MR. MEAD:  Mr. Ross, if you could just pull up

14   Government Exhibit 901B, please.

15   Q   How do you read this document, just very generally?

16   A   Yeah, so there is column label the across the top, which

17   are date, time, source user, etc.  And then there's rows kind

18   of going down which have -- which represent each event that's

19   taken place as part of the envelope process.

20           MR. MEAD:  May I approach, your Honor?

21           THE COURT:  You may.

22   Q   Ms. Ashlock, all I'm doing is handing you a paper copy of

23   Government Exhibit 901B, which is the same document you have up

24   on the screen, just for your ease of reference.

25           And if you could do me a favor and can you look over

1   that document and tell me if you see the name Calvin Darden

2   anywhere on the document?

3   A    No, I do not.

4   Q    All right.  So let's go back to the document, and can you

5   read -- you see the message column in the middle?

6   A    Yes.

7   Q    Can you read the message for the first four events?

8   A    Yes.  The first event, the message is -- the envelope was

9   created by Matthew Boyer.

10          The second event is Matthew Boyer sent an invitation

11   to James Wiseman.  The email address is

12   charles@briscoesports.com.

13          The third event is Matthew Boyer sent an invitation to

14   Donzaleigh Artis.  The email address is

15   charles@briscoesports.com.

16          And the fourth event is Matthew Boyer sent an

17   invitation to Charles Briscoe.  The email address is

18   charles@briscoesports.com.

19   Q    When you say "the email address is," you're referring to

20   that portion in brackets, right?

21   A    Correct, yes.

22   Q    When you say the "email address is," what do you mean by

23   that?  What's the significance of having an email address

24   written there?

25   A    The email address is the email address that was specified

O9PJDAR4                          Ashlock - Direct

1    by the sender when the envelope was sent to the recipients.

2    Q   Is that the email address that the invitation to sign was

3    sent to?

4    A   Correct, yes.

5    Q   Is it the same charles@briscoesports.com email address for

6    all three of those events?

7    A   Correct, yes.

8    Q   So for the signature for James Wiseman?

9    A   Yes.

10   Q   And for the signature for Donzaleigh Artis?

11   A   Yes.

12   Q   And for the invitation to view the document for Charles

13   Briscoe?

14   A   Yes.

15   Q   Okay.  Do you know what an IP address is?

16   A   I'm not an IP address expert, but I have some understanding

17   of --

18   Q   The highest possible generality, what is an IP address?

19   A   It is --

20          MR. DONALDSON:  Objection, Judge.

21          THE COURT:  Well, do you have a computer?

22          THE WITNESS:  Do I have a computer?  I do, yes.

23          THE COURT:  At home.  And do you know whether your

24   computer has an IP address?

25          THE WITNESS:  Yes.

O9PJDAR4                         Ashlock - Direct

1              THE COURT:  And at work, are you familiar with

2    computers at work having an IP address?

3              THE WITNESS:  Yes.

4              THE COURT:  All right.  Go ahead.  Objection

5    overruled.

6    BY MR. MEAD:

7    Q    At the highest possible level of generality, what is an IP

8    address?

9    A    It's the internet location where a device is connected.

10   Q    Does Docusign track IP addresses?

11   A    We do, yes.

12   Q    Do you have any understanding as to why Docusign might

13   track IP addresses?

14   A    It provides additional information around the location when

15   a device is connected as specific events occur.  So a signer

16   event was completed, we record the IP address where that

17   location of that event took place.

18   Q    Perfect.  Thank you.

19              Do you see the event towards the middle that says

20   James Wiseman signed the envelope on mobile?

21              MR. MEAD:  And Mr. Ross, if you could zoom in on that

22   line right there, perfect.

23   Q    Okay.  Do you see that line, Ms. Ashlock?

24   A    Yes, I do.

25   Q    And what is the message for this event?

O9PJDAR4                          Ashlock - Direct

1    A    The message is James Wiseman signed the envelope on mobile.

2    Q    And do you see that there's an IP address in the second

3    column from the right?

4    A    Yes.

5    Q    Can you read that IP address, please.

6    A    It's 107.77.216.198.

7         MR. MEAD:  And you can zoom out, please, Mr. Ross.  Do

8    you see the third from the bottom, Mr. Ross, can you zoom in

9    where it says Donzaleigh Artis signed.

10   Q    What is the message on this row?

11   A    The message is Donzaleigh Artis signed the envelope on

12   mobile.

13   Q    And do you see there's an IP address in the second column

14   from the right?

15   A    Yes.

16   Q    What is the IP address that Donzaleigh Artis purportedly

17   used to sign this document?

18   A    It's 107.77.216.198.

19        MR. MEAD:  And you can zoom out, please, Mr. Ross.

20   Q    And now do you see where it says towards the middle under

21   James Wiseman signed, Charles Briscoe viewed the envelope, do

22   you see that line?

23   A    Yes.

24   Q    And what is the message for that event?

25   A    The message is Charles Briscoe viewed the envelope, and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O9PJDAR4                        Ashlock - Direct

1    then in the brackets, documents redacted.

2    Q    And do you see there's an IP address in the second column

3    from the right?

4    A    Yes.

5    Q    What IP address did Charles Briscoe use to view this

6    document?

7    A    It's 107.77.216.198.

8    Q    What is the relationship between the IP address that James

9    Wiseman used to purportedly sign the document, the IP address

10   that Donzaleigh Artis used to purportedly sign the document,

11   and the IP address that Charles Briscoe used to view the

12   document?

13   A    They're the same.

14             MR. MEAD:  Let's go back to Government Exhibit 2510A

15   in evidence, please, Mr. Ross, and go to page 6.

16   Q    And do you see those Docusign signatures on the bottom for

17   James Wiseman and Donzaleigh Artis?

18   A    I do, yes.

19   Q    Would someone just looking at the signatures on this

20   document be able to tell that the email address

21   charles@briscoesports.com was used to sign those signatures?

22             MR. DONALDSON:  Objection.  Form of the question.

23             THE COURT:  I'll allow it.  Overruled.

24             MR. MEAD:  Let me ask it again.

25             THE COURT:  Okay.

O9PJDAR4                              Ashlock - Direct

1    Q    Would someone just looking at those two Docusign signatures

2    be able to tell that the person who signed the document was

3    using the email address charles@briscoesports.com?

4    A    No, not from looking at these two signature

5    representations, no.

6    Q    All someone can see is the signatures that say James

7    Wiseman and Donzaleigh Artis, right?

8    A    Correct.

9              MR. MEAD:  No further questions.

10             THE COURT:  All right.  Cross-examination?

11             MR. DONALDSON:  Can we have a sidebar real quick,

12   please, Judge?

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1              (At sidebar)

2              THE COURT:  Yes, Mr. Donaldson?

3              MR. DONALDSON:  I'm sorry.  Good afternoon.  So I

4    don't think we have any questions for this witness, but I did

5    want to know whether or not I could take a bathroom break.

6              THE COURT:  Sure.  We can take a bathroom break.  It's

7    a little early, but we can take a bathroom break after this

8    witness.  Who is the next?

9              MR. MEAD:  Next up is Ms. Suzanne Abair.

10             MR. THOMPSON:  Would this be the afternoon break, your

11   Honor?

12             THE COURT:  That's what it would be.  How long will

13   Ms. Abair be?

14             MR. THOMPSON:  The direct from the government is about

15   15 minutes.

16             MR. MEAD:  We can release this witness, though, right?

17             THE COURT:  Correct.  I'll do that now.  Well, first,

18   just say no cross-examination, no questions.  Great.

19             (Continued on next page)

20

21

22

23

24

25

O9PJDAR4

1           (In open court; jurors present)

2           THE COURT:  Mr. Donaldson, any questions for this

3     witness?

4           MR. DONALDSON:  No, your Honor.  Thank you.

5           THE COURT:  Okay.  Thank you very much.  You may step

6     down.  Pass the documents to Mr. Mead as you pass him.  Thank

7     you.

8           (Witness excused)

9           THE COURT:  Ladies and gentlemen, Ms. Disla doesn't

10    like me doing anything with electronics because she thinks it

11    would make her job dispensable, so occasionally you may see a

12    little dispute going on over here.

13          Ladies and gentlemen, it's time for cookies, all

14    right?  So we're going to take our afternoon break now.  It's a

15    little bit early for our break, but if people need to take a

16    break afterwards that's fine.  Please go back.  We'll come get

17    you around 3:30.  Relax.  Have some cookies and maybe some

18    fruit, and we'll see you in a bit.  Remember do not discuss the

19    case with one another.  Go back and relax and we'll see you in

20    a bit.  Thank you very much.

21          (Continued on next page)

22

23

24

25

O9PJDAR4

1           (In open court; jury not present)

2           THE COURT:  Thank you.  You may be seated.

3           So let me ask is there anything that we need to take

4   up before we take the break?

5           MR. MEAD:  Not from the government.

6           MR. DONALDSON:  No, your Honor.

7           THE COURT:  Okay.  Thank you very much.  See you at

8   3:30.  Thank you very much.

9           (Recess)

10           THE COURT:  Who is going to be the next witness?

11           MR. THOMPSON:  Suzanne Abair.

12           THE COURT:  Can we get the jury or do we need to

13   discuss anything?

14           MR. THOMPSON:  Nothing from the government.

15           THE COURT:  From the defense?

16           MR. DONALDSON:  Nothing, your Honor.

17           THE COURT:  Okay.  Let's get the jury.  And what I'll

18   do is I'll ask the next witness, and you can say Ms. Abair's

19   name and we'll bring her.

20           While I have you, to the extent there's no funding, if

21   the funding doesn't go through, I'm assuming that you guys at

22   the front table are going to be essential employees and there's

23   not going to be a break in the trial, and also whoever is

24   assisting you -- it has to be by October 1, so let's hope the

25   money comes through.

O9PJDAR4

1              MR. MEAD:  This half of the table will be here at

2    least.

3              THE COURT:  There are all sorts of rules about that

4    and about how you can't -- hopefully there will be money to pay

5    you guys.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O9PJDAR4                          Abair – Direct

1              (In open court; jury present)

2              THE COURT:  Ladies and gentlemen, I hope you enjoyed

3      the cookies.

4              We're going to proceed with the trial.  The

5      government's next witness?

6              MR. THOMPSON:  The government calls Suzanne Abair.

7              THE COURT:  Okay.

8      SUZANNE ABAIR,

9          called as a witness by the Government,

10          having been duly sworn, testified as follows:

11              THE COURT:  You may inquire.

12     DIRECT EXAMINATION

13     BY MR. THOMPSON:

14     Q   Good afternoon, Ms. Abair.

15              Please describe your educational background.

16     A   I graduated from undergraduate at Ithaca college in 1987.

17     I graduated from law school in 1993 from the State University

18     of New York at Buffalo.

19     Q   Please describe your professional career after completing

20     your education.

21     A   I worked for three years between my undergraduate and

22     before going to law school.  After law school, I accepted a

23     position at a firm here in New York, then called Kronish Lieb

24     Weiner & Hellman, now Cooley.  I was there for two years.

25              In the summer of 1995, I accepted a position at the

O9PJDAR4                              Abair - Direct

law firm here in New York, Fried Frank.  I was there until the

fall of 1997.  In the fall of 1997, I relocated to Boston,

accepted a position at a firm in Boston called Mintz Levin.  I

became a partner at Mintz Levin in 2001.

         And in 2004, I left the firm to become general counsel

of one of my clients called Northland Investment Corporation.

I've been employed by Northland Investment Corporation since

2004.  In 2016, I became chief operating officer, and in 2021,

I became president.

Q    What is Northland Investment Corporation?

A    Real estate private equity firm with a core focus on the

investment, operation, and development of multifamily and mixed

use assets.

Q    What, at a high level, are your duties and responsibilities

as president and chief operating officer of Northland

Investment Corporation?

A    I oversee all aspects of the management of the company.

Q    Are you an owner or a part owner of a professional sports

team?

A    Yes.

Q    Which team is that?

A    The Atlanta Dream.

Q    Does the Atlanta Dream belong to a professional sports

league?

A    Yes.

O9PJDAR4                          Abair - Direct

1    Q    Which league?

2    A    The WNBA.

3    Q    Approximately when did you begin your efforts to become an

4    owner of the Atlanta Dream?

5    A    In January 2021.

6    Q    How did you go about purchasing the Atlanta Dream?

7    A    In January of 2021, Larry Gottesdiener, who is the founder

8    and chairman of Northland, had asked me to reach out to the

9    commissioner of the WNBA, Cathy Engelbert, to inquire as to

10   whether the team was for sale and, if so, whether there was a

11   sports broker involved with that sale.

12        Cathy Engelbert put me in touch with John Brock, who

13   was handling the sale of the team.  Had a conversation with

14   Mr. Brock who informed me that they were close to awarding the

15   team.  And I asked, if they provided us with one week to do due

16   diligence, if they would afford us that opportunity, and

17   assured them that if we submitted an LOI that we would give

18   them surety in closing, that we were -- transactions were in

19   our DNA, and that we could get a deal done quickly.

20   Q    You use the term "LOI."  What is a LOI?

21   A    Letter of intent.

22   Q    Did you submit an LOI to purchase the Atlanta Dream?

23   A    We did.

24        THE COURT:  Just to be clear, and I'm not -- I

25   apologize because earlier, counsel asked you did you purchase.

1    Now, are you personally an owner or are you speaking on behalf

2    of Northland?

3              THE WITNESS:  I am personally an owner.

4              THE COURT:  Just wanted to clarify that.  Go ahead.

5    BY MR. THOMPSON:

6    Q    And Ms. Abair, just to be clear your efforts to acquire the

7    Atlanta Dream were successful; is that right?

8    A    That's correct.

9    Q    When was the acquisition of the Atlanta Dream by you and

10   your co-owners made public?

11   A    February 26, 2021.

12   Q    And when did the transaction to purchase the Atlanta Dream

13   close?

14   A    March 4, 2021.

15   Q    After this deal closed, who became the owners of the

16   Atlanta Dream?

17   A    Larry Gottesdiener, myself, and Renee Montgomery.

18   Q    And you told us who Larry Gottesdiener is.  Who is Renee

19   Montgomery?

20   A    A former WNBA player.

21   Q    From whom did you, Mr. Gottesdiener, and Ms. Montgomery

22   purchase the Atlanta Dream?

23   A    From Senator Kelly Loeffler and her partner Mary Brock.

24   Q    Between the time that you began your efforts to buy the

25   team and the time that you and your partners officially became

O9PJDAR4                              Abair - Direct

1   owners of the team in March 2021, did you discuss with any

2   other individuals or entities sharing ownership of the team?

3   A   No.

4   Q   Would you have been aware if there were conversations

5   taking place between January 2021 and March 2021 about other

6   individuals or entities acquiring a portion of the Atlanta

7   Dream from you and your co-owners?

8   A   Yes.

9   Q   Since you and your co-owners became the owners of the

10  Atlanta Dream, has anyone or any other entity owned any part of

11  the team?

12  A   No.

13  Q   Since you and your co-owners became the owners of the

14  Atlanta Dream, have you and your co-owners been the 100 percent

15  owners of the team?

16  A   Yes.

17  Q   Since you became an owner of the Atlanta Dream, have you

18  engaged with anyone or any entity about selling the entirety or

19  a portion of the team?

20  A   No.

21  Q   To your knowledge, has either of your co-owners engaged

22  with anyone or any entity about selling the entirety or a

23  portion of the team?

24  A   No.

25  Q   Do you know someone named Calvin Darden, Jr.?

1    A    No.

2    Q    Have you ever communicated with someone named Calvin

3    Darden, Jr.?

4    A    No.

5    Q    Do you know someone named Charles Briscoe?

6    A    No.

7    Q    Have you ever communicated with someone named Charles

8    Briscoe?

9    A    No.

10    Q    Do you know someone named Calvin Darden, Sr.?

11    A    No.

12    Q    Have you ever communicated someone named Calvin Darden,

13    Sr.?

14    A    No.

15    Q    Do you know someone named Shirley Franklin?

16    A    No.

17    Q    Have you ever communicated with someone named Shirley

18    Franklin?

19    A    No.

20    Q    Do you know who Dwight Howard is?

21    A    Yes.

22    Q    Who is he?

23    A    A former NBA player.

24    Q    Have you ever communicated with him?

25    A    No.

O9PJDAR4                        Abair - Direct

1              MR. THOMPSON:  Mr. Ross can you please publish

2      Government Exhibit 2413 which is in evidence.  And can you

3      please scroll to the second page.  Can you please zoom in.

4      Q    Before preparing to testify in this trial, had you ever

5      seen Government Exhibit 2413?

6      A    No.

7      Q    What is the title of the head of this document?

8      A    Letter of intent.

9      Q    The first paragraph reads, This letter of intent is signed

10     as of February 15, 2021 by and between Darden Sports Group,

11     Calvin Darden, Sr, and Shirley Franklin, purchasers, and Dream

12     Too LLC and Lawrence Gottesdiener, sellers.

13              What is Dream Too LLC?

14     A    That is the entity that owns the Atlanta Dream.

15     Q    As of February 15, 2021, the date of this letter of intent,

16     were you a member of Dream Too LLC?

17     A    No.

18     Q    The first two sentences under section two, proposed terms,

19     say, Dream Too LLC, seller, owns the WNBA team Atlanta Dream,

20     the purchased business, which plays in the city of Atlanta,

21     Georgia.  Seller is seeking to sell nine percent of its assets

22     to purchasers, along with the option for purchasers to increase

23     their ownership stake 51 percent after the conclusion of the

24     2023 season and prior to the beginning of the 2024 season for

25     no additional financial consideration.

1           Did you engage in discussions with anyone about

2   selling some portion of the Atlanta Dream to Darden Sports

3   Group, Calvin Darden, Sr., and Shirley Franklin?

4   A    No.

5   Q    To your knowledge, did Mr. Gottesdiener engage at any point

6   in discussion about selling some portion of the Atlanta Dream

7   to Darden Sports Group, Calvin Darden, Sr., and Shirley

8   Franklin?

9   A    No.

10  Q    To your knowledge, did Renee Montgomery engage at any point

11  in discussion about selling some portion of the Atlanta Dream

12  to Darden Sports Group, Calvin Darden, Sr., and Shirley

13  Franklin?

14  A    No.

15           MR. THOMPSON:  Your Honor, may I have a moment?

16           THE COURT:  Yes.

17  BY MR. THOMPSON:

18  Q    Ms. Abair, does Dwight Howard own the Atlanta Dream?

19  A    No.

20  Q    Does he own any portion of the Atlanta Dream?

21  A    No.

22           MR. THOMPSON:  Nothing further, your Honor.

23           THE COURT:  Okay.  Cross-examination?

24  CROSS-EXAMINATION

25  BY MR. DONALDSON:

O9PJDAR4                          Abair - Cross

1    Q   Good afternoon.

2    A   Good afternoon.

3    Q   You mentioned when you first began direct testimony that

4    you were informed that there was another group that was close

5    to closing when you began your conversation with Mr. Brock.

6    A   That's not exactly what I said.

7    Q   Tell me exactly what you said.

8    A   I said that Mr. Brock said there were other groups who were

9    interested in acquiring the team, and they were close to

10   awarding, not closing.

11   Q   So Mr. Brock told you there was another team or teams that

12   they were close to awarding?

13   A   He said there were other groups who were interested in

14   acquiring the team, and that they were close to awarding.

15   Therefore, we needed to move quickly if we were going to

16   acquire the team.

17   Q   Close to awarding what?

18   A   Awarding the deal.  It's a term we use, awarding the deal,

19   awarding the acquisition.

20   Q   So Mr. Brock told you they were close to awarding the

21   acquisition of the Dream to another group when you began your

22   conversations with him; is that correct?

23   A   Yes.

24   Q   And when did you begin your conversations with him?

25   A   Mid-January of 2021.

O9PJDAR4                         Abair - Cross

1    Q   Okay.  When did you close on it?

2    A   March 4, 2021.

3    Q   And what was the purchase price at that point?

4    A   That's not public information.

5    Q   Okay.  How much did you -- how much -- is it Northland?

6    A   It's not Northland.  The owners are Larry Gottesdiener,

7    myself, and Renee Montgomery.

8    Q   How much did you three pay for the acquisition or the

9    ownership of the Dream?

10   A   Again, it's not public information.

11   Q   Did you pay more than $17 million for the acquisition of

12   the Dream?

13              THE COURT:  Well, let me see counsel at sidebar.

14              (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

O9PJDAR4                           Abair - Cross

1           (At sidebar)

2           THE COURT:  So I thought there was some testimony

3     about the price.  Was there anything in the documents that show

4     the actual price that was paid for the team?

5           MR. DONALDSON:  There is information in the documents

6     that relate to $7 million for it, $10 million for assuming

7     debt.  Then there is information that they purchased the -- I

8     think the debt for practically the whole WNBA to -- in order to

9     close the deal for the Dream.  So it may very well be that

10    $7 million plus the $10 million debt for the Dream plus

11    whatever the debt was for every other WNBA team at that time.

12          THE COURT:  But let me ask would the documents in

13    question, are they under protective order?  In other words, why

14    can't you just show the witness those documents?  In other

15    words, you're asking because -- certainly the information, it

16    sounds like the division of how much each of them may have

17    contributed and the actual details, it doesn't -- so for

18    example, is the purchase agreement part of the documents you're

19    referring to?

20          MR. DONALDSON:  I don't want to say definitively that

21    I could call the actual purchase agreement from each individual

22    related to the purchase of the dream, Judge.

23          THE COURT:  I guess what I'm trying to figure out

24    is -- because it doesn't seem like this is -- I don't know if

25    it's an insurmountable issue.  But let me hear from the

O9PJDAR4                        Abair - Cross

1   government with regard to the purchase and sale or a purchase

2   and sale agreement or multiple ones part of the record in this

3   case?

4              MR. THOMPSON:  No, I don't believe so.

5              MR. MEAD:  I'm not aware of ever seeing the ultimate

6   purchase agreement.

7              MR. THOMPSON:  Nor I.

8              MR. MEAD:  I do know that Mr. Brock testified as to

9   the purchase price of $7 million and as to the assumption of

10  debt of $10 million.  So that fact is certainly at least now in

11  the public record.  I'm not aware of any details beyond that

12  about the purchase, and I'm not aware of ever seeing a document

13  showing that in this case.

14             THE COURT:  Okay.  So --

15             MR. RICCO:  Judge, I've taken a look at the WNBA

16  protocols, and I've taken a look at the -- and I don't see

17  anything in those protocols that says that these documents are

18  like some type of privileged documents.  Because we certainly

19  had testimony about the letters of intent that were sent to

20  them, and there are other documents that are there about the

21  transactions.  So the fact that -- we don't want the details

22  of, like, how much each person paid, but the purchase price

23  itself, is that something that this witness is able to agree to

24  that says that that's protected information?

25             THE COURT:  Well, I guess the question is if there are

O9PJDAR4                          Abair - Cross

1    things that are already in the record, in other words, there's

2    been testimony about the purchase price of $7 million -- and I

3    would allow a hypothetical question that if -- you could even

4    say Mr. Brock testified that there was the purchase price of

5    around $7 million.

6              MR. RICCO:  Would that be accurate?

7              THE COURT:  Or would you disagree or whatever it may

8    be?

9              But if there are other documents or any in the record

10   like the LOI that was entered, you could show the witness that.

11   But what may not be in there -- and I appreciate what you're

12   saying, Mr. Ricco, about what the WNBA things say, but is there

13   anything there about exactly what was paid?

14             MR. RICCO:  So Judge, I mean, the WNBA very well may

15   have made some exemption for this group at that time, but we

16   don't know that because we have other LOIs, but we don't have

17   this group's LOI.

18             MR. DONALDSON:  That's correct.

19             MR. RICCO:  So if, in fact, the WNBA made an exception

20   for them, fine.  We can live with that.  But somebody has to

21   explain to us why we have all this other information about all

22   the other bidders and we don't have none.  But if that's the

23   record as to what it is, then that's what it is.

24             THE COURT:  Again, I don't know the discovery that's

25   been produced in this case.  I know there's been testimony from

O9PJDAR4                          Abair - Cross

1  Mr. Brock, but I've got no idea what the contours of the deal

2  were.

3          MR. DONALDSON:  My questions were directly related to,

4  one, what Brock testified, that's now a record.  So that's not

5  a secret, and it's not private, it's not whatever.  So those

6  numbers are out there.  We do have information that they may

7  have received not only that, but other debts to get the team,

8  which we think is relevant to this case.

9          And we don't have the letters of intent from their

10 particular contractual -- between -- the relationship between

11 Dream and their group, we don't have those, but I don't think

12 and I haven't seen or heard of anything that would preclude

13 this witness from answering the question related to how much

14 they paid for the acquisition of the Dream, since its a

15 relevant topic in this case and a relevant issue in this case.

16         THE COURT:  My answer is I have no idea if there's a

17 confidentiality agreement, and I have no idea who would be part

18 of that and whether or not even before she would testify, she

19 would need to get permission from the other people.  I just

20 don't know.

21         MR. RICCO:  And Judge, it very well may be that the

22 WNBA struck a separate deal with Northland because at the time

23 this --

24         THE COURT:  Although remember --

25         MR. RICCO:  Not Northland, the ultimate buyers.

O9PJDAR4                          Abair - Cross

1    Because at the time that the sale took place, the league was in

2    a financial difficulty.  And I think one of the things that

3    these purchasers offered for them was instant financial

4    security.  And if that's true, Judge, at the end of the day,

5    it's just really background information.

6              THE COURT:  Well, again, I can't --

7              MR. RICCO:  Well, I have some suggestions.

8              THE COURT:  I think there's a way around this.

9              MR. DONALDSON:  I think I'm fine with getting the

10    questions out or the answers out based upon what's happening

11    here at the bench.  If the answers don't come out the way I

12    want them to come out, I'll move on.  I don't have to belabor

13    the point too much.

14              THE COURT:  And then figure out if there's stuff

15    within the record that that clarified.

16              (Continued on next page)

17

18

19

20

21

22

23

24

25

O9PJDAR4                          Abair - Cross

1              (In open court; jurors present)

2              THE COURT:  Mr. Donaldson, you may proceed.

3    BY MR. DONALDSON:

4    Q   If I were to tell you that Mr. Brock testified that he --

5    the Dream sold the Dream to you and your partners for

6    $7 million, would that be correct?

7              THE COURT:  You can answer that question.

8    A   It's not an accurate statement.

9    Q   If I were to say that Mr. Brock testified that you and your

10   group assumed a $10 million debt for the Dream as part of the

11   purchase of the Dream, would that be correct?

12   A   Yes.  But that goes into transaction value.  So if you're

13   asking me what was the transaction value, we -- just to be

14   clear, transaction value includes what you pay in cash and the

15   assumption of debt.

16   Q   What was the transaction value for the purchase of the

17   Dream for your partners?

18   A   $6.7 million cash and the assumption of at least

19   $10 million of debt.

20   Q   You say at least $10 million in debt.  Was there an

21   assumption of more debt than the $10 million?

22   A   I don't recall the exact number, but I believe it was

23   approximately $10 million of debt.

24   Q   Did you and your two other partners have to assume any

25   other debt related to the purchase of the Dream?

1    A    No.

2              MR. DONALDSON:  No further questions.

3              THE COURT:  Okay.  Any redirect?

4              MR. THOMPSON:  One moment, your Honor.

5              THE COURT:  Sure.

6              MR. THOMPSON:  No redirect, your Honor.

7              THE COURT:  Thank you, Ms. Abair.  You may step down.

8              (Witness excused)

9              THE COURT:  Okay.  The government's next witness.

10             MR. THOMPSON:  Yes, your Honor.  The government calls

11   Jennifer Baltimore.

12             THE COURT:  Okay.

13   JENNIFER BALTIMORE,

14        called as a witness by the Government,

15        having been duly sworn, testified as follows:

16             THE COURT:  You may inquire.

17   DIRECT EXAMINATION

18   BY MR. THOMPSON:

19   Q    Good afternoon, Ms. Baltimore.

20   A    Good afternoon.

21   Q    Please describe your educational background.

22   A    I did my undergraduate studies at the

23   University of Pennsylvania where I majored in economics,

24   minored in French.  And then I continued my professional

25   studies at Duke University School of Law, where I obtained my

O9PJDAR4                          Baltimore – Direct

1   juris doctorate in 1992.

2   Q   After finishing law school, did you practice law?

3   A   I did.

4   Q   For how long have you been practicing law?

5   A   I've practiced law for over 30 years.

6   Q   At a high level, what kind of law have you generally

7   practiced?

8   A   Primarily entertainment law and media law.

9   Q   For what organizations have you worked over your career?

10  A   Worked for organizations like Universal Music Group, AOL,

11  Lincoln Center for the Performing Arts, Verizon Hearst Media

12  Partners.

13  Q   Do you know an individual names Calvin Darden, Jr.?

14  A   I do.

15  Q   When did you first meet him?

16  A   We met in the early 2000s.

17  Q   Please describe for us briefly the nature of your

18  relationship with him since then.

19  A   We have been friends off and on.  I once considered him one

20  of my closest friends.

21          MR. THOMPSON:  Mr. Ross, can you please publish for

22  the witness and for counsel what's been marked for

23  identification purposes at Government Exhibit 3001.  And if

24  could you actually zoom in toward the top of that document,

25  please.

1   Q   Do you recognize this document marked as Government

2   Exhibit 3001?

3   A   I do.

4   Q   What is it?

5   A   It's an email.

6   Q   Are you on this email?

7   A   I am.

8          MR. THOMPSON:  Your Honor, the government offers

9   Government Exhibit 3001.

10         THE COURT:  Any objection?

11         MR. DONALDSON:  No, your Honor.

12         THE COURT:  The Government Exhibit 3001 is admitted in

13   evidence, and it can be published to the jury.

14         (Government's Exhibit 3001 received in evidence)

15         MR. THOMPSON:  Thank you.  Please publish.

16   Q   What email is listed next to the "from" line on this email?

17   A   Calvin@dardenenterprises.com.

18   Q   What name is listed next to the email address

19   calvin@dardenenterprises.com?

20   A   Calvin Darden.

21   Q   Whose name is listed next to the "to" line on this email?

22   A   My name, Jennifer Baltimore.

23   Q   Who sent you this email?

24   A   Calvin Darden.

25   Q   Did the individual who you understood to have sent you this

O9PJDAR4                        Baltimore - Direct

1   email have a middle name?

2   A   Yes.  Romero.

3   Q   And in what decade was the individual who you understand to

4   have sent you this email born?

5   A   The 1970s.

6           MR. THOMPSON:  Okay.  Can you take down this exhibit,

7   Mr. Ross, and can you please publish for counsel and the

8   witness what's been marked for identification purposes as

9   Government Exhibit 3002.  And again, please zoom towards the

10  top.

11  Q   Do you recognize this document?

12  A   I do.

13  Q   What is it?

14  A   It's an email.

15  Q   Are you on this email?

16  A   I am.

17          MR. THOMPSON:  Your Honor, the government offers

18  Government Exhibit 3002.

19          THE COURT:  Any objection?

20          MR. DONALDSON:  One second, Judge.

21          THE COURT:  All right.

22          MR. DONALDSON:  No objection.

23          THE COURT:  Okay.  Government Exhibit 3002 is admitted

24  in evidence and may be published to the jury.

25          (Government's Exhibit 3002 received in evidence)

O9PJDAR4                     Baltimore – Direct

1          MR. THOMPSON:  Please publish for the jury.

2     Q   What email is listed next to the "from" line on this email?

3     A   Calvin@dardenenterprises.com.

4     Q   What name is listed next to the email address

5     calvin@dardenenterprises.com?

6     A   Calvin Darden.

7     Q   What address is listed next to the "to" line on this email?

8     A   1jenniferbaltimore@gmail.com.

9     Q   Whose email address is that?

10    A   That's my personal email.

11    Q   Did you receive this email?

12    A   I did.

13    Q   Who sent you this email?

14    A   Calvin Darden.

15    Q   And does the individual who you understand to have sent you

16    this email have a middle name?

17    A   Yes, Romero.

18    Q   In what decade was the individual who you understand to

19    have sent you this email born?

20    A   1970s.

21         MR. THOMPSON:  Please take down this exhibit,

22    Mr. Ross.

23    Q   Did you text with Calvin Darden, Jr.?

24    A   I did.

25         MR. THOMPSON:  Mr. Ross, could you please publish for

O9PJDAR4                     Baltimore - Direct

1    counsel and the witness what's been marked for identification

2    purposes as Government Exhibit 3003.

3    Q    Do you recognize the document that's been marked as

4    Government Exhibit 3003?

5    A    I do.

6    Q    What is it?

7    A    It's a screenshot of my contact for Calvin Darden.

8    Q    And is it a screenshot from your phone?

9    A    From my cell phone, yes.

10   Q    Did you take it?

11   A    I did.

12          MR. THOMPSON:  Your Honor, the government offers

13   Government Exhibit 3003.

14          THE COURT:  Any objection?

15          MR. DONALDSON:  No.

16          THE COURT:  Government Exhibit 3003 is admitted in

17   evidence.

18          (Government's Exhibit 3003 received in evidence)

19          THE COURT:  And can be published to the jury.

20          MR. THOMPSON:  Please publish it.

21   Q    So again, Ms. Baltimore, what is Government Exhibit 3003?

22   A    This is a screenshot of Calvin's -- Calvin Darden's contact

23   information in my cell phone.

24          (Continued on next page)

25

O9PBDAR5                    Baltimore - Direct

1    BY MR. THOMPSON:

2    Q.  Are there phone numbers listed here for Calvin Darden, Jr.?

3    A.  There are two.

4    Q.  What phone numbers are listed?

5    A.  347-850-5686 and the other is 917-714-1420.

6    Q.  Did you text with Calvin Darden, Jr., using the phone

7    number 347-850-5686?

8    A.  I did.

9    Q.  Is there an email address listed for Calvin Darden, Jr.?

10   A.  The email listed is Darden.CalvinR@gmail.com.

11           MR. THOMPSON:  Mr. Ross, can you please scroll to the

12   next page.

13   Q.  Is there an address listed for Calvin Darden, Jr.?

14   A.  There is.

15   Q.  What address is listed?

16   A.  45 Waterview Court, Staten island, New York 10305.

17           MR. THOMPSON:  You can take down that exhibit,

18   Mr. Ross.  Thank you.

19   Q.  Did you and Calvin Darden, Jr., discuss your serving on an

20   advisory board for the Atlanta Dream?

21   A.  We did.

22   Q.  Approximately when did you discuss that with Calvin Darden,

23   Jr.?

24   A.  I believe that was 2019.

25   Q.  What did he say to you and what did you say to him?

O9PBDAR5                         Baltimore - Direct

A.  He shared that he was attempting to acquire the WNBA team

the Atlanta Dream and that he wanted to assemble a board of

women and he knew that I was interested in serving on a board.

I had identified that as the next step in my career.  So he

asked if I would be interested.  And I said I was, and thanked

him for considering me.

Q.  At any point during those discussions did you agree to be

on the advisory board?

A.  I did not agree.  I shared with him that I needed to --

because I was under an exclusive employment agreement with

Universal Music Group, that I would have to go to the conflicts

committee to have any kind of activity that wasn't Universal

Music Group related.  I would need to have that waived by the

conflicts committee, and that I need to do that first.

Q.  Did you share that with Calvin Darden, Jr.?

A.  I did.

Q.  And did you answer his question as to whether you would

serve on the board?

A.  I followed up maybe a day or two later that I wasn't going

to be able to do it.  And the reason being is that I had

already requested -- I had already requested a waiver of two

other projects which were not approved; and so I just thought

that this would likely not be approved as well just given this

background.

            MR. THOMPSON:  Mr. Ross, could you please publish

O9PBDAR5                          Baltimore – Direct

1    Government Exhibit 2119A which is in evidence.

2    Q.  Can you please read the text on the first page of this

3    document?

4    A.  Atlanta Dream.

5          MR. THOMPSON:  Mr. Ross, could you please scroll

6    slowly.

7    Q.  Before preparing for your testimony in this trial, had you

8    ever seen this document?

9    A.  No.

10         MR. DONALDSON:  Your Honor, excuse me.  May we

11   approach, please?

12         THE COURT:  Okay.

13         (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

O9PBDAR5                         Baltimore - Direct

1          (At the sidebar)

2          THE COURT:  Yes, Mr. Donaldson.

3          MR. DONALDSON:  I'm sorry to ask to approach.  I think

4    the last answer to the question before this last question I

5    wanted to move to strike the last part of that response.

6          THE COURT:  One second.

7          MR. DONALDSON:  As non-responsive.

8          THE COURT:  You're saying it was non-responsive to the

9    question?

10         MR. DONALDSON:  Yes, the last part.  Maybe I missed it

11   or misheard.  I thought she said that after whatever she had to

12   check and based upon his background.

13         THE COURT:  No, I think -- what's in the record is

14   based on the circumstances -- and I think I checked cause I

15   thought I heard something different and I went and I looked.

16   And it says circumstances, and I think it was referencing the

17   two times that she had made inquiry and had been rejected.

18         MR. DONALDSON:  Okay.  I thought it said something

19   about the background.

20         MR. RICCO:  And we agree.

21         THE COURT:  Thank you.

22         (Continued on next page)

23

24

25

O9PBDAR5                          Baltimore - Direct

1              (In open court)

2              THE COURT:  Okay.  You may continue.

3              MR. THOMPSON:  Thank you, your Honor.

4    BY MR. THOMPSON:

5    Q.  Ms. Baltimore, before preparing for your testimony in this

6    trial had you ever seen this document Government Exhibit 2119A?

7    A.  No.

8              MR. THOMPSON:  Mr. Ross, could you please scroll to

9    page two of this document.

10   Q.  Do you see a logo at the top of this page?

11   A.  I do.

12   Q.  Can you please read what the logo says?

13   A.  Darden Sports Group.

14             MR. THOMPSON:  Mr. Ross, could you please advance to

15   page six.

16   Q.  Page six says advisory board.  Darden Sports Group has

17   assembled a world-class advisory board comprised on superstar

18   leaders --

19             THE COURT:  Just a little slower.

20             MR. THOMPSON:  I'm sorry, your Honor.

21             THE COURT:  That's all right.

22             MR. THOMPSON:  Afternoon coffee.

23             THE COURT:  You have to cut that coffee out.  I'm

24   sorry. Go ahead.

25   BY MR. THOMPSON:

O9PBDAR5                    Baltimore - Direct

```
 1   Q.  Darden Sports Group has assembled a world-class advisory
 2   board comprised of superstar leaders within the areas of music,
 3   television, film, professional sports, business and community.
 4   Each board member has committed to using their ideas, voices,
 5   platforms, resources, relationships and influence to support
 6   the Atlanta Dream and its various initiatives.
 7            Did I read that correctly?
 8   A.  Yes.
 9   Q.  Do you see a photograph of yourself on this slide?
10   A.  I do.
11   Q.  Do you see your name?
12   A.  I do.
13   Q.  Did you give Calvin Darden, Jr., permission to use your
14   name in this document?
15   A.  No.
16   Q.  Did you give Calvin Darden, Jr., permission to use your
17   image in this document?
18   A.  No.
19   Q.  Did you give anyone permission to use your name in this
20   document?
21   A.  No.
22   Q.  Did you give anyone permission to use your image in this
23   document?
24   A.  No.
25   Q.  Have you seen this photograph of yourself in other
```

O9PBDAR5                    Baltimore - Direct

1   contexts?

2   A.  Yes, this is the photograph from my LinkedIn profile.

3   Q.  Is this photograph of you available online?

4   A.  It is.

5   Q.  Did you at any point agree to serve on this advisory board?

6   A.  No.

7          MR. THOMPSON:  Mr. Ross, you can take down this

8   exhibit, please.  And can you please publish 2144A which is in

9   evidence.

10  Q.  What does the text on this slide say?

11  A.  Atlanta Dream.

12         MR. THOMPSON:  Now, Mr. Ross, can you please scroll

13  slowly through Government Exhibit 2144A.

14  Q.  Before preparing for your testimony in this trial, had you

15  ever seen this document?

16  A.  No.

17         MR. THOMPSON:  Mr. Ross, can you stop and please go

18  back to page two.

19  Q.  What does the logo at the top of this slide say?

20  A.  Darden Sports Group.

21  Q.  Ms. Baltimore, can you please read the first paragraph

22  that's under the logo.

23  A.  Darden Sports Group, DSG, led by prominent Atlanta

24  businessman Calvin Darden, Sr. is proud to have an opportunity

25  to become the next owner of the WNBA's Atlanta Dream.  In

O9PBDAR5                        Baltimore - Direct

addition to Mr. Darden, DSG's ownership ranks are comprised of

former Atlanta mayor and businesswoman Shirley Franklin, and

one of the entertainment industries most powerful women

Jennifer Baltimore.

Q.  Were you ever an owner of the Darden Sports Group?

A.  I was not.

Q.  Were you ever involved with the Darden Sports Group?

A.  No.

Q.  Did you ever tell Calvin Darden, Jr., that you agreed to

join or otherwise be involved with the Darden Sports Group?

A.  No.

        MR. THOMPSON:  Mr. Ross, could you please advance to

slide six.

Q.  Do you see a photo of yourself on this slide?

A.  I do.

Q.  Is this photo of you available online?

A.  It is.

Q.  Do you see your name on this slide?

A.  I do.

Q.  This slide says, Jennifer Baltimore, as senior vice

president of business and legal affairs, Jennifer is charged

with creating new businesses and opportunities for the world's

largest record company, Universal Music Group.  Jennifer

focuses on the company's film and television initiatives.  And

since 2013, she oversees all global brand partnerships, sales,

O9PBDAR5                    Baltimore - Direct

1    live events, label merchandising, college marketing and fan and

2    consumer engagement.

3         Furthermore, she directs UMG's executive management

4    board and global projects that leverage the company's diverse

5    artist roster and catalogs.  Baltimore joined UMG and after a

6    decade of working in the digital arena with AOL/Verizon, Hearst

7    and Fox Interactive media.  She serves on the board of

8    directors for corporate counsel women of color and on the board

9    of trustees for Duke Law School.  Billboard Magazine ranks

10   Jennifer as one of the most powerful women in music.  Baltimore

11   received her BA in economics from University of Pennsylvania,

12   and her J.D. from Duke University School of Law.  Did I read

13   that correctly?

14   A.  You did.

15   Q.  Is this an overview of your professional background?

16   A.  Mostly.

17   Q.  Did you give Calvin Darden, Jr., permission to use your

18   name in this document in this way?

19   A.  No.

20   Q.  Did you give Calvin Darden, Jr., permission to use your

21   image in this document in this way?

22   A.  No.

23   Q.  Did you give anyone permission to use your name in this

24   document in this way?

25   A.  No.

```
O9PBDAR5                    Baltimore - Direct
```

 1              MR. THOMPSON:  Please advance to slide eight,

 2    Mr. Ross.

 3    Q.  This slide says advisory board.  Do you see a photograph of

 4    yourself on this slide?

 5    A.  Yes, it's the first photograph.

 6    Q.  And is this the same image of you that was included in the

 7    first version of this document that we just looked at?

 8    A.  Yes.

 9    Q.  Do you see your name on this slide?

10    A.  I do.

11    Q.  Did you give Calvin Darden, Jr., permission to use your

12    name in this document?

13    A.  No.

14    Q.  Did you give Calvin Darden, Jr., permission to use your

15    image in this document?

16    A.  No.

17    Q.  Did you give anyone permission to use your name in this

18    document?

19    A.  I did not.

20    Q.  Did you give anyone permission to use your -- excuse me.

21    Did you at any time agree to serve on this advisory board?

22    A.  I did not.

23              MR. THOMPSON:  Your Honor, if I could have one moment.

24              THE COURT:  You may.

25              MR. THOMPSON:  Nothing further, your Honor.

1           THE COURT:  Cross-examination.

2           MR. DONALDSON:  One second, Judge.

3           THE COURT:  Yes.

4   CROSS-EXAMINATION

5   BY MR. DONALDSON:

6   Q.  Good afternoon, Ms. Baltimore.

7   A.  Good afternoon.

8   Q.  So how long have you known Mr. Darden?

9   A.  Since I believe the early 2000s.

10  Q.  And I believe the prosecutor ask you whether you text

11  Mr. Darden and you said yes.  It's fair to say you text him a

12  lot?

13  A.  Yes, we text frequently.

14  Q.  And by frequently -- well, around 2019-20, frequently would

15  mean almost everyday, correct?

16  A.  Often times it could be several times a day, maybe not

17  everyday, but we would text frequently within a week.

18  Q.  And these text between you and Mr. Darden -- strike that.

19          Not only did you text Mr. Darden, but you would also

20  call Mr. Darden sometimes in the morning related to ideas,

21  correct?

22  A.  No.  Generally he would call me in the morning because I

23  was California-base, and he was on the East Coast, but he would

24  call me usually.

25  Q.  It would be fair to say that you have asked Mr. Darden

1    his -- well, asked Mr. Darden for his opinion on ideas that you

2    may have had, correct?

3    A.   Perhaps, but I don't recall.

4    Q.   Do you know a person named Nikki Chu?

5    A.   Yes.

6    Q.   Who is Nikki Chu?

7    A.   Nikki Chu is a designer, interior designer, and a friend of

8    mine.

9    Q.   And you're aware of I think it's called Nudies Disposal?

10   Do you know what that is?

11   A.   Yes.

12   Q.   What is that?

13   A.   That was a company that she created with disposal

14   underwear.

15   Q.   And I believe she asked you if you wanted to partner with

16   her on that, correct?

17   A.   No, she had a partner.  I wasn't a partner with her.

18   Q.   You asked Mr. Darden whether he thought that was a good

19   idea, correct?

20   A.   No.  He was looking to invest in different businesses, and

21   she was looking for funding.  And so I had asked if that might

22   be something he would be interested in, but I was not part of

23   Nudies.

24   Q.   So you contacted Mr. Darden and asked him if he would be

25   interested in investing in a fund or investing in your friend's

1    company?

2    A.  I likely mentioned to him that there was an opportunity

3    because he often called me -- but, regardless, yes.  There was

4    a discussion if he would be interested in Nudies.

5            MR. DONALDSON:  One second, Judge.  No further

6    questions, Judge.

7            THE COURT:  Any redirect?

8            MR. THOMPSON:  No, your Honor.

9            THE COURT:  Thank you, Ms. Baltimore.  You may step

10   down.

11           THE WITNESS:  Thank you.

12           (Witness excused)

13           THE COURT:  Okay.  The government's next witness.

14           MR. MEAD:  The government calls Justine Atwood.

15   JUSTINE ATWOOD,

16       called as a witness by the Government,

17       having been duly sworn, testified as follows:

18           THE COURT:  You may be seated.  And I'd ask if you

19   could please state your name and spell it for the record.

20           THE WITNESS:  J-U-S-T-I-N-E, A-T-W-O-O-D.

21           THE COURT:  You may inquire.

22           MR. MEAD:  Thank you, your Honor.  Just one second

23   with defense counsel.

24           THE COURT:  Sure.

25           MR. MEAD:  My apologies.

O9PBDAR5                         Atwood— Direct

1    DIRECT EXAMINATION

2    BY MR. MEAD:

3    Q.  Good afternoon, Special Agent Atwood.

4    A.  Good afternoon.

5    Q.  Where do you work?

6    A.  The FBI.

7    Q.  And what is your job title at the FBI?

8    A.  I'm a special agent.

9    Q.  Do you work in a particular -- well, what's a field office

10   at the FBI?

11   A.  It would be a city, so I work at field New York.

12   Q.  Could you just talk a tiny bit slower. I think the court

13   reporter was about to say the exact same thing, maybe more than

14   a tiny bit slower.

15            THE COURT:  Yes.

16   Q.  Which FBI field office do you work at?

17   A.  New York.

18   Q.  Do you currently work for a particular squad or unit in the

19   New York FBI field office?

20   A.  I do.  I work for the child exploitation and human

21   trafficking task force.

22   Q.  And generally speaking, what do you do on that task force?

23   A.  We deal with child exploitation, child pornography,

24   sextortions, sex trafficking.

25   Q.  Going back to March of 2023, what field office were you

1    working in at that time?

2    A.  New York.

3    Q.  And were you working in the squad you just described in

4    March of 2023 or in a different squad?

5    A.  I was on a different squad.

6    Q.  Just slow down a little bit more, please, Special Agent

7    Atwood.  My apologies.

8            Which squad were you on in March of 2023?

9    A.  I was on the financial institution squad.

10   Q.  Very generally, what kind of work does that squad do?

11   A.  Bank fraud, loan fraud, wire fraud.

12   Q.  Directing your attention to March of 2023, did you

13   participate in an arrest of someone named Charles Briscoe that

14   month?

15   A.  Yes.

16   Q.  Do you recall what state you did that arrest in?

17   A.  Texas.

18   Q.  Do you know what it means to be the case agent on a case?

19   A.  Yes.

20   Q.  What does it mean to be the case agent?

21   A.  You're the lead agent on that case.  You lead the

22   investigation.

23   Q.  Were you the case agent on that case?

24   A.  I was not.

25   Q.  Were you just helping out at that?

O9PBDAR5                        Atwood- Direct

1    A.  Yes.

2    Q.  Did you seize anything from -- well, was a search warrant

3    also executed that day?

4    A.  Yes.

5    Q.  On Charles Briscoe?

6    A.  Yes.

7    Q.  Did you seize anything from Charles Briscoe in connection

8    with that search and arrest in March of 2023?

9    A.  Yes, we seized electronic devices.

10   Q.  And very generally what kind of electronic devices did you

11   seize that day?

12   A.  Cell phones.

13   Q.  Do you know what a serial number on a cell phone is?

14   A.  It's the specific number tied to that phone.

15   Q.  Is it like a specific number tied to like a physical phone?

16   A.  Yes.

17   Q.  Is it unique to each specific piece of cell phone?

18   A.  Yes.

19   Q.  Off the top of your head as you sit here today, can you

20   remember the serial numbers of the cell phones that you seized

21   from Charles Briscoe?

22   A.  I cannot.

23             THE COURT:  I would have been impressed if you could.

24             MR. MEAD:  I would have been too, your Honor.

25             THE COURT:  Although -- never mind.  I was going to

1    digress and Ms. Disla would have been very upset, so you can

2    continue your examination.  I'll tell the story later on to my

3    staff.

4               MR. MEAD:  Mr. Ross, if you could pull up please not

5    for the jury Government Exhibit 491.

6    Q.  Do you recognize this document?

7    A.  Yes.

8    Q.  And who wrote this document?

9    A.  I did.

10   Q.  Is it connected to the search and arrest of Charles

11   Briscoe?

12   A.  Yes.

13   Q.  Approximately how long after the arrest and search did you

14   write this document?

15   A.  It was the next day.

16   Q.  Does this document accurately reflect your knowledge of the

17   arrest and the documents you seized at the time that you wrote

18   this document?

19   A.  Yes.

20   Q.  Do you see under item type it says item type 1B general?

21   A.  Yes.

22   Q.  Can you read the five lines underneath it under

23   description?

24   A.  It's gray iPhone 13 Pro Max.

25   Q.  Keep going.

O9PBDAR5                           Atwood- Direct

1    A.  Serial number is -- do you want me to read the whole

2    serial?

3    Q.  Yes, please.

4    A.  It's F5DQQ617K, collected on March 23, 2023 at 7 a.m.  The

5    seizing individual is Michael T. Whitmore, and it was located

6    by myself.

7    Q.  Serial numbers are a very random string of numbers and

8    letters, right?

9    A.  Yes.

10   Q.  Is it conceivably possible that you may have gotten the

11   serial number wrong by a digit when you wrote it down?

12   A.  Possibly.

13   Q.  What did you do with the phones that you seized from

14   Charles Briscoe after you seized them from him?

15   A.  They were taken to the lab down in Katy, Texas.

16   Q.  Do you remember -- well, what is the lab in Katy, Texas?

17   A.  It's a computer forensics lab in our office down there.

18   Q.  Do you remember off the top of your head who you gave the

19   cell phones to?

20   A.  I do not.

21             MR. MEAD:  No further questions.  Thank you.

22             THE COURT:  Any cross-examination?

23             MR. DONALDSON:  No.  Thank you very much.

24             THE COURT:  Okay.  Thank you, agent.  You may step

25   down.

O9PBDAR5                          Atwood- Direct

1            (Witness excused)

2            MR. MEAD:  The government calls Daryl Hardeman.  Your

3    Honor, if we could approach briefly at sidebar.

4            (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          THE COURT:  Yes, Mr. Mead.

3          MR. MEAD:  So, your Honor, we've gone from moving

4     substantially slower than I thought we would to substantially

5     faster than I thought we would.  We have another FBI agent

6     outside right now.  This is the agent who did one step of the

7     imaging of the cell phone.  I'll call him.  His testimony will

8     take approximately to five to seven minutes.  It will be very

9     brief.  There's some housekeeping admission of exhibits that

10    I'll do.  I'll read some exhibits into the record.

11         THE COURT:  Is this a long way of you telling me you

12    don't have another witness after the agent?

13         MR. MEAD:  We do have a witness, your Honor. We have

14    an accountant.  Her testimony is about three hours long, and we

15    have a long string of witnesses tomorrow.  So we could put on

16    the accountant tonight and start her, but our request would be

17    to end early.

18         THE DEPUTY CLERK:  Can they take a restroom break?

19         THE COURT:  Sure.

20         MR. DONALDSON:  I agree.

21         (Continued on next page)

22

23

24

25

1                    (In open court)

2                    THE COURT:  Apparently, ladies and gentlemen, there's

3       agreement about taking a break right now.  So, yes.  We'll take

4       a break.  We'll come and get you at 5:00.  Okay.  Thank you

5       very much.  Now do you just want to take a break because there

6       are more cookies back there or some combination of that?  I'm

7       getting some yeses, so that's fine.  We'll come and get you at

8       five.

9                    (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury not present)

2           THE COURT:  I think in light of we're taking a break

3   till five, that's fine, rather than starting a witness.  I take

4   it the witness who is an accountant you can sort of move her

5   around.

6           MR. MEAD:  She works next door, your Honor.

7           THE COURT:  Oh, I see.

8           MR. MEAD:  She's an FBI employee.

9           THE COURT:  Okay.  That's fine.  You can hold her in

10  reserve just in case.  And if there are other lay witnesses and

11  you want to bring them in tomorrow, that's fine, whenever we

12  conclude, that's fine.  And the jury will be I'm sure happy to

13  end a little early.

14          MR. MEAD:  We appreciate the courtesy, your Honor.

15          THE COURT:  Thank you very much.  See you at 5:0.

16          (Recess)

17          THE COURT:  You may be seated.  Is there anything we

18  need to take up before we get the jury from the government?

19          MR. MEAD:  No, your Honor.

20          THE COURT:  From the defense?

21          MR. DONALDSON:  No, Judge.  Thank you.

22          THE COURT:  All right.  We can get the jury.

23          (Continued on next page)

24

25

O9PBDAR5                              Atwood– Direct

1          (Jury present)

2          THE COURT:  You may be seated.  The government's next

3     witness.

4          MR. MEAD:  Before we call the next witness, your

5     Honor.  The government offers into evidence pursuant to

6     certifications under Rule 902-11, Government Exhibits 601 to

7     608 and their subparts, 616 to 617 and their subparts, 701 to

8     702 and their subparts, 704 to 713 and their subparts and 902

9     and 903 and their subparts.

10         THE COURT:  Okay.  Just to be clear for the 601, for

11    the ones where there's a numerical gap, other than just one I

12    take it they are each numbered consecutively within that range.

13    So 601 through 602, 603 basically up to 608?

14         MR. MEAD:  Yes, your Honor.  As a more technical

15    matter, they are largely bank and business records.  They have

16    with them in 601A, B, C, D and we're moving to admit those.

17         THE COURT:  Okay.  So Government Exhibits 601 through

18    608 and their subparts, however many there may be there, which

19    will be marked by letters; 606 through 617 and their subparts,

20    701 to 702 and all of their subparts, 704 to 713 and their

21    subparts, 902 and 903 and the subparts for those exhibits.  Did

22    I miss something?

23         MR. MEAD:  I think, your Honor, I think you said 606

24    to 617.

25         THE COURT:  616 it should be, yes, 616 to 617 and

O9PBDAR5                         Hardeman- Direct

1   their subparts.  Okay.  All are admitted in evidence.

2            (Government's Exhibits 601 to 608 and their subparts,

3   616 to 617 and their subparts, 701 to 702 and their subparts,

4   704 to 713 and their subparts and 902 and 903 and their

5   subparts received in evidence)

6            THE COURT:  Yes, Mr. Mead.

7            MR. MEAD:  The government calls Daryl Hardeman, your

8   Honor.

9            THE COURT:  Okay.  Mr. Hardeman, if you could step up.

10  My deputy clerk Ms. Disla will administer the oath.

11  DARYL HARDEMAN,

12       called as a witness by the Government,

13       having been duly sworn, testified as follows:

14           THE COURT:  You may have a seat.  Make yourself

15  comfortable.  I'd ask if you could please state your name and

16  spell it for the record.

17           THE WITNESS:  Daryl Hardeman, D-A-R-Y-L,

18  H-A-R-D-E-M-A-N.

19           THE COURT:  All right.  You may inquire.

20  DIRECT EXAMINATION

21  BY MR. MEAD:

22  Q.  Good afternoon, Mr. Hardeman.  Where you do work?

23  A.  I work for the Federal Bureau of Investigations at the

24  Greater Houston RCFL.

25  Q.  What is RCFL?

1    A.  That is regional computer forensic laboratory.

2    Q.  Is that laboratory part of the FBI I think you said?

3    A.  That is, yes.

4    Q.  What is your job title at the FBI?

5    A.  I'm a senior digital forensic examiner.

6    Q.  And how long have you been a digital forensic examiner with

7    that title?

8    A.  I been at that capacity for seven years.

9    Q.  And generally speaking what do you do in that job?

10   A.  So we preserve digital evidence, whether it's CD, computer,

11   digital camera, laptop.  Once you preserve it, we perform an

12   examination to display the contents of that digital media and

13   write reports.  And whatever is requested upon us, we provide

14   the artifacts that they requested.

15   Q.  At a slightly higher level of generality, is it fair to say

16   that you take evidence off of electronic devices?

17   A.  That's correct.

18   Q.  You mentioned a couple of examples.  Is a cell phone one of

19   the types of electronic devices that you frequently work with?

20   A.  Yes, it is.

21   Q.  What's your educational background?

22   A.  So I have a bachelor's in information technology, and I'm

23   currently working on my master's with a focus of digital

24   forensics at the state of Sam Houston State University.

25   Q.  Have you received training related to your job as a digital

1    forensic examiner?

2    A.  Yes, we receive training to get certified.  It takes about

3    almost two years give or take to become a certified forensic

4    examiner for the FBI.

5    Q.  Who provides that training?

6    A.  I would say a percentage of it is from the FBI, but we also

7    have like third-party vendors like Sands Training more in depth

8    digital forensic training.

9    Q.  And I think you mentioned two years of training to get a

10   certification, right?

11   A.  Yes.

12   Q.  What is that certification?

13   A.  That is -- as you get your certificate, it's forensic

14   examiner by the FBI.

15   Q.  Do you receive continuing training outside of the two years

16   at the beginning?

17   A.  Yes, it's mandated that you perform at least one training

18   after that.

19   Q.  Can digital data on cell phones be extracted from those

20   cell phones?

21   A.  Yes, they can.  They can be extracted in a number of ways.

22   Q.  Generally speaking how does that process work?

23   A.  So depending on the tool that you use, you're either

24   getting three common extractions.  It could be a logical.  It

25   can be a file system or it could be actual physical where you

O9PBDAR5                          Hardeman- Direct

1    get like bit for bit extraction, just a copy of what's on the

2    device.

3    Q.  Walk me through the steps?  How would you get one of those

4    three kinds?

5    A.  With this examination, I use the tool called Graykey.  I

6    don't think I'm at liberty to explain exactly how the inner

7    workings because it's a third party tool.

8    Q.  That's fine.

9    A.  But you would connect it to this Graykey and you would copy

10   the data onto a hard drive.

11   Q.  And you mention this case, have you personally extracted

12   digital evidence from cell phones before?

13   A.  Yes.

14   Q.  About how many different cell phones have you extracted

15   digital evidence from in your whole career at the FBI?

16   A.  I would say probably three to four hundred cell phones.

17   Q.  And then you mention there were a couple of different kinds

18   of extractions, how do you know that what's on those

19   extractions accurately reflects what's actually on the cell

20   phone itself?

21   A.  When you perform an extraction, you will get a hash.  And

22   in this case, it was an MD5 hash and a sharp 256 hash.  You

23   would compare the hash with the data that you have extracted or

24   the copy that you have.  And if those hashes match, that's how

25   you know it's an official copy.

O9PBDAR5                          Hardeman- Direct

1   Q.  For those of us who know less about this stuff, what is a
2   hash?
3   A.  A hash is a digital fingerprint.  Whether it's a given
4   file, it's an algorithm file that is I guess ran against the
5   dataset whether it's a file.  And the output is an alphanumeric
6   code, and that's a hash.
7              (Continued on next page)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

O9PJDAR6                         Hardeman - Direct

1    BY MR. MEAD:

2    Q    Did you do work on a case involving Calvin Darden, Jr.?

3    A    The name Darden sounds familiar.

4    Q    Okay.  Do you remember what work you did on the Darden

5    case?

6    A    It was two iPhones.

7    Q    What did you do with those iPhones?

8    A    I performed a digital -- I performed a full file system

9    extraction of those two devices.

10   Q    Do you remember where you got the devices?

11   A    I received them from a special agent Justin Atwood or

12   Justine Atwood, yeah.

13   Q    And do you remember just very approximately by month when

14   you got those cell phones from Justine Atwood?

15   A    It was last year probably -- I would say April of last

16   year.

17   Q    So once you got those cell phones from -- and Justine

18   Atwood is an FBI special agent?

19   A    Yes.

20   Q    After you got those cell phones from Special Agent Atwood,

21   what did you do with them?

22   A    When it came into our lab, they checked it into our

23   evidence control facility, and the case was assigned to me.  I

24   checked those out of the evidence control, brought them to my

25   work station, performed the extraction with the Graykey --

1    performed the extraction using the Graykey.  And the

2    extraction -- the copy was on a hard drive.  I took that --

3    those two copies and put them on network work storage.  From

4    network storage, I verified the hash and put the -- we made

5    another copy onto a hard drive and verified the copies on that

6    hard drive, as well, before we mailed it out.

7    Q   And you mentioned there were a couple of different kinds of

8    extractions that someone could create from the cell phone,

9    right?

10   A   Yes.

11   Q   And what were those three kinds?

12   A   So one is a logical extraction.  And I guess to kind of put

13   it in terms of understanding, a logical extraction is a library

14   shelf, you want particular science books or history books on

15   the shelf, that's a logical extraction of those subjects.  File

16   system would be all the books.  And then a bit-for-bit, like,

17   physical copy would be the whole shelf.  That's a good way of

18   thinking of it.

19   Q   That's helpful.

20          Do you remember which of those types of extractions

21   you created in the Darden case?

22   A   Full file system.

23   Q   Okay.  And that full file system extraction of the phones

24   in the Darden case, is that the kind of thing that can be

25   viewed and understood by a human being?

O9PJDAR6                    Hardeman - Direct

1   A    Not initially because it's the raw data.  You actually need

2   additional software to view the contents of that raw data.

3   Q    So how do you make that raw data viewable and

4   understandable to a person?

5   A    I would say the most widely used for us is Cellebrite

6   Physical Analyzer.  It's software that we use to parse the raw

7   data so we can view it.

8   Q    And you just used the term parsing.  What does parsing

9   mean?

10  A    Parsing is to examine or separate.  So whether it's instant

11  messages, text messages, photos, videos, Physical Analyzer will

12  parse that out or separate it so it can be viewable.

13  Q    And did you personally do the parsing to make the data

14  understandable for the Darden phones?

15  A    No, sir.

16  Q    For the phones in the Darden case?

17  A    No, sir.

18  Q    Do you remember who was supposed to do that parsing for

19  those phones?

20  A    It was another forensic examiner, Louis Diorio, I believe,

21  yeah.

22  Q    You mentioned that one of the things you did with the raw

23  data for the phones was to put them on a hard drive, right?

24  A    Yes, I did.

25  Q    What did you do with that hard drive?

```
 1    A   We FedExed that to the New York field office.

 2    Q   Well, you mentioned Louis Diorio.  What was his role

 3    supposed to be?

 4    A   So in my mind was to parse the data.

 5    Q   Okay.  Did you give the hard drive a specific kind of

 6    internal evidence number?

 7    A   Yes, I did.

 8    Q   Do you remember off the top of your head what that internal

 9    evidence number is?

10    A   No, I do not.

11    Q   That is not a problem, Mr. Hardeman.

12            MR. MEAD:  Mr. Ross, can you pull up Government

13    Exhibit 494, not for the jury, please.

14    Q   What is this document, Mr. Hardeman?

15    A   That is a DELREX that I wrote.

16    Q   And I think you said "DELREX"?

17    A   DELREX.

18    Q   Okay.  And what is that?

19    A   That's digital evidence laboratory examination report.

20    Q   And you just said you wrote it, right?

21    A   Yes.

22    Q   Is this about the two extractions that we are talking

23    about?

24    A   Yes.

25    Q   Approximately how long after doing the extractions did you
```

O9PJDAR6                          Hardeman - Direct

1    write this DELREX?

2    A    I'd say probably about ten days.

3    Q    Well, does Government Exhibit 494 — I'm going to stop

4    saying DELREX — accurately reflect your knowledge of the

5    extractions at the time that you created it?

6    A    Yes.

7              MR. MEAD:  Okay.  And Mr. Ross, if you could turn to

8    page 2 of this document, please.

9    Q    Do you see in the middle of the page there is a number in

10   bold, the one higher up, it starts with GHR?

11   A    Yes.

12   Q    Could you read this number, please?

13   A    GHR019742.

14   Q    And then can you read the sentence underneath that, please.

15             MR. DONALDSON:  Is it in evidence yet?

16             MR. MEAD:  No.

17   A    It says an Apple A2484 cell phone GHR019742 was submitted

18   to the GHRCFL.

19   Q    And then do you see underneath that there's another bolded

20   number?

21   A    Yes.

22   Q    Can you read that bolded number.

23   A    That is GHR019743.

24   Q    Can you read the first sentence underneath that also,

25   please.

1  A    An Apple A2342 cellular phone GHR019743 was submitted to

2  the GHRCFL.

3  Q    Okay.  What do those GHR numbers mean?

4  A    Those numbers are how we track our digital evidence as it

5  comes in, whether it's being submitted to us or we have

6  derivative evidence going out.  So every piece of media has a

7  number basically.

8  Q    Do you remember off the top of your head the serial numbers

9  for these cell phones that you extracted?

10 A    No, I do not.

11        MR. MEAD:  Can you please pull up not for the jury

12 Government Exhibit 492, please, Mr. Ross.

13 Q    Do you recognize this document, Mr. Hardeman?

14 A    Yes, I do.

15 Q    What kind of document is this?

16 A    This is an MDUS worksheet.  It's a mobile device unlocking

17 service worksheet.

18 Q    Is it about the two phones from the Darden case that we've

19 been talking about?

20 A    One of the two.

21 Q    Okay.  And approximately how long after the extraction for

22 this phone did you write this report?  Did you write this

23 document?

24 A    I wrote this document about ten days before the report.

25 Q    Okay.  Sorry.

1    When did you write this document in comparison to when

2  you did the extraction of the cell records here?

3  A    I wrote this document as I was doing the extraction.

4  Q    Okay.  And does it accurately reflect your understanding of

5  the extraction at the time you wrote it?

6  A    Yes.

7  Q    Okay.  Can you read the make and model of the phone

8  referenced here.

9  A    It is Apple Model A2484.

10  Q    And can you read the device name, please.

11  A    Device name is Charles iPhone Main.

12  Q    And then finally, can you slowly for the court reporter,

13  please, read the serial number listed there.

14  A    Serial number is F52DQQ617K.

15        MR. MEAD:  No further questions, thank you

16  Mr. Hardeman.

17        THE COURT:  Cross-examination?

18        MR. DONALDSON:  No, your Honor.  Thank you.

19        THE COURT:  Okay.  All right.  Thank you, Agent

20  Hardeman.  You may step down.  Safe travels back home.

21        (Witness excused)

22        THE COURT:  So ladies and gentlemen, it is now 5:24.

23  My understanding is that there are certain witnesses, but we

24  wouldn't be able to get very far with any of them, so we're

25  going to break a little early today.

1           Remember, you can leave your pads on your chair, or

2     better yet, you can put them in the jury room.  Please leave

3     them.  Do not discuss the case.  Go home, relax.  See you

4     tomorrow at 10:00.  Remember there will be breakfast in there

5     for you.  We'll see you at 10:00.  Remember no research either.

6           (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O9PJDAR6

1            (In open court; jury not present)

2            THE COURT:  You may be seated.

3            So Mr. Mead, do you have a sense of what the lineup

4    looks like for tomorrow of witnesses?

5            MR. MEAD:  Yes, your Honor.

6            So I think we have three folks who we're pretty sure

7    of.  I think Special Agent William Cromer, who is the agent who

8    did the search and arrest of Mr. Darden's house; FBI employee

9    Louis Diorio, who is the last person in the chain about the

10   Briscoe cell phones — former FBI, as my colleague is reminding

11   me; and then Dwight Howard.  Dwight Howard will go at the end.

12   It is possible that we may do one or two additional witnesses.

13           THE COURT:  Just to get them in?

14           MR. MEAD:  Just to get them in.  We'll obviously let

15   defense counsel know as soon as we come around on that.

16           THE COURT:  Is there anything else that we should take

17   up today?

18           Well, let me ask, obviously the issue the -- without

19   specifics, the issue of the criminal convictions has come in

20   during the cross-examination of Mr. Brock.  So I don't know

21   whether there's anything additional about that or what's to

22   come.  So with regard to -- I'm trying to figure out whether I

23   need to make a ruling with regard to that outstanding issue.

24           MR. MEAD:  I'm not sure if that's still in dispute,

25   your Honor.  I mean, our position is the Court's ruling, as I

O9PJDAR6

1    understood it, was the defense needed to explicitly disclaim

2    knowledge of intent. They haven't done that. And in fact, I

3    think defense counsel elicited the prior conviction. We plan

4    on introducing not tomorrow, unless things go incredibly

5    quickly, the judgment of the last conviction and the trial

6    transcript when he testified as a cooperator.

7        I think defense has asked us to hold off on doing that

8    for a little bit while they think about it. I'm not sure if

9    there's an objection to parts of it or an objection to the

10    whole thing, but our view is the conviction is in already.

11        THE COURT: Okay. So we may need to revisit that at

12    some point. But let me ask is there anything else we should

13    deal with tonight before we break for the evening?

14        MR. MEAD: I think two connected points, one of which

15    is the pace, and the other of which is the defense case. We're

16    moving extremely quickly, which is wonderful.

17        THE COURT: That's my sense.

18        MR. MEAD: So we finished eight witnesses today. We

19    expect to call likely between --

20        THE COURT: Don't pat yourself on the back.

21        MR. MEAD: We expect to have somewhere between 22 and

22    24 total witnesses. None of them we expect to be -- we don't

23    expect to be any witnesses with four, five, or six-hour

24    directs. Mr. Howard is probably only an hour. The paralegal,

25    maybe two hours, the accountant, maybe three hours.

O9PJDAR6

1          THE COURT:  I thought you said three hours --

2          MR. MEAD:  The accountant is three hours.  You get an

3     accountant and a paralegal this one.

4          THE COURT:  You're putting the folks in your office

5     through their paces.

6          MR. MEAD:  So we think we're certainly on -- knock on

7     wood, we think we're very likely to rest next week.  We think

8     it is possible that we would rest as early as Tuesday of next

9     week, which would be a very quick trial, obviously, and

10     somewhat quicker than we expected.

11          If we're going to get to the defense case, I think

12     sooner than we had thought, I'm not sure whether the defense is

13     thinking about putting on a case, other than their client.  You

14     know, we've talked to the Court about this a few times.  We

15     have a witness list.  We haven't received exhibits or 26.2

16     material.  If they're not going to put on a defense case,

17     that's obviously fine.  But if they are, we are kind of rapidly

18     approaching the point where we need to start preparing for a

19     defense case.

20          THE COURT:  Okay.  What I would say is the following,

21     we can sort of check as we go along.  But if things proceed as

22     Mr. Mead has indicated, several things are going to happen.  I

23     think the defense will need to provide the 26.2 material and

24     any exhibits and the like you intend to offer because the

25     defense case may begin on Wednesday.

O9PJDAR6

1          As things stand right now, since things are moving

2    fairly quickly, I would like that to be done before Monday.  In

3    other words, Friday or at some point if there are things that

4    are still in flux, you just need to let me know, and then why

5    they're still in flux.  The why you can put in an ex parte

6    letter to me.

7          But you should solidify the witnesses, who is on,

8    who's off, and who is likely and who's not.  And including —

9    and I hadn't mentioned this before, but if you have witnesses,

10   I expect that -- who are not sort of under the government's

11   control, in other words, people who you would ask the

12   government to produce, obviously you need to go through the

13   Touhy process if they're agents or something like that.

14         But I'm just saying you need to subpoena those folks

15   so that if anything on the back end happens so that -- because

16   I have no power if there isn't a subpoena that's been issued

17   for the folks who may want to testify.

18         So I would like that material for the defense, for you

19   to produce that stuff before we start on Monday.  If there's a

20   reason why that can't be done, obviously, as I said, you can

21   let me know in an ex parte submission.

22         And I understand -- I mean, since we're getting close

23   to the -- we'll be very close to the end of the government's

24   case, I expect to get what you know at the time, but you should

25   start producing it.

O9PJDAR6

1    I just don't want to delay the case because of that,

2  understanding that you don't have to do anything.  You may

3  decide not to do anything, but there's already been a list of

4  witnesses provided.

5    With regard to another thing, which I am going to at

6  some point, counsel, allocute your client on his right to

7  testify.  And the right is entirely up to Mr. Darden and after

8  consulting with his attorneys.  So at some point, I'm going to

9  ask that.  I just want to give you advance notice, and it will

10  be probably some point next week, I think, but just to let you

11  know that that is my practice to do that.

12    All right.  So any questions about what I've said so

13  far?

14    MR. DONALDSON:  No.

15    THE COURT:  Okay.  Any other things that we should

16  take up now before we break for the evening?  From the

17  government?

18    MR. MEAD:  No, your Honor.

19    THE COURT:  From the defense?

20    MR. DONALDSON:  No, your Honor.  Thank you.

21    THE COURT:  Okay.  And so just like I mentioned the

22  other day, if there are things that come up, please email my

23  chambers inbox and/or send an email to Ms. Folly so that I can

24  be sure that I'm in the loop, and we can meet a little earlier

25  tomorrow to deal with any of those issues, okay?

O9PJDAR6

1              Thank you very much.  We'll stand adjourned.

2              (Adjourned to September 26, 2024, at 10:00 a.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                        INDEX OF EXAMINATION

2    Examination of:                              Page

3    JOHN BROCK

4    Cross By Mr. Donaldson . . . . . . . . . . . 118

5    Redirect By Mr. Thompson . . . . . . . . . . 210

6    JENNIFER MICHELLE MCMULLIN

7    Direct By Mr. Mead . . . . . . . . . . . . . 212

8    Cross By Mr. Ricco . . . . . . . . . . . . . 218

9    Redirect By Mr. Mead . . . . . . . . . . . . 219

10   ISSA RAE

11   Direct By Mr. Thompson . . . . . . . . . . . 220

12   JULIANNE ASHLOCK

13   Direct By Mr. Mead . . . . . . . . . . . . . 226

14   SUZANNE ABAIR

15   Direct By Mr. Thompson . . . . . . . . . . . 247

16   Cross By Mr. Donaldson . . . . . . . . . . . 254

17   JENNIFER BALTIMORE

18   Direct By Mr. Thompson . . . . . . . . . . . 263

19   Cross By Mr. Donaldson . . . . . . . . . . . 279

20   JUSTINE ATWOOD

21   Direct By Mr. Mead . . . . . . . . . . . . . 282

22   DARYL HARDEMAN

23   Direct By Mr. Mead . . . . . . . . . . . . . 292

24                      GOVERNMENT EXHIBITS

25   Exhibit No.                               Received
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   2121      . . . . . . . . . . . . . . . . 158

2   901A, 901B, 2510A   . . . . . . . . . . . 230

3   3001      . . . . . . . . . . . . . . . . 265

4   3002      . . . . . . . . . . . . . . . . 266

5   3003      . . . . . . . . . . . . . . . . 268

6   601 to 608 and their subparts, 616 to . . . . 292

7            617 and their subparts, 701 to

8            702 and their subparts, 704 to

9            713 and their subparts and 902

10           and 903 and their subparts

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25