O9QJDAR1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4           v.                23 Cr. 134 (VSB)

5   CALVIN DARDEN, JR.,

6                                   Trial
               Defendant.
7   ------------------------------x

8
                                New York, N.Y.
9                                September 26, 2024
                                10:00 a.m.
10

11  Before:

12                HON. VERNON S. BRODERICK,

13                                District Judge
                                -and Jury-
14                      APPEARANCES

15  DAMIAN WILLIAMS
        United States Attorney for the
16        Southern District of New York
    KEVIN MEAD
17  STEPHEN J. RITCHIN
    WILLIAM C. KINDER
18  BRANDON C. THOMPSON
        Assistant United States Attorney
19

    DONALDSON CHILLIEST & MCDANIEL LLP
20  BY:  XAVIER R. DONALDSON
        -and-
21  ANTHONY RICCO
    STEVEN Z. LEGON
22  ERICA A. REED
        Attorneys for Defendant
23

    Also Present:
24  Alexander Ross, Paralegal
    Arjun Ahuja, Paralegal
25  Melissa Baccari, FBI Special Agent

O9QJDAR1

1          (Trial resumed; in open court; jury not present)

2          THE COURT:  Okay.  Let me ask is there anything that

3    we need to take up before we get the jury and continue with the

4    case, Mr. Mead?

5          MR. MEAD:  I don't think so, your Honor.

6          This afternoon we're going to have a blowup exhibit.

7    We'd ask to use the easel, but assume that's fine with the

8    Court.

9          THE COURT:  Is the exhibit something the defense is

10   already aware of?

11         MR. MEAD:  It's Government Exhibit 1101.  That's the

12   document tracing the money, and we do it with Ms. Bronson,

13   presumably not until the afternoon unless things move much

14   faster than we expect.

15         THE COURT:  So you're going to use the easel.  Will

16   she get up off the witness box and point at things or no?

17         MR. MEAD:  No, I think the idea will be it's an

18   exhibit we're going back to over and over again.  So I think

19   we'll have it in front of the jury with her next to it so we

20   can refer back to it periodically as she's looking at other

21   documents.

22         THE COURT:  Anything from the defense?

23         MR. DONALDSON:  No, your Honor.  Thank you.

24         THE COURT:  Okay.  And I apologize.  Who is the first

25   witness?

O9QJDAR1

1          MR. MEAD:  First we're calling Louis Diorio, who is a

2    phone witness who will be about five to ten minutes, then

3    Special Agent Cromer, who did the search.  It's about 30 to 45

4    minutes.  Then Dwight Howard, who's probably about an hour, but

5    I expect will have a very substantial cross.

6          THE COURT:  Sure.  Okay.  We can get the jury.

7          (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O9QJDAR1                      Diorio - Direct

1              (In open court; jurors present)

2              THE COURT:  You may be seated.

3              So ladies and gentlemen, I hope you had a good

4      evening, and relaxed a little before we begin the trial day.

5              We're going to continue the government's case.  The

6      government's next witness?

7              MR. MEAD:  The government called Louis Diorio.

8              THE COURT:  Okay.

9      LOUIS DIORIO,

10          called as a witness by the Government,

11          having been duly sworn, testified as follows:

12     DIRECT EXAMINATION

13     BY MR. MEAD:

14     Q   Good morning, Mr. Diorio.

15     A   Good morning.

16     Q   Where do you work now?

17     A   I currently work for a -- it's like a midsize defense

18     contractor callid ManTech.

19     Q   In 2023 where did you work?

20     A   For the Federal Bureau of Investigation.

21     Q   What was your job title at the FBI in 2023?

22     A   I was a digital forensic examiner.

23     Q   Did you work in a particular squad or unit as a digital

24     forensic examiner?

25     A   Yeah, I worked for the computer analysis response team

1    there.

2    Q   Is there an acronym that is commonly used for the computer

3    analysis response team1.

4    A   It's usually called CART.

5    Q   What field office did you work in?

6    A   The New York field office.

7    Q   Okay.  How long were you a digital forensic examiner for

8    the FBI?

9    A   Approximately four years.

10   Q   What do you do in that job or what did you do in that job?

11   A   Our responsibilities on CART are the collection,

12   preservation, analysis, and then subsequent possible testimony

13   to anything related to digital evidence.  So digital evidence

14   is any evidence from things like cell phones, computers,

15   anything like that.

16   Q   What is your educational background?

17   A   I studied at the Rochester Institute of Technology, and I

18   got a degree in computing information technology with

19   concentrations in cyber security, enterprise administration,

20   and legal studies.

21   Q   Did you receive any training related to your job as a

22   digital forensic examiner?

23   A   Yeah.  So within the FBI, we have to go through -- it's

24   about eight to ten weeks of classes to get through a

25   certification process to become a certified digital forensic

O9QJDAR1                    Diorio - Direct

1  examiner.

2  Q    And you said a "certification process."  What is the

3  certification that you end up with?

4  A    It's just an FBI digital forensic examiner certification.

5  Q    What does it mean to extract digital data from a cell

6  phone?

7  A    That means to, as close to the original data as possible on

8  the device, get that data off and then subsequently analyze it

9  so you can analyze it outside that device.

10  Q    While you were a forensic examiner with the FBI, did you

11  extract digital data from cell phones?

12  A    Yes.

13  Q    Approximately how many different cell phones?

14  A    At least over a thousand.

15  Q    Just at a general high level, can you explain the process

16  and the steps for extracting data from a cell phone and turning

17  it into a usable form.

18  A    First step that we do when we get a digital device like a

19  cell phone is we'll do a physical examination first.  It's to

20  make sure it's working and make sure that there is actually

21  data to get off of it.  Then we'll do some kind of an

22  extraction process.  Usually when we do that, we use, like, a

23  commercial tool.  There's a popular company out there called

24  Cellebrite that provides commercial tools that do cell phone

25  extractions.  We'll go through that process to extract the

O9QJDAR1                          Diorio - Direct

1   data.

2              And like I said, that's just a way of getting as close

3   to the data that was on the device as possible, getting that

4   data off.  And then we'll take that data and put it through

5   another tool which parses out the data and makes it more human

6   readable so that we can go through all the different categories

7   of data, and then we do our analysis.

8   Q   How do you know that the data taken off the cell phone

9   accurately reflects the data that was originally on the cell

10  phone?

11  A   So it's a little bit difficult with cell phones.  Just

12  inherently, when you're doing an extraction from a device like

13  a cell phone, you are changing some of the data on it because,

14  like, any time you interact with a cell phone, the data is

15  changing.  Any time even the clock changes on the phone, the

16  data is going to be changing.

17             So it's hard to completely verify 100 percent that the

18  data is the same.  Usually what we'll do is we'll spot check

19  the data on it.  And so we'll go back through the device and

20  see, and we'll make sure that certain messages on the device,

21  like if we pulled those messages off, that those messages match

22  what we see on the device itself.  It's basically just a spot

23  check process.

24  Q   And despite that difficulty, in general, are extractions of

25  cell phones performed by the FBI generally very accurate?

O9QJDAR1                           Diorio – Direct

1    A    Yes.

2              MR. DONALDSON:  Objection.  Form of the question.

3              THE COURT:  Yes, if could you rephrase it.

4    Q    You mentioned that there were some difficulties in

5    extracting data from cell phones.  How accurate do the

6    extractions tend to be despite those difficulties?

7    A    They are very accurate.

8    Q    Did you work on a case involving Calvin Darden?

9    A    Yes.

10   Q    Generally speaking, what work did you do on the Darden

11   case?

12   A    So I was provided two extractions of devices from the

13   Greater Houston Regional Computer Forensic Laboratory.  So

14   those devices were provided to me, just the data, and then I

15   also received some physical devices from the case team here in

16   New York as well.

17   Q    And focusing on that data that you got from Houston, what

18   form was that data in?

19   A    That was the raw data from the devices.

20   Q    And what did you do with that raw data once you got it?

21   A    So I'll then process it in one of our forensics tools.  In

22   this case I used a Cellebrite tool, Physical Analyzer.

23   Q    Do you recall every specific detail about those phones you

24   were working with?

25   A    Not every specific detail, no.

1          MR. MEAD:  Mr. Ross, can you please pull up not for

2    the jury Government Exhibit 495.

3    Q   Do you recognize this document?

4    A   Yes.

5    Q   What is this document?

6    A   This is an example of the exam notes that I would normally

7    take when performing a forensic examination.

8    Q   And who wrote this document?

9    A   I did.

10   Q   Approximately how long after your work on these phones did

11   you write this document?

12   A   I write up my notes as I'm doing the work.

13   Q   And does it accurately reflect your knowledge of those

14   phones at the time you wrote this document?

15   A   Yes.

16          MR. MEAD:  Mr. Ross, can you go to page 2, please.

17   Can you zoom in at the bottom chunk.  Perfect, keep going.

18   Q   Do you see where it says "original evidence"?

19   A   Yes.

20   Q   Could you read in what's in the box in the right of

21   "original evidence" please slowly.

22   A   It says on April 10, 2022, FE from the GHRCFL — that stands

23   for the Greater Houston Regional Computer Forensics

24   Laboratory — transferred the following device extractions to me

25   via OpWAN.  OpWAN is just the operational network that the FBI,

O9QJDAR1                         Diorio – Direct

1    that CART uses to transfer data between the field offices.  And

2    then the bullet point says GHR019742 and then (1B5).  And it

3    says full file system extraction of an iPhone A2342.

4    Q    What is a full file system extraction?

5    A    It's a type of extraction we can get from devices.  It's

6    the best type that we can get from iPhones.  Just means that we

7    got the entire logical data off the device.

8    Q    And I think you said that the date was April 10, 2022.  Is

9    it possible that you may have written the year wrong?

10   A    Yes, that's definitely possible.

11   Q    And you said 1B5.  What does that mean?

12   A    That is the FBI evidence number assigned to the physical

13   devices.

14              MR. MEAD:  Your Honor, may I approach?

15              THE COURT:  You may.

16              MR. MEAD:  Mr. Ross, if you could please pull up

17   Government Exhibit 400A not for the jury, please.

18   Q    Mr. Diorio I'm handing you a particular drive containing

19   Government Exhibit 400.  And I'm handing you a piece of paper

20   that is just the first two pages of Government Exhibit 400A.

21   Before we turn to this document, though, I think you -- just

22   one second.

23              So I think just a minute ago you read on April 10,

24   2022, FE from GHRCFL transferred.  I think you explained most

25   of those terms.  What is "FE"?

O9QJDAR1                      Diorio - Direct

1    A   That stands for forensic examiner.

2    Q   So turning your attention now to the flash drive that

3    you're holding, have you reviewed the contents of this flash

4    drive before?

5    A   Yes.

6    Q   How do you know that you reviewed that flash drive?

7    A   It has my initials on it.

8    Q   When did you initial them?

9    A   I initialed them last night.

10   Q   What kind of documents are on this flash drive?

11   A   So on here is a copy of the Cellebrite report from these

12   devices, and there's a PDF version of the report and also a

13   Cellebrite reader version.

14   Q   Who is the forensic examiner on these reports?

15   A   It's listed as me.

16   Q   And do these reports correspond to the phone in the notes

17   you were just talking about?

18   A   Yes.

19   Q   Okay.  Do you see in front of you Government Exhibit 400A?

20   A   Yes.

21   Q   Do you have in front of you a copy of that document?

22   A   Yes.

23   Q   What type of document is this?

24   A   This is a Cellebrite report in the PDF version.

25   Q   Again, who did the processing on this phone?

O9QJDAR1                    Diorio - Direct

1    A    I did.

2    Q    Is this report, meaning 400A and 400, a true and accurate

3    copy of a subset of the data on the phone?

4    A    Yes.

5    Q    Does it show every single piece of data on the phone or

6    just a subset of the data on the phone?

7    A    This is just a subset of the data.

8    Q    Did you pick which subset of data.

9    A    I did not.

10   Q    Do you know what a serial number on a cell phone is?

11   A    Yes.

12   Q    What's a serial number?

13   A    That's just a unique identifier that is assigned to devices

14   at the time of manufacturing.

15   Q    And if you could scroll down, do you see where it says --

16   do you see a serial number on Government Exhibit 400A?

17   A    Yes.

18   Q    Could you read that into the record, please.

19   A    It's F52DQQ617K.

20   Q    And do you see a case name listed?

21   A    Yes.

22   Q    Can you read that into the record as well, please.

23   A    It says Charles iPhone Main, and in parentheses a three.

24            MR. MEAD:  No further questions.  Thank you.

25            THE COURT:  Okay.  All right.  Any cross-examination?

1              MR. DONALDSON:  One second, Judge.

2              THE COURT:  Sure.

3              MR. DONALDSON:  No questions, Judge.  Thank you.

4              THE COURT:  Okay.  Thank you, Mr. Diorio.  You may

5    step down.

6              THE WITNESS:  Thank you.

7              (Witness excused)

8              THE COURT:  Okay.  The government's next witness?

9              MR. KINDER:  The government calls FBI Special Agent

10   William Cromer.

11   WILLIAM CROMER,

12        called as a witness by the Government,

13        having been duly sworn, testified as follows:

14             THE COURT:  You may proceed.

15   DIRECT EXAMINATION

16   BY MR. KINDER:

17   Q   Good morning, Special Agent Cromer.

18             Where do you work?

19   A   I'm a special agent with the FBI in Atlanta, Georgia.

20   Q   And how long have you been a special agent with the FBI?

21   A   27 and a half years.

22   Q   What device or squad are you assigned to?

23   A   A work on the complex financial crimes squad in Atlanta.

24   Q   What does that squad do?

25   A   We investigate all types of financial fraud, be it bank

1    fraud, wire fraud, mail fraud, securities fraud, and money

2    laundering.

3    Q    Can you briefly describe your responsibilities as a special

4    agent on the complex financial crimes squad.

5    A    Yes.  So I have my own cases that I work.  They have an

6    Atlanta nexus, so we have a lot of our own cases we work.  And

7    in addition, we help out other offices if they need something

8    done in Atlanta.

9    Q    I'd like to direct your attention to March 23, 2023.  Were

10   you working that day?

11   A    I was.

12   Q    Did anything of significance happen that day?

13   A    Yes.  We did an arrest of Calvin Darden, Jr. and a search

14   of his residence.

15   Q    Where was Calvin Darden, Jr. arrested?

16   A    It was at his house, which is 2716 Ridgewood Road NW in

17   Atlanta.

18   Q    And about what time of day did the arrest take place?

19   A    It was around 7:00 a.m.

20   Q    When you arrived at the house at 2716 Ridgewood Road, did

21   you make any phone calls?

22   A    Yes, I did.

23   Q    Who did you call?

24   A    I called Mr. Darden's cell phone.

25   Q    Why did you call his cell phone?

O9QJDAR1                          Cromer - Direct

```
 1   A    So his residence was a single-family home.  It had a gate
 2   going all the way around it including on the driveway.  We
 3   didn't want to have to knock down the gate unless we had to, so
 4   we made a decision to try to call Mr. Darden once we arrived at
 5   the gate to see if he would open the gate for us and come
 6   outside.
 7   Q    And did Calvin Darden answer the phone when you called?
 8   A    Yes, he did.
 9   Q    Do you recall what phone number you used to contact Calvin
10   Darden?
11   A    I do.
12   Q    What was the phone number?
13   A    It was (347)850-5686.
14   Q    Now, March 23, 2023 was quite a while ago, right?
15   A    Yes.
16   Q    Is there a document that you've recently reviewed that
17   refreshed your memory as to that phone number?
18   A    Yes.  For any arrest or search we prepare what's called an
19   ops plan, and so I prepared an ops plan for this arrest and
20   search, and I referred to that a few days ago just to verify
21   the phone number.
22   Q    Who was present in the home at the time of Calvin Darden's
23   arrest?
24   A    It was Calvin Darden, Jr., his wife, and his teenage
25   daughter.
```

O9QJDAR1                          Cromer – Direct

1    Q   Was anyone else present?

2    A   No one else was present in the house.

3    Q   I believe you said you conducted a search of the residence?

4    A   Yes, we did.

5    Q   That was after the arrest?

6    A   Yes, it was.

7    Q   Did you have a warrant to conduct that search?

8    A   Yes, sir.

9    Q   What was your role in the search of the residence?

10   A   So my role was I was the team leader for the search, and

11   then I was also the photographer for the search.

12   Q   And when you're a photographer for a search, what do you

13   typically take photos of?

14   A   Okay.  So when you first arrive on the scene, you take

15   what's called entry photos.  So you take pictures of the

16   outside of the house and you take pictures of every room within

17   the house just to get a view of what the house looked like when

18   you first arrived on the scene.

19        Then you take -- throughout the search, you take

20   photos of any items of evidence that you're going to take and

21   any items of interest.  So if there's something specific to the

22   case that you think might help the case, you can take a picture

23   of it.  And at the conclusion of the search, you take what are

24   called exit photos just going back through the house taking

25   pictures of all the rooms just to show the way you left the

1    house.

2    Q    And did you take photographs of the search of 2716

3    Ridgewood Road?

4    A    Yes, I did.

5    Q    Generally speaking, what did you take photographs of?

6    A    The entry photos/exit photos were just of the house.  And

7    then I took photos of some of the evidence items that we

8    seized, and then also took pictures of artwork, vehicles,

9    computers.  Those are kind of the main things -- and jewelry.

10   Q    You mentioned that there were some items that were seized.

11   Were documents among those items?

12   A    Yes, they were.

13   Q    Special Agent Cromer, in front of you is a binder of

14   documents.  I ask that you take a moment and flip through those

15   documents.

16   A    Okay.

17   Q    Have you seen the contents of that binder before?

18   A    I have.

19   Q    What are they?

20   A    Most of them are the pictures that I took during the

21   search.

22   Q    And the pictures that you took during the search that are

23   in the binder, do they fairly and accurately reflect the scene

24   of the residence of 2716 Ridgewood Road at the time of the

25   search?

O9QJDAR1                        Cromer - Direct

1   A   Yes, sir.

2                MR. KINDER:  Government offers Government Exhibits 801

3   through 850 and 852 through 897.

4                THE COURT:  And are they consecutively numbered within

5   those bands?

6                MR. KINDER:  Yes, your Honor.

7                THE COURT:  Any objections?

8                MR. DONALDSON:  No, Judge.

9                THE COURT:  Okay.  Let me just ask, agent, the photos

10  that are in the binder, do they comprise the entirety of the

11  photos you took on that date or is it a subset?

12               THE WITNESS:  It's a subset.

13               THE COURT:  Okay.  All right.  So Government

14  Exhibit 801 through 850, consecutively numbered, and 852

15  through 897, also consecutively numbered, are admitted in

16  evidence and can be published to the jury.

17               (Government's Exhibit 801 through 850, 852 through 897

18  received in evidence)

19  BY MR. KINDER:

20  Q   Special Agent Cromer, I also want you to take a look at a

21  document in the binder that's labeled 899.  Have you seen that

22  document before?

23  A   I have, yes, sir.

24  Q   What is it?

25  A   These are documents that we seized during the search.

O9QJDAR1                          Cromer - Direct

1            MR. KINDER:  The government offers Government

2   Exhibit 899.

3            THE COURT:  Okay.  Any objection?

4            MR. DONALDSON:  One second, Judge.

5            THE COURT:  Sure.

6            MR. DONALDSON:  We do have an objection to those.

7            THE COURT:  Okay.  All right.  Foundation?  What's

8   the --

9            MR. DONALDSON:  I'm sorry, Judge.  They're not

10  relevant.

11           THE COURT:  Okay.  Could I take a look at the

12  document?  Is it a single-page or multiple-page document?

13           MR. KINDER:  Multiple pages, your Honor.

14           THE COURT:  Why don't the parties come to sidebar.  If

15  you have a hard copy, bring a hard copy.

16           (Continued on next page)

17

18

19

20

21

22

23

24

25

O9QJDAR1                              Cromer - Direct

1          (At sidebar)

2          THE COURT:  Let me ask am I correct these are not

3    necessarily one document but they're multiple documents?

4          MR. KINDER:  Correct.  These are papers including mail

5    seized from the home that reflect the names of two corporate

6    entities, Legacy AC LLC, and Darden Enterprises, with addresses

7    matching the defendant's home address, which establish his

8    control of those companies.

9          THE COURT:  Okay.

10         MR. KINDER:  And for example, Legacy AC is a company

11   that has a bank account that a lot of fraud proceeds end up

12   being sent to that's the purpose of establishing that control.

13         MR. DONALDSON:  Are they also tax documents and IRS

14   statements?

15         MR. KINDER:  I think there are some tax related

16   documents, but they're being offered for the same purpose,

17   which is they have the corporate entity's name on them found in

18   his home establishing his --

19         THE COURT:  Am I correct that the lion's share of the

20   documents are basically done for purposes of identity of either

21   corporations or Mr. Darden himself and his connection to those,

22   or at least an inference of that since the documents were

23   seized from his home?

24         MR. KINDER:  That is correct.

25         THE COURT:  Okay.  All right.  So why don't you -- if

O9QJDAR1                          Cromer - Direct

1    there are specific issues, I think as a general matter the

2    documents would be admissible for purposes of identity, both

3    identity tying Mr. Darden to the various corporate entities,

4    also identity specifically because, as has come up in this

5    case, there is an issue because he's got the same name as his

6    dad, to also distinguish between any companies.  And I have no

7    idea what the evidence is going to be.  His dad may own and the

8    like.

9            So I think for those purposes, the documents are

10   admissible and the fact that they were seized from his home.

11           (Pause)

12           THE COURT:  All right.  So I'm going to overrule the

13   objection, and I will indicate that the document is being

14   admitted.  Do you have an extra hard copy at all for the

15   defense?  Is that possible?

16           MR. KINDER:  We only printed two binders.  I'm happy

17   to give this to him now.  I can bring it up on the screen, and

18   I can give you the rest of this binder.  From here on out, I'm

19   just going to be using the screen.

20           MR. DONALDSON:  My exhibits ended at 898.

21           MR. KINDER:  And just to make the record clear, we're

22   working on this.  We had been supplementing our exhibit

23   productions on an essentially daily basis.  We produced this

24   one a few days ago, and Mr. Donaldson, his last copy that he

25   had downloaded had not loaded, which is part of the confusion.

O9QJDAR1                          Cromer - Direct

1            THE COURT:  All right.

2            MR. DONALDSON:  Appreciate that.  Thank you.

3            (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O9QJDAR1                          Cromer - Direct

1                (In open court; jurors present)

2                THE COURT:  So the objection is overruled, Government

3       Exhibit 899 is admitted in evidence.  You may proceed.

4                (Government's Exhibit 899 received in evidence)

5                MR. KINDER:  Mr. Ross, can we please publish for the

6       jury what's in evidence as Government Exhibit 801.

7       Q    Special Agent Cromer, can you describe what this photograph

8       shows.

9       A    Yes.  This is an exterior of the residence at 2716

10      Ridgewood Road.  This was one of my entry photos.  So this is

11      after the gate had already been opened and the arrest had

12      already occurred.

13      Q    Do you see the gate in this photo?

14      A    Yes, sir.

15      Q    Can you identify where it is.

16      A    It's on the left-hand side of the photo.  You can see the

17      little call box right beside it.

18      Q    Please publish Government Exhibit 802.

19                What does this photo depict?

20      A    So this is just a closer-up picture of the front of the

21      house.

22      Q    And what do you see at the walkway in this photograph?

23      A    There was a walkway leading into the -- towards the front

24      door, and it went across a koi pond.

25      Q    Government Exhibit 803, please.

1              What's shown here?

2    A   This is the walkway leading to the front door going over

3    that koi pond.  And then you see some of the koi fish in the

4    picture there on the right-hand side.

5    Q   What is a koi pond?

6    A   Koi fish are kind of like big goldfish.  They're just more

7    expensive than goldfish.

8    Q   And on the left above the Government Exhibit sticker, what

9    is in the water?  What is that?

10   A   They had fountains on each side of the koi pond.

11   Q   Where the fountains bubbling up?

12   A   Yes, they were.

13   Q   Government Exhibit 813, please.

14              What does this photo depict?

15   A   So the home had three levels.  The middle level is where

16   you came into through the front door, so this is on the middle

17   level.  This was the kitchen area and then a sitting room.

18   Q   You mentioned there were three levels.  If you're in this

19   house, how do you get between the levels of the home?

20   A   So two different ways.  One when you first came in, there

21   was a landing with stairs going up to the third floor and

22   stairs going down to the bottom floor.  And there was also an

23   elevator at the residence.

24   Q   Publish 890.

25              What does this photograph show?

O9QJDAR1                          Cromer – Direct

1   A   So this is a view of the backyard.  This picture was taken

2   right by that sitting area in the previous picture looking out

3   onto the backyard.

4   Q   And is that a pool on the left-hand side?

5   A   Yes, sir.

6   Q   What is the square object to the right of the pool?

7   A   That was a TV, outside TV.

8   Q   To the right of the TV, what do you see there?

9   A   Well, there was a -- like a fire pit area.

10  Q   And from where in the house was this photograph taken?

11  A   Middle level right there at the kitchen sitting room.

12  Q   Publish 814.

13          What does this photo show?

14  A   This is a just a different view of the kitchen that was on

15  the middle level.

16  Q   Let's publish 847.

17          What does this photo show?

18  A   This was a weight room/gym that was on the third level of

19  the house.

20  Q   And 892.

21          What's shown here?

22  A   So this was on the bottom level of the house.  There was

23  another kind of den sitting room area looking out into the

24  backyard into the pool.

25  Q   Now let's publish 864, please.

O9QJDAR1                        Cromer - Direct

1              Special Agent Cromer, what is this photo of?

2       A    So we found Mr. Darden, Jr.'s wallet.  We took everything

3       out of the wallet and then made a picture of all the wallet

4       contents along with the wallet.

5       Q    Can we zoom in on the driver's license, please.

6              Special Agent Cromer, can you read the name on this

7       license.

8       A    Calvin Ramarro Darden.

9       Q    What is the address?

10      A    375 Park Avenue 2607, New York, New York 10152.

11      Q    And what state's driver's license is this?

12      A    New York State.

13      Q    What is the year of birth listed on this license?

14      A    1974.

15      Q    Can we zoom back.

16             Special Agent Cromer, is this the person you arrested

17      on March 23, 2023?

18      A    Yes, it is.

19      Q    Let's publish 836.

20             Can you describe what's depicted in this photograph.

21      A    So again, this is on the bottom level of the house looking

22      down towards -- there was another sitting area and then a

23      piano.  And then further at the back end of the picture there

24      was a bar.

25      Q    There was a couch at the bottom of this photograph.

1   A   Yes, sir.

2   Q   Did we see that couch in a prior photograph?

3   A   Yes, in the other one that showed the pool from the bottom

4   level, you can see that same couch.

5   Q   Publish 861.

6           What's shown here?

7   A   So this was a Steinway piano that was in the home from that

8   previous photo.  This is just a closer-up view of the piano.

9   Q   841.  What's shown here?

10  A   Side angle of the same piano.

11  Q   Do you see there's text on the side of the piano?

12  A   Yeah, it says Steinway & Sons.

13  Q   862, please.  What is this?

14  A   This was the serial number for the piano.  It was located

15  inside of the piano.

16  Q   Can you read what is the serial number?

17  A   601861.

18  Q   834, please.

19          What's shown here?

20  A   So this is another view of the piano.  And there was also

21  artwork that was on the wall beside the piano.  And then you

22  can see the bar on the right-hand side.

23  Q   Now let's go to 816.

24          What does this photograph depict?

25  A   So in the garage, which was just right off the kitchen,

1    there were three vehicles located in the garage.

2    Q    What were the vehicles?

3    A    So the first one here, the black one is a Lamborghini SUV.

4    The middle one, the white one is a Lamborghini sports car, and

5    then the one on the far end is a Rolls-Royce SUV.

6    Q    821, please.

7         What's shown here?

8    A    So this is the back side of the Lamborghini SUV.  And it

9    shows the Georgia tag that it had on it.

10   Q    825, please.

11        What's shown here?

12   A    This is the backs ide of the Lamborghini sports car showing

13   it had a New Jersey tag on it.

14   Q    830, please.

15        What is this a photo of is?

16   A    This was the VIN number that was on the white Lamborghini

17   sports car.

18   Q    What are the last four digits of this VIN number?

19   A    2763.

20   Q    And what is a VIN number?

21   A    So it stands for "vehicle identification number."  It's a

22   unique number that every vehicle gets.  It's just a way to

23   track the history of that particular vehicle.

24   Q    Why did you take a photograph of it?

25   A    It's the easiest way to identify a vehicle.  People can

O9QJDAR1                          Cromer - Direct

 1   move tags around from car to car, but the VIN usually stays

 2   with the car.  So it's the easiest way to identify the car.

 3              THE COURT:  Agent, when you say "tags," what does that

 4   mean?

 5              THE WITNESS:  Tags, I mean license plates.

 6              THE COURT:  Okay.  Go ahead.

 7   Q   Let's publish 826.

 8              What's shown here?

 9   A   This is the Rolls-Royce SUV.

10   Q   891, please.

11              What's shown here?

12   A   This is the inside of the Rolls-Royce SUV.

13   Q   Can we zoom in on the steering wheel, please.  Move that to

14   the center of the screen.

15              Special Agent Cromer, what do you see in the middle of

16   the steering wheel here?

17   A   The Rolls-Royce emblem.

18   Q   Do you see text on the dashboard behind the steering wheel?

19   A   Yes, sir.

20   Q   What does it say?

21   A   Welcome Calvin.

22   Q   Can we go to 883, please.

23              What is this a photograph of?

24   A   So this is -- again, on the middle level of the house there

25   was a master bedroom, and then there were two master closets.

O9QJDAR1                          Cromer – Direct

1   This is one of the master closets.  And in that closet, it had

2   a large collection of sneakers.  And then on the bottom right,

3   there was a safe in that closet as well.

4   Q    What color is the safe?

5   A    Black.

6   Q    Can we publish 881.

7        What's shown here?

8   A    This is the inside of the safe that was in the previous

9   picture.

10  Q    And let's publish 855.

11       What is this a photograph of?

12  A    So this is a Rolex Yacht Master II watch that was inside of

13  the safe.

14  Q    856, please.

15       What does this show?

16  A    These are three other watches that were located within the

17  safe.  The one on the far right is a Rolex.  The one on the far

18  left is a Rolex.  And the one in the middle is an Audemars

19  Piguet, not sure how to pronounce it.

20       MR. MEAD:  Mr. Ross, can you please zoom in on the

21  watch in the middle.

22  Q    This is the Audemars Piguet that you just referred to?

23  A    Yes, sir.

24  Q    Publish 897, please.  And can we zoom in on the top half of

25  the document.

1          Special Agent Cromer, what does this photograph show?

2   A    So this was an invoice that we located inside of the safe,

3   and it referenced two of the watches that were in the safe.

4   Q    Starting at the top left of the document, do you see a

5   logo?

6   A    Yes, sir.

7   Q    What is the logo?

8   A    It's for JD.

9   Q    And then do you see there's a website listed next to the

10  JD?

11  A    Yes.

12  Q    What is the web sate?

13  A    It's www.jdwatches.com.

14  Q    And there's an address underneath that website?

15  A    20 West 47th Street, Suite 307, New York, New York 10036.

16  Q    Underneath that logo, there's a heading "billing address."

17  Do you see that?

18  A    Yes, sir.

19  Q    What is the billing address listed?

20  A    Legacy AC LLC with an address of 45 West 132nd Street, New

21  York, New York 10037.

22  Q    And there's a telephone number listed below that?

23  A    Yes, there's a telephone number of (347)850-5686.

24  Q    How do that phone number compare to the one you called on

25  the morning of March 23, 2023 before arresting Calvin Darden,

O9QJDAR1                         Cromer - Direct

1    Jr.?

2    A    That's the same phone number I called Mr. Darden on that

3    morning.

4    Q    And on the upper right-hand portion there's a shipping

5    address?

6    A    Yes.

7    Q    And a phone number as well?

8    A    Yes.

9    Q    Does that shipping address and phone number match the

10   billing address and phone number?

11   A    Yes, it does.

12   Q    You see there are two photographs of watch faces in the

13   lower middle portion of this photo?

14   A    Yes, sir.

15   Q    And next to that, there's a column that says "description"?

16   A    Yes.

17   Q    Can you read the brand that is listed for the first watch?

18   A    For the first watch it's a Rolex.

19   Q    And what about the brand for the second watch?

20   A    Audemars Piguet.

21   Q    And then to the right, there's a column that reads

22   "extended price"?

23   A    Yes.

24   Q    What is the extended price for the Rolex?

25   A    Rolex is $31,000.

O9QJDAR1                          Cromer - Direct

1    Q    And what is the extended price for the Audemars Piguet?

2    A    57,500.

3    Q    Looking back at the left side of the screen underneath

4    billing address, there's a heading that says "ordered by."  Do

5    you see that?

6    A    Yes, sir.

7    Q    What is the text listed underneath that?

8    A    Calvin.

9    Q    And in the upper right-hand portion under the word

10   "invoice," there are a few lines of text.  Do you see that?

11   A    Yes, sir.

12   Q    And one entry for order date?

13   A    Yes?

14   Q    What is the order date.

15   A    11/21/2019.

16   Q    And what is the invoice date?

17   A    11/29/2019.

18   Q    Can we please publish Government Exhibit 899.

19           Special Agent Cromer, what's contained in this

20   exhibit?

21   A    So in this exhibit are the business documents that we

22   seized during the execution of the search warrant.

23   Q    So this isn't a photograph that you took?

24   A    No, this is not.  These are the actual documents that we

25   took.

O9QJDAR1                              Cromer - Direct

1   Q    This is a scan of the documents you physically took?

2   A    Yes, sir.

3   Q    Directing your attention to the upper left-hand portion.

    Do you see there's an address listed?

5   A    Yes.

6   Q    Can you read the address, please.

7   A    Legacy -- the address is 2716 Ridgewood Road NW, Atlanta,

8   Georgia 30327-1923.

9   Q    I'm sorry.  Could you read the full line that appears

10  before 2716 Ridgewood Road.

11  A    Yeah.  Legacy AC LLC.

12  Q    And do you see that name and the same name and address

13  under the heading "state public information" in the middle of

14  the page?

15  A    Yes, sir.

16  Q    Can we go to page 3, please.  And let's zoom in on that

17  address there.

18         Special Agent Cromer, this is another document that

19  was seized during the search of the home?

20  A    Yes.

21  Q    Can you read this address?

22  A    Legacy AC LLC, 2716 Ridgewood Road NW, Atlanta, Georgia

23  30327-1923.

24  Q    Zoom out and let's zoom in on the body of text that begins

25  with the word "congratulations."

1          Special Agent Cromer, can you please read the first

2     sentence of this body of text.

3     A   Yes.  Congratulations on registering your new business with

4     the state of Georgia.

5     Q   We can take that down.  Let's go to page 6.

6          What's shown here?

7     A   So this was another item that was part of the documents we

8     seized during the search.

9     Q   And are there two items here?

10    A   Yes.  It's two pieces of mail.

11    Q   And I'm sorry to make you crane your neck.  On the yellow

12    one, you see an address?

13    A   Yes, sir.

14    Q   What's the address?

15    A   It's the same as the ones on the previous ones, Legacy AC

16    LLC, 2716 Ridgewood Road NW, Atlanta, Georgia 30327-1923.

17    Q   And what's the address on the other one?

18    A   Legacy AC LLC, 2716 Ridgewood Road NW, Atlanta, Georgia

19    30327-1923.

20    Q   And just to be clear, these were pieces of mail that you

21    found inside the home?

22    A   Yes, sir.

23    Q   Can we please publish Government Exhibit 806.

24          What's shown here?

25    A   So this is on the middle level when you came in the front

1    door, you ended up on this little walkway area.  You can see

2    the stairs on the left-hand side that go down to the bottom

3    level, and then there's stairs on the -- at the top of the

4    picture going to the upstairs.  And then there was artwork

5    along that back wall.

6    Q   Can we go to 808, please.

7             What's shown here?

8    A   This is the four pieces of artwork that were along that

9    back wall from the previous picture.

10   Q   809, please.  What's shown here?

11   A   This is a close-up of one of those four pieces of art.

12   Q   810.

13   A   This is a close-up of the second piece of art.

14   Q   811.  What's this?

15   A   This is the -- a close-up of the third piece of artwork.

16   Q   Do you see yourself in this?

17   A   I do.  Not a very good photographer.

18   Q   Can you identify where you are?

19   A   Yeah.  It's on that middle level -- I'm on the left-hand

20   side of the picture.  Sorry.

21   Q   That's your reflection?

22   A   Yes, sir.

23   Q   812.  What's shown here?

24   A   This is the fourth piece of artwork, a close-up of it.

25   Q   885.  What's shown here?

1    A    This is when you came in the front door there was some kind

2    of big wall as you first walked in, on the back side of that

3    wall.  Again, this is where the previous picture showed the

4    stairs going up and the stairs going down.  There was this

5    piece of artwork that said "dope."

6    Q    804.  What's shown here?

7    A    This is again on the middle level.  It was an office area.

8    Q    884.  What's shown here?

9    A    This was the master bath.  It had a bathtub that looked out

10   on the backyard.

11   Q    832.  What's shown here?

12   A    So this is on the bottom level.  There's been previous

13   pictures of these two white sofas, so it's just another view

14   from that bottom level.  And in the back corner in the middle

15   of the picture there's a pool table.

16            MR. KINDER:  One moment, your Honor.

17            THE COURT:  Okay.

18            MR. KINDER:  No further questions.

19            THE COURT:  Okay.  Cross-examination?

20   CROSS-EXAMINATION

21   BY MS. REED:

22   Q    Good morning, Special Agent Cromer.

23   A    Good morning.

24   Q    I'm going ask you a few questions about the photographs you

25   were just shown in the Government Exhibit Series 800 Exhibits.

O9QJDAR1                          Howard – Direct

 1          Do you know whether or not Calvin Darden, Sr. owns and
 2   holds the mortgage on the home that you photographed?
 3   A   I do not know.
 4   Q   And do you know whether or not Calvin Darden, Sr. bought or
 5   financed any of the vehicles that you photographed?
 6   A   I do not know.
 7              MS. REED:  No further questions.
 8              THE COURT:  Okay.  Any redirect?
 9              MR. KINDER:  No, your Honor.
10              THE COURT:  Okay.  Thank you, agent.  You may step
11   down.
12              (Witness excused)
13              MR. MEAD:  Government calls Dwight Howard, your Honor.
14   DWIGHT HOWARD,
15        called as a witness by the Government,
16        having been duly sworn, testified as follows:
17   DIRECT EXAMINATION
18   BY MR. MEAD:
19   Q   Have you played professional sports before, Mr. Howard?
20   A   Yes, sir.
21   Q   Did you play in the NBA?
22   A   Right now, no.
23   Q   In the past?
24   A   In the past I have, yes, sir.
25   Q   What year were you drafted into the NBA?

O9QJDAR1                          Howard – Direct

1   A   2004.

2   Q   What number pick were you in the 2004 NBA draft?

3   A   Number one.

4   Q   And were you drafted straight from high school or from

5   college?

6   A   High school.

7   Q   What are some of your career highlights in the NBA?

8   A   Champion, Olympic champion, defensive player of the year,

9   All Star, eight-time All Star.  That's a couple things, yeah.

10  Q   That covers it, I think.

11           Are you currently playing professional basketball?

12  A   I am not currently playing professional basketball.

13  Q   What was your last year in the NBA?

14  A   2022.

15  Q   Are you currently on a TV show?

16  A   I am on a TV show.  Yes.

17  Q   What TV show are you on?

18  A   *Dancing with the Stars*.

19  Q   How did you do this week?

20  A   How did I do this week?

21  Q   Yeah.

22  A   Oh, I did pretty good.  Yeah.

23  Q   Directing your attention to the end of 2020 --

24           THE COURT:  That's just a self-evaluation though,

25  right?  I mean, I don't watch the show, but that -- you don't

O9QJDAR1                          Howard – Direct

 1   have to answer that.

 2          Go ahead, Mr. Mead.

 3   BY MR. MEAD:

 4   Q   Directing your attention to the end of 2020, did you

 5   transfer about $7 million from one of your bank accounts?

 6   A   Yes, sir.

 7   Q   Why did you send that money?

 8   A   I wanted to purchase a WNBA team.

 9   Q   Which WNBA team?

10   A   Atlanta Dream.

11   Q   Did you get the Atlanta Dream for your $7 million?

12   A   No, sir.

13   Q   Did you get anything from your $7 million?

14   A   I got a slap in the face.

15          MR. DONALDSON:  Objection.

16          THE COURT:  Yeah.  The answer will be stricken.  Go

17   ahead.

18   BY MR. MEAD:

19   Q   Just a yes or no, did you get anything for your $7 million?

20   A   No.  I wish.

21          MR. DONALDSON:  Objection.  Move to strike the last

22   part of Mr. Howard's answer.

23          THE COURT:  I'll allow the response.  Objection

24   overruled.

25   Q   Did you get your $7 million back?

1   A    No, sir.

2   Q    Do you know an individual named Charles Briscoe?

3   A    Yes, sir.

4        MR. MEAD:  Mr. Ross, could you please pull up not for

5   the jury Government Exhibit 13, please.

6   Q    Do you recognize the person in Government Exhibit 13?

7   A    Yes, sir.

8   Q    Who is that person?

9   A    He was my agent.

10   Q    What's his name?

11   A    Charles Briscoe.

12        MR. MEAD:  The government offers Government Exhibit 13

13   into evidence.

14        THE COURT:  Any objection?

15        MR. DONALDSON:  No.

16        THE COURT:  All right.  Government Exhibit 13 is

17   admitted in evidence.

18        (Government's Exhibit 13 received in evidence)

19   BY MR. MEAD:

20   Q    How do you know Charles Briscoe?

21   A    He was my agent at the time.

22   Q    About when did he become your agent?

23   A    2019, 2020, right before my season with the Lakers.

24   Q    About when did he stop being your agent?

25   A    Right after the next season.  I was with the Philadelphia

O9QJDAR1                          Howard - Direct

1    76ers.

2    Q   So that would be 2021 or so?

3    A   Yes, sir.

4    Q   Who ended that relationship, you or him?

5    A   I did.

6    Q   Why did you terminate him as your agent?

7    A   Wasn't really doing his job like he was supposed to, and

8    the situation where I lost the money didn't feel like his

9    services was needed.

10   Q   How many years did you play in the NBA?

11   A   18.

12   Q   Based on your experience as an NBA player, what's the job

13   of an agent to an NBA player?

14   A   Agent's job is to find deals, also be like the mediator

15   between the team and the player, kind of their voice.  He also

16   is in charge of, you know, finding off-court deals.  If there's

17   any projects that I want to be a part of, I would go to the

18   agent.  The agent would then use his resources or use my

19   resources to try to find a way to get to whatever goal I'm

20   trying to get to.

21   Q   In your experience as an NBA player, what's the

22   relationship typically like between an NBA player and his

23   agent?

24             MR. DONALDSON:  Objection.

25             THE COURT:  I'll allow it.  Objection overruled.

1   Q    You can answer Mr. Howard?

2   A    Usually the agent and the player have the -- like, a real

3   close connection.  The agent is always -- the player is always

4   talking to the agent, always asking questions, always --

5   they're kind of like a Catholic priest of the person that you

6   go and vent to and tell all your problems to as well.  You

7   know, so he was kind of like the close -- one of the closest

8   people to me at the time.

9   Q    And if you had important professional or financial

10  decisions to make during the time when Briscoe was your agent,

11  who would you typically go to with those decisions?

12  A    I would go to him, I would talk to him about it.

13  Q    Why is he the person you'd go to?

14  A    I just felt like he had that duty as an agent.  It was

15  something that all of us players, you know, have kind of, you

16  know, felt like somebody that's your agent, that's their job to

17  kind of tell you the truth, tell you no, be the one to say this

18  is not a good deal, that is a great deal, we should really get

19  into this, we should do this, stuff like that.

20  Q    During the period when Briscoe was your agent, how often

21  did you talk to him?

22  A    We talked almost every day.

23          MR. MEAD:  You can take this document down, Mr. Ross,

24  please.

25  Q    Where did you grow up, Mr. Howard?

O9QJDAR1                          Howard – Direct

1    A    Atlanta –– in College Park, Georgia.

2    Q    And you said Atlanta first.  Is College Park close to

3    Atlanta?

4    A    College Park is close to Atlanta, yes.

5    Q    Are you familiar with a team called the Atlanta Dream?

6    A    Yes, I am.

7    Q    What is the Atlanta Dream?

8    A    It's a WNBA professional women's basketball team.

9    Q    Are you a fan of the Atlanta Dream?

10   A    I am a fan of the Dream and the WNBA, yes.

11   Q    And just generally, why are you a fan of the Dream and the

12   WNBA?

13   A    Played basketball forever.  My daughters play basketball.

14   My mom, she went to all the games.  I actually got her season

15   tickets.  I used to go to all the games.  I love women's

16   basketball, so thought it was going to be fun.

17   Q    When you say your mom had season tickets and went to all

18   the games, do you mean the WNBA generally or the Atlanta Dream

19   games?

20   A    Atlanta Dream games.

21   Q    Did there come a time when you considered buying the

22   Atlanta Dream, the WNBA team?

23   A    Yes, sir.

24   Q    Whose idea was your buying the Atlanta Dream?

25   A    It was mine.

O9QJDAR1                          Howard - Direct

1   Q   And was there a particular event that made you start to

2   think about buying the team or trying to buy the team?

3   A   Yes.  It -- it was a -- it was on the ticker of ESPN News,

4   something was going on with one of the owners of the team and

5   the players were highly upset about some things she had said

6   and stuff like that.  And they went up, you know, to be bought,

7   and so I felt like it would have been great.  I'm a homegrown

8   person.  I love the Dream, love women's basketball.  I felt

9   like at the time the women's game was taking off, it was going

10  to be big like it is now.  So I felt like it would have been

11  the perfect time.

12  Q   At first, who did you talk to about your idea of buying the

13  Atlanta Dream?

14  A   Oh, Charles.

15  Q   And do you mean Charles Briscoe?

16  A   Charles Briscoe, yeah.

17  Q   Why did you go to Charles Briscoe about that?

18  A   I mean, any ideas I would have, you know, I would talk to

19  him first just to see what he thought.  Some things that, you

20  know, he thought about, what we talked about, we actually tried

21  to put into motion.  So you know, that's why I went to him

22  first.

23          MR. MEAD:  Mr. Ross, can you pull up not for the jury,

24  please, Government Exhibit 201A.  And if you could zoom in on

25  maybe just the first two messages for a second, please.

O9QJDAR1                        Howard - Direct

1    Q   Do you recognize these messages, Mr. Howard?

2    A   Yes, sir.

3    Q   Who are they between?

4    A   Myself and Charles Briscoe.

5            MR. MEAD:  Government offers Government Exhibit 201A

6    into evidence.

7            THE COURT:  Any objection?

8            MR. DONALDSON:  No.

9            THE COURT:  Government Exhibit 201A is admitted in

10   evidence.

11           (Government's Exhibit 201A received in evidence)

12           MR. MEAD:  And you can publish, please, Mr. Ross.

13   Okay.

14   Q   You see these text messages on the screen, right?

15   A   Yes, sir.

16   Q   Who is the blue bubbles?

17   A   That is Charles.

18   Q   And who is the green bubbles?

19   A   That is mine.

20   Q   Okay.  Can you read the first message by Charles Briscoe in

21   the top left, please.

22   A   Bro there is some real value in the WNBA.

23   Q   And what did you understand that Mr. Briscoe was talking

24   about when he sent you this message?

25   A   That basically, you know, conversations that we had on the

O9QJDAR1                         Howard – Direct

1    phone, how the WNBA is rising, more viewers, talent level is

2    getting better, it was taking off, so yeah.

3                (Continued on next page)

O9QBDAR2                           Howard - Direct

1   BY MR. MEAD:

2   Q.  When did Charles Briscoe send you this message?

3   A.  7/7/2020.

4   Q.  Is this around the time when you started to think about

5   buying the Atlanta Dream?

6   A.  Yes, sir.

7          MR. MEAD:  Can you go to page three, please, Mr. Ross,

8   and can you zoom in on the first message, please, on the top.

9   Q.  Can you read this message that you sent on July 7, 2020,

10  please?

11  A.  We have to go public and apply pressure because she's

12  probably going to be stepping down soon and it's going to be a

13  fire sale.

14  Q.  What did you mean by that?

15  A.  The owner of the Dream, she probably going to be stepping

16  down, so I just wanted to apply some pressure to the team, see

17  if we could get some movement before anybody else decides to.

18  Q.  You thought it would be a good opportunity to buy the team?

19  A.  Yes, sir.

20          MR. MEAD:  Can we go to page six of this document,

21  Mr. Ross.

22  Q.  Can you read the top message in this --

23          MR. MEAD:  Can you zoom in on the top message.

24  Q.  And, Mr. Howard, could you read the top message from

25  Charles Briscoe?

O9QBDAR2                         Howard - Direct

1    A.  Call me, bro, I got to tell you this.  I just got off with

2    Cal.

3              MR. MEAD:  And, Mr. Ross, can you go to page 12 of

4    this document, please.  If you could zoom in on all four of the

5    messages as much as you can, please.

6    Q.  And let's read these messages, Mr. Howard.  And I will

7    be -- I'll be Mr. Briscoe and you can be yourself.

8              Briscoe:  Cal said what help do you need right now for

9    the Dream thing.

10   A.  It's Cal junior?

11   Q.  Yep.  Dad is Cal senior.

12             MR. MEAD:  Next page, please, Mr. Ross.  Actually, you

13   can go back, Mr. Ross.

14   Q.  Who is the Cal -- who did you understand -- strike that.

15             Who is the Cal, Jr. you mention in the message?

16   A.  The Cal, Jr?

17   Q.  Yes.

18   A.  That is Cal Darden, Jr. of the two guys we ended up

19   meeting.

20   Q.  Did you see there's a reference below to, Dad is Cal, Sr.?

21   A.  Yes, sir.

22   Q.  Who did you understand Mr. Briscoe was referring to when he

23   said Cal, Sr.?

24   A.  That's Cal, Jr.'s father.

25   Q.  Whose name is what?

O9QBDAR2                        Howard - Direct

1   A.  Calvin Darden, Sr.

2   Q.  Okay.  Did you understand that Calvin Darden, Jr., had a

3   role to play in your goal of purchasing the Atlanta Dream?

4   A.  I did.

5   Q.  What did you understand Mr. Darden junior's role to be?

6   A.  He was part of the group that was going to, I guess, head

7   the WNBA with Dream between Cal, Sr., Cal, Jr. and Charles and

8   myself.

9   Q.  And what did you under -- did you understand that Cal

10  Darden, Sr., had a role to play in buying the Atlanta Dream?

11  A.  I felt like he was the head guy with Charles, and that

12  Cal, Jr. is like of like, hey, this is my son.  He's apart of

13  it as well.

14          MR. DONALDSON:  I'm sorry.  I didn't get the last part

15  of the answer.

16          THE COURT:  I felt like he was the head guy with Cal

17  Sr. and Cal, Jr. is -- excuse me -- with Charles, and Cal, Jr.

18  is like, hey, this is my son.  He's apart of it as well.

19  Q.  Did you have an understanding as to why you needed Calvin

20  Darden, Sr., and Calvin Darden, Jr., to help you buy the team?

21  A.  For my understanding those two gentleman, Cal, Jr. and

22  Cal, Sr. had did some business projects before.  Charles told

23  me that they headed this big charity event in China during one

24  of the lockout years for the NBA where they supposedly played

25  players to come out there and play in their tournament.  He

O9QBDAR2                    Howard - Direct

 1   also told me that senior was the chairman of the board for Coca

 2   Cola, and he also was on the board for UPS or something like

 3   that.  I'm thinking that they're both legit businessmen,

 4   especially senior.

 5   Q.  Let me ask it a different way. Did you think anything was

 6   preventing you from just buying the team all by yourself?

 7   A.  Not at first, yes.

 8   Q.  Did that change?

 9   A.  It did change.  Charles told me that because I play in the

10   NBA that I couldn't buy a team outright.  I didn't really

11   understand it.  He really didn't explain too much along with

12   that.

13   Q.  Who introduced you to Calvin Darden, Jr., and Calvin

14   Darden, Sr.?

15   A.  Charles.

16   Q.  And again you mean Mr. Briscoe?

17   A.  Mr. Briscoe.

18   Q.  Did you know either of them at all before the introduction

19   from Charles Briscoe?

20   A.  No, sir.

21   Q.  Did Briscoe introduce them to you at around the time you

22   were considering buying the Dream?

23   A.  Yes, sir.

24   Q.  You just had I think kind of described a little bit about

25   their background.  Where did you hear about that background

O9QBDAR2                        Howard - Direct

1    from?

2    A.   I mainly heard more so about the father that, you know, he

3    was CEO or chairman of the board for these different companies

4    that he had done charity events oversees.  He's known for stuff

5    like that, so I thought he was legit.

6    Q.   Who told you that stuff about Calvin Darden, Sr.?

7    A.   Charles did.

8    Q.   Did you trust Calvin Darden, Jr., when Charles Briscoe

9    introduced him to you?

10   A.   I did.

11   Q.   How come?

12   A.   Well, I thought Charles was a man in right standing.  I

13   didn't think that he would introduce me to, you know, some guys

14   who would scam me.  And, you know, I just had a lot of faith in

15   the fact that him being my agent, he knew how serious I was

16   about the whole project and wanted to do something for the

17   WNBA.

18          MR. MEAD:  Mr. Ross, can you go to page 16 in this

19   document.

20   Q.   Let's keep reading these chats, Mr. Howard.  And again, if

21   you can be yourself and I will be Mr. Briscoe.

22   A.   When do you want to do phone call?

23   Q.   Whenever.  I am ready.

24   A.   The zoom, my bad.

25   Q.   Yeah, whenever, give me a time.

O9QBDAR2                         Howard – Direct

1    A.  What time Cal want to talk?

2           MR. MEAD:  Next page, please, Mr. Ross.

3    Q.  He's free whenever.

4    A.  Want me to tell them one?  He said 1:30.

5           MR. MEAD:  Next page please, Mr. Ross.

6    Q.  Send the zoom info over.

7    A.  I did.

8    Q.  And then did you send the zoom link?

9    A.  Yes, sir.

10   Q.  Mr. Briscoe:  That?

11          MR. MEAD:  Next page, please, Mr. Ross.

12   A.  You said 3:30.

13   Q.  Four.  And did you send another zoom link?

14   A.  Yes.

15   Q.  That, so we all set for four.

16          MR. MEAD:  Take this up for a second.

17   Q.  Did you ever have a video call with Calvin Darden, Jr., and

18   Calvin Darden, Sr.?

19   A.  Yes, sir.

20   Q.  And did you send this zoom link on July 9, 2020?

21   A.  Yes, sir.

22   Q.  Was the video call with the two of them around this time?

23   A.  Mm hm.  Yes, I'm sorry.

24   Q.  Everyone does it.  Believe me.  Okay.

25          MR. MEAD:  Mr. Ross, if you could please pull up not

O9QBDAR2                         Howard - Direct

1    for the jury Government Exhibit 403.

2    Q.  Do you recognize this document?

3    A.  Yes, sir.

4    Q.  Who are these text messages between?

5    A.  Myself, Charles and Calvin Darden, Jr.

6              MR. MEAD:  The government offers Government Exhibit

7    403 into evidence.

8              THE COURT:  Any objection?

9              MR. DONALDSON:  No.

10             THE COURT:  Government Exhibit 403 is admitted into

11   evidence.

12             (Government's Exhibit 403 received in evidence)

13   BY MR. MEAD:

14   Q.  I think you said these are between Briscoe, yourself and

15   Calvin Darden, Jr., right?

16   A.  Yes, sir.

17   Q.  This time IS the green Charles Briscoe?

18   A.  Yes, sir.

19   Q.  And is the blue both you and Calvin Darden, Jr.?

20   A.  Yes, sir.

21   Q.  Okay.  So let's read --

22             MR. MEAD:  Can you zoom in on the first message,

23   Mr. Ross.

24   Q.  What's the date of the first message in this thread?

25   A.  7/9/2020.

O9QBDAR2                    Howard – Direct

1         MR. MEAD:  Can you zoom out.

2    Q.  Let's read these messages, and why don't you be yourself,

3    and I will be both Calvin Darden, Jr., and Charles Briscoe.

4         So Briscoe:  Yo, fellahs, that was a good call.  Let's

5    keep this momentum going.

6    A.  Yessir.  Let's get it.

7    Q.  Calvin Darden, Jr:  Absolutely.

8         Calvin Darden, Jr:  My father and I really appreciate

9    the opportunity to work with you guys.  We're also really

10   appreciative of your trust.  Thank you.

11   A.  Thank you, Cal.  I appreciate you.

12   Q.  From Calvin Darden, Jr:  My pleasure, brother.

13        From Briscoe:  Yessir.  Let's –– and Cal, thank you

14   guys for everything.  We all a team.  We all will win together.

15        From Calvin Darden, Jr:  Absolutely.

16        From Calvin Darden, Jr:  Good morning, gents.  Please

17   check your email when you give a moment.  Just wanted to share

18   my thoughts re potential next steps.

19        In this kind of time period of summer and fall of

20   2020, do you remember like where you physically were?

21   A.  I was in the bubble.

22   Q.  What's the bubble?

23   A.  For the NBA playoffs kind of like the rest of the season we

24   kind of like stop playing because of Covid, and then we picked

25   up the season at this time.

O9QBDAR2                          Howard – Direct

1    Q.  Where did the bubble happen?

2    A.  Orlando, Florida.

3           MR. MEAD:  Mr. Ross, can you go to Government Exhibit

4    201B, please, and not for the jury.

5    Q.  Do recognize these messages?

6    A.  Yes, sir.

7    Q.  And who are they between?

8    A.  Myself and Charles.

9           MR. MEAD:  Government offers Government Exhibit 201B

10   as in boy into evidence.

11          THE COURT:  Any objection?

12          MR. DONALDSON:  No objection.

13          THE COURT:  Government Exhibit 201-B is admitted into

14   evidence.

15          (Government's Exhibit 201-B received in evidence)

16   BY MR. MEAD:

17   Q.  In these Charles Briscoe is blue?

18   A.  He is blue.

19   Q.  And are you green?

20   A.  I am green.

21   Q.  Can you read the first message by Charles Briscoe on this

22   page?

23   A.  I am about to call you.  Cal nem are good with the Dream

24   percentage with you getting 50 percent, me getting 20 percent,

25   and them getting 30 percent.

O9QBDAR2                          Howard – Direct

1   Q.  What's the date of this message?

2   A.  7/12/2020.

3   Q.  What did you understand this message from Charles Briscoe

4   to mean or to be talking about?

5   A.  The percentages that, you know, we would get from owning

6   the team.

7   Q.  So what percentage was he talking about you owning?

8   A.  50 percent.

9   Q.  And what percent was he talking about Charles Briscoe

10  owning?

11  A.  20.

12  Q.  And what percentage was he talking about Calvin Darden,

13  Jr., and Calvin Darden, Sr., owning?

14  A.  30.

15          MR. MEAD:  Can we go to page 40, please, Mr. Ross.

16  Q.  Can you read the message at the bottom of page four by

17  Charles Briscoe?

18  A.  The bottom where it says they ask about the partners.  It's

19  just me and Cal, Sr.

20          MR. MEAD:  Mr. Ross, can we show the bottom of page

21  four and the top of page five are shown together and then zoom

22  in on those two messages.  That's fine.

23  Q.  And does the first message from Charles Briscoe say, When

24  they ask about the partners, it's just me, you, and Cal, Sr.?

25  A.  Yes, sir.

O9QBDAR2                    Howard - Direct

1  Q.  And does the second message from Charles Briscoe then, Cal,

2  Jr. is just backing him up?

3  A.  Yes, sir.

4  Q.  What did you understand that Charles Briscoe was talking

5  about when he sent these messages?

6  A.  That senior was the head.  He's basically the one in

7  charge, the one that should be doing most of the dealings as

8  far as with the team, and that Calvin Darden, Jr., is just his

9  backup.

10        MR. MEAD:  Could you please pull up, not for the jury,

11 Government Exhibit 201-G, Mr. Ross.

12 Q.  Do you recognize these chats?

13 A.  Yes, sir.

14 Q.  And who are they between?

15 A.  Charles and myself.

16        MR. MEAD:  The government offers Government Exhibit

17 201-G into evidence.

18        THE COURT:  Any objection?

19        MR. DONALDSON:  No.

20        THE COURT:  Government Exhibit 201-G is admitted in

21 evidence.

22        (Government's Exhibit 201-G received in evidence)

23 BY MR. MEAD:

24 Q.  What is the date of the first message in this chain?

25 A.  8/27/2020.

O9QBDAR2                        Howard - Direct

Q.  And we jumped ahead maybe four or five weeks now?

A.  Yes, sir.

Q.  All right.  Let's read the chats, and you be yourself in

green, and I will be Mr. Briscoe in blue.

        Also, when will you be free to get on a quick call

with me and Cal?

        Who do you understand "Cal" to be in this message if

you understand anything about who it was?

A.  This was Cal, Jr.

Q.  Next message:  Also, we need to talk with Serge and Jeff

too quick call.

        Who did you understand Serge and Jeff to be in this

message from Mr. Briscoe?

A.  Serge and Jeff were my financial advisors from BMO, the

bank.

Q.  What was their role in this Dream transaction?

A.  They were to help wire the money from BMO.

Q.  So let's keep going to the next message.

A.  I can't talk.  I'm all talked out.

        MR. MEAD:  Next page, please, Mr. Ross.

Q.  That, I feel you on that, bro.  Are you sure you are good,

and just two questions.  We need your approval on payment for

this company to do a strategy deck with the Dream so we all can

be on the same page.  And Jeff and Serge asked about who to be

over authorization with the Dream experiences, me or you.  And

O9QBDAR2                          Howard - Direct

1    I told them you, unless you wanted me to do it.  I told him

2    that I only would do it if you wanted me to do it or couldn't

3    do it.

4            Did you ultimately approve this payment for strategy

5    deck described in message?

6    A.  We may have talked about it on the phone.

7    Q.  It sounds like -- are you sure either way?

8    A.  I'm sure we had a conversation, yeah.

9            MR. DONALDSON:  Judge, just a point of clarification

10   as to who the "we" is.

11           THE COURT:  If you could ask a follow-up question to

12   clarify.

13   Q.  I think you just said we had a conversation, you were sure

14   we had a conversation on the phone about it?

15   A.  Yes, me and Charles.

16   Q.  And did you ultimately see a strategy deck about the

17   Atlanta Dream?

18   A.  Yes, PDF, yes.

19   Q.  Let's keep reading the messages, and you are next.

20   A.  Could I call after the meetings.

21   Q.  From Briscoe:  Yes.

22           From Briscoe:  When you got meetings and if you are

23   not you up to talking, I get it bro.

24           MR. MEAD:  Next page, please, Mr. Ross.

25   Q.  From Briscoe, that's from Cal.  There is a consulting

O9QBDAR2                          Howard - Direct

1    agency that has reviewed the Atlanta Dream opportunity.  They

2    will prepare a business plan/opportunity summary that will

3    detail the specific growth areas.  They will outline the

4    opportunity for growth and areas that are virtually untapped

5    such as merchandising and advertising, as well as the

6    opportunity to merge sports and hiphop.

7            Additionally, they will outline the creation of a

8    production company that will create and own content centered

9    around the players and the league.  This presentation will

10   craft the narrative of a black-owned professional sports team.

11   This new narrative will be the backdrop for increased

12   sponsorship revenue.

13           What did you understand the Atlanta Dream opportunity

14   in this message to be?

15   A.  The opportunity of the Dream.

16   Q.  To buy the team?

17   A.  To buy the team, yes.

18           MR. MEAD:  Mr. Ross Government, Exhibit 2303 in

19   evidence, please.  Zoom in at the top for a second.

20   Q.  Who --

21   A.  Charles Briscoe.

22   Q.  Wait for the question.  But who sent the email?

23   A.  Who sent this?

24   Q.  Yes.

25   A.  Charles Briscoe.

O9QBDAR2                          Howard - Direct

1   Q.  And who is it sent to?

2   A.  Dwight Howard.

3   Q.  And under attachment line is the first attachment

4   invoice.pdf?

5   A.  Yes.

6        MR. MEAD:  Let's go to the last page of this document

7   the attachment please Mr. Ross.  You can zoom in on there.

8   Perfect.

9   Q.  Do you see that there is a company listed at the top left?

10  A.  Legacy.

11  Q.  And what are the two words after that?

12  A.  Consulting corporation.

13  Q.  And then is there an address listed for Legacy Consulting

14  Corporation?

15  A.  375 Park Avenue, New York, New York.

16  Q.  Do you see to the kind of top left middle there's a line

17  that says "client?"

18  A.  Yes, sir.

19  Q.  Who is listed as the client on this client billing

20  statement?

21  A.  Atlanta Dream and Briscoe Sports Group.

22  Q.  Do you see in the table there's a line that says vendor

23  description?

24  A.  Yes, sir.

25  Q.  What's it say under that?

O9QBDAR2                    Howard - Direct

 1    A.   Monthly consultant fee including strategy deck.

 2    Q.   And do you see it says cost?

 3    A.   Yes, sir.

 4    Q.   What is the cost of the monthly consulting fee including

 5    strategy deck from Legal Consulting Corporation?

 6    A.   75,000.

 7    Q.   Underneath this box do you see it says please wire payment

 8    as follows?

 9    A.   Yes, sir.

10    Q.   What's the company listed under that line?

11    A.   Legacy AC, LLC.

12    Q.   With what -- and can you read the next two lines or the

13    next three lines underneath that?

14    A.   Where it says bank Wells Fargo, bank address 143 Lenox

15    Avenue, New York, New York account name Legacy AC, LLC.

16    Q.   That's good.  Thank you.

17         Did you pay this invoice?

18    A.   Yes.

19    Q.   Did you have any understanding about what the purpose of

20    this payment was for $75,000?

21    A.   Just a little bit.  Like I thought this was for them to

22    kind of put a deck for me or have a deck made for me.  I'm

23    sorry.

24    Q.   Did you ultimately see a deck that was made for you?

25    A.   I did.

O9QBDAR2                          Howard - Direct

1           MR. MEAD:  Government Exhibit 2119A in evidence,

2     please.  Mr. Ross.  If you could just scroll through it for a

3     second, please Mr. Ross slowly.

4     Q.  Have you ever seen this document, Mr. Howard?

5     A.  Yes.

6     Q.  Who showed it to you?

7     A.  Charles did.

8     Q.  And again meaning Charles Briscoe?

9     A.  Charles Briscoe.

10          MR. MEAD:  Let's go to page one, please, Mr. Ross.

11    Q.  You recognize that logo?

12    A.  Yes, sir.

13    Q.  And what's the logo?

14    A.  This is the Atlanta Dream's logo.

15          MR. MEAD:  Page two, please, Mr. Ross.

16    Q.  Can you read the first sentence, please?

17    A.  Darden Sports Group, DSG, led by prominent Atlanta

18    businessman Cal Darden, Sr. is proud to have an opportunity to

19    become the next owner of the WNBA's Atlanta Dream.

20    Q.  What did you understand that this power point was about?

21    A.  The power point was supposed to show me, you know, what the

22    plans was going to be, everything that we had our video call

23    about between the Dardens and Charles, everything that we

24    talked about, everything that I expressed was supposed to be

25    put into this strategy guide for the Dream.

O9QBDAR2                        Howard - Direct

1   Q.  Did you have -- do you remember if you show up anywhere in

2   this document?

3   A.  I don't think I do.

4   Q.  Do you have an understanding as to why you're not in this

5   document?

6   A.  Nah, not really.

7   Q.  Do you have an understanding about why Charles Briscoe

8   showed you this document?

9   A.  Yes, I do.  He showed me so I could, you know, take the

10  next step of purchasing the team.

11  Q.  And what affect did seeing this document have on you?

12  A.  I thought this was it.  I thought this was the one.

13  Q.  What do you mean by that?

14  A.  The one, what I mean, if you go through the pdf, it has

15  some prominent names in the industry.  I really thought that

16  they had got in contact with all these people, these companies

17  for sponsorship.  So I'm like, man, this is golden.  We got all

18  the right pieces.

19  Q.  What did you want to do after you saw this?

20  A.  Get the team, buy the team, yeah.

21          MR. MEAD:  Let's go to page six of this document

22  Mr. Ross.

23  Q.  I'm just going to read the first two lines.

24  A.  Advisory board -- you want me to read it?

25  Q.  I'll read it.  I'll give you a break for that.

O9QBDAR2                          Howard - Direct

1           Advisory Board.  Darden Sports Group has assembled a

2   world-class advisory board comprised of superstar leaders

3   within the areas of music, television, film, professional

4   sports, business and community.  Each board member has

5   committed to using their ideas, voices, platforms, resources,

6   relationships and influence to support the Atlanta Dream and

7   its various initiatives.

8   Q.  Who are the people then listed as members of the advisory

9   board?

10  A.  Jennifer Baltimore, Naomi Osaka, Rosalind Brewer, Tyler

11  Perry, Shirley Franklin, Issa Rae, Lamar Jackson and Kanye

12  West.

13  Q.  What was your impression when you saw this page?

14  A.  I was like, these some pretty big heavy hitters.  All the

15  things we had our conversation with between myself and Cal, a

16  lot of the things that I was telling Charles about, you know,

17  what the team would need.  And, you know, looking at this list

18  I'm thinking like, man, we have Kanye for shoes and apparel for

19  all the girls.  And Tyler Perry was supposed to be doing like

20  off the court recording, you know, trying to show the women in

21  a different light. So I'm thinking that this is it.

22  Q.  What role did you understand that these eight people would

23  have if you bought the team?

24  A.  They would be apart of the team as well making sure that

25  everything that we're trying to accomplish, the goals that we

O9QBDAR2                          Howard - Direct

1   have for the team, the city, and the women would be met.

2   Q.  Did you move forward with your plan to purchase the team

3   after you saw this page?

4   A.  Yes, sir.

5   Q.  And was this page important to your decision to move

6   forward to buying the team?

7   A.  It definitely was.

8   Q.  How come?

9   A.  I mean, Tyler Perry speaks for itself.  Kanye West, you

10  know.  We had some dealings with him before.  So I'm like, man,

11  Kanye West is outfitting my team with shoes and jerseys, you

12  know, what else can we ask for.  The Mayor Shirley Franklin at

13  the time.  I'm thinking that this is some real legit stuff.

14  Q.  Did you call any of these people to make sure that they

15  were really going to be involved?

16  A.  No, I didn't.

17  Q.  How come?

18  A.  I had a lot of trust in my agent and everybody involved

19  that they weren't bullshitting me with this list.  So, no, I

20  didn't call any of the people.

21  Q.  Did you personally know any of the eight people on this

22  list?

23  A.  Not to where I could just call them and stuff like that,

24  no.

25  Q.  And I think you mentioned having some dealings with Kanye

O9QBDAR2                          Howard - Direct

1    West in the past?

2    A.  Yes.

3    Q.  Were you personally close with Kanye West?

4    A.  No.  I went to his church service when he use to do like

5    the little singing around.  I went to that, met him.  We

6    actually had our kids at the same hospital, so I saw him there;

7    but, no, I don't have no relationship with him.

8    Q.  Did you tell Charles Briscoe or Calvin Darden, Jr., that

9    they should put these people on this list?

10   A.  That they shouldn't?

11   Q.  That they should?

12   A.  I didn't know they was putting them on the list until I

13   actually saw this whole list.

14          MR. MEAD:  Let's go to page 16 of this document,

15   please, Mr. Ross.  I'm going to read some of this.

16          Corporate affiliations.

17          Given DSG's extensive relationships with the C-suites

18   of some of America's largest corporation, especially those

19   based in the Atlanta area, the new Atlanta Dream will attract a

20   significantly higher amount of corporate support and investment

21   than ever before.  DSG has had preliminary discussions with

22   each of its corporate partners in regards to marketing and

23   sponsorship investment opportunities with the new Atlanta

24   Dream.  DSGs corporate partners understand the value of women's

25   sports and are committed to investing in and across the Dream's

O9QBDAR2                      Howard - Direct

1   various platforms and properties.  DSG's corporate partners

2   include.  And then are there a whole bunch of companies listed

3   there, Mr. Howard?

4   A.  A whole lot of companies.

5   Q.  What was your impression when you saw this page?

6   A.  Damn, the team is on.  We're heading in the right

7   direction.  I mean, I don't think -- I think anybody who's --

8          MR. DONALDSON:  Objection.

9   A.  want to get a team.

10         THE COURT:  Sustained.  Mr. Howard, rather than

11  anybody --

12         THE WITNESS:  Myself.

13         THE COURT:  Correct.  Exactly.

14  A.  After I looked at this myself, I thought that anyone who

15  would see this besides myself would say this is pretty awesome

16  to have the likes of McDonald's, Starbucks, Delta, Coca Cola, I

17  mean these are big companies.

18  Q.  You mention anyone would think, did you think it was

19  impressive?

20  A.  Yeah.

21  Q.  And did you have an understanding about what role this

22  group of companies would play with the team if you bought the

23  team?

24  A.  That they would be the sponsorships our corporate sponsors

25  basically.  I mean, NBA teams don't have sponsorships like

O9QBDAR2                        Howard - Direct

1   this, so I thought that they had legit.

2   Q.  And corporate sponsorships meaning that they would pay the

3   team to be sponsors?

4   A.  Yes.

5   Q.  Did you move forward with your plan to purchase the Dream

6   after seeing this page?

7   A.  Yes, sir.

8   Q.  And was this page important to your decision?

9   A.  Very important.

10  Q.  And again why was it important?

11  A.  Just because of the sponsors that was on here, having an

12  opportunity to work with some of these big entities again.

13  I've worked with some of them in the past as far as McDonald's,

14  Coca Cola and Delta.  So being able to work with them, I felt

15  would have been really good.

16       MR. MEAD:  Your Honor, I think do one more slide and

17  then break. I don't need a break, but --

18       THE COURT:  That's fine.  We can take our morning

19  break.  Why don't you -- you said you had one more slide and

20  then we'll take our morning break.

21       MR. MEAD:  Thank you, your Honor.  If we can go to

22  page 20 of this document, please, Mr. Ross.

23  Q.  Let me read this slide at the top.

24       Darden Sports Group plus Tyler Perry Studios People's

25  Dream Productions.  Darden Sports Group and Tyler Perry Studios

O9QBDAR2                           Howard - Direct

1    have agreed to form a joint venture production company to

2    create, develop, and distribute original content showcasing

3    powerful, impactful, intelligent, and influential women. Dream

4    productions will document and showcase women's diverse interest

5    and stories across sports, business, culture and more.  In

6    addition, Dream productions will partner with WNBA players and

7    other female athletes to create their own series while

8    documenting their off-court lives.

9             Have you heard of Tyler Perry Studios before?

10   A.  Yes, sir.

11   Q.  What is it?

12   A.  It's like a production studio with his movies and all that

13   stuff.

14   Q.  When you say his movies, whose movies?

15   A.  Tyler Perry.

16   Q.  What was your impression when you saw this page?

17   A.  It was something that we spoke about myself, Cal, Jr, Sr.

18   and Charles about, you know, trying to do something to put the

19   women on the map, show what they do off the court, kind of

20   highlight their charity work, how hard it is being a woman

21   playing professional sports and having to carry kids and do all

22   of that stuff.  So we wanted to kind of, like, highlight all

23   that, show what these women are doing; hence, the Dream's

24   Production, the Dream Productions mixed with Tyler Perry's.

25   Q.  Whose idea was it to have some sort of video series

O9QBDAR2                              Howard - Direct

following the players around?

A.  It was my idea.

Q.  Did you ever Charles Briscoe --

A.  I did.  I'm sorry.

Q.  One second. Did you ever tell Calvin Darden, Jr., or Sr. or
Charles Briscoe that you personally had lined up Tyler Perry to
work on that project?

A.  No, I didn't tell them that, no.

Q.  Did you move forward with your plan to purchase the Atlanta
Dream after seeing this slide?

A.  Yes, sir.

Q.  And was this slide important to your decision?

A.  Yes, it was.

Q.  And how come?

A.  To work with Tyler Perry to put something together for
these woman to kind of show their off-the-court life, it's
something I wanted to highlight and something that I talked
about a lot with the guys.

        MR. MEAD:  I think now would be a good time for a
break, your Honor, if that's convenient.

        THE COURT:  Ladies and gentlemen, we're going to take
our morning break.  Please remember do not discuss the case
with one another, no research.  Just go back.  Relax.  We'll
come and get you probably about 12:10, 12:15.  It's now about
11:50.  You can step down.  Thank you.

O9QBDAR2                        Howard – Direct

1              (Jury not present)

2              (Witness exited courtroom)

3              THE COURT:  You may be seated.  Is there anything that

4    we should deal with before we take our morning break?

5              MR. MEAD:  Not from the government.  We've got maybe

6    15 or 20 minutes left of direct.

7              THE COURT:  Mr. Donaldson, will you be conducting the

8    cross-examination.

9              MR. DONALDSON:  Yes?

10             THE COURT:  And do you have a sense about how long it

11   will be?  I'm not going to hold you.  It's just to determine

12   whether and when we would get to additional witnesses.

13             MR. DONALDSON:  At least an hour and a half.

14             THE COURT:  Okay.  All right.  Okay.  So I'll see

15   everybody about 12:10.  Okay.  Thank you very much.

16             (Recess)

17             THE COURT:  You can be seated.  Is there anything we

18   need to deal with before we have the witness on the stand and

19   we get the jury?  From the government.

20             MR. MEAD:  No, your Honor.

21             THE COURT:  From the defense?

22             MR. DONALDSON:  No, your Honor.

23             THE COURT:  If we could have Mr. Howard and we can get

24   the jury.  Thank you.  Mr. Howard I ask you to remain standing

25   until the jury comes in and then you can have a seat.

O9QBDAR2                    Howard - Direct

1   Mr. Howard, you can have a seat.

2            Ladies and gentlemen, I hope you had a good break.

3   We're going to continue with the examination of Mr. Howard.

4   You may proceed, Mr. Mead.

5   BY MR. MEAD:

6   Q.  Mr. Howard, did you ultimately send money to buy the

7   Atlanta Dream?

8   A.  Yes, sir.

9   Q.  How much money?

10  A.  $7 million.

11            MR. MEAD:  Mr. Ross, can you pull up Government

12  Exhibit 602-C1, page two in evidence, please.  Okay.

13  Q.  Do you see where it says --

14            MR. MEAD:  And if you could zoom in.

15  Q.  Do you see where it says remitter, Mr. Howard?

16  A.  Yes.

17  Q.  And who's listed as the remitter on this wire?

18  A.  Myself, Dwight David Howard, II.

19  Q.  Do you see where it says beneficiary on this wire?

20  A.  Yes, sir.

21  Q.  Who is listed as the beneficiary?

22  A.  Legacy AC/LLC.

23            MR. MEAD:  And if you could zoom out.

24  Q.  Do you see where it says debit amount toward the top?

25  A.  Yes, sir.

O9QBDAR2                          Howard - Direct

1   Q.  What's the debit amount of this wire?

2   A.  $4 million.

3   Q.  And what is the date of this wire, the post date at the top

4   right?

5   A.  11/13/2020.

6   Q.  Did you send this $4 million wire to legacy AC, LLC?

7   A.  Yes, sir.

8   Q.  Page three, please.

9           Again, who is the remitter on this wire?

10  A.  Myself.

11  Q.  And again who is the beneficiary on this wire?

12  A.  Legacy AC.

13  Q.  What is the debit amount on this wire?

14  A.  Three million.

15  Q.  And the post date on this wire?

16  A.  12/1/2020.

17  Q.  Did you send this $3 million to Legacy AC/LLC?

18  A.  Yes, sir.

19  Q.  What's the total amount of the two wires?

20  A.  Seven million.

21  Q.  What did you understand was the purpose for which you were

22  sending this $7 million?

23  A.  To purchase the Atlanta Dream.

24  Q.  Where did you get that understanding from?

25  A.  Charles, Charles Briscoe.

O9QBDAR2                          Howard – Direct

1   Q.  Are you familiar with something called a line of credit?

2   A.  Yes, sir.

3   Q.  Did you obtain a line of credit in connection with these

4   wires?

5   A.  Yes, sir.

6   Q.  Do you remember what bank?

7   A.  BMO.

8   Q.  And what was the purpose of the line of credit?

9   A.  To purchase the Dream.

10  Q.  Whose idea was it for you to get a line of credit to

11  purchase the Dream?

12  A.  Charles.

13          MR. MEAD:  Mr. Ross, if you could pull up, not for the

14  jury, please, Government Exhibit 201-I.

15  Q.  Do you recognize these messages, Mr. Howard?

16  A.  Yes.

17  Q.  And who are they between?

18  A.  Myself and Charles.

19          MR. MEAD:  Government offers 201-I into evidence.

20          THE COURT:  Any objection?

21          MR. DONALDSON:  No.

22          THE COURT:  Government Exhibit 201-I is admitted into

23  evidence.

24          (Government's Exhibit 201-I received in evidence)

25  Q.  Could you zoom in on the first message, Mr. Ross.  This is

O9QBDAR2                          Howard - Direct

1    a message from Charles Briscoe?

2    A.  Yes, sir.

3    Q.  What's the date on this message?

4    A.  11/9/2020.

5    Q.  Can you read the message, please.

6    A.  Yessir.  It's about to get real, bro.  Also Cal said he

7    will have that agreement ready tomorrow.

8            MR. MEAD:  Mr. Ross, if you could please pull up

9    Government Exhibit 201-I side-by-side with Government Exhibit

10   602-C1 at page two, please.

11   Q.  The message on the left is from Charles Briscoe, can you

12   read that message again?

13   A.  Yessir, it's about to get real bro.  Also Cal said he would

14   have that agreement ready tomorrow.

15   Q.  Again the date is November 9, 2020?

16   A.  Yes, sir.

17   Q.  You can zoom out.

18            And then is the date on the wire on the right for $4

19   million November 13, 2020?

20   A.  Yes, sir.

21   Q.  So is that message saying, Cal said he'll have the

22   agreement ready tomorrow, is that from four days before you

23   wired $4 million?

24   A.  Yes.

25            MR. MEAD:  Mr. Ross, if you could please pull up

O9QBDAR2                          Howard – Direct

1    Government Exhibit 2413 at page seven which is in evidence

2    please.  You can just click through the first couple of pages

3    of this document until you get to the end.  A little more

4    slowly, please, Mr. Ross.

5    Q.  Do you recognize -- well, on the last page, it's a little

6    bit hard to see.  Is that your signature?

7    A.  You can't really see anything.

8    Q.  Is says your name underneath it?

9    A.  It does say my name underneath it, yes.

10   Q.  What's the date on this document?

11   A.  November 11, 2020.

12   Q.  Have you looked at a version of this document where your

13   signature was a little more clear?

14   A.  Yes.

15   Q.  So you have no reason to think this is not your signature,

16   right?

17   A.  I've seen the signature.

18          MR. MEAD:  You can go back to page seven of this

19   document, please, Mr. Ross.

20   Q.  What's the title of this document?

21   A.  Convertible Promissory Note Financing of Darden Sports

22   Group.

23   Q.  And then do you see where it says issuer?

24   A.  Yes, sir.

25   Q.  What's it say for issuer?

O9QBDAR2                          Howard - Direct

1    A.   Darden Enterprises LLC, d/b/a Darden Sports Group, a

2    Florida Limited Liability Corporation.

3    Q.   And do you see where it says investor?

4    A.   Yes, sir.

5    Q.   And then does it say that you're the investor?

6    A.   Yes, sir.

7    Q.   And did you sign this document?

8    A.   Yes, sir.

9    Q.   How carefully did you read this document before you signed

10   it?

11            MR. DONALDSON:  Objection to the form of the question.

12            THE COURT:  Only one.  Okay.  If you could rephrase

13   the question.  Objection sustained.

14   Q.   Did you read this document before you signed it?

15   A.   I kind of went -- briefly went through it.  I had Charles

16   as the main person look over it.  And, yeah.

17   Q.   Why did you only briefly look through it?

18   A.   Well, I had some trust in Charles and what he was sending

19   me.  A lot of times after I would -- or when I would sign any

20   documents, he would, before I sign, he would be the one to go

21   over the documents to kind of make sure everything is

22   copasetic, is good, and I can go in and sign.

23   Q.   Did you talk about this document with anyone other than

24   Charles Briscoe?

25   A.   No.

O9QBDAR2                          Howard - Direct

1    Q.  Did you show it to anyone else before you signed it?

2    A.  No.

3    Q.  Do you see where it says financing amount?

4    A.  Yes, sir.

5    Q.  What's the financing amount?

6    A.  Seven million.

7    Q.  And is that the amount of money that you wired to buy the

8    Atlanta Dream?

9    A.  Yes, sir.

10   Q.  Do you see where it says use of proceeds?

11   A.  Yes, sir.

12   Q.  Could you read where it says use of proceeds, please?

13   A.  The company intends to use the proceeds of this offering

14   for the company operating expenses of 2.5 million a year,

15   expansion of its lines of business, specifically the addition

16   of production company 2.5 million a year, OTT channel, 1

17   million a year and associated costs and expenses.

18   Q.  And does it say the Atlanta Dream anywhere in that

19   paragraph?

20   A.  No, sir.

21   Q.  Do you see where it says interest?

22   A.  Yes, sir.

23   Q.  Can you read what it says for interest?

24   A.  Seven percent per annum based on a 365 day year.

25   Q.  Have you received any interest payments on this $7 million

O9QBDAR2                         Howard - Direct

1    note from Darden Sports Group, Darden Enterprises or Calvin

2    Darden, Jr., or Sr.?

3    A.  No, sir.

4           MR. MEAD:  Can we go to page eight of this document

5    please Mr. Ross. Can you zoom in on conversion, please.

6    Q.  And can you read these two paragraphs for conversion,

7    please, Mr. Howard?

8    A.  Involuntarily conversion at the maturity date in the event

9    of default and the note has not been paid on or about the

10   maturity date, the note will convert to majority of the

11   ownership of the company and its assets.

12          Voluntary conversion at the maturity date.  If the

13   note has not been previously converted pursuant to the

14   retirement of the investor, then effective upon the maturity

15   date the company may elect to convert the note into majority

16   ownership of the company and its assets.

17   Q.  You're the investor in this document, right?

18   A.  Yes, sir.

19   Q.  Are you retired from the NBA?

20   A.  No, sir.

21          MR. MEAD:  Can we go back to page seven in this

22   document, please.

23   Q.  Do you see where it says maturity?

24   A.  Yes, sir.

25   Q.  What's it say?

O9QBDAR2                        Howard - Direct

1   A.  Unless earlier converted, the entire balance under the note

2   shall be due and payable 36 months from the initial closing.

3   Q.  36 months is three years, right?

4   A.  Yes, sir.

5   Q.  What's three years from November 11, 2020?

6   A.  2023.

7   Q.  Have you gotten paid back on this note?

8   A.  No sir.

9   Q.  Are you currently the owner of the Darden Sports Group or

10  the Darden Enterprises?

11  A.  No, sir.

12         MR. MEAD:  Page ten of this document please, Mr. Ross.

13  Q.  So we talked about your signature, who sign this document

14  on behalf of the Darden Sports Group?

15  A.  It says Calvin R. Darden.  I don't know if that's junior or

16  senior.

17  Q.  And what's the title there?

18  A.  Chairman and chief executive officer.

19  Q.  And you don't know the middle name Calvin Darden, Jr., or

20  Calvin Darden, Sr.; is that right?

21  A.  No, I don't.

22  Q.  After you sent the $7 million, who did you understand owned

23  the Atlanta Dream?

24  A.  Myself.

25  Q.  And why did you think that?  Why did you think you were the

O9QBDAR2                        Howard - Direct

1    owner?

2    A.   When I sent the money, I wired the money, and that's when

3    Charles came and tell me that, you know, I was the new owner of

4    the Dream, congratulation all that stuff.

5              MR. MEAD:   Can you please pull up Government Exhibit

6    201-J, not for the jury please, Mr. Ross.

7    Q.   Do you recognize these messages, Mr. Howard?

8    A.   Yes, sir.

9    Q.   Who are they between?

10   A.   Myself and Charles.

11             MR. MEAD:   The government offers Government Exhibit

12   201-J into evidence.

13             THE COURT:   Any objection?

14             MR. DONALDSON:   No.

15             THE COURT:   Government Exhibit 201-J is admitted in

16   evidence.

17             (Government's Exhibit 201-J received in evidence)

18   BY MR. MEAD:

19   Q.   All right.   What's the date on these messages?

20   A.   1/6/21.

21   Q.   And is this after you've wired the $7 million?

22   A.   This is after.

23   Q.   So let's read these messages.   And you be yourself and I'll

24   be Mr. Briscoe.

25   A.   You see Lebron talking about owning the Dream.

O9QBDAR2                    Howard - Direct

1    Q.  And then you send a Twitter link.  And do you see after

2    twitter.com it says King James?

3    A.  Yes, sir.

4    Q.  Do you know what Twitter handle King James is?

5    A.  I think that's -- that is Lebron James.

6                (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O9QJDAR3                        Howard - Direct

1   BY MR. MEAD:

2   Q   All right.  Then Mr. Briscoe, lol crazy it's too late for

3   that.

4           What do you understand that Mr. Briscoe meant when he

5   said "lol crazy it's too late for that" in response to your

6   messages?

7   A   It was too late for Lebron to be owning the Dream.

8   Q   Why did you understand that it was too late at this point

9   for Lebron to own the Dream?

10  A   Oh, because he told me that I had already owned it.

11          MR. MEAD:  Can we go to the next page, please,

12  Mr. Ross.  Can you zoom in on these messages?

13  Q   All right.  You be yourself, and I will be Mr. Briscoe.

14  A   We still good on that.

15  Q   Briscoe, yes, sir.

16          When you said "we still good on that," what did you

17  mean?

18  A   He was talking about the Dream.

19  Q   And when Mr. Briscoe said "yes, sir," what did you

20  understand he meant?

21  A   Yes, we still good.

22          MR. MEAD:  Government Exhibit 202K not for the jury,

23  please, Mr. Ross.

24  Q   Do you recognize these messages?

25  A   Yes, sir.

O9QJDAR3                          Howard – Direct

1   Q   And who are they between?

2   A   Myself and Charles.

3           MR. MEAD:  The government offers Government

4   Exhibit 202K into evidence.

5           THE COURT:  Any objection?

6           MR. DONALDSON:  No.

7           THE COURT:  202K is admitted in evidence.

8           (Government's Exhibit 202K received in evidence)

9   BY MR. MEAD:

10  Q   What's the date on this first message?

11  A   1/11/21.

12  Q   Is this about five days after the messages we just looked

13  at?

14  A   Uh-huh.  Yes.  Yes.

15  Q   Again, before or after you sent the $7 million?

16  A   After.

17  Q   All right.  Let's read these messages and you be yourself

18  and I will be Mr. Briscoe.

19  A   What's going on with the Dream?

20  Q   With who?  The Sixers?

21  A   No, the Dream.

22          MR. MEAD:  Next page, please, Mr. Ross.  Is that the

23  end?  That's the end.  Never mind.  Okay.

24  Q   We've looked at a couple of sets of messages today, right?

25  A   Uh-huh.

O9QJDAR3                          Howard – Direct

1    Q   Sorry.  Yes or no?

2    A   Yes.

3    Q   Have almost all of those messages been between you and

4    Charles Briscoe.

5    A   Yes, sir.

6    Q   Who did you mainly talk to about buying the Atlanta Dream?

7    A   Charles Briscoe.

8    Q   Why?

9    A   He's my agent.  He was the one that was kind of, like I

10   said earlier, mediator or the person that would talk to the

11   Dardens.

12   Q   And how often did you talk directly to Darden Jr. about

13   buying the Dream?

14   A   We didn't.  It was more so Charles speaking with them.

15   Q   When you say "we didn't," does that mean we never ever did

16   or only occasionally?

17   A   We had the conversation on Zoom, but it wasn't a lot of

18   conversations between myself and Darden.

19   Q   And as to Darden Sr., how often did you talk to Darden Sr.

20   directly about buying the Dream?

21   A   We had the one conversation.  And other than that, it was

22   Charles being the one to speak to them.

23   Q   How did you have an understanding about what Darden Jr. and

24   Darden Sr. were doing with regard to buying the Atlanta Dream?

25   A   Can you say that again.

1  Q    Did you have an understanding about what Calvin Darden, Jr.

2  and Calvin Darden, Sr. were doing to buy the Dream?

3  A    Yes, sir.

4  Q    How did you get that understanding if you weren't talking

5  to them directly very often?

6  A    Charles.

7  Q    Do you know who Chandler Parsons is?

8  A    I do.

9  Q    Who is he?

10  A    He is an old teammate of mine.  We played together in

11  Houston, professional NBA players -- ex-professional NBA

12  player.

13          MR. MEAD:  All right.  One second, your Honor.

14          THE COURT:  Yes.

15  Q    Almost done, Mr. Howard.

16          Did there come a time when you learned that you did

17  not actually own the Atlanta Dream?

18  A    Yes, sir.

19  Q    How did you find that out?

20  A    The same way I found out about the getting the Dream, on

21  the ticker.

22  Q    What do you mean it was "on the ticker"?

23  A    It was on the ESPN ticker that the Dream was purchased by

24  someone else.

25  Q    Is that the little yellow line that goes across the bottom

O9QJDAR3                        Howard - Direct

1    on ESPN?

2    A    It could be yellow, red, whatever the breaking news is at

3    the time.

4    Q    What did you do when you found out that someone else bought

5    the Dream?

6    A    I was about to jump off a cliff.  No, I was sad.  I was

7    super sad.  I was mad, very upset.  I called Charles a couple

8    times, but -- not a couple times, but a lot, trying to figure

9    out what was going on.  But I was really upset.

10   Q    Tell me about your conversations with Charles after you

11   found this out.

12   A    Telling him I want my money back.  There was a lot of

13   anger.  Told him that, you know, if I don't get my money back,

14   I'm going to come get you.  I was hurt at the time when it

15   happened, so yeah.

16   Q    And what did Charles say in response to your request for

17   your money back?

18   A    I'm going to get your money back, I'm going to call Cal.

19   Sometimes he was saying he just got off the phone with Cal and

20   that he's -- I'm like can you call him back?  He's like yeah,

21   one second.  And then he's like oh, he didn't answer this time.

22   So it was always an excuse.

23   Q    Did he tell you what had happened to your money?

24   A    He said yeah, the money is supposed to be used now for some

25   projects around the arena and real estate.  And I'm like hold

1  up, this doesn't go together.  It's supposed to be for the

2  purchase of the Dream.  Why is my money going to some real

3  estate?  Give me my money back.

4  Q   Did you ever have an understanding before you sent the

5  money that it was going to be for real estate in Atlanta?

6  A   No.

7  Q   And when you said "he" told you that, are you referring to

8  Charles Briscoe?

9  A   Charles Briscoe, yes, sir.

10  Q   Did you ever talk to Calvin Darden, Jr. again after you

11  found out you didn't own the team?

12  A   No, couldn't get in contact with nobody.

13  Q   Did you ever talk to Calvin Darden, Sr. again after you

14  learned you didn't own the team?

15  A   No, sir.

16  Q   Did you try and talk to them?

17  A   No.  I tried to go through Charles.  He was the one that

18  set it up.  He was the one that introduced me to both of them,

19  so yeah.

20  Q   What did you send the $7 million for?

21          MR. DONALDSON:  Objection, your Honor.  Asked and

22  answered.

23          THE COURT:  I'll allow it.

24  A   What did I send the seven -- for the purchase of the Dream.

25  Q   Did you intend for any of money to go to buy a $3.7 million

O9QJDAR3                          Howard - Direct

1     house for Calvin Darden, Jr.?

2     A   Not, not all.

3     Q   Did you intend for any of the money to buy a Porsche for

4     Calvin Darden, Jr.?

5     A   No, sir.

6     Q   What about a Rolls-Royce for him?

7     A   No, sir.

8     Q   What about a Lamborghini for him?

9     A   No, sir.

10    Q   Did you intend for any of the money to go to buy expensive

11    art for Calvin Darden, Jr.?

12    A   No, sir.

13    Q   What about cryptocurrency for Calvin Darden, Jr.?

14    A   No, sir.

15    Q   Did you intend for a million dollars in money to go to

16    Charles Briscoe?

17    A   No, sir.

18    Q   Do you own the Atlanta Dream or any part of the Atlanta

19    Dream?

20    A   No, sir.

21    Q   Do you own any real estate connected to the Atlanta Dream?

22    A   No, sir.

23    Q   Did you get anything for your $7 million?

24    A   No, sir.

25    Q   Did you get your money back?

1    A   No, sir.

2              MR. MEAD:  No further questions.  Thank you,

3    Mr. Howard.

4              THE COURT:  Thank you.

5              Cross-examination?  By my watch, we have about five

6    minutes or so, but if you want to start after lunch.

7              MR. DONALDSON:  I think that's better, Judge, rather

8    than my starting and stopping in five minutes.

9              THE COURT:  Ladies and gentlemen, we're going to take

10   your lunch break now and return at -- why don't we come back at

11   2:00.  2:00 come back.  So relax, have a good lunch.  Remember

12   do not discuss the case.  If anybody approaches you, tell them

13   that I said not to discuss the case.  You can leave your pads

14   on your chairs or take them with you, and we'll see you at

15   2:00, all right?  Thank you.

16              (Continued on next page)

17

18

19

20

21

22

23

24

25

O9QJDAR3

1              (In open court; jury not present)

2              THE COURT:  Mr. Howard, you can step down.  The only

3    thing I will say during the lunch break, no substantive

4    communications with the government about your examination, all

5    right, because you're now on cross-examination.  But I'll see

6    you after lunch, okay?

7              THE WITNESS:  Yes, sir.

8              (Witness temporarily excused)

9              THE COURT:  You may be seated.

10             Is there anything we need to take up before the lunch

11   break?

12             MR. MEAD:  Nothing from the government.  I think

13   Mr. Ricco may have something to take up at sidebar.

14             MR. RICCO:  Sidebar with the government, but unrelated

15   to the case, with the government present.

16             THE COURT:  Let me just ask, after Mr. Howard what do

17   we think the lineup will be?

18             MR. MEAD:  After Mr. Howard, we have Ms. Bronson who

19   is the accountant.  I'm assuming that will take us to the end

20   of the day.  If you think the cross is going to be

21   substantially shorter, try and let us know and we can get the

22   next witness here, who is a paralegal.  But I'm assuming

23   Ms. Bronson will take us to the end of the day.

24             Why don't we come to sidebar.

25             (Discussion off the record; luncheon recess)

O9QJDAR3

1                          AFTERNOON SESSION

2                              2:10 p.m.

3            (In open court; jury not present)

4            THE COURT:  Is there anything we need to take up

5    before we bring the jury in?

6            MR. MEAD:  Not from the government.

7            THE COURT:  From the defense?

8            MR. DONALDSON:  No, your Honor.

9            THE COURT:  So why don't we get Mr. Howard and we can

10   get the jury.

11           Same as before, I ask you to remain standing.  And

12   once the jury is in, you can have a seat.  Thank you.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court; jury present)

2              THE COURT:  Ladies and gentlemen, I hope you had a

3    good lunch.  And we're going to continue now with the

4    cross-examination of Mr. Howard.  Okay.

5              Mr. Donaldson?

6              MR. DONALDSON:  Thank you, Judge.

7              THE COURT:  Sure.

8    CROSS-EXAMINATION

9    BY MR. DONALDSON:

10   Q   Good afternoon, sir.

11   A   Good afternoon.

12   Q   Normally I would ask people to speak up so the last person

13   can hear them, but you seem to be good with that.  But speak up

14   anyway so we can hear you way back here, all right?

15             Is that a yes?  You got to say yes.

16   A   Yes, sir.

17   Q   All right.  Now, so I want to ask you some questions about

18   your direct testimony and also about the Atlanta Dream.  If you

19   don't understand a question, just let me know, all right?

20   A   Yes, sir.

21   Q   All right.  Now, regarding the Dream, you had initially had

22   conversations with the owners of the team, correct?

23   A   Did I initially have conversations with the owners?

24   Q   Yes.

25   A   Can you explain what you mean by that question.

1    Q   Sure.  You said you wanted to -- in your brain you wanted

2    to buy the Dream, correct?

3    A   Not in my brain, in actual real life I wanted to buy the

4    Dream.

5    Q   So --

6    A   It wasn't my brain.  It was real life.

7    Q   At some point in time in July 2020 in real life, you wanted

8    to buy the Dream?

9    A   That is correct.

10   Q   You came to that realization while you were down in the

11   bubble, correct?

12   A   It was before.

13   Q   Before you were in the bubble?

14   A   Uh-huh.

15   Q   Is that a yes?

16           THE COURT:  The issue, Mr. Howard, is that when you

17   say "uh-huh," the only think that appears in the transcript is

18   "uh-huh."  So we all know it means "yes," so you need to

19   articulate a yes or a no.

20           THE WITNESS:  Yes, sir.  Yes, sir.

21           THE COURT:  Thank you.

22   Q   So sometime in July of 2020, would it be fair to say that

23   you had thoughts in reality about purchasing the Dream?  Would

24   that be fair to say?

25   A   That year I wanted to buy the Dream.  But before that, I'd

1   been in talks with people around the league, my peers, about

2   having ownership in different things.  And I always wanted to

3   own a WNBA team, so 2020 was the year that I thought was going

4   to be a chance to make it happen.

5   Q   And you started with wanting to buy the Dream, correct?

6   A   That is correct.

7   Q   And you called Mr. Siento from the Dream to inquire about

8   purchasing the Dream, correct?

9   A   Mr. Siento?

10  Q   Yes.  Sienko.

11  A   Sienko?

12  Q   Yes.

13  A   I called Charles Briscoe.

14  Q   Did you call a member of the Dream executive staff before

15  you called Charles Briscoe related to purchasing the Dream?

16  A   I don't think so.

17  Q   You called Charles Briscoe first?

18  A   I think it was one of the first people that I did talk to

19  about it.

20  Q   And then after that, you called someone from the WNBA --

21  someone from the Dream, correct?

22  A   I did have some conversations.  I don't actually recall who

23  it was from the beginning because mainly I talked to Charles

24  Briscoe about, you know, what my ideas was at first.

25  Q   After you talked to Charles Briscoe about your ideas, you

1   did call either Mr. Brock or Mr. Sienko from the Atlanta Dream,

2   correct?

3   A   Brock.  I think Brock was the person that I had some

4   contact with.

5   Q   Now, when you spoke to Mr. Brock about your idea of

6   purchasing the Dream, you told him why you wanted to buy the

7   Dream, correct?

8   A   Uh-huh.

9   Q   Is that a yes?

10  A   Yes, sir.  Sorry.

11  Q   And that initial call to purchase the Dream, you didn't

12  have any information about the Dream yet, correct?

13  A   On the initial call?

14  Q   Yes.

15  A   Information pertaining to --

16  Q   Well, do you have a deck or any kind of business plan or

17  anything like that when you called Mr. Brock and talked to him

18  about buying the Dream?

19  A   On our first day of conversation?

20  Q   Yes.

21  A   I don't think nobody does that.  But no, I didn't do that.

22  Q   I'm not doubting what anyone else does.

23  A   I didn't do it, no.

24  Q   Okay, good.

25          When you made that phone call to Mr. Brock about

1  purchasing the Dream, it was just you and Mr. Brock speaking,

2  correct?

3  A   At that time, uh-huh.

4  Q   That a yes?

5  A   At the time, that was Mr. Brock and myself.

6  Q   Okay.  After that phone call with Mr. Brock, you then

7  called Mr. Briscoe up again and said you spoke to Mr. Brock,

8  correct?

9  A   I don't necessarily remember how that happened, but I did

10 have a conversation with him.

11 Q   With who?  Mr. Briscoe?

12 A   Mr. Briscoe.

13 Q   During these conversations between yourself and

14 Mr. Briscoe, you all were discussing the financial viability of

15 the Dream, correct?

16 A   Can you explain what that means when you say the "financial

17 liability" of the team.

18 Q   You were discussing why would it make sense to buy the

19 Dream, correct?

20 A   Our conversation was more so hey, Charles, I love the WNBA,

21 I think WNBA has a chance to be really good down the line.  I

22 see the progression.  I see the way women's sports is going,

23 and I think that you know, I'd be a great owner, great person

24 to lead, you know, a new era of basketball in Atlanta as far as

25 with the Dream and women.  So it wasn't just I just want to be

O9QJDAR3                          Howard - Cross

1    something great just on the financial side.  It was really also

2    to help empower the women.

3             MR. DONALDSON:  Can we pull up 201, please, the long

4    chat part.  Can we go to page 766, please, of the long chat, if

5    you can, just for us and the witness.  Go to page 766 of the

6    long chat.

7    Q   Mr. Howard, do you see what's on the screen in front of

8    you?

9    A   Yes, sir.

10   Q   And that is a conversation between you and Mr. Briscoe,

11   correct?

12   A   Yes, sir.

13   Q   And the blue would be Mr. Briscoe and the green would be

14   you, correct?

15   A   Yes, sir.

16   Q   And this conversation happened on July 7, 2020, correct?

17   A   Yes, sir.

18   Q   And in this conversation you and Mr. Briscoe are talking

19   about the financial or the money part of the Dream, correct?

20   A   He said that there's some real value in the WNBA.

21   Q   And you responded what?

22   A   Yes, I'm telling you I see it, I promise.

23   Q   And then thereafter, he said I got some figures that will

24   blow your mind, correct?

25   A   Uh-huh.

O9QJDAR3                          Howard – Cross

1    Q   Is that a yes?

2    A   Yes, sir.

3    Q   And when he said "I got some figures that will blow your

4    mind," he was talking about money, correct?

5    A   I'm pretty sure he probably was.

6    Q   And then after that, he says, them owners making money,

7    bro.  You see that?

8    A   Oh, yes, sir, I see that.

9    Q   And that's part of the same conversation of July 7,

10   correct?

11   A   Yes, sir.

12   Q   And that's where you were talking about the Dream, correct?

13   A   Yes, sir.

14   Q   And that was your initial conversation with Mr. Briscoe

15   about the Dream, correct?

16   A   A couple -- one of the first couple ones.

17   Q   One of the first conversations you had with Mr. Briscoe

18   related to the Dream was about the finances about the value of

19   the Dream, correct?

20   A   It was about the value, yes.

21   Q   Can we scroll down one page, please.

22   A   Uh-huh.

23   Q   You then said the owner is for real, correct?

24   A   Yes, sir.

25   Q   And then he said yes, it's crazy, bro, correct?

1   A   Yes, sir.

2   Q   And then he went on to say, bro we should buy more than one

3   team at that price, correct?

4   A   Yes, sir.

5   Q   Because you all are talking about the price of the Dream,

6   correct?

7   A   Yes, sir.

8   Q   And you were talking about how it was a low price, correct?

9   A   How it was a low price?

10  Q   How it was a low price to get the Dream, correct?

11  A   Well, I don't think it was a low price, but it wasn't -- it

12  wasn't as expensive as a NBA team.

13  Q   Can you scroll down one page, please.

14          He then sends you an article, correct, and you read

15  the article, correct?

16  A   Probably scanned through it.

17  Q   Scanned through it?

18  A   Skimmed through it, however you want to call it, yeah.

19  Q   He then says, bro, we need to move ASAP, I got financial

20  numbers also.  You recall that?

21  A   I see that here, yes, sir.

22  Q   And then you said, let's go, correct?

23  A   Yes, sir.

24  Q   Slide up one more, go down one more.

25          You then start talking about the splits on how much

O9QJDAR3                           Howard - Cross

1   the WNBA teams make, correct?

2   A   Yes, sir.

3   Q   He then says, oh, on how they do the splits and it's only

4   12 teams, correct?

5   A   Yes, sir.

6   Q   Then you say, I swear, correct?

7   A   Uh-huh.  Yes, sir.

8   Q   Then you say, I'm trying to win with you, correct?

9   A   Yes, sir.

10  Q   And he goes and says, I know how much they get from TV

11  deals and all that, correct?

12  A   Yes, sir.

13  Q   So this whole conversation you all are having is about

14  money, correct?

15  A   It's about the finances and the value of the team, that is

16  correct.

17  Q   Right.  It's not about doing something great for the women,

18  correct?

19  A   That is wrong.  I never said that, that I wasn't doing

20  nothing for the women.

21  Q   In your first conversation with Mr. Briscoe, your agent,

22  about the Dream, you and Mr. Briscoe were specifically talking

23  about how much money you all could make from purchasing the

24  Dream, correct?

25  A   We did have a conversation about the finances, yes.

O9QJDAR3                          Howard - Cross

1    Q    And that's because at that time you didn't have any

2    sponsors at that time, correct?

3    A    Yeah.  Just started talking about purchasing the team, so I

4    don't think there was no sponsors.

5    Q    I'm talking about -- excuse me one sec.  Next screen,

6    please.  I'm sorry.

7            He then says, okay bro let's get it, correct?

8    Mr. Briscoe then says to you, bro let's get it, correct?

9    A    Yes, sir.

10   Q    He then goes on to say, bro their minimum gate from ticket

11   sales alone is about 28 million, correct?

12   A    That's what he says here.

13   Q    And then you respond, okay so what we doing, correct?

14   A    That is correct.

15   Q    Because right now you all are talking about the $28 million

16   that they make, and then you respond, so what are we doing,

17   correct?

18   A    Uh-huh.  Yes, sir.

19   Q    Because you are now saying let's get started trying to buy

20   this team so we can get part of that $28 million, correct?

21   A    That's not what you see me wrote on here.  There's not

22   nothing on here that ever said that, let's do this so I can get

23   28 million.

24   Q    Scroll down one more page, please.  Take that off the

25   screen.  Thank you.

O9QJDAR3                        Howard - Cross

1          Now, at this point, on July 7, 2020, you were

2    interested in buying the WNBA Dream team after discussing with

3    Mr. Briscoe the money part, correct?

4    A    Yes.

5    Q    And you were also interested in buying a WNBA team because

6    you wanted to own a WNBA team, correct?

7    A    Yes.

8    Q    And you then took steps to make that happen, correct?

9    A    Yes.

10   Q    And those steps you took were to call a WNBA executive,

11   correct?

12   A    Yes.

13   Q    And you also took steps to meet an WNBA executive, correct?

14   A    Yes.

15   Q    And then you actually had a Zoom call with a WNBA

16   executive, correct?

17   A    Uh-huh.  Yes, sir.

18   Q    And all these were with the intent to purchase the Dream,

19   correct?

20   A    Yes.

21   Q    And that was before you received any kind of vision plan,

22   correct?

23   A    Yes.

24   Q    So you were actually already intending to buy a WNBA team

25   without seeing a vision plan, correct?

```
1    A   Well, that's what we talked about when we first started.  I
2    did have a plan to buy.  I would want to buy a WNBA team.
3    Q   Right.  So you had discussed with Mr. Darden, Jr. and
4    Mr. Darden, Sr. and Briscoe about buying a WNBA team prior to
5    receiving a vision plan, correct?
6    A   Prior to receiving the vision plan from Darden?
7    Q   Yes.
8    A   Did I talk to who again?
9    Q   You talked to Mr. Darden, Mr. Briscoe, and Mr. Darden, Sr.
10   about purchasing a WNBA team, correct?
11   A   That is correct.
12   Q   You actually met with WNBA executives prior to receiving
13   this vision board, correct?
14   A   I did.  Because --
15   Q   Yes or no?
16   A   I went to a lot of the games, so I met a lot of the people
17   at the games.  I am one of the most recognizable athletes in
18   basketball, so --
19   Q   Are you?
20   A   Yes, sir.
21   Q   Okay.  Thank you.
22           MR. DONALDSON:  Move to strike.
23           THE COURT:  So Mr. Howard, just listen to
24   Mr. Donaldson's questions and just answer the question that's
25   posed.
```

1              THE WITNESS:  Yes, sir.

2              THE COURT:  So the answer will be stricken.  Next

3   question.

4   BY MR. DONALDSON:

5   Q    Mr. Howard, it would be fair to say that you and

6   Mr. Briscoe brought Mr. Darden and his father to this Dream

7   deal, correct?

8   A    I didn't bring them.  Charles brought them to me so we

9   could kind of do this together.

10  Q    Well, it would be fair to say that Mr. Darden didn't reach

11  out to you and say, hey, Mr. Howard, I want to help you buy a

12  WNBA team, correct?

13  A    No, he didn't.  I never met him before that.

14  Q    I'm sorry?

15  A    I never met him before this situation.

16  Q    Would it be fair to say that you and Mr. Briscoe brought

17  the Dardens into the Dream deal because the WNBA told Briscoe

18  that you couldn't buy the team yourself?

19  A    The WNBA said --

20  Q    Yes or no?

21  A    -- well, this is what --

22  Q    Say it again.

23             THE COURT:  Mr. Howard, if you can answer the question

24  yes or no.

25             THE WITNESS:  I just wanted to give him an explanation

1  because yes or no won't really answer the question.

2          THE COURT:  So that's a separate thing.  If you can

3  answer a question yes or no, you should do so.  If you can't,

4  you can also indicate, I can't answer that yes or no.

5          THE WITNESS:  Okay.

6          THE COURT:  All right?  But the main thing is you just

7  answer his questions.  Unfortunately it's not like a

8  conversation, so it's just question and answer, okay?

9          THE WITNESS:  Understood.

10          THE COURT:  All right.  Go ahead, Mr. Donaldson.

11  BY MR. DONALDSON:

12  Q   Isn't it true that you and Mr. Briscoe brought the Dardens

13  into the Dream deal because the NBA told Mr. Briscoe that you

14  could not buy the team yourself?

15  A   That's partially true.

16  Q   And isn't it true that when Mr. Briscoe told you the NBA

17  said that you could not buy the team by yourself, you told him

18  we need to find an investment group or some people that could

19  be the head of the organization until I retire?

20  A   That is true, I did say that.

21  Q   And then you said after you retire, you would then go ahead

22  and step in and you could be behind the scenes until that

23  point?

24  A   That is true.

25  Q   And that is when you and Mr. Briscoe brought the Dardens

1    in, correct?

2    A    This is when we had our conversation with them, yes.

3    Q    After you and Mr. Briscoe decided that you couldn't buy the

4    team and that you would be behind the scenes until you retire,

5    correct?

6    A    That is partially true, yes.

7    Q    Well, not partially --

8              THE COURT:  Just a question.

9              MR. DONALDSON:  I'm sorry, Judge.

10             THE COURT:  No comments.

11             MR. DONALDSON:  One sec.

12             Can we put up 3524-46, please.  Page 2, please.  Third

13   PowerPoint down under chats excerpt one.

14   Q    Mr. Howard, do you see the third PowerPoint under chats

15   excerpt one?

16   A    Yes, sir.

17   Q    Now, on August 16, 2024, you had a meeting with the U.S.

18   Attorney's Office, correct?

19   A    Yes, sir.

20   Q    And in that meeting you were asked questions about what

21   your relationship was with Mr. Darden, Mr. Darden, Sr., and the

22   purchase of the Dream, correct?

23   A    Yes, sir.

24   Q    And at that meeting, did you tell the prosecutors that the

25   reason to bring junior and senior in was because NBA told

1  Briscoe that Dwight Howard couldn't buy team itself.  I said we

2  could find an investment group, some people who could be the

3  head of the organization until I retire, and then I could go

4  ahead and step in.  And until then, I could be behind the

5  scenes.  That's when we brought in Darden.

6          MR. MEAD:  Objection, your Honor.

7          THE COURT:  Well, if you could rephrase the question.

8  Objection sustained.  If you could just ask a question.

9          MR. DONALDSON:  Very good.

10  Q   Did you tell the prosecutors that you would find an

11  investment group, some people who could be the head of the

12  organization until you retire and then go ahead and step in,

13  and until then you would be behind the scenes?

14  A   Yes, we talked about that.  Yes.

15  Q   Did you say that?

16  A   Yes.

17  Q   Did you also say at that point is when you brought in the

18  Dardens?

19  A   Yes.

20  Q   So then after you and Briscoe realized that you could not

21  buy the team is when you brought in the Dardens, correct?

22  A   After me and Briscoe realized that we couldn't buy the

23  team?

24  Q   Yes.

25  A   That's when we had got the Dardens to come in, yes.

1   Q    And you decided at that point that you would be behind the

2   scenes while someone else purchased the team; is that correct?

3   A    Someone else was running the team basically, kind of like

4   what a lot of players have done in the past.  They put money

5   with investment groups, and behind the scenes they're the ones

6   kind of making the decisions.  And they might have somebody

7   else be the face.

8              MR. DONALDSON:  One second, please, your Honor.

9              THE COURT:  Okay.

10  Q    Now, you mentioned on direct regarding the vision plan.

11  All the people that were on the plan are people that you all

12  had conversations about; is that correct?

13  A    That we had conversations about?

14  Q    Yes.

15  A    What do you mean?

16  Q    Well, you said on direct in your answers to Mr. Mead that

17  when viewing the vision plan, the people that were on the plan

18  were people that you and Mr. Darden and Mr. Briscoe and

19  Mr. Darden, Sr. had conversations about; isn't that correct?

20  A    About the people that were on there?

21  Q    Yes.

22  A    No, we didn't have conversations, like, about each and

23  every person that was on there when we talked.

24  Q    You had conversations about some of the people on there?

25  A    No.

1    Q    Would it be fair to say that the ideas in the vision plan

2    were started by you and Mr. Briscoe?

3    A    The ideas?

4    Q    Yes.

5    A    Yes, I had went to them -- went to him and told him about

6    my ideas, yes.

7    Q    You want to Mr. Darden and told --

8    A    I went to Briscoe and told him the things that I think

9    would be great for the team, my ideas.  And then after that,

10   when we had our conversations with Cal and his -- the two Cals,

11   Cal, Sr. and Cal, Jr. then that's when I expressed more of the

12   things that I would like on the team.  But I don't think the

13   conversation had anything to do with the people that was on the

14   advisory board.

15   Q    Could we put up 2119, please.  Thank you.  Can we go to

16   page 20, please.

17          The phrase Dream Productions, that came from you,

18   correct?

19   A    The phrase Dream Productions came from me?

20   Q    Yes.

21   A    No.

22   Q    Isn't DSG plus Tyler Perry Studios equals Dream Productions

23   the conversation that you had with Mr. Darden prior to this --

24   A    I didn't make Dream Productions.

25   Q    Not asking if you made it.  What I'm asking you is isn't it

1    true that you and Mr. Briscoe and Mr. Darden, Jr. had

2    conversations related to DSG plus Tyler Perry Studios starting

3    a production company?

4    A   They're the ones who told me that Tyler Perry was going to

5    be working with all of us to produce this Dream thing, but I

6    never talked to Tyler.  So I don't know how it could have been

7    me who made the Dream productions if I never had a conversation

8    with him.

9             MR. DONALDSON:  One second, please, judge.

10            THE COURT:  Okay.

11            MR. DONALDSON:  Can you put up 3524-46.  Go to page 2,

12   please.  We go down to the last --

13   Q   Mr. Howard?

14   A   Yes, sir.

15   Q   Would it be fair to say that you and Mr. Briscoe spoke

16   about different ideas that you wanted to see done for the Dream

17   before this vision plan was drafted?

18   A   Yes.

19   Q   Would it be fair to say that you spoke to Mr. Briscoe about

20   having more fans involved and more people involved?  Would that

21   be correct?

22   A   Yes.

23   Q   Would it also be fair to say that you and Mr. Briscoe took

24   your ideas to Mr. Darden and the Darden Group?

25   A   Yes.

O9QJDAR3                          Howard – Cross

1    Q    And would it be fair that after they took your ideas and

2    plans to them, they sent you a PDF or concept that captured

3    your plans and ideas?

4    A    Well, I thought that that was what they had did, that they

5    had spoke to all the people that was in the PDF.

6    Q    Would it be fair to say in August of 2024 you had a

7    conversation with the government related to this vision plan?

8    A    Did I have a conversation with the government?

9    Q    Yes.

10   A    Yes.

11   Q    You did, right?

12        And in that conversation, did you not tell them that

13   Briscoe took our ideas back to Darden who sent me a PDF file of

14   all the people who are going to be involved?

15   A    Yes.

16   Q    So after you and Briscoe gave him the ideas, he sent you

17   back a PDF with the people that were going to be involved?

18   A    After we had our -- say that again.

19   Q    I'll move on.

20        Now, between July 2020 and January 2021, it would be

21   fair to say you spoke to Darden, Jr. approximately three times

22   correct?

23   A    Maybe three times, yes.  Uh-huh.

24   Q    Would it be fair to say all three of those times were in

25   July or August of 2020, correct?

O9QJDAR3                          Howard - Cross

1   A   I don't necessarily remember all the dates, to be honest

2   with you.

3   Q   Not dates.  You didn't speak to Mr. Darden, Jr. any time in

4   the fall of 2020, correct?

5   A   I don't think so.

6   Q   And you didn't speak to Mr. Darden, Jr. any time in the

7   winter of 2020, correct?

8   A   I spoke to Charles mostly, so I don't think that I spoke to

9   him that much.  I think we had a couple conversations, me and

10  Mr. Junior -- Darden, Jr.

11  Q   And that was in August of 2020 -- in July of 2020 when you

12  first started discussing the purchase of the Dream, correct?

13  A   Yes, sir.

14  Q   Between August 2020 and January 2021, everything you think

15  Mr. Darden, Jr. was doing, Briscoe told you, correct?

16  A   Everything that Darden was doing Briscoe told me?

17  Q   Everything that you think Mr. Darden was doing was based

18  upon what Briscoe told you, correct?

19  A   I don't understand your question.

20  Q   Between August 2020 and January of 2021, anything regarding

21  Mr. Darden that you learned came from Mr. Briscoe, correct?

22  A   Any information that I learned from Darden came from

23  Briscoe?

24  Q   Anything you learned about Mr. Darden.

25  A   Oh, yeah.  I didn't know him before that, no.  So all my

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    information came from Charles.

2    Q    Anything that you think Mr. Darden was saying between

3    August 2020 and January 2021 also came from Mr. Briscoe,

4    correct?

5    A    Anything that I thought he was saying?

6    Q    Yes.

7    A    Pertaining -- I don't --

8    Q    My question is, Mr. Howard, since you didn't speak

9    Mr. Darden between August 2020 and 2022 or thereafter, anything

10   that you -- any knowledge you have about Mr. Darden came from

11   Mr. Briscoe, correct?

12   A    The information -- yes, any information I had came from

13   him.

14   Q    Now Briscoe became your agent in 2019, right?

15   A    Yes, sir.

16   Q    And it's fair to say that Mr. Briscoe is a liar, correct?

17   A    Well, now I can say he -- he's lied about a lot of stuff,

18   but --

19   Q    When, you say "lied" --

20   A    Now I can say he's lied about a lot of stuff, looking back

21   on it.  But at the time, I didn't think he was a liar.  I had

22   respect and trust in his word and anything he said to me when

23   it came to business, when it came to basketball.  I didn't

24   think he would be someone to tell a lie.

25   Q    Back in -- well, you said "now."  You thought Mr. Briscoe

1   was a liar prior to today, correct?

2   A    Prior to today?

3   Q    Yes.

4   A    I would say back then, when he was my agent, I didn't think

5   he was a liar.  But now, knowing what I feel about him, he's

6   lied about a lot of things now, that I see now.  But back then,

7   I didn't think he was a liar, and I trusted him.

8   Q    August 2023, you thought he was a liar, correct?

9   A    August 2023?

10  Q    Yes.

11  A    Like last year?

12  Q    Like last year.

13  A    Yeah.

14  Q    Yes, right?

15  A    I mean --

16  Q    Is that a yes?

17  A    Yeah, I guess.  Yeah.

18  Q    Okay.  January 2023, you thought Mr. Briscoe was a liar,

19  correct?

20  A    Yeah.  After I knew all the stuff that I know now.  It was

21  two years after -- prior -- three years after the Dream.

22  Q    June 2021, you thought Mr. Briscoe was a liar, correct?

23  A    I don't remember.  I thought he was a liar.

24  Q    Well, when did you fire him?

25  A    2000 -- right after my Philly season.

O9QJDAR3                        Howard - Cross

1    Q   When was that?

2    A   2021.

3    Q   Right.  So June 2021, after your season, you thought he was

4    a liar, correct?

5    A   No, I just thought he was a bad agent.  I fired him because

6    he was a liar.

7    Q   Now, you said that your first meeting with Mr. Darden was

8    during the time that you were trying to purchase the Dream,

9    correct?

10   A   Which Darden?

11   Q   Calvin Darden, Jr.

12   A   My first meeting with him?

13   Q   Yes.

14   A   We had a Zoom call with his father, myself, and Charles.

15   Q   That was in July of 2020, correct?

16   A   That was whenever my first time meeting was, yes.

17   Q   That was related to the purchase of the Dream, correct?

18   A   Yes, sir.

19   Q   But that wasn't your first time having some type of

20   business relation with Calvin Darden, Jr., correct?

21   A   I never met the dude.

22   Q   Can we pull up 201, please.  Go to page 741.

23       Right now we're looking at page 741, 201.  And this is

24   a chat between you and Mr. Briscoe, correct?

25   A   Yes, sir.

1    Q    The green part is you, correct?

2    A    Yes, sir.

3    Q    The blue part is Mr. Briscoe, correct?

4    A    Yes, sir.

5    Q    And green part says 30 percent.  You see that?

6    A    Uh-huh.

7    Q    That a yes?

8    A    Yes, sir.

9    Q    And the blue part, Mr. Briscoe says bet.  You see that?

10    A    Yes, sir.

11    Q    Around that, it says hit me up.  You see that?

12    A    Yes, sir.

13    Q    The next thing says, Cal said they gone look at starting a

14    league option also.  You see that?

15    A    I do see that.

16    Q    And that's where he said, Cal said that, correct?

17    A    I do see that.

18    Q    That was prior to this Dream deal, correct?

19    A    I don't even know when that is.  I can't remember where

20    that came from, to be honest with you.

21    Q    This is --

22    A    I can read what that says, but I don't know what he's

23    talking about.

24    Q    This is Briscoe talking to you on your text messages,

25    correct?

O9QJDAR3                         Howard - Cross

1   A    Yeah.

2   Q    And you talking to Briscoe on the text messages, correct?

3   A    That's what the messages said.

4   Q    Briscoe said to you, Cal said that they gone look at

5   starting a league option also, correct?

6   A    That is correct.

7   Q    Because y'all was talking about a business deal related to

8   a different NBA league, correct?

9   A    I don't even remember this part, to be honest with you.

10  Q    So Briscoe said "Cal" and you have no idea where that comes

11  from, right?

12  A    I don't remember it.

13  Q    Because you don't remember it now?

14  A    No, I don't.  But I do remember the $7 million that they

15  took.

16  Q    I'm sure you remember that part.  But you do remember that

17  you and Cal and Mr. Briscoe were also working on a production

18  deal regarding a possible league that competes with the NBA,

19  correct?

20  A    No, I don't remember that.

21  Q    You do also remember that you and Cal and Briscoe were

22  working on a PEAK deal related to sneakers, correct?

23  A    No.

24  Q    You did have a PEAK deal related to sneakers, correct?

25  A    I had a PEAK deal before I got with Cal -- what's his name?

1   Charles Briscoe.

2   Q    That was through Calvin Darden, Jr., correct?

3   A    That was not through Calvin Darden, Jr., so that is

4   incorrect.  The person who got me the PEAK deal has passed away

5   now.

6            THE COURT:  I'll allow it.

7            THE WITNESS:  That is a lie.

8            THE COURT:  Well, no, no.  That I won't allow.

9            THE WITNESS:  Sorry.  That's not true.  Cal Darden and

10   PEAK never happened.  That came from somebody that's passed

11   away.

12            THE COURT:  Okay.  The part of the answer that --

13   that's stricken, "that is a lie."  That's stricken from the

14   record.

15            All right.  Next question.

16   BY MR. DONALDSON:

17   Q    You had more than one Zoom call with the Dardens, correct?

18   A    Maybe had one or two.

19   Q    Could you put up, please, 201B.  Please go to page 815,

20   please.

21            That again is a conversation between you and

22   Mr. Briscoe, correct?

23   A    Yes, sir.

24   Q    And the blue part is Briscoe, and the green part is you,

25   correct?

O9QJDAR3                         Howard - Cross

1  A   Uh-huh.  Yes, sir.

2  Q   And the date of this conversation is July 12, correct?

3  A   Yes, sir.

4  Q   And Mr. Briscoe at this point is sending you Zoom

5  information, correct?

6  A   Yes, sir.

7  Q   And then he says to you, one today, correct?

8  A   Yes, sir.

9  Q   And then you say, she's not on, correct?

10 A   Yes, sir.

11 Q   And that's related to the Zoom call, correct?

12 A   Yes, sir.

13 Q   And that was on July 12, correct?

14 A   Yes, sir.

15 Q   So it would be fair to say that on July 12, 2020, you were

16 on a Zoom call with Briscoe?

17 A   Zoom?

18 Q   Zoom.

19 A   Uh-huh.

20 Q   That a yes?

21 A   With Senior and --

22 Q   You have to say yes.  Are you on a Zoom call July 12, 2020?

23 A   With these people that's on here?

24 Q   Yes.

25 A   Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   Q   Okay.  Can we go to 201I.

2           Now, this is a conversation you spoke about on direct.

3   The blue is Mr. Briscoe and the green is you, correct?

4   A   Yes, sir.

5   Q   And this was on November 9, 2020, correct?

6   A   Yes, sir.

7   Q   And Mr. Briscoe says, yes, sir, it's about to get real bro.

8   Also Cal said he will have that agreement ready tomorrow,

9   correct?

10  A   Yes, sir.

11  Q   You say, this crazy, correct?

12  A   Uh-huh.  Yes, sir.

13  Q   What agreement?

14  A   I think he was talking about the Dream.

15  Q   You think he was talking about the Dream?

16  A   Yeah.

17  Q   I want to ask you another question, Mr. Howard.  Do you

18  know somebody named James Wiseman?

19  A   I do.

20  Q   You do?

21  A   Uh-huh.  Yes, sir.

22          THE COURT:  You can sit back a little, Mr. Howard.

23  It's just if you're too close, there's feedback.  Go ahead.

24  Q   Mr. Briscoe actually introduced you to James Wiseman,

25  correct?

O9QJDAR3                          Howard - Cross

1   A   I think he did, if I'm not mistaken.  I think he did.  I

2   don't remember.

3   Q   Can we put up 3524-5 and go to page 12, please.  Is there a

4   page 12?

5           THE COURT:  What page, Mr. Donaldson?

6           MR. DONALDSON:  Page 12, please.

7           THE COURT:  Where are you going to direct the witness?

8           MR. DONALDSON:  I'm going to direct the witness to the

9   middle of the page where it says, Howard knew James Wiseman.

10  May I start, Judge?

11          THE COURT:  You may, but are you -- so the testimony

12  was he didn't recall.

13  Q   I want to show you a one-page document on the screen, see

14  if that refreshes your recollection as to whether or not you

15  recall meeting James Wiseman.  Please review that document

16  right in the middle where it starts off with, Howard knew James

17  Wiseman.  Read that part.

18  A   Said Howard knew James Wiseman --

19  Q   To yourself.  Read it to yourself.

20  A   I'm asking you which part, the part where it says, Howard

21  knew James Wiseman, and then it has Wiseman?

22          THE COURT:  That paragraph, read it to yourself, then

23  look up when you finish reading the paragraph.  And then

24  Mr. Donaldson will have a question for you.

25          THE WITNESS:  Okay.

O9QJDAR3                         Howard - Cross

1    Q   Now, you interviewed with the U.S. Attorney's Office

2    prosecutors on March 6, 2023.  Do you recall that?

3    A   Yes.

4    Q   Take your hand off your mouth, please.

5    A   Yes, sir.

6             THE COURT:  Mr. Donaldson is correct.  If you have

7    your hand over your mouth, the court reporter won't be able to

8    take things down.

9             THE WITNESS:  Yes, sir.  My hands is cold.  I'm sorry.

10            THE COURT:  I know that.  The jurors probably will

11   agree with you it's like an ice box in here.  Okay.  Go ahead.

12            So the question was, now, you interviewed with the

13   United States Attorney's Office prosecutors on March 6, 2023,

14   do.  You recall that?  That was yes.  So next question.

15            MR. MEAD:  Going to object to that question, your

16   Honor.

17            THE COURT:  Okay.  Well, I'll allow it.  Overruled.

18            Go ahead.  Next question.

19   BY MR. DONALDSON:

20   Q   Question is did Mr. Briscoe introduce you to James Wiseman?

21            THE COURT:  Having read --

22   Q   Having read that, does that refresh your recollection?

23   A   I don't recall if it was him who introduced me or another

24   agent at an event during the ESPYs.  I really don't recall.

25   Q   Is it fair to say that on March 6, 2023 that you informed

O9QJDAR3                         Howard - Cross

1   the government that Mr. Briscoe introduced you to James

2   Wiseman?

3   A    Could have happened.  I just don't remember, to be honest.

4   Q    Is it also fair to say that Mr. Briscoe introduced you to

5   Mr. Wiseman prior to Mr. Wiseman being drafted?

6   A    To the NBA?

7   Q    Yes.

8   A    I just don't remember.  He could have, but I don't

9   remember, to be honest.

10  Q    And is it true that you met Mr. Wiseman in California along

11  with Mr. Wiseman's mom when Briscoe had an event during the

12  ESPYs?

13  A    I just don't recall the whole situation.  I recall there

14  was a point where I could have met him.  I don't know if it was

15  with Briscoe.  Yeah, I don't remember.  I don't recall.

16  Q    Today you're saying that.  But you did tell the government

17  that back in March of 2023 correct?

18  A    If it's on here, then I must have said it.  What I'm saying

19  now is I don't recall how the situation went down with Briscoe

20  and him introducing me to James Wiseman's mom and James.

21        MR. DONALDSON:  Take that down, please.

22  Q    Now, when you first started your direct, you indicated that

23  you were in the NBA from 2004 to I believe 2021; is that

24  correct?

25  A    Yes, sir.

O9QJDAR3                    Howard - Cross

1   Q   Maybe '22?

2   A   Yes, sir.  Something like that.

3            THE COURT:  I think it may have been '22, but

4   whatever.  So ladies and gentlemen whatever the testimony is is

5   what it is, whether it's '21 or '22.  Okay.  Next question.

6   Q   Between 2004 to 2012 you played for the Orlando Magic,

7   correct?

8   A   Yes.

9   Q   And for each of those years you signed an NBA contract,

10  correct?

11  A   Not for each of those years.

12  Q   How many contracts did you sign between 2004 and 2012 while

13  you were playing for the Orlando Magic?

14  A   I want to say it was two contracts.

15  Q   And each one of those contracts was for a certain amount of

16  money, correct?

17  A   That is correct, yes.

18  Q   Do you remember what the amount was for each contract?

19  A   Off top, no.  The first -- no.  No.

20  Q   After 2012, between 2013 and 2016, you signed -- you were

21  playing for the Houston Rockets, correct?

22  A   Yes, sir.

23  Q   And between 2013 and 2016, you again signed NBA contracts,

24  correct?

25  A   Yes, sir.

1    Q   How many contracts did you sign between 2013 and 2016?

2    A   Oh, maybe one.

3    Q   Do you recall how much that contract was for?

4    A   No.

5    Q   Between 2016 and 2017, you played for the Atlanta Hawks,

6    correct?

7    A   Yes, sir.

8    Q   Do you recall what -- you signed NBA contracts with the

9    Atlanta Hawks, correct?

10   A   Well, the contract -- I think it was a trade.  I got traded

11   there, so it would go from the last team.  I wouldn't have to

12   redo a new contract.

13   Q   Okay.

14   A   It's like a trade, go to a new team.

15   Q   2017 to 2018, you played for the Charlotte Hornets,

16   correct?

17   A   That is correct.

18   Q   Did you sign a contract when you were playing for the

19   Charlotte Hornets?

20   A   I'm pretty sure I had to sign a contract, yes.

21   Q   Each one of these NBA contracts when you signed them --

22   well, you have to sign them, correct?  You have to actually

23   sign the contract; is that correct?

24   A   Yes, sir.

25            MR. DONALDSON:  Can we put up Government Exhibit 399,

1   please, for the lawyers and witness only.

2   Q   Mr. Howard, that's your 2018 contract.  You see that?

3   A   Yes, sir.

4   Q   Can you scroll down one page, please.

5           And when you signed these contracts, they have a term

6   and services and compensation paragraphs, correct?

7   A   Yes, sir.

8   Q   And they have what they call an initial paragraph that has

9   a date on it that indicates the date that you're signing the

10  contract; is that correct?

11  A   Yes, sir.

12  Q   And then your NBA contracts, it has -- when it says "term,"

13  it has the term of how long the contract is going to last,

14  correct?

15  A   Yes, sir.

16  Q   And then it has "services," paragraph 2.  It tells you the

17  services that's going to be rendered by the player, correct?

18  A   Yes, sir.

19  Q   Pursuant to this particular contract; is that right?

20  A   Yes, sir.

21  Q   And then paragraph 3 would say "compensation"; is that

22  right?

23  A   Yes, sir.

24  Q   And that paragraph will generally tell you how much you're

25  getting paid, correct?

O9QJDAR3                          Howard - Cross

1    A   Yes, sir.

2    Q   Can we go to the next page, please.

3            Paragraph 4 of these NBA contracts --

4            THE COURT:  I'm sorry is this in evidence?

5            MR. DONALDSON:  No, it's not, Judge.  I'm sorry.

6            THE COURT:  Okay.

7    Q   When you have these NBA contracts, you review them, do you

8    not?

9    A   For the most part our agent does.  That's what we hire the

10   agents for, to review the contracts and make sure that

11   everything is right on the contracts.  Usually the agent says

12   it's a standard NBA contract, you probably seen this from the

13   time you been in the NBA.  And most of the players trust what

14   the agents, you know, have in the contracts before they sign

15   them.

16           MR. DONALDSON:  Move to strike the part about most

17   players trust their agents, please.

18           THE COURT:  Well, I'll allow it.  Objection overruled.

19   Next question.

20   Q   Could we go down to the last page of this.  One page up,

21   please.  One more page.  I'm sorry.  One more page.  One more

22   page, please.

23           Mr. Howard, in these NBA contracts there's a provision

24   that says read carefully before signing, correct?

25   A   Is there a provision that says that in the contract?

O9QJDAR3                         Howard - Cross

1    Q   Yes.

2    A   To be honest, I never read that.

3    Q   Can we go up one more page, please.  One more, please.  Go

4    one more page.

5            There's also a certification page in these contracts,

6    correct?

7    A   Yes, sir.

8    Q   And that certification page is for the agents to sign,

9    correct?

10   A   Yes, sir.

11   Q   Could you go up one more page, please.

12           Now, you also had a September 2019 contract.  Could

13   you put up GX-398, please.

14           THE COURT:  Are you offering this?

15           MR. DONALDSON:  Oh, okay, Judge.  It would be a good

16   time to take a break.

17           THE COURT:  Oh, okay sure.  All right.

18           MR. MEAD:  I'm the person who made the request, your

19   Honor.  My apologies.

20           THE COURT:  You don't have to out yourself.

21           So ladies and gentlemen, we're going to take our

22   afternoon break right now.  I think I did hear the afternoon

23   snack in there, so what we're going to do is we'll come get you

24   when we're ready for you.  It's going to be about 15 minutes or

25   so, okay?

O9QJDAR3                          Howard – Cross

1            Go back, relax, don't talk about the case.  Eat the

2    cookies, if you like, or not.

3            (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O9QJDAR3

1              (In open court; jury not present)

2              THE COURT:  Mr. Howard, you can step down.

3              THE WITNESS:  Go back?

4              THE COURT:  And again, no substantive conversation

5    with the government, and they'll come get you when they're

6    ready.  Thank you.

7              (Witness temporarily excused)

8              THE COURT:  You may be seated.  Okay.

9              Is there anything that we need to take up before we

10   take the break, from the government?

11             MR. MEAD:  No, your Honor.

12             THE COURT:  From the defense?

13             MR. DONALDSON:  No, your Honor.

14             THE COURT:  Okay.  About how long do you think you

15   have?

16             MR. DONALDSON:  Maybe 30 more minutes.

17             THE COURT:  Okay.

18             MR. DONALDSON:  30, 35, say 45.

19             THE COURT:  There will be some redirect?

20             MR. MEAD:  Yes.

21             THE COURT:  Okay.  See everybody in about 15 minutes,

22   all right?  Thank you very much.

23             (Recess)

24             (Continued on next page)

25

O9QBDAR4                    Howard - Cross

1          (In open court; jury not present)

2          THE COURT:  I understand there's an issue the parties

3     want to take up with me.

4          MR. DONALDSON:  Yes, Judge.  It's an issue we're

5     trying to front before it became an issue.  The government and

6     I have agreed to the admission of 399 and 394, so that part

7     is -- we'll take care of that, but there's an another issue

8     that might be an issue.

9          THE COURT:  Those are the contracts?

10          MR. DONALDSON:  Yes.

11          THE COURT:  399 and 394?

12          MR. DONALDSON:  That's correct.

13          THE COURT:  My understanding there's some other issue?

14          MR. DONALDSON:  We are aware that Mr. Howard filed a

15     civil lawsuit related to this matter back in August of 2023.

16     We intended on crossing him -- we intend on us using that

17     document to cross him.  I ask the government this afternoon

18     whether they would object to just admitting it and make things

19     go a lot quicker.  They said they would not.  We provided them

20     with a copy of the indictment.  We believe that --

21          THE COURT:  They would not object to it or they would

22     object?  What exactly is it?

23          MR. DONALDSON:  They would object to the civil

24     complaint.

25          THE COURT:  So it's the complaint?

O9QBDAR4                    Howard - Cross

1             MR. DONALDSON:  Yes, filed by Mr. Howard.  The reason

2    why I said I'm fronting it now, not related to

3    cross-examination or impeachment stuff, but whether or not --

4    whether they would consent to it being admitted into evidence.

5    They said they would not.  We think it falls under the public

6    records exception it should come in, but that was the issue

7    that might come.  I thought we'd bring it up before the jury

8    came in.

9             THE COURT:  A couple of things.  Does anybody have an

10   extra copy.

11            MS. REED:  We've e-mailed it to you, your Honor.

12            THE COURT:  Let me hear from the government.

13            MR. RITCHIN:  Your Honor, the defense has offered this

14   pursuant to the public records exception, to the hearsay rule.

15   It fits none of the categories described.  Under 8038, a record

16   or statement of a public office qualifies under the rule if it

17   sets out the officer's activities, a matter observed while

18   under a legal duty to report, but not including in a criminal

19   case a matter observed by law enforcement personnel or in a

20   civil case or against the government in a criminal case factual

21   findings from the legally authorized investigation and does not

22   show that the source of information or circumstance would

23   indicate a lack of trustworthiness.

24            This is a complaint filed by a party in a lawsuit.  It

25   meets none of those criteria.  And if one looks at the advisory

O9QBDAR4                          Howard - Cross

1   committee notes, the justification -- and I'm reading from the

2   second paragraph under the note paragraph eight.  The

3   justification for the exception is the assumption that a public

4   official will perform his duty properly, and the unlikelihood

5   that he will remember details independently of the record.

6   This is a document filed with the court.  It is not a statement

7   by a public official, nor does it meet any of the other

8   criteria under subsection eight.

9           THE COURT:  I guess in terms of cross-examination, you

10  can cross him on that the lawsuit was filed.  In terms of the

11  complaint itself, I suppose there could be judicial notice to

12  him, but it's not offered for the truth.  I'm just not sure --

13  and I would need to know more about how it was prepared, who

14  prepared it.  It's not a verified complaint, so Mr. Howard

15  didn't sign it.  But you're free to cross-examine him about the

16  complaint, and about the fact that he filed a complaint

17  against -- what is it, Darden Enterprises, LLC, and Darden

18  Sports Group.  Let me ask, does anybody know the status of this

19  case?

20          MS. REED:  He got a judgment.

21          THE COURT:  And the judgment in the amount of, what,

22  $7 million?

23          MR. DONALDSON:  I believe the amount contained in the

24  complaint, yes.

25          THE COURT:  Okay.  So you're free to cross-examine on

O9QBDAR4                    Howard - Cross

1    it. And it maybe not falls under the rule, but I think the

2    public records was meant for a different sort of document,

3    usually governmental prepared documents rather than complaints,

4    but obviously you can cross-examine on it.

5            MR. DONALDSON:  Very good, Judge.  We just wanted to

6    confront that issue before the jury is here.

7            THE COURT:  Just so everybody is clear, you can ask

8    him the questions.  You can ask questions by -- you'll do the

9    cross-examination, and we'll see where it go.

10           MR. DONALDSON:  Very good.  Thank you.

11           THE COURT:  Anywhere else before we get Mr. Howard and

12   then get the jury?

13           MR. MEAD:  No, your Honor.

14           MR. DONALDSON:  No, your Honor.  Thank you.

15           THE COURT:  All right.  Can we get Mr. Howard, and if

16   we could get the jury.  Thank you.

17           (Continued on next page)

18

19

20

21

22

23

24

25

O9QBDAR4                          Howard - Cross

 1          (Jury present)

 2          THE COURT:  Ladies and gentlemen, I apologize for the

 3   delay.  I had to take care of some matters.  Hopefully you had

 4   a good break, and we're now going to continue with the

 5   examination of Mr. Howard.

 6          Actually before Mr. Donaldson you begin, my

 7   understanding is that there are two exhibits that I want to

 8   admit, Government Exhibit 399 and Government Exhibit 394.  You

 9   may recall there was some testimony about those documents prior

10   to the break.  Go ahead, Mr. Donaldson.

11          (Government's Exhibits 394 and 399 received in

12   evidence)

13          MR. DONALDSON:  Thank you, Judge.  Can we put up

14   Government Exhibit 399, please.  Can we go to page 16.

15   BY MR. DONALDSON:

16   Q.  Mr. Howard, do you see where it says on page 16 of

17   Government Exhibit 399, you see that in front of you?

18   A.  Yes, sir.

19   Q.  Could you read that part that's in bold that's underlined

20   at the top of the page?

21   A.  Yeah, examine this contract carefully before signing it.

22   Q.  And then under that two lines down it says dated July 11,

23   2018, correct?

24   A.  Yes, sir.

25   Q.  And under that it has -- or to the right and down has your

O9QBDAR4                        Howard - Cross

1    name, correct?

2    A.  Yes, sir.

3    Q.  Is that your signature?

4    A.  Yes, sir.

5    Q.  And so on the top part where it says, examine this contract

6    carefully before signing, you did that, correct?

7    A.  I don't think I did read the whole contract before I signed

8    it.

9          MR. DONALDSON:  Can we go to Government Exhibit 394,

10   please.

11   Q.  This is your NBA contract from November 2020, correct?

12   A.  Yes, sir.

13   Q.  And this is dated November 21, 2020, correct?

14   A.  Yes, sir.

15   Q.  Could you go to page 16 of this contract as well.

16          Could you read the top of that form, please, top part

17   that's underlined in bold?

18   A.  Examine this contract carefully before signing it.

19   Q.  And under that it says, this contract includes exhibits 1A,

20   2, 5, 6 and 7, correct?

21   A.  Yes, sir.

22   Q.  Which are attached hereto and made apart hereof, correct?

23   A.  Yes, sir.

24   Q.  And then below that is a date, it says November 21, 2020,

25   correct?

O9QBDAR4                        Howard - Cross

1   A.  Yes, sir.

2   Q.  And the second date down says the same date, November 21,

3   2020?

4   A.  Yes, sir.

5   Q.  And to the right of that, that's your signature, correct?

6   A.  Yes, sir.

7   Q.  And you signed that, correct?

8   A.  Yes, sir.

9   Q.  And when you say you signed that, you actually signed your

10  name on it, correct?

11  A.  That's what you just asked me.

12  Q.  Is that the answer to the question?

13  A.  Yes.  You just asked me, yes.

14  Q.  And that was the same thing you did for the prior contract

15  that we showed you?  You actually signed the contract, correct?

16  A.  I signed the contract.

17  Q.  Now, you mentioned that when you sent this $7 million over,

18  you mentioned that you thought you bought the team, correct?

19  A.  Yes.

20  Q.  You also said that you thought that you would be running

21  the team from behind the scenes, correct?

22  A.  Yes.

23  Q.  And so when you say running the team from behind the

24  scenes, you mean you would be making decisions related to the

25  team, correct?

O9QBDAR4                    Howard - Cross

1   A.  Yes.

2   Q.  And you would be, what, hiring and firing employees related

3   to the team from behind the scenes?

4   A.  I would be helping the guys who would be running the team

5   in the forefront, yes.

6   Q.  And this is while you're an NBA player?

7   A.  Yes, sir.

8   Q.  And while you're an NBA player, you would be helping run

9   the team by I guess participating in the draft as well?

10  A.  When you say participating in the draft, what do you mean?

11  Q.  So there's a WNBA draft, correct?

12  A.  What do you mean participate in it?

13  Q.  When you say you'd be behind the scenes running the team,

14  you'll be helping make the decisions to do a WNBA draft,

15  correct?

16  A.  I couldn't do a WNBA draft.  I can't participate in it, so,

17  I wouldn't be able to do that.

18  Q.  I guess my question, Mr. Howard, when you say you would be

19  running the team, you would be helping the people make the

20  decisions in the running of the team, correct?

21  A.  Correct.

22  Q.  And part of the decision in running a professional WNBA

23  team would be to participate in the drafting of the players for

24  that team, correct?

25  A.  I can't participate in the draft, but I could watch the

O9QBDAR4                      Howard - Cross

1    draft.

2    Q.  You would also in running the team help with whatever

3    decision-making relates to the employees for the team, correct?

4    A.  That would probably happen.  That probably would have

5    happened, yes.

6    Q.  You would also had been, if you had to, fire people related

7    to the team, correct?

8    A.  Sure, yeah.

9    Q.  And you said you would be running the team from behind the

10   scenes until you retire, correct?

11   A.  That is correct.

12   Q.  The year before you were set to retire, correct?

13   A.  No.

14   Q.  Weren't you going --

15          THE COURT:  I'm sorry.  The year before, you just have

16   to say the year before what.

17   Q.  In 2020, the summer of 2020 during the bubble, you were

18   considering retiring, correct?

19   A.  I was considering retiring?

20   Q.  You were considering retiring?

21   A.  I haven't retired, so, no.

22   Q.  When you were going to run the team from behind the scenes

23   until you retired, when were going to retire?

24   A.  I haven't retired, so I don't know.

25   Q.  My question is, in 2020 when you said you were going to

O9QBDAR4                          Howard - Cross

1    purchase the Dream and run it from behind the scenes until you

2    retire, when were you planning on retiring?

3    A.   I haven't retired, so I can't plan on retiring or doing

4    something if I haven't retired.

5    Q.   So when you decided to send the $7 million over and run the

6    team until you retired, what date were you planning on retiring

7    is my question?

8    A.   I don't have a date.  I haven't retired.

9    Q.   So you had planned on running the team from behind the

10   scenes until you stopped playing basketball?

11   A.   I haven't retired yet, so.

12   Q.   So then, Mr. Howard, the question would be, the question is

13   if you were going to run the team from behind the scenes until

14   you retired, how long was that going to be?

15   A.   I can't make any assumptions.

16   Q.   So then you had no endpoint on running the team from behind

17   the scenes?

18   A.   I can't make any assumptions on when I was going to retire

19   because I still haven't retired.

20   Q.   Which meant if you had purchased the team, you would still

21   be running it from behind the scenes?

22   A.   We don't know what would have happened because none of this

23   stuff ever happened.

24   Q.   Now, back in August of 2023 you filed a lawsuit against

25   Darden Enterprises in the State of Florida, correct?

O9QBDAR4                         Howard - Cross

1   A.  Yes.  Lawsuit?

2   Q.  Yes.  You sued.

3         Mr. Howard, you filed a lawsuit against Darden

4   Enterprises LLC d/b/a Darden Sports Group in August 17, 2023 in

5   the State of Florida, correct?

6   A.  Yes, sir.

7   Q.  And in that lawsuit you -- you had an attorney that filed

8   the lawsuit for you, correct?

9   A.  Yes, sir.

10  Q.  And you spoke to your attorney and told them about the

11  facts related to this Darden Enterprise and Dream team

12  purchase, correct?

13        MR. MEAD:  Objection, privilege.

14        THE COURT:  Sustained.

15  Q.  In that lawsuit you sued alleging breach of contract and

16  misappropriation of funds by Darden Sports Group, correct?

17  A.  Yes, sir.

18  Q.  In that lawsuit you allege that the events that led up to

19  this -- that gave rise to this lawsuit was an inducement into a

20  contract based upon a material representation, correct?

21  A.  Can you explain what that means.

22  Q.  Did you not allege that the fact that you weren't told that

23  Mr. Darden, Jr., was a felon was what caused you to lose your

24  $7 million?

25  A.  The fact that I didn't know he was a felon?

O9QBDAR4                        Howard - Cross

1    Q.  Yes.

2    A.  I don't understand what you mean.

3    Q.  Did you not allege in your lawsuit that Mr. Darden, Sr. had

4    a duty to notify you of the material fact that Mr. Darden, Jr.,

5    was a felon?

6    A.  Nobody told me he was a felon before these events.

7    Q.  Did you allege in your lawsuit -- strike that.

8        You didn't allege in your lawsuit that the vision plan

9    was what caused you to provide $7 million, correct?

10   A.  The vision plan cause me to provide $7 million; is that

11   what you're asking?

12   Q.  My question is, isn't it true that you did not allege in

13   your lawsuit that the vision plan caused you to provide

14   $7 million to the Darden group?

15   A.  I don't understand your question.  I'm sorry.

16   Q.  When you filed this lawsuit against Mr. Darden and Darden

17   Enterprises, you allege that you lost $7 million, correct?

18   A.  Yes.

19   Q.  And you alleged you lost this $7 million because of what?

20   A.  I thought it was for the purchase of Dream.

21   Q.  In your lawsuit isn't it true that you do not mention that

22   you lost $7 million because of the Dream?

23   A.  In my lawsuit I didn't mention it?

24   Q.  In the lawsuit filed by you in August of 2023, isn't it

25   true that you did not mention that you lost the $7 million

O9QBDAR4                    Howard - Cross

1   because of -- you wanted to buy the Dream?

2           MR. MEAD:  Objection.  Document is not in evidence and

3   asked and answered.

4           THE COURT:  I'll allow it.  Objection overruled.  Do

5   you remember?  The question was, Mr. Howard, in the lawsuit

6   filed by you in August of 2023, isn't it true that you did not

7   mention that you lost $7 million because you wanted to buy the

8   Dream?

9           THE WITNESS:  In the lawsuit?

10           THE COURT:  Correct.

11           THE WITNESS:  I don't even get what that means.  Did I

12   say in the lawsuit this is why?

13           THE COURT:  Correct.  Do you recall whether you said

14   in the lawsuit that you -- well, that you did not say or you

15   did not mention that you lost $7 million because you wanted to

16   buy the Dream?

17           THE WITNESS:  I don't recall.

18           THE COURT:  Okay.  All right.

19   Q.  In this lawsuit that you filed on August 17, 2023, isn't it

20   true that you stated that the plain language of the November

21   2020 contract expresses the understanding and agreement of all

22   the parties as to how the funds were to be used?

23   A.  The plain language?

24   Q.  Yes.

25   A.  The language in our contract?

O9QBDAR4                    Howard - Cross

1    Q.  Yes.

2    A.  Can you --

3            MR. DONALDSON:  Can we put up what's in evidence as

4    Government Exhibit 2413.  Can we scroll down to the beginning

5    of the promissory note.

6    Q.  Mr. Howard, do you see what's on the screen now as 2413,

7    page seven?

8    A.  Yes, sir.

9    Q.  That's the promissory note from November 11, 2020, correct?

10   A.  Yes, sir.

11   Q.  That's the promissory note or contract that you said was

12   breached by the Darden Group, correct?

13   A.  Yes, sir.

14   Q.  And that's the contract you base your lawsuit on in August

15   of 2023, correct?

16   A.  This right here?

17   Q.  Isn't it true that the lawsuit in August 2023 you were

18   suing to get the $7 million back based upon this contract?

19   A.  I was suing to get my money back from what I assume would

20   be the purchase of the Dream.

21   Q.  Isn't it true that in your August 2023 lawsuit you sued for

22   breach of contract; is that not true?

23   A.  Did I sue for breach of contract?

24   Q.  Yes?

25   A.  Yes.

O9QBDAR4                    Howard - Cross

1    Q.  And the breach of contract related to the contract, that's

2    on the screen 2413, correct?

3    A.  On the screen, I thought that the money in the suit was for

4    them stealing the money for the Dream.

5    Q.  My question is, Mr. Howard -- I'll start again.

6              August of 2023 you sued Darden Enterprises for breach

7    of contract, yes or no?

8    A.  Yes.

9    Q.  And the contract that you were talking about in that

10   lawsuit was the November 11, 2020 contract, correct?

11   A.  That's what's stated here, yes.

12   Q.  And in that lawsuit isn't it true that you indicated that

13   --

14             MR. MEAD:  Objection to reading the document.

15   Q.  Strike that.  Isn't it true that you allege that the plain

16   language of a contract expresses the understanding and

17   agreement of the parties as to how all funds are used?

18             THE COURT:  Objection overruled.  I'll allow it.  Do

19   you remember that that was an allegation or a claim in the

20   lawsuit?  And by that I mean that you allege that the plain

21   language of a contract express the understanding and agreement

22   of the parties as to how the funds are used.

23   A.  Again, I was under the understanding that that's what --

24   the money was for the seven million for the team.  Charles was

25   the one who went over most of the agreements, and I trusted his

O9QBDAR4                    Howard - Cross

1    word on what the agreements and everything said.  So a lot of

2    this stuff that, you know, I'm seeing, some of the things that

3    I really didn't go through because that was Charles' job as my

4    agent.

5         THE COURT:  All right.  Mr. Donaldson, go ahead.

6         MR. DONALDSON:  Can you go to paragraph 38 please.

7    Judge, I apologize.  We're working on getting it up on the

8    screen.

9         THE COURT:  It's okay.  It's up on the witness's

10   screen.

11        MR. DONALDSON:  Very good, Judge.  Go to page one

12   first, please.

13   Q.  Now, Mr. Howard, as you indicated this is -- well, you

14   filed a complaint, civil complaint in Florida 2023, correct?

15   A.  Yes, sir.

16   Q.  And this is the complaint?  The screen that you're looking

17   at is the complaint, right?

18   A.  Yes, sir.

19        MR. DONALDSON:  Can you go to paragraph 38, please.

20   Q.  Just looking at the screen in front of you and reading

21   paragraph 38, does that refresh your recollection as to whether

22   or not you alleged in your civil complaint that the plain

23   language of the contract at issue expresses the understanding

24   and agreement of all parties as to how funds were to be used?

25   A.  Um, again --

O9QBDAR4                        Howard - Cross

1    Q.  Just yes or no.

2    A.  My agent --

3    Q.  Yes or no, Mr. Howard.

4    A.  I don't have a yes or no answer for this.

5            THE COURT:  Okay.  Well, the question is, does it

6    refresh your recollection.

7            THE WITNESS:  I've had a lot of suits.  I've had a lot

8    of papers in front of me, that's why I said no the first time.

9    I don't remember all of this.

10           THE COURT:  All right.

11   Q.  You do remember that you received a judgment related to

12   this lawsuit, correct?

13   A.  What do you mean?

14   Q.  You do remember that you received a judgment related to the

15   lawsuit against Darden Enterprises?

16   A.  When you say judgment, I don't understand.

17   Q.  What you asked for the money that you claim you lost, you

18   received a civil judgment related to that contract, correct?

19   A.  I don't recall everything.

20   Q.  You don't recall anything?

21   A.  I don't recall everything.

22   Q.  In this lawsuit you didn't name Calvin Darden, Jr., as any

23   person that took money from you or committed fraud against you,

24   correct?

25   A.  I don't remember the whole claim, everything that's in the

O9QBDAR4                    Howard - Cross

claim by heart.

Q.  In this lawsuit you didn't sue Calvin Darden, Jr., correct?

A.  Who was the lawsuit for?

            MR. DONALDSON:  Ms. Reed, go to page one, please.

Q.  Please review page one and see if that refreshes your

recollection as to who the lawsuit is against?

A.  This says Darden Enterprises.

Q.  This lawsuit was filed in August 2023, correct?  Is that a

yes?

A.  Yes, sir.

Q.  And I believe you said early on direct that August 23 you

realize that Charles Briscoe was lying to you as well, correct?

A.  Yes, sir.

Q.  In this lawsuit you didn't identify Charles Briscoe as

someone -- as a defendant either, correct?

A.  It's Darden Sports Group.

Q.  You didn't identify -- as a matter of fact you didn't even

name Charles Briscoe in this lawsuit, correct?

A.  No, the people that's named is the group, the Darden Sports

Group.

            MR. DONALDSON:  Can we put up 2413, please.

Q.  Earlier on direct you indicated that you actually signed

this document, correct?

A.  Yes.

Q.  When you say you signed it, you either pen or some writing

O9QBDAR4                    Howard - Cross

1   device, you actually physically signed this document, correct?

2   A.  Yes.

3   Q.  And that's the same signature that you did with the other

4   two NBA contracts, correct?

5   A.  Yes, sir.

6   Q.  That's the same signature that you use for all your NBA

7   contracts, correct?

8   A.  I'm pretty sure, yes, sir.

9   Q.  This was done on November 11, 2020, correct?

10  A.  Yes, sir.

11  Q.  And that last NBA contract was signed I believe November

12  20, 2020, correct?

13  A.  I think so, yes, sir.

14  Q.  So approximately a week after you signed this contract you

15  signed another NBA contract, correct?

16  A.  Mm hm, yes, sir.

17  Q.  Now, it's fair to say that Briscoe sent you this contract

18  via email prior to you sending the money over, correct?

19  A.  Yes, sir.

20  Q.  So you actually had possession of this contract, correct?

21  A.  Yes, sir.

22  Q.  And you had it -- in fact, it would be fair to say you had

23  this contract for several days before you signed it, correct?

24  A.  Yes, sir.

25  Q.  You were actually speaking with Mr. Briscoe about this

O9QBDAR4                    Howard - Cross

1   contract for several days before you signed it, correct?

2   A.  When you say speaking, do you mean on the phone or in text

3   message?

4   Q.  Phone or text message, you were speaking to Mr. Briscoe

5   about this contract, correct?

6   A.  We could have, sure.

7   Q.  And then --

8           MR. DONALDSON:  Go to page one, please, Mr. Ross.

9   Q.  Page one of the contract indicates that Convertible

10  Promissory Note Financing of Darden Sports Group.  You see at

11  the top?

12  A.  Yes.

13  Q.  Do you know what a convertible promissory note is?

14  A.  Could you explain it?

15  Q.  No.  I'm asking you do you know what it is?

16  A.  I guess it's a promissory note.

17  Q.  And you thought it was a loan, correct?

18  A.  I thought this was to get a loan so we could purchase the

19  team.

20  Q.  And it says at the top, Financing of Darden Sports Group,

21  correct?

22  A.  That's what it says at the top.

23  Q.  And it says that underlined in bold print, correct?

24  A.  Convertible promissory, that part?

25  Q.  It says Convertible Promissory Note Financing of Darden

O9QBDAR4                    Howard - Cross

1   Sports Group, correct?

2   A.  I do see what that says, yes.

3   Q.  And this is the same contract that you said in your civil

4   lawsuit that all parties agree with the language of it,

5   correct?

6   A.  I didn't understand it.

7   Q.  The next paragraph says, issuer Darden Enterprises, LLC

8   doing business as Darden Sports Group, a Florida limited

9   liability corporation.  You see that, correct?

10  A.  Yes, sir.

11  Q.  And next one says investor, do you see that part?

12  A.  Yes, sir.

13  Q.  And it says Dwight D. Howard, that's you, correct?

14  A.  Yes, sir.

15  Q.  As an individual and other investors mutually agreed upon

16  by and the company.  You see that language, correct?

17  A.  Yes, sir.

18  Q.  And all that's on the first page, correct?

19  A.  Yes, sir.

20  Q.  And then it says USD $7 million in aggregate principal

21  amount of convertible promissory note, correct?

22  A.  Yes, sir.

23  Q.  Now, before November 11, 2020, the conversations about the

24  sell of the Dream was for $3 million?

25  A.  It was for $3 million?

O9QBDAR4                    Howard - Cross

1   Q.  You agreed that it was for $3 million, correct?

2   A.  I sent $7 million, so I don't know how I agreed to $3

3   million.

4   Q.  We'll talk about that.  In July 2020, there was a letter of

5   intent for $3 million, correct?

6   A.  Can you show me so I could see it.

7   Q.  I'm asking you.

8   A.  I just want to refresh my memory.

9   Q.  Was there a letter of intent in July of 2020 for $3

10  million?

11  A.  Can I see it?  Is there a way I could see it?

12          THE COURT:  Well, that's fine, Mr. Howard.  But

13  sitting here today, do you remember whether there was a letter

14  of intent on the date in July of 2020 for $3 million?

15          THE WITNESS:  There was one for 4 million and 3

16  million.  There was two wires that was sent.

17          THE COURT:  Okay.

18          MR. DONALDSON:  I'll move on, Judge.  Thank you.

19          THE COURT:  Yes.  Thank you.

20  BY MR. DONALDSON:

21  Q.  Now, you knew prior to sending this money over you could

22  not purchase the team as an active player, correct?

23  A.  Yes, sir.

24  Q.  And you knew that prior to signing this agreement to send

25  over $7 million, correct?

O9QBDAR4                    Howard – Cross

1   A.  Yes, sir.

2   Q.  So prior to you sending over $7 million that you say to

3   purchase the Dream, you knew that you could not be an owner,

4   correct?

5   A.  I knew I couldn't be an owner?

6   Q.  Yes or no, Mr. Howard.  You knew that you could not be an

7   owner of the Dream prior to sending that $7 million over,

8   correct?

9   A.  Not for myself I couldn't.  As Dwight Howard, I couldn't.

10  Q.  Let's go back to August 2020.  Do you recall that the NBA

11  gave you and Mr. Briscoe forms to complete related to the

12  purchase of the Dream?

13  A.  Yes.

14  Q.  And as you said, these formed related to becoming an owner

15  of the Dream, correct?

16  A.  Yes.

17  Q.  And you tried to fill out those forms, correct?

18  A.  My assistant did.  I didn't fill them out.

19  Q.  And your assistant, we're talking about Joyce, correct?

20  A.  Yes, sir.

21  Q.  You told Joyce to fill out the WNBA forms that was provided

22  to you so that you could purchase the Dream, correct?

23  A.  Yes.

24  Q.  And in fact Joyce sent you back the forms filled out and

25  asked you was that information correct.  Do you recall that

O9QBDAR4                    Howard – Cross

1    email?

2    A.  Yes.

3    Q.  I'm sorry?

4    A.  Yes.

5    Q.  And then you read that email and said the information is

6    good, correct?

7    A.  Yes.

8    Q.  In order to send it back to WNBA to purchase the Dream,

9    correct?

10   A.  Yes.

11   Q.  Before that date, though, you knew at that time that you

12   and Briscoe had already planned not to tell the WNBA about your

13   attempt to buy the team, correct?

14   A.  What do you mean?

15   Q.  You and Briscoe before that date already planned not to

16   tell the WNBA that you all were trying to buy a team, correct?

17   A.  I think the WNBA knew that I wanted to purchase the team.

18   I was at the games.  I spoke to the owners.  I spoke to the

19   different owners.  The Atlanta Dream themselves said that they

20   wanted me to have the team verbally because I was from Atlanta.

21           MR. DONALDSON:  Your Honor, move to strike that.

22           THE COURT:  I'm going to allow it.  Objection

23   overruled.  Next question.

24           MR. DONALDSON:  Can we pull up 2534-28 please, witness

25   only please.

O9QBDAR4                    Howard - Cross

1              THE WITNESS:  Yeah, buddy.  I wasn't talking to you,

2      sir.

3              MR. DONALDSON:  I'm sorry, Judge, there's --

4              THE WITNESS:  Mr. Darden said something to me.

5              THE COURT:  All right.  Look, just focus on --

6              THE WITNESS:  Oh, I am.  He just looked at me and said

7      something.

8              THE COURT:  That's okay.  You can ignore that.  So no

9      gestures.  No comments.  No mouthing words from anyone while

10     the witness is on the witness stand.  Okay.

11             Go ahead, Mr. Donaldson.

12             MR. DONALDSON:  Thank you.

13     BY MR. DONALDSON:

14     Q.  Mr. Howard, you did sit down and talk with the prosecution

15     on September 5, 2024, correct?

16     A.  Yes, sir.

17     Q.  And in that conversation they ask you questions about your

18     desire to purchase the Dream, correct?

19     A.  Yes, sir.

20     Q.  And during that conversation is it not -- you did tell the

21     prosecution that you and Charles were asked to fill out a WNBA

22     forms, but you didn't know why you were filling them out

23     because given the plan not to tell the WNBA about your role?

24             MR. MEAD:  Objection, your Honor.

25             THE COURT:  Sustained.

O9QBDAR4                    Howard - Cross

1   Q.  Strike that.  I'll ask it a different way.

2           Isn't it true that you and Mr. Briscoe had hatched --

3   had a plan not to tell the NBA about your role in purchasing

4   the Dream?

5   A.  No, they already knew that I wanted to have the Dream.

6   Q.  September 5, 2024, you sat down and talked to the

7   prosecution, correct?

8   A.  Mm hm.

9   Q.  Is that a yes?

10  A.  Yes.

11          MR. DONALDSON:  Going down, Judge, if I can, page one,

12  bullet point seven.

13  Q.  Mr. Howard, I'd like you to read what's in front of you

14  page one, bullet point seven.

15  A.  Where it says understood that the WNBA -- that one?

16  Q.  Where it says, what starts with 8/10/2020 email.

17  A.  8/10/2020 email.

18  Q.  Don't read it out loud.

19  A.  Okay.  Okay.

20  Q.  Did you read that?

21  A.  Yeah.

22  Q.  Does that refresh your recollection as to whether or not on

23  September 5, 2024, you told the prosecutors that me and

24  Charles --

25          MR. DONALDSON:  I'm just asking what refresh his

O9QBDAR4                    Howard - Cross

1    recollection as to what he told you all on September 5, 2024.

2            THE COURT:  Having read it, do you now have a memory

3    of this?

4            THE WITNESS:  You're talking about this part that me

5    and Charles ask to fill out.  I don't know why we're filling

6    out the form?

7            THE COURT:  Do you remember that?

8            THE WITNESS:  Yeah, I guess I said that.

9    BY MR. DONALDSON:

10   Q.  One second.  Question:  Back on September 5, 2024, you

11   said, I don't know why we were filling out this form given the

12   plan not to tell the WNBA about my role?

13           MR. MEAD:  Objection.

14           THE COURT:  I'll allow this question then we'll move

15   on.

16   Q.  That's true, correct?

17           THE COURT:  Do you remember saying that?

18   A.  I don't know why filling out a form given the plan not to

19   tell the WNBA about my role.  I had already spoken to the WNBA.

20           THE COURT:  Okay.  Next question.

21           MR. DONALDSON:  Yes, your Honor.

22   Q.  Now, after you sent the money over to Darden Enterprises,

23   you did not speak to anyone related to the Dream because you

24   did not want your name associated with it, correct?

25   A.  After I sent the money over, it was no need for me to talk

O9QBDAR4                    Howard - Cross

1    to anybody.  I thought that we was already -- it was already

2    set.  Who else was I suppose to talk to?

3    Q.  That's not my question.  My question is, after you sent the

4    money over to Darden Enterprises, you did not speak to anyone

5    related to the Dream because you did not want your name

6    associated with it; isn't that correct?

7    A.  Why would I speak to anybody from the Dream if the money is

8    sent?  I would think that I would be the owner because Charles

9    had already told me, you know, about owning the team.  So why

10   would I have to speak to old people about owning the Dream?

11   Q.  Weren't you told by NBA executive and Charles Briscoe that

12   you could not own the team, weren't you told that?

13   A.  And I had already express to the WNBA team the Dream and

14   their owners that I wanted to own the team.  We met at games.

15   We talked about it.  They express that they only wanted me to

16   own the team in person verbally, so that wasn't something that

17   was on a email or thread or anything like that.  So I think

18   they already knew that I wanted to purchase the team.

19   Q.  Isn't it true that Mr. Dershowitz, Mr. Brock, Mr. Briscoe

20   all informed you that as a NBA player you could not own a WNBA

21   team?

22   A.  I do not recall those three people having that conversation

23   with me.

24   Q.  You don't recall Mr. Briscoe telling you that you could not

25   own an NDA team?

O9QBDAR4                        Howard - Cross

A.  Mr. Briscoe, and he said it a couple of times, but I don't

recall the John Brock guy or the other guy saying anything

about me not being able to purchase the team.

Q.  So after Mr. Briscoe told you, you couldn't own the team,

you then sent over $7 million to own the team?

A.  I sent it over to the group because I thought that's what

we were going to be doing together.  Cause I couldn't own it in

my name myself, so I thought that I had to do it with an

entity.

Q.  Right.  You said you couldn't own it in your name yourself,

correct?

A.  Yes.

Q.  That's because the WNBA executives told you, you couldn't

old it, correct?

A.  Charles.

Q.  So Charles told you, you couldn't own it; is that correct?

A.  Charles is the one who said that the WNBA told him that.

And I went back and told him that we should probably put a

group together and I can be behind the scenes.

Q.  Weren't you told by the NBA executive Mr. Dershowitz and

Mr. Brock you could not own a NBA from behind the scenes as

well?

A.  No.

            MR. MEAD:  Objection, asked and answered.

            THE COURT:  I'll allow it.  Objection overruled.

O9QBDAR4                    Howard – Cross

1    Q.  Is that not correct?

2              THE COURT:  The witness answered no.

3    Q.  Isn't it also true that you didn't tell anyone about you

4    purchasing the team because you had to keep the news quiet

5    because of your active status?

6    A.  No.

7              MR. DONALDSON:  3524.

8    A.  I told my mom.

9              MR. DONALDSON:  Can you please put up 3524, number

10   five.

11             THE WITNESS:  You have a problem too, sir?  No, the

12   guy behind you.  The same thing that he was doing, he's doing.

13   The guy with the bow tie.

14             THE COURT:  I think that sometimes people are talking

15   to their colleagues next to them rather than --

16             MR. RICCO:  Your Honor, can we have a sidebar, please.

17             THE COURT:  Sure.  One second ladies and gentlemen.

18             THE WITNESS:  Yo, you still gotta do that?  Does he

19   still have to do that, sir?

20             THE COURT:  Look, I don't know what is going on.

21             MR. MEAD:  Every time he look at me he smiling.

22             THE COURT:  Stop. Stop. Stop.  I don't know what is

23   going on, smiling or whatever it is.  Mr. Howard, concentrate

24   on the questions.  And Mr. Darden, just keep it straight, speak

25   to your lawyers.  That's fine, but no facial expressions

O9QBDAR4                        Howard - Cross

1    about -- no facial expressions if you can avoid it.  Okay.  All

2    right.   Thank you.

3              (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O9QBDAR4                          Howard - Cross

1                (At the sidebar)

2                MR. RICCO:  Judge, I'm making a representation as an

3    officer of the court in this court where I've practiced for

4    decades.  I'm sitting in my seat, and Mr. Howard is going back

5    and forth looking, looking.  He tilts his head over towards me

6    trying to get some type of response.  I look him off.  I don't

7    open my mouth.  I don't blink.  I don't do anything, and then

8    he started talking.  That's what happened.  Nothing.  Zero.

9    Nothing.

10               THE COURT:  Okay.

11               MR. RICCO:  He's just -- he just needs to calm down.

12   We all want a civil proceeding here.

13               THE COURT:  Yeah.  All right.  I accept your

14   representation.  But, look, I think part of what's going on is

15   the witness is getting frustrated.  And so what I'd like to --

16   how much more to you think you have?

17               MR. DONALDSON:  I'm going to get out just a few more

18   points that I have to get out, Judge, what I think are major

19   points that I have to get out.  I understand the dynamics that

20   are going on, so I appreciate that, so I will move it long

21   efficiently as I can.

22               MR. RICCO:  The judge wants to know about how much

23   longer, just ballpark.

24               MR. DONALDSON:  Fifteen, 20 minutes.

25               THE COURT:  All right.  Again, let's try not to cover

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O9QBDAR4                    Howard – Cross

1    a ground that's already been covered.

2              MR. DONALDSON:  I'm trying.  It's just that I think --

3    I'm trying.

4              THE COURT:  Thank you.

5              (Continued on next page)

O9QBDAR4                        Howard - Cross

1              (In open court; jury present)

2              THE COURT:  Next question.

3    BY MR. DONALDSON:

4    Q.  I believe the last question I ask just to refresh,

5    Mr. Howard you indicated that you did not say that you had to

6    keep the news quiet because of your -- the news of your

7    purchase quiet because of your active status.  You said you did

8    not say that, that's correct?

9    A.  What do you mean?  I bought it public is that what you're

10   trying to say?

11   Q.  No, I'm not suggesting you bought it public.  What I'm

12   asking is that you wanted to keep your transaction for

13   $7 million quiet because you weren't supposed to be known to

14   have purchased the WNBA team because of your active status,

15   correct?

16   A.  That's not why I was keeping it quiet.

17             MR. DONALDSON:  Do we have 3424-5 up?  Can we go to

18   page seven, please, fourth full paragraph down.

19   Q.  Mr. Howard, you met with and spoke to the government back

20   on March the 6th, 2023, correct?

21   A.  3/6/23?

22   Q.  You met and spoke to the government back on March 6, 2023

23   related to the purchase of the Dream?

24   A.  Yes, sir.

25   Q.  And on that date you were asked questions about your

O9QBDAR4                          Howard - Cross

1    interactions or what you did related to that purchase, correct?

2    A.  Yes, sir.

3    Q.  And back on that day is it not true that you told the

4    government that you had to keep the news about you owning a

5    team quiet because of your active player status with the NBA?

6    A.  Yes, sir.

7            MR. DONALDSON:  You can take that down for me.  Thank

8    you.  Can we put back up 2413, please.  Can we go to the first

9    page of the promissory note.  Thank you, again, sir for helping

10   me out.  Can we go to the second page, please.  You can place

11   it for everybody, sir.

12   Q.  On the second page of this contract that you signed

13   November 2020 that talks about conversion prepayment security

14   and protective provisions, do you see that on the contract in

15   bold print left-hand side?

16   A.  Yes, sir.

17   Q.  You see anything in there about the Dream?

18   A.  No, sir.

19           MR. DONALDSON:  Can we go back to page one, please.

20   Q.  This talks about the issuer, the investor, financing

21   amount, use of proceeds, closing, maturity and interest.  Do

22   you see those in bold print on the left-hand side?

23   A.  Yes, sir.

24   Q.  Does that say anything about the Dream?

25   A.  No, this paper doesn't.

O9QBDAR4                    Howard - Cross

Q.  Where it says use of proceeds, do you see that section?

A.  Yes, sir.

Q.  Now go back up.  It says the company intends to use the proceeds of this offering for the company operating expenses of $2.5 million per year.  Do you see that?

A.  Yes, sir.

Q.  Do you see where it says, expansion of its lines of business specifically the addition of a production company.  Do you see that?

A.  Yes, sir.

Q.  And do you see where it says, OTT channel and associated cost and expenses.  Do you see that?

A.  Yes, sir.

Q.  Now back up to the top the bold print underline says, financing of Darden Sports Group.  Do you see that?

A.  Mm hm.

Q.  Is that a yes?

A.  I do.

Q.  Do you see anything on page one that has anything to do with the Dream?

A.  No, sir.

        MR. DONALDSON:  Go to page three.

Q.  Page three has a section that says representations and warranties, fees and expenses.  Do you see that?

A.  Yes, sir.

O9QBDAR4                         Howard - Cross

1    Q.  Does that say anything to do with the Dream?

2    A.  No, sir.

3    Q.  Can you go to the next page.  It says acknowledge and agree

     in bold print.  Do you see that?

5    A.  Yes, sir.

6    Q.  Where it says investor.  Do you see that?

7    A.  Yes, sir.

8    Q.  And where it says name, whose name is that?

9    A.  That's my name.

10   Q.  Dwight Howard, correct?

11   A.  Yes, sir.

12   Q.  And that's signed by you, correct?

13   A.  Yes, sir.

14   Q.  Personally signed by you, correct?

15           MR. DONALDSON:  I'm sorry, Judge.

16           THE COURT:  Right.  Thank you.

17           (Continued to next page)

18

19

20

21

22

23

24

25

O9QJDAR5                          Howard - Cross

1    BY MR. DONALDSON:

2    Q   You sent the $7 million in two different allotments,

3    correct?  Or two different sections, correct?

4    A   Uh-huh.  Yes, sir.

5    Q   And the first was $4 million?

6    A   Yes, sir.

7    Q   And that was from the BMO Bank, correct?

8    A   Yes, sir.

9    Q   And you authorized him to send that money over, correct?

10   A   Yes, sir.

11   Q   And you spoke to someone in BMO bank before you sent the

12   money over, correct?

13   A   Yes, sir.

14   Q   And you spoke to someone named Mr. Smith, correct?

15   A   Yes, sir.

16   Q   And you and Mr. Smith talked about you sending $4 million

17   to the Darden Sports Group, correct?

18   A   Yes, sir.

19   Q   And then after that conversation, you then authorized

20   Mr. Smith to wire the money over, correct?

21   A   Yes, sir.

22   Q   And then about a month later, you wired over another

23   $3 million, correct?

24   A   Yes, sir.

25   Q   And before you wired that over, you again spoke to

1    Mr. Smith, correct?

2    A    Yes, sir.

3    Q    And you authorized him to wire the money over, correct?

4    A    Yes, sir.

5    Q    Now, after you wired the first $4 million over, you did not

6    email or contact Mr. Darden, Jr. at all, correct?

7    A    No, sir.

8    Q    You didn't email him and say, let's get it, let's get

9    started on this Dream deal, correct?

10   A    No, sir.

11   Q    After you sent the $3 million over to Mr. Darden

12   Enterprises, you didn't send any email or calls or anything to

13   Mr. Darden related to a Dream acquisition, correct?

14   A    No, sir.

15           MR. DONALDSON:  One second, please.

16   Q    Just a few more questions, Mr. Howard.

17           When you say you're not retired from the NBA, does

18   that mean you're still an active player?

19   A    It just means I'm not retired.

20   Q    Does that mean you're still earning a salary from the NBA?

21   A    If I'm not on a team, how can I be compensated?

22   Q    How much did you earn over the course of your 18 years in

23   the NBA?

24           MR. MEAD:  Objection.  Relevance.

25           MR. DONALDSON:  I'll reframe the question.

1          THE COURT:  Okay.

2          MR. DONALDSON:  One second, Judge.

3    Q   Do you recall how much you earned for your last contract in

4    the NBA with the Lakers?

5    A   I don't think the Lakers was my last team, so I wouldn't

6    think that that would have been my last contract.

7    Q   Who was your last contract?

8    A   The 76ers.  You pulled it up.

9    Q   How much did you earn for that contract?

10   A   I think it was whatever the vet minimum was at the time,

11   that's what it was.

12   Q   How much did you earn with the Lakers in that contract?

13   A   Whatever the vet minimum was at the time.  It's changed the

14   last couple years.

15   Q   Before you were with the Lakers, what team were you with?

16         MR. MEAD:  Same relevance objection, your Honor.

17   A   Washington, the Wizards.  And then I got traded, so I was

18   with three teams, Washington, Memphis, and then the Lakers and

19   then Philly.

20   Q   How much did you earn in those contracts, if you remember?

21         MR. MEAD:  Same objection.

22         THE COURT:  I'll allow it.  But this is the last

23   question on this line.

24         MR. DONALDSON:  Yes, your Honor.

25   A   How much did I earn?

O9QJDAR5                           Howard - Redirect

1    Q   How about this, would it be fair to say over the course of

2    your NBA career, you earned approximately $200 million from NBA

3    contracts?

4    A   Not -- I don't want to say that's true, no.

5           MR. DONALDSON:  No further questions.

6           THE COURT:  Okay.  Redirect?

7    REDIRECT EXAMINATION

8    BY MR. MEAD:

9    Q   You remember being shown a lawsuit, Mr. Howard?

10   A   Yes, sir.

11   Q   Are you a lawyer?

12   A   I am not a lawyer.

13   Q   Did you ever go to law school?

14   A   No.

15   Q   What has your main job been in your life?

16   A   Professional basketball.

17   Q   And does that involve writing contracts for lawsuits

18   generally?

19   A   No, sir.

20   Q   Okay.  The lawsuit you were shown, did you personally write

21   that lawsuit?

22   A   No, sir.

23   Q   Did you personally decide who it made the most sense to

24   sue?

25   A   No, sir.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   Q   Did your lawyer make those decisions?

2   A   He did.

3   Q   Okay.  You remember being shown some NBA contract?

4   A   Yes, sir.

5           MR. MEAD:  Mr. Ross, would you please pull up

6   Government Exhibit 394 in evidence.

7   Q   Is this one of the contracts that you were shown?

8   A   Yes, sir.

9   Q   And is this a contract between you and the Philadelphia

10  76ers?

11  A   Yes, it is.  Yes.

12  Q   Okay.  Is this document called a National Basketball

13  Association Uniform Player Contract?

14  A   Yes, sir.

15  Q   And does "uniform" mean it's the same?

16  A   Yeah, for the most part.  Yeah.  Uh-huh.

17  Q   Okay.  And did you have people you trusted as advisors to

18  help you look at contracts like this?

19  A   Yes.  That's what the agent's job is for.  To be honest, I

20  mean, I couldn't speak on all the NBA players, but for myself

21  and the players that, you know, I've been around, it was the

22  agents who looked at the contracts, read them over.  We also

23  had maybe another lawyer outside of the agent looking over the

24  contract.  The player, we just signed the bottom line, and we

25  just had blind trust, blind faith in the agent and whoever the

1  lawyer was.  So that could have been our fault, but I mean,

2  that's what their duties was as the agent.

3  Q   And it's the job of the agent and if there's a lawyer, a

4  lawyer, to read these contracts and advise you about them?

5  A   Yes, sir.

6          MR. DONALDSON:  Objection.  Form of the question.

7          THE COURT:  I'll allow it.  Overruled.

8  Q   Do you remember being asked about when you initially

9  started thinking about buying the Dream?

10 A   Yes, sir.

11 Q   And was that around July of 2020 or so?

12 A   Yes, sir.

13 Q   Okay.  And do you remember being then shown an email -- the

14 vision plan?

15 A   Yes, sir.

16 Q   And do you remember being asked if you got the vision plan

17 after you originally thought about buying the Dream?

18 A   Uh-huh.

19 Q   Yes or no?

20 A   I'm sorry.  Yes.

21 Q   Not a problem.

22          In July, if you'd been told that the Atlanta Dream

23 cost $150 million, would you have gone ahead and bought it?

24          MR. DONALDSON:  Objection.

25 A   No.

1      THE COURT:  I'll allow it.  Overruled.

2  Q   And when you were thinking about buying the Dream, your

3  decision about whether you were ultimately going to buy it

4  depended on a whole bunch of other things that you didn't know

5  yet, right?

6      MR. DONALDSON:  Objection.

7  A   Yes, sir.

8      THE COURT:  Sustained.  A little less leading.

9      MR. MEAD:  Sorry, your Honor.

10  Q   In July of 2020, were you sure that you wanted to buy the

11  Dream?

12  A   At the time, I thought I was very sure that I wanted it,

13  yeah.

14  Q   Were there things that could have happened that would

15  change your mind?

16      MR. DONALDSON:  Objection.

17      THE COURT:  I'll allow that.  Overruled.  You can

18  answer.

19  A   Yes, there were things.

20  Q   Okay.  Ultimately, who did you try and buy the Dream with?

21  A   The Dardens and Charles.

22  Q   Okay.  And would it have been possible to buy the Dream

23  with other people, potentially?

24      MR. DONALDSON:  Objection.

25  A   It could have been possible.

O9QJDAR5                          Howard – Redirect

1            THE COURT:  Well, rephrase the question.  Sustained.

2   Q    Were there other potential ways to buy the Atlanta Dream?

3   A    Yes, there was.

4   Q    Okay.  Were there other potential people you could have

5   bought the Atlanta Dream with?

6   A    Yes, there was.

7   Q    Okay.  Do you remember being asked about your reasons for

8   wanting to buy the Atlanta Dream?

9   A    Yes.

10  Q    Do people sometimes want to do things for multiple reasons?

11           MR. DONALDSON:  Objection, Judge.

12           THE COURT:  Well, rephrase the question.  Sustained.

13           Mr. Howard, did you have more than one reason for

14  wanting to purchase the Dream?

15           THE WITNESS:  Yes, sir.

16           THE COURT:  Okay.  Next question.

17  BY MR. MEAD:

18  Q    Did you know how the Dream was doing financially when you

19  initially thought about buying the Dream?

20  A    No, I didn't.

21  Q    Was how the Dream was doing financially an important factor

22  in whether you would go forward with that?

23  A    No.  Not at the time, no.

24  Q    Okay.  Do you remember being asked about a judgment in your

25  civil case?

1   A   This case?

2   Q   No.  So do you remember being shown the lawsuit?

3   A   Yes, sir.

4   Q   Do you remember being asked if there was a judgment in that

5   civil case?

6   A   Yes, sir.

7   Q   And did you know the answer to that question or not?

8   A   I didn't know the answer.

9   Q   Do you know whether you got $7 million back from that

10  lawsuit?

11  A   I didn't.

12  Q   Okay.  You know you did not?

13  A   I know, I didn't, no.

14          MR. MEAD:  Can you show Government Exhibit 201J in

15  evidence, please, Mr. Ross.

16  Q   Do you remember being asked questions about why you sent

17  the $7 million?

18  A   Yes, sir.

19  Q   Okay.  Do you remember talking about this text chain with

20  me when I asked you questions?

21  A   Yes, sir.

22  Q   Is this from before or after you sent the money?

23  A   This is after.

24  Q   And what are you and Charles Briscoe talking about here?

25  A   I asked him if he seen Lebron talking about owning the

1    Dream.  Then I sent him a message on Twitter, and then he says

2    lol crazy, it's too late for that.

3    Q    What did you understand he meant when he said lol crazy,

4    it's too late for that?

5    A    It's too late for him to own the team.

6    Q    Too late for Lebron to own the team?

7    A    Yes, sir.

8    Q    Why?

9    A    Because I had already purchased it.

10           MR. MEAD:  Mr. Ross, 2119A in evidence, please.

11   Q    Do you remember being asked on cross-examination whether

12   you talked with the Dardens about some of your ideas for the

13   Atlanta Dream?

14   A    Yes.

15   Q    And did you have a conversation about that?

16   A    Uh-huh, yes.

17           MR. MEAD:  Okay.  Can we go to page 6 of this

18   document, please, Mr. Ross.

19   Q    Before you saw this document, did you know who Jennifer

20   Baltimore was?

21   A    No.

22   Q    Did you ever tell the Dardens or anyone else that Jennifer

23   Baltimore had agreed to be on the advisory board for the

24   Atlanta Dream?

25   A    No.

1    Q   Before you saw this, did you know who Rosalind Brewer was?

2    A   No.

3    Q   Did you ever tell the Dardens or anyone else that Rosalind

4    Brewer had agreed to be on the vision board for the Atlanta

5    Dream?

6    A   No.

7    Q   Do you know who Naomi Osaka is?

8    A   I know she is, yes.

9    Q   Did you ever tell the Dardens or anyone else that Naomi

10   Osaka agreed to be on the advisory board for the Atlanta Dream?

11   A   No, sir.

12   Q   What about Tyler Perry?

13   A   I know who he is, but I didn't.

14   Q   The last four people on this page, did you ever tell the

15   Dardens or anyone else that they had agreed to be on an

16   advisory board for the Atlanta Dream?

17   A   No, sir.

18           MR. MEAD:  All right.  Can you go to the page with the

19   corporate sponsorships, please, Mr. Ross.  I think it's

20   page 18.

21   Q   Do you remember talking about this page, Mr. Howard?

22   A   Yes, sir.

23   Q   Okay.  Did you ever tell the Dardens or anyone else that --

24   for example, do you know what Cardinal Health is?

25   A   Not really.  It's a healthcare hospital something.

1    Q    Do you know what Aramark is?

2    A    No.  I seen it, but I don't know what they do.

3    Q    Did you ever tell the Dardens or anyone else that Aramark

4    or Cardinal Health had agreed to be corporate sponsors for the

5    Atlanta Dream?

6    A    No, sir.

7    Q    Did you ever tell the Dardens or anyone else that any of

8    the companies on this page had agreed to be corporate sponsors

9    for the Atlanta Dream?

10    A    No, sir.

11            MR. MEAD:  Can you go about four pages further to the

12    Dream Productions page.

13    Q    Do you remember being asked on cross-examination if you

14    talked to the Dardens about a video production?

15    A    Yes, I remember.

16    Q    Associated with the Dream, yes?

17    A    Uh-huh.

18    Q    Did you have that conversation with the Dardens?

19    A    Not about Dream Productions, as far as me having myself.

20    Q    Did you ever tell the Dardens or anyone else that Tyler

21    Perry had agreed to work with you and the Atlanta Dream?

22    A    No, sir.

23            MR. MEAD:  Just one second, your Honor.

24            THE COURT:  Okay.

25            MR. MEAD:  No further questions.  Thank you.

O9QJDAR5

1          THE COURT:  Okay.  Anything else, Mr. Donaldson?

2          MR. DONALDSON:  One second.  No, Judge.  Thank you.

3          THE COURT:  Okay.  Thank you, Mr. Howard.  You may

4     step down.

5          (Witness excused)

6          THE COURT:  Okay.  The government's next witness?

7          MR. MEAD:  The government calls Jillian Bronson.

8          THE COURT:  We're going to take another break right

9     now, ladies and gentlemen, which is fine.  And so we'll come

10    and get you by five after 5:00, okay?  And then we'll power

11    through the rest of the day.  Remember do not discuss the case.

12    Go back, relax.  Finish off the cookies or whatever else is

13    back there, and we'll come and get you.

14          Thank you very much.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

O9QJDAR5

```
 1              (In open court; jury not present)

 2              THE COURT:  You may be seated.  All right.

 3              Is there anything we need to take up before we take

 4    our break?

 5              MR. MEAD:  Not now, your Honor.  I think at the end of

 6    the day we should talk about the schedule going forward.

 7              THE COURT:  Absolutely, yes.

 8              Anything from the defense?

 9              MR. DONALDSON:  No, thank you.

10              THE COURT:  All right.  See everybody at 5:05.  Thank

11    you.

12              (Recess)

13              THE COURT:  Anything we need to talk about before we

14    bring the jury out?

15              MR. MEAD:  Assuming the Court is fine with the easel

16    here.

17              THE COURT:  I'm fine with the easel.  The question

18    will be can, Mr. Donaldson, will you be able to see the witness

19    with the easel up there?

20              MR. DONALDSON:  I don't have a problem moving over

21    some.

22              THE COURT:  Why don't we do this for now, are you

23    going to use the demonstrative right off the bat?

24              MR. MEAD:  So my thinking is relatively quickly,

25    within the first 15 minutes or so.  And as soon as I admit it,
```

O9QJDAR5

1    I would flip it around so the jury can actually see it, but

2    keep it so they can't see it until it's admitted into evidence.

3              THE COURT:  The other side is blank, right?

4              MR. MEAD:  Yes, your Honor.

5              THE COURT:  The only thing I'm saying is put it down

6    in front of the easel right now, and that way Mr. Donaldson can

7    see.  When you're ready to do it, pick it up, flip it, and

8    you're ready to go.  And Mr. Donaldson, you can adjust your

9    seat so you can see.

10             All right.  We're going to get the jury.

11             (Continued on next page)

1           (In open court; jury present)

2           THE COURT:  You may be seated.

3           Okay.  The government's next witness?

4           MR. MEAD:  The government calls Jillian Bronson, your

5    Honor.

6           THE COURT:  Okay.

7    JILLIAN BRONSON,

8         called as a witness by the Government,

9         having been duly sworn, testified as follows:

10          THE COURT:  Okay you may inquire.

11   DIRECT EXAMINATION

12   BY MR. MEAD:

13   Q   Good afternoon, Ms. Bronson?

14   A   Good afternoon.

15   Q   Where do you work?

16   A   I work at the FBI.

17   Q   What is your title at the FBI?

18   A   I'm a forensic accountant.

19   Q   How long have you been a forensic accountant at the FBI.

20   A   Approximately three years.

21   Q   Do you work right now on a particular squad or unit at the

22   FBI?

23   A   Yes.

24   Q   And what squad or unit is that?

25   A   I work in the cyber division.

1    Q    How long have you worked in the cyber division?

2    A    About a year and a half.

3    Q    Before that, did you work in any other units at the FBI?

4    A    Yes.

5    Q    Generally speaking, what other units?

6    A    I worked in the criminal division as well as the

7    counterterrorism division.

8    Q    Generally speaking, what are your responsibilities as an

9    FBI forensic accountant?

10   A    I will typically review any sort of financial data that is

11   obtained through subpoenas and help define any patterns or

12   indications of suspicious activity going on.

13   Q    Where did you work before you worked at the FBI?

14   A    I worked at KPMG.

15   Q    What is KPMG?

16   A    It is a public accounting firm.

17   Q    What was your job title at KPMG?

18   A    I was an audit associate as well as a senior audit

19   associate.

20   Q    What did you do in those jobs?

21   A    I analyzed bank records, any sort of financial data, in

22   order to determine that clients' books were in order.

23   Q    Tiny bit slower, please, Ms. Bronson.

24        Can you describe your educational background.

25   A    Yes.  I have a bachelor's of science in accounting, as well

O9QJDAR5                          Bronson - Direct

1   as a master's in business administration.

2   Q   Do you have any professional certifications?

3   A   Yes.

4   Q   And what are those?

5   A   I'm a certified public accountant.

6   Q   And is that often called a CPA?

7   A   Yes.

8   Q   What types of analyses do forensic accountants typically

9   do?

10  A   We will primarily review any sort of financial data or any

11  data that is provided to us by a case agent to look for any

12  sort of pattern.

13  Q   In your time at the FBI, approximately how many sets of

14  bank statements have you looked at?

15  A   Probably hundreds.

16  Q   Did there come a time when you were asked to examine

17  certain bank records in connection with the case involving

18  Calvin Darden, Jr.?

19  A   Yes.

20  Q   Did you track what happened to $7 million sent by Dwight

21  Howard?

22  A   Yes.

23  Q   Do you know what it means to be a signatory on a bank

24  account?

25  A   Yes.

O9QJDAR5                        Bronson - Direct

1    Q   What does it mean?

2    A   It means you are able to move money or utilize money within

3    that bank account or you have some type of ownership on that

4    account.

5    Q   Approximately how much of the $7 million from Dwight Howard

6    went to bank accounts that Calvin Darden, Jr. was the signatory

7    on?

8    A   Approximately $5.5 million.

9    Q   And in the bank accounts that you examined, did any of the

10   $7 million from Dwight Howard go back to Dwight Howard?

11   A   No.

12   Q   Did you track what happened to a $1 million payment by

13   Chandler Parsons?

14   A   Yes.

15   Q   And the bank accounts that you examined, did any of the

16   $1 million from Chandler Parsons go to James Wiseman?

17   A   No.

18   Q   And the bank accounts that you examined, did any of the

19   $1 million from Chandler Parsons go back to Chandler Parsons?

20   A   No.

21   Q   Can you describe generally how you went about analyzing the

22   bank records that you reviewed in this case?

23   A   I primarily started by reviewing the bank statements and

24   the supporting documentation that is provided by the banks,

25   which can include any sort of check copy, a wire transaction

1    detail or report, or any sort of indication or support that the

2    bank provides.

3    Q    You see a binder in front of you?

4    A    Yes.

5    Q    In the binder in front of you there are exhibits marked

6    1101, 1102, 1103, 1104, 1105A, 1105B, 1106A, 1106B, 1107, 1111

7    through 1117, 1121 through 1124, and 1131 through 1134.

8            Have you looked at these exhibits before?

9    A    Yes.

10   Q    What are they?

11   A    They are the exhibits I created for this trial.

12   Q    Generally, what time period do they cover?

13   A    Approximately November 2019 to March of 2022.

14   Q    Where did the information in these exhibits come from?

15   A    They came from the bank statements and the supporting

16   documentation I reviewed.

17   Q    And did you create or edit these charts and diagrams at the

18   instruction of the federal prosecutors, including me?

19   A    Yes.

20   Q    Did these charts and diagrams summarize otherwise

21   voluminous data in the underlying bank records and

22   spreadsheets?

23   A    Yes.

24   Q    Does the information in these exhibits fairly and

25   accurately reflect the information in the bank records upon

O9QJDAR5                          Bronson – Direct

1    which the exhibits are based?

2    A    Yes.

3    Q    How do you know that?

4    A    I reviewed it all myself.

5               MR. MEAD:   The government offers into evidence

6    Government Exhibits 1101, 1102, 1103, 1104, 1105A, 1105B,

7    1106A, 1106B, 1107, 1111 through 1117, consecutive, 1121

8    through 1124 consecutive, and 1131 through 1134 consecutive.

9               THE COURT:   Any objection?

10              MR. RICCO:   Your Honor, can we have a very brief

11   sidebar?

12              (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At sidebar)

2          MR. RICCO:  Judge, we have no objection to the

3     documents coming into evidence.

4          In one of the questions, Mr. Mead in questioning the

5     witness said, "Did you work with the federal prosecutors

6     including me?"  And I would move to strike that reference.  If

7     the Court is not inclined to strike "me," it's just a problem

8     for a question that would make himself -- I'm sure it was

9     inadvertent, which is why I didn't want to interrupt.

10          THE COURT:  I think it's fine that -- is it that you'd

11     like to strike the "including me"?

12          MR. RICCO:  Just the "me."  And Judge, even if --

13          THE COURT:  May not be an objection.

14          MR. MEAD:  No objection.

15          THE COURT:  That's fine.  That's stricken.

16          MR. RICCO:  I didn't want to interrupt.

17          THE COURT:  Sorry we were talking all at once.

18          (Continued on next page)

19

20

21

22

23

24

25

O9QJDAR5                          Bronson – Direct

1              (In open court; jury present)

2              THE COURT:  Okay.  You may proceed.

3              Ladies and gentlemen, there was a question that

4    Mr. Mead asked that included "including me."  The "including

5    me" is stricken from the record.

6              Go ahead.

7              MR. MEAD:  Your Honor, we'd move the exhibits into

8    evidence.

9              THE COURT:  Yes.  Oh, I'm sorry.  So the following

10   exhibits are admitted into evidence:  1101, 1102, 1103, 1104,

11   1105A, 1105B, 1106A, 1106B, 1107, 1111 through 1117,

12   consecutive, 1121 through 1124 consecutive, and 1131 through

13   1134 consecutive.

14             MR. RICCO:  That's without objection, your Honor.

15             THE COURT:  Those are admitted in evidence without

16   objection.

17             (Government's Exhibit 1101, 1102, 1103, 1104, 1105A,

18   1105B received in evidence)

19             (Government's Exhibit 1106A, 1106B, 1107, 1111 through

20   1117 received in evidence)

21             (Government's Exhibit 1121 through 1124, 1131 through

22   1134 received in evidence)

23             THE COURT:  You may proceed.

24             MR. MEAD:  May I approach the exhibit, your Honor?

25             THE COURT:  You may.

1            MR. MEAD:  Can you pull up Exhibit 1101 on the screen,

2     Mr. Ross.

3     Q   You can see this for just a second before it goes out of

4     your view, Ms. Bronson.

5            Ms. Bronson, the same Government Exhibit 1101 is up on

6     the screen and up on the easel, right?

7     A   Yes.

8     Q   What does Government Exhibit 1101 show?

9     A   It shows the movement of the wires from Dwight Howard that

10    he made to the Legacy AC account and how those funds moved

11    afterwards.

12    Q   Okay.  And do you see the blue numbers at the top and the

13    bottom?

14    A   Yes.

15    Q   And are those just a way to keep track of each of the

16    financial transactions on this chart?

17    A   Yes.

18    Q   What is financial transaction number one on this chart?

19    A   Number one represents the three wires that are sent by

20    Dwight Howard to the Legacy AC Wells Fargo account.

21    Q   And what's the picture of the guy on the far left, what

22    does that depict?

23    A   That depicts Dwight Howard's BMO Bank account.

24    Q   And then the account one over, what does that label say?

25    A   That says Legacy AC Wells Fargo.

1   Q   Why does it say "Legacy AC" in that top line?

2   A   That is the title of the account.

3   Q   And why does it say "Wells Fargo" underneath that?

4   A   That where that account is held.

5   Q   Okay.  And what does the arrow between the Dwight

6   Howard/BMO to Legacy AC Wells Fargo mean?

7   A   It shows the direction of where the funds are moving to.

8   Q   And what transactions are shown in that arrow number one?

9   A   There are three wire transactions, there is a $75,000 wire

10  on August 28, 2020, a $4 million wire on November 13, 2020, and

11  a $3 million wire on December 1, 2020.

12  Q   Okay.  And those wires go from Dwight Howard to the Legacy

13  AC Wells Fargo account?

14  A   Yes.

15  Q   What's the next financial transaction, transaction number

16  two on the chart?

17  A   That is a wire from the Legacy AC account to the Darden

18  Enterprise Morgan Stanley account for $5.5 million on

19  December 24, 2020.

20  Q   And why is that account labeled Darden Enterprises Morgan

21  Stanley?

22  A   Darden Enterprises is the title or name on the account, and

23  Morgan Stanley is where the account is held.

24  Q   What does financial transaction number three show?

25  A   That is a $3.8 million wire from the Darden Enterprise

O9QJDAR5                        Bronson – Direct

1   account to the Darden Hyperion Bank account on March 11, 2021.

2   Q   Why does it say "Darden" at the top?

3   A   That is the name on the account.

4   Q   And what is Hyperion?

5   A   This is where the account is held.

6   Q   All right.  What is transaction number four?

7   A   That is an approximately $2.6 million check from the Darden

8   Hyperion account to the Darden Atlantic Capital account on

9   April 27, 2021.

10  Q   Why does it say "Darden"?

11  A   That is the name of the account.

12  Q   Why does it say "Atlantic Capital"?

13  A   There is where the account is held.

14  Q   It's the bank?

15  A   Yes.

16  Q   What's the transaction number five?

17  A   That is another check for approximately $2.6 million on

18  May 3, 2021 from the Darden Atlantic Capital account to the

19  Darden Wells Fargo account.

20  Q   And then transaction number six?

21  A   That is a check for $618,000 on November 9, 2021 from the

22  Darden Wells Fargo account to the Darden Fifth Third account.

23  Q   Is Fifth Third the name of a bank?

24  A   Yes.

25  Q   And transaction number seven?

O9QJDAR5                          Bronson - Direct

1    A    That is a wire for approximately $78,000 on March 2, 2022

2    from the Darden Fifth Third account to the Darden Ameris Bank

3    account.

4    Q    Is Ameris the name of a bank?

5    A    Yes.

6    Q    And finally, transaction number eight?

7    A    That is a wire for approximately $38,000 on March 11, 2021

8    from the Darden Enterprises Morgan Stanley account to the

9    Darden Wells Fargo account.

10   Q    We're going to talk about each of these wires or

11   transactions, but can you remind me what number one is?

12   A    Those are the three wires sent by Dwight Howard to the

13   Legacy AC account.

14   Q    Totaling how much?

15   A    Totaling $7,075,000.

16        MR. MEAD:  Mr. Ross, Government Exhibit 602C-1 in

17   evidence, please.

18   Q    What is a wire?

19   A    It is a method of electronic payment and a way to send

20   money electronically.

21   Q    From one bank account to another?

22   A    Yes.

23   Q    What kind of document is this up on the screen?

24   A    This is a wire transaction report.

25   Q    And what does this wire transaction report show?

O9QJDAR5                        Bronson - Direct

1   A   It shows the $75,000 wire from Dwight Howard to the Legacy
2   AC account.
3   Q   And where it says "remitter," what does remitter mean on a
4   wire report like this?
5   A   That is the individual who is sending the money.
6   Q   And who is the remitter listed here?
7   A   Dwight David Howard II.
8   Q   Who is the beneficiary listed here?
9   A   Legacy AC LLC.
10  Q   What does it mean to be the beneficiary of a wire?
11  A   You are the individual or company benefiting from the
12  transaction, so you're receiving the money.
13  Q   Do you see that there are two different addresses for
14  Legacy AC LLC on this wire report?
15  A   Yes.
16  Q   What's the first address on the left?
17  A   45 West 132nd Street, apartment 7P, New York, New York.
18  Q   And is that in Manhattan?
19  A   Yes.
20  Q   And what's the second address listed to the Legacy AC LLC?
21  A   143 Lenox Avenue, New York.
22  Q   Where on this page do you see the amount of the wire?
23  A   It's about the fourth line down on the upper left side.
24  Q   Where it says "debit amount"?
25  A   Yes.

1  Q   And where do you see the date of this wire?

2  A   It is three lines below that.

3           MR. MEAD:  Can you just highlight those, Mr. Ross, as

4  Ms. Bronson is saying it.

5  Q   Sorry.  The date?

6  A   It is three lines below that where it says "debit value

7  date".

8           MR. MEAD:  Go to page 2 of this document, please,

9  Mr. Ross.

10 Q   Is this a different wire report?

11 A   Yes.

12 Q   What does this one show?

13 A   This is the wire report for the $4 million wire sent by

14 Dwight Howard.

15 Q   And is he listed as the remitter?

16 A   Yes.

17 Q   Again, who is the beneficiary?

18 A   Legacy AC LLC.

19 Q   Okay.  What's the amount?

20 A   $4 million.

21 Q   And the date again?

22 A   November 13, 2020.

23           MR. MEAD:  Okay.  Page 3, please Mr. Ross.

24 Q   What's this wire report show?

25 A   This is a wire for $3 million from Dwight Howard.

O9QJDAR5                          Bronson – Direct

1   Q   What is the total amount of these three wires from Dwight

2   Howard to Legacy AC LLC?

3   A   $7,075,000.

4   Q   Okay.  And do those three wire reports correspond to

5   financial transaction number one on Government Exhibit 1101?

6   A   Yes.

7   Q   And do you have a copy of 1101 in your binder in case you

8   need it while there are other things on the screen?

9   A   Yes.

10  Q   Great.  What account got this money?

11  A   The Legacy AC LLC Wells Fargo account.

12          MR. MEAD:  All right.  Government Exhibit 602A in

13  evidence, please, Mr. Ross.

14  Q   What kind of document is this?

15  A   This is an account application document.  It's part of the

16  opening documentation when a bank account is opened.

17  Q   What bank is this account opening document for?

18  A   Wells Fargo.

19  Q   And what is the customer name of this particular bank

20  account?

21  A   Legacy AC LLC.

22  Q   Okay.  And is this the account application for the Legacy

23  AC account that gets the $7.075 million?

24  A   Yes.

25          MR. MEAD:  Okay.  Can you go to page 3 of 602A,

 1   please, Mr. Ross.

 2   Q   Do you see at the top it says "owner/key individual 1

 3   information"?

 4   A   Yes.

 5   Q   And then it says "customer name"?

 6   A   Yes.

 7   Q   What's the person's name listed?

 8   A   Trevor A. Baldwin.

 9   Q   Do you see underneath that it says business relationship?

10   A   Yes.

11   Q   And what's it say underneath that?

12   A   Owner with control of the entity.

13   Q   Can you go to page 4 of this document, please.

14           Do you remember talking about who the signatory for a

15   bank account was?

16   A   Yes.

17   Q   Who is listed as the signatory on this Legacy AC bank

18   account?

19   A   Trevor A. Baldwin.

20   Q   Is there a signature below the name Trevor A. Baldwin

21   there?

22   A   Yes.

23   Q   What's the date?

24   A   August 15, 2017.

25   Q   Okay.  And remind me what's the name of the company on this

O9QJDAR5                          Bronson - Direct

1    bank account?

2    A   Legacy AC LLC.

3            MR. MEAD:  Mr. Ross, Government Exhibit 702A in

4    evidence, please.

5    Q   Can you read the first three lines of this document.

6    A   State of Georgia Secretary of State Corporations Division.

7    Q   Have you seen documents like this before in your career?

8    A   Yes.

9    Q   Very generally, what kind of document is this?

10   A   They are business record documents for when a corporation

11   or a partnership is opened.

12   Q   Is this one from the state of Georgia?

13   A   Yes.

14   Q   Do you see what company this incorporation record is for?

15   A   Yes.

16   Q   And what company?

17   A   Legacy AC LLC.

18   Q   Okay.  Is that the same name as the company that got the

19   approximately $7 million from Dwight Howard?

20   A   Yes.

21           MR. MEAD:  Okay.  Let's go to page 3, please.

22           THE COURT:  Mr. Mead, it's 5:30 now.  Is this a good

23   place to take a break?  Or would you like to finish page 3?

24   That's up to you.

25           MR. MEAD:  One question on page 3.

1          THE COURT:  All right.

2   BY MR. MEAD:

3   Q    Do you see where it says "organizer"?

4   A    Yes.

5          THE COURT:  All right.  That's the question.

6          I knew as soon as you said the one question where my

7   joke was going to come in, but go ahead.  I understand.

8          Go ahead and finish the thought.

9   Q    Who is listed as the organizer for the Legacy AC LLC?

10  A    Calvin Darden.

11  Q    What address is listed for Calvin Darden as the organizer

12  of Legacy AC LLC?

13  A    2716 Ridgewood Road NW, Atlanta, Georgia.

14         MR. MEAD:  Now is a good time, your Honor.

15         THE COURT:  Ladies and gentlemen, we're going to take

16  our evening break.  You can leave your pads here, you can take

17  them back with you.  Don't discuss the case.  I don't know when

18  *Dancing with the Stars* is on.  Don't watch it.  Don't email,

19  don't text, don't research about the case.

20         We'll see you tomorrow morning at 10:00.  Thank you.

21         (Continued on next page)

22

23

24

25

O9QBDAR6

1            (Jury not present)

2            THE COURT:  You may be seated.  Ms. Bronson, you can

3    step down.  Thank you.

4            (Witness excused)

5            THE COURT:  Okay.  So we're going to go through

6    Ms. Bronson.  I think, Mr. Mead, you had indicated there was

7    some scheduling stuff that you thought we should talk about

8    before we break?

9            MR. MEAD:  It seems possible we will run out of

10   witnesses tomorrow.  We've got about two more hours with

11   Ms. Bronson.  The defense has told us to expect a pretty

12   substantial cross of her.  If that's the case, I think we go

13   through the end of the day safely.  We've got after her James

14   Wiseman who's a basketball player, Jeffrey Acosta who received

15   some of the money in the fraud, and then the paralegal who's a

16   pretty substantial witness.  I think that if there's a long

17   cross of Mr. Bronson, I think that carries us through the end

18   of the day.  If there's not, I think we run out of witnesses.

19   We had a witness from Tennessee, Ms. Artis, who's sick, was

20   supposed to be tomorrow.  We're hoping to get her here on

21   Monday.  And honestly we're moving faster than we expected as

22   well.

23            THE COURT:  We'll see how things are playing out.  I'm

24   sure the jury is not going to object if we're able to let them

25   go for the weekend earlier than 5:30 tomorrow.  Is there

O9QBDAR6

1   anything else from the government that we should take up today?

2           MR. MEAD:  I think we're still very much on track to

3   rest on Tuesday, knock on wood.  Things can happen, but I think

4   that's what we're on track for.

5           THE COURT:  Is there anything for the defense?

6           MR. DONALDSON:  No, your Honor.  Thank you.

7           THE COURT:  Mr. Mead, at what point in time -- well,

8   does the government still intend to offer I think the judgment

9   of conviction or things related to Mr. Darden's prior

10  conviction?

11          MR. MEAD:  Yes, and my colleague was just reminding me

12  of that as well.  We have the judgment and the cooperator

13  transcript, we do intend to offer.  We expect we would offer it

14  tomorrow.  We've been holding off, which is fine until

15  tomorrow.  I'm not sure if there's still a defense objection or

16  not, but we do kind of need to offer it tomorrow at this point.

17          THE COURT:  Is there an objection to, I think it's the

18  judgment and then testimony from Mr. Darden, testimony in the

19  prior criminal trial?

20          MR. DONALDSON:  I think we are still discussing the

21  exact nature and extent of that objection, but we'll have an

22  answer for the Court tomorrow or maybe tonight actually.

23          THE COURT:  Whether or not there's an objection or

24  not, I'd like the parties to meet and confer, assuming the

25  documents and the testimony come in, a curative instruction

O9QBDAR6

1  that I will read either prior to the jury seeing the exhibits

2  or after to the effect of the limitation for which the jury is

3  to consider that evidence.  And that way, obviously if the

4  proposed language, if there's a dispute about it, I'll break

5  the tie.

6         But I think hopefully the parties will be able to

7  agree to that.  And then I'll hear also -- I mean if it makes

8  sense -- let me ask.  The question is whether we come a little

9  bit early and I hear any objection if there are to the judgment

10 and the testimony, or whether we can do that during a break.  I

11 don't know.

12        MR. MEAD:  We certainly wouldn't introduce the

13 document until after at least one break.  We're happy to come

14 in the morning, whatever the Court's preference is, but there

15 will at least one break before we have to introduce the

16 document.

17        THE COURT:  Okay.  It's fairly straightforward

18 argument, so we don't have to address it earlier but at the

19 first light of the morning break or we may get to the

20 afternoon.

21        We will get to the afternoon.  Ms. Bronson will still

22 be on the stand, assuming the cross-examination is going to

23 take a fair amount of time, but we'll deal with it at that

24 juncture.  All right.  Yes, Mr. Donaldson.

25        MR. DONALDSON:  I was just going to thank you very

O9QBDAR6

1    much, Judge.

2            THE COURT:  I'll see everybody tomorrow morning. We'll

3    stand adjourned.

4            (Adjourned to September 27, 2024 at 10 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination  of:                                    Page

LOUIS DIORIO

Direct By Mr. Mead . . . . . . . . . . . . . . 315

WILLIAM CROMER

Direct By Mr. Kinder . . . . . . . . . . . . . 324

Cross By Ms. Reed  . . . . . . . . . . . . . . 348

DWIGHT HOWARD

Direct By Mr. Mead . . . . . . . . . . . . . . 349

Cross By Mr. Donaldson . . . . . . . . . . . . 406

Redirect By Mr. Mead . . . . . . . . . . . . . 485

JILLIAN BRONSON

Direct By Mr. Mead . . . . . . . . . . . . . . 497

                    GOVERNMENT EXHIBITS

Exhibit No.                                    Received

 801 through 850, 852 through 897  . . . . . 329

 899   . . . . . . . . . . . . . . . . . . . 334

 13    . . . . . . . . . . . . . . . . . . . 352

 201A  . . . . . . . . . . . . . . . . . . . 357

 403   . . . . . . . . . . . . . . . . . . . 365

 201-B . . . . . . . . . . . . . . . . . . . 367

 201-G . . . . . . . . . . . . . . . . . . . 369

 201-I . . . . . . . . . . . . . . . . . . . 387

 201-J . . . . . . . . . . . . . . . . . . . 394

 202K  . . . . . . . . . . . . . . . . . . . 397

1  394 and 399 . . . . . . . . . . . . . . 449

2  1101, 1102, 1103, 1104, 1105A, 1105B   . . . 504

3  1106A, 1106B, 1107, 1111 through 1117   . . . 504

4  1121 through 1124, 1131 through 1134    . . . 504

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25