O9RBDAR1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                        23 Cr. 134 (VSB)

 5   CALVIN DARDEN, JR.,

 6                                        Trial
                 Defendant.
 7   ------------------------------x

 8                                        New York, N.Y.
 9                                        September 27, 2024
                                          10:30 a.m.
10

11   Before:

12                   HON. VERNON S. BRODERICK,

13                                        District Judge
                                          -and Jury-
14                        APPEARANCES

15   DAMIAN WILLIAMS
          United States Attorney for the
16        Southern District of New York
     KEVIN MEAD
17   STEPHEN J. RITCHIN
     WILLIAM C. KINDER
18   BRANDON C. THOMPSON
          Assistant United States Attorneys
19
     DONALDSON CHILLIEST & MCDANIEL LLP
20   BY:  XAVIER R. DONALDSON
          -and-
21   ANTHONY RICCO
     STEVEN Z. LEGON
22   ERICA A. REED
          Attorneys for Defendant
23
     Also Present:
24   Alexander Ross, Paralegal
     Arjun Ahuja, Paralegal
25   Melissa Baccari, FBI Special Agent
```

O9RBDAR1

1                    (Trial resumed; jury not present)

2                    THE COURT:  Is there anything we need to discuss

3     before we get the witness and the jury?

4                    MR. MEAD:  After the break, but nothing before the

5     jury comes, your Honor.

6                    MR. RICCO:  Your Honor, we definitely appreciate the

7     time this morning, cause we think we've saved substantial time

8     at the back-end.

9                    THE COURT:  That's great.  Let's have Ms. Bronson come

10    up, and we'll get the jury.  Thank you.

11                   MR. MEAD:  Thank you, your Honor.

12                   THE COURT:  Ms. Bronson, you can have a seat.  I only

13    ask that you stand when the jury comes in.  Thank you.

14                   (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

O9RBDAR1                        Bronson- Direct

1          (Jury present)

2          THE COURT:  Ladies and gentlemen, I hope you had a

3   relaxing evening.  My understanding you sort of seen the flurry

4   of activity.  Cases get randomly assigned, and that's why it

5   could be in either courthouse.  But the most important thing

6   for you guys is that my understanding is the arraignment is

7   going to be around noon, so by the time we break for lunch,

8   it's going to be a little bit less chaotic.  We're going to

9   continue with the testimony of Ms. Bronson.  You may continue.

10          MR. MEAD:  May I approach the easel, your Honor?

11          THE COURT:  You may.

12  JILLIAN BRONSON, resumed.

13  DIRECT EXAMINATION CONTINUED

14  BY MR. MEAD:

15  Q.  Yesterday, Ms. Bronson, we were talking about this chart

16  with the money on it, right?

17  A.  Yes.

18  Q.  And we were talking about this Legacy AC Wells Fargo

19  account, right?

20  A.  Yes.

21  Q.  And this is the account that got $7,075,000 from Dwight

22  Howard, right?

23  A.  Yes.

24  Q.  What was the name on that account?

25  A.  The account title you mean?

O9RBDAR1                         Bronson- Direct

1    Q.  The company name.

2    A.  Legacy AC/LLC.

3    Q.  What bank?

4    A.  It was Wells Fargo.

5           MR. MEAD:  Mr. Ross, Government Exhibit 602B in

6    evidence, please.

7    Q.  What is this document on the screen?

8    A.  This is the part of the bank statement for the Wells Fargo

9    Legacy AC account.

10   Q.  This is the account that got the $7 million from Dwight

11   Howard?

12   A.  Yes.

13   Q.  What's the address listed there for Legacy AC/LLC?

14   A.  It's P.O. Box 250786 New York, New York.

15          MR. MEAD:  Can you go to page 50 of this document

16   please, Mr. Ross.

17   Q.  Generally speaking, what does this page of the bank

18   statement show?

19   A.  This shows transactions from the period of April 1, 2018 to

20   April 30, 2018.

21   Q.  For this same Legacy AC account, right?

22   A.  Yes.

23          MR. MEAD:  Mr. Ross, can you zoom in on the last April

24   30th transaction, please.

25   Q.  What does this line show?

O9RBDAR1                          Bronson- Direct

1    A.  This shows a transaction that occurred on April 30 of 2018.

2    Q.  And can you read the description of that transaction as

3    listed in the bank statement?

4    A.  It is VZ Wireless, VNE check.

5    Q.  You could skip the number.

6    A.  Calvin Darden.

7    Q.  What's the amount of the transaction?

8    A.  $667.41.

9    Q.  Is that money going into the account or going out of the

10   account?

11   A.  It's going out.

12          MR. MEAD:  Page 65, Mr. Ross, please.

13   Q.  Is this also showing transactions?

14   A.  Yes.

15          MR. MEAD:  Zoom on the bottom line, please, Mr. Ross.

16   Q.  What is this line from the Legacy AC bank account say?

17   A.  This is a transaction on July 30 of 2018 to VZ Wireless for

18   Calvin Darden.

19   Q.  What's the amount?

20   A.  $939.75.

21   Q.  Is that coming in or going out?

22   A.  It is going out.

23          MR. MEAD:  Page 122, please, Mr. Ross.  You can zoom

24   in on the third transaction on here, please.

25   Q.  What's this transaction?

1    A.   This is a wire transaction.

2    Q.   And what's the name of the person or the people on the wire

3    transaction?

4    A.   Calvin Darden or Patricia G. Darden.

5    Q.   What's the amount of the transaction?

6    A.   $13,947.

7    Q.   And this is coming in or going out?

8    A.   This is coming in.

9         MR. MEAD:   Page 137, please, Mr. Ross.  And if you go

10   about five lines down and pick those three transactions,

11   please.  Thank you.

12   Q.   What do these three transactions show, Ms. Bronson?

13   A.   They are three transactions from Paypal for Calvin Darden.

14        MR. MEAD:   Page 138, please, Mr. Ross, and about three

15   quarters of the way down that big group of transactions,

16   please.  Thank you.

17   Q.   What do these four transaction show, Ms. Bronson?

18   A.   They are Paypal transfers to the vendor Goat for Calvin

19   Darden.

20        MR. MEAD:   And page 152, please, Mr. Ross, about

21   halfway down that big block of transactions.

22   Q.   What are all of these transactions show, or what do all

23   these transactions show?

24   A.   They are Paypal transfers for Calvin Darden to about three

25   different vendors.

O9RBDAR1                          Bronson- Direct

1   Q.   What are the vendors?

2   A.   Lyft, Spoof Card and Uber.

3            MR. MEAD:   157 please, Mr. Ross, halfway down that big

4   block of transactions.

5   Q.   What are these transactions, Ms. Bronson?

6   A.   There is a Verizon Wireless or VZ Wireless transaction for

7   Calvin Darden, three Paypal transfers to goat for Calvin

8   Darden, and another Paypal payment for Calvin Darden to Chen

9   Cun Ping.

10  Q.   And all these --

11           THE COURT:   A little slower, Mr. Mead.

12  Q.   Do all of the transactions we've been looking at in this

13  bank statement so far have Calvin Darden's name on it?

14  A.   Yes.

15           MR. MEAD:   602E-1 in evidence please, Mr. Ross.

16           MR. DONALDSON:   You said 602E-1?

17           MR. MEAD:   Yes.

18  Q.   What's on the screen, Ms. Bronson?

19  A.   It is a copy of a check.

20  Q.   And do you know what it means to endorse a check?

21  A.   Yes.

22  Q.   What does it mean to endorse a check?

23  A.   Typically an endorser is the one who is depositing the

24  check, so they will sign a check in order to deposit it into a

25  bank account.

1   Q.   Who is this check to?

2   A.   This check is to Calvin Darden.

3   Q.   And what's the amount of the check?

4   A.   $2,000.

5   Q.   Is the top third of this document the front of the check?

6   A.   Yes.

7   Q.   What's the middle third of the document?

8   A.   That's the back.

9   Q.   And what does the back of the check show?

10  A.   That shows the individuals who are endorsing the check.

11  Q.   And who is endorsing the check?

12  A.   Calvin Darden and Trevor Baldwin.

13  Q.   And what account did this check made out to Calvin Darden

14  get deposited into?

15  A.   The Legacy AC/LLC Wells Fargo account.

16        MR. MEAD:   Page two of this document, Mr. Ross.

17  Q.   Is this also a check?

18  A.   Yes.

19  Q.   Who's this check made out to?

20  A.   Calvin Darden.

21  Q.   What's the amount of the check?

22  A.   $5,000.

23  Q.   And can you -- it's kind of sideways, what does the back of

24  the check say on the last line?

25  A.   Paid to the order of Legacy AC/LLC.

O9RBDAR1                         Bronson- Direct

1    Q.  And what account was this $5,000 check to Calvin Darden

2    deposited into?

3    A.  The Wells Fargo account for Legacy AC/LLC.

4           MR. MEAD:  Page three of this document, please.

5    Q.  Who is this check made out to?

6    A.  Calvin Darden.

7    Q.  Who wrote this check?

8    A.  Calvin Darden and Patricia Darden.

9    Q.  And what's the amount of the check?

10   A.  $5,000.

11   Q.  What is it say on the bottom line of the back of the check?

12   A.  Paid to the order of Legacy AC/LLC.

13   Q.  And what account was this check made out to Calvin Darden

14   deposited into it?

15   A.  The Legacy AC/LLC Wells Fargo account.

16   Q.  So this Legacy AC account, on the bank opening documents,

17   does Calvin Darden's name appear anywhere on them?

18   A.  No.

19   Q.  And have we looked at a number of checks to Calvin Darden

20   that were deposited into that account?

21   A.  Yes.

22   Q.  Have we looked at a number of transactions in that account

23   for the benefit of Calvin Darden?

24   A.  Yes.

25   Q.  So going back then to our chart.  We just talked about

O9RBDAR1                          Bronson- Direct

1    transaction number one, and this first account the Legacy AC

2    account.  The next transaction, transaction number two, what is

3    that?

4              MR. DONALDSON:  Do you mind if I stand up?

5              THE COURT:  No, that's fine.

6              MR. DONALDSON:  Can you do that pointing again.

7    BY MR. MEAD:

8    Q.  So we just talked about this first transaction, transaction

9    number one, and this first account the Legacy AC/LLC Wells

10   Fargo account.  What is transaction number two?

11   A.  That is a $5.5 million wire on December 24, 2020 from the

12   Legacy AC account to the Darden Enterprises Morgan Stanley

13   account.

14             MR. MEAD:  Mr. Ross, can you please pull up Government

15   Exhibit 602C-3 please in evidence.

16   Q.  What kind of document is this?

17   A.  This is a wire transaction report.

18   Q.  And what is this wire transaction report show?

19   A.  It shows the $5.5 million wire from the Legacy AC account

20   to the Darden Enterprises Morgan Stanley account.

21   Q.  That's the transaction number two up on that chart, right?

22   A.  Yes.

23   Q.  When does the Legacy AC account transfer $5.5 million to

24   this Darden Enterprises account?

25   A.  December 23, 2020.

1   Q.  And do you see where it says credit address?

2   A.  Yes.

3   Q.  What's the address the bank listed there in the credit

4   address?

5   A.  399 Park Avenue New York, New York.

6   Q.  Is that in Manhattan?

7   A.  Yes.

8   Q.  And underneath that, do you see where it says details?

9   A.  Yes.

10  Q.  What do the first three lines of details say?

11  A.  Purchase agreement licensing deal.

12  Q.  And the company name is on two lines, I think.  Do you see

13  the name of the company that this money is sent to?

14  A.  Yes.

15  Q.  And what is that company?

16  A.  Darden Enterprises.

17          MR. MEAD:  Government Exhibit 60 --

18  Q.  And above it, it says Morgan Stanley, right?

19  A.  Yes.

20  Q.  Is that the bank that the account was held at that got the

21  money?

22  A.  Yes.

23          MR. MEAD:  Government Exhibit 603B in evidence please

24  Mr. Ross.

25  Q.  What is this document?

O9RBDAR1                        Bronson- Direct

1    A.   This is part of the opening documentation for the Morgan

2    Stanley bank account.

3    Q.   Do you see at the very top there's a name of a company?

4    A.   Yes.

5    Q.   And what's the name of the company?

6    A.   Darden Enterprises, LLC.

7              MR. MEAD:   And then if you zoom out.

8    Q.   Underneath that the next two lines are for people, what two

9    names are listed there for people?

10   A.   Calvin Darden.

11   Q.   And?

12   A.   Calvin Darden.

13             MR. MEAD:   Could you go to page 12 of this document

14   please, Mr. Ross.   Page 12, please.

15   Q.   Do you see where it says client contacts at the bottom?

16             MR. MEAD:   And if you could zoom in on that box please

17   Mr. Ross.

18   A.   Yes.

19   Q.   What is the full name of that client contact?

20   A.   Calvin Darden, Sr.

21   Q.   And do you see that there's then a date of birth there?

22   A.   Yes.

23   Q.   And what's just the year of the date of birth listed there?

24   A.   1950.

25             MR. MEAD:   Can we go to page 15 of this document,

1    please.

2    Q.  What is the name listed for this second client contact?

3    A.  Calvin Darden, Jr.

4    Q.  Do you see if there's a date of birth?

5    A.  Yes.

6    Q.  What is the year of birth?

7    A.  1974.

8    Q.  And then do you see there's kind of a blank line.  Does

9    that say managing partner there?

10   A.  Yes.

11         MR. MEAD:  You can take that down, Mr. Ross.

12   Q.  So we just talked about this transaction number two, and

13   this account that got the $5.5 million in transaction number

14   two, right?

15   A.  Yes.

16   Q.  What is transaction number three?

17   A.  That is a $3,800,000 wire on March 11, 2021, from the

18   Darden Enterprises Morgan Stanley to the Darden Hyperion bank

19   account.

20         MR. MEAD:  Government Exhibit 604C in evidence please

21   Mr. Ross.

22   Q.  What kind of document is this?

23   A.  This is a wire detail.

24   Q.  How come it looks different than the other wire detail

25   report we were looking at?

O9RBDAR1                          Bronson- Direct

```
 1   A.  Each bank has different wire detail reports.
 2   Q.  Who is the originator on this wire?
 3   A.  Darden Enterprises, LLC.
 4   Q.  And do you see there's a name of a human being two lines
 5   below that?
 6   A.  Yes.
 7   Q.  What's that name?
 8   A.  Calvin Darden, Jr.
 9   Q.  What does it mean to be the originator of a wire?
10   A.  You're the individual sending the money.
11        MR. MEAD:  If you can zoom out, Mr. Ross.
12   Q.  What's the amount of this wire?
13   A.  $3,800,000.
14   Q.  There it is.  What's the date of the wire?
15   A.  March 11, 2021.
16   Q.  And who is listed as the beneficiary of the wire?
17   A.  Calvin Darden.
18   Q.  What does it means to be the beneficiary?
19   A.  You're the individual or company receiving the money.
20   Q.  When it says the beneficiary at the bottom.
21        MR. MEAD:  You can zoom in on that again please,
22   Mr. Ross.
23   Q.  Does it say junior or senior at the end there?
24   A.  No.
25   Q.  It just says Calvin Darden, right?
```

 1   A.  Yes.

 2   Q.  Is there an address listed though?

 3   A.  Yes.

 4   Q.  What's that address?

 5   A.  45 Waterview Court, Staten Island, New York.

 6           MR. MEAD:  Can you zoom out, Mr. Ross, and go back to

 7   the originator.

 8   Q.  Now on the originator line does it say junior or senior?

 9   A.  Yes.

10   Q.  Which one?

11   A.  It says junior.

12   Q.  And what address is listed there?

13   A.  45 Waterview Court, Staten Island, New York.

14   Q.  And that's the same address as the beneficiary address,

15   right?

16   A.  Yes.

17           MR. MEAD:  Government Exhibit 604A in evidence please

18   Mr. Ross.

19   Q.  What kind of document is this?

20   A.  This is the account application form or opening document

21   for the Hyperion bank account.

22   Q.  The one that got the $3.8 million wire we just looked at?

23   A.  Yes.

24   Q.  Okay.  Does it look like that there are two people on this

25   bank account?

1     A.  Yes.

2     Q.  Is that each column a person?

3     A.  Yes.

4     Q.  Let's start with the left-hand column.  What's the name of

5     the person?

6     A.  Calvin Darden.

7     Q.  It doesn't say junior or senior, right?

8     A.  No.

9     Q.  Is there a year of birth for that person?

10    A.  Yes.

11    Q.  What's the year of birth?

12    A.  1950.

13    Q.  Is there an address for that person?

14    A.  Yes.

15    Q.  What is the address?

16    A.  2950 Mount Wilkinson Parkway, Atlanta, Georgia.

17    Q.  Is there an email address and phone number listed for

18    Calvin Darden who was born in 1950?

19    A.  Yes.

20    Q.  What email address is listed?

21    A.  Cal@Dardenenterprises.com.

22    Q.  And what phone number is listed?

23    A.  347-850-5686.

24          MR. MEAD:  If we zoom into the right-hand column

25    please, Mr. Ross.

O9RBDAR1                        Bronson- Direct

1   Q.  What name is listed there for that joint owner?

2   A.  Calvin R. Darden, Jr.

3   Q.  Is there a year of birth?

4   A.  Yes.

5   Q.  What's that year of birth?

6   A.  1974.

7   Q.  And what's the address listed there?

8   A.  4020 Summit Drive Marietta, Georgia.

9           MR. MEAD:  You can zoom out now, Mr. Ross.

10  Q.  Is there an email address listed?

11  A.  Yes.

12  Q.  What's the email address?

13  A.  Calvin@Dardenenterprises.com.

14  Q.  Is there a phone number?

15  A.  Yes.

16  Q.  What's the phone number?

17  A.  404-850-1779.

18          MR. MEAD:  And zoom out, Mr. Ross.

19  Q.  Who is listed as the employer for Mr. Darden, Jr.?

20  A.  Self.

21  Q.  And what's the occupation listed for Mr. Darden, Jr.?

22  A.  Consulting.

23  Q.  So we just talked about transaction number three, the

24  $3.8 million transfer to this Darden Hyperion account, and we

25  talked about this account itself.

O9RBDAR1                          Bronson- Direct

1              Next up is transaction number four.  What is

2     transaction number four?

3     A.   That is a check from the Darden Hyperion account to the

4     Darden Atlanta Capital account for approximately $2.6 million.

5              MR. MEAD:  Government Exhibit 604D in evidence,

6     please, page two.

7     Q.   What is this document?

8     A.   This is a check.

9     Q.   Who is the check to?

10    A.   It is paid to the order of Calvin Darden and

11    Calvin R. Darden, Jr.

12    Q.   And who is the remitter?

13    A.   Calvin Darden and Calvin R. Darden, Jr.

14    Q.   What's it mean to be the remitter?

15    A.   You are the individual or company sending the funds.

16    Q.   It says closed account under memo, right?

17    A.   Yes.

18    Q.   What's the amount of this check?

19    A.   $2,695,412.32.

20    Q.   And what's the date of the check?

21    A.   April 22, 2021.

22    Q.   And is it from Hyperion Bank?

23    A.   Yes.

24    Q.   Is that the transaction -- is this the check that matches

25    transaction number four on the chart?

1    A.  Yes.

2    Q.  And do you see where it says Atlanta Capital Bank at the

3    bottom?

4    A.  Yes.

5    Q.  What does that mean?

6    A.  That is the bank where the check was deposited to.

7    Q.  Let's look at that account.

8           MR. MEAD:  Can you pull up Government Exhibit 605B in

9    evidence please, Mr. Ross.

10   Q.  What is this document?

11   A.  This is the bank statement for the Calvin Darden bank

12   account at Atlanta Capital.

13   Q.  And how do you know it's the account that got the money?

14   A.  If you look about two-thirds of the way down, you'll see a

15   deposit on April 27, 2021 for $2,695,412.32.

16   Q.  Do you see an address, a name and address listed here?

17   A.  Yes.

18   Q.  What's that name and address?

19   A.  Calvin Darden 375 Park Avenue, Suite 2067, New York, New

20   York.

21   Q.  Is that an address in Manhattan?

22   A.  Yes.

23   Q.  So we have done now transaction number four and the account

24   that got the $2.7 million in transaction number four.  What is

25   transaction number five?

O9RBDAR1                         Bronson- Direct

1   A.  That is a check from the Darden Atlanta Capital account to

2   the Darden Wells Fargo account for approximately $2.6 million.

3           MR. MEAD:  606E in evidence please page six Mr. Ross.

4   Q.  What's this document?

5   A.  This is a cashier's check.

6   Q.  For how much?

7   A.  For $2,695,427.09.

8   Q.  And is this a cashier's check that corresponds to

9   transaction number five on the chart?

10  A.  Yes.

11  Q.  Who is the check payable to?

12  A.  Calvin Darden and Calvin R. Darden, Jr.

13  Q.  And what does it say under purpose on that bottom left?

14  A.  Close account.

15  Q.  Is this a cashier's check?

16  A.  Yes.

17  Q.  What is a cashier's check?

18  A.  It is a check issued by the bank on behalf of an

19  individual.

20          MR. MEAD:  606A please, Mr. Ross.

21  Q.  What kind of document is this?

22  A.  This is the application or part of the opening

23  documentation for a Wells Fargo account.

24  Q.  And is this the account application form for the Wells

25  Fargo account that got that $2.7 million check that we just

O9RBDAR1                           Bronson- Direct

1    looked at?

2    A.  Yes.

3    Q.  So what is the name of the person listed there on this

4    account opening document?

5    A.  Calvin Darden.

6    Q.  Does it say junior or senior?

7    A.  No.

8    Q.  But is there a year of birth?

9    A.  Yes.

10   Q.  And what is the year of birth?

11   A.  1974.

12   Q.  Does that correspond to the year of birth for Calvin

13   Darden, Jr., on the Hyperion account?

14   A.  Yes.

15   Q.  What's the email address listed here?

16   A.  Darden.CalvinR@gmail.com.

17   Q.  And the phone number?

18   A.  347-850-5686.

19        MR. MEAD:  Page five of this document, Mr. Ross.

20   Q.  Do you see where it says customer one information?

21   A.  Yes.

22   Q.  What name is listed there?

23   A.  Calvin R. Darden.

24   Q.  And same 1974 birth date?

25   A.  Yes.

O9RBDAR1                          Bronson- Direct

1    Q.  What street address is listed for him?

2    A.  2716 Ridgewood Road Northwest, Atlanta, Georgia.

3    Q.  And what phone number?

4    A.  347-850-5686.

5    Q.  Below that do you see a customer to information?

6    A.  Yes.

7    Q.  What's the name listed there?

8    A.  Calvin Darden.

9    Q.  And any senior or junior?

10   A.  No.

11   Q.  What's the year of birth listed there?

12   A.  1950.

13   Q.  And what address is listed for him?

14   A.  11235 Strip Road Roswell, Georgia.

15           MR. MEAD:  You can take that down, Mr. Ross.

16   Q.  So we just looked at transaction number five, the

17   $2.7 million wire from the Darden Atlanta Capital account to

18   the Darden Wells Fargo account.  We also looked at the Darden

19   Wells Fargo account document.

20           Now, transaction number six.  What is transaction

21   number six?

22   A.  It is a check for $618,000 on November 9, 2021, from the

23   Darden Wells Fargo account to the Darden Fifth Third bank

24   account.

25           MR. MEAD:  Government Exhibit 607D in evidence please,

1    Mr. Ross.

2    Q.  What is this document?

3    A.  This is a cashier's check.

4    Q.  Who is it payable to?

5    A.  Calvin Darden.

6    Q.  And for how much?

7    A.  $618,000.

8    Q.  In the bottom left does it say the bank that it came from?

9    A.  Yes.

10   Q.  Which is what?

11   A.  Wells Fargo.

12   Q.  Is this the cashier's check that corresponds to transaction

13   number six on the chart up there?

14   A.  Yes.

15   Q.  And what account did this check get deposited into?

16   A.  The Darden Fifth Third bank account.

17            MR. MEAD:  Can we look at Government 607A in evidence,

18   Mr. Ross.

19   Q.  What kind of document is this?

20   A.  This is a signature card.

21   Q.  For which bank account?

22   A.  The Fifth Third bank account.

23   Q.  The one that got the $618,000.

24   A.  Yes.

25   Q.  Who is listed as the owner of the account?

O9RBDAR1                         Bronson- Direct

1    A.  Calvin Darden.

2    Q.  Any senior or junior?

3    A.  No.

4    Q.  What's the year of birth listed?

5    A.  1974.

6    Q.  Is that the year of birth that matches Calvin Darden, Jr.?

7    A.  Yes.

8    Q.  What phone number is listed?

9    A.  347-850-5686.

10   Q.  What street address?

11   A.  2716 Ridgewood Road Northwest Atlanta, Georgia.

12   Q.  What does it say for employer?

13   A.  Self-employed.

14        MR. MEAD:  You can take that down.

15   Q.  We're getting close to the end at this part.  We just

16   looked at transaction number six $618,000 to the Darden Fifth

17   Third account.  We looked at the Darden Fifth Third account.

18        What is transaction number seven?

19   A.  It is a wire from the Darden Fifth Third bank account to

20   the Darden Ameris for approximately $78,000.

21        MR. MEAD:  Government Exhibit 607C, please, Mr. Ross.

22   Q.  And what kind of document is this?

23   A.  This is an excel file with the wire details for the bank

24   account.

25   Q.  Was this provided by the bank?

O9RBDAR1                        Bronson- Direct

1    A.  Yes.

2              MR. MEAD:  Can you highlight the second row from the

3    bottom, please, Mr. Ross, and you may have to scroll a little

4    bit.

5    Q.  What does this row show?

6    A.  It shows the wire from the Fifth Third bank account to the

7    Darden Ameris bank account for $78,853.91.

8              MR. MEAD:  You can take this down and pull up

9    Government Exhibit 617A in evidence, please, Mr. Ross.

10   Q.  That spreadsheet that we looked at, did that correspond to

11   transaction number seven on the chart?

12   A.  Yes.

13   Q.  So 617A, what kind of document is this?

14   A.  This is a opening document for the Ameris bank account.

15   Q.  And is this the account that got the $78,000 wire we just

16   looked at?

17   A.  Yes.

18   Q.  Who is listed as the account owner?

19   A.  It is Calvin R. Darden.

20   Q.  With what address?

21   A.  2716 Ridgewood Road Northwest, Atlanta, Georgia.

22             MR. MEAD:  Can you go to page two of this document,

23   Mr. Ross.

24   Q.  Do you see there's more information for owner signer number

25   one?

1    A.   Yes.

2    Q.   What is the -- and does it say Calvin R. Darden?

3    A.   Yes.

4    Q.   What year of birth is listed for Calvin R. Darden?

5    A.   1974.

6    Q.   What phone number?

7    A.   347-850-5686.

8    Q.   Who is his employer name?

9    A.   Darden Enterprises.

10   Q.   Back to the chart.

11           So we just looked at transaction number seven and the

12   account that received that money, right?

13   A.   Yes.

14   Q.   What is transaction number eight?

15   A.   That is a wire for approximately $38,000 from the Darden

16   Enterprises Morgan Stanley account to the Darden Wells Fargo

17   account.

18   Q.   What was the date of the transaction?

19   A.   March 11, 2021.

20   Q.   So besides the movement between each of these accounts, did

21   you also analyze other transactions in many of the accounts up

22   on that chart?

23   A.   Yes.

24   Q.   Let's start with the Legacy AC account.  That's the account

25   that received the $7 million from Dwight Howard, right?

1    A.  Yes.

2            MR. MEAD:  Mr. Ross, Government Exhibit 1111 in

3    evidence, please.

4    Q.  Did you prepare this chart?

5    A.  Yes.

6    Q.  And is it about the Legacy AC account that got this money?

7    A.  Yes.

8    Q.  What does the left-hand column show?

9    A.  The left-hand column shows some general information about

10   the account and the information of the money it received from

11   Dwight Howard.

12   Q.  So when was the account open?

13   A.  August 15, 2017.

14   Q.  Who's the signatory on the account?

15   A.  Trevor A. Baldwin.

16   Q.  Can you describe the money it got from Dwight Howard?

17   A.  It got a total of $7,075,000 on three separate dates.

18   Q.  When the account got $75,000 from Dwight Howard on August

19   28, 2020, how much money was in the account right before that?

20   A.  Approximately $3700.

21   Q.  And when the account got $4 million from Dwight Howard on

22   November 13, 2020, how much money was in the account before

23   that?

24   A.  Approximately $2,600.

25   Q.  And what does the right-hand column show?

O9RBDAR1                           Bronson- Direct

1   A.  It shows any other money that was received into the account

2   after the first wire from Dwight Howard?

3   Q.  And what's the chart on the bottom show?

4   A.  It depicts the money received by Dwight Howard and any

5   other incoming money after receiving Dwight Howard's funds.

6   Q.  So from the time it got the Dwight Howard money onwards,

7   what percentage of the total money that went into that bank

8   account came from Dwight Howard?

9   A.  99.79 percent.

10  Q.  And how much total other money came into that account?

11  A.  .21 percent.

12  Q.  What was the amount on that?

13  A.  $14,861.87.

14       MR. MEAD:  Now you can zoom out, Mr. Ross.

15  Q.  This chart is about money going into that account, right?

16  A.  Yes.

17  Q.  Did you also look at money going out of that Legacy AC

18  account that received $7 million from Dwight Howard?

19  A.  Yes.

20  Q.  Let's look at that.

21       MR. MEAD:  Government Exhibit 1102 in evidence please

22  Mr. Ross.

23  Q.  What does this chart show?

24  A.  This chart shows specific outflows from the outgoing money

25  from the Legacy AC Wells Fargo account for transactions that

1  occurred after receiving the Dwight Howard money and the

2  transactions that are a thousand dollars or above.

3  Q.  There's a lot going on so let's break this into pieces.

4        MR. MEAD:  Mr. Ross, can you zoom in on the top of the

5  third of it.

6  Q.  What does the top half of the zoom in this chart shows?

7  A.  That shows the Dwight Howard account and the three wires it

8  sent to the Legacy AC Wells Fargo account.

9  Q.  And everything else on this chart is money going out of

10  that account, right?

11  A.  Yes.

12        MR. MEAD:  Mr. Ross, can you zoom in on the big green

13  arrow in the middle.

14  Q.  What's that big green arrow show?

15  A.  That shows the $5.5 million sent from the Legacy AC account

16  to the Darden Enterprises account?

17  Q.  And does that big green arrow match up with transaction

18  number two?

19  A.  Yes.

20  Q.  And in general on these charts are the green arrows the

21  arrows that match these transactions?

22  A.  Yes.

23        THE COURT:  Just to be clear, when you say these

24  transaction, I know you were pointing to the chart, do you mean

25  that the --

O9RBDAR1                          Bronson- Direct

1              MR. MEAD:  The transactions on Government Exhibit

2    1101.

3              THE COURT:  Okay.  Go ahead.

4              MR. MEAD:  Thank you, your Honor.

5              THE COURT:  Sure.

6              MR. MEAD:  Zoom out, please, Mr. Ross.

7    Q.  So there's a lot of arrows of money going out of this

8    account, right?

9    A.  Yes.

10   Q.  Is this showing every single time money went out of the

11   account?

12   A.  No.

13   Q.  How is it limited?

14   A.  It is limited to a thousand dollars and above.

15   Q.  Is it also date limited?

16   A.  Yes.

17   Q.  How so?

18   A.  It is transactions after August 28, 2020 and on.

19   Q.  Do you see some of the arrows are in blue and kind of

20   bolded?

21   A.  Yes.

22   Q.  So let's start on the left-hand side, that first arrow, and

23   then pull the zoom to the side.

24              What does that blue arrow show?

25   A.  That shows a transaction to First Family Group, LLC for

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O9RBDAR1                        Bronson- Direct

1    $40,000 on November 23, 2020.

2    Q.  And then the blue arrow next to it, and I don't think we

3    need to zoom in on all of these, but the next one over?

4    A.  It is a $20,000 transaction on November 19, 2020 to Mystic

5    De Silva.

6    Q.  And then the next one over?

7    A.  There are four transactions to Charles Briscoe for

8    approximately $290,000.

9    Q.  $290,000 you said?

10   A.  Yes.

11   Q.  And how soon after getting the money from Dwight Howard

12   were these $290,000 to Charles Briscoe go out?

13   A.  Within a few days.

14   Q.  And where did the money to make that payment come from

15   originally?

16   A.  Primarily it came from the wires received by Dwight Howard.

17   Q.  How do you know that the money to pay Charles Briscoe from

18   this Legacy AC account must have come from the Dwight Howard

19   money?

20   A.  For example, he sent $40,000 on August 31, 2020, and on

21   August 27, the account only had $3,704.71.  And the following

22   day it received $75,000 from Dwight Howard.

23   Q.  So is it fair to say that the only reason the Legacy AC

24   account had enough money to make these payment was because it

25   had gotten $7 million from Dwight Howard?

O9RBDAR1                              Bronson- Direct

1   A.  Yes.

2            MR. DONALDSON:  Objection, form of the question.

3            THE COURT:  Yeah. If you could rephrase the question.

4   The answer will be stricken.

5            MR. MEAD:  I'll move on.  You can zoom out of all of

6   this Mr. Ross, please.  If we can capture the next blue arrows.

7   Q.  What is the first transaction in the first blue arrows on

8   the left show?

9   A.  There are three arrows for three outgoing transactions to

10  Patricia Darden for approximately $450,000.

11  Q.  Where did the money to make those payments to Patricia

12  Darden come from?

13  A.  Primarily from the wires received by Dwight Howard.

14           MR. DONALDSON:  Judge, I would object to that.

15           THE COURT:  Well, I'll allow it for -- Mr. Mead, you

16  should follow-up with some clarification.  I think you said

17  primarily wires received by Dwight Howard or was it from Dwight

18  Howard?

19           THE WITNESS:  From Dwight Howard.

20           THE COURT:  Go ahead.  Mr. Mead.

21  Q.  How do you know that those $490,000 to Patricia Darden came

22  from the money from Dwight Howard?

23  A.  For example, on November 23, 2020, there was a payment made

24  for $83,855.  And on November 12, 2020, the account only had

25  $2,679.26.  And on November 13, it received $4 million from

1   Dwight Howard.

2   Q.  What's the next blue arrow over?

3   A.  It is a payment to SC Motor Cars for $255,000.

4   Q.  And where did the money to pay $255,000 to SC Motor Cars

5   come from?

6   A.  Primarily the money sent by Dwight Howard.

7   Q.  How do you know that?

8   A.  Because that payment was mostly funded by the wires that

9   were sent, because otherwise there wouldn't have been enough

10  money to send to make that payment.

11              MR. MEAD:  Mr. Ross, can you pull up Government

12  Exhibit.  One second, your Honor.

13              THE COURT:  Yes.

14              MR. MEAD:  Government Exhibit 2418 in evidence,

15  Mr. Ross.

16  Q.  Do you see this email, Ms. Bronson?

17  A.  Yes.

18  Q.  Who is the email from?

19  A.  C.Darden or Darden.CalvinR@gmail.com.

20  Q.  When was the email sent?

21  A.  December 23, 2020.

22  Q.  Who is the email to?

23  A.  Trev Better or TBBaldwin@gmail.com.

24  Q.  Who is copied on this email?

25  A.  Calvin Darden or Calvin@Dardenenterprises.com.

O9RBDAR1                          Bronson- Direct

1    Q.  What's the subject on the email?

2    A.  Wire info.

3            MR. MEAD:  You can zoom out please, Mr. Ross.

4    Q.  Just at a very general level, what does this email appear

5    to be showing?

6    A.  It is showing four transactions that are made.

7            MR. MEAD:  Can we put now Government Exhibit 2418 and

8    1102 side-by-side.

9    Q.  And, Ms. Bronson, it may help if you turn to 1102 in your

10   binder because it's going to get a little crowded up here.

11           Do you see the first transaction described in the

12   email?

13   A.  Yes.

14   Q.  What transaction is that?

15   A.  That is a $5.5 million wire from a Morgan Stanley account

16   with the name Darden Enterprises, LLC.

17   Q.  And is there a $5.5 million wire that was sent out from the

18   Legacy AC account?

19   A.  Yes.

20   Q.  And is that the green arrow?

21           MR. MEAD:  If you can zoom in on that, Mr. Ross.

22   A.  Yes.

23   Q.  What is the date of that $5.5 million wire?

24   A.  December 23, 2020.

25   Q.  And what's the date on the email about the $5.5 million

O9RBDAR1                          Bronson- Direct

1    wire?

2    A.  December 23, 2020.

3    Q.  What's the second wire described there on the email?

4    A.  It is a transaction of approximately $284,000 to Town Motor

5    Car Corp.

6    Q.  Is there a corresponding outgoing transaction in Government

7    Exhibit 1102?

8    A.  Yes.

9    Q.  And is that what Mr. Ross has just zoomed in on?

10   A.  Yes.

11   Q.  What is the date of the transaction on the chart?

12   A.  December 23, 2020.

13   Q.  What's the date of the email?

14   A.  December 23, 2020.

15   Q.  What's the third wire shown on this chart?

16   A.  It is a $30,000 transaction to Selim Rusi.

17   Q.  You may have to hunt for this one, do you see a $30,000

18   wire on Government Exhibit 1102?

19   A.  Yes.

20   Q.  And about where is it?

21   A.  Towards the right-hand side.

22   Q.  And what is the date of that transaction?

23   A.  December 23, 2020.

24   Q.  And the amount?

25   A.  $30,000.

O9RBDAR1                          Bronson- Direct

1    Q.   And the recipient?

2    A.   Selim Rusi.

3    Q.   And all that information corresponds to the email, right?

4    A.   Yes.

5    Q.   Finally what's the fourth transaction in the email?

6    A.   $13,900 transaction to AWC NYC Corp.

7    Q.   Do you see that matching transaction anywhere on the chart?

8    A.   Yes.

9    Q.   And is it the one Mr. Ross just zoomed in on?

10   A.   Yes.

11   Q.   Are all these transactions the very same day as the email?

12   A.   Yes.

13   Q.   Who sends the email?

14   A.   Darden.CalvinR@gmail.com.

15   Q.   And who is it to?

16   A.   Trev Better or TBBaldwin@gmail.com.

17   Q.   Do you remember who the signatory of the Legacy AC account

18   is?

19   A.   Yes.

20   Q.   Who is it?

21   A.   Trevor A. Baldwin.

22          MR. MEAD:  You can this down, Mr. Ross.

23   Q.   So the next account that got money is the Darden

24   Enterprises Morgan Stanley account here, right?

25   A.   Yes.

O9RBDAR1                        Bronson- Direct

1   Q.  Let's look at that account.

2          MR. MEAD:  Government Exhibit 1112 in evidence please,

3   Mr. Ross.

4   Q.  Is this a chart like the one we looked at a little while

5   ago?

6   A.  Yes.

7   Q.  What account is this chart for?

8   A.  The Darden Enterprises Morgan Stanley account.

9   Q.  And focusing on the left-hand column, when was the Darden

10  Enterprises Morgan Stanley account open?

11  A.  December 7, 2020.

12  Q.  Who are the signatories on the account?

13  A.  Calvin Darden, Sr. and Calvin Darden, Jr.

14  Q.  When did the account get money in the Dwight Howard flow of

15  funds?

16  A.  December 24, 2020.

17  Q.  How much money?

18  A.  $5.5 million.

19  Q.  How much money was in that account before it got

20  $5.5 million from the Dwight Howard flow of funds?

21  A.  Zero.

22  Q.  What percentage of the total money that went into this

23  account was from the Dwight Howard flow of funds?

24  A.  99.7 percent.

25  Q.  Now, did you also look at the money coming out of this

O9RBDAR1                         Bronson- Direct

1  Darden Enterprises account that had zero dollars before it got

2  the Dwight Howard money?

3  A.  Yes.

4          MR. MEAD:  Government Exhibit 1103 in evidence,

5  please.

6  Q.  Now, is this a chart like the one we looked at before?

7  A.  Yes.

8  Q.  And what account is this chart for?

9  A.  The Darden Enterprises Morgan Stanley account.

10 Q.  Does this chart show money going out of this account?

11 A.  Yes.

12 Q.  Do you see the two green arrows?

13         MR. MEAD:  And if you can zoom in on that, Mr. Ross.

14 A.  Yes.

15 Q.  What do the two green arrows show?

16 A.  They show the $3.8 million wire sent to the Calvin Darden

17 Hyperion account, and the approximately $38,000 wire sent to

18 the Calvin Darden Wells Fargo account.

19 Q.  And going back to our chart Government Exhibit 1101, which

20 transactions do those two green wires correspond to?

21 A.  They correspond to transaction three and transaction eight.

22         MR. MEAD:  You can zoom out again, Mr. Ross.

23 Q.  Now, again, is this chart Government Exhibit 1103 showing

24 every single outgoing transaction?

25 A.  No.

O9RBDAR1                          Bronson- Direct

1   Q.  Which ones?

2   A.  Any transaction that is a thousand dollars or above.

3   Q.  And are some of these arrows in blue?

4   A.  Yes.

5   Q.  Let's zoom in on the two sets of blue arrows right there.

6          What's the one in the left show?

7   A.  A approximately $54,000 transaction on January 13, '21 to

8   MMS Motor Sports, LLC.

9   Q.  And the transactions next to it?

10  A.  Three transactions to Charles Briscoe for approximately

11  $840,000.

12  Q.  And the transaction next to it?

13  A.  It is a $75,000 transaction to Patricia Darden.

14  Q.  Where did the money for those payments to MMS Motor Sports,

15  Charles Briscoe and Patricia Darden come from?

16  A.  Primarily the wire sent in the Dwight Howard flow of funds.

17  Q.  How do you know that?

18  A.  Because the account only received approximately $16,000 in

19  addition to those funds.

20          MR. MEAD:  Zoom out please, Mr. Ross.  You can zoom in

21  on the next set of blue arrows on the other side.

22  Q.  Can you walk us through these transactions, Ms. Bronson?

23  A.  There are First Third Capital, Inc. for approximately

24  $285,000, a transaction to Weissman, PC for a $100,000, and a

25  $150,000 transaction sent to Pop International Gallery.

O9RBDAR1                          Bronson- Direct

1   Q.  Where did the hundreds of thousands of dollars to make

2   these payments come from?

3   A.  Primarily the $5.5 million received in the Dwight Howard

4   flow of funds.

5   Q.  How do you know that?

6   A.  Because the account only received about $16,000 in addition

7   to that.

8          MR. MEAD:  You can take this down, Mr. Ross.

9   Q.  We were looking at this Darden Enterprises account on

10  Government Exhibit 1101, right?

11  A.  Yes.

12  Q.  And the next account, what's the next account that got

13  money in the Dwight Howard flow of funds?

14  A.  The Darden Hyperion account.

15  Q.  Let's look at that one.

16         MR. MEAD:  Government Exhibit 1113 in evidence,

17  please.

18  Q.  Is this a chart like the ones we've been looking at?

19  A.  Yes.

20  Q.  What account is Government Exhibit -- strike that.

21         What bank account does Government Exhibit 1113 respond

22  to?

23  A.  The Calvin Darden and Calvin R. Darden, Jr. Hyperion

24  Account.

25  Q.  Which is the next account that got money in this flow of

O9RBDAR1                          Bronson- Direct

1    funds, right?

2    A.  Yes.

3    Q.  What date was this account open?

4    A.  March 11, 2021.

5    Q.  Who are the signatories on this account?

6    A.  Calvin Darden and Calvin R. Darden, Jr.

7    Q.  When did it get money in the Dwight Howard flow of funds?

8    A.  March 11, 2021.

9    Q.  How much money?

10   A.  $3,800,000.

11   Q.  And how much money was in this account before it got

12   $3.8 million from the Dwight Howard flow of funds?

13   A.  Zero.

14   Q.  What percentage of the total money to ever come into this

15   bank account came from the Dwight Howard flow of funds?

16   A.  99.97 percent.

17   Q.  And did you also look at money going out of this Hyperion

18   account?

19   A.  Yes.

20            MR. MEAD:  Government Exhibit 1104 please, Mr. Ross.

21   Q.  Is this a chart like the ones we've been looking at?

22   A.  Yes.

23   Q.  And what account does this correspond to?

24   A.  The Calvin Darden Hyperion bank account.

25   Q.  And at the top is that money coming into the account?

1   A.  Yes.

2   Q.  And all the other arrows are money going out of the

3   account?

4   A.  Yes.

5   Q.  Do you see the green arrow?

6   A.  Yes.

7   Q.  What does the green arrow show?

8   A.  That shows the approximately $2.6 million check from the

9   Hyperion bank account to the Calvin Darden Atlanta bank

10   account.

11   Q.  Is that transaction number four on our chart?

12   A.  Yes.

13   Q.  Can you walk us through the first two blue arrows on here,

14   Ms. Bronson?

15   A.  There are two transactions to a Mindful Home, LLC.  One is

16   for $35,500, and the other is for $183,000.  The next arrow is

17   a $110,650 transaction to Steinway, Inc.

18   Q.  And where did the hundreds of thousands of dollars to make

19   these payments come from?

20   A.  Primarily the flow of funds from the Dwight Howard money

21   from the $3.8 million.

22   Q.  How do you know that?

23   A.  Because the account only received about a thousand dollars

24   of interest, and that was the only other incoming funds.

25   Q.  And what are the transactions on the right, the blue arrows

O9RBDAR1                          Bronson– Direct

1   on the right?

2   A.   There is a $50,000 transaction to ADCO Properties, LLC, and

3   a approximately $665,000 to Weissman, PC.

4   Q.   And where did the money to make those hundreds and

5   thousands of dollars in payments come from?

6   A.   Primarily the $3.8 million received in the Dwight Howard

7   flow of funds.

8   Q.   Again, how do you know that?

9   A.   Because the account only received about a thousand dollars

10   in interest otherwise.

11              MR. MEAD:  You can take that down, Mr. Ross.

12              THE COURT:  I apologize for interrupting, Mr. Mead.

13   When you say the account only received approximately a thousand

14   dollars in interest, what do you mean by that?  In other words,

15   was it an interest bearing account, so the interest was based

16   upon -- in other words, what is the interest?

17              THE WITNESS:  The interest is what the account was

18   earning from the money that was in the account.

19              THE COURT:  Okay.  So based upon the money in the

20   account, a thousand dollars in interest was earned?

21              THE WITNESS:  In total, yes.

22              THE COURT:  All right.  Thank you.

23              MR. MEAD:  Just to clarify, can you pull up Government

24   Exhibit 1113 again, Mr. Ross.

25   Q.   So when you were talking about interest payments, are those

O9RBDAR1                        Bronson- Direct

1    shown on this chart?

2    A.  Yes.

3    Q.  And where are they?

4    A.  They are on the upper right-hand side.

5    Q.  And about how much money in interest was earned on this

6    account during this time period?

7    A.  About a thousand dollars.

8    Q.  Okay.

9         MR. MEAD:  You can take that down, Mr. Ross.  So

10   Government Exhibit 1114, please, Mr. Ross.

11   Q.  And is this a chart similar to the ones we've been looking

12   at?

13   A.  Yes.

14   Q.  And which account does this correspond to?

15   A.  The Calvin Darden Atlanta Capital account.

16   Q.  That's the account that got money from the transaction

17   number four on our chart, right?

18   A.  Yes.

19   Q.  When was this account open?

20   A.  April 26, 2021.

21   Q.  Who is the signatory on it?

22   A.  Calvin Darden.

23   Q.  When did it get money in the Dwight Howard flow of funds?

24   A.  April 27, 2021.

25   Q.  And how much money was that?

O9RBDAR1                         Bronson- Direct

1    A.  $2,695,412.32.

2    Q.  How much money was in that bank account before it got

3    approximately $2.7 million from the Dwight Howard flow of

4    funds?

5    A.  Zero.

6    Q.  How much other money did this account ever get?

7    A.  $14.77.

8    Q.  So what percentage of the total money going into this

9    account came from the Dwight Howard flow of funds?

10   A.  99.99 percent.

11   Q.  And we've been using the term "flow of funds," what does

12   that mean?

13   A.  It's just the way money moves from an account to another

14   account.

15            MR. MEAD:  You can zoom out please, Mr. Ross.

16   Q.  Did you also make a chart tracking the money going out of

17   this account?

18   A.  No.

19   Q.  How come?

20   A.  There's only one transaction going out of this account.

21   Q.  And is that transaction number five on our chart?

22   A.  Yes.

23   Q.  And so the next account that gets the money in transaction

24   number five, which account is that?

25   A.  That is the Darden Wells Fargo account.

O9RBDAR1                          Bronson– Direct

                    MR. MEAD:  Government Exhibit 1115 in evidence,

please.

Q.  Is this a chart like the ones we've been looking at?

A.  Yes.

Q.  What account does this correspond?

A.  The Calvin R. Darden and Calvin Darden Wells Fargo account.

Q.  This is the account that got the money in transaction

number five, right?

A.  Yes.

Q.  What date was this account open?

A.  November 12, 2020.

Q.  And this account got money in two separate transactions as

part of the Dwight Howard flow of funds, right?

A.  Yes.

Q.  And which transactions were those?

A.  They are transactions five and eight.

Q.  When did this account first get money in the Dwight Howard

flow of funds?

A.  March 11, 2021.

Q.  And how much money was that?

A.  $38,057.99.

Q.  What was the balance in that account before it got $38,000

from the Dwight Howard flow of funds?

A.  On March 8 it was $2.54.

Q.  When was the second time it got money in the Dwight Howard

O9RBDAR1                        Bronson- Direct

1    flow of funds?

2    A.   May 3, 2021.

3    Q.   How much money did it get then?

4    A.   $2,695.427.09.

5    Q.   And how much money was in this bank account before it got

6    $2.7 million in the Dwight Howard flow of funds?

7    A.   $1,792.65.

8    Q.   What's the piechart show?

9    A.   It shows the Dwight Howard money as well as any other

10   inflows after receiving that money.

11   Q.   And what percentage of that money came from Dwight Howard?

12   A.   97.41 percent.

13   Q.   Did you also make a chart tracking the money going out of

14   that account?

15   A.   Yes.

16         MR. MEAD:   Government Exhibit 1105A in evidence

17   please, Mr. Ross.

18   Q.   Were there a lot of outgoing transactions in this account?

19   A.   Yes.

20   Q.   Did you make a chart that kind of simplifies it?

21   A.   Yes.

22         MR. MEAD:   Can you put up Government Exhibit 1105B in

23   evidence please Mr. Ross.

24   Q.   Is this the same chart, but with a whole bunch of

25   transactions removed to make it easier to read?

1    A.  Yes.

2    Q.  What's shown at the top?

3    A.  It shows incoming money from the Calvin Darden Hyperion

4    bank account into the Atlanta bank account, and then the money

5    sent from the Atlanta bank account to the Calvin R. Darden and

6    Calvin Darden Wells Fargo account.

7    Q.  And all the other arrows below that, are those monies going

8    out of the Wells Fargo account?

9    A.  Yes.

10   Q.  Do you see the big green arrow?

11   A.  Yes.

12   Q.  What is that transaction?

13   A.  That is the $618,000 check from the Wells Fargo account to

14   the Calvin Darden Fifth Third bank account.

15   Q.  Does that correspond to transaction number six on our

16   chart?

17   A.  Yes.

18   Q.  Does this chart show every single outgoing transaction?

19   A.  No.

20   Q.  How did you decide which transaction to show on the chart?

21   A.  I was instructed which to include.

22   Q.  Let's talk about the blue arrows.

23        MR. MEAD:  Can you zoom in on the first chunk of them

24   on the left, Mr. Ross.

25   Q.  What do these arrow show?

O9RBDAR1                        Bronson- Direct

1    A.  There are three outgoing transactions to a Mindful Home.

2    One is for $40,000 dollars.  The other is for $80,000, and the

3    last one is for $22,000.

4    Q.  And then what's the next transfer of arrows show?

5    A.  There are two outgoing transactions to Splendor Koi for a

6    total of $29,450.

7    Q.  You see there's like text in quotation marks underneath

8    each of those?

9    A.  Yes.

10   Q.  Where did that text come from?

11   A.  It came from either the check or the transaction detail on

12   the transaction.

13   Q.  Can you read what those lines say for each of these

14   transactions?

15   A.  Yes.  For the three transactions for a Mindful home, two of

16   them say A/B or AV.  The last one says outside AV.

17   Q.  And the other one?

18   A.  For the two other transactions, one says koi pond, and the

19   other says koi pond completion.

20   Q.  And where did the money to pay for AV, outside AV, koi pond

21   and koi pond completion come from?

22   A.  Primarily from the money it received in the Dwight Howard

23   flow of funds.

24   Q.  How do you know that?

25   A.  I reviewed the statements and accounts myself.

O9RBDAR1                          Bronson- Direct

1   Q.  How do you know that the money came from the Dwight Howard

2   flow of funds to make these payments?

3   A.  It was the main source of funds that the account received.

4          MR. MEAD:  You can zoom out of this, Mr. Ross, and

5   maybe capture about half of the blue arrows in the right

6   please.

7   Q.  What do these transaction show?

8   A.  They are three transactions to Pop International Galleries

9   for approximately $157,000.  There are two transactions to

10  Tactical Fleet for approximately $343,000, and there are five

11  transactions to Jesus Carillo for approximately $70,000.

12  Q.  And what did the memo line or the description say for some

13  of those Jesus Carillo payments?

14  A.  Landscaping.

15  Q.  Where did the money to make these hundreds of thousands of

16  dollars come from?

17  A.  Primarily the money received in the Dwight Howard flow of

18  funds.

19  Q.  How do you know that it came from the money in the Dwight

20  Howard flow of funds?

21  A.  Because it was the primary source of funds that the account

22  received.

23          MR. MEAD:  And then finally, Mr. Ross, can you capture

24  the last set of blue arrows.

25  Q.  What are these transactions?

O9RBDAR1                     Bronson- Direct

1    A.   There are two transactions to Charles Briscoe for a total

2    of $15,000, and two transactions to Coinbase for $60,000.

3    Q.   And where did the money to make these payments come from?

4    A.   Primarily from the money received in the Dwight Howard flow

5    of funds.

6    Q.   Back to our chart.

7         We just talked about money the Darden Wells Fargo

8    account. What is the next account that received money -- and

9    Ms. Bronson if you need a break at any point please let us

10   know?

11   A.   The Darden Fifth Third bank account.

12        MR. MEAD:  Let's look at that account.

13        (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1            MR. MEAD:  Can you pull up Government Exhibit 1116 in

2    evidence, please, Mr. Ross.

3    Q    Is this a chart like the ones we've been looking at?

4    A    Yes.

5    Q    Which account is this one for?

6    A    The Calvin Darden Fifth Third bank account.

7    Q    Okay.  When was this account opened?

8    A    November 9, 2021.

9    Q    And who is the signatory on it?

10   A    Calvin Darden.

11   Q    When did it get money in the Dwight Howard flow of funds?

12   A    November 9, 2021.

13   Q    How much money?

14   A    $618,000.

15   Q    And how much money was in this bank account before it got

16   $618,000 in the Dwight Howard flow of funds?

17   A    Zero.

18   Q    Okay.  What does the pie chart show?

19   A    It shows the money from Dwight Howard corresponding to the

20   other inflows of the account.

21   Q    And how much other money did this account get?

22   A    $355,080.87.

23           MR. MEAD:  Can you zoom out, please, Mr. Ross.

24   Q    Those other incoming payments, are those shown on this

25   chart?

1    A    Yes.

2    Q    Where are they?

3    A    On the right-hand side.

4    Q    So what percentage of the total number in this time period

5    came from the Dwight Howard flow of funds?

6    A    63.51 percent.

7         MR. MEAD:  Government Exhibit 1106A in evidence,

8    please.

9    Q    Is this another one where there are a lot of outgoing

10   transactions?

11   A    Yes.

12   Q    Did you make a simplified version of this chart?

13   A    Yes.

14        MR. MEAD:  Government Exhibit 1106B in evidence,

15   please.

16   Q    Is this the same chart but with many of the other

17   transactions removed to make it simpler?

18   A    Yes.

19   Q    How did you decide which transactions to leave in?

20   A    I was instructed which ones to include.

21   Q    See the big green arrow in the middle?

22   A    Yes.

23   Q    What does that show?

24   A    That shows the $78,853.91 transaction from the Calvin

25   Darden Fifth Third account to the Calvin Darden Ameris bank

1    account.

2    Q   Is that transaction seven on our chart on Government

3    Exhibit 1101?

4    A   Yes.

5    Q   So looking at some of those transactions on Government

6    Exhibit 1106B, what are the blue arrows on the left showing?

7    A   Those show several transactions sent to Coinbase.

8    Q   I'm not a math wiz, but ballpark how much money?

9    A   I would say approximately a couple hundred thousand

10   dollars.

11   Q   And then what are the transactions on the right showing?

12           MR. MEAD:  If you could zoom in on those blue arrows,

13   please, Mr. Ross.

14   A   They are two transactions to A Mindful Home for

15   approximately $20,000 and a transaction to Jesus Carillo for

16   $12,000.

17           MR. MEAD:  You can take this down, Mr. Ross.

18   Q   What's the next account that got money in the Dwight Howard

19   flow of funds?

20   A   The Ameris bank account.

21   Q   Is that the account that got the money in transaction

22   number seven on Government Exhibit 1101?

23   A   Yes.

24           MR. MEAD:  Let's look at that account, Government

25   Exhibit 1117, in evidence, please Mr. Ross.

1    Q    Is this a chart like the ones we looked at?

2    A    Yes.

3    Q    For which bank account is this chart?

4    A    The Calvin R. Darden Ameris bank account.

5    Q    When was this bank account opened?

6    A    March 2, 2022.

7    Q    Who is the signatory on it?

8    A    Calvin R. Darden.

9    Q    And when did it get money in the Dwight Howard flow of

10   funds?

11   A    March 2, 2022.

12   Q    How much money?

13   A    $78,853.91.

14   Q    What was the total balance in that account before getting

15   $78,000 in the Dwight Howard flow of funds?

16   A    Zero.

17   Q    What percentage of the money going into this account came

18   from the Dwight Howard flow of funds?

19   A    95.63 percent.

20   Q    Did you also look at money going out of this account?

21   A    Yes.

22        MR. MEAD:  Government Exhibit 1107, please.

23   Q    What does this chart show?

24   A    This chart shows some of outgoing transactions from the

25   Ameris bank account.

O9RJDAR2                    Bronson - Direct

1  Q   Okay.  And what's the transaction on the far left?

2  A   It is the $5,240 transaction to Jesus Carillo.

3  Q   For what?

4  A   For landscaping.

5  Q   What's the transaction on the far right?

6  A   It is a $1,829.70 transaction to Burberry.

7              MR. MEAD:  Your Honor, I'm more than happy to keep

8  going, but now is also a convenient breaking point.  Up to the

9  Court.

10             THE COURT:  Ladies and gentlemen, we're going to take

11 our morning break.  Do not discuss the case.  Go back and

12 relax.  We'll come and get you in about 15 minutes.  Thank you

13 very much.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

O9RJDAR2                        Bronson - Direct

1              (In open court; jury not present)

2              THE COURT:  You may be seated.  Ms. Bronson, you may

3    step down.

4              (Witness temporarily excused)

5              THE COURT:  Mr. Mead, how much longer do you

6    anticipate of your direct?

7              MR. MEAD:  I'm more than halfway, but not much more

8    than halfway, so 90 minutes or a little bit less, I think.

9              THE COURT:  All right.  And I can't remember -- I

10   think there was an indication that the cross was going to be

11   fairly robust or lengthy.  Is that still the case?

12             MR. DONALDSON:  I don't believe it will be.  No, I

13   don't believe it will be.

14             THE COURT:  All right.  Is there anything we need to

15   take up before we take our break?

16             MR. MEAD:  Why don't we come back in ten minutes

17   perhaps, your Honor, and maybe take up a couple things then.

18             THE COURT:  Sure.  Let me know when you're ready to do

19   that and I'll come out.  Thank you very much.

20             We'll stand adjourned.

21             (Recess)

22             THE COURT:  So are there some matters to take up?

23             MR. KINDER:  Your Honor, we have been discussing with

24   defense counsel the issue of the 404(b) evidence which we

25   intend to put in with a paralegal who will likely go on this

O9RJDAR2                              Bronson - Direct

1     afternoon.  We have two exhibits, one of which is the certified

2     copy of the judgment of his prior conviction.  The other is a

3     transcript of his cooperator testimony from the Harvey Newkirk

4     trial, which was the same case.

5          That transcript has been heavily redacted by us to

6     include only the portions that we intend to read, which we

7     believe are sort of narrowly configured relating to the issues

8     of knowledge, intent, lack of mistake, *modus operandi* that are

9     relevant in this particular case.  So we wanted to flag for the

10    Court that we intend to offer those.  I believe defense was

11    going to take another look at those exhibits today, and I don't

12    know the latest on what their position is.

13         THE COURT:  Just remind me again, I apologize -- okay.

14    All right, this afternoon.  Let me hear from the defense.  Have

15    you had an opportunity to look at those specific exhibits

16    and/or more generally with regard to this issue?

17         MR. RICCO:  Judge, the largest one in dispute is 1001,

18    and so that's the transcript.  The government has sent us the

19    redacted.  We'll get it together.  We're in the same universe;

20    we're just trying to narrow it down.

21         THE COURT:  All right.  So I'd ask you to continue to

22    meet and confer with regard to that.  And if there's any

23    issue -- if there's still a dispute, just let me know and I'll

24    hear from the parties concerning that dispute.

25         Do you have a curative instruction for me with regard

O9RJDAR2                          Bronson - Direct

1      to that evidence?

2                MR. KINDER:  We're also working on that.  We've been

3      discussing.

4                MR. RICCO:  We'll be able to resolve it.

5                THE COURT:  All right.  Because I think we're going to

6      get to lunch and beyond, I think, with Ms. Bronson.  So is

7      there anything else we need to take up or can we bring the jury

8      out?

9                MR. MEAD:  Nothing from the government.  Shall I get

10     the witness in?

11               THE COURT:  Yes.  Let's get the witness, and we can

12     get the jury.

13                     (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

O9RJDAR2                          Bronson - Direct

 1                  (In open court; jury present)

 2                  THE COURT:  You may be seated.

 3                  Ladies and gentlemen, we're going to continue with the

 4     testimony of Ms. Bronson.

 5                  Mr. Mead, you may continue.

 6     BY MR. MEAD:

 7     Q    Do you remember before the break, Ms. Bronson, we were

 8     talking about a lot of the money going out of these accounts?

 9     A    Yes.

10     Q    And some of that was shown by blue arrows, right?

11     A    Yes.

12     Q    Let's talk about some of those in a little bit more detail.

13                  MR. MEAD:  Government Exhibit 1121 in evidence,

14     please, Mr. Ross.

15     Q    What does this chart show?

16     A    This chart shows some of the uses of the Howard funds.

17     Q    And generally speaking, where did the money for these

18     payments come from?

19     A    Sorry.  Can you rephrase?

20     Q    Yes.

21                  Well, do you remember the big chart we looked at,

22     Government Exhibit 1101?

23     A    Yes.

24     Q    Do these payments come from all of those different

25     accounts?

O9RJDAR2                          Bronson - Direct

1    A    Yes.

2    Q    And generally speaking, where did the funds to make the

3    payments that are shown on Government Exhibit 1121, where did

4    that money come from originally?

5    A    Primarily the three wires sent by Dwight Howard for

6    $7,075,000.

7    Q    And how do you know that that is primarily where the money

8    to make all of the payments came from?

9    A    I reviewed the bank accounts and noted the -- that there

10   was only so much money else received into those accounts.

11   Q    Can you walk the jury through each of the categories of

12   payments shown on this chart with the Dwight Howard flow of

13   funds.

14   A    Yes.

15   Q    Just march through that, each row, please, Ms. Bronson.

16   A    Just the recipient name?

17   Q    The recipient and amount.

18   A    SZ Motorcars for $255,000.  Town Motorcar for approximately

19   $284,000.  Tactical Fleet for approximately $343,000.  Briscoe

20   for approximately $1.1 million.  Patricia Darden for

21   approximately $519,000.  Loan repayments for $60,000.  Pop

22   International Art for approximately $307,000.  First Third

23   Capital for $285,000.  Steinway for approximately $110,000.

24   Crypto for approximately $492,000.  Koi pond for approximately

25   $29,000.  MMS Motorsports for approximately $54,000.  Mindful

O9RJDAR2                          Bronson - Direct

1   Home for approximately $380,000.  Jesus Carillo for

2   approximately $89,000.  House purchase for approximately

3   $765,000.  Miscellaneous luxury goods for approximately

4   $91,000.  Miscellaneous home expenses for approximately

5   $242,000.  And payments to miscellaneous individuals for

6   approximately $692,000.

7   Q    What's the grand total?

8   A    $6,149,133.95.

9   Q    How much money did Dwight Howard send?

10  A    $7,075,000.

11  Q    Does this chart show every single payment or only some of

12  them?

13  A    Only some of them.

14  Q    So the first payment is SZ Motorcars, $255,000, right?

15  A    Yes.

16          MR. MEAD:  Government Exhibit 602D-3 in evidence,

17  please, Mr. Ross.

18  Q    What is this document?

19  A    This is a check.

20  Q    And what account wrote this check?

21  A    The Legacy AC LLC Wells Fargo account.

22  Q    How much money is it.

23  A    $255,000.

24  Q    And who is it to?

25  A    SZ Motorcars.

1          MR. MEAD:  Okay.  Can you pull up Government

2     Exhibit 602D-3 side by side with Government Exhibit 1111.

3     Q    How soon after receiving the $4 million from Dwight Howard

4     was this check for $255,000 written?

5     A    12 days.

6     Q    And where did the money to make this $255,000 payment to SZ

7     Motorcars come from?

8     A    Mainly in the $4 million received from Dwight Howard.

9     Q    How do you know that?

10    A    Because there was only $2,679.26 on the date before it

11    received $4 million from Dwight Howard.

12         MR. MEAD:  You can take these down.  And let's go to

13    Government Exhibit 602-C at page 25, please.

14    Q    What kind of document is this?

15    A    This is a wire transaction report.

16    Q    And what's it show?

17    A    It shows the -- a wire from Legacy AC LLC to Town Motorcar

18    Corp for $284,151.19.

19    Q    On what date?

20    A    On December 23, 2020.

21    Q    Do you see where it says "detail," what's it say there?

22    A    Purchasing vehicle.

23    Q    Town Motorcar, right?

24    A    Yes.

25         MR. MEAD:  Government Exhibit 704-A, page 3 in

O9RJDAR2                          Bronson - Direct

1   evidence, please Mr. Ross.  Zoom in at the top.

2   Q   What is in the kind of top middle?  It's a little hard to

3   read, but what's it say in big text on the top middle

4   underneath the logo?

5   A   Porsche.  Town Motors Porsche.

6   Q   Do you see customer's name?

7   A   Yes.

8   Q   What's it say?

9   A   Cal Darden.

10  Q   What's the email address?

11  A   Darden.calvinr@gmail.com.

12  Q   And then do you see "please enter my order for one," can

13  you read the next couple words after that.

14  A   2021 Porsche.

15  Q   Keep going.

16  A   911 Turbo S.

17          MR. MEAD:  Go to page 39 of this document, please,

18  Mr. Ross.

19  Q   Do you see where it says "name of primary registrant"?

20  A   Yes.

21  Q   What name is listed there?

22  A   Darden, Calvin.

23  Q   Does it say senior or junior?

24  A   No.

25  Q   Do you see underneath that it says a date of birth?

1    A    Yes.

2    Q    What is the year of birth?

3    A    1974.

4    Q    And is that the year of birth that corresponds with Calvin

5    Darden, Jr. from the other documents we've seen?

6    A    Yes.

7             MR. MEAD:  Zoom out, please Mr. Ross.  And I think

8    that's it on this page.

9             Page 41, please.  Zoom in.

10            Again, what is the information about the vehicle here?

11   A    2021 Porsche 911.

12   Q    And the new owner?

13   A    Darden, Calvin.

14   Q    And the previous owner?

15   A    Town Motorcar Corp.

16   Q    Is that the company that got the $284,000 wire we looked

17   at?

18   A    Yes.

19            MR. MEAD:  Government Exhibit 1111 side by side with

20   602-C at page 25, please, Mr. Ross.

21   Q    Where did the money to buy that Porsche for Calvin Darden

22   come from?

23   A    Primarily from the wire sent by Dwight Howard that the

24   account received.

25   Q    How do you know that?

O9RJDAR2                          Bronson - Direct

1   A   Because prior to that wire being sent, there was a balance

2   in the account of November 30 of approximately 3.2 million, and

3   3 million of that dollars was probably from the $4 million wire

4   sent on November 13, 2020.

5           MR. MEAD:  Take these down, Mr. Ross, please.

6           Government Exhibit 606-C, page 16.

7   Q   What does this document show, Ms. Bronson?

8   A   A wire transaction from Calvin R. Darden to Tactical Fleet.

9   Q   And for how much money, about?

10  A   Approximately $341,000.

11  Q   And what date?

12  A   October 8, 2021.

13          MR. MEAD:  Okay.  Government Exhibit 712-A, please, in

14  evidence, page 3.

15  Q   What's it say in the top left of the logo?

16  A   Tactical Fleet.

17  Q   And is that the name of the company that got the $341,000

18  wire we just looked at?

19  A   Yes.

20  Q   What is the title of the document?

21  A   Retail purchase agreement.

22  Q   Who is listed as the purchaser's name?

23  A   Calvin Darden.

24  Q   What address is listed for him?

25  A   375 Park Avenue, number 2607, New York, New York.

O9RJDAR2                          Bronson - Direct

1    Q   And the date?

2    A   October 8, 2021.

3           MR. MEAD:  Zoom out, Mr. Ross and then focus on the

4    vehicle.

5    Q   What kind of car is this a retail purchase agreement for?

6    A   A 2014 Lamborghini Aventador.

7           MR. MEAD:  Okay.  Zoom out.

8    Q   At the bottom right where it says "total due," how much

9    money did this Lamborghini Aventador cost?

10   A   $341,128.94.

11          MR. MEAD:  Go to page 8 of the same document, please,

12   now, Mr. Ross.

13   Q   What does this look like?

14   A   It's a New York State driver's license.

15   Q   What's the name on it?

16   A   Darden Calvin Ramarro.

17   Q   What's the address on it?

18   A   375 Park Avenue, 2607, New York, New York.

19          MR. MEAD:  Page 22 of the same document, please,

20   Mr. Ross.

21   Q   What is the title of this document?

22   A   Motor vehicle retail installment sales contract.

23   Q   And then do you see there are kind of two boxes for buyer

24   and co-buyer?

25   A   Yes.

1    Q   What's the first buyer?

2    A   Legacy AC LLC.

3    Q   What address?

4    A   2716 Ridgewood Road NW, Atlanta, Georgia.

5    Q   Who is the co-buyer?

6    A   Calvin Darden.

7    Q   And does it say senior or junior?

8    A   No.

9    Q   What address is listed for Calvin Darden?

10   A   2716 Ridgewood Road NW, Atlanta, Georgia.

11           MR. MEAD:  Zoom out, Mr. Ross, and then zoom in in

12   kind of the middle box right there.

13   Q   What vehicle is this document for?

14   A   2021 Rolls-Royce Cullinan.

15           MR. MEAD:  Go back to 603-H, please, in evidence,

16   Mr. Ross.  I think it's in Excel.  Highlight row six, and you

17   may need to scroll a little bit.

18   Q   What does row six show, Ms. Bronson?

19           MR. DONALDSON:  Judge, we don't have a signal back

20   here.  Now it's back up.

21   Q   What is row six of this document showing?  If you need

22   Mr. Ross to go side to side, just let us know.

23   A   Can you go to the left a little bit.  It's a $35,000 wire

24   sent to Charles Briscoe.

25   Q   What about transaction -- row ten?

O9RJDAR2                         Bronson - Direct

1    A    It is a $800,000 wire sent to Charles Corey Briscoe.

2    Q    Do you know which account sent these?

3    A    It is the Darden Enterprises Morgan Stanley account.

4    Q    When you looked at these bank statements, did you also see

5    sometimes payments from Briscoe into some of the accounts on

6    Government Exhibit 1101?

7    A    Yes.

8    Q    And what's the total of these two wires to Charles Briscoe?

9    A    $835,000.

10        MR. MEAD:  Government Exhibit 1112 in evidence,

11   please, Mr. Ross.

12        Is this the chart for the account that sent the

13   $835,000 to Charles Briscoe?

14   A    Yes.

15   Q    Where did that money come from originally?

16   A    Sorry.  Can you rephrase?

17   Q    Where did the $835,000 that went to Charles Briscoe, where

18   did the money come from in the first place?

19   A    It primarily came from the $5.5 million it received in the

20   Dwight Howard flow of funds.

21   Q    How do you know that?

22   A    Because the account only received about 16 to $17,000 in

23   other sources of funds.

24        MR. MEAD:  Government Exhibit 1121 in evidence,

25   please.

O9RJDAR2                          Bronson - Direct

1    Q    What was the total amount that was sent to Charles Briscoe

2    from these accounts?

3    A    $1,146,174.30.

4    Q    Okay.  And have we now talked about the first four

5    categories on here?

6    A    Yes.

7              MR. MEAD:  Okay.  Government Exhibit 602-C, page 22 in

8    evidence, please, Mr. Ross.

9    Q    What does this document show?

10   A    It shows a wire from Legacy AC LLC to Patricia Darden.

11   Q    For how much money?

12   A    $50,000.

13   Q    And same document, page 18.  What does this --

14   A    This is the --

15   Q    Sorry.  I think I've got the wrong page.  That's okay.  Can

16   we go to page 22, please.

17             What does this show?

18   A    This shows a wire from the Legacy AC LLC account to

19   Patricia Darden for $50,000.

20   Q    And does Patricia Darden have the same last name as Calvin

21   Darden, Jr.?

22   A    Yes.

23   Q    Are there other transactions to Patricia Darden that we

24   haven't looked at on here?

25   A    Yes.

O9RJDAR2                          Bronson - Direct

1           MR. MEAD:  Government Exhibit 2413 at page 2 in

2      evidence, please, Mr. Ross.

3      Q   Do you see where it says "Calvin Darden, Sr." at the very

4      top?

5      A   Yes.

6           MR. MEAD:  Okay.  Now let's go to page 6.  And if you

7      could zoom in on the second paragraph.

8      Q   Who is identified as the wife of Cal Darden in this

9      paragraph?

10     A   Patricia.

11     Q   And is that the name of the person who received the money

12     we've been talking about?

13     A   Yes.

14          MR. MEAD:  Okay.  You can take this down, please.

15     Mr. Ross.  Go back to 1121, please, Mr. Ross.

16     Q   So what's the total amount of money that was sent to

17     Patricia Darden from these accounts?

18     A   $519,172.

19          MR. MEAD:  Can you go to Government Exhibit 602-D

20     page 16, please Mr. Ross.

21     Q   What is this document?

22     A   It is a check.

23     Q   And who is it to?

24     A   Mystik Dasilva.

25     Q   For how much money?

O9RJDAR2                        Bronson - Direct

1    A   $20,000.

2    Q   What is the date?

3    A   November 19, 2020.

4    Q   And what's it say it's for?

5    A   Loan repayment.

6    Q   Can you go to page 17 of this document, please.

7            What's this?

8    A   A copy of another check.

9    Q   And what's the amount?

10   A   $40,000.

11   Q   How much is it for?  Sorry.  Who is it to?

12   A   First Family Group LLC.

13   Q   And what's it say under the "for" line?

14   A   Loan repayment in (Kevin Bent).

15   Q   Do both these checks come from the Legacy AC account?

16   A   Yes.

17           MR. MEAD:  Can we go to Government Exhibit 1111,

18   please, Mr. Ross.

19   Q   Is this the chart for the Legacy AC account that wrote

20   those two checks?

21   A   Yes.

22   Q   How soon after getting $4 million from Dwight Howard did

23   this account write those two checks for loan repayment?

24   A   Within a couple days.

25           MR. MEAD:  Government Exhibit 606-C in evidence,

1    please, Mr. Ross.  I think that's in Excel.  Oh, no, it's not

2    in Excel.  Page 8, please.

3    Q    What does this show?

4    A    This is a wire from Calvin R. Darden to Pop International

5    Galleries.

6    Q    For how much money?

7    A    $7,906.

8    Q    What date?

9    A    On August 3, 2021.

10   Q    Page 12, please.

11            Who sent this wire?

12   A    Calvin R. Darden.

13   Q    What's the amount?

14   A    $100,000.

15   Q    Who is it to?

16   A    Pop International Galleries.

17            MR. MEAD:  And page 13, please, Mr. Ross.

18   Q    Who sent this wire?

19   A    Calvin R. Darden.

20   Q    What amount?

21   A    $50,000.

22   Q    And to who?

23   A    Pop International Galleries.

24            MR. MEAD:  603-H in evidence, please, Mr. Ross, in

25   Excel.

O9RJDAR2                          Bronson - Direct

1  Q    Can you look at row eight, please, Ms. Bronson.  What does

2  this row on this wire report show?

3  A    $150,000 wire to Pop International Galleries.

4          MR. MEAD:  Let's now go to Government Exhibit 705-A in

5  evidence, please, Mr. Ross.

6  Q    What is the name of the company on this invoice?

7  A    Pop International Galleries Inc.

8  Q    And is that the same company that got all the money we were

9  just looking at a minute ago?

10  A    Yes.

11  Q    And what does it say under "ship to"?

12  A    Calvin Darden, 307 Murray Avenue, Englewood, New Jersey.

13  Q    What's it say under "collector email"?

14  A    Darden.Calvin@gmail.com.

15  Q    What's it say under "shipping telephone number"?

16  A    (347)850-5686.

17  Q    And then you see where it says "description," can you just

18  read the first line underneath description.

19  A    Jean-Michel Basquiat Untitled (Rinso).

20  Q    And how much did that piece of art cost?

21  A    $160,708.

22  Q    Go to page 2, please.

23          Is this a piece of art?

24  A    Yes.

25  Q    Do you see right in the middle it says 1950 Rinso?

O9RJDAR2                          Bronson - Direct

1    A    Yes.

2              MR. MEAD:  Okay.  Now let's take 705-A, page 2, side

3    by side with Government Exhibit 808, please.

4    Q    Do you recognize this $140,000 Basquiat painting in the

5    picture on the right?

6    A    Yes.

7    Q    And where is it?

8    A    It's on the left-hand side.

9              MR. MEAD:  Can you zoom in, please, Mr. Ross, to help

10   out a little bit.  Leave that.

11   Q    Does that appear to be the same picture on the invoice?

12   A    Yes.

13             MR. MEAD:  Government Exhibit 705-C, please, Mr. Ross.

14   Q    What is the company name on here?

15   A    Pop International Galleries.

16   Q    And again, is that the same company that got the money we

17   were looking at?

18   A    Yes.

19   Q    What's the "ship to" say?

20   A    Calvin Darden, 2716 Ridgewood Road NW, Atlanta, Georgia.

21   Q    Collector email?

22   A    Darden.calvinr@gmail.com.

23   Q    Shipping telephone number?

24   A    (347)850-5686.

25   Q    And do you see under "description," can you read that first

O9RJDAR2                          Bronson - Direct

1    line, please.

2    A    Jean-Michel Basquiat Untitled (Per Capita).

3    Q    How much did this one cost?

4    A    $150,000.

5           MR. MEAD:  Page through this document, please.

6    Q    What's the text at the very top on this painting on the

7    invoice?

8    A    Per Capita.

9           MR. MEAD:  705-C, page 2, side by side with 808,

10   please.

11   Q    And do you recognize the $150,000 Basquiat on the invoice

12   in the picture on the right?

13   A    Yes.

14   Q    And is it the part that Mr. Ross has just zoomed in on, the

15   second from the right?

16   A    Yes.

17   Q    Do those appear to be the same painting?

18   A    Yes.

19          MR. MEAD:  Okay.  Government Exhibit 1121, please.

20   Q    How much money in total was sent to Pop International Art?

21   A    $307,906.

22   Q    And that amount is in the chart, right?

23   A    Yes.

24   Q    And the next thing on the chart is First Third Capital,

25   right?

O9RJDAR2                          Bronson – Direct

1    A    Yes.

2              MR. MEAD:  603-H in evidence, please, Mr. Ross.

3    Q    What does row four on this wire report show?

4    A    A wire of $135,000 to First Third Capital Inc.

5    Q    And what's row five show?

6    A    A $150,000 wire sent to First Third Capital Inc.

7              MR. MEAD:  Government Exhibit 706-A, please.

8    Q    What is the company on this invoice at the top?

9    A    First Third Capital Inc.

10   Q    That's the same company that got the $285,000?

11   A    Yes.

12   Q    Okay.  What does it say under the "to" line?

13   A    Calvin Darden, 45 Waterview Court, Staten Island, New York.

14   Q    And what phone number?

15   A    (347)850-5685.

16   Q    Zoom out, please.

17            What does the first line of the description say?

18   A    Untitled (Head) by Jean-Michel Basquiat artworks on paper.

19   Q    And how much money did that piece of art cost?

20   A    $130,000.

21            MR. MEAD:  Go to 706-D please, Mr. Ross.

22   Q    What's the name of the company at the top here?

23   A    First Third Capital Inc.

24   Q    And is the "ship to" information the same as the invoice

25   from First Third Capital Inc. we just looked at?

O9RJDAR2                          Bronson - Direct

1    A    Yes.

2    Q    What's the first line of the description say?

3    A    Untitled (Ernok) by Jean-Michel Basquiat artworks on paper.

4    Q    How much did this one cost?

5    A    $153,000.

6          MR. MEAD:  Government Exhibit 706-D side by side with

7    Government Exhibit 808, please.  Sorry.

8          706-D, please, Mr. Ross.

9    Q    Did one of the invoices we just looked at say "head" on it?

10   A    Yes.

11         MR. MEAD:  706-B, please, Mr. Ross.  Sorry.  Try

12   706-C.

13   Q    What's the second line of text on the top there?

14   A    Ernok.

15   Q    Did one of the invoices we looked at say "Ernok"?

16   A    Yes.

17         MR. MEAD:  Can we do 706-D side by side with 808,

18   please.

19   Q    And do you recognize that Basquiat painting in the picture

20   on the right?

21   A    Yes.

22   Q    And where is it?

23   A    It's on the right-hand side.

24         MR. MEAD:  Okay.  Government Exhibit 706-C with 812,

25   please, Mr. Ross.  Side by side with 812, please.

1    Q    And does this Ernok Basquiat painting from the invoice

2    appear to match the picture on the right?

3    A    Yes.

4         MR. MEAD:  Okay.  Government Exhibit 604-C, please,

5    page 3.

6    Q    What's this document show?

7    A    It is a wire transfer form from Hyperion bank.

8    Q    Who is the beneficiary?

9    A    Steinway Inc.

10   Q    And what does "beneficiary" mean?

11   A    It's the individual receiving the money.

12   Q    What's it say under beneficiary info/purpose?

13   A    Purchase-piano.

14   Q    And what's the amount of the wire?

15   A    $110,650.

16        MR. MEAD:  Okay.  Government Exhibit 707A, please in

17   evidence.

18   Q    What's the company name at the top of this invoice?

19   A    Steinway & Sons.

20   Q    And what's it say under "sold to"?

21   A    Calvin Darden.

22   Q    And what's the address?

23   A    45 Waterview Court, Staten Island, New York.

24   Q    And what's the phone number?

25   A    (347)850-5686.

O9RJDAR2                          Bronson - Direct

1   Q   Do you see where it says "delivered to"?

2   A   Yes.

3   Q   What name?

4   A   Calvin Darden.

5   Q   Is doesn't say senior or junior, right?

6   A   No.

7   Q   What address is it to be delivered to?

8   A   2716 Ridgewood Road NW, Atlanta, Georgia.

9            MR. MEAD:  Zoom out please, Mr. Ross.  Can you zoom in

10  on the description section, please.

11  Q   What kind of piano is shown here?

12  A   A ebony DiamondGloss.

13  Q   Is there a serial number?

14  A   Yes.

15  Q   What is it?

16  A   601861.

17  Q   And how much does the ebony DiamondGloss Steinway piano

18  sell for?

19  A   $110,000.

20           MR. MEAD:  Can you go to Government Exhibit 840,

21  please, Mr. Ross.

22  Q   What's the company name in this picture of the piano?

23  A   Steinway & Sons.

24           MR. MEAD:  Can you do 862 and 707-A side by side,

25  please, Mr. Ross.

O9RJDAR2                          Bronson - Direct

1   Q   Do you remember seeing the serial number on the invoice?

2   A   Yes.

3   Q   What is it?

4   A   601861.

5   Q   And what's the serial number on the piano in the picture?

6   A   601861.

7           MR. MEAD:   Government Exhibit 1105-B in evidence,

8   please, Mr. Ross.

9   Q   Do you see payments to Coinbase on here?

10  A   Yes.

11  Q   Where on the chart are those?

12  A   The right-hand side.

13  Q   About how much money total?

14  A   $60,000.

15          MR. MEAD:   Can we go to Government Exhibit 1106-B now,

16  please.

17  Q   Do you see payments to Coinbase on here?

18  A   Yes.

19  Q   And again, just a ballpark about how much money?

20  A   Say couple hundred thousand dollars.

21  Q   Do you know what Coinbase is?

22  A   Yes.

23  Q   What is it?

24  A   A cryptocurrency exchange.

25          MR. MEAD:   Okay.  Government Exhibit 608-A, please, in

O9RJDAR2                         Bronson - Direct

1    evidence, spreadsheet.

2    Q    Okay.  On this document, do you see line 4?

3    A    Yes.

4    Q    What's the name?

5    A    Calvin Darden.

6    Q    And what is the email address?

7    A    Darden.calvinr@gmail.com.

8    Q    And on line 13, what's the address listed?

9    A    2716 Ridgewood Road NW in Atlanta, Georgia.

10              MR. MEAD:  Mr. Ross, can you expand column B for a

11   minute.

12   Q    What's the birthday listed on row 19?

13   A    1974.

14   Q    And can you go down a little bit.  On rows 24 through 28,

15   what does it say in column B -- well, sorry.  Do lines 24

16   through 28 refer to driver's licenses and photo verifications?

17   A    Yes.

18   Q    What's the name listed there in column E?

19   A    Calvin Ramarro Darden.

20              MR. MEAD:  Keep going to the right, please, Mr. Ross.

21   Q    With what year of birth?

22   A    1974.

23   Q    And what address?

24   A    375 Park Avenue 2607, New York, New York.

25              MR. MEAD:  Government Exhibit 606-D, please, at

O9RJDAR2                          Bronson - Direct

1   page 23.

2   Q    What's this document?

3   A    It is a copy of a check.

4   Q    Who is it to?

5   A    Splendor Koi.

6   Q    What's the amount?

7   A    $21,450.

8   Q    And what's in the "for" line?

9   A    Koi pond completion.

10  Q    Page 27, please.  Who's this check to?

11  A    A check to Splendor Koi.

12  Q    For how much money?

13  A    $8,000.

14  Q    And what's it say in the top left about who's writing the

15  check?

16  A    Calvin R. Darden and Calvin Darden.

17  Q    With what address?

18  A    2716 Ridgewood Road NW, Atlanta, Georgia.

19  Q    Do you know what a koi pond is?

20  A    Yes.

21  Q    What is it?

22  A    It is a pond with koi fish in it.

23        MR. MEAD:  Government Exhibit 803, please.

24  Q    What does this picture appear to show?

25  A    A koi pond.

1          MR. MEAD:  Government Exhibit 603-H in evidence,

2     please, Mr. Ross.

3     Q   And go to row three.  What does this transaction show?

4     A   A wire for $54,108.72 to MMS Motor Sports LLC.

5          MR. MEAD:  Government Exhibit 708-A in evidence,

6     please, Mr. Ross.

7     Q   What is the company name at the top of this bill of sale?

8     A   Mountain Motor Sports.

9     Q   And who is listed as the buyer?

10    A   Darden, Calvin.

11    Q   With what address?

12    A   45 Waterview Court, Staten Island, New York.

13    Q   And what phone number?

14    A   (347)850-5686.

15    Q   What email address?

16    A   Darden.calvinr@gmail.com.

17    Q   Page 2 of this document, please.

18          What does this look like?

19    A   It's a New York State driver's license.

20    Q   For who?

21    A   Calvin R. Darden.

22    Q   Page 8 of this document, please.

23          What is the name on this page?

24    A   Calvin Darden.

25    Q   Is there a middle name?

O9RJDAR2                          Bronson – Direct

1    A    Yes.

2    Q    Which is what?

3    A    Ramarro.

4    Q    Is there a year of birth?

5    A    Yes.

6    Q    Which is what?

7    A    1974.

8         MR. MEAD:  Back to page 1 of this document please,

9    Mr. Ross.  Actually page 2.  Page 8.  Where is the thing I'm

10   looking for?  Try page 8, Mr. Ross.

11   Q    Okay.  Do you see where it says "vehicle"?

12   A    Yes.

13   Q    You see it says "model"?

14   A    Yes.

15   Q    What's the model on this bill of sale for MMS Motorsports?

16   A    Maverick XRS Max Turbo.

17        MR. MEAD:  Government Exhibit 604C page 2, please.

18   Q    What is this document?

19   A    It's a wire transfer form.

20   Q    Who is the beneficiary?

21   A    A Mindful Home LLC.

22   Q    And what's the originator name?

23   A    Calvin Darden.

24   Q    What's the amount of this wire?

25   A    $183,000.

O9RJDAR2                          Bronson - Direct

1              MR. MEAD:  Page 23 of this document please, Mr. Ross.

2    Q   What's this?

3    A   It's a wire transfer form.

4    Q   To who?

5    A   A Mindful Home LLC.

6    Q   What amount?

7    A   $35,500.

8    Q   What's it say under "beneficiary info/purpose"?

9    A   Home design/AV-smart home contractor.

10   Q   Okay.  And then underneath at the bottom, do you see in the

11   bottom left section — can we zoom in on that, Mr. Ross — do you

12   see where it says "call back is required if received via fax or

13   email"?

14   A   Yes.

15   Q   And do you see it says "call back date and time"?

16   A   Yes.

17   Q   And then do you see underneath it says "client name

18   confirming wire"?

19   A   Yes.

20   Q   What name is listed there?

21   A   Calvin Darden, Jr.

22   Q   And do you see it says "call back number used"?

23   A   Yes.

24   Q   What phone number is listed there?

25   A   (404)850-1779.

O9RJDAR2                      Bronson – Direct

1            MR. MEAD:  Okay.  Government Exhibit 606-D in evidence

2   at page 24, please, Mr. Ross.

3   Q   Who is this check to?

4   A   A Mindful Home.

5   Q   For how much?

6   A   $80,000.

7   Q   And what does it say in the "for" line?

8   A   A/V.

9            MR. MEAD:  Page 31, please, of this document,

10  Mr. Ross.

11  Q   Who is this check to?

12  A   A Mindful Home.

13  Q   For what amount?

14  A   $22,000.

15  Q   And are there names at the top left?

16  A   Yes.

17  Q   What are they?

18  A   Calvin R. Darden and Calvin Darden.

19  Q   What address?

20  A   2716 Ridgewood Road NW, Atlanta, Georgia.

21  Q   What's it say in the "for" line?

22  A   Outside A/V.

23           MR. MEAD:  Page 40 please, Mr. Ross.

24  Q   Who is this check to?

25  A   A Mindful Home.

O9RJDAR2                          Bronson - Direct

1    Q    And what amount?

2    A    $40,000.

3    Q    What's it say in the "for" line?

4    A    A/V.

5         MR. MEAD:  607-E at page 5 in evidence, please,

6    Mr. Ross.

7    Q    Again, who is this check to?

8    A    A Mindful Home.

9    Q    For what amount?

10   A    $16,940.68.

11   Q    And who is it from at the top left?

12   A    Calvin Darden.

13   Q    To what address?

14   A    2716 Ridgewood Road NW, Atlanta, Georgia.

15   Q    What's it say in the "for" line?

16   A    Theater.

17        MR. MEAD:  Page 7 of this document, please, Mr. Ross.

18   Q    Who is this check to?

19   A    A Mindful Home.

20   Q    And what is the amount of the check?

21   A    $3,500.

22   Q    And does it say it's for art lighting?

23   A    Yes.

24        MR. MEAD:  Government Exhibit 709-A, page 1, please,

25   Mr. Ross.

O9RJDAR2                          Bronson - Direct

1    Q   What does the big text in this document say?

2    A   Darden home.

3    Q   And then underneath it says a proposal for?

4    A   Calvin and Sue Darden.

5    Q   And keep going to the next four lines, please.

6    A   Calvin@dardenenterprises.com.  The phone number is

7    (347)850-5686.  Address is 2716 Ridgewood Road NW, Atlanta,

8    Georgia.

9    Q   At the bottom, do you see where it says "A Mindful Home

10   LLC"?

11   A   Yes.

12   Q   And is that the name of the company that got all those

13   checks and wires we were just looking at?

14   A   Yes.

15           MR. MEAD:  Can you go, please, to page 32 of this

16   document.

17   Q   What is the total price of this proposal from A Mindful

18   Home for Calvin and Sue Darden?

19   A   $355,440.68.

20           MR. MEAD:  Can you go to page 1, Mr. Ross, and just

21   kind of slowly scroll through the document maybe a half second

22   on each page.  A little bit more slowly than that.  Thank you.

23   I think that's enough, Mr. Ross.

24           If you can go to Government Exhibit 709-B at page 1,

25   please.

O9RJDAR2                          Bronson - Direct

1           THE COURT:  Mr. Mead, let me ask, it's about 12:45.

2    Is this a good time to break or would you like to complete this

3    document?

4           MR. MEAD:  If I could do three or four more minutes,

5    your Honor, then it would be a convenient stopping point.

6           THE COURT:  All right.

7    BY MR. MEAD:

8    Q    What does it say in big text here?

9    A    Outdoor video and audio.

10   Q    At the bottom, does it again say "A Mindful Home LLC"?

11   A    Yes.

12   Q    Does it have all the same information for Calvin and Sue

13   Darden there?

14   A    Yes.

15          MR. MEAD:  Go to page 3 of this document, please.

16   Q    Do you see the first item, a 75-inch full sun outdoor TV?

17   A    Yes.

18   Q    How much does that cost?

19   A    $11,000.

20   Q    Page 6, please.

21          What's the total on this proposal?

22   A    $22,000.

23          MR. MEAD:  709-C, please, page 1.

24   Q    What's it say here in big text?

25   A    Art lighting.

1   Q   And then the same email, phone number, address for Calvin

2   and Sue Darden?

3   A   Yes.

4   Q   Does it again say "A Mindful Home" at the bottom --

5   A   Yes.

6   Q   -- is the company that got the checks we were looking at.

7   A   Yes.

8           MR. MEAD:  Can you go to page 4 of this document.

9   Q   What's the total?

10  A   $4,963.66.

11          MR. MEAD:  Government Exhibit 1121, please, Mr. Ross.

12  Q   What was the total amount of money sent to A Mindful Home?

13  A   $380,940.68.

14  Q   And where did most of the money to make those payments to A

15  Mindful Home come from?

16  A   Primarily from the Dwight Howard flow of funds.

17          MR. MEAD:  And now is a convenient place, your Honor.

18  Thank you.

19          THE COURT:  Okay.  Thank you very much.  So ladies and

20  gentlemen, we're going to take our lunch break.  Please

21  remember do not discuss the case.  Just go, have a relaxing

22  lunch.  Remember, no Googling, no searches.  If anyone

23  approaches you to discuss the case, please tell them that you

24  can't, and let Ms. Disla know, all right?  Thank you very much.

25  2:00.  Thank you.                     (Continued on next page)

O9RJDAR2                         Bronson - Direct

1              (In open court; jury not present)

2              THE COURT:  Okay.  You may be seated.

3              Ms. Bronson, you may step down.

4              (Witness temporarily excused)

5              THE COURT:  Let me ask is there anything we should

6    take up before we take the lunch break?

7              MR. MEAD:  I don't think so, your Honor.  Not from the

8    government.

9              THE COURT:  Okay.  Yes?

10             MR. DONALDSON:  Not from the defense right now.

11             THE COURT:  Let me ask, Mr. Mead, in terms of timing,

12   because I know yesterday you thought, oh, we might run out of

13   witnesses, it seems that that's probably not going to be the

14   case today, but let me --

15             MR. MEAD:  It is still possible we run out of

16   witnesses.  But we'll get at least pretty close to 5:30, I

17   think.  After Ms. Bronson, we will call James Wiseman.  Then we

18   will call Jeffrey Acosta.  Both of those witnesses are pretty

19   short, 15 or 20 minutes each.  Then Olivia Sebade, a paralegal,

20   who will be on for an hour and a half or so.  So I think that

21   probably takes up almost the whole day, at least.

22             THE COURT:  All right.  Thank you very much.  We'll

23   stand adjourned.  We'll see everybody at 2:00 after lunch.

24   Thank you.

25             (Luncheon recess)

O9RBDAR3

1                          AFTERNOON SESSION

2                              2:15 p.m.

3           (In open court; jury not present)

4           THE COURT:  I understand there are certain disputes

5    related to the transcript.  What I propose is the following:  I

6    will print out the relevant exhibit, and I think we have the

7    actual objections.  And while the testimony of Ms. Bronson

8    continues, I'll take a look at it.  And maybe at the break or

9    at some point I can make a ruling rather than taking the time

10   up now.

11          MS. REED:  I was going to say, your Honor, I have a

12   highlighted version with all of those sections highlighted that

13   are in dispute that I can share.

14          THE COURT:  You can share that, and obviously copy the

15   government on it.

16          MS. REED:  Absolutely.

17          THE COURT:  And if you send it to my chamber's in-box,

18   they'll forward it to me.  I think you have my direct email.

19   You can send it to my email.  Rather than taking up the time

20   now and us having a back and forth, let me familiarize myself

21   with it, and then we can talk about it.

22          MR. RICCO:  Judge, I know you don't want to do this,

23   but those objections are limited to really just one topic.

24   It's just in different places.

25          THE COURT:  Okay. If you could just tell me what is

O9RBDAR3

the topic.

MR. RICCO:  It's the impersonation of the father and using the voice to impersonate the father.

MS. REED:  Those segments are limited to that.

THE COURT:  Okay.  All right.  Let me ask, I said I wasn't going do to it, but I guess I'm going to do it at least in part.  Is there a place or is the government going to be pointing to a point in this case where you're going to ask the jury to infer that it's Mr. Darden, Jr. who is making a call or doing a text or whatever it may be and not his father?

MR. KINDER:  Yes, your Honor, on both phone calls and text messages.

THE COURT:  Okay.  And how many phone calls?

MR. KINDER:  We expect that there will be a witness who will testify that he was speaking to a person he thought to be senior on a particular phone number that we can tie to the defendant.

THE COURT:  On one occasion, more than one occasion?

MR. KINDER:  More than one.  I don't think we have a specific number.  And that witness also had text messages with that number under the impression that it was senior.

MS. REED:  Your Honor, we have not seen anything to indicate that that's the case in this case, and that's why we're objecting to --

THE COURT:  One moment, because I think I asked about

O9RBDAR3

1    this case as opposed to the other case.

2            MR. KINDER:  Correct.  In this case that witness has

3    not yet testified, but we intend to offer that.

4            THE COURT:  And offer it before?  When do you intend

5    to offer it?

6            MR. KINDER:  That witness is expected to testify on

7    Monday.  We also have text messages, which we are planning to

8    move in today, which we can tie with a phone number tied to the

9    defendant that are conveying that the user of that number in

10   these particular text messages as senior.  So that is evidence

11   that will come in today, and it's also relevant on that point.

12           THE COURT:  Let me ask in terms of when the judgment

13   and when the testimony comes in, obviously I can rule based

14   upon your proffer, but my preference would be if I could hear

15   and see -- cause I don't think, right, are you going to need a

16   witness?  In other words, would it be a problem to delay

17   admitting that until we get that information?

18           MR. KINDER:  I don't think so, your Honor.  And one

19   way to do that is, we're planning on putting in the 404(b)

20   evidence with the same paralegal who is going to be reading

21   text messages.  If we do the text messages first, I think that

22   would provide a sufficient basis.  We can take a break at

23   sidebar.  We can explain what our view of that basis is, and

24   then the 404(b) evidence could come in with the paralegal today

25   if the Court thinks that what we offer is sufficient.

O9RBDAR3

1          THE COURT:  In terms of the phone.  What I would ask

2     then is, is the person on Monday going to testify about the

3     phone?

4          MR. KINDER:  Yes, that's right.  To be clear, your

5     Honor, that person will testify about phone calls as well as

6     text messages.  The text message evidence that we plan to put

7     in today is just text messages, but it's also the use of a

8     phone to impersonate senior.

9          MS. REED:  But that's not direct evidence.  The

10    paralegal is not a fact witness that's going to be able to make

11    that conclusion.  It's in fact impersonation of his father.

12         THE COURT:  What I would just need, and it could be

13    just the documents that show, call at this number.  The number

14    is tied not to senior, but to junior.  And so I don't think I

15    need to have testimony from a witness necessarily if there's a

16    colorable argument, there's an argument to be made that the

17    jury can draw the inference that the phone number, if it's the

18    347 number or 850, whatever it is, if that's number or some

19    other number that information that's been provided is tied to

20    Mr. Darden, Jr. and not to Sr. I mean, obviously, you're

21    entitled to make an argument that, well, his father could have

22    had his phone, or whatever it may be.  But that goes to the

23    weight, not necessarily admissibility.

24         MS. REED:  I think when you look at the highlighted

25    portions of what I'm going to send you, it's so detailed, it

O9RBDAR3

1    goes way beyond an inference of maybe this was him using the

2    phone.  It's details about a tone of voice.  It's highly

3    prejudicial.

4            THE COURT:  All right.  Well, I'll take a look at

5    that.  Let me take a look at that.  Look, I understand you have

6    an order of proof, but would it be the same paralegal who would

7    basically get in these things.  All right.  So let me think

8    about that.

9            MR. KINDER:  The answer to that question is yes, your

10   Honor.  Just to give you some context as you're reviewing this.

11   Government Exhibits 404 which are a series of text messages

12   from the 5686 number.  We've already had a lot of evidence that

13   that is associated with the defendant.  404 are text messages

14   from the 5686 number presenting themselves as Sr., and I think

15   that is clear from the context of the words in the text

16   messages. And also 1141 and 1142 are phone number summary

17   charts which we intend to offer with the paralegal that

18   identify phone numbers and how they are tied to the defendant

19   that are also relevant.

20           THE COURT:  Okay.  All right. Let me take a look at

21   the testimony, and then we'll -- am I correct it's Ms. Bronson

22   then Mr. Wiseman, or is it Bronson and then the legal assistant

23   paralegal.

24           MR. MEAD:  Ms. Bronson then Mr. Wiseman then

25   Mr. Acosta, but Acosta and Wiseman are both pretty short.

O9RBDAR3

1          THE COURT:  Okay.  Let's see, I'll take a look at the

2    testimony.  Is there anything else that we should take up

3    before we get the witness and the jury?

4          MR. MEAD:  Just two quick things, which we don't

5    necessarily need to resolve now, but I want to flag for the

6    Court.  We have one witness who cannot be here until Tuesday

7    morning.  That's Rosalind Brewer, we think we're likely to go

8    through the whole day on Monday or almost the entire day on

9    Monday, and then rest on Tuesday morning probably pretty early.

10   One option if the Court is able to do this is do a charge

11   conference Monday, break early for a charge conference on

12   Monday, and then we have a little bit more case on Tuesday.  We

13   could send the jury home.  The defense case would start, if

14   there is a defense case, and then we could close on Wednesday

15   morning first thing potentially.  I don't know if that is

16   something the Court has --

17         THE COURT:  Well, let me see, because I obviously

18   haven't gotten you the draft charge yet, so I don't know if

19   Monday is going to be doable for that.  But let me think about

20   that.  Probably not Monday, Mr. Mead, and also there's still a

21   lot of moving parts.  Obviously the government is winding down

22   its case, but the defense may be about to ramp up their case,

23   so let me think about that, but probably not.

24         MR. MEAD:  Understood.  And then as to the defense

25   closing.  The defense often makes arguments about you didn't

O9RBDAR3

1   hear from this witness and that witness and this witness.

2   Generally those arguments are somewhat appropriate and there's

3   a jury instruction that the Court gives about it.  I'm not sure

4   if the defense is planning to say you have not heard from

5   Calvin Darden, Sr., in their closing. We don't think that that

6   would be an appropriate argument for the defense to make in

7   this case where they have specifically moved to preclude him

8   from testifying in the case.

9         THE COURT:  Well, we can talk about that, but I think

10   part of the issue is, my understanding of their position is no

11   one could call him because he's not competent to testify.  With

12   regard to the sort of you haven't heard from this person, that

13   person, missing witness instruction.  I think even if neither

14   side was going to mention it, I think there are enough folks

15   that have been mentioned that haven't testified, including

16   Mr. Darden, Sr., that giving the instruction so the jury knows

17   they should just disregard that and just focus on whatever the

18   evidence is that's been put before them here in court.

19         So we can deal with the detail about that.  Let me

20   ask.  Does that mean, Mr. Mead, that at this stage the

21   government hasn't changed its view? It's not going to try to

22   get in the statement 302 I guess it was, or want me to have

23   some form of competency hearing of some sort to figure out

24   Mr. Darden, Sr.'s competence to testify?

25         MR. MEAD:  I don't think our view has changed, your

O9RBDAR3

Honor.  If we thought the defense was going to make this kind

of argument, we could conceivably move in, for example, the

medical records for Mr. Darden, Sr. showing his lack of

competence as an explanation for the jury in case they were

wondering.  We're currently not planning on doing that, but

it's something that we could do depending on where the Court

comes out on this.

          THE COURT:  Well, let me think about that.  Who's

going to be giving the summation on the defense side?

          MR. RICCO:  We haven't decided that yet.

          THE COURT:  All right.  Okay. I'm just smiling

cause -- yeah, okay.  I understand, there are different levels

of decisions.

          MR. RICCO:  Judge, I can just assure the Court we can

put the government to rest, we will not be making inappropriate

remarks in our closing argument.

          THE COURT:  Yeah.  I understand that.  But, you know,

let me think about it.  Look, I don't think it's going to be an

issue, but we just want to avoid anything where we have to

interrupt anybody's summation and come to sidebar.  Neither

side wants to do that.  Okay.  Can we get the jury?

          MR. MEAD:  Yes, your Honor.

          THE COURT:  All right.

          MR. MEAD:  Shall I get the witness, your Honor?

          THE COURT:  Yes, please.

O9RBDAR3

1          (Jury present)

2          THE COURT:  You may be seated.  Ladies and gentlemen,

3    I apologize.  There was some matters I needed to take up with

4    the attorneys, and that's why we're a little bit delayed in

5    starting after lunch.  But what I will say to you is that we're

6    making very good progress in the trial in terms of the

7    preparation of evidence.  So things are right on schedule or a

8    little ahead of schedule, so I'll be able to give you a better

9    sense of that next week.  Okay.  All right.  We're going to

10   continue with the testimony of Ms. Bronson.

11          Mr. Mead, you may continue.

12          MR. MEAD:  Put up Government Exhibit 1121, please

13   Mr. Ross.

14   Q.  Is this the chart we were looking at a little bit before we

15   broke for lunch, Ms. Bronson?

16   A.  Yes.

17   Q.  Generally what does this chart show?

18   A.  It shows some of the uses of the funds of the accounts that

19   we looked at earlier.

20   Q.  And generally speaking where did that money come from?

21   A.  Primarily the flow of funds from Dwight Howard.

22   Q.  And we've kind of been going through this whole list of

23   entries, right?

24   A.  Yes.

25   Q.  You remember what's the last one we did before we broke?

O9RBDAR3

1    A.  I believe it was Mindful Home.

2    Q.  Okay.

3         MR. MEAD:  Can you pull up Government Exhibit 606D in

4    evidence, please, Mr. Ross, and go to page four, please.

5    Q.  What's this?

6    A.  A check.

7    Q.  To who?

8    A.  Jesus Carillo.

9    Q.  And what's it say in the "from" in the top left?

10   A.  Calvin Darden and Calvin R. Darden.

11   Q.  What address?

12   A.  2716 Ridgewood Road Northwest, Atlanta, Georgia.

13   Q.  And what is it for?

14   A.  Landscaping.

15        MR. MEAD:  And page 11, please.

16   Q.  Who is this check to?

17   A.  Jesus Carillo.

18   Q.  For what?

19   A.  Landscaping.

20   Q.  How much money?

21   A.  $32,000.

22   Q.  Are there other checks to Jesus Carillo?

23   A.  Yes.

24        MR. MEAD:  Back to Government Exhibit 1121, please,

25   Mr. Ross.

O9RBDAR3

Q.   How much money in total was paid to Jesus Carillo?

A.   $89,440.

          MR. MEAD:  Mr. Ross, could you go to Government

Exhibit 713A at page 11, please.

Q.   You see at the top it says, By signing this agreement,

buyer and seller agree that they have each read and understood

this agreement and agreed to its terms?

A.   Yes.

          MR. MEAD:  Can you go to the next page, Mr. Ross.

Q.   Do you see it says --

          MR. MEAD:  Can you zoom in on starting with "this

exhibit" please.

Q.   Can you read that sentence.

A.   This exhibit is part of the agreement with an offer date of

February 8, 2021, for the purchase and sale of that certain

property known as 2716 Ridgewood Road, Northwest, Atlanta,

Georgia, 30327.

Q.   Thank you.

          MR. MEAD:  And now can you go back one page before to

page 11.

Q.   Do you see it says buyer acceptance and contact

information?

A.   Yes.

Q.   So let's start with the first one.

          Who is listed as the first buyer on here?

O9RBDAR3

1    A.   Calvin Darden, Jr.

2    Q.   And what address?

3    A.   45 Waterview Court, Staten Island, New York.

4    Q.   And what's the phone number?

5    A.   347-850-5686.

6    Q.   And what email address?

7    A.   Calvin@Dardenenterprises.com.

8    Q.   And then who's listed as buyer to?

9    A.   Calvin Darden, Sr.

10   Q.   Do you see the line where it says buyer's phone number?

11   A.   Yes.

12   Q.   Is that line for Calvin Darden, Sr., blank?

13   A.   Yes.

14        MR. MEAD:  Can you zoom out please Mr. Ross.

15   Q.   Do you see there's a signature block under each of these

16   people?

17   A.   Yes.

18   Q.   Do you see that there are signatures for Calvin Darden, Sr.

19   as buyer, Calvin Darden, Jr., as buyer and Jeff Fountain as

20   buyer's broker?

21   A.   Yes.

22   Q.   On the seller side, is anything filled in?  Strike that.

23        On the seller side on the right, are there any

24   signatures?

25   A.   No.

O9RBDAR3

1    MR. MEAD:  Let's now go to the beginning of this

2    document to page one please, Mr. Ross.

3    Q.  Do you see that the first line says counteroffer to or

4    modification of the unaccepted original offer?

5    A.  Yes.

6    Q.  Can you read the paragraph that begins, this is a

7    counteroffer, please?

8    A.  This is a counteroffer to or modification of as the case

9    maybe here and after collectively counteroffer.  The unaccepted

10   original offer set forth in the purchase and sale agreement

11   dated February 8, 2021, including all exhibits attached hereto

12   or incorporated by reference therein original offer for

13   property located at 2716 Ridgewood Road Northwest, Atlanta

14   Georgia.

15   Q.  And do you see where it says purchase price of property to

16   be paid by buyer?

17   A.  Yes.

18   Q.  What's that amount?

19   A.  $3,700,000.

20       MR. MEAD:  If you can zoom out, Mr. Ross.

21   Q.  Do you see holder of earnest money, do you see that box?

22   A.  Yes.

23   Q.  And it also says, who's listed as the holder of earnest

24   money?

25   A.  Weissman.

O9RBDAR3

Q.   And what's listed as the closing attorney/law firm?

A.   Weissman.

Q.   And how much earnest money is suppose to be paid?

A.   $100,000.

          MR. MEAD:   And then can you zoom in on kind of the
initials, buyer's initials.

Q.   Are you able to read that?

A.   Yes.

Q.   What's it say for buyer's initials?

A.   CDS.

Q.   Does it say CDJ anywhere on that page?

A.   No.

          MR. MEAD:   Let's go to page two of this document,
please.   Can you zoom in on other modification to the original
offer, please.

Q.   Can you please read everything but number three please
here?

A.   All parties agree cooperating brokerage compass Georgia
LLC/Fountain Group shall receive 3 percent commission ADCO
Property Management shall be referred to as seller and hereby
agree to perform the following work prior to the closing by
qualified professionals in the given field of expertise of the
work to be performed and complete in the timeliest fashion, but
will have to defer to the subcontractor's project timeline.

          Work will begin after the due diligence contingency is

O9RBDAR3

removed.  If the timeline exceeds the closing date, then at

such time the closing will be extended until the work is

completed.  Invoices provided and the work is signed off by the

buyer.  The work will be contracted and managed by ADCO

Properties and shall include:  Install a residential elevator

in the home that will service all three floors and shall not

exceed in cost to the builder $30,000.  Any additional monies

above and beyond $30,000 will be paid for by the buyer and

collected at the closing.

Interior finish will consist of a standard finish

elevator using a white paint finish and floor that matches the

rest of the floors.  Install mirror wall and rubber flooring in

bedroom closet to downstairs bar area for use as a home gym.

Install two chandeliers in main den area selected by and paid

for by the buyer.  Builder will facilitate and manage the

installation of a fence and gate to match neighbor's fence

chosen and will be paid for by the buyer to be installed by

Allied Fence company or a vendor chosen by the buyer.

Q.  And does modification number three say, All parties

recognize removal of Calvin Darden, Jr., from contract.  Calvin

Darden shall replace, and hence forth be recognized as buyer.

Did I read that right?

A.  Yes.

MR. MEAD:  Can you now go to page three, please.

Q.  And does this look like the document we looked at a few

O9RBDAR3

1    minutes ago?

2    A.  Yes.

3    Q.  But this time are there signatures for all of the people on

4    here?

5    A.  Yes.

6    Q.  Who's listed as the first buyer on this fully signed

7    document?

8    A.  Calvin Darden, Sr., sorry.  That's the signature.  The name

9    is Calvin Darden.

10   Q.  And the signature above him?

11   A.  Calvin Darden, Sr.

12        MR. MEAD:  Zoom out, please, for a second, Mr. Ross,

13   and get both the buyer blocks.

14   Q.  Is anyone listed as the second buyer on this page?

15   A.  No.

16   Q.  What phone number is listed for Calvin Darden, Sr., on this

17   contract?

18   A.  347-850-5686.

19   Q.  And is that the same phone number that was listed for

20   Calvin Darden, Jr., before he was removed from this contract?

21   A.  Yes.

22   Q.  Okay.

23        MR. MEAD:  Government Exhibit 713B, please, page one.

24   Q.  Do you see where it says property address here?

25   A.  Yes.

O9RBDAR3

Q.  What's the property address listed?

A.  2716 Ridgewood Road Northwest, Atlanta, Georgia.

        MR. MEAD:  And zoom out for a second.

Q.  Do you see it says borrower?

A.  Yes.

        MR. MEAD:  Both boxes for the borrower, please, if you could zoom out, Mr. Ross.

A.  Calvin Darden, 2716 Ridgewood Road, Northwest Atlanta, Georgia, Darden Enterprises LLC, 2716 Ridgewood Road, Northwest Atlanta, Georgia.

        MR. MEAD:  If could zoom out now Mr. Ross.

Q.  You see where it says sale price of property?

A.  Yes.

Q.  What's the sale price of property listed?

A.  $3,700,000.

Q.  You see where it says deposit?

A.  Yes.

Q.  What's the deposit listed?

A.  $100,000.

Q.  Go to page three, please.

        Do you see where it says due from borrower?

A.  Yes.

Q.  What amount is listed there?

A.  $665,765.20.

        MR. MEAD:  Can you pull up Government Exhibit 603H,

O9RBDAR3

1  please, Mr. Ross, and look at line nine, please.

2  Q.  Ms. Bronson, what is line nine showing?

3  A.  A $100,000 wire to Weissman, PC.

4  Q.  And does that correspond to the $100,000 in earnest money

5  in the contract we looked at?

6  A.  Yes.

7       MR. MEAD:  Can you go to Government Exhibit 604C,

8  please, at page 13, Mr. Ross.

9  Q.  What does this page show?

10  A.  This is a wire transfer form.

11  Q.  And who is the beneficiary?

12  A.  Weissman, PC.

13  Q.  Who is listed as the escrow attorney on the contract we

14  looked at?  We could pull it up again.

15       MR. MEAD:  If you could pull up side-by-side with this

16  document 713A at page one please, Mr. Ross.

17  Q.  Do you see where it says holder of earnest money and

18  closing attorney law firm on this document on the right?

19  A.  Yes.

20  Q.  Who is listed?

21  A.  Weissman.

22  Q.  Who is listed as the beneficiary name on the wire?

23  A.  Weissman, PC.

24  Q.  What is the amount of this wire?

25  A.  $665,696.04.

O9RBDAR3

1    Q.  Does that approximately match the amount due to the

2    borrower on the document we looked at a minute ago -- strike

3    that.

4            Does that amount in the wire approximately match the

5    amount due by the borrower on the document we just looked at?

6    A.  Approximately, yes.

7    Q.  Do you see the originator name?

8    A.  Yes.

9    Q.  What's listed?

10   A.  Calvin Darden.

11   Q.  Any senior or junior?

12   A.  No.

13   Q.  Do you see the call back if required line down below that?

14   A.  Yes.

15           MR. MEAD:  Can you zoom out of that box please

16   Mr. Ross.

17   Q.  Who's listed as the client name confirming the wire?

18   A.  Calvin Darden.

19   Q.  Any senior or junior?

20   A.  No.

21   Q.  You see the call back number listed?

22   A.  Yes.

23   Q.  Are you able to read it?  It's a little hard to read I

24   know?

25   A.  404-850-1779.

O9RBDAR3

1          MR. MEAD:  Can you pull up 604A and 604C, page 13

2     side-by-side, please, Mr. Ross.  And if you could zoom in on

3     the Calvin Darden, Jr. section, including the phone number in

4     604A please, Mr. Ross.  And then the call back number for the

5     $600,000 wire for the house in the bottom right please, Ms.

6     Ross.

7     Q.  What phone number is listed as belonging to Calvin Darden,

8     Jr., in the bank opening document on the left?

9     A.  440-850-1779.

10     Q.  And does that match the call back number used to pay for

11     the house?

12     A.  Yes.

13          MR. MEAD:  Back to Government Exhibit 1121 in evidence

14     please, Mr. Ross.

15     Q.  How much total was paid for the house purchase?

16     A.  $765,696.04.

17     Q.  And based on the documents we just looked at, is that just

18     a down payment or is that full payment for the house?

19     A.  It appears to be the down payment.

20     Q.  Where did the $765,000 as a down payment for the house,

21     where did that money primarily come from?

22     A.  Primarily from the Dwight Howard flow of funds.

23     Q.  How do you know that?

24     A.  Because I reviewed the bank supporting documentation, and

25     the accounts would have had to receive those funds in order to

O9RBDAR3

1   fund this purchase.

2            MR. MEAD:  Take this down, Mr. Ross.  And if you could

3   pull up Government Exhibit 1122 in evidence, please.

4   Q.  What does this chart show?

5   A.  This chart shows luxury good purchases that were made from

6   the accounts I analyzed.

7   Q.  And we're not going to look at all of this, but just a

8   couple of examples.  Do you see a September 17, 2020 payment?

9   A.  Yes.

10  Q.  And who is the recipient of that?

11  A.  G Fine Jewelers.

12  Q.  For how much money?

13  A.  $2,500.

14  Q.  Do you see a January 6, 2021 payment?

15  A.  Yes.

16  Q.  Who is the recipient?

17  A.  G and A Fine Jewelry.

18  Q.  Do you see an October 5, 2021 payment?

19  A.  Yes.

20  Q.  And who is the recipient?

21  A.  G and A Fine Jewelry.

22  Q.  How much money?

23  A.  $30,000.

24           MR. MEAD:  Page two of this document, Mr. Ross.

25  Q.  What is the total on the luxury good payments?

O9RBDAR3

1    A.  $91,148.09.

2           MR. MEAD:  Government Exhibit 1123 in evidence please

3    Mr. Ross.

4    Q.  What's this chart show?

5    A.  This chart shows payments for home related expenses.

6    Q.  With what money?

7    A.  With the use of primarily Dwight Howard funds.

8    Q.  Do you see a May 27, 2021 line on here?

9    A.  Yes.

10   Q.  What's that say?

11   A.  Luis Leon Chandelier Installation.

12   Q.  How much money?

13   A.  $3,500.

14   Q.  Do you see a June 7, 2021 line on there?

15   A.  Yes.

16   Q.  What's that say?

17   A.  Door Architects garage doors.

18   Q.  Do you see a June 16, 2021 line on there?

19   A.  Yes.

20   Q.  What's that say?

21   A.  Fitness Depot gym equipment.

22           MR. MEAD:  Page two, please, Mr. Ross.

23   Q.  Do you see a July 15, 2021 payment on here?

24   A.  Yes.

25   Q.  What's that say?

O9RBDAR3

A.   Chuck Krisp koi pond.

Q.   And do you see a February 3, 2022 on here.  I'm sorry, do you see two of them, right?

A.   Yes.

Q.   What are the two of them?

A.   One is to Chuck Krisp for $4,000, and another is to David Adams for front gate for $17,406.

          MR. MEAD:  Government Exhibit 1124 in evidence please Mr. Ross.

Q.   What does this chart shows?

A.   This chart shows payment to specific individuals with the use of the money received from Dwight Howard.

Q.   Do you recall off the top of your head the day that the Legacy AC account got $4 million from Dwight Howard?

A.   I believe it was November 13, 2020.

Q.   Can you describe the outgoing payments that also happened on November 13, 2020 right after getting the $4 million?

A.   There were four, two of them were to LNPaulk for a total of $10,000.  One was to Medina Jenise for $5,000, and one was to Trevor Baldwin for $10,000.

Q.   Do you see a February 7th payment to Osman Kocic on this chart, a December 7, 2020 payment to Osman Kocic on this chart?

A.   Yes.

Q.   And how much was that?

A.   $39,600.

O9RBDAR3

1    Q.  And do you see a December 23, 2020 payment on here?

2    A.  Yes.

3    Q.  How much was that?

4    A.  It was $30,000 to Selim Rusi.

5         MR. MEAD:  And page three of this document please,

6    Mr. Ross.

7    Q.  Do you see a May 12, 2021 payment to Suhaine Pedroso on

8    here?

9    A.  Yes.

10   Q.  How much was that?

11   A.  $70,000.

12   Q.  Do you see a May 18, 2021 payment on here as well?

13   A.  Yes.

14   Q.  How much is that one?

15   A.  $40,000.

16        MR. MEAD:  Can you go to page six of this document

17   please, Mr. Ross.

18   Q.  What's the total on these payments to individuals?

19   A.  $692,469.10.

20   Q.  And where primarily did the money for these payments come

21   from?

22   A.  Primarily from the wires received from Dwight Howard.

23        MR. MEAD:  Can we go back to Government Exhibit 1121

24   in evidence.

25   Q.  Is the total for miscellaneous luxury goods listed on this

O9RBDAR3

1    chart?

2    A.  Yes.

3    Q.  Is the miscellaneous home expenses listed on this chart?

4    A.  Yes.

5    Q.  Are the payments for miscellaneous individuals listed on

6    this chart?

7    A.  Yes.

8    Q.  And again what's the total amount of money spent here?

9    A.  From the total chart?

10   Q.  Yes, Ms. Bronson.

11   A.  $6,149,133.95.

12   Q.  And where primarily did the $6,150,000 to make those

13   payments come from?

14   A.  The Dwight Howard funds.

15   Q.  In the bank records you looked at, did any of the money go

16   back to Dwight Howard.

17   A.  No.

18   Q.  We've been talking a lot about the money from Dwight

19   Howard, right?

20   A.  Yes.

21   Q.  Did you also examine bank records to determine what

22   happened to $1 million from Chandler Parsons?

23   A.  Yes.

24   Q.  I promise you, Ms. Bronson, this part is much faster than

25   the last part.

O9RBDAR3

1          MR. MEAD:  Can you go to Government Exhibit 1132,

2     Mr. Ross, in evidence.

3     Q.  What does this chart show?

4     A.  This chart shows the million dollars that was sent by

5     Chandler Parsons and where the funds went after that.

6     Q.  So can you kind of walk us through it step by step starting

7     with the arrow at the top, please?

8     A.  Yes. The arrow at the top shows the million dollars sent

9     from Chandler Parsons' Morgan Stanley account on November 20,

10    2019, to the Briscoe Sports Group Bank of America account.

11         After that, the Briscoe Sports Group account sent

12    $544,000 on November 21, 2019, to the Legacy AC/LLC Wells Fargo

13    account.  And on the same day it sent $306,642 to Blue Equity

14    Sports Television to a Chase Bank account.

15    Q.  How soon after receiving the million dollars from Chandler

16    Parsons did the Briscoe Sports Group account make those two

17    payments?

18    A.  The next day.

19    Q.  And how much money did the Briscoe Sports Group Bank

20    account have before getting $1 million from Chandler Parsons?

21    A.  Approximately $13,000.

22    Q.  So where did the money for -- strike that.

23         Where did the $544,000 for Legacy AC come from?

24    A.  Primarily from the million dollars sent by Chandler

25    Parsons.

O9RBDAR3

1   Q.   And where did the $306,000 for Blue Equity Sports

2   Television come from?

3   A.   Primarily from the million dollars sent by Chandler

4   Parsons.

5   Q.   And how do you know that those two wires must have

6   primarily come from the $1 million from Chandler Parsons?

7   A.   Because the Briscoe Sport Group only had approximately

8   $13,000 in it two days before those transactions were made.

9   Q.   Now, the Legacy AC/LLC account in the bottom left, is that

10  the same account we were talking about earlier that got money

11  from Dwight Howard?

12  A.   Yes.

13  Q.   And what happens first, the Chandler Parsons money or the

14  Dwight Howard money?

15  A.   The Chandler Parsons money.

16  Q.   And how much earlier is the Chandler Parsons money come in?

17  A.   About ten months earlier.

18          MR. MEAD:   Can you go to Government Exhibit 601P

19  please in evidence, page 79, Mr. Ross.

20  Q.   What kind of document is this?

21  A.   This is a Bank of America bank statement.

22  Q.   For what bank account?

23  A.   For the Briscoe Sports Group, LLC account.

24  Q.   And can you go to page 81.  Sorry, what date is this

25  particular statement for?

O9RBDAR3

1  A.  November 1, 2019 to November 30, 2019.

2          MR. MEAD:  Can you go to page 81 of this document

3  please, Mr. Ross.

4  Q.  Do you see that 11/2019 incoming transaction?

5  A.  Yes.

6  Q.  What does that show?

7  A.  That is the wire from Chandler Parsons for a million

8  dollars.

9  Q.  How you do know it's from Chandler Parsons?

10  A.  It says Orig or ORIG, and that is the originator.

11  Q.  And what name is listed after that?

12  A.  Chandler Parsons.

13  Q.  What's it mean to originate a wire?

14  A.  You're the individual or business sending the funds.

15          MR. MEAD:  Government Exhibit 602C-2 in evidence,

16  Mr. Ross.

17  Q.  What's this?

18  A.  This is a wire transaction report.

19  Q.  And what's it show?

20  A.  It shows the wire from Briscoe Sports Group LLC to Legacy

21  AC/LLC for $544,000.

22  Q.  On what date?

23  A.  November 21, 2019.

24  Q.  And I'm not going to ask you to read all the addresses, but

25  the debit address, the credit address, the remitter bank

O9RBDAR3

1    address and the beneficiary address all addresses in Manhattan?

2    A.   Sorry.  Can you repeat the question.

3    Q.   Sure.  Is the debit address listed here in Manhattan?

4    A.   Yes.

5    Q.   Is the credit address listed here in Manhattan?

6    A.   Yes.

7    Q.   Is the remitter bank address listed here in Manhattan?

8    A.   Yes.

9    Q.   Is the beneficiary address listed here in Manhattan?

10   A.   Yes.

11          MR. MEAD:  Can you go to Government Exhibit 1134 in

12   evidence, please, Mr. Ross.

13   Q.   Have we looked at charts like this before, Ms. Bronson?

14   A.   Yes.

15   Q.   Which account is this for?

16   A.   The Legacy AC/LLC Wells Fargo account.

17   Q.   Is this for a chart for the Chandler Parsons money or the

18   Dwight Howard money?

19   A.   The Chandler Parsons money.

20   Q.   When did this Legacy AC account get open?

21   A.   August 15, 2017.

22   Q.   Who is the signatory on it?

23   A.   Trevor A. Baldwin.

24   Q.   When did he get money in the Chandler Parsons flow of

25   funds?

O9RBDAR3

1    A.  November 21, 2019.

2    Q.  How much money?

3    A.  $544,000.

4    Q.  How much money did this Legacy AC account have before

5    getting $544,000 in the Chandler Parsons flow of funds?

6    A.  $7,418.64.

7    Q.  What time period does this chart cover?

8    A.  It covers from November 21, 2019 to August 27, 2020.

9    Q.  Is that what's shown in the little asterisk in the bottom

10   right?

11   A.  Yes.

12   Q.  Does it end at 8/27/2020 as the account starts getting

13   Dwight Howard money right after that?

14   A.  Yes.

15   Q.  This chart is about money going into this account, right?

16   A.  Yes.

17   Q.  Did you also look at money going out of this account?

18   A.  Yes.

19          MR. MEAD:  Government Exhibit 1130-1, please,

20   Mr. Ross.  Just a minute, ladies and gentlemen.

21   Q.  What does this chart show?

22   A.  This is a summary of the Legacy AC Wells Fargo account uses

23   of the Parsons funds.

24          MR. MEAD:  Just for the record, this is Government

25   Exhibit 1131.  If you could zoom out a tiny bit, Mr. Ross.

O9RBDAR3

Q.   Remind us what this chart shows?

A.   This is a summary of the Legacy AC/LLC Wells Fargo account

uses of the Parsons funds.

Q.   And what's the first line on there?

A.   SZ plus Acosta.

Q.   How much money?

A.   $244,582.

Q.   I'm not going to go through all of these, but what is the

total of all these amounts?

A.   $502,480.60.

Q.   And what is the time period that this chart is limited to?

A.   November 21, 2019 to February 18, 2020.

Q.   Where did the money to make these payments on this chart

come from?

A.   Primarily the funds sent by Chandler Parsons.

Q.   How do you know?

A.   I reviewed the bank statements and the account only

received probably a couple hundred thousand dollars in addition

to the money sent from the Chandler Parsons flow of funds.

         MR. MEAD:  Can you go to Government Exhibit 1133,

Mr. Ross.

Q.   What does this chart show?

A.   It shows some of the outgoing transactions from the Legacy

AC/LLC account after receiving the $544,00 from Briscoe Sports

Group.

O9RBDAR3

1  Q.  Does it show every outgoing transaction?

2  A.  No.

3  Q.  How is it limited?

4  A.  It's limited to a thousand dollars and above.

5       MR. MEAD:  Can you zoom in just on the top a little

6  bit, please, Mr. Ross.

7  Q.  And what does this top arrow show?

8  A.  It shows the $544,000 sent by Briscoe Sports Group to

9  Legacy AC/LLC.

10      MR. MEAD:  Zoom out, please, Mr. Ross.

11 Q.  And are all the other arrows money going out of the Legacy

12 AC account?

13 A.  Yes.

14 Q.  You see some of the arrows are blue?

15 A.  Yes.

16 Q.  Do those blue arrows correspond to that list of totals that

17 we just looked at a minute ago?

18 A.  Yes.

19 Q.  So let's start going through some of these blue arrows?

20      MR. MEAD:  If you could zoom in on the left quarter of

21 this chart please Mr. Ross.

22 Q.  What are the first two arrows?

23 A.  They are payments to SZ Motor Cars for a total of

24 approximately $194,000.

25 Q.  What's the next payment?

O9RBDAR3

1  A.  A payment to JD watches for $84,500.

2  Q.  On what date?

3  A.  On November 1, 2019.

4       MR. MEAD:  Let's go to Government Exhibit 602-D at

5  page nine, Mr. Ross.

6  Q.  What's this document?

7  A.  This is a copy of a check.

8  Q.  And is it a copy of a check that matches the blue arrow to

9  JD Watches we were just looking at?

10 A.  Yes.

11 Q.  What does this check show?

12 A.  It shows the $88,500 sent to JD Watches from Legacy AC/LLC.

13 Q.  What is date on this check?

14 A.  November 21, 2019.

15 Q.  What is the date in which the Legacy AC account that wrote

16 this check got $544,000 as part of the Chandler Parsons flow of

17 funds?

18 A.  November 21, 2019.

19 Q.  So the check was written the same day the account got the

20 money?

21 A.  Yes.

22      MR. MEAD:  Can you go to Government Exhibit 897 in

23 evidence, please.  Can you zoom in on the top half of this

24 piece of paper, please.

25 Q.  You see the website up at the top left?

O9RBDAR3

1   A.   Yes.

2   Q.   What's it say?

3   A.   WWW.JDWatches.com.

4   Q.   And does that appear to match that name on the check?

5   A.   Yes.

6   Q.   What is the billing address on here?

7   A.   Legacy AC/LLC 45 West 132nd Street New York, New York.

8   Q.   What phone number?

9   A.   347-850-5686.

10  Q.   What shipping address is listed here?

11  A.   Legacy AC/LLC, 45 West 132nd Street, New York, New York.

12  Q.   Phone number?

13  A.   347-850-5686.

14  Q.   What's the order date in the top right-hand corner of the

15  invoice?

16  A.   November 21, 2019.

17  Q.   Does that match the date of the check we just looked at?

18  A.   Yes.

19  Q.   Does it also match the date that the Legacy AC/LLC got

20  $544,000 from the Chandler Parsons flow of funds?

21  A.   Yes.

22  Q.   Can you read the description of the two watches on this

23  invoice and their prices, please?

24  A.   The first one is a Rolex 44 millimeter.  The second --

25  sorry you said prices as well?

O9RBDAR3

1    Q.  Yes, please.

2    A.  That one is for $31,000.  And the second one is a Audemars

3    Piguet, 41 millimeter for $57,500,000.

4           MR. MEAD:  Can you go back to Government Exhibit 1133

5    please.  Let's zoom in on the left-hand corner or so.

6    Q.  What's the next wire after the JD Watches wire?

7    A.  A payment to Darrow Consulting Corporation for

8    approximately $55,000.

9    Q.  What's the date on that wire?

10   A.  November 21, 2019.

11   Q.  Is that the very same day this account got the money in the

12   Chandler Parsons flow of funds?

13   A.  Yes.

14          MR. MEAD:  Can you go to Government Exhibit 2419 in

15   evidence please at page two, Mr. Ross.

16   Q.  What's the name of the company at the top left?

17   A.  Darrow Consulting Corporation.

18   Q.  And does that name match the name of the company that got

19   the $55,000?

20   A.  Yes.

21   Q.  Who's listed as the client?

22   A.  Darden Enterprises, Inc.

23   Q.  Can you read the address?

24   A.  1330 Avenue of Americas, Suite 23A, New York, New York.

25   Q.  What's the total amount on the invoice?

O9RBDAR3

1   A.  $75,000.

2   Q.  And do you see where it says under vendor description, 90

3   days past due, 120 days past due, 150 days past due?

4   A.  Yes.

5         MR. MEAD:  Mr. Ross, take this down and go to

6   Government Exhibit 1133, please, Mr. Ross.  And if you could

7   zoom in on the left-hand quarter or so.

8   Q.  What's the next wire after the Darrow Consulting

9   Corporation?

10  A.  It's a payment of 50,000 to Jeffrey Acosta.

11  Q.  And then are there about $41,000 to random properties.

12  A.  Yes.

13  Q.  About $25,000 to Calvin Darden?

14  A.  Yes.

15  Q.  About $9,000 to Suhai 7 via Paypal?

16  A.  Yes.

17  Q.  About $5,000 LNPaulk via Paypal?

18  A.  Yes.

19  Q.  What date was that wire to LNPaulk via Paypal sent?

20  A.  November 21, 2019.

21  Q.  What's the significance of that date?

22  A.  It's the same day the Legacy AC account received the

23  $544,000 from the Chandler Parsons flow of funds.

24        MR. MEAD:  Can you zoom out please and capture the

25  next quarter or so of this chart Mr. Ross of the blue arrows.

O9RBDAR3

1  Q.  Does the next group of blue arrows show about 11 or $12,000

2  to Best Buy?

3  A.  Yes.

4  Q.  And then almost $4,000 to Bose Corp?

5  A.  Yes.

6  Q.  And then about $3,000 to Suhaine Pedroso?

7  A.  Yes.

8  Q.  And then about $8,000 G Fine Jewelers?

9  A.  Yes.

10         MR. MEAD:  And if we could finish it off whatever is

11  left, Mr. Ross.

12  Q.  About $4500 for auto sports?

13  A.  Yes.

14  Q.  About $3,000 to Royal Caribbean?

15  A.  Yes.

16         MR. MEAD:  And go back to Government Exhibit 1131.

17  Q.  What was the total amount that was spent in those blue

18  arrows?

19  A.  $502,480.60.

20  Q.  In the bank records that you looked at did any of the money

21  go to James Wiseman?

22  A.  No.

23  Q.  Did any of it go back to Chandler Parsons?

24  A.  No.

25         MR. MEAD:  No further questions.  Thank you,

O9RBDAR3                        Bronson - Cross

1    Ms. Bronson.

2            THE COURT:  Cross-examination.

3    CROSS-EXAMINATION CONTINUED

4    BY MR. RICCO:

5    Q.  Good afternoon.

6    A.  Good afternoon.

7            MR. RICCO:  Can we put the chart up.  Thank you.

8    Q.  You of course developed the charts, right?

9    A.  Yes.

10   Q.  And the charts help in your testimony to the jury, right?

11   A.  Yes.

12   Q.  To explain the flow of money, right?

13   A.  Yes.

14   Q.  It takes us from one point to the next to the next to the

15   next, correct?

16   A.  Yes.

17   Q.  And in addition to that, we also get a timeline, right?

18   A.  Correct.

19   Q.  And from those timelines it allows you as a witness to come

20   to certain conclusions, right?

21   A.  Sorry.  Can you rephrase the question.

22   Q.  From the timelines you're able to look at the forensic

23   evidence and come to some conclusions about where the money

24   started and where it went, right?

25   A.  Yes.

O9RBDAR3                    Bronson - Cross

1   Q.  So, for example, Mr. Mead said to you, well, did any of the

2   money go back to Dwight Howard, right?  You are able to say,

3   no, right?

4   A.  Yes.

5   Q.  Because you follow the timeline, right?

6   A.  Yes.

7   Q.  And in that timeline you were able to infer information

8   that assisted you in the conclusions that you would ultimately

9   reach, correct?

10  A.  Yes.

11  Q.  And so we can agree that when you're reviewing evidence,

12  the timeline becomes very important, correct?

13  A.  Yes.

14  Q.  Now, the chart, the flow helped you determine how the money

15  was transferred, correct?

16  A.  Yes.

17  Q.  But not why, correct?

18  A.  Correct.

19          MR. RICCO:  Thank you.  No further questions.

20          THE COURT:  Okay.  Any redirect?

21          MR. MEAD:  No, your Honor.

22          THE COURT:  Okay.  Thank you, Ms. Bronson.  You may

23  step down.

24          (Witness excused)

25          MR. MEAD:  With the Court's permission, I'm going to

O9RBDAR3                      Wiseman- Direct

1   put this away, and the easel.

2            THE COURT:  Yes.  You can put it away.  Okay.  The

3   government's next witness.

4            MR. KINDER:  The government calls James Wiseman.

5            THE COURT:  My deputy clerk Ms. Disla is going to

6   administer the oath and then you can have a seat.

7   JAMES WISEMAN,

8         called as a witness by the Government,

9         having been duly sworn, testified as follows:

10           THE COURT:  Mr. Wiseman, have a seat.  Make yourself

11  comfortable.  I know it's a little tight in there for you.  If

12  I could ask you to state your name and spell it for the record.

13           THE WITNESS:  James Wiseman, J-A-M-E-S, W-I-S-E-M-A-N.

14  DIRECT EXAMINATION

15  BY MR. KINDER:

16  Q.  Good afternoon.  Mr. Wiseman.

17  A.  Good afternoon.

18  Q.  What do you do for a living?

19  A.  I'm a professional basketball player.

20  Q.  Who do you play for?

21  A.  Indiana Pacers.

22           THE COURT:  A little slower and maybe scooch the

23  microphone a little closer.

24  Q.  You play for the Indiana Pacers?

25  A.  Yes.

1    Q.  And that's a team in the NBA?

2    A.  Yes, sir.

3    Q.  When did you join the NBA?

4    A.  I joined the NBA in 2020.

5    Q.  Starting with 2020, can you explain what NBA teams you have

6    played for and in what years?

7    A.  Yes, sir.  I played with Garden State Warriors for three

8    years, played with Detroit for two years, and I'm going on my

9    six year with Indiana Pacers.

10   Q.  When did you start playing for the Indiana Pacers?

11   A.  I stated playing with the Indiana Pacers this past summer I

12   signed with them.

13   Q.  When you came into the NBA, did you participate in the NBA

14   draft?

15   A.  Yes, sir.

16   Q.  What number were you picked in the draft?

17   A.  Number two.

18   Q.  What team picked you?

19   A.  Garden State Warriors.

20   Q.  Are you represented by a sports agent?

21   A.  Yes, sir.

22   Q.  Who is your agent?

23   A.  Jeff Schwartz.

24   Q.  What agency does he work for?

25   A.  Excel Sports Management.

1   Q.  Have you ever been represented by an agent other than Jeff

2   Schwartz?

3   A.  No, sir.

4   Q.  Who made the decision to hire Jeff Schwartz?

5   A.  That was my decision.

6   Q.  Do you recall about when you hired Jeff Schwartz?

7   A.  I hired Jeff Schwartz in 2020 as I was transitioning into

8   the NBA.

9   Q.  When you were transitioning into the NBA, did you make an

10  announcement that you planned to enter the NBA?

11  A.  Yes, sir.

12  Q.  After you made that announcement, did you start receiving a

13  salary immediately or did you have to wait until you signed

14  with a team?

15  A.  Originally during that time when I was training, Excel

16  Sports and just other draftees during that time, and it was

17  Covid, that's when we were able to get apartments and be able

18  to work out, yeah.

19  Q.  Just so I understand, when did you first begin receiving a

20  salary for playing professional basketball, was that after you

21  signed with a team or before?

22  A.  After.

23  Q.  And before you signed with a team, was there anyone who

24  paid for living or training expenses?

25  A.  Really mostly Excel.

1    Q.  Excel Sports your agents?

2    A.  Yes, sir.

3             MR. KINDER:  Can we please publish what's in evidence

4    as Government Exhibit 2510, please.

5    Q.  Mr. Wiseman, before preparing to testify in this case, had

6    you ever seen this document?

7    A.  No, sir.

8    Q.  We'll come back to this page in a moment.

9             MR. KINDER:  Can we please go to page two of this

10   document.

11   Q.  Mr. Wiseman, can you read the heading that appears in the

12   yellow band at the top?

13   A.  NBPA Standard Player Agent Contract.

14   Q.  And I'm going to read the first line of text. Agreement

15   made this day of, by and between, and then there are two names.

16   Do you see those names?

17   A.  Yes, sir.

18   Q.  What are those two names?

19   A.  Charles Briscoe James Wiseman.

20   Q.  Before preparing to testify in this case, had you ever seen

21   this document?

22   A.  Never seen it.

23   Q.  I'm going to read from the -- you see the heading midway

24   down the page, Contract Services?

25   A.  Yes, sir.  (Continued on next page)

O9RJDAR4                          Wiseman – Direct

1    BY MR. KINDER:

2    Q   I'm going to read the first paragraph.  "Commencing on the

3    date of this agreement, the player agent agrees to represent

4    the player to the extent requested by the player in conducting

5    individual compensation negotiations or in assisting, advising,

6    or counseling the player in connection with individual

7    compensation negotiations for the performance of the player's

8    services as a professional basketball player with the player's

9    NBA team."

10          We can zoom out.

11          Mr. Wiseman, did you ever enter into an agreement with

12   a person named Charles Briscoe?

13   A   No, sir.

14   Q   Do you know a person named Charles Briscoe?

15   A   No, sir.

16   Q   Do you recall ever meeting a person named Charles Briscoe?

17   A   No, sir.

18          MR. KINDER:  Can we go to page 4, please.  And let's

19   zoom in on the top third of the page.

20   Q   Just above the line that says four percent, the text reads,

21   "The parties hereto have agreed to the following fee not to

22   exceed the maximum amount stated above."

23          And the lower right-hand portion you see there are

24   spaces for initials, Mr. Wiseman, you see that?

25   A   Yes, sir.

O9RJDAR4                      Wiseman – Direct

1    Q   And the top line has the initials "JW"?

2            You have to say yes or no.

3    A   Yes, sir.

4    Q   And those are your initials, right?

5    A   Yes, sir.

6    Q   Did you initial this document?

7    A   No, sir.

8    Q   Okay.  Did you ever authorize anyone to initial this

9    document on your behalf?

10   A   No, sir.

11           MR. KINDER:  Page 7, please.  Can we zoom in

12   beginning -- let's capture the "examine this contract" and the

13   rest of the text.

14   Q   Midway down the page, there's the language the matter the

15   here to have here under signed their names.  You see that,

16   Mr. Wiseman?

17   A   Yes, sir.

18   Q   There are three signatures lines?

19   A   Yes, sir.

20   Q   In the middle signature line, what is the name that is

21   written there?

22   A   James Wiseman.  It's my signature.

23   Q   Did you sign this document?

24   A   No, sir.

25   Q   Is that how you sign documents, that font?  That

1    handwriting?

2    A    No.

3    Q    Did you authorize anyone to sign this document on your

4    behalf?

5    A    No, sir.

6    Q    The name that appears below yours on this document, can you

7    read that name?

8    A    Donzaleigh Artis.

9    Q    Who is that?

10   A    My mother.

11   Q    Are you familiar with your mother's signature?

12   A    Yes, sir.

13   Q    Is that your mother's signature?

14   A    No, sir.

15            MR. KINDER:  Can we go back to page 1, please.  And

16   can we zoom in on the text at the very top band there.

17   Q    Mr. Wiseman, can you read the text that appears in the "to"

18   line?

19   A    James Wiseman, charles@briscoesports.com.

20   Q    Mr. Wiseman, have you ever used the email address

21   charles@briscoesports.com to receive emails?

22   A    No.

23            MR. KINDER:  We can take that down.

24   Q    Mr. Wiseman, do you know someone named Calvin Darden, Jr.?

25   A    No.

1   Q   Did you ever speak to someone named Calvin Darden, Jr.

2   about what sports agent to hire?

3   A   No.

4   Q   Do you know Dwight Howard?

5   A   I know of him, but I don't know him personally.

6   Q   Have you ever met Dwight Howard?

7   A   No really, just on the court my rookie year when I played

8   against him.  Other than that, no, sir.

9   Q   You played basketball against him and met him in that

10  context?

11  A   Yeah.

12  Q   But not otherwise?

13  A   No.

14  Q   Do you know of a person named Chandler Parsons?

15  A   Same thing.  I know of him, but I don't know him

16  personally.

17  Q   Who is he?

18  A   Basketball player played in the league for a couple years,

19  NBA.

20  Q   Is he playing in the league still?

21  A   No.

22  Q   Do you recall ever meeting Chandler Parsons?

23  A   No.

24  Q   Did you ever receive any payment from Chandler Parsons?

25  A   No.

O9RJDAR4                        Wiseman - Direct

1    Q    Want to turn back to Charles Briscoe.  Did you ever receive

2    any payment from Charles Briscoe?

3    A    No.

4    Q    Did you ever receive any payment from Briscoe Sports Group?

5    A    No.

6              MR. KINDER:  One moment, your Honor.

7              Can we please bring up what's in evidence as

8    Government Exhibit 13.

9    Q    Mr. Wiseman, do you recognize this person?

10   A    No.

11             MR. KINDER:  We can take that down.

12   Q    Turning back to Calvin Darden, Jr., did you ever receive

13   any payment from him?

14   A    No.

15   Q    Did you ever receive any payment from a company called

16   Darden Enterprises?

17   A    No.

18   Q    Did you ever receive any payment from a company called

19   Darden Sports Group?

20   A    No.

21   Q    Did you ever receive any payment from a company called

22   Legacy AC LLC?

23   A    No.

24             MR. KINDER:  Your Honor, I request that the defendant

25   be asked to stand.

O9RJDAR4                        Wiseman - Cross

1                THE COURT:  Sure.  Okay.

2    Q    Mr. Wiseman, do you recognize this individual?

3    A    No.

4                THE COURT:  All right.  You can be seated.

5                MR. KINDER:  No further questions.

6                THE COURT:  Okay.  Any cross-examination?

7                MR. RICCO:  Thank you, Judge.

8    CROSS-EXAMINATION

9    BY MR. RICCO:

10   Q    Good afternoon.

11   A    Good afternoon.

12   Q    I'm smiling because you're a lot taller in person than you

13   are on television.

14   A    Yes, sir.

15   Q    I just want to ask you a couple of questions, no sucker

16   questions, just a few questions.

17   A    Okay.

18   Q    All right.  So you went into the NBA as a teenager, right?

19   A    Yes, sir.

20   Q    And you got to play with legendary people, Lebron James and

21   individuals like that, right?

22   A    Yes, sir.

23   Q    So what was it like to be on the Court with Lebron James?

24               MR. KINDER:  Objection, your Honor.

25               THE COURT:  Well, I'll allow it.  I'll allow it.

O9RJDAR4                    Wiseman - Cross

1    A    He a legend.  Be on the court with him, play against him,

2    it's fun.

3    Q    You ever get a chance to dunk on him?

4    A    Put-back dunk.

5    Q    Okay.  Counts, right?

6         I take it that you've enjoyed the opportunity to play

7    in the NBA?

8    A    Yes, sir.

9    Q    Has it been what you expected it to be?

10   A    It's been what I expected to be.  Of course playing against

11   high level athletes, it's going to be way more difficult, but

12   being able to be out there and play is fun.

13   Q    And during the course of your playing, I think you told us

14   that you have one agent, right?

15   A    Yes.

16   Q    And it's a good person, right?

17   A    Great person.

18   Q    Right.  And has looked out for you, right?

19   A    Yes.

20   Q    And I think you said you've been six years now with the

21   Pacers?

22   A    Six years in the league.

23   Q    In the league six years.  You've been a little older.  And

24   you were with the Pacers from when to when?

25   A    Just signed this summer.

O9RJDAR4                    Wiseman – Cross

1    Q   Oh, this summer, okay.  All right.  And.

2            You're able to talk about your experiences with your

3    agent, right?

4    A   Yes.

5    Q   And you rely on them, right?

6    A   Nah.

7    Q   Oh, you don't?  All right.

8            Well, you talk about things with your agent, right?

9    A   Yeah.

10   Q   Okay.  But at the end of the day, you make your own

11   decisions I would take it, right?

12   A   Yes, sir.  As a man I make my own decisions.

13   Q   That's right.

14           And are you looking forward to continuing in the NBA?

15   A   Yes, sir.

16   Q   All right.  Are you enjoying the life that it has brought

17   you?

18   A   I'm enjoying it.

19   Q   Okay.  Now, do you plan to go back to school?

20   A   In the future yes, sir.

21   Q   All right.  Now, I see you smile, right, but make sure you

22   go back to school, okay?  Because at some point all of that NBA

23   stuff is going to come to an end, and when it does, you're

24   going to need to fall back on your education.

25   A   No doubt.

O9RJDAR4                          Acosta - Direct

1    Q    All right.  Thank you for coming in.  Enjoy your career.

2    A    Yes, sir.  Thank you.

3              MR. RICCO:  Yes, sir.

4              THE COURT:  Any redirect?

5              MR. KINDER:  No, your Honor.

6              THE COURT:  Okay.  Thank you very much, Mr. Wiseman.

7    You can step down.

8              (Witness excused)

9              THE COURT:  Okay.  The government's next witness?

10             MR. KINDER:  The government calls Jeffrey Acosta.

11   JEFFREY ACOSTA,

12        called as a witness by the Government,

13        having been duly sworn, testified as follows:

14             THE COURT:  Thank you.  You may inquire.

15   DIRECT EXAMINATION

16   BY MR. KINDER:

17   Q    Good afternoon, Mr. Acosta.

18   A    Good afternoon.

19   Q    What do you do for a living?

20   A    I wholesale vehicles.

21   Q    And when you say "I wholesale vehicles" you mean you sell

22   cars?

23   A    Yes, to dealers.

24   Q    You sell cars to dealers.  That's what makes it wholesale?

25   A    Yes.

O9RJDAR4                      Acosta - Direct

1   Q   In 2018, what were you doing for work?

2   A   I had just opened my own business.

3   Q   What was the business?

4   A   Luxury dealership.

5   Q   A luxury car dealership?

6   A   Yes, sir.

7   Q   Was that also a wholesale dealership?

8   A   No, strictly retail.

9   Q   Retail.

10          Can you explain for the jury what is retail car sales,

11  as opposed to wholesale?

12  A   Wholesale you sell to other dealers through auctions or

13  directly.  Retail you're selling directly to the end user.

14  Q   The end user being someone who wants to come buy a car for

15  their personal use?

16  A   Correct.

17  Q   What was the name of your business?

18  A   SZ Motorcars.

19  Q   Where was it located?

20  A   Woodbury, Long Island.

21  Q   And were there particular types of cars that SZ Motorcars

22  specialized in?

23  A   Mostly luxury vehicles.

24  Q   Did there come a time when you sold a car for Calvin

25  Darden, Jr.?

1    A    Yes.

2    Q    About when was that?

3    A    About a year or so after I had bought the business.

4    Q    What kind of car did you sell to Calvin Darden, Jr.?

5    A    Mercedes-Benz.

6    Q    What was the model of Mercedes?

7    A    G63.

8    Q    Mercedes G63?

9    A    Yes.

10   Q    Do you recall how he paid you?

11   A    He paid in cash.

12   Q    And in the car business what does it mean to pay in cash?

13   A    That there's no financing, so typically they write a check

14   for it.

15   Q    And did Calvin Darden, Jr. write a check to buy the

16   Mercedes?

17   A    Yes.

18             MR. KINDER:  Can we please publish 602D-2 in evidence.

19             Mr. Acosta, I'll ask you to take a look at this, and

20   Mr. Ross, can you please scroll through a couple of the pages.

21   And then can we go back to the top.

22   Q    Mr. Acosta, well, the exhibit we just clicked through has a

23   series of three checks; is that right?

24   A    Yes.

25   Q    Do you recognize these checks?

1    A    Yes.

2    Q    Do they relate to a particular car transaction?

3    A    Yes.

4    Q    What car transaction?

5    A    The G63 that we're talking about.

6    Q    The Mercedes G63 that you sold to Calvin Darden, Jr.?

7    A    Correct.

8    Q    Taking a look at this first page, who is this check made

9    out to?

10   A    Me.

11   Q    And can you read your name?

12   A    Jeffrey Acosta.

13   Q    What's the date of the check?

14   A    December 9, 2019.

15   Q    And how much is it for?

16   A    50,000.

17   Q    And who is the check written from?

18   A    Legacy AC.

19   Q    Legacy AC LLC?

20   A    Correct.

21   Q    Do you know what Legacy AC LLC is?

22   A    No.

23   Q    Did Mr. Darden tell you anything about who this check was

24   from?

25   A    No, he just said it was his company.

O9RJDAR4                          Acosta - Direct

1    Q   He said that the check was from his company?

2    A   Yes.

3              MR. KINDER:   Can we go to page 2, please.  I'm sorry

4    let's go back to page 1.

5    Q   Just to be clear, did you receive this check?

6    A   Yes.

7    Q   And who did you receive it from?

8    A   Calvin.

9    Q   Calvin Darden, Jr.?

10   A   Yes.

11   Q   Next page, please.

12             This is a check to SZ Motorcars for $144,582.  Did I

13   read that right?

14   A   Yes.

15   Q   And the date is December 9, 2019?

16   A   Yes.

17   Q   It's also from Legacy AC LLC?

18   A   Yes.

19   Q   Did you receive this check?

20   A   Yes.

21   Q   From whom did you receive it?

22   A   From Calvin.

23   Q   Calvin Darden, Jr.?

24   A   Yes.

25   Q   And what was this payment for?

O9RJDAR4                           Acosta – Direct

1    A    It was towards the G63.

2    Q    Page 3, please.

3              This is a check to SZ Motorcars from Legacy AC LLC,

4    dated December 16, 2019 in the amount of $50,000.  Did you

5    receive this check?

6    A    Yes.

7    Q    From whom?

8    A    From Calvin.

9    Q    What was this payment for?

10   A    The remaining balance.

11   Q    The remaining balance for what?

12   A    For the G63.

13             MR. KINDER:  Okay.  And I think I forgot to ask the

14   question about the first page.  Can we go to the first page.

15   Q    Just to be clear, what was the check on this first page for

16   $50,000 to you, what was this payment for?

17   A    That was partially my profit and the profit that was

18   promised to the previous owner of the vehicle.

19   Q    Okay.  So this also related to the sale of the Mercedes G63

20   to Calvin Darden, Jr.?

21   A    The sale and the purchase, yes.

22   Q    Okay.  We can take that down.

23             After the sale of the Mercedes G63, did you ever

24   assist Calvin Darden, Jr. in acquiring another car?

25   A    Yes.

O9RJDAR4                              Acosta – Direct

1    Q    What was that?

2    A    It was a Rolls-Royce.

3    Q    And what role did you play in that transaction?

4              JUROR:  Your Honor, I'm having a hard time hearing.

5              THE COURT:  Mr. Acosta, if I could ask you to pull the

6    microphone a little bit closer to you, and if I could ask you

7    to speak up a little bit so everybody can hear, okay.

8              Go ahead.

9    Q    What role did you play in the transaction of the

10   Rolls-Royce?

11   A    I was the broker.

12   Q    And what does it mean to be a broker for a car deal?

13   A    To pair someone selling a vehicle with a buyer.

14             MR. KINDER:  Can we please publish 602D-3.

15   Q    This is a check from Legacy AC LLC to SZ Motorcars dated

16   November 25, 2020 in the amount of $255,000.  Did you receive

17   this check?

18   A    Yes.

19   Q    From whom did you receive it?

20   A    From Calvin.

21   Q    What was this payment for?

22   A    For the Rolls-Royce.

23             MR. KINDER:  One moment, your Honor.

24             THE COURT:  Okay.

25             MR. KINDER:  No further questions.

O9RJDAR4

1              THE COURT:  Okay.  Cross-examination?

2              MR. DONALDSON:  No, your Honor.

3              THE COURT:  Okay.  Thank you very much, Mr. Acosta.

4    You may step down.

5              (Witness excused)

6              THE COURT:  Is now a good time for a break or do you

7    want to --

8              MR. KINDER:  The government's next witness is Olivia

9    Sebade, paralegal from our office.

10             THE COURT:  Okay.  So why don't we take the break.

11             Ladies and gentlemen, we're going to take our

12   afternoon break now.  We'll come and get you in about -- maybe

13   a little bit longer break.  Go back.  I think the cookies are

14   back there.  Do not discuss the case.  Go back, relax, and

15   we'll come and get you when we're ready for you.  Thank you

16   very much.

17             (Continued on next page)

18

19

20

21

22

23

24

25

O9RJDAR4

1              (In open court; jury not present)

2              THE COURT:  Okay.  You may be seated.  So I've read

3     through the transcript.  As I understand it, the testimony that

4     will come in through the paralegal, am I correct that there

5     will be testimony about text messages, the text messages will

6     be linked to certain phone numbers, and the government is going

7     to argue basically that that phone number is associated with

8     Mr. Darden, Jr, not his father?

9              MR. KINDER:  That's right, your Honor.

10             We are planning to moving into evidence with the

11    paralegal the relevant text messages.  We weren't necessarily

12    planning on presenting those, but they will be moved into

13    evidence.  And so we would argue on the basis of those text

14    messages that they reflect the defendant using a 5686 number to

15    impersonate his father.

16             THE COURT:  By what you said, so you're going to admit

17    the text messages.  Are you going to publish them to the jury?

18             MR. KINDER:  I think not.  We have a lot of text

19    messages.  We're planning on publishing many of them.  We're

20    not planning on publishing those ones in particular.

21             THE COURT:  All right.  So you'll get the text

22    messages in, and they'll be reference to the phone numbers from

23    which the text emanated or --

24             MR. KINDER:  Correct.

25             THE COURT:  -- and were received?

O9RJDAR4

1          MR. KINDER:  Correct.  We're also planning to move in

2     with this paralegal a couple of summary charts which relate to

3     the phone numbers that we can tie to the defendant, which is

4     also helpful context for the text messages and the various

5     numbers from which they were sent.

6          THE COURT:  Okay.  And as I understand it, the

7     testimony that will be presented on Monday, that's of an

8     individual who spoke on the phone with someone; is that

9     accurate?

10          MR. KINDER:  That's correct.

11          THE COURT:  And there will be phone records that are

12     associated with the timing of those calls that will be admitted

13     today?

14          MR. KINDER:  So my understanding is that that witness

15     will testify that they spoke and/or texted with a person they

16     thought to be Calvin Darden, Sr. at a particular phone number.

17     That phone number we have other evidence already in the

18     record can be tied to the defendant.

19          THE COURT:  And what is that phone number?

20          MR. KINDER:  That is the 1779 phone number.

21          THE COURT:  Okay.  All right.  Let me hear from the

22     defense with regard to that.  I might as well -- I think I can

23     do this based upon the proffer.  I don't need -- unless there's

24     a dispute -- there has been.  I've seen the 1779 number.  I've

25     seen the 847 number, which I think -- is that the one --

O9RJDAR4

1           MR. KINDER:  There's the 5686 number.  There's been a

2   lot of evidence today and other days that that is used by the

3   defendant.  There's also the 1779 number, which we also have

4   evidence is used by the defendant.

5           THE COURT:  Okay.  All right.

6           MS. REED:  Yes, your Honor.  So I'll start with the

7   text messages that they're going to bring in through the

8   paralegal, but they're not going to publish to the jury.  Did I

9   hear that correctly?

10          MR. KINDER:  We were not planning on publishing those

11  today.

12          MS. REED:  Because the paralegal can't speak to the

13  substance or circumstances surrounding the content of those

14  text messages, right?

15          THE COURT:  But the words are the words, I guess.  So

16  I think I've allowed it in other cases.  I mean, in other

17  words, they could have a back and forth where they read it and

18  it doesn't necessarily have to be the person who received it or

19  sent it.  But it sounds like they're not going to do that with

20  this witness; is that correct?

21          MR. KINDER:  No, your Honor.  We do plan on publishing

22  many of the text messages, and I do plan to do a back and forth

23  where I read a set of the blue messages and the paralegal reads

24  the green messages so that we have a running oral presentation

25  of the messages that will also be on the screen, but not the

O9RJDAR4

1    impersonation messages.

2            MS. REED:  So there's not a basis on that front to

3    bring in the impersonation excerpts from the transcript.  Those

4    should be redacted because how are they now relevant at this

5    point in time in the trial?

6            MR. KINDER:  We do plan on moving those into evidence,

7    just not publishing them on the screen and reading them at this

8    point.

9            THE COURT:  Just so that I understand, there are text

10   messages associated with those two phone numbers, the 1779

11   phone number and the 5686 number.  Okay.

12           MS. REED:  We would object to subject to them making

13   the connection between the content of the text messages and

14   their ability to therefore make a nexus to, okay, he was

15   impersonating his father.  I still think that it's --

16           THE COURT:  There's a separate issue, though, because

17   when they're coming in now, there doesn't have to be any sort

18   of impersonation at all.  They're coming in because they're

19   numbers associated that are connected in some way with

20   Mr. Darden Jr.  Now, separately -- and I don't know when -- I

21   mean, as a technical matter, they could -- well, I don't know

22   when the impersonation part is going to come into the -- so is

23   it the government's intention to -- well, would that be Monday?

24           MS. REED:  And your Honor, just to be clear, yes,

25   there's no objection to the text messages coming in.  Our

O9RJDAR4

1    objection is to the government then wanted to use the

2    introduction of those text messages to open the door to then

3    putting into evidence a transcript from a plea hearing where

4    there was a proffer to impersonation in a very detailed manner

5    based on then some speculation at this point that a witness

6    will testify on Monday to what they think the witness will say.

7              THE COURT:  Okay.  Yes?

8              MR. KINDER:  Just to get a little bit more specific,

9    the 404 series of text messages which we plan to move into

10   evidence are between the 5686 number and Charles Briscoe.

11   They're texts extracted from Briscoe's phone.  When you read

12   the messages from the 5686 number in that particular thread, it

13   is clear that the person using that 5686 number is conveying

14   themselves as Calvin Darden, Sr.

15             MS. REED:  I don't think that the messages will speak

16   for themselves, but it still does not create a nexus to -- it

17   doesn't open the door to, therefore he was for sure

18   impersonating his father, and so we should include testimony

19   from a prior plea where he gave details about having committed

20   an impersonation.

21             THE COURT:  Well, I guess what I would say is the

22   following, I think I would prefer to -- well, couple of things.

23   I'd like to hear the testimony and make an assessment and

24   making a final ruling with regard to the transcript.  What I

25   would say is that those statements are admissible as statements

O9RJDAR4

1    against a party opponent.  Separate and apart from the fact

2    that Mr. Darden Jr. had pled guilty, in other words, unlike the

3    judgment, where the analysis is under 609, there's a separate

4    basis.

5            In other words, I don't know how the testimony is

6    going to come in.  It may not even be that the jury is aware

7    that he was testifying.  This was after his guilty plea.  I

8    don't know.  So the issue becomes whether or not -- how

9    relevant the testimony is, and so I'd like to hear the

10   testimony that -- even if there isn't obviously going to be an

11   argument about that.  But if it's clear from the text messages

12   that the person who is using the telephone number appears to be

13   Darden, Sr. and on Monday, if the person testifies about using

14   the phone and believing it was Darden, Sr., you know, the --

15   and then I'll make a final ruling.

16           But what I would say is my initial view would be it

17   goes to the -- I mean, if there's going to be an argument that

18   it, in fact, was Darden, Sr. that they utilized this phone,

19   went back and forth, okay, but it goes to weight, doesn't go to

20   admissibility.  That's sort of where -- just to give everybody

21   my thinking on it.

22           But I think I'd like to sort of hear the testimony in

23   light of the fact that we can get it in through a witness

24   that's not someone who's flying in or something like that.  So

25   I can make the ruling afterwards with regard to the judgment

O9RJDAR4

 1   and with regard to the -- well, I guess with regard to the

 2   judgment.

 3            Well, let me ask is there an objection to the

 4   judgment?  As it stands, right -- well, there may be an

 5   objection, but -- well, is there an objection to the judgment?

 6            MS. REED:  Well, there are a few pages in the judgment

 7   that speak to his sentence, his supervised release, and the

 8   amount of money at issue that we would object to.

 9            THE COURT:  Okay.  What I would say is speak to the

10   government and figure out what parts can be redacted.  Because

11   obviously punishment is up to me.  We don't necessarily want to

12   inject punishment into the issue.  I guess an argument could be

13   made that supervised release is a little different, but it is

14   still part of the sentence.

15            So figure out how to redact it, and we can move from

16   there.  And assuming it's redacted in a way that's satisfactory

17   to the defense, if it's not, then I'll make a ruling on it.

18            MS. REED:  Thank you.

19            THE COURT:  Does that make sense?

20            MS. REED:  Yes, that makes sense.

21            MR. KINDER:  That's fine, your Honor.

22            THE COURT:  All right.  Is there anything else we need

23   to take up before we take our break?  So why don't we come back

24   at 4:05 or so, okay, and we'll give everybody a little bit

25   extra time on the break, all right?

O9RJDAR4

1              Thank you very much.

2              (Recess)

3              (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O9RBDAR5

1            (Jury not present)

2            THE COURT:  Is there anything we need to take up or

3    can we get the jury?

4            MR. MEAD:  Just two seconds, your Honor.  Mr. Acosta

5    testified, a FBI agent was kind of sitting with him before his

6    testimony.  He told that FBI agent, I got bored. I Googled the

7    case or something to that effect.

8            THE COURT:  He said what?

9            MR. MEAD:  He got bored and he Googled the case.  It's

10   fine to us from various perspectives.  Defense ask us to inform

11   the Court, so we're informing the Court.

12           THE COURT:  I think it was straight information.  I

13   had this car.  He came and purchased the car, so I think that's

14   fine.  And he wasn't asking any questions about the allegations

15   in the case.  Let me hear from the defense?

16           MR. DONALDSON:  No, Judge.

17           THE COURT:  All right.  Can we get the jury?

18           MR. MEAD:  Yes, your Honor.

19           THE COURT:  All right.  Thanks.  I may mention to them

20   that I was just taking some time because one of my clerk is

21   leaving so that's why we're running late.

22           (Continued on next page)

23

24

25

O9RBDAR5

1        THE COURT:  Ladies and gentlemen, I apologize for the

2    delay.  It was entirely me.  So one of my law clerks, not

3    Ms. Folly, it's his last day.  It was also his birthday.  So

4    during the break we took sometime to sing him happy birthday.

5    Ms. Disla insisted to his embarrassment, so that's why we took

6    a little bit of time.  But we're going to continue now with the

7    government's next witness.

8        MR. KINDER:  The government calls Olivia Sebade,

9    S-E-B-A-D-E.

10   OLIVIA SEBADE,

11       called as a witness by the Government,

12       having been duly sworn, testified as follows:

13       THE COURT:  Make yourself comfortable, and if I could

14   ask you to state your name.

15       THE WITNESS:  Olivia Sebade, O-L-I-V-I-A, S-E-B-A-D-E.

16       THE COURT:  All right.  You may inquire.

17       MR. KINDER:  Your Honor, before I begin my questions,

18   the government offers Government Exhibit 2503 pursuant to the

19   certification at Government Exhibit 2,000Z.

20       THE COURT:  Any objection?

21       MR. DONALDSON:  No.  It was 2503?

22       MR. KINDER:  Yes.

23       THE COURT:  And the second one.

24       MR. KINDER:  The certification at GX2000Z.

25       THE COURT:  I see.  Okay.  Government exhibits 2503 is

1    admitted in evidence.

2              (Government's Exhibit 2503 received in evidence)

3              THE COURT:  With the certification?  I don't think you

4    need the certification.  Any other exhibits?

5              MR. KINDER:  Not yet, your Honor.

6    DIRECT EXAMINATION

7    BY MR. KINDER:

8    Q.  Good afternoon, Ms. Sebade.

9    A.  Good afternoon.

10   Q.  Did you review certain financial and business records in

11   connection with this case?

12   A.  I did.

13             MR. KINDER:  Can we please publish for the witness

14   only what's been marked for identification as Government

15   Exhibit 1142.

16             THE COURT:  Where do you work?

17             THE WITNESS:  The United States Attorney's office with

18   the Southern District of New York.

19             THE COURT:  What is your position?

20             THE WITNESS:  I'm a paralegal.

21             THE COURT:  Go ahead. You were going to get to that?

22             MR. KINDER:  I'm sorry, your Honor.  I was going to

23   get to that.

24   Q.  Ms. Sebade, what are your responsibilities as paralegal at

25   the U.S. Attorney's office?

1    A.  I help the lawyers in my office with administrative task.

2    Q.  Prior to approximately this week, had you worked on this

3    case?

4    A.  No.

5    Q.  And what were you asked to do in connection with this case?

6    A.  I was asked to review subpoena returns, text messages,

7    transcripts and similar documents.

8    Q.  In front of you on the screen is what's been marked for

9    identification as Government Exhibit 1142.  What is this?

10   A.  This is a summary chart.

11   Q.  And is this a summary chart of records that you have

12   reviewed?

13   A.  It is.

14   Q.  Financial and business records?

15   A.  Yes.

16   Q.  Does this chart fairly and accurately reflect information

17   contained in those records that you reviewed?

18   A.  It does.

19            MR. KINDER:  The government offers 1142.

20            THE COURT:  Any objection?

21            MR. DONALDSON:  No.

22            THE COURT:  Government Exhibit 1142 is admitted in

23   evidence.

24            (Government's Exhibit 1142 received in evidence)

25            MR. KINDER:  Can we please publish that for the jury.

1           THE COURT:  You may.

2    Q.  Ms. Sebade, what is reflected in the left-hand column?

3    A.  The source of the respective information.

4    Q.  I want to walk through each of the sources starting with

5    the first row.  What is the source of that information?

6    A.  Ameris Bank records.

7    Q.  What is the phone number listed in those records?

8    A.  347-850-5686.

9    Q.  What is the information about the user of that phone number

10   reflected in those records with respect to the date of birth, I

11   ask that you read only the year?

12   A.  Sure.  The name is Calvin R. Darden, year of birth is 1974,

13   the address is 2716 Ridgewood Road, Northwest, Atlanta Georgia,

14   and the email is Darden.CalvinR@gmail.com.

15   Q.  The next row is Fifth Third bank records, the phone number

16   347-850-5686.  What is the information about the user contained

17   in those record?

18   A.  Name, Calvin Darden; year of birth, 1974.  The address is

19   2716 Ridgewood Road, Northwest, Atlanta Georgia.

20   Q.  Next one is Wells Fargo bank records.  The same 5686

21   number.  What is the information about the user?

22   A.  Name, Calvin Darden; year of birth, 1974.  Address, 45

23   Waterview Court, Staten Island, New York, email

24   Darden.CalvinR@gmail.com.

25   Q.  Next row is records from Pop International Galleries.  The

1    phone number is the same 5686 number.  What is the information

2    about the user?

3    A.   The name is Calvin Darden, address 2716 Ridgewood Road,

4    Northwest, Atlanta Georgia, email is Darden.CalvinR@gmail.com.

5    Q.   The next row are records of Steinway the same 5686 number,

6    and what is the information about the user?

7    A.   Name, Calvin Darden; address 45 Waterview Court, Staten

8    Island, New York.

9    Q.   Next row is records from a Mindful Home, the same 5686

10   number.  What is the information about the user?

11   A.   The name is Calvin and Sue Darden; address 2716 Ridgewood

12   Road, Northwest, Atlanta, Georgia; email

13   Calvin@dardenenterprises.com.

14   Q.   Next row are records from Town Motor Car, the phone number

15   is the same 5686 number.  What is the information about the

16   user?

17   A.   Name, Calvin Darden; year of birth 1974; address, 45

18   Waterview Court, Staten Island, New York.

19   Q.   Next row are records from Coinbase, the same 5686 number.

20   What is the information about the user?

21   A.   Name, Calvin Darden; year of birth 1974; address 2716

22   Ridgewood Road, Northwest, Atlanta Georgia, another address

23   listed 357 Park Avenue, Suite 2607, New York, New York.

24           MR. KINDER:  Next page, please.

25   Q.   The next row is records from First Third Capital, same 5686

O9RBDAR5                            Sebade- Direct

1  phone number.  What's the information about the user?

2  A.  The name is Calvin Darden, address is 45 Waterview Court,

3  Staten Island, New York.

4  Q.  Next records are from SERV Corp, same 5686 phone number.

5  What is the information about the user?

6  A.  Name, Calvin Darden, address 375 Park Avenue, Suite 2607,

7  New York, New York.

8  Q.  Next records are from Mountain Motor Sports with the same

9  5686 phone number.  What is the information about the user?

10  A.  Name, Calvin Darden; address 45 Waterview Court, Staten

11  Island, New York; email Darden.CalvinR@gmail.com.

12  Q.  The last row on this page are records from Verizon with the

13  same 5686 phone number.  What is the information about the

14  user?

15  A.  The name is Calvin Darden, address 2716 Ridgewood Road,

16  Northwest, Atlanta Georgia.

17  Q.  Ms. Sebade, in the first column on the chart that we just

18  reviewed there are several numbers in parenthesis, do you see

19  those?

20  A.  I do.

21  Q.  What are those?

22  A.  Those are the exhibit numbers for the respective records.

23  Q.  Do those attached exhibit numbers appear on the first page

24  in connection with each row of records?

25  A.  They do.

1    Q.  On the bottom half of this page, what do you see there?

2    A.  It's a scan of a driver license.

3    Q.  Can you please read the name, address and year of birth

4    that appear on this license?

5    A.  The name is Calvin Ramarro Darden, address is 375 Park

6    Avenue 2607, New York, New York 10152, and the year of birth is

7    1974.

8    Q.  And you see there's the line of text underneath that.  It

9    says source?

10   A.  Yes.

11   Q.  What does that reflect?

12   A.  That's the government exhibit where this scan came from.

13        MR. KINDER:  We can take that down.

14   Q.  Ms. Sebade, did you review certain phone records in

15   connection with this case?

16   A.  I did.

17        MR. KINDER:  Please publish for the witness only

18   what's been marked for identification as Government Exhibit

19   1141.

20   Q.  Ms. Sebade, what is this?

21   A.  This is another summary chart.

22   Q.  And does this summary chart contain information from phone

23   records that you reviewed?

24   A.  It does.

25        MR. KINDER:  The government offers 1141.

1          THE COURT:  Any objection?

2          MR. DONALDSON:  No, your Honor.

3          THE COURT:  Government Exhibit 1141 is admitted in

4     evidence.

5          (Government's Exhibit 1141 received in evidence)

6          MR. KINDER:  Let's publish that for the jury.

7    Q.  Ms. Sebade, you see there's a first row that reads phone

8    number?

9    A.  Yes.

10   Q.  And there are two phone numbers that appear?

11   A.  Yes.

12   Q.  What's the phone number that appears in the first column

13   where there's information contained?

14   A.  347-850-5686.

15   Q.  Is that the same phone that was the subject of the chart in

16   the prior exhibit?

17   A.  It is.

18   Q.  What is the phone number in the next column to the right?

19   A.  404-850-1779.

20   Q.  Okay.  Starting with the column for the 5686 number, can

21   you please identify what the service provider is for that

22   number?

23   A.  It's Verizon.

24   Q.  And are the dates that that number has been active?

25   A.  From August 3, 2010 to present.

O9RBDAR5                          Sebade- Direct

1    Q.   What is the name of the subscriber for that phone number?

2    A.   Calvin Darden.

3    Q.   What is the subscriber's address?

4    A.   2716 Ridgewood Road, Northwest Atlanta, Georgia.

5    Q.   Now looking at the column for the 1779 number, who is the

6    service provider for that phone number?

7    A.   Pinger.

8    Q.   What are the dates that that phone number has been active?

9    A.   July 31, 2017 to present.

10   Q.   And in the very last row in that same 1779 column, there's

11   an entry for linked registered phone number.  What is the phone

12   number that is the linked registered phone number for the 1779

13   number?

14   A.   It's 347-850-5686.

15   Q.   And the source of this information are Government Exhibits

16   902A and 903A?

17   A.   That's correct.

18            MR. KINDER:  We can take that down.

19   Q.   Ms. Sebade, have you had a chance to review a document that

20   has been marked for identification as Government Exhibit 400?

21   A.   I have.

22   Q.   What is that document?

23   A.   It's a cell phone extract.

24   Q.   There is a binder in front of you.  I ask that you take a

25   moment to review the documents in that binder.  Are the

O9RBDAR5                        Sebade- Direct

1   documents in that binder accurate copies of text messages

2   contained in the text message extract that you reviewed at

3   Government Exhibit 400?

4   A.  Yes.

5         MR. KINDER:  The government offers several exhibits.

6   I apologize to everyone for the length of this list.

7   Government offers the following:  401-255, 401-267, 401-283,

8   401-289, 401-295, 401-308, 401-325, 401-787 --

9         THE COURT:  So 401, what's the first one?

10         MR. KINDER:  The first one is 255.

11         THE COURT:  And next?

12         MR. KINDER:  401-267.

13         THE COURT:  Okay.

14         MR. KINDER:  401-283, 401-289, 401-295, 401-308,

15   401-325, 401-787, 401-925, 401-961, 401-1000, 401-1029,

16   401-1147, 401-1177, 401-1177A, 401-1178A, 401-1202, 401-1202A,

17   402-414, 402-434, 402-440, 402-440A, 402-503, 402-576, 404,

18   404-1, 404-9, 404-31, 405.

19         THE COURT:  Okay.  Any objection?

20         MR. DONALDSON:  One second, Judge.

21         THE COURT:  Okay.

22         MR. DONALDSON:  No objection.

23         THE COURT:  Okay.  So government exhibits 401-255,

24   next government exhibit 401-267, Government Exhibit 401-283,

25   Government Exhibit 401-289, Government Exhibit 401-295,

1    Government Exhibit 401-308, Government Exhibit 401-325,

2    Government Exhibit 401-787, Government Exhibit 401-925,

3    Government Exhibit 401-961, Government Exhibit 401-1000,

4    Government Exhibit 401-1029, Government Exhibit 401-1147,

5    Government Exhibit 401-1177, Government Exhibit 401-1177-A,

6    Government Exhibit 401-1178-A, Government Exhibit 401-1202,

7    Government Exhibit 401-1202A, Government Exhibit 402-414,

8    Government Exhibit 402-434, Government Exhibit 402-440,

9    Government Exhibit 402-442A, 402-443A, 402-576, Government

10   Exhibit 404, Government Exhibit 404-1, Government Exhibit

11   404-9, Government Exhibit 404-31 and Government Exhibit 405 are

12   all admitted in evidence, and can be published to the jury.

13            (Government's Exhibits 401-255, 401-267, 401-283,

14   401-289, 401-295, 401-308, 401-325, 401-787 401-925, 401-961,

15   401-1000, 401-1029, 401-1147, 401-1177, 401-1177A, 401-1178A,

16   401-1202, 401-1202A, 402-414, 402-434, 402-440, 402-440A,

17   402-503, 402-576, 404, 404-1, 404-9, 404-31, 405 received in

18   evidence)

19            MR. KINDER:  Can we please publish Government Exhibit

20   402-414, Mr. Ross.

21   BY MR. KINDER:

22   Q.  Ms. Sebade, you see those blue text message on the screen?

23   A.  I do.

24   Q.  Can you please read the number and name that appears after

25   the word "from" at the top?

O9RBDAR5                         Sebade- Direct

1    A.  1407-342-6161, Chandler Parsons.

2    Q.  And the number and name after the "to" line?

3    A.  1713-898-6696 Charles (owner).

4    Q.  And we're going to read the messages in a moment.

5         MR. KINDER:  But, Mr. Ross, can you scroll down to the

6    next message.

7    Q.  The green message here, Ms. Sebade, is the "from" number,

8    the same 6696 number from Charles (owner)?

9    A.  Yes.

10   Q.  And the "to" message is the same 6161 number of Chandler

11   Parsons?

12   A.  Yes.

13   Q.  Let's scroll up to the top.

14        Ms. Sebade, I'm going to read the blue messages, and

15   I'd like you to read the green messages.  I'm going to start by

16   identifying the name and the date of this message.  We'll do

17   that for the first few messages.  Then we're going to look at a

18   lot of text messages where we go through that same process.

19        First message from Chandler Parsons:  November 11,

20   2019.  Have you met him?

21   A.  Him briefly, mostly mom and lawyer.

22   Q.  Cool.  They live in Memphis with him?  What's his lawyer

23   name?

24   A.  Yes, they do.  Him and penny have the same lawyer Arthorne.

25        MR. KINDER:  Let's publish 401-255, please.

1    Q.  Ms. Sebade, can you please read the number and name after

2    the word "from" in the top blue message?

3    A.  1404-850-1779 Calvin Darden, Jr.

4    Q.  And the number and name that appear after the "to" line?

5    A.  1713-898-6696 Charles (owner).

6    Q.  Let's scroll down to the green.

7            Same thing, Ms. Sebade, the number and name in the

8    "from" line?

9    A.  1713-898-6696 Charles (owner).

10   Q.  And the "to" line?

11   A.  1404-850-1779 Cal Darden, Jr.

12   Q.  Scroll to the top, please.

13           I will read the blue messages from the Cal Darden, Jr.

14   1779 number. I'd like you to read the green messages from the

15   6696 Charles (owner) number.

16           Cal Darden, Jr. November 10, 2019.  As of about 15 min

17   ago, the other lawyers for Wiseman has been replaced by Art.  I

18   have a call in 50 min with Wiseman's mom, penny and Art.

19   A.  Cool.

20   Q.  When they give us an amount, you have someone that would be

21   willing to put it up?

22   A.  Need to know the details, but yes.

23   Q.  I don't have details yet, but will DEF let you know when I

24   get it.

25   A.  Okay.

1   Q.  BTW how are you feeling?

2   A.  Feeling a little better.

3   Q.  That's good.

4   A.  Thanks bro.

5   Q.  Just got the confirmation that I can get Wells Fargo.

6   A.  Hit in the am, bro. I got great news for Wiseman.  I got it

7   done.  Ready to seal the deal bro.

8   Q.  Can you talk in about 15 min?

9   A.  Yep.

10  Q.  Just hit you bro.  Did you call me?

11  A.  Pocket dial.

12  Q.  Okay.  Also remember I told you that I'll have the

13  revolving line set up at Wells Fargo so technically the

14  Wiseman's can get it through that.

15  A.  Right.

16  Q.  How much time do you think you have with J blue and is

17  Chandler requiring you to sign an agreement between yourself

18  and BSG?

19  A.  No agreement and not much time is the feeling I'm getting.

20  Q.  Okay.  I got to figure this Jonathan Blue situation ASAP.

21  He can mess everything up that we're working on.

22  A.  I know.

23  Q.  Hey, bro, sorry for the delay.  Had to pick my daughter up,

24  take her to practice and now finishing up helping her with her

25  homework.

| 1 | Good morning bro.  Spoke to penny and Art around 2:30 |
| 2 | a.m. my time.  They're ready to go.  We can get this done |
| 3 | today.  Just tried you. |
| 4 | A.  In meetings bro, what's up? |
| 5 | Q.  Nothing urgent.  Want to start moving things along to get |
| 6 | everything wrapped up.  Hit me when you're done. |
| 7 | A.  Cool. |
| 8 | Q.  Hit me back when you can. |
| 9 | Hey bro.  Just spoke to his cousin.  He's ready to go. |
| 10 | He will sign an employment agreement with BSG and loan |
| 11 | documents.  We can do a call with him tomorrow whenever is good |
| 12 | for us.  It's go time. |
| 13 | A.  Yessir.  Let's go. |
| 14 | Q.  It's kind of crazy how we combine forces and land the |
| 15 | number one draft pick, bro.  God is good. |
| 16 | A.  Yessir.  Let's go. |
| 17 | MR. KINDER:  Can we please publish 401-267. |
| 18 | Q.  Do the "from" and "to" line on the top messages reflect |
| 19 | that these are messages between the 6696 Charles number and the |
| 20 | 1779 Cal Darden, Jr. number? |
| 21 | A.  They do. |
| 22 | Q.  Can you please read the green messages from Charles, and I |
| 23 | will read the blue messages from Cal Darden, Jr. |
| 24 | A.  Lawyer doing the agreement. |
| 25 | Q.  Okay.  So we're good?  CP is good? |

1    A.  Yes, sir.

2    Q.  That's great.  Good morning bro.  Just tried you.

3    A.  Hit me back.

4    Q.  Hey bro, are you on top of the attorney?  They're on me

5    bro.

6    A.  I'm about to call lawyer.

7    Q.  Okay.  Lemme know.  I know it's not your fault, but we're

8    about to start looking bad.

9            Call you right back.  On with Art.

10   A.  Need to talk to him.

11           And then he sends a Twitter link.

12   Q.  Just tried you back.

13           Call me.

14           How did it go with CP?

15   A.  He's going to call me later because too many people around.

16   Q.  Okay.  Cool.  Please keep me posted bro.

17           Do you anticipate any problems?

18   A.  I don't.

19   Q.  Okay, brother.

20           What's good my man?

21           Just checking in.  Call me.

22           I know you said we should be good .... but .... what

23   do you think are the chances that he switches course?  Do you

24   really feel super confident.  When you said as long as he

25   doesn't switch course, it made me a little nervous.  Tell me

1  something, bro.

2  A.  Bro, I meant nothing by it.  Was just making a statement

3  that was all.

4  Q.  Okay.  My man LOL.  My bad LOL.  I'm sorry if I'm trippin.

5  We just have a lot on the line with this one bro.

6  A.  CP good to go.  He is meeting with his financial advisor

7  later today to authorize the payment to go out in the morning

8  Cali time.

9  Q.  That's great news.

10  A.  Got one question that came up to me was if James would sign

11  a postdated SPAC agreement.

12  Q.  IDK what a SPAC agreement is, and I'm really not sure he'd

13  sign anything postdated bro.

14  A.  I know.

15  Q.  What's a SPAC?

16  A.  Player Agent Agreement.  That's what every NBA player signs

17  when they're agents before they enter the NBA.

18  Q.  If I'm him, there's no way I'd sign that bro, but do you

19  want me to ask.  I think it's inviting trouble for him and for

20  us.

21  A.  Actually every player does it.  It's standard.  He will

22  have to do it eventually so you can just wait.

23  Q.  Ms. Sebade, what is the date on the last message from

24  Charles that we're looking at?

25  A.  November 17, 2019.

1          MR. KINDER:  And, Mr. Ross, can you please scroll up

2     to the very top message.

3     Q.   What is the date on the first message from Charles in this

4     string of text messages that we just read?

5     A.   November 14, 2019.

6     Q.   Can we please go to 402-434.

7          Ms. Sebade, is this a string of text between the 6696

8     Charles number and Chandler Parsons?

9     A.   It is.

10    Q.   I'd like you again to read Charles.  I will read the blue

11    messages from Chandler Parsons, and can you start by

12    identifying the date of the first message that you read.

13    A.   The date is November 16, 2019.  Let's go bro.  Everything

14    signed.

15    Q.   Aye.  He signed.  Sorry with a bunch of people.

16    A.   Cool.  Let's talk tomorrow.

17         Hit me today bro.  We need to talk about this Wiseman

18    thing.

19    Q.   What's good.

20    A.   They want to make sure that all is good on our end with the

21    advance and Penny is ready to turn us onto the other kids there

22    besides Wiseman.

23         MR. KINDER:  Can we please go to Exhibit 2508 please.

24    Q.   Ms. Sebade is this an email that you've reviewed?

25    A.   It is.

1  Q.  Who is the email from?

2  A.  Charles Briscoe from Charles@briscoesports.com.

3  Q.  What is the date it is sent?

4  A.  November 17, 2019.

5  Q.  Who is it sent to?

6  A.  Matt Boyer, Mat@briscoesports.com.

7  Q.  Can you please read the subject line and then the

8  attachments line?

9  A.  The subject is 2018 NBPA SPAC, effective 7.1.18.pdf.

10 Attachments is NBPA SPAC effective 7.1.18.pdf, and an untitled

11 attachment.

12 Q.  Can you please read the message of the email from the

13 Charles@briscoesports.com email address.

14 A.  Can you put this in Docusign and send back to me for James

15 Wiseman signature and for Donzaleigh Artis parent signature on

16 page six.

17         MR. KINDER:  Mr. Ross, can you please scroll through

18 slowly the rest of the document.  You can keep going all the

19 way to the bottom.  Stop when you get to the signature page.

20 Scroll down a little bit more.

21 Q.  Ms. Sebade, you see three signature lines here?

22 A.  I do.

23 Q.  Which one does a signature appear on?

24 A.  Above player agent.

25 Q.  And the other two are blank?

1   A.  Yes.

2           MR. KINDER:  Can we please publish 2510, please.

3   Q.  Ms. Sebade, is this also an email you reviewed?

4   A.  It is.

5   Q.  Can you read the "from" line, please?

6   A.  Matthew Boyer via Docusign.

7   Q.  And what's the email address that follows?

8   A.  DSE@Docusign.net.

9   Q.  What appears in the "to" line?

10  A.  James Wiseman Charles@briscoesports.com.

11  Q.  Please read the date sent and the subject?

12  A.  Sunday, November 17, 2019, subject completed.  Please

13  Docusign 2018 NBPA SPAC effective 7.1.18.pdf.

14  Q.  Is there a blue text that reflects attachment.

15  A.  Yes.

16  Q.  What's the title of the attachment?

17  A.  2018 NBPA SPAC effective 7.1.18.

18  Q.  What is the text of the message in blue?

19  A.  Your document has been completed.  You completed document.

20          MR. KINDER:  Mr. Ross, can you please scroll through

21  the rest of this document.  Let's stop when you get to the --

22  there we go.

23  Q.  Ms. Sebade, are all three signature lines filled in here?

24  A.  They are.

25  Q.  And what is the name that appears above the player line?

O9RBDAR5                          Sebade- Direct

1   A.  It looks like James Wiseman.

2   Q.  And what is the name that appears before parent/guardian?

3   A.  It looks like Donzaleigh Artis.

4           MR. KINDER:  Can we please publish 402-440.

5   Q.  Ms. Sebade, is this a text message from the 6696 Charles

6   number to Chandler Parsons?

7   A.  Yes.

8   Q.  Can you please read the message in green from Charles.

9   A.  Yessir.  Let's go bro, and he includes a PDF attachment.

10  Q.  Have you reviewed what that attachment was?

11  A.  Yes.

12  Q.  And what is the date that this message was sent?

13  A.  November 17, 2019.

14          MR. KINDER:  Can we please go to 402-440A.

15  Q.  Ms. Sebade, is this the attachment that was sent in the

16  text message that we just reviewed?

17  A.  It is.

18          MR. KINDER:  Mr. Ross, can you please scroll through

19  it.  You can go through it a little more quickly.  Stop when

20  you get to the signature line.  Okay.  Can we go back to

21  402-440.  Let's scroll down.  Okay.  Let's publish 401-283.

22  Q.  I'll read the top message from the 1779 Cal Darden, Jr.

23  number.  Can you please read the green messages from Charles.

24          Dated of this first message is November 18, 2019.  Cal

25  Darden, Jr:  Okay. We got to make this work.

1  A.  I know bro.  I am pushing hard for several reasons.

2  Q.  I think having BSG guarantee the money with Darden

3  Enterprises backing BSG could work also.  Just a thought.  FYI

4  we have Wiseman's mom on standby.

5  A.  Bet.  Cool.

6       MR. KINDER:  401-289, please.

7  Q.  Ms. Sebade, please read the green messages from Charles.

8  I'll read the blue from Cal Darden, Jr.

9  A.  Give me a minute. I will call you.

10  Q.  And what is the date of that first message Ms. Sebade?

11  A.  November 19, 2019.

12  Q.  What's your title at Briscoe Sports.

13       MR. KINDER:  Mr. Ross, can you please scroll.

14  Q.  President?

15  A.  Yep.

16  Q.  The lawyer just sent me a promissory note with a personal

17  guarantee that my father did a few years ago.  He's adding your

18  logo on it now and making the appropriate changes. I'll send it

19  to you within five min. The personal guarantee covers them in

20  the event of a defauling.  Still need you to call me.

21  *default.  Check your email.  Did you read it.  They really

22  shouldn't have any problem with it.  It covers them completely.

23  A.  I just sent it over, bro.  I trust you 100 percent.

24  Q.  Thanks brother.  I feel the same way about you.  He's going

25  to get back to you tonight.

1  A.  Yep.

2  Q.  Okay.  Cool.  I'm staying up bro.

3          MR. KINDER:  Can we please publish 2501.

4  Q.  Ms. Sebade, this is an email that you reviewed?

5  A.  It is.

6  Q.  Who is it from?

7  A.  Calvin Darden from Calvin@Dardenenterprises.com.

8  Q.  What is the date that it was sent?

9  A.  November 19, 2019.

10 Q.  Who was it sent to?

11 A.  Charles Briscoe, Charles@Briscoesports.com.

12 Q.  What is the subject and attachment lines read?

13 A.  Subject is, partially executed promissory note and personal

14 guarantee.  Attachments, promissory note to Darden

15 Enterprises.pdf.

16 Q.  I'll read the text:  Charles, please see attached partially

17 executed agreement.  At your convenience, please sign and send

18 back for my records.  Also the wiring instructions are as

19 follows: Bank, Wells Fargo.

20          Routing number, 121000248.

21          Account name, Legacy AC, LLC.

22          Account number, 6837204830.  Please let me know if you

23 need any additional information.  Thanks.

24          MR. KINDER:  Go down a little bit more, please.

25 Q.  Ms. Sebade, what is the heading at the top of this

O9RBDAR5                              Sebade– Direct

1    document?

2    A.  Promissory note.

3    Q.  Is this the attachment connected to that email?

4    A.  It is.

5    Q.  What is the amount of money in the upper left-hand column?

6    A.  One million.

7    Q.  And what is the date on the right?

8    A.  November 18, 2019.

9    Q.  Can you please read the first paragraph and the first

10   sentence of the second paragraph?

11   A.  For value received Darden Enterprises, LLC, a Delaware

12   Limited Liability Company, promises to pay to the order of

13   Briscoe Sports Group or assigns at 8782 Sydney Harbor Circle

14   Delray Beach, Florida, or at such other address as to which

15   payee shall give written notice to payor the sum of $1 million

16   on or before June 1, 2020.  Payee shall acknowledge full

17   release and satisfaction of this note upon the payments by

18   payor of the total sum of $1,050,000 due and payable on the

19   majority date.

20           MR. KINDER:  Can you please scroll through the rest of

21   the document, Mr. Ross.  Stop there.  Let's scroll down a

22   little bit more.

23   Q.  Ms. Sebade, what's the first signature line read?

24   A.  Name, Charles Briscoe, title president Briscoe Sports

25   Group.

1   Q.  Is the signature filled in?

2   A.  No.

3   Q.  And can you read the text on the second signature line?

4   A.  Name, Calvin R.Darden; title, managing member Darden

5   Enterprises, LLC.

6   Q.  Is the signature filled in?

7   A.  It is.

8           MR. KINDER:  Let's scroll through the rest of the

9   document.  Scroll up a little bit, little bit more.  Sorry,

10  back down.

11  Q.  There's a signature on the final page, correct?

12  A.  Yes.

13  Q.  That's a signature of Calvin R. Darden?

14  A.  It is.

15          MR. KINDER:  Can we please publish 401-295, please.

16  Q.  Ms. Sebade, these are text messages between the Cal Darden,

17  1779 number and the Charles 6696 number?

18  A.  Yes.

19  Q.  I'll read the blue.  Can you please read the green.

20          Cal Darden, Jr. November 19, 2019:  Just a thought.

21  Hey, bro, just a thought.  Maybe before reaching out to the

22  lawyer and advisor you should speak to CP.  Let him know you

23  got the loan agreement signed with a personal guarantee in the

24  event of default.  If he says okay, the only thing he has to do

25  is authorize the advisor to immediately wire funds.  That's all

1   that has to be done?

2   A.  Bet.

3   Q.  I say that because ultimately the advisor has to do

4   whatever he says.  CP trust you, so if he knows you have an

5   agreement signed and guaranteed and he wants to do the deal, he

6   just needs to authorize it.  He left it up to you to do the

7   diligence.  So now he just needs to know everything is done and

8   there's no risk of him not getting his money back.  It's go

9   time bro.  Seriously my man, please do not go missing on me

10  today.

11  A.  What you talking about bro?  No news yet.  I got calls in.

12  Q.  I called you a couple of times and hadn't heard back from

13  you.  Need some help trying to figure out what to tell the

14  folks in Memphis to keep them calm.  Also not sure if he

15  reached you but my pops had a couple of questions about your

16  guys before heading into his meeting.

17          Plus you mentioned you were going to start reaching

18  out to them around 8 or 8:30PST so I wanted any update

19  A.  I spoke to your pops and yeah, I started reaching out.

20  Q.  What if you told them you'd provide an additional

21  guarantee?

22  A.  Like what.

23  Q.  Not sure if it's necessary, but CP knows you and is

24  obviously comfortable with your business.  Effectively the same

25  guarantee that J Blue ask for which is basically guaranteed by

1   the assets (contracts) of your company.

2   A.   True.

3   Q.   There's enough of a guarantee with the one I sent you this

4   morning, but maybe having you would just give them more

5   comfort.  So effectively they're backed up twice, but they're

6   already familiar with how your business work and its value.  No

7   what I mean?

8          It doesn't effect your business at all because if

9   there was a default, Darden Enterprises would be responsible,

10  but you providing one as well will give them an extra layer of

11  comfort.

12         Spoken to anyone?

13         Spoke to the advisor?

14  A.   On now.  I think we will be good.  Hit you soon.

15  Q.   Perfect.  We really need it to go out today bro.

16  A.   I know.  On with a team.

17  Q.   Hit me.

18  A.   Give me a second.

19  Q.   I need an update for these people on my back bro.  Do you

20  think we're still good?  Do you think the wire will go out by

21  5 p.m.?

22         MR. KINDER:  401-308, please.

23  Q.   Ms. Sebade, please read the green messages from Charles.

24  I'll read the blue messages from Cal Darden Jr.

25         What is the date of the top message?

1    A.  November 20, 2019.

2    Q.  And go ahead.

3    A.  I got you.

4    Q.  Just know the key to all of this is CP.  You're just

5    spinning your wheels in the mud by dealing with the lawyer and

6    advisor.  They will keep putting up hurdle after hurdle.  Once

7    you clear one, they'll make the next one higher until you fall.

8           Ms. Sebade, what are the initials for the name

9    Chandler Parsons?

10   A.  CP.

11          MR. KINDER:  Scroll down, please.

12   Q.  Cal Darden, Jr:  We need to get this done for a multitude

13   of reasons.  Mainly to have the number one draft pick, but to

14   also to get Jonathan off our backs.  That said I believe in you

15   100 percent.  I believe you'll get it done.

16          Good morning bro.  Hit me when you get this.  First, I

17   have a call with Target about Dwight in 25 min and might need

18   to get you on the call.

19          Second and more importantly I need to know what we're

20   looking like today with the Memphis situation.  Art has called

21   me already.  You still at your daughter's school?

22   A.  Yep.  What's up.

23   Q.  BTW, why did he say 900K instead?

24   A.  No clue but at this point I didn't ask.  Just trying to get

25   something done.

1   Q.  I get it, but it was his suggestion or yours?

2   A.  His originally.  He said 500 to 1, so I guess it's in

3   between.

4   Q.  One thing to know when speaking is on the advisor, legally

5   he's not allowed to take directions from you about sending

6   client funds out unless you have power of attorney.  Otherwise

7   he needs a letter of authorization from his client.  So what

8   you might need to think about doing is having CP send an email

9   to the advisor instructing him to wire blank $ to BSG.  And

10  just so everyone is on the same page, you should ask CP to CC

11  you in the email *one thing to know when speaking to the

12  advisor...

13         Lastly, even if it's 750, we're good.  That gets them

14  the 450 they owe plus 300 to J Blue.

15         MR. KINDER:  Please publish 2503, please.

16  Q.  Ms. Sebade, is this one of the emails you have reviewed?

17  A.  Yes.

18  Q.  Can you please identify the text in the "from" line?

19  A.  Charles Briscoe, Charles@Briscoesports.com.

20  Q.  What's the date it was sent?

21  A.  November 20, 2019.

22  Q.  Who is it sent to?

23  A.  Charles, Charles@Briscoesports.com.

24  Q.  What is the text that follows attachments?

25  A.  Promissory note to Darden Enterprises.PDF and an untitled

O9RBDAR5                         Sebade- Direct

1   attachment.

2            MR. KINDER:  Please scroll to the next page.

3   Q.  Ms. Sebade, what's the heading of this page?

4   A.  Promissory note.

5   Q.  And what is the amount on the upper-left?

6   A.  $1 million.

7   Q.  And the date?

8   A.  November 18, 2019.

9   Q.  Can you please read the first paragraph in the first line

10  of this second paragraph.  I'm sorry, the first sentence of the

11  second paragraph.

12  A.  For value received, Darden Enterprises, LLC, a Delaware

13  Limited Liability Company, promises to pay to the order of

14  Briscoe Sports Group or assigns at 8782 Sydney Harbor Circle,

15  Delray Beach, Florida, or at such other address as to which

16  payee shall give written notice to payor.  The sum of

17  $1 million on or before June 1, 2020. Payee shall acknowledge

18  full release and satisfaction of this note upon the payment by

19  payor of the total sum of $1,050,000 due and payable on the

20  maturity date.

21  Q.  Ms. Sebade, in the first sentence do you see that there's a

22  parenthesis following the clause that reads Darden Enterprises

23  LLC at Delaware Limited Liability Company?

24  A.  Yes.

25  Q.  What's in the parenthesis?

O9RBDAR5                          Sebade- Direct

1    A.  Payor.

2    Q.  And there's parenthesis following Briscoe Sports Group?

3    A.  Yes.

4    Q.  What does it say there?

5    A.  Payee.

6    Q.  And there's a parenthesis after the date June 1, 2020.

7    What's in that parenthesis?

8    A.  The maturity date.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. KINDER:

2    Q   Please keep scrolling.  Let's stop there.  Scroll up a

3    little bit so we see the text above.  Can you zoom out

4    slightly.

5            Ms. Sebade, you see the same signature block as we did

6    on the prior promissory note that we reviewed?

7    A   Yes.

8    Q   And are both of these signature lines signed?

9    A   Yes.

10   Q   401-325.  Ms. Sebade, I will read the blue messages from

11   Cal, the 1779 Calvin Darden, Jr. number.  Ms. Sebade, please

12   read the green messages from the 6696 Charles number.

13           Calvin Darden, Jr., November 20, 2019.  Do you know

14   who he is?

15           I hope it's 900 bro.  I told them they'd be getting

16   600 today.  Either way, I'm glad we got it done.  Any update?

17   Just nervous about the 5:00 p.m. deadline.

18   A   Not there yet.

19   Q   You sure he authorized it?

20   A   Yes.

21   Q   Okay bro.

22   A   I thought you was sending it as 850.

23   Q   Oh, my bad.  Give me five min.

24   A   On a call.

25   Q   Interest?

1    A    Five percent.

2    Q    Check you inbox.  Good morning bro you have my wiring

3    instructions?  Or should I send it again?  FYI-here are the

4    wiring instructions: Bank, Wells Fargo (143 Lenox Avenue, New

5    York, New York, 10026).  Routing number, 121000248.  Account

6    name, Legacy AC LLC.  Account number 6837204830.

7              Can we please go to 2506, please.

8              Okay.  Ms. Sebade, who is this email from?

9    A    Charles Briscoe, charles@briscoesports.com.

10   Q    What's the date it was sent?

11   A    November 21, 2019.

12   Q    Who is it sent to?

13   A    Charles, charles@briscoesports.com.

14   Q    What are the attachments?

15   A    Promissory note to Briscoe Sports Group 2.PDF and an

16   untitled attachment.

17   Q    Scroll down to the next page.

18             Ms. Sebade, the heading reads promissory note amount

19   is $1 million.  What is the date?

20   A    November 20, 2019.

21   Q    Can you please read the first paragraph.

22   A    For value received, Briscoe Sports Group, payor, a limited

23   liability company, at 8782 Sydney Harbor Circle, Delray Beach,

24   Florida, promises to pay to the order of Chandler Parsons,

25   payee, or assigns the sum of $1 million on or before June 10,

 1    2020, the maturity date.

 2    Q    Please read the next sentence.

 3    A    Payee shall acknowledge full release and satisfaction of

 4    this note upon the payment by payor of the total sum of

 5    $1,050,000 due and payable on the maturity date.

 6    Q    Can we please scroll through the rest of the document.

 7    Let's go to 616A, please.  Can we zoom in a little bit.

 8            Ms. Sebade, what is this exhibit?

 9    A    It's a bank statement from Morgan Stanley.

10    Q    What is the period of the bank statement?

11    A    November 1 through November 30 of 2019.

12    Q    And there's text in the left that says statement for?

13    A    Yes.

14    Q    Can you please read the text that appears underneath that.

15    A    Chandler Parsons TTEE, Chandler Parsons revocable trust U/A

16    DTD 01/30/2016.

17    Q    Can you please go to page 5.  Scroll down.

18            Ms. Sebade, you see at the top of this page there are

19    a series of rows underneath the heading cash related activity

20    electronic transfers?

21    A    Yes.

22    Q    And do you see there's an entry with the activity date of

23    11/20?

24    A    Yes.

25    Q    Can you please read the text that appears in that row for

1   November 20?

2   A    Activity type is funds transferred.  Description is wired

3   funds sent.  Comments is BENE: Briscoe Sports Group, account

4   ending in 1870 for 1 million.

5   Q    And is the 1 million credit or a debit?

6   A    A debit.

7   Q    Go to 402-503, please.

8        Ms. Sebade, is this a message from the 6696 Charles

9   number to Chandler Parsons?

10  A    Yes.

11  Q    What is the date?

12  A    December 27, 2019.

13  Q    Can you please read the text of the message.

14  A    Wiseman screwed us and signed with excel.  I am working on

15  getting getting everything back now.

16  Q    401-787, please.

17       Ms. Sebade, these are messages between the Charles

18  number and the Cal Darden, Jr. number?

19  A    Yes.

20  Q    Can you please read the Charles messages in green and

21  identify the date of the first message.

22  A    The date is May 20, 2020.  Yeah give me a minute.  Chandler

23  keeps hitting me about the loan.  Dwight interested in owning a

24  team.  I told him about you.  He wants your help in putting

25  together a group.  This company is interested in being bought.

1   Then he sends a link to sigsports.com.  Wife keep asking me

2   what's going on with everything.  Bro I really don't want to

3   hit you with any of this stuff especially with what's going on

4   with you.  I may be leaving out several things but here are a

5   few things bro and get better soon.

6   Q   I'll call you soon.

7   A   Cool are you sure you will be able to talk?

8   Q   We'll pay Chandler back as soon as we close the first of

9   any of the deals we're working on.  I can help Dwight with

10  that.  I'll look into Sig Sports.  Might make sense to roll

11  them into waves.  Please tell the wife I'm working on the deal

12  with the Chinese.  They will offer us better terms than the

13  Saudis.  They're still locked down too, contrary to what the

14  media says.  As soon as that's lifted within the next few weeks

15  we'll get closed.  My investment banker team isn't back in the

16  office until the middle of June at the earliest, but we'll get

17  it done.

18  A   Cool.  Thank you again.

19  Q   Of course bro.

20          401-925, please.

21          Cal Darden, Jr., September 16, 2020.  Hey bro I'm not

22  sure you understand just how big of an opportunity this Atlanta

23  Dream deal can be for us.  We need to keep this deal alive with

24  Dwight by any means.  I'm sure I'm a little off, but it just

25  seems like it's not that big of a deal to you bro or maybe

O9RJDAR6                        Sebade - Direct

1  you're just busy with a million other things.  Regardless, this

2  deal opens up a pipeline of things for us unlike anything we've

3  ever seen before.  Trust me on this.

4          402-576, please.

5          Ms. Sebade these are messages between Chandler Parsons

6  in blue and Charles in green?

7  A    Yes.

8  Q    Chandler Parsons, October 7, 2020.  What's his name and who

9  is he?

10  A    Calvin Darden.

11  Q    And who exactly is he?

12  A    He has your number.  Also he guarantee the bread for JW.

13  Q    401-961, please.

14          Ms. Sebade these are messages between Charles in green

15  and Cal Darden, Jr. in blue?

16  A    Yes.

17  Q    Please read the first green message starting with the date.

18  A    October 21, 2020, cool let me know.  I kept forgetting to

19  ask you.

20  Q    No problem bro.  I'm going send you this deck and call you

21  in a few.

22  A    Bet.

23  Q    Let's stop there, please.  Scroll up a little bit more.

24  Scroll down.  Can we please try keeping this up side by side

25  with 2401.  Can we zoom in a little bit on that middle text

1   message.  Okay.

2           And Ms. Sebade, on the right is 2401.  That's an email

3   you reviewed?

4   A   Yes.

5   Q   Who is it from?

6   A   Calvin Darden, calvin@dardenenterprises.com.

7   Q   What's the date and time that it was sent?

8   A   October 21, 2020, 9:16:27 p.m.

9   Q   Who was it sent to?

10  A   Kev Valentine, kdvalentine@gmail.com.

11  Q   What is listed in the subject and attachments?

12  A   Subject is Atlanta Dream Vision Plan (draft).  Attachment

13  in Atlanta Dream Vision Plan.PDF.

14          MR. KINDER:  And Mr. Ross, can you please scroll

15  through the attachment to this email.  Can we please bring up

16  on the right 2402.  Before we do that, 2401, can you scroll

17  back up to the top.  And scroll down to the first page.  First

18  page of the -- scroll down one more page to the attachment.

19          You see there's a logo at the top there, Ms. Sebade?

20  A   Yes.

21  Q   What does it read?

22  A   Darden Sports Group.

23  Q   Can you please read the first sentence of text.

24  A   Darden Sports Group DSG, led by prominent Atlanta

25  businessman Calvin Darden, Sr., is proud to have an opportunity

1    to become the next owner of the WNBA's Atlanta Dream.

2    Q    Scroll up one page so we see the first of the attachment.

3         What's the text that's written on this page?

4    A    Atlanta Dream.

5    Q    Let's go to 2402 on the right-hand side.  Zoom in a little

6    bit.

7         Ms. Sebade, who is this email from?

8    A    Calvin Darden, calvin@dardenenterprises.com.

9    Q    The date?

10   A    October 21, 2020.

11   Q    And the time?

12   A    9:18:28 p.m.

13   Q    Sent to?

14   A    Charles Briscoe, charles@briscoesports.com.

15   Q    And subject and attachments?

16   A    The subject is Atlanta Dream Vision Plan (draft).

17   Attachment is Atlanta Dream Vision Plan.PDF.

18   Q    Can we please scroll through the rest of the document.  And

19   then when you're done let's go to 2404.  Zoom in a little bit.

20        Ms. Sebade, can you please read the from, sent to,

21   subject, and attachment.

22   A    From Calvin Darden, calvin@dardenenterprises.com.  Sent,

23   October 22, 2020 at 2:57:40 a.m. to Charles Briscoe,

24   charles@briscoesports.com.  Subject, Atlanta Dream Vision

25   Plan-1.PDF.  Attachments, Atlanta Dream Vision Plan-1.PDF.

O9RJDAR6                          Sebade – Direct

1   Q   Can you please read the text of this email.

2   A   Hey brother I fixed a couple issues, typos and formatting

3   issues, here is the newest version.  By the way, I'm really

4   glad you like it and see the vision.  Let's get it bro.

5   Q   Can we scroll through the rest of the document.  Then let's

6   go to 2405.  Zoom in a little bit.

7         Ms. Sebade, same thing, can you please read the from,

8   sent to, BCC, subject, and attachments lines?

9   A   From Charles Briscoe, charles@briscoesports.com.  Sent

10  October 22, 2020, 2:33:40 p.m. to Serge Banker BMO Ecityan,

11  serge.ecityan@bmo.com, and Jeffrey L. Schmidt,

12  jeffrey.l.schmidt@bmo.com.  The BCC line is

13  charles@briscoesports.com.  Subject, Atlanta Dream Vision

14  Plan-1.PDF.  Attachments, Atlanta Dream Vision Plan-1.PDF and

15  an untitled attachment.

16  Q   What is the text of the message?

17  A   Serge, here is the deck for the Atlanta Dream.

18  Q   Let's scroll through, you can go a little bit more quickly.

19  Let's go back to 401-961, full screen.

20        Ms. Sebade, we'll continue reading these text

21  messages.

22        MR. KINDER:  And then, your Honor, maybe makes sense

23  to break there?

24        THE COURT:  Yes.

25  Q   Calvin Darden, Jr., October 21, 2020.  I'm going to send

O9RJDAR6                              Sebade - Direct

1    you this deck and call you in a few.

2    A    Bet.  Serge Ecityan, Jeff Schmidt, 1-855-743-6463,

3    Conference ID, 8225973.  Confirmed tomorrow at 11:30 a.m. ET.

4    What address should I use for your pops?  Don't forget to send

5    address.

6    Q    Calvin Darden, 4020 Summit Drive Marietta, Georgia 30068.

7    A    Thanks bro.

8    Q    No problem.  Were you able to speak to the bankers again?

9    A    Bankers want to reschedule for Monday.

10   Q    Hopefully we won't have to.

11   A    Right.

12   Q    You think he'll do it?

13   A    I think there is a great chance.  He is very intrigued by

14   the deck.  At some point next week it may be worth doing a call

15   and have you give him more insight on the deck.

16   Q    What amount do you think?

17   A    Meant to tell you also that.  They are starting the NBA

18   season back before Christmas.  And not sure on the amount.

19   Q    Calling you in five min.

20   A    Okay.

21   Q    By the way, did the guys from the BMO bank get back to you?

22   A    They are speaking with me tomorrow.

23   Q    As far as the bankers, I think you tell them we'll only

24   need 2-3M.

25   A    Cool.  And okay I will tell them that.

1    Q   I think we can get five from Dwight bro.

2    A   Me too.

3    Q   What's good bro?

4    A   NM.  What's up bro?

5    Q   Been on a call with WNBA because they had some questions

6    about the deck and how quickly we'd be able to execute.  Really

7    good call.  Now I just got in front of my computer to start

8    working on this deal sheet for Dwight.  What's up with the

9    bankers?

10   A   Cool and nothing much.  They keep talking about trying to

11   secure it with something.  I told them that won't work.  We

12   need to secure it with the Dream.  1-239-887-1238.  Serge.

13   Jeff.  1-231-420-5924.  Call Jeff now.  He is available.

14   Q   He didn't answer.  Did you just speak to him?

15   A   What's up bro.  Got it bro.

16   Q   My man.

17   A   Let's get this done bro.

18   Q   Ball is your court now bro.  I've done all the heavy

19   lifting.  LOL.

20   A   I got you bro.

21   Q   Hey my man.  How's it going?

22   A   Waiting on him to call me haven't spoken to him yet.

23   Q   Do you know if he left for vacation?

24   A   I don't think so.

25   Q   You feel good about talking to him?

O9RJDAR6                        Sebade - Direct

1    A   Yes, whenever I do.

2    Q   Bro great job with Dwight today.  I'm excited.  Sounds like

3    he'll probably do it.

4    A   Me too bro and I think so.

5    Q   What amount did you guys discuss five or seven?  And did he

6    think it was too much?

7    A   Five and no.

8    Q   Okay cool.

9            MR. KINDER:  Okay.  I think that makes sense to stop

10   there, your Honor.

11           THE COURT:  All right.  Ladies and gentlemen, we are

12   going to adjourn for the day.  You can leave your pads on your

13   chairs or take them back and leave them in the robing room, but

14   you have to leave them here.  Remember do not discuss the case,

15   no research, nothing like that.  Just go home, relax, have a

16   great weekend.

17           We'll see you on Monday, 10:00.  Thank you very much.

18   Everybody get home safely.

19           (Continued on next page)

20

21

22

23

24

25

O9RJDAR6

1              (In open court; jury not present)

2              THE COURT:  Okay.  You may be seated.  And Ms. Sebade,

3      you may step down.  Thank you.

4              (Witness temporarily excused)

5              THE COURT:  Okay.  How much more do you think on

6      direct examination?

7              MR. KINDER:  I think about 20 or less, your Honor.

8              THE COURT:  Okay.  All right.  I don't know who's

9      doing the cross-examination.  Any idea about how long the cross

10     might be?

11             MR. DONALDSON:  No, not that much, Judge.

12             THE COURT:  I'm just trying -- again, I'm trying to

13     figure out timing for witnesses on Monday, but okay.  All

14     right.  Why don't we figure we'll have at least an hour, hour

15     and a half or two on Monday taken to complete Ms. Sebade?

16             MR. KINDER:  I think substantially less than that.  I

17     think only about 20 minutes left on direct.

18             MR. DONALDSON:  Very little, Judge.  I'm quoting

19     Mr. Ricco, but very little.

20             THE COURT:  That's fine.  So why don't we say 20

21     minutes, 40 minutes, something like that?

22             MR. DONALDSON:  Tops.

23             THE COURT:  All right.  Who would be the next witness

24     in?

25             MR. MEAD:  Then your Honor, for Monday we have three

O9RJDAR6

1   definites.  That would be Jeffrey Schmidt.  He's one of the BMO

2   bankers.  He's the most substantial witness we'd be calling.

3   He's about an hour and 15 or so probably.

4           THE COURT:  Okay.

5           MR. MEAD:  We have Brannon Anthony.

6           THE COURT:  Okay.

7           MR. MEAD:  Who is a representative of Tyler Perry.

8   He'll be relatively brief, around 20 minutes.  We have Stuart

9   Duguid.  He is a representative of Naomi Osaka.  He's also

10  pretty short, about 20 minutes.  And then there's a couple of

11  people that we may call, Donzaleigh Crawley Artis, who is the

12  mother of Mr. Wiseman, and Serge Ecityan, the BMO banker.  Both

13  of those two people are in the maybe category.  I think if all

14  five of them testify, we get through most of the day on Monday.

15  I think if only the three definites testify, we're looking at a

16  shorter day probably.  Then we've got Rosalind Brewer, who is

17  coming in from Germany on I think --

18          THE COURT:  Tuesday?

19          MR. MEAD:  Coming in late on Monday so she can testify

20  first thing on Tuesday.  And then we may recall -- sounds like

21  the Court is still thinking about the 404(b) issue, which is

22  fine.  So we may recall Ms. Sebade, if that's acceptable, just

23  on the 404(b) and have her be perhaps the last witness after

24  Ms. Brewer.

25          THE COURT:  Okay.

O9RJDAR6

1          MR. MEAD:  So --

2          THE COURT:  You may rest Tuesday?

3          MR. MEAD:  Yes, I think we may rest Tuesday at, like,

4     11:00 or 11:30 or something.  So I wonder if it makes sense for

5     the defense case to start that day, if they're available.  It

6     sounds like the Court is thinking there won't be a charge

7     conference on Monday, which is of course fine, from the

8     government's perspective.

9          So maybe we're looking at kind of a close on

10    Wednesday, if there's a short defense case or no defense case,

11    and potentially later than Wednesday if there's a substantial

12    defense case.

13         THE COURT:  All right.  So let me turn to the defense

14    now.  So it looks as if the government's going to rest its case

15    Tuesday morning, perhaps as early as 11:00, but let's just say

16    certainly by lunch.  So what's the status of first the defense

17    case and who will the witnesses be and how long do you think it

18    might last?

19         MR. DONALDSON:  Judge, I know we will be ready to go

20    on Tuesday afternoon or maybe morning with the witnesses that

21    we have.  I know Ms. Reed spoke to the government this morning

22    about a few witnesses and the documents that we had.  I think

23    we may have already emailed a document over to them related to

24    a potential witness, I think.

25         Pretty sure that there is one of the witnesses that

O9RJDAR6

1    the government said that they would not call, we have already

2    reached out to Mr. Dershowitz's attorney and spoke to the

3    attorney and working on getting that person here on Tuesday.

4    So hopefully they'll be here.  So we're doing everything we can

5    to make sure we're ready to go Tuesday afternoon.

6         THE COURT:  Let me ask are you -- because there was a

7    mention of Mr. Parsons.  Are you attempting to get Mr. Parsons

8    here?

9         MR. DONALDSON:  I'm pretty confident we are not

10   attempting to get Mr. Parsons here.

11        THE COURT:  The only reason I ask is there may be

12   various issues I need to deal with related to any of his

13   testimony.  But right now I'll assume that he's not testifying

14   unless I'm advised otherwise.

15        MR. DONALDSON:  We will let the Court know, if the

16   Court doesn't mind, over the weekend whether or not we think

17   that's going to happen, but I'm almost confident that's not

18   going to happen.

19        THE COURT:  I would like to know.  That way we can

20   deal with it Monday morning or whatever just to make sure

21   because -- and discuss what the parameters of that testimony

22   might be.

23        MR. DONALDSON:  I understand.

24        THE COURT:  Okay.

25        MR. RICCO:  So Judge, I think that if the government

O9RJDAR6

1    is resting on Tuesday morning, I think we will be ready to go.

2    So we've sort of gone through the witnesses, given the

3    government the information, you know, spoke to folks and their

4    counsel.  And those people who will take the fifth and have

5    other issues, we're not going to be calling those witnesses.

6            THE COURT:  By "those people," Mr. Briscoe you're

7    referring to?

8            MR. RICCO:  Persons like Mr. Briscoe and Mr. Baldwin,

9    whatever.  We think that with respect to Mr. Dershowitz, we

10   would be able to put in our case on Tuesday.  There's one very

11   discrete outstanding issue with respect to paralegal testimony,

12   but we're going to find out what the government's position is

13   on it.  They don't know it yet.  They have a case to put in

14   before we start discussing our defense case, but I want them to

15   have enough information so we can keep moving.

16           THE COURT:  But just to be clear, Mr. Dershowitz, but

17   it's -- it would be a calling a paralegal from -- on the

18   defense side, not associated with Mr. Dershowitz?

19           MR. RICCO:  Totally unassociated.  This paralegal

20   would be sort of like a chart witness like we're getting now.

21           THE COURT:  Summary witness?

22           MR. RICCO:  That's right.  So that paralegal's

23   testimony, Judge, tops, testimony would take 15 minutes, tops.

24   So we're talking very short amount.  And then of course we have

25   other issues to discuss with the defendant with respect to his

O9RJDAR6

1    rights.  But given all of that, we should be ready to go on

2    Tuesday morning, should the government rest at that time.

3            THE COURT:  That's fine.  And so I'll anticipate that

4    we'll start the defense case, if you need a little -- after the

5    government closes.  There may be an application.  I can hear

6    the application at that time or what have you.  And then if we

7    break a little bit early for lunch just to make sure

8    everybody -- your witnesses are -- whatever it may be.  But

9    from what I've heard, my intention is defense case will start

10   on Tuesday either immediately after the government's concluded

11   or shortly thereafter.

12           So you are going to have a conversation — "you" being

13   the defense team — with Mr. Darden, I think Monday at some

14   point.  Monday I'm going to allocute Mr. Darden about his right

15   to testify.  So Mr. Darden, don't say anything right now, but

16   basically I'm going to ask you -- you don't have to stand up.

17   That's okay.

18           I'm going to talk with you about your right to

19   testify, which is your right, no one else's, your right.

20   However, in exercising your right, you absolutely should speak

21   with your counsel, and they will provide you with whatever

22   advice they might have.  But at the end of the day, even with

23   the advice, it's still your call.

24           And so I'm going to ask you about that on Monday,

25   okay?  So I just want everybody to be prepared so you have the

O9RJDAR6

1    opportunity to have as full a discussion as you want, and then

2    we'll take care of that.  So it sounds as if, again, absent --

3    and the decision is yours.  It doesn't matter, Mr. Darden, to

4    me.  We just need to know.

5         And so the case may be concluded -- is it fair to say,

6    the defense case will be concluded on Tuesday, unless

7    Mr. Darden testifies, which may mean we bleed over into

8    Wednesday?

9         MR. RICCO:  That's very accurate, your Honor.

10        And based upon what Ms. Reed, who unfortunately had to

11   leave early because she had to pick her son up, but based upon

12   Ms. Reed's discussions with Mr. Dershowitz's counsel, which has

13   already begun, we might have to go over a little bit Wednesday

14   morning.  May, but I don't think so.  But I feel pretty

15   confident we can get it in the morning/afternoon session on

16   Tuesday.

17        THE COURT:  Okay.  Is it because of a potential

18   scheduling issue with Mr. Dershowitz?

19        MR. RICCO:  It may be that's the issue, Judge.

20        THE COURT:  I ask that you keep the government

21   informed because we can -- look, maybe we can try and do -- if

22   we excuse the jury, do the charging conference on Tuesday, and

23   then do the defense case on Wednesday.  So obviously

24   Mr. Dershowitz is not a party, is now finding out recently that

25   he's going to be called to testify.  Obviously whether there's

O9RJDAR6

1    been a subpoena issued or not, whatever it may be, recognizing

2    if -- but by the same token, he understands that he does have

3    other things.  When do you think you may have sort of a

4    definite answer about his availability?

5             MR. RICCO:  I think we'll have that later today.

6             THE COURT:  Or at some point over the weekend?

7             MR. RICCO:  Or at some point over the weekend.  And

8    we'll notify the government.  We'll CC the Court on that.  It's

9    scheduling, so we're comfortable with that.

10            THE COURT:  Because I'd like to figure out exactly

11   when we would sit and have the charging conference.  Although

12   granted, with certain exceptions, the charge should be fairly

13   straightforward in terms of the counts in the indictment.  I

14   mean, there may be -- oh, I still need to get language on the

15   judgment 404(b) on the curative instruction that I would do

16   when that evidence gets admitted, but also include in the

17   request to charge.

18            MR. RICCO:  Judge, with respect to that, we have

19   something else that we addressed on the defense side today.

20   We're going to send our proposal to the government, and agree

21   or disagree, we'll get that to the Court over the weekend.

22            THE COURT:  Okay.

23            MR. RICCO:  We'll get that to your Honor tomorrow.  I

24   think we all recognize an instruction is required.  It's just a

25   question of what the language is going to be.

O9RJDAR6

1          THE COURT:  Sure.  Okay.  Is there anything else we

2      should take up now?

3          I guess, Mr. Mead, in terms of when -- I'll be able to

4      provide a better idea to the parties about when charging

5      conference and summation will occur once we figure out the

6      defense case, in particular Mr. Dershowitz's situation.

7          MR. MEAD:  For the sake of all of my team, it sounds

8      like we are not going to close on Tuesday.  Wednesday would be

9      the earliest.

10         THE COURT:  That's correct.  And I promise I won't

11     bait and switch you.  Although I like the look of sheer panic

12     on people's faces, but I wouldn't do that.  You should have the

13     time you need, within reason, to marshal the evidence.

14         I mean, look, the case has moved more quickly than the

15     parties anticipated.  So my main concern would be with the

16     jury, but we don't have those concerns because we said two and

17     a half weeks.  We're going to come in way under that.  So we're

18     not going to close Tuesday.

19         MR. MEAD:  Then obviously if the only witnesses are

20     Mr. Dershowitz, who was our witness, and a paralegal, we

21     wouldn't necessarily expect 26.2 material for those witnesses.

22         THE COURT:  I don't know what the -- I mean, I'm not

23     sure what the summary is about, but yeah.  Okay.

24         MR. MEAD:  If the defense witness list changes, as I

25     would understand if it did tonight or tomorrow, we of course

O9RJDAR6

1     ask the defense to let us know promptly, and then also to get

2     us any exhibits or charge that may be coming in as soon as

3     possible as well.

4                THE COURT:  Yes.  Obviously the summary charts or

5     anything like that for the paralegal, I know there's going to

6     be some meet and confer about that.

7                MR. RICCO:  Judge, I know Mr. Mead is always nervous

8     about these things for some reason.  He'll get the stuff way in

9     advance so that he'll be prepared.  No one wants to do anything

10    by surprise, Judge.  It just slows things down.

11               THE COURT:  Well, also, again, what I don't want to

12    have happen is for there to be a delay.  For example, if you

13    create something and the government objects to certain things,

14    you need to tweak it.  But you have to go back to the office to

15    tweak it.  I don't want to delay in front of the jury.  That's

16    fine.

17               MR. RICCO:  And Judge, one of the charts that the

18    paralegal will testify to, all of the evidence isn't in on the

19    subject yet.

20               THE COURT:  Oh, is not in?

21               MR. RICCO:  Is not in evidence.  So most of it is in,

22    but it's all not in.  Some of it came in this afternoon.

23               THE COURT:  Okay.  All right.  So I would ask that you

24    speak with the government.  It sounds like everything should be

25    in order.  If there are issues that I need to take up before

O9RJDAR6

1    the 10:00 start, I can do that.  Just let me know.

2            My practice is to send all of the exhibits back to the

3    jury after summations.  All the exhibits are all electronic.

4    Across the street there's more of an ability to be able to have

5    electronic materials provided to the jury.  We would have to

6    get a standalone laptop.  The parties would need to review it

7    to make sure that all the exhibits are on there.  I don't have

8    an objection to that.

9            It's either that or is the government planning to

10   provide a binder of the exhibits, understanding that some of

11   them, the voluminous phone records, things like that, could be

12   on a drive of some sort — again, I don't have a particular

13   preference — or even a combination of both.  But let me hear

14   from the government with regard to that.

15           MR. MEAD:  We can do a standalone laptop, which will

16   make our paralegals happy.

17           THE COURT:  It just means that the parties need to

18   review it, make sure everything is on there.  And I don't know

19   if it's disabled, like the Wi-Fi is turned off or --

20           MR. MEAD:  I forget the exact details, but we do it

21   pretty routinely, so we'll figure it out.

22           THE COURT:  That's fine.  Okay.  And to the extent

23   there are exhibits that we don't have, in other words, hasn't

24   been updated, if we could get any updated exhibits that would

25   be great, just in case there are any issues.

O9RJDAR6

1          Similarly, if the defense has exhibits, they don't

2    necessarily -- if they could be on the laptop, fantastic, GX,

3    DX, and that would be perfect.  My recollection is there may be

4    some exhibits that came in for which they need to be redacted

5    because they have personal identifying information.

6          MR. MEAD:  So our plan, your Honor, was that the

7    exhibits would go to the jury un-redacted.  The only issue

8    would be if the press happened to ask for an exhibit, at that

9    point we would redact BII.

10         THE COURT:  That's fine.  I think the press has got

11   other things they're focused on at this stage, but you never

12   know.

13         So I'll see everybody Monday at 10:00.  Thank you very

14   much.

15         (Adjourned to September 30, 2024, at 10:00 a.m.)

16

17

18

19

20

21

22

23

24

25

1                          INDEX OF EXAMINATION

2    Examination of:                              Page

3    JILLIAN BRONSON

4    Direct By Mr. Mead . . . . . . . . . . . . . 523

5    Cross By Mr. Ricco . . . . . . . . . . . . . 650

6    JAMES WISEMAN

7    Direct By Mr. Kinder . . . . . . . . . . . . 652

8    Cross By Mr. Ricco . . . . . . . . . . . . . 661

9    JEFFREY ACOSTA

10   Direct By Mr. Kinder . . . . . . . . . . . . 664

11   OLIVIA SEBADE

12   Direct By Mr. Kinder . . . . . . . . . . . . 682

13                          GOVERNMENT EXHIBITS

14   Exhibit No.                              Received

15    2503     . . . . . . . . . . . . . . . . . 682

16    1142     . . . . . . . . . . . . . . . . . 683

17    1141     . . . . . . . . . . . . . . . . . 688

18    401-255, 401-267, 401-283, 401-289, . . . . 691

19              401-295, 401-308, 401-325,

20              401-787 401-925, 401-961,

21              401-1000, 401-1029, 401-1147,

22              401-1177, 401-1177A,

23              401-1178A, 401-1202,

24              401-1202A, 402-414, 402-434,

25              402-440, 402-440A, 402-503,

1          402-576, 404, 404-1, 404-9,

2          404-31, 405

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25