OA2JDAR1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4                   v.                          23 Cr. 134 (VSB)

5   CALVIN DARDEN, JR.,

6                                              Trial

        Defendant.
7   ------------------------------x

8                                              New York, N.Y.
9                                              October 2, 2024
                                               10:00 a.m.
10

11  Before:

12                  HON. VERNON S. BRODERICK,

13                                             District Judge
                                               -and Jury-
14                          APPEARANCES

15  DAMIAN WILLIAMS
         United States Attorney for the
16       Southern District of New York
    KEVIN MEAD
17  STEPHEN J. RITCHIN
    WILLIAM C. KINDER
18  BRANDON C. THOMPSON
         Assistant United States Attorney
19
    DONALDSON CHILLIEST & MCDANIEL LLP
20  BY:  XAVIER R. DONALDSON
         -and-
21  ANTHONY RICCO
    STEVEN Z. LEGON
22       Attorneys for Defendant

23  Also Present:
    Alexander Ross, Paralegal
24  Arjun Ahuja, Paralegal
    Melissa Baccari, FBI Special Agent
25

1          (Trial resumed; jury not present)

2          THE COURT:  Okay.  We received the email from

3     Mr. Ricco with regard to the instructions.  The first ones

4     appeared just to be pointing out a typo, which was a reference

5     to Count One.  The second one is it, Mr. Ricco, that the

6     request is we include the "mere association" language that

7     appears in the charge elsewhere in the --

8          MR. RICCO:  Yes, Judge.

9          THE COURT:  -- in the other section?

10          MR. RICCO:  Yes.  I didn't say that, but that's what I

11     was suggesting.  I think the Court has a line on it, I think,

12     on page 28 or some other place.  That's what we're requesting.

13     No more than that.

14          THE COURT:  Okay.  All right.  Does the government

15     have any objection?  You want to think about that or -- I think

16     it's just a copy and paste in the aiding and abetting section,

17     a sentence or two from the "mere association" that appears

18     somewhere else.  I mean -- go ahead.

19          MR. MEAD:  That sounds fine.  If you don't mind, if we

20     take a look over lunch and we'll get back to the Court.

21          THE COURT:  So with regard to this morning, my

22     understanding is it's going to be Mr. Slade and then -- no?

23     I'm sorry.  Go ahead, Mr. Donaldson.

24          MR. DONALDSON:  Mr. Sienko is going to go first and

25     probably only -- not probably, only.

OA2JDAR1

1        THE COURT:  And how long do you think his direct will

2    be?

3        MR. DONALDSON:  I don't imagine more than 15, 20

4    minutes.  If it goes anything better than yesterday, should be

5    15 minutes.

6        THE COURT:  Okay.  All right.  Okay.  And is there

7    anyone -- I mean, those are the folks I was aware of.  Is there

8    anything else?  Yes, Mr. Ricco?

9        MR. RICCO:  No, your Honor.  There isn't anything

10   else, and the defendant is ready for your Honor's inquiry on

11   the issue that has been raised.

12       THE COURT:  To close the loop.  And that's exactly

13   where I was going.  So why don't I just go through each of the

14   questions.  Mr. Darden, you can remain seated.  Just pull the

15   microphone closer to you to make sure everyone hears.

16       As I indicated previously, I want to make sure that

17   you are aware that you do not have to put on any evidence in

18   this trial — however, there has been a defense case — because

19   it's the government's burden to prove you guilty of the charges

20   contained in the indictment beyond a reasonable doubt.

21       Now, do you understand that?

22       THE DEFENDANT:  I do, your Honor.

23       THE COURT:  Now, however, you do have the right to

24   testify in your own defense, if you so choose.

25       Do you understand that?

OA2JDAR1

1    THE DEFENDANT:  I do, your Honor.

2    THE COURT:  Now, you also have the right not to

3    testify.  Do you understand that?

4    THE DEFENDANT:  I do.  Thank you, your Honor.

5    THE COURT:  Now, with regard to your right not to

6    testify, I will instruct the jury — in fact, I've already

7    instructed the jury, but I will do so again.  I already

8    instructed in my preliminary remarks, and I will do so again in

9    the instructions that we went over yesterday that they may not

10   draw any inference of guilt against you based upon your

11   decision not to testify and the fact that you did not testify,

12   and that fact may not enter into their deliberations in any

13   way.

14   So I want to make sure that you know that the decision

15   whether or not to testify is yours.  You're obviously entitled

16   to, and I assume that you've been speaking with your attorneys

17   to assist you in making that decision.  In other words you're

18   entitled to their advice.  But at the end of the day, the

19   decision is yours to make.

20   Do you understand that?

21   THE DEFENDANT:  Yes, your Honor.

22   THE COURT:  Now, counsel, so Mr. Donaldson, Mr. Ricco,

23   have you discussed this issue with Mr. Darden, his decision

24   whether or not to testify with him?

25   MR. RICCO:  Yes, I have, your Honor.

OA2JDAR1

1   THE COURT:  And have you had enough time to discuss
2   the issue with him?
3   MR. RICCO:  Your Honor, I strongly believe that we've
4   had enough time to discuss the issue, particularly in light of
5   your Honor's instructions along the way.  At every opportunity
6   in between, we've further discussed those issues with
7   Mr. Darden, and I feel that they've been sufficiently addressed
8   by Mr. Darden.
9   THE COURT:  Okay.
10  MR. RICCO:  And he's nodding in agreement.
11  THE DEFENDANT:  I agree.
12  THE COURT:  So the next question was, Mr. Darden, you
13  agree that you've had sufficient time to speak with your
14  attorneys about your decision whether or not to testify?
15  THE DEFENDANT:  Yes, sir.
16  THE COURT:  All right.  Now, do you understand that
17  that decision is entirely up to you?
18  THE DEFENDANT:  Yes, sir.
19  THE COURT:  All right.  As you sit here today, do you
20  intend to testify?
21  THE DEFENDANT:  I do not, your Honor.
22  THE COURT:  Okay.  All right.  Now, there's a small
23  window, one witness, where you can change your mind and decide
24  to.  So when Mr. Sienko is done testifying, before the defense
25  rests, what I may do is excuse the jury, since we're going to

OA2JDAR1

1    break for the day -- well, let me ask, as things stand right

2    now, without Mr. Sienko's testimony, does the government have a

3    rebuttal case?

4             MR. MEAD:  I would be extremely surprised, your Honor.

5             THE COURT:  Okay.  So it's likely no.  Okay.

6             So what I will do is excuse the jury after Mr. Sienko.

7    We can take some time if there are any housekeeping matters,

8    other things that we need to discuss.

9             As I understand it, the government has indicated its

10   summation will be about an hour and a half.  The defense has

11   indicated about the same amount of time.  Or let me revisit the

12   government.  It's just that --

13            MR. THOMPSON:  90 minutes, your Honor.

14            THE COURT:  And Mr. Donaldson?

15            MR. DONALDSON:  I'm still at at least 90 minutes,

16   judge?

17            THE COURT:  It doesn't matter if it's more.  The only

18   reason I was asking is should we start -- I will ask the jury

19   when they come back out if they can start earlier and whether

20   9:00 or 9:30 would be better.

21            MR. DONALDSON:  I think 9:30 would be better.  It's up

22   to the Court.  If they can come here at 9:00, that's fine, but

23   9:30 is fine as well.

24            THE COURT:  The only reason I want to ask the jury is

25   it's an issue if folks are taking mass transportation, if

1    they're taking the train from one of the upper counties, the

2    schedule may not work out in a certain way.  We can go off the

3    record for two seconds.

4              (Discussion off the record)

5              THE COURT:  So I will speak with the jury about that.

6    And it's just a matter of timing, but if 9:30 works better for

7    counsel, we can sort of say that.  My desire is that we get

8    through the summations in the morning.  And so normally when

9    the jury is deliberating, we get them lunch.  We'll get them

10   lunch tomorrow, but they can have lunch and then I'll do the

11   jury charge and then they'll get the case.

12             Hopefully we'll be able to get all of the jury

13   addresses done in that timeframe.  If not, then the rebuttal

14   has to be in the afternoon.  We can revisit that.

15             Anything we should deal with before we bring the jury

16   out from the government?

17             MR. MEAD:  So last night, in anticipation of Mr. Slade

18   testifying, the government obtained a handful of documents,

19   which we had been considering introducing through Mr. Slade on

20   his cross-examination.  We're not going to do that.  We had not

21   turned those documents over to the defense.  I'm going to turn

22   them over to the defense now in an abundance of caution, but

23   obviously we're turning them over with an understanding that

24   Mr. Slade is not testifying.

25             THE COURT:  That's fine.  By chance, do you have an

1    extra copy of those?

2              MR. MEAD:  I do, your Honor.

3              THE COURT:  To satisfy my curiosity.  Because I'm sure

4    you did more than I do, which is go to the Google machine to

5    see what I can recover.

6              MR. MEAD:  There were some phone calls.

7              (Discussion off the record)

8              THE COURT:  Thank you.  The government has just handed

9    me a copy of it, but my understanding, just to confirm,

10   Mr. Mead, that the exhibits that you just provided to the

11   defense and provided to me, they were in anticipation of

12   Mr. Slade testifying.  However, since he's not testifying, the

13   government does not intend to offer those?

14             MR. MEAD:  That's correct.  And since we're doing a

15   lot of this on the record, the documents are a couple buckets.

16   One bucket is Instagram photos from the defendant's wife

17   showing her at present in the house.  Another bucket is

18   excerpts of a music video, still images from a music video.

19   Another bucket is a production agreement with some affiliate of

20   Sony Pictures.

21             THE COURT:  All right.  Thank you.  So I take it

22   Mr. Sienko is here; is that correct?

23             MR. RICCO:  Yes, Judge.  He's right outside.

24             THE COURT:  So any reason why we shouldn't get the

25   jury at this stage?

OA2JDAR1

1              MR. MEAD:  No, your Honor.

2              MR. DONALDSON:  No, your Honor.  Thank you.

3              THE COURT:  All right.  We can get the jury.  Thank

4    you.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1              (In open court; jury present)

 2              THE COURT:  Okay.  Ladies and gentlemen, just to give

 3    you advance notice, today is also going to be a short day.

 4    Tomorrow you will get the case.  We'll have the summations

 5    tomorrow and the jury instructions.

 6              So remember, although we're very close, you still

 7    don't have the case.  So you're still not to discuss the case

 8    or do any research with regard to the case.  And we're going to

 9    continue now with the defense case.

10              The defense's next witness?

11              MR. DONALDSON:  The defense called Mr. Sienko.

12              THE COURT:  Okay.

13    CHRISTOPHER SIENKO,

14         called as a witness by the Defense,

15         having been duly sworn, testified as follows:

16              THE COURT:  Mr. Donaldson, you may inquire.

17    DIRECT EXAMINATION

18    BY MR. DONALDSON:

19    Q   Mr. Sienko, good morning.

20    A   Good morning.

21    Q   How are you?

22    A   I'm well, thank you.  How are you?

23    Q   I'm pretty good.  Thank you for asking.

24              So I want to just get right to it.  What's your -- if

25    you can tell the jury what your educational background is.

OA2JDAR1                         Sienko - Direct

1    A    I graduated from the University of Connecticut back in

2    1987, bachelor's in fine arts.

3    Q    And if you can tell the jury a little bit about your

4    employment history.

5    A    Certainly.  I've owned several of my own small companies,

6    but as it relates to basketball I was at Mohegan Sun for about

7    14 years overseeing the Connecticut Sun, the New England Black

8    Wolves regional marketing and sponsorship for 14 years as a

9    vice president of the company.  I was a general manager and

10   vice president of the Connecticut Sun.  After that, I left in

11   2016.  I started my small consulting firm.  And then I became

12   employed by the Atlanta Dream in 2017 as their general manager

13   first as a consultant and then general manger and came onboard

14   as the president and GM in 2018.  And I left there in 2021,

15   April of 2021.

16   Q    So I want to get right to your employment with the Atlanta

17   Dream.  What years were you there again?

18   A    I was there from 2017 till 2021, April of 2021.

19   Q    Were you a part of the process to sell the Atlanta Dream?

20   A    Yes, sir.

21   Q    And what was your role in that process?

22   A    As a general manager I was a liaison between the ownership

23   group and potential purchasers of the team.

24   Q    When you say liaison between the ownership and potential

25   purchasers, what do you mean by "liaison"?

OA2JDAR1                    Sienko - Direct

1   A    The ownership group, which my primary contact at the time

2   was John Brock, would ask me to talk and vet with different

3   ownership groups, supply them with information that they

4   required as it related to budgets, marketing -- oh, information

5   that they required so they could put together a -- excuse me --

6   a proposal for sale -- for purchase, rather.

7   Q    Do you recall someone named Calvin Darden during that

8   process of selling the Atlanta Dream in 2020?

9   A    I interacted with Calvin Darden, Jr., correct.

10  Q    Do you recall Calvin Darden, Sr.?

11  A    I met Calvin Darden, Sr. one time.

12  Q    And when did you meet -- well, who did you meet Calvin

13  Darden, Sr. with?

14  A    With Calvin Darden, Jr. and my coach at the time, Nicki

15  Collen.

16  Q    Where did that meeting take place, if you recall?

17  A    I don't remember the name of it.  It was a restaurant

18  somewhere in Atlanta.

19  Q    And what was the purpose of that meeting between you,

20  Calvin Darden, Jr., Calvin Darden, Sr., and the coach of the

21  Atlanta Dream?

22  A    It was to meet them face to face.  They wanted to meet

23  Coach Nicki and just kind of explain what they were thinking as

24  it related to the Atlanta Dream purchase.

25  Q    When you say they wanted to explain, are you speaking about

1    Calvin Darden, Jr. and Calvin Darden, Sr?

2    A    They were both in attendance, that's correct.  So most of

3    the conversations was with Calvin Darden, Jr.

4    Q    And did you as part of your responsibilities with the Dream

5    and the purchase sale of it -- I believe you said you

6    interacted with the potential purchasers related to, I guess,

7    giving them information related to the Dream?

8    A    That's correct.

9    Q    Do you recall someone named Dwight Howard?

10   A    Yes.

11   Q    Do you recall having any kind of communication with him

12   related to the sale or purchase of the Dream in 2020?

13   A    Yes, I had a phone call with him in July of 2020.

14   Q    And after July 2020, did you have any other communications

15   with Dwight Howard?

16   A    Not that I recall.

17              MR. DONALDSON:  Can I have one second, please, Judge?

18              THE COURT:  Yes.

19   Q    Did you have any communications with Mr. Darden, Jr.

20   related to a pitch deck or vision board?

21   A    Yes, sir.

22   Q    Do you recall whether or not you provided recommendations

23   to Mr. Darden related to that vision board?

24   A    Yes, I did.

25              MR. DONALDSON:  One second, please, your Honor.

OA2JDAR1                    Sienko – Cross

1              THE COURT:  Okay.

2              MR. DONALDSON:  Can I have -- Mr. Ross, could you put

3    up 2165 for the witness and attorneys only, please, Government

4    Exhibit 2165.

5    Q   Now, when you had these communications with Mr. Darden, Jr.

6    related to the vision board -- strike that.

7              You said you offered suggestions to Mr. Darden related

8    to that, correct?

9    A   That's correct.

10   Q   And did you speak to Mr. Darden, Jr. related to any

11   upcoming meetings he might be having related to his purchase or

12   their purchase of the Dream?

13   A   Not unlike any other ownership group, they would all be

14   potentially vetting themselves or they would be vetting

15   themselves with the WNBA -- vetted by the WNBA, as well as the

16   ownership group prior to any purchase.

17   Q   Say that again.

18   A   So any suggestions I would make would go toward that deck

19   so they could better present themselves for ownership groups or

20   the league.

21             MR. DONALDSON:  No further questions.

22             MR. MEAD:  Pull up Grand Jury Exhibit 2119 in

23   evidence, please, Mr. Ross.

24   CROSS-EXAMINATION

25   BY MR. MEAD:

OA2JDAR1                        Sienko – Cross

1    Q    Good morning, Mr. Sienko.

2    A    Good morning.

3    Q    Do you remember being asked questions about a vision plan

4    on your direct?

5    A    Yes, sir.

6    Q    And that vision plan was provided to you and the Dream by

7    Calvin Darden, Jr., right?

8    A    That's correct.

9    Q    2119.

10        Is this the email where Calvin Darden, Jr. sent John

11   Brock the original version of the vision plan?

12   A    Yes, sir.

13   Q    Okay.  And do you remember being asked questions on direct

14   about whether you provided suggestions to the vision plan?

15   A    Yes, sir.

16   Q    Did you ever tell Calvin Darden, Jr. that he should lie in

17   the vision plan?

18   A    No, sir.

19        MR. MEAD:  Okay.  Can we go, please, to page -- I

20   think it's seven of this document, Mr. Ross.

21   Q    Do you see this advisory board slide?

22   A    Yes, sir.

23   Q    Have you seen this before?

24   A    Yes, sir.

25   Q    This was in the original version of the vision plan, right?

OA2JDAR1                       Sienko - Cross

1    A    As I recall, yes.

2    Q    Before you provided any suggestions about edits to this

3    vision plan right?

4    A    That's correct, sir.

5    Q    You ever tell Calvin Darden, Jr. that Jennifer Baltimore

6    would join an advisory board for him?

7    A    No, sir.

8    Q    You ever tell him that Naomi Osaka would join a vision

9    board for them?

10   A    No, sir.

11   Q    Rosalind Brewer?

12   A    No, sir.

13   Q    Tyler Perry?

14   A    No, sir.

15   Q    Any of the other folks on this page?

16   A    No, sir.

17   Q    Okay.  Page 17 of this document, please.

18            And again, this is the original version of the vision

19   plan, right?

20   A    That I recall, yes.

21   Q    Okay.  You ever tell Calvin Darden, Jr. that he should lie

22   about his corporate sponsors?

23   A    No, sir.

24   Q    You ever tell him that Aflac was going to be a corporate

25   sponsor for him?

1  A   No, sir.

2  Q   What about Tyler Perry Studios?

3  A   No, sir.

4  Q   What about Starbucks?

5  A   No, sir.

6  Q   Okay.  You understood that the purpose of this PowerPoint

7  was to help Calvin Darden, Jr. buy the team, right?

8  A   That's correct.

9          MR. MEAD:  You can take this down, Mr. Ross.

10  Q   Do you remember being asked questions about your meetings

11  and communications with Calvin Darden, Jr. and Calvin Darden,

12  Sr. on direct?

13  A   Yes, sir.

14  Q   You talked to Calvin Darden, Jr. a good number of times,

15  right?

16  A   Yes, sir.

17  Q   By phone?

18  A   Yes, sir.

19  Q   By email?

20  A   Yes, sir.

21  Q   And once in person?

22  A   That's correct.

23  Q   Okay.  Calvin Darden, Sr., you talked to him too, right?

24  A   One time, that is correct.

25  Q   And that was just the single in-person meeting, right?

OA2JDAR1                        Sienko - Cross

1   A   That's correct.

2   Q   You ever talk to him on phone?

3   A   No, sir.

4   Q   You ever email with him that you know about?

5   A   Not that I can recall.

6   Q   And the one meeting, I think you said was in Atlanta?

7   A   That's correct.

8   Q   Was it in a coffee shop?

9   A   Yes, sir.

10  Q   And it was you and the coach?

11  A   That's correct.

12  Q   And Calvin Darden, Jr. and Calvin Darden, Sr., right?

13  A   Correct.

14  Q   And Calvin Darden, Jr. did almost all the talking, right?

15  A   Most of the talking as I can recall, yes.

16           MR. DONALDSON:  I'm sorry, Judge.  I didn't hear the

17  last part of the answer.

18           THE COURT:  So the question was, "And Calvin Darden,

19  Jr. did almost all of the talking, right?"  "Most of the

20  talking that I can recall, yes."

21  Q   And based on the fact that almost all of your

22  communications about this process were with Calvin Darden, Jr.,

23  be fair to say that Calvin Darden, Sr. seemed kind of more like

24  a figurehead in this deal, right?

25           MR. DONALDSON:  Objection.

1        THE COURT:  Well, if you could rephrase the question.

2   Objection sustained.

3        MR. MEAD:  I can move on, your Honor.

4   Q    There was a purchase group that had as kind of in the

5   moving parts Dwight Howard, Calvin Darden, Jr., and Calvin

6   Darden, Sr., right?

7   A    My recollection was Dwight Howard at the very beginning,

8   and then he kind of faded out of the picture, that it was more

9   Calvin Darden, Jr.

10  Q    That group never bought the Atlanta Dream, right?

11  A    No, they did not.

12  Q    And no part of the Atlanta Dream was ever bought by that

13  group, right?

14  A    That's correct.

15       MR. MEAD:  One second.

16       THE COURT:  Yes.

17       MR. MEAD:  Just a second, your Honor.

18       THE COURT:  Sure.

19  Q    Do you remember when we looked at the corporate sponsors

20  and the advisory board?

21  A    Yes, sir.

22  Q    Did you understand at the time that you saw that document

23  that those were real?

24  A    Yes, sir.

25  Q    And that those people really were going to be part of the

OA2JDAR1                    Sienko - Redirect

1  advisory board?

2  A   That's how I interpreted it, yes.

3  Q   And that the corporate sponsors really were going to be

4  corporate sponsors for the Atlanta Dream if the deal went

5  through?

6  A   Yes, sir.

7  Q   Did you ask Calvin Darden whether those things were real?

8  A   I did not, no.

9  Q   Okay.  And you never told him to put any of those names or

10 companies in, right?

11 A   That's correct.

12         MR. MEAD:  No further questions.  Thank you.

13         THE COURT:  Okay.  Any redirect?

14         MR. DONALDSON:  Just briefly, Judge.  Well, one

15 second.

16         THE COURT:  Okay.

17 REDIRECT EXAMINATION

18 BY MR. DONALDSON:

19 Q   Could you put up 2142, please government Exhibit 2142.

20         Now, related to the cross, you mentioned that you did

21 review this vision board and you did give suggestions, right?

22 A   Correct.

23 Q   Now, one of those suggestions, you actually said -- you

24 suggested that as it related to sponsors, if there's any way of

25 using the word commitment to the team upon ownership

OA2JDAR1                    Sienko – Recross

1    transaction being made.  Do you recall asking Mr. Darden to add

2    the word "commitment" to the sponsorship part, correct?

3    A    That's what's written here, yes.

4    Q    And so you also asked Mr. Darden to -- you suggested an

5    over-the-top presentation that would seem "pie in the sky,"

6    correct?

7            MR. MEAD:  Objection.

8            THE COURT:  Sustained.  I mean, is there --

9            MR. DONALDSON:  As to form?

10            THE COURT:  You can rephrase the question.

11    Q    Did you suggest to Mr. Darden that they do some type of

12    over-the-top, pie-in-the-sky type presentation for the WNBA?

13    A    No, I was -- I believe how I'm interpreting it is it should

14    not be pie in the sky.

15            THE COURT:  I'm sorry.  Should?

16            THE WITNESS:  Not be pie in the sky.

17            MR. DONALDSON:  No further questions.

18            THE COURT:  Okay.

19            MR. MEAD:  Just a second, your Honor.

20            Leave up 2142, please.  And you can zoom in on the

21    line that says "the last thing," please, Mr. Ross.

22    RECROSS EXAMINATION

23    BY MR. MEAD:

24    Q    Mr. Sienko, you told Calvin Darden, Jr. the last thing that

25    should be suggested is an over-the-top presentation that seems

1    pie in the sky to the W, right?

2    A    That's correct.

3    Q    And the "W" is the WNBA, right?

4    A    That is correct.

5    Q    And you were telling Calvin Darden, Jr. that you shouldn't

6    exaggerate what he could do with this deal, right?

7    A    Exactly.

8              MR. MEAD:  Can you zoom out of this, Mr. Ross.

9    Q    Then you see the line as it relates to sponsors?  And you

10   told Calvin Darden, Jr. as it relates to sponsors, if there is

11   any way of using the word commitment to the team upon ownership

12   transaction being made, that's what you told him, right?

13   A    That's correct.

14   Q    And you weren't telling him to lie that there were

15   commitments, right?

16   A    That's correct.

17   Q    You were asking him whether there were actually commitments

18   from these companies, right?

19   A    That's correct.  It would help them in the sales or the

20   purchase process if he had committed sponsors.  That's correct.

21   Q    And Calvin Darden, Jr., in fact, added that language in the

22   vision plan, didn't he?

23   A    In the second iteration, yes, sir.

24   Q    And you understood he added it because it was true, right?

25   A    Yes, sir.

OA2JDAR1                          Sienko – Recross

1              MR. MEAD:  No further questions.

2              THE COURT:  Okay.  All right.  So ladies and

3    gentlemen, we're going to take a brief break.  I need to speak

4    to the attorneys, and then we'll come and get you.  So go back,

5    relax.  Do not discuss the case, and we'll come and get you in

6    a moment.  Mr. Sienko, you may step down.  Thank you.

7              (Witness excused)

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

OA2JDAR1

1                    (In open court; jury not present)

2                    THE COURT:  Okay.  You may be seated.

3              So first, Mr. Darden, when the jury comes back --

4    well, let me ask, Mr. Donaldson, when the jury comes back and I

5    ask for the defense's next witness, is the defense going to

6    rest?

7                    MR. DONALDSON:  Yes.

8                    THE COURT:  Okay.  So Mr. Darden, in light of the fact

9    that when the jury comes back in, the defense is going to rest,

10   I'm going to ask you again as you stand here right now, are you

11   going to testify?

12                   THE DEFENDANT:  No, your Honor.

13                   THE COURT:  Okay.  All right.  Thank you.  You may be

14   seated.  Okay.

15             So the defense case will be concluded.  And so when

16   the jury comes out, there are several things I'm going to

17   mention, to reiterate they're going to get the case tomorrow.

18   We're going to do summations tomorrow.  I'm going to ask them

19   whether they can come in at 9:00 or 9:30.

20             Well, let me ask counsel.  So why don't we say

21   9:30 and then we'll see how it plays out and then indicate to

22   them that after the summations there will be the jury

23   instructions.  And after that, they will get the case.

24             The parties should be prepared to send back the

25   exhibits.  I don't believe there are any exhibits -- well, are

there any exhibits that for whatever reason we're not going to

send back?  I don't know whether the underlying phone records

and other things came in or not.  But in any event, I'm going

to -- you guys should be prepared to have those go back as soon

as the jury gets the case.  We'll send them back.

First thing they'll do is vote on a foreperson, and

then we'll send the exhibits back with them after the jury

charge.  And if possible, my recollection is that there are no

standalone defense exhibits that, in other words --

MR. DONALDSON:  No.

THE COURT:  And no DXs.  So the parties should review

the laptop, if that's what it's going to be on.  Or it could be

a laptop and a hard copy, however the parties choose to do it,

to make sure that everybody's in agreement that everything that

is in evidence is part of that.

Let me ask is there anything else that I should

mention to the jury before excusing them for the day from the

government's perspective?

MR. MEAD:  No, your Honor.  Thank you.

THE COURT:  From the defense perspective?

MR. DONALDSON:  No, your Honor.

THE COURT:  Okay.  Is there anything else -- well, we

can talk about is there any housekeeping matters.  We will turn

the jury instruction and verdict sheet and provide it to the

parties later on today.  I'd ask that by close of business

OA2JDAR1

 1    today -- well, obviously you can interject objections, but

 2    we're going to need to print the request to charge.  So I just

 3    ask if things do come to you as you review the instructions

 4    that we send, if you could provide us with whatever comments

 5    you have by the close of business today, that would be helpful

 6    because we will be printing those out for the jury.

 7              Okay.  Ms. Disla, if we could get the jury.  And I'm

 8    going to apologize to them.  I'll say it's my fault that we

 9    have such a short day, but that we have things to do, I have

10    things to do with you for the balance of the day.  And so we'll

11    see them tomorrow morning for the summations.  Okay?  All

12    right.

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

OA2JDAR1

1          (In open court; jury present)

2          THE COURT:  The defense's next witness?

3          MR. DONALDSON:  Your Honor, the defense rests.

4          THE COURT:  Okay.  All right.  So ladies and

5    gentlemen, so that concludes the presentation of evidence.  And

6    I apologize for having you come in.  I know it was a short day.

7    But we're done with the evidence, so tomorrow, we're going to

8    have summations in the beginning of the day.  It will be the

9    government's summation and the defense, if they choose to make

10   a summation, but I believe they're going to, and then a

11   rebuttal by the government.  So that will take up probably the

12   morning.

13         So I'm going to make a request of you, if it's

14   possible, which is would we be able to start at about 9:30?

15   Now, I know that some of you are traveling and you may be using

16   mass transportation, so the schedule may not work out.  Just if

17   you're able to make it at 9:30, we'd like to start at 9:30 so

18   that we can try and get all of the summations in before lunch.

19         We'll take a break for lunch, if we're able to do

20   that, and then I'll give you the instructions because it's

21   always better to have the instructions after eating.  I'm just

22   kidding.  The instructions you'll see, and each of you will get

23   a copy.  You'll be able to follow along.  But they're

24   50-something pages, and I read them.  So we want all of your

25   focus.  And so breaking it up I think makes sense.  And you're

OA2JDAR1

1    going to be able to take the instructions back with you to the

2    jury room.

3            So before you depart for the day, we're going to

4    provide you with lunch tomorrow.  And so Ms. Disla will --

5    there are order sheets that she needs your assistance to fill

6    out for lunch tomorrow.

7            Now, is there any member — all you have to do is raise

8    your hand — who would not be able to make it at 9:30 tomorrow?

9    So we'll see everybody tomorrow at 9:30.  And you're inching

10   closer and closer to getting the case.  But remember you don't

11   have it yet.  You haven't heard the arguments of the parties.

12   You haven't heard also my instructions on the law, which are

13   going to be a guide to you as you consider the facts and apply

14   them to the law.

15           So do not discuss the case with anyone else.  Do not

16   do any research.  Go home or spend the day relaxing.  If you

17   have to go to work, go to work.  And we'll see you tomorrow

18   morning at 9:30 okay?  Thank you very much.

19               (Continued on next page)

20

21

22

23

24

25

OA2JDAR1

```
 1              (In open court; jury not present)
 2              THE COURT:  Okay.  So 9:30.  Let me ask in terms of --
 3    I know that both sides indicated there may be demonstratives
 4    used during summations.  I think the rebuttal there sounds like
 5    there may be something used.  In the main summation is there
 6    going to be?
 7              MR. THOMPSON:  Just a PowerPoint, but nothing beyond
 8    that.
 9              THE COURT:  I think you still -- in terms of -- if you
10    could show it to the defense.
11              MR. THOMPSON:  Certainly.
12              THE COURT:  Just to make sure if there are any
13    objections.  And it's a PowerPoint, am I correct, just to be
14    utilized to assist the jury and aid as you're presenting your
15    summations?
16              MR. THOMPSON:  That's right, Judge, and we will
17    provide it.
18              MR. DONALDSON:  Judge, I'm sorry.  I have a
19    PowerPoint, as well, and I'll just say for the record I don't
20    normally provide that to the prosecution prior to my summation.
21    If I had some -- I don't know, some actual demonstratives
22    stuff, then yes.  But as far as my PowerPoint is concerned, I
23    don't generally --
24              THE COURT:  I mean, look, it's up to --
25              MR. DONALDSON:  -- provide that to the government
```

1    before I do my summation.

2         THE COURT:  I typically, you know, ask the parties

3    that they do so.  The argument is not evidence, I do understand

4    that, but it's a goose/gander thing.  If you're not going to

5    provide it, they're not going to provide it.  If there's an

6    objection, there will be an objection, and I'll work that out

7    as you go along.

8         MR. DONALDSON:  I think that's, from my perspective,

9    more welcome to do it that way.

10         THE COURT:  But I would like to see them in advance.

11    So even if you don't provide them to one another, please

12    provide them to me just in case as I -- I mean, I'm highly

13    unlikely to interject, absent something that -- either

14    questions that I have or something that I think is just not

15    something that should be before the jury, which I highly doubt

16    that will be the case.  But if you could provide it to me,

17    that's fine.  And if there are objections as you go through,

18    I'll deal with those as we -- as the jury addresses are going

19    on.

20         MR. DONALDSON:  Very good.

21         MR. MEAD:  The opening/closing PowerPoint and the

22    defense PowerPoint we'll get to the judge ex parte.  I am

23    unlikely to have slides.  If I have slides, I will certainly

24    share them with the Court for my rebuttal.  I will have a

25    demonstrative chart that is created for the purpose of this.  I

OA2JDAR1

```
 1    do intend to show that to the defense.  If the defense is
 2    creating anything, I would say that is new, that is not just
 3    "here's a picture of an exhibit, here's bullet points," I guess
 4    that makes sense to exchange.  But I'm assuming the defense is
 5    not going to do anything like that anyway.
 6              THE COURT:  In other words, it's a demonstrative chart
 7    that is further summarization of the evidence?
 8              MR. MEAD:  Additional financial information summary.
 9              MR. RICCO:  So your Honor, I understand Mr. Mead's
10    point.  We have no such chart.
11              THE COURT:  Okay.
12              MR. RICCO:  Should that change, we will, of course,
13    give that to the government.  As we're here now, we don't have
14    one and we don't anticipate using such a chart.
15              THE COURT:  That's fine.  Let me ask, so I think we've
16    covered all of the logistics matters, but is there anything
17    else we should take up at this juncture?
18              You know, my hope is that we're able to get -- with a
19    break probably after -- I'll see how it goes, but an hour and a
20    half, if we're able to take a break in between the addresses, I
21    think that makes -- if they're an hour and a half, right?
22    Aren't there studies that show after about two hours, folks'
23    attention span starts to drop?
24              But I'll see how it goes.  It may be I'll try and get
25    the -- three hours is a long time, so I may take a break.  But
```

OA2JDAR1

```
1    I do want to try and get them done before lunch.  If not, the
2    jury is going to be here, so we could have a lunch, that's --
3    it may just be an hour.  And I will obviously advise the jury
4    that even though they've heard argument, they still don't have
5    the case, they haven't heard the instructions, and so they're
6    to relax, have lunch, that way they're able to -- the
7    alternates will also have lunch.
8           But once I do the jury charge, I'll excuse the
9    alternates, and they'll be -- let me just confirm, is there any
10   objection so what I propose, which is -- and I just want to
11   confirm again to letting the alternates go, but advising them
12   they may be called back so they shouldn't discuss the case with
13   anyone, rather than keeping them in the courthouse?
14          MR. MEAD:  No objection.
15          THE COURT:  Okay.  Defense?
16          MR. DONALDSON:  No objection to that.
17          THE COURT:  Okay.  So we'll follow that.
18          So let me ask are there any other things that we
19   should take up?
20          MR. MEAD:  I think I speak for all the lawyers when I
21   say even if a very short bathroom break in between all the
22   summations, I think would be great.
23          And then I think we owe the Court an answer on one
24   jury instruction issue.  We can send the court a one-sentence
25   letter or maybe an email something on that.  I think we'll
```

1    consent, but we'll get back to the Court.

2            THE COURT:  That's the copy and pasting a sentence or

3    two from one part of the instructions to the aiding and

4    abetting portion.  I think it's the association language that's

5    in another section.

6            MR. RICCO:  Yes, Judge.  That's what we're requesting.

7    No more.

8            THE COURT:  And just to be clear, I haven't actually

9    looked at it in place.  But I will say that from my

10   perspective, I don't have an objection if there's no legal

11   problem with it, but that the instructions are to be taken as a

12   whole, and that instruction is part of it, and "that

13   instruction," meaning the association.  And so the jury should

14   take that.

15           Having said that, if it's appropriate to remind the

16   jury in the aiding and abetting section of that, I don't have a

17   problem with necessarily repetition.  But if there is an issue,

18   in other words, we need to discuss it, just let me know and

19   we'll come in tomorrow, we still will have time to print out

20   the copies.

21           All right.  Anything else?  Anything from the defense?

22           MR. RICCO:  Yes, Judge.

23           THE COURT:  Yes?

24           MR. RICCO:  At the close of all evidence, the defense

25   moves, pursuant to Rule 29, for a judgment of acquittal with

1    respect to each of the five counts, specifically that the

2    government has presented insufficient evidence on the elements

3    of knowledge and intent as it relates to each count to sustain

4    a conviction under those individual counts.

5              THE COURT:  Okay.

6              MR. RICCO:  Thank you.  And I rest, your Honor, on the

7    evidence that has been presented.  I have no additional

8    arguments or evidence to point to.

9              THE COURT:  Anything from the government?

10             MR. THOMPSON:  Your Honor, nothing has changed with

11   the defense's case.  And for the reasons the government

12   explained in its first response to defense's motion, the

13   government's position is that there's an abundance of evidence

14   demonstrating that the jury could find the defendant guilty.

15             THE COURT:  Okay.  So what I would say is I previously

16   considered the defense's Rule 29 motion after the close of the

17   government's case.  My comments at that time are equally

18   applicable here, so they should be considered as reiterated in

19   connection with my denial at that time.

20             Since that time, my views have not changed concerning

21   the evidence, and I do believe there's more than sufficient

22   evidence to present the case to the jury with regard to each of

23   the counts and the elements of those counts, and that nothing

24   that has been presented in the defense case would cause me to

25   change that view concerning the Rule 29 application.  In other

1   words, it still should go to the jury, and then we'll see what

2   the jury does.  Okay?  All right.

3          Thank you very much.  I'll see everybody tomorrow at

4   9:30 unless we have to take up -- yes, Mr. Ritchin?

5          MR. RITCHIN:  Judge, I wanted to apologize.  I won't

6   be able to be here tomorrow or Friday.

7          THE COURT:  All right.  You know what I neglected to

8   do?  I would have assumed that the jurors would have mentioned,

9   and I think we -- I think if there was an issue with regard to

10  the holiday, and I think the jurors that had issues I think had

11  been excused.  Okay, Mr. Ritchin.  All right.  Well --

12         MR. RICCO:  Judge, also Mr. Legon will be also absent

13  during the same time period.  He's also observing.

14         THE COURT:  All right.  Well, both of you should have

15  a good holiday, hopefully spending it with family.  And

16  Mr. Ritchin, hopefully the wheels don't come off the bus in

17  your absence.  We'll see.  But --

18         MR. RITCHIN:  I have great confidence in the team,

19  your Honor.

20         THE COURT:  At least someone does.  And obviously that

21  was just tongue-in-cheek.

22         All right.  Thank you, everyone.  I'll see everybody

23  at 9:30.  Thank you very much.  We'll stand adjourned.

24             (Adjourned to October 3, 2024, at 9:30 a.m.)

25

1                        INDEX OF EXAMINATION

2    Examination  of:                              Page

3    CHRISTOPHER SIENKO

4    Direct By Mr. Donaldson  . . . . . . . . . . .10

5    Cross By Mr. Mead  . . . . . . . . . . . . . .14

6    Redirect By Mr. Donaldson  . . . . . . . . . .20

7    Recross By Mr. Mead  . . . . . . . . . . . . .21

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25