OA3BDAR1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                          23 Cr. 134 (VSB)

 5   CALVIN DARDEN, JR.,

 6                                          Trial

                Defendant.
 7   ------------------------------x

 8
                                           New York, N.Y.
 9                                         October 3, 2024
                                           9:45 a.m.
10

11   Before:

12                   HON. VERNON S. BRODERICK,

13                                          District Judge
                                            -and Jury-
14                       APPEARANCES

15   DAMIAN WILLIAMS
          United States Attorney for the
16        Southern District of New York
     KEVIN MEAD
17   WILLIAM C. KINDER
     BRANDON C. THOMPSON
18        Assistant United States Attorneys

19   DONALDSON CHILLIEST & MCDANIEL LLP
     BY:  XAVIER R. DONALDSON
20        -and-
     ANTHONY RICCO
21   STEVEN LEGON
          Attorneys for Defendant
22
     Also Present:
23   Alexander Ross, Paralegal
     Arjun Ahuja, Paralegal
24   Melissa Baccari, FBI Special Agent

25
```

OA3BDAR1

1              (Trial resumed; jury not present)

2              THE COURT:  Is there anything we need to take up?  The

3      jury is here now.  Slight delay for one of the jurors because

4      of mass transportation.  Anything we should take up before we

5      start summation?

6              MR. THOMPSON:  No, your Honor.

7              THE COURT:  From the defense?

8              MR. DONALDSON:  No, your Honor.  Thank you.

9              THE COURT:  All right.  Let's get the jury.

10             MR. MEAD:  Your Honor, just for the Court's reference,

11     I think the summation will be a little bit shorter than we

12     initially anticipated, more in the range of 45 minutes to an

13     hour.

14             THE COURT:  All right.  So the main summation.  All

15     right.  Thank you.  Just one thing, I did receive the

16     respective power points of the parties' and the one

17     demonstrative from the government.  I flipped through them.

18     They are what they are, so thank you for that.

19             (Continued on next page)

20

21

22

23

24

25

OA3BDAR1                    Summation - Mr. Thompson

1          THE DEPUTY CLERK:  All rise.

2          (Jury present)

3          THE COURT:  You may be seated.  Ladies and gentlemen,

4     I hope you had a relaxing evening.  We're now going to have the

5     parties' summation beginning with the government.  The

6     government summation.

7          MR. THOMPSON:  Thank you, your Honor.

8          THE COURT:  Thank you.

9          MR. THOMPSON:  May I proceed.

10         THE COURT:  You may.

11         MR. THOMPSON:  In a few hours you'll be asked to

12    decide whether the evidence has shown that this man, Calvin

13    Darden, Jr., committed fraud and money laundering crimes.  The

14    evidence that he committed these crimes is overwhelming.  The

15    defendant and his co-conspirator conned two basketball players

16    Dwight Howard and Chandler Parsons into sending millions of

17    dollars into the bank account of a shell corporation from which

18    they received absolutely nothing in return.  Instead, he simply

19    spent it on himself on his lavish home in Atlanta, on a luxury

20    car, on artwork, on watches, on the cryptocurrency, among many,

21    many other things.  And in order to keep that money and to keep

22    the con going, he lied.  He lied about what he would spend the

23    basketball players on.  He lied in the vision plan about what

24    and what corporation were supporting.

25         He and his co-conspirator lied about signing James

1  Wiseman.  The defendant lied when he impersonated his father.

2  And once the news broke that someone else had actually

3  purchased the Atlanta Dream, the defendant and his

4  co-conspirator kept lying to keep the con going.  And what

5  happened to the money before the defendant spent it?  He

6  laundered it making it harder to find and harder to trace by

7  sending it to a bank account that wasn't in his name and then

8  moving it from account to account to account.  In short, the

9  evidence has shown beyond any reasonable doubt that the

10  defendant is guilty.

11         We're going to cover three things today.  First, I

12  will explain what is not seriously disputed between the

13  parties.  Second, I'm going to discuss the charges.  And third,

14  I will tell you what the evidence shows and how it proves that

15  the defendant is guilty.  The defendant is charged in five

16  counts.  He's charged with bank fraud.  He's charged with wire

17  fraud.  He's charged with money laundering and with conspiring

18  to commit these offenses.  Before I turn to why the defendant

19  had the intent to defraud his victims, there are just a few

20  elements of these charges that we need to talk about.  Judge

21  Broderick will give you more detailed instruction on the law

22  and what he says controls.  I will just talk a little bit about

23  what I expect he will say about some of these elements which

24  aren't really in dispute.

25         First, interstate wires.  Count Two is called wire

1    fraud.  I expect that Judge Broderick will tell you that a wire

2    must pass between two or more states.  Every telephone call is

3    a wire.  Every email is a wire.  Every zoom call is a wire.

4    Wiring of money and bank transfers, wires.  You saw emails in

5    this case that the defendant sent in furtherance of his fraud.

6    The recipients of these emails lived in different states.

7    Some, such as the WNBA employees were based in New York.

8    Others, such as Dwight Howard, were in Florida at the time of

9    the fraud.  There's testimony from Mr. Howard explaining that

10   he was based in Florida playing in the NBA's bubble during this

11   time period.

12        You will also see Cathy Engelbert's signature block

13   from her emails clearly showing that the WNBA's headquarters

14   are in Manhattan.  You heard testimony from John Brock

15   explaining that he participated in a zoom call in 2020 with

16   Calvin Darden, Jr., Calvin Darden, Sr., Cathy Engelbert, Jamin

17   Dershowitz, and Dwight Howard, participants on this call joined

18   from different states.  So the interstate wires element is not

19   seriously at issue.

20        The second issue is venue.  I expect Judge Broderick

21   will tell you that the government needs to prove something

22   called venue.  This means that a part of each of the crimes

23   happened in the Southern District of New York.  The Southern

24   District of New York includes Manhattan, the Bronx, Westchester

25   and several other counties.  You heard testimony from John

1   Brock that he visited the WNBA's headquarters in Manhattan, and

2   Brock told you that he participated in the zoom call with Cathy

3   Engelbert and James Dershowitz, both employees of the WNBA

4   which is headquartered in Manhattan.  You heard testimony and

5   you saw records that the money that the defendant stole from

6   his victims was directed into bank accounts associated with

7   addresses in Manhattan.  So these all establish venue.  You

8   also saw that the defendant purchased a Grand Piano from

9   Steinway and over $150,000 worth of artwork.  You saw records

10  showing that both Steinway and the art gallery from which the

11  defendant purchased this art were based in Manhattan.  So,

12  members of the jury, just like interstate wires, the question

13  of venue is not seriously at issue.

14          Let's now turn to the evidence.  There are four key

15  facts that cannot be reasonably disputed between the parties.

16          MR. RICCO:  Your Honor, I'm reluctant to consult.  I

17  object to this continuing reference that issues are not in

18  dispute by the defense.

19          THE COURT:  Ladies and gentlemen, this is the parties

20  opportunity to present argument.  These are arguments.  Whether

21  they appeal to your common sense, that's entirely up to you.

22  All right.  All right.  You may continue.

23          MR. RICCO:  Your Honor, my objection goes to burden.

24          THE COURT:  Well, I'll allow it.  Objection overruled.

25          MR. THOMPSON:  Let's start there, members of the jury,

OA3BDAR1                    Summation - Mr. Thompson

1    what cannot be seriously in dispute.  First, there can be no

2    serious dispute that Chandler Parsons wired $1 million to

3    Charles Briscoe, the defendant's co-conspirator.  And that over

4    half of this $1 million was ultimately transferred to the

5    defendant himself.  Second, there is no serious dispute that

6    Dwight Howard wired more than $7 million to Legacy AC, LLC.

7    These wires were sent by BMO, Howard's bank on behalf of

8    Howard.  I expect that Judge Broderick will instruct you that

9    Count Three, bank fraud, requires that this bank was insured by

10   the Federal Deposit Insurance Corporation.

11       Jeffrey Schmidt testified and he told you just this.

12   He told you that BMO is in fact insured by the Federal Deposit

13   Corporation.  And this is relevant, members of the jury,

14   because the bank itself is relevant for the purposes of the

15   bank fraud charge.  Third, there is no serious dispute that the

16   defendant's investment group never purchased the Atlanta Dream,

17   and that Dwight Howard did not become the owner of the Atlanta

18   Dream.  John Brock testified, he told you that the Dream was

19   actually sold to Northland.  Here's his testimony on that

20   point.  And Suzanne Abair, the chief operating officer and

21   president of Northland, she also told you that it was she and

22   two other individuals that purchased the Dream.

23       Finally, there's no serious dispute that neither

24   Dwight Howard nor Chandler Parsons ever got their money back.

25   Dwight Howard told you this himself.  "Did you get your money

1    back?  Answer:  No, sir."  And the FBI's forensic accountant

2    who testified, she told you this about Chandler Parsons' money.

3    What is in dispute, members of the jury, is whether the

4    defendant intended to defraud Dwight Howard and Chandler

5    Parsons, and whether he intended to launder this fraud money.

6         THE COURT:  Ladies and gentlemen, just to remind you,

7    it is the government's burden to prove the defendant's guilt

8    beyond a reasonable doubt, and that burden remains with the

9    government.  Okay.  Go ahead.

10         MR. THOMPSON:  And there's no question that he

11    intended to commit these crimes.  Today I'm going to focus on

12    eight reasons, eight reasons that allow you to know that the

13    defendant knowingly and willfully committed these crimes.  The

14    first reason you know that the defendant intended to defraud is

15    because he told lie after lie to get the money.  The defendant

16    cheated Dwight Howard.  He told Dwight Howard he would purchase

17    the Atlanta Dream on his behalf.  He took $7 million from

18    Dwight Howard for this purpose.  The defendant did not purchase

19    the Atlanta Dream.  The defendant did not purchase anything for

20    Dwight Howard.  Howard didn't get anything.  The defendant just

21    lied to take his money.  Look at what the defendant said to

22    Briscoe, his co-conspirator, just weeks before Howard sent his

23    first wire "I'm not sure you understand how big of an

24    opportunity this Atlanta Dream deal can be for us.  We need to

25    keep this deal with Dwight by any means."

1           By any means, members of the jury, that's what he

2     said.  This was a big opportunity for him.  But the opportunity

3     wasn't to buy the Dream, it was to use that as an opportunity,

4     a hook, to take millions of dollars from Dwight Howard in

5     exchange for nothing.  That was the real opportunity for the

6     defendant, and that's why he lied.

7           Take a look at Government Exhibit 401-961.  The

8     defendant says "I think we can get five from Dwight, bro." $5

9     million, that's what the defendant wanted.  And he got it.  In

10    fact, he got even more than that, but only by lying to Dwight

11    Howard.  Let's talk about the specific lies that the defendant

12    told to steal this money.  Brock told the defendant that it

13    would be helpful if he put together a plan for how he would

14    manage the Atlanta Dream, so the defendant created the vision

15    plan.  There's no question about that.  Look at this text on

16    your screen.  The defendant told Briscoe that he's going to

17    send him a deck.  Just over an hour later, the defendant

18    emailed the vision plan to Briscoe.  And you know, members of

19    the jury, that the defendant and Briscoe sent this vision plan

20    to Brock, to Howard, and to Howard's bank.  The vision plan

21    contained the defendant's words.  And he was so eager to

22    convince Dwight Howard to hand over his money that he didn't

23    let the truth get in his way.

24          At this point you know that the vision plan was full

25    of lies.  You have heard this from many of the people who the

1    defendant said would serve on an imaginary advisory board if he

2    was successful in buying the team.  Those people have told you

3    that they did not know Calvin Darden, Jr., that they did not

4    agree to serve on any advisory board and that they did not give

5    Calvin Darden, Jr., or anybody else permission to use their

6    names or pictures in the vision plan.  You heard this from Issa

7    Rae.  You heard this from Rosalind Brewer.  You heard this from

8    Stuart Duguid, Naomi Osaka's agent, and you heard this from

9    Jennifer Baltimore.  The defendant also lied about corporate

10   sponsorships in the vision plan.  Brandon Anthony told you that

11   Tyler Perry Studios never entered into a corporate partnership

12   with Darden Sports Group or agreed to form a joint venture

13   production company.

14        You heard testimony from Jennifer McMullin, a senior

15   brand manager at Aflac.  She testified that Aflac had not even

16   had preliminary discussions about corporate sponsorship with

17   Darden Sports Group, Calvin Darden, Jr., or Calvin Darden, Sr.

18   Rosalind Brewer, the former COO of Starbucks.  She testified

19   that Starbucks never had any sort of sponsorship agreement with

20   Darden Sports Group or Calvin Darden, Jr. Now, Brock explicitly

21   asked the defendant if the people he listed on the advisory

22   board had agreed to serve on this advisory board.  And what did

23   the defendant say?  He said yes.  And the defendant also told

24   Brock that the corporate sponsors were on board.  Complete

25   lies.  He not only sent his vision plan to Brock.  He also sent

1   it to Dwight Howard, and with these lies he managed to cheat

2   Howard out of $7 million.  And after getting their hands on

3   Howard's funds, the defendant and Briscoe then told Howard that

4   he had succeeded in purchasing the team.  Look at Government

5   Exhibit 201-J.  This is a message from Briscoe, the defendant's

6   co-conspirator, to Howard in January of 2021 after Howard had

7   sent the two wires totaling $7 million.  Briscoe tells Howard,

8   "It's too late for Lebron James to swoop in and buy the Dream."

9   Howard asked, "We still good on that?"  And Briscoe says,

10  "yes."

11          Now, the defendants lies also conned Chandler Parsons

12  out of $1 million.  And here's how this fraud worked.  As

13  you've learned in this trial, Charles Briscoe, the defendant's

14  co-conspirator was a sports agent.  He had access to the very

15  people the defendant wanted to steal money from, and the

16  defendant used Briscoe to access these people.  The defendant

17  knew that Briscoe had a relationship with Chandler Parsons.

18  The defendant told Briscoe that he knew and had a relationship

19  with James Wiseman, a top pick in the NBA draft, and that

20  Wiseman would sign with Briscoe.  Take a look at government's

21  exhibit 401-255.  The defendant tells Briscoe "he will sign an

22  employment agreement with DSG and loan documents." The

23  defendant is talking about Wiseman here.  The defendant told

24  Briscoe that Wiseman would only sign with Briscoe if someone

25  gave Wiseman a $1 million loan.  These were more lies, more

1    lies from the defendant.  And that's right, members of the

2    jury, the defendant didn't just lie to his victims, he also

3    lied at times to his own co-conspirator in his own fraud.  And

4    the defendant told these lies because the defendant knew that

5    Briscoe had a network of wealthy athletes who might not have

6    significant business experience that the defendant could Target

7    for fraud.

8           And how do you know these are lies?  You heard it for

9    yourself.  Wiseman testified that he didn't know the defendant,

10   that he had never met the defendant, and that he never did any

11   sort of business with the defendant.  The defendant just picked

12   a top NBA draft pick because he knew that Briscoe would want to

13   sign him.  Now, the defendant and Briscoe fooled Parsons into

14   giving them the loan money that the defendant falsely claimed

15   Wiseman wanted.  The defendant instructed Briscoe how to

16   convince Parsons to give them the $1 million.  He told Briscoe

17   to tell Parsons that Briscoe would provide an additional

18   guarantor if Parsons gave up the money, and the defendant told

19   Briscoe that he himself would serve as his guarantor.  Now, you

20   already know that this whole idea of a loan was fiction.  It

21   was based on the defendant's first lie that he knew James

22   Wiseman.  So when the defendant is telling Briscoe all kinds of

23   things to say to Parsons about guaranteeing this loan, the

24   defendant knows that there's no loan at all.  And, members of

25   the jury, that's why he agreed to guarantee it.  He's not

1    concerned about guaranteeing a large amount of money that he

2    never intended to pay back.  And you saw in this trial that

3    Briscoe followed the defendant's plan.  Briscoe prepared a

4    promissory note for Parsons just as the defendant recommended.

5    And just as he promised, the defendant was the guarantor for

6    this loan.  That's because they were co-conspirators, and

7    that's because they worked together in this fraud.

8          Now, this wasn't the extent of the lies.  They had to

9    provide some sort of proof to Parsons that they could actually

10   sign Wiseman.  So to get this fraud over the finish line,

11   Briscoe sent Parsons a player agent agreement.  Now, they

12   couldn't get Wiseman's signature or the signature of his mother

13   on this document.  And you know why that is, ladies and

14   gentlemen.  That's because again the defendant didn't know

15   James Wiseman.  He lied about that.  So what did they do

16   instead?  They forged the necessary signatures and sent a

17   fraudulent document to Parsons, and they did that because

18   Parsons wouldn't give up the money unless Wiseman had signed

19   with Briscoe.  And remember, there's no question about this.

20   Wiseman told you that this was forgery.  Question:  Did you

21   sign this document?  Answer:  No, sir."

22         That's what the representative from Docusign told you

23   too.  She told you that to sign the player agent agreement,

24   someone only needed access to Briscoe's email.  She also told

25   you that Wiseman's signature and the signature of his mother

1    were executed from the same IP address, and that this was the

2    IP address that Briscoe used to view this document.  I

3    anticipate that Judge Broderick will instruct you that false

4    representations are an element of the fraud charges against the

5    defendant.  And you have seen, members of the jury, over this

6    trial that the defendant told many lies and made many false

7    representations to get money from his victims.

8            So let's talk about the money.  The second reason you

9    know that the defendant intended to defraud his victims and

10   intended to commit these crimes is because he got all of the

11   money while the victims got nothing.  Chandler Parsons wired $1

12   million to Briscoe, the defendant's co-conspirator.  And

13   Briscoe wired $544,000 to Legacy AC, LLC the very next day.

14   Howard wired over $7 million to this same Legacy LLC account.

15   So let's take a step back for a moment.

16           What was Legacy AC, LLC?  And why did almost all of

17   the victims money go there?  Legacy AC, LLC was the defendant's

18   shell corporation.  The defendant used it to run his frauds.

19   Sure, it was registered in the name of someone else.  It was

20   registered in the name of Trevor A. Baldwin.  You saw documents

21   that say that, and you heard testimony about this.  But this

22   was just to give the defendant cover.  He had Legacy AC, LLC in

23   someone else's name because this was the account where his

24   fraud money went, and he didn't want his name on it.  You know

25   that the defendant controlled Legacy AC, LLC and that he used

OA3BDAR1                Summation  —  Mr. Thompson

it to commit these frauds against Chandler Parsons and Dwight
Howard.  Legacy AC, LLC's incorporating documents and financial
documents, you see these on the screen here, are linked to not
just one of the defendant's addresses, but two.  And the
defendant provided the account information for Legacy AC, LLC
when he was scamming people.  That's exactly what he did in
this case.  On the left of this slide is an email from the
defendant to Briscoe.  The defendant tells Briscoe to wire
funds to this Legacy AC, LLC's bank account.  On the right of
the slide is a text from the defendant to Briscoe.  Again, the
defendant tells Briscoe to wire money to the Legacy AC, LLC
bank account.  The defendant had the fraud money end up in the
Legacy AC, LLC account because it was his entity under his
control.  And he knew that he could control his fraud money
using this account.

          So we know that the money went to the defendant, but
did any of it make its way back to the victims?  No.  Howard
testified and told you this for himself, and the forensic
accountant you heard from, she told you that none of this money
went back to Chandler Parsons' account.  The victims, they also
didn't get anything for the money that they gave the defendant.
Howard and Parsons gave the defendant their money expecting
that the defendant will deliver on his representations and make
good on his promises.  And the fact that almost all of these
proceeds went to the defendant tells you all that you need to

know.  His promises were lies.  The defendant spent the money

that he stole from Parsons and Howard on himself.  Almost

immediately after Howard wired the millions of dollars, the

defendant started spending this money on luxury items and

personal expenses.  What does this tell you?  It tells you that

he never intended to use this money to buy the Dream.  It was

always intended to fund his extravagant lifestyle.  The

defendant bought a $314,000 Lamborghini with the fraud money

from Howard.  He bought a $110,000 Steinway Grand Piano with

Howard's money.  He spent $765,000 of Howard's fraud money on a

down payment for a luxurious $3.7 million home.  He spent

$218,000 of Howard's fraud money to equip that home with tech

upgrades.  He put in an elevator.  He put in $29,000 koi pond.

He bought hundreds of thousands of dollars worth of art.  He

set up an outdoor TV.  He spent $240,000 on furniture, a home

gym, light fixtures, interior design services and other home

expenses.  And he paid for all of that using Howard's fraud

money.

        Members of the jury, it's easy to spend money without

a care when it isn't your money.  I could keep going, but the

bottom line is this:  The defendant spent $6,149,133.95 of

Dwight Howard's money.  However it served him, however he

wanted, and however he saw fit.  And he did the exact same

thing with the money he stole from Chandler Parsons.  The very

same day the defendant got $544,000 of the fraud money from

Parsons, he spent nearly $90,000 of it on luxury watches.  He
sent tens of thousands of dollars to his own bank accounts.  He
spent thousands of dollars at Best Buy at Lowes, at Cartier, at
Overstock.com, and he spent about $200,000 of it on a Mercedes
G63 SUV.  I could continue and walk you through the thousands
of dollars he spent at Bose, at Macy's, at G Fine Jewelers, but
I trust you understand what happened here.  The defendant and
Briscoe lied to Parsons and told him that he needed to provide
$1 million to do business with James Wiseman, the top NBA draft
pick who the defendant did not actually know at all.  And after
stealing this money from Parsons, the defendant spent his cut
of these fraud proceeds on luxury items for himself.  That's
how you know that the defendant had the intent to defraud, the
cars, the luxury home, the expensive art, the millions of
dollars.  This was his motive.  It was his greed.  The
defendant had the intent to commit these crimes because it paid
for his lavish lifestyle.  And the victims got nothing.

        The third reason you know that the defendant had the
intent to defraud is because he impersonated his father and
leveraged his father's good name and successful career to
commit these frauds.  The defendant used two phone numbers to
deceive people.  One of these numbers ended in 5686, and the
other number ended in 1779.  He used one number to text with
some people as himself, Calvin Darden, Jr.; while using the
other number to text with certain people as his father Calvin

1   Darden, Sr. The defendant even pretended to be his father in
2   messages that he sent to Briscoe.  This is Government Exhibit
3   404.  The defendant texted from the 5686 number and said to
4   Briscoe:  Hi, Charles.  I'm no longer on Coke's board.  I'm on
5   Target, Cardinal Health, Aramark.  Was the defendant on any of
6   these boards?  No.  But his father was, and this was part of
7   the fraud.  The defendant still impersonating his father then
8   told Briscoe that he should work with Calvin Darden, Jr.

9       Now I'm just going to say this again.  The defendant
10  impersonating his father Calvin Darden, Sr., told Briscoe via
11  text that he should get to know Calvin Darden, Jr., and it was
12  the defendant impersonating his father to Briscoe who started
13  the discussion about Wiseman and kicked off the fraud that the
14  defendant and Briscoe eventually ran on Parsons.  Briscoe says,
15  Your son has James Wiseman.  That's awesome.  He's a bigtime
16  player.  And Briscoe text the defendant because the defendant
17  led him to believe in this moment that he was talking to Calvin
18  Darden, Sr.  The defendant pretending to be his father
19  responds, My son will make the introduction for you.  More
20  insane lies.

21      Now, while the defendant is texting Briscoe using the
22  5686 number and pretending to be his father Calvin Darden, Sr.,
23  the defendant began texting with Briscoe as himself, Calvin
24  Darden, Jr., using the phone number ending in 1779.  Look at
25  this text.  The defendant text Briscoe and says:  Hi, Charles.

OA3BDAR1                    Summation - Mr. Thompson

This is Calvin Darden, Jr. My father asked me to give you a
call. And why did the defendant do all of this? He did this
because he knew that Briscoe could get him access to the very
people that he wanted to defraud.

Pretending to be his father wasn't a one-off or some
sort of accident. He did the same exact thing in the Atlanta
Dream fraud. The defendant pretended to be his father when he
spoke to Schmidt at BMO bank. Schmidt testified that at all
times he thought he was speaking to Calvin Darden, Sr. You saw
text messages that Schmidt and his colleagues exchanged with
who they thought was Calvin Darden, Sr. In the text on the left
of this slide you saw that one of the BMO employees asked for
financial statements. The defendant then emailed records
associated, not with him, but with his father, and he did this
because he was tricking the bankers into thinking that they
were dealing with his father. Schmidt testified about these
documents. He told you that these financial statements were
consistent with Calvin Darden, Sr., the individual who the
defendant put in the vision plan.

So why does this all matter? What does it show? Ask
yourselves, does anyone attempting to organize and execute
legitimate business transactions impersonate anyone, let alone
their father? No, they don't. The truth is simply this: The
defendant pretended to be his father because his father was a
successful businessman, and using his father's name gave a

1    veneer of credibility to his frauds, credibility he needed to

2    steal money from his victims.

3        Reason four.  The fourth reason you know that the

4    defendant intended to defraud his victims is because the lies

5    he told were important, and he knew that these lies were

6    important.  These lies were not small.  They were important and

7    material to the defendant's fraud.  You know this because

8    Brock, Schmidt and Howard testified.  They told you that the

9    list of celebrities and successful business people in the

10   advisory board and the list of corporate sponsors in the

11   advisory board impressed them, that this made them believe that

12   the defendant's group was legitimate.  You know that these lies

13   were material because it just makes sense.  Anyone interested

14   in or invested in a professional sports team would care about

15   corporate sponsors, would care if celebrities were on board.

16   That would drive ticket sales and it would attract positive

17   attention.  And you know that the lies were material because

18   the defendant spent so much time crafting them and making them

19   look real.  He put them in a shiny and polished vision deck,

20   and he set up an elaborate detailed plan setting forth how he

21   would manage the team if he won.

22        There really weren't any limits to these lies.  The

23   defendant just made up whatever he thought was necessary to get

24   Dwight Howard on board.  You can see that in the defendant's

25   text to Briscoe.  Here's Government Exhibit 401-925.  The

1   defendant said, The deal needed to happen by any means.  And

2   look at Government Exhibit 401-1000.  The defendant says, Bro,

3   we need him at 7.  That's $7 million.  That's Howard at $7

4   million.  And what does Briscoe say in response.  He says, I

5   already know, bro, because me and you can both use the money.

6   They intended all along to pocket Howard's $7 million.  And

7   through the defendant's lies and his vision plan, they pulled

8   it off.  Now, you know that the defendant intended to defraud

9   because he told these material lies that were designed

10  specifically to impress the person who was running the sales

11  process of the team, to trick Howard to turning over $7

12  million, and to mislead the bank that ultimately wired the

13  funds of Howard's money.  He couldn't have gotten this far

14  without these lies, and that's why he lied.

15          The fifth reason you know that the defendant had the

16  intent to defraud is because he created and relied on

17  fraudulent and misleading documents to carry out his crimes.

18  You saw this in how the defendant defrauded Chandler Parsons.

19  We talked about this a little this morning.  He and Briscoe

20  didn't know Wiseman and Wiseman's mother, but they needed their

21  signatures, so they forged their signature and passed off the

22  fraudulent documents. He did the same thing to defraud Dwight

23  Howard. The defendant told Howard he was going to buy the Dream

24  on his behalf, and also told him he would set up a marketing

25  company.  Howard gave the $7 million for those purposes.

1          And then the defendant pulled a fast one.  He slipped

2    Howard a convertible promissory note.  The promissory note was

3    a cheap trick intended to justify what you know was fraud.  It

4    was a way for the defendant to steal millions of dollars based

5    on lies while giving Howard exactly nothing.  And now in this

6    trial he's trying to pull the same fast one by pointing to this

7    document.

8          And don't forget about the February 15, 2021 letter of

9    intent.  This was the document the defendant wrote after it was

10   becoming irrefutable that he had not purchased the team, but

11   that he had kept Howard's money.  The document, you'll recall,

12   describes a business transaction where the actual owners of the

13   team would sell nine percent of the team to the defendant,

14   Darden Sports Group, and the defendant's father.  But Suzanne

15   Abair, one of the actual owners of the Dream exposed this for

16   what it was, more lies from the defendant.  She told you that

17   neither she or any of the actual owners of the Dream ever

18   engaged with anyone about selling part or the entirety of the

19   team.  And she had told you that she had never seen this bogus

20   letter of intent before preparing to testify.  More fake

21   documents, more lies.

22         The sixth reason you know that the defendant had the

23   intent to defraud is because he worked hard to cover up his

24   lies and conceal his fraud.  Brock testified that he told the

25   defendant that the team had been sold to someone else in

February of 2021.  It was around this same time February 2021
that Dwight Howard began demanding the return of his $7
million.  Schmidt testified to this, and you saw emails sent by
BMO employees requesting that the defendant return Howard's
money.  So what did the defendant do?  Did he return the money?
Did he respond to these emails asking where the money was?  No.
He created that fake letter of intent saying that his
investment group would purchase part of the Dream from the
actual owners.  And there's no question that the defendant made
this letter of intent himself.  Here's an email in which the
defendant is emailing this fake document to himself.  And you
know, members of the jury, we just discussed that this
document, this transaction had no basis in reality.  Suzanne
Abair told you that.  The defendant told Briscoe this lie so
that Dwight Howard would think that he hadn't been conned.

Remember, at this time Briscoe was Howard's agent.
Look at this text Government Exhibit 401-1177.  The defendant
says, I told Brock we're going to do the deal with them.  We're
not going to be named in the deal though.  That's convenient.
They want my father's and the mayor's help in getting the new
project done.  Can you let Dwight know.  He then tells Briscoe
that "it's the same deal that we laid out initially." This is
all after the defendant has been told that the Dream was sold,
that the Dream had been sold to someone else.  This deal that
he's talking about is dead, but he's continuing to claim and

1    make people think that it's still happening.  These are just

2    more lies from the defendant.  You learned that the individuals

3    who actually purchased the Dream never discussed any deals with

4    him, and Brock testified that at the had no contact with the

5    defendant about the Atlanta Dream after he told him that the

6    team had been sold to someone else.  You know that the

7    defendant had the intent to defraud because he told more lies,

8    created more fake documents, and made up the most farfetched

9    stories to hide the simple truth, which is that he took

10   Howard's money for nothing in return.

11          The seventh reason you know that the defendant had the

12   intent to defraud is because he laundered the money.  With the

13   help of others such as Trevor Baldwin and Charles Briscoe, he

14   moved the funds that he stole into various accounts under his

15   control.  Dwight Howard wired just over $7 million to Legacy

16   AC, LLC.  That's the defendant's fraudulent shell corporation.

17   Howard wired this money between August 2020 and December 2020.

18   Over the next roughly one-and-a-half years, the defendant moved

19   the funds that he tricked Howard into giving up into six other

20   accounts in his name or otherwise under his control.  These

21   accounts for the most part had relatively little or absolutely

22   no money in them, aside from the money that the defendant stole

23   from Howard.  Did the defendant send all this money to these

24   accounts, send all these wires, make all these transfers

25   because it was somehow the best way to do business?  Of course

1    not.  The defendant sent these wires and made these transfers

2    to try to distance himself from the crimes he committed and the

3    frauds that he ran.  That's what money laundering is.  The

4    eighth reason you know that the defendant had the intent to

5    defraud is because he used the same methods that he used in the

6    past.  You heard testimony that in the past the defendant

7    committed fraud by impersonating his father and by using his

8    father's name to give legitimacy to his lies.  That's how you

9    know that the defendant in this case had the intent to defraud.

10   This wasn't an accident. He carried out this fraud using the

11   same method as the previous frauds for which he had been

12   convicted.  Those are eight reasons, eight reasons that let you

13   know beyond a reasonable doubt that the defendant had the

14   intent to defraud his victims.

15           Members of the jury, I'm about to sit down.  Over the

16   course of this trial you have seen overwhelming evidence of the

17   defendant's frauds.  You have heard how the defendant defrauded

18   Chandler Parsons and Dwight Howard out of $8 million total.

19   You heard how he lied to try to cover up his tracks when Dwight

20   Howard began demanding repayment.  Look at his actions.

21   Pretending to be his father, wiring fraud proceeds from account

22   to account, creating a vision plan full of lies, keeping and

23   spending the millions that he stole on luxury items for

24   himself.  The evidence of his fraud is overwhelming.  It's

25   clear and it is plain.  If you look at all of the evidence you

OA3BDAR1                  Summation - Mr. Thompson

1   have seen and heard, and if you weigh it and apply your common

2   sense to the facts in front of you, you will reach the only

3   verdict that is consistent with the evidence, the law, and your

4   common sense that the defendant is guilty.

5              THE COURT:  Okay.  Thank you very much.  Ladies and

6   gentlemen, we're going to take a brief break about 10 minutes.

7   We'll come back and get you.  Remember, do not discuss the

8   case.  You heard the government's summation.  We're going to

9   hear from the defense next.  Go back.  Relax.  We'll come and

10  get you for the defense summation in about 10 minutes.  Thank

11  you very much.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  Okay.  You may be seated.  Is there

3    anything we need to discuss before we take our break from the

4    government?

5          MR. THOMPSON:  No, your Honor.

6          THE COURT:  From the defense?

7          MR. RICCO:  Yes, Judge.  Thank you very much for that

8    instruction you gave the jury.  That satisfied my concerns.

9          THE COURT:  Okay.

10          MR. RICCO:  Thank you.  The other issue, Judge, is as

11    you may notice that Ms. Reed is not here this morning.

12          THE COURT:  Yes.

13          MR. RICCO:  Her mom is very ill, and so she is

14    attending to her mom in Maryland and she wanted the Court to

15    know.

16          THE COURT:  All right.  Thank you for letting me know,

17    and pass along my hope that things resolve themselves

18    positively, but okay.  Thank you.

19          MR. DONALDSON:  That's it, Judge.  Thank you.

20          THE COURT:  All right.  See everybody in about 10

21    minutes.  Thank you very much.

22          (Recess)

23

24

25

1              (In open court; jury not present)

2              THE COURT:  Is there anything we need to discuss

3      before we get the jury?

4              MR. THOMPSON:  Not from the government, your Honor.

5              THE COURT:  From the defense?

6              MR. DONALDSON:  No, your Honor.

7              THE COURT:  Okay.  Let's get the jury.

8              (In open court; jury present)

9              THE COURT:  Ladies and gentlemen, I hope you had a

10     good break.  We're now going to continue with summations with

11     the defense summations.

12             Mr. Donaldson.

13             MR. DONALDSON:  Thank you, your Honor.

14             Good morning.  I didn't get the opportunity to speak

15     to you during openings.  My colleague, Mr. Ricco, did.  And we

16     tried to lay out what we thought or what we wanted you to focus

17     on and to remember that you have to keep that open mind that

18     the Court was talking about and that you have to not just

19     listen to one side and end your thoughts there.  That's not how

20     this works.

21             I think the Court even instructed you early on that

22     you have a burden, but there might be another side.  There

23     might be another narrative.  The witnesses might say one thing

24     and then something else might come up that changes your mind

25     about what they said.  It's called listening.  It's life.  It's

1   what we do as adults.

2          And so that's what I want you to continue doing for

3   the rest of this time I'm speaking.  When I sit down, the

4   government gets back up, when you deliberate, I want you to

5   continue listening and keeping an open mind because for no

6   other reason than you promised you would do that.  You promised

7   you would be fair.  That's what you promised.  And so we want

8   to hold you to your promise.  We want to make sure that you

9   stay focused on your promise to be fair.

10          Mr. Darden, my client, our client sitting over there,

11   he, in fact, did plead guilty in the past.  There's no doubt

12   about that.  We knew that.  He pleaded guilty.  He admitted

13   what he did in the past.  He accepted his responsibility for

14   what he did in the past.  He raised his hand and testified for

15   the government related to what he did in the past.  That's what

16   he did.  There's no doubt about that.

17          As the government said earlier, there are some facts

18   that are not in dispute.  That is that fact, that Mr. Darden,

19   Jr. pleaded guilty in the past.  What's also not in dispute is

20   that as soon as he spoke to Mr. Brock, the president or the

21   husband of one of the owners of the Dream, as soon as he spoke

22   to him, he said, I am a felon.  I have a prior conviction.  You

23   know what that means?  That's the part that the government left

24   out.  There are a few things that we're going to talk about

25   that the government just conveniently left out.

1          That part is important.  Why is that important?

2   Because there are no secrets.  Mr. Darden, Jr. did not keep

3   that a secret.  What fraudster in their right mind tells the

4   person who he's trying to defraud that "I am a felon" up front?

5   You need to know that about me.  Who does that?  I think the

6   judge said common sense.  The prosecutor said common sense.

7          I am imploring you to use your common sense for the

8   rest of the time I'm standing, when they get back up, and when

9   you go deliberate.  Use your common sense because your common

10  sense is going to take you down a road you may not want to go

11  down.  But I'm here to tell you you're going down that road.

12  I'm taking you down that road, like it or not.

13          First thing out of his mouth, Mr. Brock, I am a felon.

14  And what did Mr. Brock say?  He knew that as well.  And what

15  did Mr. Brock do?  He continued to speak to him about the sale

16  of the Dream.  He shared internal documents with Mr. Darden,

17  Jr., a prior convicted felon.  He clearly did not hold that

18  against Mr. Darden, Jr., a prior convicted felon.

19          Now, the question really is are you?  Are you going to

20  do that?  The judge is going to give you specific instructions

21  as to what you're supposed to do with that knowledge, and I can

22  guarantee you it's not if you're in there saying right now when

23  you heard the other day a paralegal get up there and testify

24  that my client is a convicted felon.  If that made you say at

25  that point, well, he must be guilty, then you have now violated

1    your oath.  You have violated that what you promised not to do.

2    You are now sitting here as an unfair juror, and that's not

3    what you promised to do.

4            I kind of heard you say that.  If you are saying right

5    now after the government got up here and said, well, you know

6    what?  He's impersonating his dad like he did before, he must

7    be guilty.  If you're saying that now, guess what?  You're not

8    being a fair juror, and you're now violating your promises not

9    only to us, but to yourselves.

10            That's what Mr. Ricco was talking about in his

11    opening, commitment to yourself and the responsibility you have

12    about being jurors, how important that is, the sacrifices

13    people made before for you to sit there, to be fair.  So if you

14    are saying right now that he must be guilty because of his

15    prior convictions, you're being unfair.

16            There was no impersonation.  Zero, zilch, nada,

17    nothing.  That's why we started out with I am a felon.  That's

18    why that's important.  That's why they didn't tell you that.

19    That's why they didn't remind you of that because that little

20    thing is important.  There is no impersonation.  I am a felon

21    that's what I did.  I know you're a felon, that's fine.  Let's

22    do business.

23            How do we know there's no impersonation?  Mr. Brock.

24    Details — I think someone said a long time ago the devil's in

25    the details — angels, too, angels are in the details as well.

1    Throughout the process Brock knew he was speaking to Darden,

2    Sr.  That's one of those indisputable facts that the government

3    said.

4         He spent ten years with Darden, Sr. on the board.

5    That's an indisputable fact.  He talked to him several times in

6    those ten years.  That's an indisputable fact.  Met with him

7    several times in those ten years, indisputable fact.  Received

8    emails, said my "father and I," indisputable fact.  Kind of

9    makes you wonder, if I am impersonating my dad, why am I

10   writing emails saying, my father and I want to meet with you?

11        That common sense thing starts, take you down a road

12   because I know sometimes when you sitting down and the

13   government says something, you just want to believe it because

14   the government said so.  But no.

15        Saw him on Zoom calls.  Mr. Brock saw Mr. Darden, Sr.

16   on Zoom calls, on a video talking to him, talking to Junior,

17   talking to other people, how is that impersonation?  Why would

18   you be impersonating your father if your father is on the Zoom

19   calls with someone that your father knows for ten years, shared

20   board meetings with, they know each other's family?  How am I

21   impersonating my father to this dude?  Common sense dictates

22   that is not -- doesn't make sense.

23        Not one time did Brock tell you he thought,

24   questioned, was concerned, imagined, anything that he wasn't

25   speaking to Darden, Jr., he was speaking to Darden, Sr.  Not

OA3JDAR2                    Summation - Mr. Donaldson

1    one single time.  No impersonation.

2           Brock and Schmidt.  Now, Schmidt never said that he

3    had concerns at all that he was not speaking to Darden, Sr.,

4    not one single time.  Feel free to look back through all the

5    transcripts.  Not one single time did Schmidt say, you know

6    what?  I think I might be talking to somebody else and not

7    Darden, Sr.  That did not happen.

8           So if that did not happen, that's called an

9    indisputable fact.  It didn't happen.  Schmidt received banking

10   and other documents from Senior.  Not one time did Schmidt say,

11   these might be coming from somebody else.  Not one time did he

12   say that.  As a matter of fact, what did Schmidt do?  He tried

13   to get another compliant.  He tried to bring Darden, Sr. in.

14   He started asking him for documents so he can try to snatch

15   another client up because he wanted that money.

16          I mean, there's nothing wrong with bankers wanting

17   money, but that's what he was doing, plain and simple.  Not one

18   time did he say, this might not be coming from Darden, Sr.

19   Darden, Jr. might be -- somebody else might be impersonating

20   him.  There's no evidence of that.

21          It doesn't matter what phone number used another

22   number.  It doesn't matter.  It can't matter because the red

23   part is the question.  Do you have any evidence in this trial

24   anywhere -- and I mean anywhere that Schmidt was not speaking

25   to Darden, Sr.?  You don't have it.

1          What you have is the government saying it.  And my
2    father always told me just because somebody says something,
3    doesn't make it true.  What you have is them saying that
4    without a scintilla — a word we like using — a scintilla of
5    evidence to support that, but let's keep going.

6          We know he's not impersonating him.  Howard, Sr. on
7    the July Zoom call, Howard, Sr. on another July Zoom call,
8    Howard, Sr. on a January Zoom call, Howard, Sr. on multiple
9    phone calls with Brock, Howard Sr. on calls with Schmidt,
10   Howard, Sr. in person productive meeting with Sienko and coach.

11         Stop for a second.  I'm impersonating my father, but
12   I'm setting up a meeting so that my father and I can talk to
13   the general manager/president of the Dream and the coach of the
14   Dream to talk about purchasing the Dream.  So I'm impersonating
15   my father by bringing my father with me to the meeting.  They
16   left that part out too.

17         More importantly or equally important, Brock, the
18   person who knows Senior the most, said unequivocally Darden,
19   Sr. played an active role in the Dream purchase.  Unequivocal
20   fact.  Indisputable fact.  So again, where is the evidence of
21   impersonation?  Let's keep going.

22         Text messages between Briscoe and Calvin Darden, Sr.
23   The government just got up here and told you those were Darden,
24   Jr. speaking on the text messages.  I ask you again, besides
25   them saying that — and I get sometimes people have the power of

1  authority when they talk, I get it — but besides them saying

2  that in this courtroom in a court of law where evidence is

3  required, question plus answer is evidence, besides them saying

4  that that was Darden, Jr., where is the evidence that that was

5  Darden, Jr.?

6          Better question.  Where is the evidence that it wasn't

7  Darden, Sr.?  Besides the government getting up and saying, you

8  see the text messages here, that was Darden, Jr.  Somebody

9  should ask, well, how do you know that?  A question mark should

10 arose up on top of somebody's head and say, well, how do you

11 know that?  And then the answer would have been, I'm thinking

12 it was, it had to be because we need it to be.  Other than

13 that, there is no evidence of that.  Keep going.

14         Message between Schmidt and Darden, Sr.  They got up

15 here again, that was Darden, Jr. sending those financials over,

16 that was Darden, Jr. on the phone call.  Question mark pops up,

17 well, how do you know that?  Well, because it had to be.  He

18 did it before in the past, so this must be the same thing.

19 There's a difference between speculations and inferences.

20 There's a difference between assumptions and inferences.

21         Assumptions we don't use in courthouses.  Speculation

22 we don't use in courthouses.  Inferences we do.  That's not an

23 inference because there is no information, reliable, credible,

24 or otherwise, to support that statement that they made.  Except

25 the fact that they said it, and they expect you to believe it

1  because they said it.

2          There was no impersonation, zero evidence of

3  impersonation.  In fact, it was the complete opposite.  It

4  appeared from the evidence that Mr. Darden, Jr., after

5  announcing that he was a felon, did everything possible to show

6  that he wasn't impersonating his father.  That's what the

7  evidence shows.

8          Let's talk about Chandler Parsons.  Let's talk about

9  this NBA player.  Let's talk about this NBA player who the

10  government is saying tried to pay $1 million to Wiseman, an

11  undrafted athlete, to get him to be part of a sports agency.

12  Let's just think that through for a second.  Chandler Parsons

13  as an NBA player was trying to pay $1 million to an undrafted

14  athlete to make that athlete part of his agency.

15          Just let that sit there for a second.  Just let that

16  resonate.  Our client is alleged to have tried to help Chandler

17  Parsons, this NBA player, send a million dollars to an

18  undrafted athlete.  Just let that sit down for a second again.

19  Just let that resonate with you for a second.

20          Problem that they didn't mention, again, their

21  claiming my client was committing fraud.  We're saying there's

22  no attempt at fraud.  They're right.  That's an indisputable

23  fact we're arguing about intent.  There was no attempt to

24  defraud.

25          Government Exhibit 401-263, page 276 to 278, if you

1    want to look at it, Briscoe asked whether Wiseman would sign a

2    postdated SPAC.  That's what Briscoe did.  Client asked,

3    according to them, text message, what in God's name is a SPAC?

4    Because obviously client don't know what a SPAC is.  Briscoe

5    said it's where players sign with agents before they enter into

6    the NBA.

7            So go back.  Parsons and his agent, Briscoe, his

8    agent, Briscoe, is asking Wiseman, who is not a NBA player, to

9    accept a million dollars from an NBA player for an agency.

10   Again, just let that sit for a second.  Just let this fact sit

11   for a second that that's what Parsons was trying to do.

12           But client says to Briscoe about this SPAC, if I'm

13   him, no way I sign a postdated SPAC.  Now, stop for a second.

14   They're saying my client's trying to commit a fraud.  They're

15   saying my client's working with Briscoe to commit a fraud with

16   Wiseman and Parsons.  This text message appears to say that my

17   client does not want to do that, does not think that Wiseman

18   should sign a postdated player agreement, and why would he do

19   something like that?  And then he goes on and says, I think

20   that's inviting trouble for him and us.

21           What fraudster in their right mind who's trying to

22   defraud Wiseman and Parsons is now trying to protect Wiseman

23   from signing a postdated SPAC that my client doesn't even know

24   what a postdated SPAC?  The first thing is, I wouldn't do that.

25   If I was him, I wouldn't do that.  More importantly, that seems

to be causing trouble for us and him.

What fraudster is doing that? It would seem more reasonable, common sense for a fraudster to say, let's do that, I'm going to get him to do that. Or better yet, why don't I just sign his name? But that's not what happened. That's the little part they didn't want you to hear about because that shows a lack of fraudulent intent. But keep going.

And regarding Parsons, client played absolutely no role in providing Parsons a forged player contract related to Wiseman, no role at all. The material inducement — and that's important — that the government identified, this forged player contract, Mr. Darden played absolutely no role in that, zero, zilch, nada, absolutely no role. So the material inducement that they're saying caused Parsons to send $1 million, the forged contract, Mr. Darden played zero role in that.

Docusign, I think they put up a witness from Docusign, put up the signatures, had the locations, said where it came from, Briscoe. Briscoe, same place. Briscoe did the signatures. Briscoe did the email. They even tried a few times to call them Darden phones. Check the record. When the witness got up here and testified, Darden phones, Darden phones here, we recovered Darden phones. We got Darden phones and Darden phones this, Darden phones that. Okay.

Well, in reality, they're Briscoe's phones, thought I'd tell you that. In reality they're Briscoe's property. In

reality, Briscoe is the one that did his Docusign.  In reality,

Briscoe is the one that forged this document.

         And they have zero evidence in this transcript that

that man had anything to do with it.  They even have zero

evidence in the whole transcript that that man had any

knowledge that a forged contract was happening.  Let's keep

going.

         Plus we know that based upon the Parsons and Briscoe

text chain, Parsons did not even know who Mr. Darden was.

Mr. Darden had no relationship to Parsons, no contact with

Parsons, didn't know who he was.  That was a Briscoe thing.

That was a Briscoe forgery.  That was a Briscoe conspiracy, not

a Darden conspiracy.

         But I get it, they're going to say, well, you know

Briscoe, you texted Briscoe.  That must mean you're guilty.

And they're going to try to say, I think, when I sit down, the

aided and abetting part.  Well, he helped it happen.  No.

Again, that material inducement part that they keep talking

about for this one is the forged contracts that our client had

zero to do with.

         Thus.  Put a "thus" there because our client did not

participate in obtaining a forged document, did not provide

Parsons with a forged document, was not in any contact or

relationship with Parsons and didn't help Briscoe induce

Parsons to do anything related to this forged contract.

1          One more thing.  Where is Parsons?  Anybody can call a

2   witness.  You're going to hear that instruction.  Anybody can

3   call a witness.  It's not our burden to prove.  Where is the

4   NBA player that was trying to give $1 million to an undrafted

5   player only after said player signed a player contract that

6   says he lost a million dollars?  Where is that guy?  They

7   brought in Issa Rae.  They brought in James Wiseman.  They

8   brought in Dwight Howard.  They brought in COOs.  They brought

9   in some wonderful COO from Spelman College, marvelous woman.

10  They brought in all kinds of people.

11         Where is the guy that lost the $1 million for saying

12  he was trying to sign an undrafted player while he was an NBA

13  player and signed to an agency?  Where is that guy?  Questions

14  abound.

15         Dwight Howard.  We're going to talk about Dwight

16  Howard.  And I'm sorry I'm going to take up some of your time,

17  but I got to take up some of your time.  Who did you mainly

18  talk to about buying the Atlanta Dream?  Dwight Howard, Charles

19  Briscoe.  They need Briscoe.  When I say "they," the government

20  needs Briscoe.  This is my first time with Cal and this Dream

21  thing.  That's what he said during his direct testimony.  It's

22  my first time.  He brought them to the thing, and Briscoe

23  brought him to me and it's my first time meeting Cal, hearing

24  about Cal, my first time.

25         Excuse me.  Cross coming next.  I read the stuff.

OA3JDAR2                    Summation - Mr. Donaldson

1  Guess what?  Scroll back up higher.  What did he say several

2  days before, two weeks before this Dream thing even came up?

3  Who's chatting again?  Briscoe and who?  Dwight Howard.  What

4  are they talking about?  Some new league.  What are they

5  talking about?  $30,000.

6          What are they talking about?  What does Briscoe say?

7  Yo, I'm going to talk to Cal about that new league we're

8  talking about.  Dwight, you just said first time y'all was

9  doing business with the Dream, I don't know what that is.

10 Memory start going crazy.

11         The judge is going to tell you about credibility.

12 Memory starts going crazy.  I guess Briscoe just dropped Cal

13 out the sky.  Everybody in this courtroom was calling Calvin

14 Darden "Cal," everybody.  Cal, Cal, Cal.  Now we got a text

15 message between Briscoe and Howard talking about Cal several

16 weeks before the Dream.  And all of a sudden, nobody knows who

17 Cal is.  It's called convenience.

18         And one wonders why we didn't bring that up.  I tell

19 you why.  Because it directly affects his credibility.  He is —

20 I hate to say it.  I know it's not a good thing to say in

21 courthouses, but I'm sorry.  I told you I'm going to take you

22 down a road.  You're not going to want to go with me, but I'm

23 taking you anyway.  Howard got on that stand and the

24 misdirection, the misleading, the oh, my God, I'm a dumb

25 athlete.  No, bro.  Stop.

OA3JDAR2                         Summation - Mr. Donaldson

1           We talked about Cal several weeks ago before this

2    Dream and production companies and leagues and things like

3    that.  You did that.  They can't get up here and say, well, the

4    Briscoe/Howard text messages are showing what happened except

5    for when it shows what they don't want it to see.  No, no.

6    Bring it all in.

7           I wanted to buy the Dream to help out the women.

8    That's what he said on direct.  I was all for the women.

9    That's why I wanted to do it.  I'm a big fan.  My mother's a

10   fan.  I like helping out ladies and ladies' sports.  So do I.

11   That's all I was thinking about was helping out women.  Okay,

12   sounds good.  Made y'all love him.  It's a beautiful thing.

13          But it's not true.  But it's not true.  He's telling

14   y'all things so that you can like him, so you can believe he's

15   a victim.  But that wasn't true.  How do we know it wasn't

16   true?  Because go back to the text messages that we presented

17   to him that they're not telling you about again.  You saw them.

18          The first ones, the first day that he was talking

19   about buying the Dream, the very first day, him and Briscoe,

20   the only thing they talked about that was a motivation for

21   buying the Dream was how much money they could make, nothing

22   else.  Not a single text message about any helping women,

23   helping ladies, helping girls, helping ladies' sports, none of

24   that.  That's what he told you all last week.

25          But on the text messages when he thinks nobody's

1    watching, he talked about what he really wanted to talk about,

2    money, trying to get money.  How to get the WNBA to make some

3    money.  How he can make money off the WNBA.  They talked about

4    budgets.  They talked about financing.  They talked about how

5    much team owners make.  They talked about everything except

6    what he told you all was his motivation.

7            Now, you don't want to hear that.  No.  Why is that

8    important?  Because when you get up on that stand and raise

9    your hand and say, I'm telling the truth about what happened,

10   what was in my mind, what I was thinking, be honest or you'll

11   get caught like he did.

12           They need Briscoe.  They need Briscoe.  Why do they

13   need Briscoe?  Because literally about 40 percent of that

14   summation that I heard this morning was about what Briscoe

15   thought and what somebody thought Briscoe thought and what

16   somebody felt Briscoe said and how they believe Briscoe meant

17   this.  We must have had 17 interpretations of what is going on

18   in Briscoe's mind.

19           That's what they're trying to convict my client off

20   of, what someone else thinks that Briscoe thought when Briscoe

21   said whatever he said.  Let that settle for a second, and ask

22   yourself whether or not that's sufficient that you think that

23   you want to convict somebody on.  I want to convict Mr. Darden

24   based upon what somebody thought Briscoe was thinking when

25   Briscoe said what he said.  That's tough.

1        My agent does everything for me, everything for me.

2   Literally got up there and start literally assuming the

3   shut-up-and-play mode, which most of us are trying to avoid,

4   got up there and just said all that because that's the only way

5   it makes sense because your common sense in a second is going

6   to take you someplace else.

7        That's what he needed you -- I am a victim, I don't

8   know anything.  I'm dumb.  I don't read contracts.  I've been

9   in the league for 18 years.  I've been in nine different teams.

10  I've signed almost a dozen different contracts with my

11  signature on it.  I'm a multiple-time All Star, NBA champion

12  Olympic champion.  But oh, I'm sorry, I'm a NBA basketball

13  player.  I don't read contracts.  Most of my colleagues, we

14  don't read contracts.  What?  This ain't 1910.

15        What?  No.  But don't worry did it.  I'm going to

16  prove it to you because that doesn't make sense.  I'm going to

17  tell you why it doesn't make sense.  Because you can't get up

18  here and say, I'm dumb, I don't read contracts, I let my agent

19  tell me whatever I'm supposed to be doing, but then at the same

20  time tell you good people that I am buying a WNBA team, I'm

21  going to be the owner of a WNBA team, and I'm going to run this

22  team.

23        Wait a minute, bro.  Wait a minute, bro.  You don't

24  read contracts.  Your agent tells you what to do.  You don't

25  tie your shoes by yourself.  You don't do anything, but now you

1    expect the jury to believe, oh, I thought I was buying a

2    professional sports organization and I was going to run it from

3    behind the scenes and y'all need to believe that because I'm

4    saying that?

5        So when I just said, I'm dumb and I don't do anything

6    by myself, forget that.  For these purposes I'm smart.  I'm

7    going to buy this WNBA team and run it from the background and

8    take care of all the decisions, the hiring, the firing, the HR.

9    I'm doing all that because I'm smart.  But when it comes to

10    reading my contracts, I don't do that because I'm dumb.

11        Yeah, common sense part time now.  How does that make

12    sense?  I mean, you can believe it if you want to.  But I'm

13    kind of thinking in your common sense daily routines, if

14    somebody said that outside this courthouse, if you were sitting

15    outside on the street walking down the block or in your house

16    and somebody said that to you, you'd be like, stop, don't

17    change it now.

18        I think the judge said bring your common sense into

19    the courtroom, let it snuggle with you in the chair, wrap it

20    around you like a blanket.

21        But guess what we had?  Mr. Wiseman come in here fresh

22    out of high school, went to the NBA.  And guess what

23    Mr. Wiseman told you?  I am my own man.  Because you know what?

24    That's what basketball players are in the NBA these days.  They

25    are their own man.

1          So that nonsense Mr. Howard was telling you, stop.

2    Because Wiseman same thing, straight out of high school went to

3    the NBA, and guess what he told you?  I am my own man.

4    Government tried to ask him a question.  You did what the

5    agents tell you to do, right?  No, heck no.  What?  Are you

6    crazy?

7          So while Howard was trying to make that seem normal,

8    he wanted you all to think that NBA players are just these dumb

9    jocks.  Then they brought Wiseman in here and he said no, no,

10   no, no, no, no, no, no.  We don't do that.  We don't do that.

11   I am my own man.  Really glad to hear that brother say that.

12   But let's keep going.

13         Lack of evidence.  Judge is going to talk about that.

14   He's going to say lack of evidence.  If you have a lack of

15   evidence, that could mean not guilty.  Why is there a lack of

16   evidence?  Let's see.  Questions you need to ask yourself to

17   help you with that lack of evidence analysis.

18         Find me a conversation anywhere, and I mean go through

19   9,000 text messages, 6,000 emails, I think it was 542 documents

20   from Schmidt.  Go through all of them.  Find me a conversation

21   between Briscoe and Howard about a $7 million purchase for the

22   Dream.  Find it.  You're not.  What you're going to have to

23   base it on is the government telling you.

24         Find me any conversation between Briscoe and Howard

25   about 7 million for purchasing the Dream.  That's his agent.

1   They talked about everything else, according to Howard.  I

2   think he said we talked almost every day all the time, I talk

3   to my agent all the time.  Find that text message.  Locate it

4   where Briscoe and Howard are discussing purchasing the Dream

5   with the Darden Group for $7 million, which is why we're here.

6        You're not going to find that.  Why are you not going

7   to find that?  Because it didn't happen.  Why didn't it happen?

8   Because that's not what Howard was doing.  Keep going.

9        Any conversations between Briscoe and my client about

10  $7 million for the Dream is not going to be there.  Any

11  evidence indicating the convertible — emphasis — convertible

12  promissory note that they spent about two minutes talking about

13  is fake or not actually signed by Howard.

14        Like signing my name at the end of a contract agreeing

15  to the terms of the contract.  That's what adults do.

16  Professionals do.  That's what owners of NBA or professional

17  sports organizations do.  They sign lots of contracts, unless

18  you're Dwight Howard where you don't sign a contract, or if you

19  do sign a contract, you don't read them.  But that didn't

20  happen here.

21        Better question, 3 million versus 7 million.  They

22  didn't talk about that either.  When in the July to January

23  process did it go from 3 million to 7 million to Dwight Howard?

24  When did in that process?  It didn't happen.  It was 3 million

25  in the LOI in July.  It was 3.5 million in the LOI in December.

1    In never was 7 million.  Never was 7 million.

2         That's a problem for them.  It never was 7 million.

3    Heck, if they had offered Brock $7 million, he would have sold

4    that team a long time ago.  It was never 7 million.  The

5    7 million was for something else that's in the promissory note.

6    That's the 7 million.  Not for any Dream, never 7 million.  The

7    devil's in the details.  Find someplace, anywhere, where Howard

8    told by Brock or anybody that the Dream is going for $7 million

9    now to the Darden Group and you can get in on it.  That didn't

10   happen.

11        Better second question, isn't there enough evidence to

12   prove that Briscoe was lying to Howard and Parsons about what

13   Darden was saying and doing?  They asked Howard that question.

14   Do you know what Darden was doing?  Howard tells you, I don't

15   know.  I have to go by what Briscoe says.  Now we know that

16   Howard only knows what the Dardens are doing based upon what

17   Briscoe was telling him.

18        But the problem with that is that you'd have to

19   believe Briscoe, who is a known liar, is telling Howard and

20   Parsons the truth.  That's the only way you can go from point A

21   to point C.  You got to believe point B, which is that Briscoe

22   is telling the truth to Howard.  Problem is Briscoe ain't here.

23   That's why I said they need Briscoe.

24        Second problem is Briscoe is a liar.  So how do you

25   get from point A to point C when point B is just a big gulf?

OA3JDAR2                    Summation - Mr. Donaldson

They want you to convict this man, and if I'm being honest, because of his prior convictions.  They were led by the fact that he had prior convictions.  Heard he had prior convictions, and just went that way, didn't go left, didn't go right.  He got prior convictions.  This is happening, it must be fraud.

That's why we're really here because they went straight and forgot to look left and look right.  They went straight in relying on Briscoe.  Guesswork, speculation does not equal guilt.  But there's more.  There's a civil lawsuit filed — dates are important — filed in August of 2023.  Please remember that date.  The lawsuit was filed in August of 2023.

Question from the judge, actually, do you -- well, what is the lawsuit about?  Breach of contract.  Judge, do you recall whether you said in the lawsuit that you did not say or --

MR. MEAD:  Objection, your Honor.  The third bullet point from the bottom, the document is not in evidence.

THE COURT:  Yes.

MR. DONALDSON:  Okay.

Do you recall in your lawsuit whether or not you said that you lost $7 million because of them not purchasing the Dream?  It was a simple question.  The lawsuit was sitting on that screen right in front of him.

MR. MEAD:  Objection, your Honor.

THE COURT:  Sustained.

1          MR. DONALDSON:  Okay.

2          THE COURT:  Not okay.  The document was never in

3     evidence, all right?

4          MR. DONALDSON:  Yes, sir.

5          Do you recall that being in the lawsuit?  Answer, I

6     don't recall.

7          The reason for the lawsuit, the reason why he's

8     claiming that he lost money, the significant element, the

9     significant factor, the significant point of why he claims he's

10    here is because he claims he lost $7 million related to the

11    dream.  A lawsuit is filed in August of 2023, and he doesn't

12    recall whether or not it has the Dream in it.  How does that

13    make sense?  It doesn't.  It makes zero sense.  It goes to the

14    credibility part that you're going to hear from the judge,

15    whether or not it appears that the witnesses are being evasive.

16         You can answer that question yourself.  And again, I'm

17    saying use your common sense.  Go back to what you did before

18    you became jurors.  Use your common sense in your daily life

19    experiences.  Lawsuit related to XYZ.  Sir, is the lawsuit

20    related to the dream and the $7 million?  I don't know.

21         Vision plan that we had so much testimony about, that

22    we talked about for every witness, in every witness.  Why do we

23    talk about it?  Because it was important.  Why was it

24    important?  Because it's their belief — "they" being the

25    government — that that's the material inducement for the money.

OA3JDAR2                    Summation - Mr. Donaldson

1    It's their belief that Howard sent the money based upon the

2    vision plan.  That's the material part that they're talking

3    about.  It's their belief that Brock called this material and

4    important.

5            So was the vision plan material is the question.

6    Let's go to the details.  First of all, it is indisputable —

7    I'm going to keep using this word — it is indisputable that

8    that vision plan was the result of -- it was a combination of

9    all of their input.  Literally, Sienko and Brock literally sent

10   back multiple emails providing suggestions and what to put in

11   the vision plan.  Literally.

12           And what did Darden say in the response?  I have

13   incorporated your suggestions.  I have put your recommendations

14   in the vision plan.  Check this out now.  Almost like a group

15   effort.  Now they want you to say, well, this vision plan that

16   appears to be the result of a combined effort is the fraud part

17   because of the advisory board part and the corporation part

18   that we're not running away from.

19           We don't care if you brought Issa Rae and a

20   representative for Osaka and somebody from Tyler Perry and, you

21   know, Ms. Brewer.  Wonderful.  I mean, should have brought in

22   Chandler Parsons, but I get it.  But it doesn't matter because

23   it was not material to Dwight Howard and it was not material to

24   Brock.

25           How do we know?  July 2020, Howard.  Let's talk about

1    Howard first.  He told you he was almost hellbent on buying the

2    Dream before he even got a vision plan.  The vision plan was

3    not what made him want to buy the Dream.  First, he said it was

4    his love for women and women's sports.  Then we showed him it

5    was his desire to get the money and make money from him.

6          But in any event, what he wanted to buy the Dream for

7    had nothing to do with a vision plan.  He took affirmative

8    steps to buy the Dream without a vision plan.  He did.

9    July 2020, he had meetings.  He had Zoom calls.  He called

10   people.  He met with his agent.  He met with -- he was on Zoom

11   calls with the WNBA and Dream.  He took affirmative steps to

12   take the Dream then without the vision board.

13         It wasn't until around August or September when he was

14   told he couldn't that he stopped.  How else do we know?  He

15   received documents.  He received lots of documents, financial

16   documents from the Dream, to purchase the Dream.  No vision

17   board stuff at that time.  So we know for a fact it's an

18   indisputable fact that he was trying to buy the Dream, had

19   intentions to buy the Dream, wanted to buy the Dream, took

20   affirmative steps to buy the Dream without ever seeing a vision

21   board.

22         Howard sent $7 million.  Their claim is because of the

23   vision board.  No, it wasn't.  As we said, he wanted to buy the

24   Dream back in July and August.  He sent the money in November.

25   He couldn't buy the Dream between August and whenever because

1    they told him he couldn't.  But another opportunity arose to
2    make more money.  The $7 million was sent after the promissory
3    note was signed by Howard.

4         The promissory note that he signed, he told you he
5    signed, was the inducement for the $7 million, not the vision
6    plan.  And that's what the evidence shows.  He got the
7    promissory note, he signed the promissory note.  He then sent
8    the $7 million on the basis of the promissory note, not because
9    of the vision plan.

10        Brock.  Query.  Was the vision plan material for him
11   to do whatever they claim he was doing based upon that?
12   Absolutely not.  Yes, he helped.  Yes, he told y'all the vision
13   plan was important to me.  The advisory board was very
14   important to me.  The corporate part was very important to me.
15   Was that material to him making a decision?  Absolutely not.

16        How do we know that?  He's been trying to sell the
17   Dream since January.  He wanted to get the most money possible.
18   To him this was about getting money.  Vision plan, not
19   material.  How do we know?  He didn't check it out.  He called
20   one person, Franklin, and she said, I'm in.  He knew Darden,
21   Sr. for at least 10, 15 years.

22        What did he say to you about Franklin and Darden?
23   They are significantly positive.  How do we know again that the
24   vision board or plan was not material to the Darden Group
25   getting the deal?  Because he told you.  Northland.  He told

1    you he did.  He fact checked them.  He fact checked them.  He

2    fact checked them.

3           Did he fact check the Darden Group?  No.  Because he

4    didn't care about the vision plan with the Darden Group.  But

5    when the other group called, he fact checked them.  He said he

6    checked the people they were involved with.  He checked the

7    people who knew them.  He checked what kind of business they

8    were doing.  He checked everything about them.  But when it

9    came to the Darden Group, he didn't check that.  Why?  Because

10   it wasn't important.  But that's not it.

11          They had a January 9, 2021 call, Brock and Darden,

12   before the January 10 Zoom call about the sale of the Dream.

13   Why is that important?  Because on January 10, we had a new

14   person in the room, we had Loeffler's husband.  Never was he a

15   part of the interactions with the Darden Group or the Howard

16   group.  Now we have the husband of one of the owners.  That's

17   an important step.

18          So what did they do?  They had a call before that to

19   talk about that, brock and Darden, Jr.  Not one single iota of

20   conversation was about the advisory board, how great it is.

21   How that's the one that's going to bring you all up.  Not one

22   single thing about the corporations, the corporate sponsors,

23   how that's important to the Dream, and that's the one that's

24   setting y'all apart.  Not one single conversation about that.

25   Why?  Because it wasn't important.  But keep going.

1          Question, page 169, and that's why at the time, by

2    December 8, 2020, the Darden Group was the leading group,

3    correct?  Answer, correct.  Question, with that 3 million in

4    the letter of intent, correct?  Answer, yes.

5          The money was material, not the vision board for

6    Brock.  But keep going.

7          12/8 email saying Darden in top group and why others

8    are being dropped out — no mention again of any vision board.

9    Even after putting all their suggestions in there, nothing

10   about advisory board or corporations.  That wasn't important to

11   Mr. Brock.

12         What caused the sale of the Dream?  $17 million,

13   7 million in cash plus 10 million in debt.  That was what was

14   important to Mr. Brock, not the vision board, not the advisory

15   group, not corporations, none of that matters.  What mattered

16   was who is going to give them the most money, and the persons

17   that brought them the most money got the sale.

18         And he said it on page 185, to make sure you clearly

19   have it, he said to you all what was important to him, what was

20   material to them, he told you what was material.  Price, the

21   money part, and certainty of closing the deal, meaning the deal

22   is going to happen.  That is what is important to Mr. Brock,

23   not the vision board.

24         Vision plan versus letters of intent.  Why is that

25   important?  Because the July letter of intent, in fact, Brock

1    indicated that he okayed it being electronically signed.  Why

2    was that important?  Why is that important?  Because it was

3    electronically signed.  Unlike Briscoe with Wiseman, there is

4    nothing here saying that our client did something forged or

5    anything else untoward with those electronically signed

6    signatures, nothing.

7         Why?  Because, like I said earlier, when he said from

8    the beginning, I'm a felon, when he was bringing his father or

9    his father was going with him to different Zoom calls, when he

10   was on different Zoom meetings, when he was at different calls,

11   when they were attending things together to be a part of

12   purchasing the Dream, it appears from the evidence that he was

13   doing everything he could not to do anything fraudulent, not to

14   appear to be fraudulent.  That's what the evidence shows.

15        January letter of intent, again electronically signed,

16   provided to the WNBA.  Unlike Briscoe, again, there is no

17   evidence that Mr. Darden did anything untoward with these

18   signatures, nothing.

19        There's a difference between the letter of intent and

20   the vision plan.  When they got up here during the case and

21   said, well, you see where it has Darden, Sr., Franklin, and

22   Baltimore?  That's important.  No, it's not.  Well, it's

23   important because the letter of intent that came after that did

24   not have Baltimore's name on it.  Why?  Because she didn't want

25   to be owner.  They took her name off, and they sent them the

1   letter of intent with the actual owner group, Franklin and

2   Darden, Sr.  There's a reason why there are no emails or any

3   exchanges to Baltimore because she wasn't part of the ownership

4   group.

5           The letter of intent indicates that.  Brock admitted

6   that.  Brock told you that.  He told you the letters of intent

7   is the official documents between the parties negotiating, not

8   this vision board or vision plan or whatever you want to call

9   it, not the vision.  Definition of "vision" means future, what

10  you hope to do.  But I guess it means something else today.

11          But the letter of intent with the names on it, with

12  the emails exchanged from the ownership of the WNBA and the

13  Dream with Ms. Franklin and Mr. Darden, Sr. and Mr. Darden,

14  Jr., that's the official communications between the parties to

15  sell the Dream or to purchase the Dream.

16          That's why the January 2010 zoom was important.

17  Because on that Zoom and other Zooms, Ms. Franklin was invited

18  as well.  Mr. Darden, Sr. was invited as well.  Mr. Darden, Jr.

19  was invited as well.  Mr. Brock was invited as well.  And they

20  spoke on a Zoom where pictures are up and you can see people

21  talking about purchasing the Dream.  That's probably why Brock

22  said that Mr. Darden, Sr. was playing an active role in the

23  purchase process because he was all over the place

24  participating, not being impersonated.

25          We talked about this, but there's no evidence at all

OA3JDAR2                    Summation - Mr. Donaldson

1    that any of the LOIs were fraudulently done by Darden with the

2    purpose of buying the Dream.  Now, they're going to say, no,

3    what about that February 2021, the February 15 one that the

4    government got up here and said, well, he sent that one to

5    himself?  I'm going to assume they made a mistake.  We

6    shouldn't assume in court, but I'm going to assume they made a

7    mistake.

8         We're going to assume they didn't say that Mr. Darden,

9    Jr. sent it to himself so that he can do things with it because

10   that wouldn't be true.  Because the evidence, the emails said

11   that he sent it to his father.  It went from Cal Darden, Jr.

12   email address to Cal Darden, Sr.'s address.

13        Now, again why would he be doing a fraud?  That

14   wouldn't make sense.  That just wouldn't make sense.  And

15   there's a reason why the other -- no one else got it because it

16   wasn't supposed to go any place else.  That doesn't make sense.

17   So there's absolutely not one single letter of intent — that's

18   the official document that you exchange between the

19   negotiating -- purchasing and selling party — that was

20   fraudulent.  That material document accepted by Brock,

21   negotiated about by Brock, was absolutely, positively,

22   unequivocally a legal document by the Darden Group with the

23   Dream.  That's the official documents.

24        Howard was not trying to buy the Dream with Dardens

25   after August.  How do we know that?  How do we know that Howard

1    was not trying to buy the Dream with the Dardens after August?

2    How often did you talk directly to Mr. Darden, Jr. about buying

3    the Dream?  We didn't.  Page 399.  How did you get an

4    understanding of what Darden, Jr. and Darden, Sr. were doing to

5    buy the Dream?  Charles Briscoe.  Page 399.  That's why I keep

6    saying they need Briscoe.

7          Did you try and talk to them, the Dardens, about the

8    Dream when you wanted your money back?  No, I tried to go

9    through Charles.  They need Charles.

10          Question, if you sent $7 million to your business

11    partners to purchase the -- I put the Dream -- to purchase

12    anything, you sent seven -- don't use $7 million.  If you sent

13    $100, let's just go way down.  If you sent $100 to your

14    business partners to purchase anything and you claim what you

15    wanted to purchase wasn't done, does anyone here believe that

16    you don't call that person?

17          Starting out a common sense question, you give

18    somebody money to purchase something.  You then find out in

19    your brain that wasn't purchased, who in this jury says, I'm

20    not going to call the person that I just gave my money to and

21    say what's up with that that I tried to purchase it?  That's

22    not evidence that he's not smart.  That's evidence that that

23    didn't happen.  Common sense dictates that didn't happen.

24          Again, I'm just asking you the common sense road.

25    We're going down the common sense road.  Common sense says if I

give $500 to him and in order for him to give me something, I

go home, I don't have it, I go back to him.  That's what common

sense dictates unless I never went to him from the beginning.

But somehow we going to -- I know it, we're going to --

Mr. Donaldson, that's just too easy.  He had to want to do

something else.  I mean, if he was going to make something up,

he would've made a better story up.  He just had to do

something else, that doesn't make sense.  Exactly.  Exactly.

        And if you were any place else besides sitting in

those chairs, you would say to yourself, nah, come on, bro,

that didn't happen.  Stop.  What really happened?  What really

happened, Mr. Howard?  What really, really happened?  Because

that, what you just said happened, $7 million, gave it to

somebody, you claim they didn't do what they're supposed to do

with it and you didn't call them?  You didn't what?  That

didn't happen.

        There's no reasonable evidence establishing a Dream

relationship between Howard and the Dardens.  How do we know

that?  Sienko told you.  How did Sienko tell you?  Because his

job is to communicate with purchasers, according to him.

Howard was out of the picture since at least August or

September.  Who was Sienko, who was a general manager and

president, communicating with since at least September?  He

said purchasers.  Who are the purchasers?  Dardens.  Why?

Because everyone knew that Howard could not buy the team.

1   Everyone knew that.

2          More importantly, details go back to July, go back to

3   July when Briscoe was appointed or anointed the point person,

4   spokesperson for the Howard group.  Briscoe, the agent of

5   Howard, is the spokesperson for the Howard group to the WNBA

6   and the Dream.

7          Okay.  So that means then if Briscoe is no longer

8   speaking to the WNBA and the Dream executives, Sienko is not

9   speaking to Briscoe since August.  Guess what that means?  Two

10  plus two is four, generally.  That means then that Howard is

11  not in the group to buy the Dream.  So all this stuff he's

12  telling you I was trying to buy the Dream with my $7 million is

13  not true again, as evidenced by the details.

14         This is what we know.  July 2020, Briscoe is Howard's

15  agent.  We went through it.  He was the spokesperson.  He is no

16  longer the spokesperson.  Now Darden, Jr. is the spokesperson

17  for the Darden Group because the Darden Group is purchasing the

18  Dream, not the Howard group.  And outside of Howard's, I now

19  want my money back text, there is no objective evidence that

20  Howard is still trying to buy the Dream, zero.

21         There is zero objective evidence in this case that

22  after September that Howard was trying to buy the Dream with

23  the Dardens, zero.  Feel free, look at every transcript page,

24  every line, evidence, text messages, emails, whatever you want

25  to look at, it's not there.  Why?  Because it didn't happen.

1          Howard was told that he could have no ownership

2    interest in the Dream including behind the scenes.  This is the

3    bad part because NBA told Brock that an agent could not own the

4    team.  It's on page 155.  The NBA told Brock that Howard could

5    not purchase the team.  NBA told Brock that Howard could not be

6    a member of the purchasing group and then own it at some point

7    later.  The NBA told Brock that — and this is the next part in

8    red — all of the above was communicated by the WNBA executives

9    to Briscoe, Brock, and Howard, page 155.

10          Here's that common sense road that you're not going to

11   like now because Brock literally told you that the NBA told

12   Howard that he could not be a member of the purchasing group

13   and then own it at some point.

14          Now, this is a problem now because Howard is telling

15   you that I want to be a part of the purchasing group and own it

16   from the back.  Well, now we got a problem because they're

17   going to tell you disregard what Brock said.  They have to.

18   They have to tell you to disregard that because if they don't

19   tell you that and you take that for truth that Howard was told

20   that as well, and then you take Howard for truth that he did

21   exactly what he was told he could not do, now we got a problem.

22          Now we got a problem.  We got a problem.  That means

23   that Howard was doing something that he knew he could not do

24   related to the WNBA if you believe Howard.  If you believe

25   Brock, pick one.  Take your pick.  This kind of destroys their

1  whole case though, kind of destroys the whole theory.  The

2  whole theory now is kind of imploded because Brock is their

3  witness.  He's the guy.  Howard is their witness.  He's the

4  guy.  But now they're testifying about two materially different

5  things that are extremely important.  Now what?  Let you think

6  about that.

7          Darden Group legitimately tried to buy the Dream,

8  legitimately.  How do we know that?  Howard and Briscoe

9  recruited Darden to this process.  Let's be clear about that.

10 Darden didn't come into the process and say, hey, let me try to

11 figure out a way to defraud these people.  That didn't happen.

12 They called him into the process.  Based upon the government's

13 evidence, they called him into the process.  Now they're saying

14 that he defrauded them.  Okay.  We already know there are no

15 more calls between Howard and WNBA after a certain time period.

16 We know that.  But there are many emails between Darden and

17 Dream executives between August 2020 and 2021, specifically

18 trying to buy the Dream.

19          We know that there were in-person meetings with Dream

20 executives, specifically trying to buy the Dream.  We know that

21 there were Zoom calls between both Dardens, WNBA executives,

22 Dream executives, everybody specifically trying to buy the

23 Dream.

24          We know that — that's the big one — we know that the

25 Darden Group actually offered to give money into escrow to buy

1   the Dream.  These are called good-faith legitimate efforts to

2   buy the Dream.  Why?  Because Mr. Darden, Jr., as the evidence

3   has lining up more and more, is doing everything he can not to

4   appear to commit fraud because he has that record.

5          That's why I said at the beginning that was important.

6   I'm telling you up front I have a felony conviction.  I'm

7   telling you up front I have a prior.  I'm telling you that up

8   front so that everything is out on the table.  There is no

9   secrets here.  That's why everything they did was clearly

10  legitimate, as opposed to what you now know happened or may

11  have happened, somebody claiming to buy a WNBA team and be

12  behind the scenes when they know they're not supposed to.

13         That side doing it legitimately or trying to, another

14  side based upon some evidence might be trying to do it in

15  illegitimate ways.  But somehow we want to convict that side.

16  Literally offered to place money into escrow.  Brock, first he

17  said, I said no.  But then we checked, no, Brock, look at what

18  you said in the emails.  Oh, yes, I said it was a good idea.  I

19  told him escrow was a great way to demonstrate commitment and

20  willingness to close, those three words again.  Willingness to

21  close.  Why?  Because that was what was important to Mr. Brock.

22         Details, folks, details.  What was important to

23  Mr. Brock he told you before?  Price point, commitment to

24  close.  What did he say in his email to Mr. Darden, Jr.?  That

25  escrow shows a commitment and willingness to close.  What was

1    he interested in?  Money and commitment to close.  Starting to

2    add up now.  Not the vision board, not the vision plan.  Money,

3    willingness to close, escrow, here you go.

4         Okay.  We going to think about that.  That's a

5    good-faith effort.  That's not illegitimate.  That's not fraud.

6    That's taking affirmative, positive steps to buy the Dream the

7    right way.  Brock appreciated that.  How do we know that?

8    Because he wanted the Darden Group to be successful.  I mean,

9    heck, he was helping them out any way he could.  You're not

10   helping someone to be successful to purchase a WNBA team if you

11   think they have fraudulent intent, are you?  You're not doing

12   that.

13        I mean he's COO this, COO of Coca-Cola, business

14   acumen, 40 years in this, 40 years in that.  I have a wealth of

15   experience.  I was the natural -- I think he said, I was the

16   natural selection to help my wife sell the team because of my

17   wealth of business experience and how much I did this and how

18   much I did that.  Great.  You're right.  I agree.

19        So using all that stuff, your ability to vet people,

20   and knowing who is a good person, all that good stuff.  That's

21   why several months between Brock and that man communicating,

22   our client and the Darden Group was resulting almost in the

23   purchase of the Dream until $17 million came up.  They want you

24   to forget about that though.

25        $7 million, not for the Dream.  We talked about this.

OA3JDAR2                    Summation - Mr. Donaldson

1   There is no $7 million anywhere, spoke about anywhere with

2   Howard.  Didn't happen.  How do we know?  Again — and this is

3   the common sense road — but wait, I put there.  But wait.  Why

4   did I put "but wait"?  Because Howard is supposed to told you

5   all, I was buying the Dream for $7 million to get the Dream for

6   when I retire.

7           So I asked him that question, seemed like a crazy

8   question at the time because I asked it, like, five times, I

9   guess.  But when were you going to retire?  I don't know.

10  Start over.  You sent $7 million?  Yes.  To buy the Dream?

11  Yes.  To do what?  To hold it, and I will be in the background

12  behind the scenes until I retire.  Okay.  When do you retire?

13  I don't know.  Where are you going to retire?  I don't know.  A

14  year later?  I don't know.  So you were going to just stand

15  behind the scenes and -- when?  What does that mean?  I don't

16  know.  Okay.

17          There must have been some kind of side deal, but there

18  wasn't.  There's no evidence of that.  There's no evidence

19  there was a side deal, well, bro, you buy the Dream now, when

20  you retire, we'll give it to you.  Think about that for a

21  second.  This is the common sense part again.  He's saying he

22  gave $7 million to buy the Dream, and there's no proof of that

23  anywhere.  There's no proof of that anywhere, none.

24          You can't go to Nordstrom and buy a shirt without

25  getting a receipt.  You can't go down the block and buy coffee

1   without getting a receipt.  You can't do anything without

2   getting a receipt.  He's telling you and wants you all to

3   believe this, that he gave up $7 million to buy the Dream and

4   there's not a scintilla of proof to say that.

5           There's not a scintilla of proof to show that he's

6   supposed to get it when he retired.  There's not a -- what

7   happens if he retired the next year?  I want the Dream now

8   based upon what?  I said I bought it for $7 million.  Where did

9   you say that?  How does that make sense?

10          And again, I'm not -- it's not because we're saying,

11  oh, he's gullible and that's the -- no.  We're saying that

12  doesn't make sense because that didn't happen.  That's why

13  we're saying it.  It didn't happen.  He didn't give $7 million

14  for the Dream.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

OA3BDAR3                         Summation - Mr. Donaldson

1          MR. DONALDSON:  He gave $7 million for that promissory

2     note to make money with DSG later on.  That's what the

3     $7 million is for.  That's why the $7 million went out after he

4     sign the contract.  Not a second before.  It went out.  He

5     signed the contract, $7 million go out.  But wait, there's

6     more.  He's going to be running the team from behind the

7     scenes, participating in hiring, participating in firing,

8     participating in personnel decisions while playing in the NBA.

9     I forgot to say, he also said he wasn't going to tell the WNBA

10    he's doing it.  How does that make sense again?  Why are you

11    keeping that a secret?  Why are you not telling the WNBA that

12    you just bought the team, and you're behind the scenes?  Maybe

13    because that didn't happen, or maybe because he wasn't suppose

14    to do it.  Pick one.  Either way it goes, it messes up their

15    theory.  Take your pick, because that doesn't make any sense

16    either.  The common sense road is staring to get really narrow.

17    That doesn't make any sense either.  I'm buying a professional

18    sports team from a professional league, and I'm not telling

19    anyone that I did that.  I'm not telling anyone that I bought

20    it.  I'm telling my mother.  I'm not telling anybody else.

21    That makes no sense.  Because that didn't happen.

22          Government Exhibit 401-961 does not help the

23    government.  It simply doesn't.  They need Briscoe, or they're

24    going to be up here all day saying based upon my thoughts,

25    Briscoe meant this.  What do you think Briscoe meant by that?

OA3BDAR3                    Summation - Mr. Donaldson

1    Who do you think Briscoe was talking about when he said that?

2    Literally they want you to convict based upon someone

3    interpreting what someone else said.  That is a scary thought

4    when you really think about it.  When you really think about

5    it, that's a scary thought.  This one doesn't help either.  "We

6    still good on that?  Yes, sir."  Howard says, this is a

7    conversation about the purchase and sale of the Dream.  Help me

8    understand that.  Help yourself understand that.  Howard, We

9    still good on that?  Briscoe, Yes, sir.  Howard, what does that

10   mean?  This conversation is about us talking about the Dream

11   and about me buying the Dream, them selling the Dream and

12   everything about the Dream.  Really.

13        Dumb question.  I'll ask it.  If you're texting

14   somebody back and forth, they're your agent, somebody who he

15   says he trust.  I trust him with my life.  I trust him with my

16   decisions.  He does everything for me.  You're talking to him

17   naturally.  You're not hiding words.  You're not concealing

18   words.  You're just talking naturally.  You don't think

19   anybody's listening to your calls or surveilling your text

20   messages.  You're just talking.  How in God's name does that

21   mean what he said?  "We still good on that?  Yes, sir."  I mean,

22   something behind it, something.  How does that mean that?

23        In order for this to make sense from their

24   perspective, from the government's perspective, you have to go

25   with what Brock said, which means that Brock told you all that

OA3BDAR3                         Summation - Mr. Donaldson

1    Howard knew he could not buy a team and be part of a group and

2    be in the background.  Brock told you that the WNBA told

3    Briscoe, Brock and Howard that.  So now, the only way this

4    makes sense from their perspective, the only way it makes sense

5    from the government's perspective is that that's what happened,

6    that he actually did that in violation of what the WNBA told

7    him not to do, which kind of makes sense now, because maybe

8    that's why he was saying, I'm not telling the WNBA.  There goes

9    that common sense road now.

10           So now we're saying that -- walk with me -- that I

11   didn't tell the WNBA that I bought it.  Why?  Because Brock

12   told you all that the WNBA said I couldn't do that.  What did

13   you do?  I did it any way.  Really?  You don't want to believe

14   that because you know that would mean that he is committing

15   some kind of whatever you want to call it.  So got to go back

16   to the other one.  If he's not doing that, because God knows he

17   wouldn't do that, that means the money couldn't be for the

18   Dream.  You see the problem?  You don't want to say, they don't

19   want you to say that he took the money and used it for the

20   Dream when he was told by the WNBA he can't do that.  Okay.

21   So, fine.  He didn't do that then.  He didn't commit fraud.  He

22   didn't do something violating agreements.  He didn't do that.

23   So now the question is, if he didn't do that, what was the

24   money for?  The promissory note, which is what he signed, which

25   is why he's starting to say, I didn't sign it.  I told you he

OA3BDAR3                    Summation - Mr. Donaldson

1    wasn't going to wanna walk down this road with me because I'm

2    going to tell it to you.

3         Promissory note.  I think it's Government Exhibit

4    2407.  I put in red here, read, review repeat.  Why did I say

5    that?  You get to take the evidence.  You get to look at it.

6    Read, review, repeat.  They say if you say things in threes you

7    remember it more.  Read, review, repeat, or repeat, review,

8    read.  However you want to use the three "R"s, but feel free to

9    go through it.  There's no scheme to obtain money from BMO

10   using material false representations.  There's nothing outside

11   that contract that manifest itself as fraud, that makes this,

12   the providing of that money fraudulent.  There's nothing there.

13   You can ask it all day.  We just went through it.  Either he

14   gave the money and he's buying a team and working behind the

15   scenes, which we know he's not supposed to do, not going to

16   admit that.  So that must mean he gave the money for something

17   else, which is what he did.  Civil complaint filing.  I'll get

18   back to that.  Why is that important for the promissory note?

19   Because in his civil complaint, he admitted that he alleged a

20   breach of contract.  What was the contract that you're saying

21   was breached?  The promissory note.  It's on page 459.  He

22   alleged somehow he remembers that part of the civil complaint,

23   but we'll talk about that later.  He alleges that there was a

24   contract breached.  What contract was breached?

25         MR. MEAD:  Objection, your Honor, to this line on a

OA3BDAR3                    Summation - Mr. Donaldson

1   document that's not in evidence.

2           THE COURT:  Ladies and gentlemen, we're now, as I

3   said, in counsel's arguments.  The issue of the contract was

4   not -- excuse me, the complaint was not admitted in evidence,

5   but there was testimony about it.  Your recollection of the

6   testimony is what controls.  All right.  Go ahead.

7           MR. DONALDSON:  Thank you, Judge.  My apologies.  So

8   we're on page 459 of the testimony.  Mr. Howard indicated that

9   the contract in the civil complaint that was the subject of the

10  breach was the promissory note.  He didn't say that, you know,

11  it was an unenforceable contract.  He didn't say that it was a

12  fraudulent contract.  He said that the promissory note was

13  breached.  They're going to say that he didn't read it, the

14  promissory note.  Oh, my God.  Mr. Briscoe is my agent.  He

15  does everything for me.  I don't know what to do.  I can't tie

16  my shoes.  I have to wait until he calls me to use whatever.  I

17  don't know what's going on, Mr. Donaldson.  I don't know.

18          Stop.  Second line.  Well, first line first.

19  Convertible note was discussed days before the money was wired.

20  Check.  Then this promissory note was emailed to Howard a

21  couple of days prior to the signing of the contract.  Stop for

22  a second.  Why is your agent emailing you the contract several

23  days before?  The common sense answer to that is, so that I can

24  read it.  What other reason would there be to email the

25  contract to you several days before?  I know some of y'all

OA3BDAR3                        Summation – Mr. Donaldson

like, maybe he just got it so he could look at it, put it on

his wall, put a thumbtack in it.  But that wouldn't be common

sense.  When someone emails you something you keep for several

days.  You are doing what?  You're reading it.  That's the

purpose of giving it to you for several days.  That kind of

makes sense.  Then he personally signs it several days later,

not electronically signed, not someone signs it for him, not

his cousin comes over and signs it.  He signs it.  What's

remarkable about this is that he also signs his NBA contract

for that year a few days later.  But again, he's going to tell

you, I don't read these things.  It just so happen to be ironic

that he did that.  It wasn't ironic.  He does read his

contracts.  He read this one before he signed it.  That's why

it was given to him several days before.  But wait, he wants

you to believe that he gave $7 million without reading a

contract.  I get it.  That's what he told y'all because he

never reads any of his NBA contracts. I get it.  That's what he

told y'all.  He wants y'all to believe, I'm just a basketball

player.

          Okay.  This is the problem.  The ones that give him

money, the NBA contracts, I don't read those.  Why?  This is

the big one.  Because he and the government, government ask the

question.  Well, this is a standard contract, right,

Mr. Howard.  Yes, it is.  This is the same contract that you

always sign?  Yes, it is.  So therefore because it's standard,

OA3BDAR3                    Summation - Mr. Donaldson

1   ah ah ah, I just go ahead and sign it.  Yes, it's standard.  It

2   says the same thing.  It makes sense to you guys.  Fine.  I get

3   it.  This is the problem with that.  According to Schmidt, this

4   promissory note is not a standard contract.  This is not a

5   standard contract.  This is different than any NBA contract.

6   This is a convertible promissory note, so this is not standard.

7   So your justification for not reading NBA contracts and just

8   signing them doesn't apply here.

9           Now what?  Also important in this contract, he is

10  giving $7 million away.  And the NBA contracts, he's receiving

11  money.  So we go back to the common sense part.  We have a

12  nonstandard contract and you are giving $7 million which is

13  significantly different than any of the NBA contracts.  And

14  their belief is to tell you, he didn't read it, that he had it

15  for several days.  Now go back to it again.  The justification

16  for not reading standard contract.  Okay, is this standard?

17  No.  Okay, well that killed that justification.  NBA contract.

18  I sign a contract and they give me my money.  Okay.  Fine.  You

19  get money.  What are you doing in this one?  I'm giving away

20  $7 million.  Okay.  Now they'll different again.  So your

21  justifications that you claim you have for not reading

22  contracts do not exist in this case which is why he got the

23  contract several days before so that he could read it

24  understand it, sign it, and then send the money off, which is

25  what he did.  Common sense lane.

OA3BDAR3                    Summation – Mr. Donaldson

1          Irony of bounds.  Why is irony of bound?  Because I

2     like listening to things unfortunately.  And during the direct

3     of the agent about the multiple banking contracts and the bank

4     statements and all that stuff, focus was placed on a top part

5     of a contract.  This is what it says:  You agree to be bound by

6     X, Y, Z, signed by –– they put a big highlighted signed by

7     Calvin Darden.  Why?  So they could show you that Mr. Darden

8     had a contract that said you are bound by X,Y,Z.  And because

9     you signed it, you are bound by the provision.  Okay.  I get

10    it.

11         So for Mr. Darden for their purposes, for prosecution

12    purposes, if a person signs a contract that has the language in

13    it that you read it, then you're bound by it.  But for

14    prosecution purposes for their own witness, contract, bound by

15    it, signed it, he's not bound by that.  Irony of bounds.  So

16    for their witnesses against Mr. Darden, he signed a contract,

17    that must mean you read it.  It's against you.  For Howard,

18    same thing.  Sign the contract, same provision.  No way, he

19    didn't read it.  Doesn't work like that for him.  We call

20    that –– my son calls that ironic.  He says ironical.  It's not

21    irony.  It's something else.

22         Title of the promissory note.  Can you put that up,

23    the promissory note 2407.  The title of the promissory note is

24    important.  We're going to go through it just for a quick

25    second, and I want you to read, review, and repeat that

promissory note.  Just read it.  Just go through it.  But for
right now the title of it is important because they mention in
their case zero funds was in the account before the $7 million.
That makes sense because the title of it says, financing of
Darden Sports Group, financing of the Darden Sports Group,
putting money into the Darden Sports Group.  That's literally
what it says.  It literally says at the top, financing of the
Darden Sports Group, means putting money into the Darden Sports
Group.  It literally says that.  The money is to finance the
group, finance the company.  That's literally what it says.  So
he might be upset that he wants his money back, but that's what
the contract says.

Use of proceeds section.  It clearly says it was not
suppose to be used for the Dream.  Schmidt said it was not
suppose to be used for the Dream.  Said another way, the
promissory note signed by Howard was not supposed to be used
for the Dream.  That's what Schmidt said.  That's what the
contract says.  That's what he signed says.  So if he comes in
here now and says, listen, I gave the money for the Dream, but
the contract says it wasn't for the Dream and you signed it,
what now?  Did he get his money back?  Better question is, was
he suppose to?  Where in this promissory note does it say you
get your money back?  Where in the agreement does it say you
get your money back?  What it does say is that he takes an
equity in Darden Enterprises at the end of the maturity period.

OA3BDAR3                    Summation – Mr. Donaldson

1   It converts at the end of the maturity period.  November 2023

2   is when the maturity period ended.  My client was arrested in

3   March 2023.  He got sued in August 2023.

4           MR. MEAD:  Your Honor, objection to the third bullet

5   point on the bottom.  I'm not aware of any evidence on that

6   point.

7           THE COURT:  I'm sorry.

8           MR. DONALDSON:  I just moved it just in case.  I

9   didn't want to leave it there.

10          THE COURT:  Hold on.  Let me find it.  What page is

11  this?  Ladies and gentlemen, as I mentioned, summations by both

12  parties, summations are argument.  They are not evidence.  Your

13  recollection of the evidence and the evidence that will get

14  sent back with you, that is the evidence.  The arguments of the

15  lawyers are not.  Whether it appeals to your common sense,

16  that's one thing.  But the evidence is the evidence, and that's

17  for you to decide the facts of the case.  Go ahead,

18  Mr. Donaldson.

19          MR. DONALDSON:  Thank you.  As I said, it says that he

20  is suppose to take an equity interest in Darden Enterprises at

21  the end of the maturity period which is at the end of November

22  of 2023.  As I said, he got arrested in March of 2023.  He got

23  sued in August 2023, not him, Darden Enterprises got sued in

24  August of 2023.  That's the timeline.  Mr. Howard exercised

25  none -- or he didn't testify that he did -- exercise any of

OA3BDAR3                    Summation - Mr. Donaldson

1  those rights before my client was arrested in March of 2023,

2  not one.  He invested in DSG with the hope that when he retires

3  three years later, he would be able to convert that investment

4  to Darden Enterprises assets.  That's what was supposed to

5  happen.  It was a convertible promissory note.  It converted

6  after November 2023, not before, not 2021, not 2022, November

7  2023.

8             MR. RICCO:  Mr. Donaldson, your screen's out.

9             MR. DONALDSON:  Your screen is out too?

10            JUROR:  Yes.

11            MR. DONALDSON:  My fault.  I don't need that.  Let's

12  go.  The promissory note, the convertible promissory note.

13  Judge, you have yours up?

14            THE COURT:  It's not on my screen.  Okay.  It's on my

15  screen.  Is it on your screens?

16            JUROR:  Yes.

17            MR. RICCO:  It's back.

18            MR. DONALDSON:  My apologies, ladies and gentlemen.

19  The convertible promissory note.  What is particularly

20  interesting is that Mr. Schmidt testified about it.  He

21  testified about it, about it's unusual nature I guess is what

22  he said or something to that effect.  But there was no expert

23  here called by the prosecution who has the burden to say

24  anything and I mean nothing about this convertible promissory

25  note that Dwight Howard signed.  No evidence that Mr. Schmidt,

OA3BDAR3                    Summation - Mr. Donaldson

who he said called the lawyer, challenged this promissory note

at all, and he apparently saw it in 2021.  Not at any time in

2021, not any time in 2022.  He told you all that he was

responsible for Mr. Howard's finances.  He had the promissory

note in his hand.  He read the promissory note.  He even asked

Dwight Howard and Briscoe to let a lawyer look at the

promissory note.  What did both of them say or what did neither

one of them do?  Not according to Howard and according to

Mr. Schmidt.  They did not take that opportunity.  Why?

Because they were okay with it.  They signed it.  Well, Howard

signed it.  He agreed to it.  There was no point of going to a

lawyer because that's what he agreed to.

        There's no evidence, and I mean zero, that Mr. Howard

exercised any rights related to this promissory note except in

August 2023, and it didn't convert until November of 2023.

According to Mr. Schmidt, it was structured as a debt, equity.

He wanted equity.  He paid for equity.  He didn't pay to say I

want my money back.  It doesn't say that in the contract.  So

when they ask him, Did you get your money back?  That's

probably not the right question, because nothing in the

contract says, You get your money back.

        Now if somebody wants to say, that's a messed up

contract, Mr. Donaldson.  That's not cool, Mr. Donaldson,

whatever you want to say.  The fact of the matter is, is that

Mr. Howard signed a contract.  The provisions are in the

OA3BDAR3                          Summation - Mr. Donaldson

1    contract.  There's nothing about the Dream in the contract.  He

2    provided $7 million to the Darden Sports Group pursuant to the

3    contract and nothing else.  There was absolutely no scheme by

4    Mr. Darden to obtain money from BMO using any materially false

5    representations.  There's nothing in the record to say that.

6    So when you go back and deliberate and you ask yourself that

7    question, there's nothing in the record that says that

8    Mr. Darden did anything, said anything, any material

9    misrepresentations to get BMO to send $7 million.

10            There's no aiding and abetting.  Just because he was

11    present, just because he talk to him on text messages, that

12    doesn't make it aiding and abetting.  Acquiescence is not

13    enough.  They need Briscoe.  They need the person who they

14    relied upon, the liar guy.  They need him.  The problem is,

15    he's a liar.  Money laundering.  But before we get to that,

16    somebody should be asking, Why do they want their money back or

17    why did he want his money back?  Why did Howard want his money

18    back?

19            Mr. Ricco on cross-examination of Mr. Schmidt probably

20    answered that question.  And they didn't talk about that in

21    their summation.  I believe as Government Exhibit 359.  And

22    what Government Exhibit 359 says I believe is that before the

23    team got sold, before the team got sold but after the

24    $7 million went out to DSG, to Darden Sports Group, somebody,

25    an employee working at BMO contacted Charles Briscoe and told

him, listen, Howard has a very large IRS bill.  We don't want

to liquidate his assets.  Call Cal and try to get that money

back.  That was before the team got sold.  So before the team

got sold, Mr. Howard was trying to get his money back, before.

This wasn't about no, the Dream got sold and I gave $7 million

for the Dream.  No.  No.  That's what he's using as an excuse.

But we know now based upon that wonderful question from

Mr. Ricco, small little detail, that before the Dream was sold,

I believe it was February 18, 2021, I believe that's the right

date, that's when BMO reached out and said, listen, Howard has

a large IRS bill.  We don't want to liquidate his assets.

Contact Cal.  Get that money back.  And that my friends is why

you're really sitting here.

          Money laundering.  Let's talk about it for a quick

second.  Judge, I'm almost finish.

          THE COURT:  Okay.

          MR. DONALDSON:  This legacy account they talked about

earlier.  They put something up on a screen, and they put up on

the screen they had names, Baldwin, Legacy account.  But what

they didn't put up there was the date.  That's what they didn't

put up there.  But feel free to look at the evidence, the

exhibits.  Look at the Legacy account exhibits.  It will tell

you, they're claiming now, oh, the Legacy account was made for

Mr. Darden to use it as fraud.  He put the money in it.  And

everybody was like, yeah, that's probably right because it

OA3BDAR3                    Summation - Mr. Donaldson

assumes he got the money.  It went to the Legacy account, and
we know it's money laundering because he was hiding his name.
It was by somebody else, Trevor Baldwin.  Okay.  Sounds good.
Problem.  The account was open in 2017 by Trevor Baldwin long
before this stuff happened.  So this part about the account
being opened by Trevor Baldwin or being opened by someone in a
different name in order to facilitate the money laundering.
Well, not when you look at the details, because the details say
this account was opened back in 2017 by Trevor Baldwin.  Look
at the evidence.  Feel free.  Not in 2019, not in 2020, not
when they claim the money started going into the accounts,
three or four years earlier.  Nothing to do with this, but
that's not what they're going to tell you because they got to
figure out a way to make this make sense.

        Why a smart person like Mr. Darden really smart guy
according to them able to do all this doggone fraud is going to
be so dumb that in an effort to conceal where the $7 million
and the $1 million came from, he transferred it to bank
accounts, bought items using his own name.  That's how you do
it, buddy.  That's how you conceal where the money came from.
I put it into an account that says Calvin Darden.  I use the
email that says Darden Enterprises.  I use my actual driver
license in the account.  I use my actual name and date of birth
in the accounts.  I put my social security number in the
accounts.  I really want you to look at the evidence of all

OA3BDAR3                    Summation - Mr. Donaldson

1  those banks and look at the information provided to those

2  banks.  And after you do that ask yourself, wait a minute, how

3  is this trying to hide something if he's putting this --

4  literally there are pictures of him in the bank accounts.  Like

5  driver license, picture Calvin Darden with his face.  I'm

6  trying to figure out how that's trying to hide.  How that's

7  trying to conceal?  How's that even possible?  Literally each

8  account.

9          As Mr. Ricco asked the fantastic agent who testified,

10 you told us what happened?  Yes.  It went from that account to

11 that account.  Do you know why it went from that account to

12 that account.  I don't know that.  Neither do they.  Just

13 because they say it doesn't mean it's true.  And just because

14 his name is on all the accounts, first and last name, father's

15 first and last name, verified addresses, verified date of

16 births, verified social security numbers, that somehow doesn't

17 appear to be a person trying to hide what he's doing.  That

18 appears to be a person saying, I'm doing this out loud,

19 transparent.  Look at me.  Hear me roar.  Just like he told

20 Brock when he first met him, I am a felon.  I'm not doing

21 anything wrong.  Just like he told the banks, here's my driver

22 license.  Here's my name.  Here's my social security number.

23 I'm not doing anything wrong. Run it.  That's not called

24 concealment, unless you're an idiot.  He's presumed innocent,

25 but he's not presumed to be stupid.  Why go from bank to bank?

OA3BDAR3                      Summation – Mr. Donaldson

 1   Again, if there's a law that says you can't do that, fine.

 2   Fine.  But I don't think you're going to hear that from the

 3   Court.  I don't think the Court is going to say, well, if you

 4   go from bank to bank, that's a crime and you're convicted.  I

 5   don't think you're going to hear that.  I may be wrong, but I

 6   don't think you're going to hear that.

 7         Other part of money laundering.  There's no proceeds

 8   from unlawful activity.  How do we know that?  Because the

 9   proceeds came from the $7 million.  Where did the $7 million

10   come from, the promissory note.  The promissory note was

11   lawful.  Again, we can do this all day.  We can go back to the

12   team.  I bought the team.  I knew I wasn't suppose to buy the

13   team.  I committed fraud against the WNBA that's why I'm not

14   telling anybody.  Or, okay, you got me.  I didn't do that.

15   You're right.  I use $7 million for the promissory note.  I

16   just really want it back.  That means no fraudulent activity.

17   That means no money laundering.  That means check not guilty,

18   let's move onto the next one.

19         Our client has pleaded not guilty.  As such, he denies

20   all the charges in this indictment.  As he's sitting there

21   right now, he's pleaded not guilt.  And as he's sitting there

22   right now, he's denied all the charges in this indictment.

23   Mr. Parsons, an NBA player attempted to provide a million

24   dollars to a college athlete before he got drafted to go to an

25   agent.  Mr. Howard, an active NBA player who either was trying

OA3BDAR3                    Summation – Mr. Donaldson

1   to commit fraud against the WNBA or he's telling you all a feel

2   about using that money to buy an WNBA team.  Mr. Darden

3   legitimately attempted to help his father purchase the Dream,

4   legitimately told Mr. Brock he's a felon, legitimately he and

5   his father met with Dream executives, legitimately he and his

6   father met with WNBA executives.  Legitimately he and his

7   father met with Loffler's husband.  And legitimately as an

8   offer of good faith he and his father attempted to give them

9   money to put in an escrow account to hold it to show that they

10  were bona fide good faith purchasers of the Dream.  That my

11  friends is why Calvin Darden, Jr., is not guilty.  Thank you.

12          THE COURT:  Thank you very much.  If I see counsel

13  quickly at sidebar.  Thank you.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

OA3BDAR3                          Summation – Mr. Donaldson

1                (At the sidebar)

2                THE COURT:  I know I stated the plan was that we would

3     break in between and try and do things before lunch, but it's

4     already it's 1:00.  I don't know how long is the government's

5     rebuttal?

6                MR. MEAD:  Close to two hours, I think we probably got

7     half an hour, so I think it does make sense to break for lunch.

8                MR. RICCO:  I agree.

9                THE COURT:  We're going to break for lunch, no talking

10    about the case because they don't have the case yet, and then

11    we're going to come back at 2:00, 2:15.

12               MR. MEAD:  Whatever works.

13               THE COURT:  Why don't we come back at 2:15.  All

14    right.

15               MR. DONALDSON:  Thank you.

16               THE COURT:  And we'll do the rebuttal summation and

17    then I'll go right into the charge.  Okay.  All right.  Thank

18    you very much.

19               MR. RICCO:  Judge, just so you know we need the break.

20               THE COURT:  All right.

21               (Continued on next page)

22

23

24

25

OA3BDAR3                          Summation – Mr. Donaldson

1              (In open court)

2              THE COURT:  Okay.  So, ladies and gentlemen, a slight

3    change of plans.  I know I had mentioned that we were going to

4    try to get all the jury addresses in before you have lunch, but

5    it's 1:00 now.  We still have to do the government's rebuttal

6    summation.  So we're going to take our launch break.  We'll

7    come get you at about 2:15.  Go back.  Enjoy your lunch.  You

8    don't have the case yet, can't discuss it.  Go back and enjoy

9    your lunch, and we will come and get you.  We'll hear the

10   government's rebuttal summation and then the jury charge.

11   Okay.  Thank you very much have a good lunch.

12              (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

OA3BDAR3                    Summation - Mr. Donaldson

1          (Jury not present)

2          THE COURT:  Thank you.  You may be seated.  Let me ask

3     is there anything we need to deal with before we take our lunch

4     break?

5          MR. MEAD:  Not from the government.

6          MR. DONALDSON:  No, your Honor.  Thank you.

7          MR. RICCO:  No.

8          THE COURT:  There was that one issue with regard to

9     adding an additional sentence to the aiding and abetting.  I

10    take it since we didn't hear from the government or was there

11    an objection?

12         MR. KINDER:  The language that the Court proposed is

13    fine with the government, your Honor.  While we're on the

14    subject we have one observation about the verdict sheet.  For

15    Counts One and Two which are broken out by victim, we have in

16    italics, please address both A and B. Your verdict must be

17    unanimous.  The statement, Your verdict must be unanimous is

18    then not present for Three, Four and Five.

19         THE COURT:  We can include it.

20         MR. KINDER:  Two suggestions.  One is take out your

21    verdict must be unanimous and state orally to the jury that

22    each entry that you make, your verdict must be unanimous, or

23    add it for Three, Four and Five.

24         THE COURT:  I think I'll add it for each of them.  I

25    agree with them.  The charge already has that it has to be

OA3BDAR3                          Summation – Mr. Donaldson

1    unanimous, but we can add that to the verdict sheet to the

2    other counts.  Okay.  All right.  Thanks, everyone.  See you

3    after lunch.

4            (Recess)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

AFTERNOON SESSION

1
2:25 p.m.

2

3          (Jury not present)

4          THE COURT:  You may be seated.  Okay.  Is there

5     anything we need to address before we get the jury and do the

6     rebuttal summation?

7          MR. MEAD:  Not from the government, your Honor.

8          THE COURT:  Defense?

9          MR. DONALDSON:  No, your Honor.  Thank you.

10         THE COURT:  All right.  Let's get the jury.

11         (Jury present)

12         THE COURT:  You may be seated.  Ladies and gentlemen,

13    I hope that you had a relaxing lunch.  We're now going to

14    continue with the summations and the government's rebuttal

15    summation.  Mr. Mead, you may proceed.

16         MR. MEAD:  Ladies and gentlemen, the defense counsel

17    in this case are very good lawyers, and it's their job to

18    advocate for their client.

19         THE COURT:  Mr. Mead, I apologize.  Is the microphone

20    on?

21         MR. MEAD:  It appears not to be.

22         THE COURT:  It slides.  There you go.  I think it's on

23    now.  Great.  Thank you.

24         MR. MEAD:  Can you hear me?  What the defense counsel

25    in this case are not are magicians, and they can't make the

1   evidence in this case disappear.  They can't make the lies that

2   the defendant and Briscoe told disappear.  And they can't make

3   the millions of dollars that went from the victims into the

4   defendant's pockets disappear, the millions he took from his

5   victims, put into his shell companies, bank accounts and

6   laundered through six more bank accounts.  The millions he

7   spent buying a mansion in Atlanta, buying the Lamborghini, a

8   Rolls-Royce, a Porsche and a Mercedes, buying art, jewelry,

9   watches and other luxury goods for himself.  They can't make

10  any of that evidence disappear.  So what do they try and do?

11  They distract you, but don't be distracted.  Focus on the

12  evidence.

13          Now, defense counsel made a lot of different arguments

14  to you, and I don't have time to address every single one of

15  them.  Mr. Thompson has already laid out the evidence piece by

16  piece to show how it all fits together.  And I trust, ladies

17  and gentlemen, that you understand what happened in this case.

18  You know the evidence.  You've seen this trial.  But I do want

19  to respond to a couple of points that the defense made.  Before

20  I do that though, I want to make one thing crystal clear here.

21  The defendant in this case does not have to do anything at all

22  in this trial.  He doesn't have to make any arguments.  He

23  doesn't have to submit any evidence.  He has no burden.  The

24  burden to prove beyond a reasonable doubt, that's our burden,

25  and we embrace that burden, and we've done it here.  But when

1    the defense counsel does make arguments, you are permitted to

2    scrutinize those arguments.  And here's one thing that all the

3    lawyers in this case agree on.  You guys when you're back in

4    that jury room, you should use your common sense, and you

5    should use your common sense to think about whether the

6    arguments the lawyers are making to you in these closing

7    arguments make sense or not.

8            So let's talk about a couple of the arguments from the

9    defense and whether they're consistent with your common sense

10   and with the evidence in this case.  Now, the defense got up

11   and said that there were "no secrets" in this case.  There were

12   secrets in this case.  There were lies.  The people and the

13   companies on the vision plan, they weren't really involved.

14   The defendant kept that fact secret from everyone.  He lied

15   about it.  The defendant didn't intend for the money that he

16   got to go to James Wiseman or to buy the Atlanta Dream.  He

17   kept that secret too.  He lied about it.

18           Now, it is true that the defendant didn't lie about

19   everything all the time.  Let's use our common sense here.

20   That's not how frauds work.  That's when you get caught right

21   away. If you lie about everything the second someone checks on

22   something, you're done.  You're caught.  If you're good at

23   committing a fraud though, you only lie about the stuff you

24   think you can get away with, and that's what the defendant did.

25   You don't lie about whether or not you were convicted of a

1  felony in the past.  The defendant testified in open court in

2  2015 about the crimes he committed.  That information was out

3  there.  If he tried to hide that, the second anyone looked him

4  up, they would have found out about it and it would have been

5  over for him.  And the defendant didn't impersonate Calvin

6  Darden, Sr., to John Brock.  John Brock knew Calvin Darden, Sr.

7  It would be hard to impersonate someone that the person knew.

8  That's how you get caught.  But there was impersonation in this

9  case.  The impersonation wasn't to John Brock the person who

10 knew Calvin Darden, Sr. The impersonation that the defendant

11 did of his own father, he did that to Briscoe and Jeff Schmidt,

12 the banker.  They didn't know Calvin Darden, Sr. personally.

13 And the impersonation on them, it worked.  That's why you

14 didn't hear Jeff Schmidt testify that the defendant was

15 impersonating his dad.  The impersonation worked.

16      Now, let's look at the phone numbers again.  The

17 defendant controlled two phone numbers, the number ending in

18 5686 and the number ending in 1779.  You saw all the evidence

19 that he controlled those numbers.  He used them to talk to

20 people, and he listed them as his phone numbers over and over

21 again.  I just want to show you just one example because the

22 defense said there was no evidence of this.

23      Mr. Ross, can you please pull up Government Exhibit

24 404 at page four side-by-side with Government Exhibit 1142, and

25 you can zoom in on the blue message, please, on the left.

1          The blue messages, these are the defendant sending

2     them using the 5686 phone number.  He says, Hi, Charles, I'm no

3     longer on Coke's board.  I'm on Target, Cardinal Health and

4     Aramark.  Those are the boards that Calvin Darden, Sr., serves

5     on, and the defendant is sending this message from the 5686

6     phone number.  Okay.  How do you know that that 5686 phone

7     number actually belongs to the defendant, that the defendant

8     was actually using it?  Well, there's a ton of evidence in this

9     case.  This chart on the left.  These are all of the bank

10    documents and invoices and phone records where the defendant

11    says, this 5686 phone number, this is my phone number.  And you

12    also heard from Special Agent Cromer.  He arrested the

13    defendant.  And right before he arrested him, right at seven in

14    the morning, he called the defendant on this same phone number

15    he's using to impersonate his dad so he could go in and arrest

16    him.  And the defendant picked up on that phone number.  The

17    evidence that the defendant was impersonating his dad in this

18    case, it's there on the screen.  It's evidence.  It's black and

19    white.  You can take that down, Mr. Ross.

20         Now, the defendant impersonated his dad, but the

21    defense said that his dad was also involved in some of these

22    deals.  Sure he was a little bit, as a figurehead.  Calvin

23    Darden, Sr., showed up at one meeting, and he showed up on the

24    zoom call.  Why?  Because the defendant needed his father's

25    credibility to make this con work.  Who got the money?  The

defendant.  Who did the lying?  The defendant.  Who

impersonated Calvin Darden, Sr. as we just saw?  The defendant.

Who did most of the talking in the meeting, in the emails

you've seen?  The defendant.  The defendant and Briscoe were

the ones running this con.  Calvin Darden, Sr., the defendant's

dad, he was just one of the many people that the defendant used

to make this fraud work.

Now, the defense talks about Charles Briscoe a whole

bunch, one of the defendant's co-conspirators.  And the defense

wants you to think this whole scheme, this was all Charles

Briscoe, not my guy.  But, ladies and gentlemen, you know that

the defendant knew exactly what he was doing in this fraud.  He

wasn't some dupe of Charles Briscoe.  How do you know that?

Mr. Ross, Government Exhibit 1121 in evidence, please.  This is

the money from Dwight Howard.  And what happened to the money?

There's a little bit over $6 million on this chart.  And

Charles Briscoe got a little over $1 million of it.  The

defendant got the rest of it.  More than $5 million.  It was

the defendant's house that was bought with fraud proceeds.  The

defendant's cars, the defendant's art, the defendant's luxury

goods, and payments to the defendant's mom.  The guy who gets

almost all of the money in the fraud, that's not the dupe,

that's the mastermind.

Now $1 million was also stolen from Chandler Parsons,

and more than half of that went to the defendant as his cut of

1    the fraud.  The defendant wants you to believe that he's the

2    unluckiest guy in the world.  Charles Briscoe committed a fraud

3    and then gave the defendant almost all of the money from it.

4    Does that make any sense to you, ladies and gentlemen?  No, it

5    doesn't.  It's the defendant's fraud.  He did it with Briscoe.

6            Now, look at who, besides the money, look at who

7    played a bigger role in these frauds.  On the Dream fraud.  Who

8    is the point of contact with the Dream and the WNBA and the

9    bank?  The defendant.  Who wrote the vision plan with its false

10   promises?  The defendant.  Who wrote and signed the promissory

11   note with Howard?  Again, the defendant.  On the Wiseman fraud.

12   Who originally falsely claimed to have the relationship with

13   Wiseman?  The defendant.  Who sent text after text with ideas

14   about how to pressure Chandler Parsons into sending the money?

15   The defendant.  Who impersonated his own father to get this

16   fraud done?  The defendant.

17           And finally on Charles Briscoe.  I expect Judge

18   Broderick to tell you that even if the defendant had a lesser

19   role than Charles Briscoe in this fraud, it doesn't matter.  As

20   long as the defendant knowingly participated in the fraud.  And

21   of course the evidence shows that he at least knowingly

22   participated in the fraud.  These were his fraud schemes.  The

23   defendant says that he was really trying to buy the Atlanta

24   Dream.  With what money?  You've looked at the bank accounts

25   belonging to the defendant.  He doesn't have any money other

1    than the money that he stole from Chandler Parsons and Dwight

2    Howard.  If he was ever going to buy the Dream, it was going to

3    be with Dwight Howard's money.  And if he was ever planning on

4    using that money to buy the Dream, he sure didn't act like it

5    when Dwight Howard's money showed up in his bank account.  The

6    defendant got $7 million from Dwight Howard in November and

7    December.  And you learned that someone else was buying the

8    Dream in late January or early February.  What did he do in

9    that period in between when he got the money and after he got

10   the money before he learn there was another buyer?  Can you put

11   up the demonstrative, Mr. Ross.  Thank you.

12        This is what the defendant did with the money before

13   the deal fell through.  He spent more than $1.4 million of

14   Dwight Howard's money before he even learned that there was

15   another buyer.  He bought a Rolls-Royce for himself, a Porsche

16   for himself.  He gave more than $400,00 to his mom, $250,000 to

17   Charles Briscoe who helped him rip off Dwight Howard; $60,000

18   in loan repayments, $130,000 to other people.  And that's what

19   happened before he learned that the deal had gone through.

20   What did he do after he learned that someone else was buying

21   the Atlanta Dream?  He spent the rest of the money.

22        Now, ladies and gentlemen, use your common sense here.

23   What would someone trying to do a real deal acting in good

24   faith had done?  They would have kept Howard's money safe while

25   they tried to finish the deal with the Dream.  When that deal

OA3BDAR3                    Rebuttal - Mr. Mead

1    fell through and he couldn't use that money to buy the team
2    anymore, they would have given Dwight Howard his money back.
3    But the defendant, he stole it, and he spent it.  Now, the
4    defense says that Dwight Howard is lying.  And, ladies and
5    gentlemen, there's no dispute that Dwight Howard sent this
6    $7 million.  We're going to talk about what he got in return,
7    but he got nothing in return.

8            There was a lot of talk about Dwight Howard.  And
9    maybe it is true that the WNBA wouldn't have wanted Howard to
10   be a behind the scenes owner of the Atlanta Dream.  But even if
11   that's true, that doesn't mean the defendant is allowed to
12   steal $7 million from him.  Dwight Howard told you what the
13   money was for.  He told you it was for the team, so did Jeff
14   Schmidt, the banker.  There was a lot of talk about, oh, Dwight
15   Howard had a motive to lie.  The banker has no motive to lie at
16   all.  He said the money was for the team.  And that's what
17   Dwight Howard was telling Briscoe, and what Briscoe was telling
18   Howard even after he signed the promissory note and sent the
19   money.

20           201-J, please, Mr. Ross on page one.  You can zoom in
21   on the messages.  The defense talked about -- so these are text
22   messages, ladies and gentlemen, between Howard and Briscoe.
23   And Howard is in green and Briscoe is in blue.  And these are
24   messages from January 6, 2021, after Dwight Howard has sent
25   $7 million to the defendant, and before he's found out that

1    someone else has actually bought the team.  The defense talked

2    about these messages.  Let me read them to you.

3           Dwight Howard:  You see Lebron is talking about owning

4    the team.  Then there's a tweet from Lebron sent.  And then

5    Charles Briscoe says:  It's too late for that.  Go to page two.

6    Dwight Howard ask:  We still good on that?  And Briscoe says,

7    Yes, sir.  If we can go back to page one and zoom in on the

8    messages again.  The defense said, don't worry about these

9    messages when they were just talking to you.  They said these

10   messages are cryptic.  They say, who knows what they're really

11   talking about here.  Well, these messages aren't cryptic.  You

12   see Lebron talking about owning the Dream.  It is crystal clear

13   what they're talking about.  Dwight Howard thinks that he has

14   bought the team, and he's checking in with Charles Briscoe to

15   make sure that's right.  And Charles Briscoe says, Yeah, of

16   course, you got the team.  Lebron can't buy it.  You own it.

17   Okay.

18          The defense talked about the vision plan a lot.  And

19   there's no dispute that the vision plan was full of lies.

20   There's no dispute that all those people on there didn't

21   actually agree to join the board.  There's no dispute that all

22   those companies up there didn't really agree to be sponsors.

23   But what about the idea the defense said that the defendant was

24   pushed into including these people and companies into the

25   vision plan.  There was kind of a joint effort between the

OA3BDAR3                         Rebuttal - Mr. Mead

1  defendant and Mr. Brock and Mr. Sienko, and, you know, he
2  wasn't really responsible for whatever was on there.  It's
3  absurd, ladies and gentlemen.  The defendant is the one who
4  wrote the vision plan.  Chris Sienko, John Brock, Dwight
5  Howard, yeah, they had some ideas for the team.  They had some
6  ideas for how the defendant could run the team, but they didn't
7  tell the defendant to lie.  They didn't make him tell these
8  lies.  Dwight Howard didn't even know who some of those people
9  were.  Jennifer Baltimore, the defendant's friend who testified
10 and said she never agreed to be involved.  Of course putting
11 her in there was the defendant's idea.  It was the defendant's
12 idea to take advantage of people he knew like Jennifer
13 Baltimore and his father to get money for himself.  No one ever
14 told the defendant to lie in the vision plan.  He did that all
15 by himself.
16         The defendant says the lies in the vision plan didn't
17 matter.  Well, you heard from Issa Rae, from Jennifer
18 Baltimore, from Rosalind Brewer, from representative of Aflac,
19 Tyler Perry and Naomi Osaka, the defendant lied about their
20 involvement.  And let's start with the obvious.  The defendant
21 knew what he was doing there.  He lied about the involvement of
22 these people and companies because he knew it would make it
23 more likely that Dwight Howard would give him $7 million.  The
24 defense made a big deal about why Dwight Howard wanted to buy
25 the team.  And ladies and gentlemen, you don't have to decide

1    whether Dwight Howard wanted the team because he wanted to help

2    women play basketball or because he thought he would make

3    money.  Usually people do things for multiple reasons, and I

4    think that's what happened here.  But of course Dwight Howard

5    either way would rather own a team that made money than lost

6    money.  And of course owning a team with a bunch of corporate

7    sponsors and some of the most famous celebrities in the world

8    would be better than owning it without them.

9            Think about just the sponsorships for a minute.  The

10   defendant is saying we have all these corporate sponsors.  He's

11   lying about how much money the team is going to make.  He's

12   lying about the bottom line.  A team without those sponsorships

13   and that income is worth less than a team with them, especially

14   when WNBA teams were generally losing money.  But we can look

15   at some text messages from the defendant because he knows how

16   important his vision plan is. Mr. Ross, can you please pull up

17   Government Exhibit 401-961, page five, side-by-side with

18   Government Exhibit 2404, 401-961 page five, please Mr. Ross.

19   If you could zoom in on the top two messages on the left,

20   please, Mr. Ross.

21           Now these are messages between Calvin Darden, Jr., and

22   Charles Briscoe.  And Calvin Darden, Jr., says, You think he'll

23   do it?  Briscoe responds, I think there is a great chance.  He

24   is very intrigued by the deck.  At some point next week it

25   maybe worth doing a call and have you give him more insight on

1    the deck.  The defense talked about these text messages too.

2    They said these are cryptic too, who knows what they're talking

3    about.  A deck, this can be anything.  It can't be anything,

4    ladies and gentlemen.  Because you have an email on the right

5    where Calvin Darden is sending Charles Briscoe the vision plan,

6    the document that's full of lies.  And he sends Briscoe the

7    vision plan the day before these text messages.  So what do you

8    know happened, ladies and gentlemen?  The defendant sent

9    Briscoe the vision plan.  Briscoe talked about it with Dwight

10   Howard, and the very next day Briscoe tells the defendant, Man,

11   Dwight Howard was pretty interested in this vision plan.  I

12   think he's going to do it.

13        There was also some talk about the letter of intent

14   from February of 2021, the fake letter of intent.  And,

15   Mr. Ross, if you could do 2413 at page two side-by-side with

16   401-1177 at five.  On the left you got the letter of intent.

17   This document, it's fake.  It's totally made up.  This says

18   that the defendant's group is going to be part owners with

19   Suzanne Abair's group.  They're going to own the team together.

20   That never happened.  You heard from Ms. Abair.  She explain to

21   you that this was never a real deal.  This was never a

22   contract.  You heard John Brock say the same thing.  The

23   document is fake.

24        The defense response was, well, this is a document

25   that the defendant just emailed to himself for his dad.  How do

OA3BDAR3                        Rebuttal - Mr. Mead

1    you know that this slide went anywhere else?  Well, you know

2    from the text messages, ladies and gentlemen.  One second, your

3    Honor

4              THE COURT:  Yes.

5              MR. MEAD:  The message on the right, this is from

6    Calvin Darden, Jr. to Briscoe.  And he says, the defendant

7    says, I told Brock we're going to do the deal with them.  We're

8    not going to be named in the deal though.  They want my

9    father's and the mayor's help in getting their new project

10   done.  You can also let Dwight know.  This is a text message

11   about the fake deal.  And the defendant is telling Briscoe,

12   tell Dwight Howard about this fake deal.  Tell him about this

13   fake deal.  Why is he doing that?  Why does this matter?  He

14   wants Dwight Howard off his back.  He wants to trick Dwight

15   Howard into thinking that he actually owns the team even though

16   he doesn't.

17             Now, let's talk about the promissory note because the

18   defense talked about that a lot too.  The defense says that the

19   defendant was allowed to take Dwight Howard's $7 million and

20   spend it on whatever he wanted because of the promissory note

21   that he and Howard, he and Briscoe had Dwight Howard sign.

22   That promissory note is just another part of the fraud.  Now,

23   according to the defense, this promissory note, this was a good

24   deal for Dwight Howard.  What did the defense say that Dwight

25   Howard got when they stood up right before the lunch break?

1    They said he got a stake in Darden Sports Group, a percentage

2    of the company, and that was worth $7 million.  But let's look

3    at the Darden Sports Group.  We've seen their bank accounts in

4    this case.

5         Mr. Ross, Government Exhibit 1112, please.  Now, this

6    is a summary on the screen of the Darden Enterprises which is

7    the Darden Sports Group bank account.  And you can see on the

8    left of the screen exactly how much money the Darden Sports

9    Group had before it got millions of dollars from Dwight Howard.

10   Zero.  No money in its bank account.  That company was

11   worthless.  Now the defense says there was a house.  They got

12   up and said that the house belonged to the Darden Sports Group.

13   That's not true.  Can we go to Government Exhibit 713-A at 3

14   please Mr. Ross.  Up on the screen, this is the contract to buy

15   that huge mansion in Atlanta that we've looked at a couple of

16   times now.  It doesn't say Darden Sports Group or Darden

17   Enterprises anywhere on here.

18        MR. DONALDSON:  Objection.

19        THE COURT:  Well, ladies and gentlemen, you're

20   entitled to look at the exhibit and see what it says.  The

21   government is making argument, but it's your recollection of

22   the evidence and the testimony, including exhibits that will

23   control.  Okay.  Go ahead.

24        MR. MEAD:  Ladies and gentlemen, you should look at

25   it, but if you look in the top right, it says buyer signature,

OA3BDAR3                          Rebuttal - Mr. Mead

1    Calvin Darden.  It doesn't say anything about Darden

2    Enterprises, anything about the Darden Sports Group.  And, yes,

3    the name on there is Calvin Darden, Sr. But sometimes the

4    details matter.  There's a phone number.  If you could zoom in

5    on that phone number please, Mr. Ross.  That phone number that

6    is listed for Calvin Darden, Sr., that's that same 5686 phone

7    number that belongs to the defendant, that the defendant used

8    to impersonate his father.  And you know something else

9    important about the house, the defendant lives there.  It was

10   full of his stuff.  It wasn't an asset of the company.  It was

11   his own personal house, and Darden Sports Group had nothing.

12   It was worthless, and so was Dwight Howard's stake in it.

13           So just think about this defense argument for a

14   minute.  The defendant gets $7 million from Dwight Howard.

15   Dwight Howard gets nothing in return, a stake in a worthless

16   company.  And the defense says, that's a legitimate business

17   transaction.  Does that make sense to you, or does that sound

18   to you, ladies and gentlemen, like a fraud?  And on the

19   promissory note, I expect Judge Broderick will give you an

20   instruction about the promissory note, and his instruction

21   controls, not what I say, what he says.  But I expect that he

22   will tell you, ladies and gentlemen, that the defendant cannot

23   use limitations in a contract to avoid criminal liability for

24   lies made with an intent to defraud.

25           Now, ladies and gentlemen, have you ever signed a

1   document without understanding every single part of it?  Have
2   you ever signed it because someone you trusted had read it and
3   said it was okay for you to sign?  Maybe that person was a
4   spouse or a lawyer or an accountant or real estate agent, and
5   maybe that document was a tax return or a lease or a mortgage.
6   That kind of thing happens all the time, and that's what
7   happened here.  Dwight Howard is a former professional
8   basketball player and a very good one.  He didn't go to
9   college.  He's not a lawyer.  He's a champion on the basketball
10  court, but not in reviewing contracts.  For that he relied on
11  someone he trusted, that person was his agent Charles Briscoe.
12  But what Dwight Howard didn't know was that Briscoe was
13  conspiring with the defendant to steal his money.  So Briscoe
14  told Howard to sign the contract and he did because he trusted
15  Briscoe and he trusted the people that Briscoe brought to work
16  with him, people like the defendant.  And the defendant knew
17  that Dwight Howard trusted him, and he took advantage of that.
18  He told Howard in a text message that he was grateful for
19  Howard's trust in him.  The defendant and Briscoe took
20  advantage of that trust.  They tricked Dwight Howard into
21  signing the document.  It does not reflect what the defendant,
22  Briscoe, Howard and the other people involved in the deal were
23  actually talking about.  Howard told you that.  And Schmidt the
24  banker told you that.  This note was not a real agreement.  It
25  was part of the fraud.  And tricking victims with documents is

1    exactly what the defendant and Briscoe did over and over again

2    in this case.  When they can get a victim to sign the document,

3    that's what they did, and that's what they did to Howard.  But

4    when they couldn't get someone to sign a document, they just

5    made it up.  That's what they did with the Wiseman contract.

6    They forged Wiseman's signature and his mom's signature.

7    That's what they did with the February 2021 letter of intent

8    that we talked about.  It's fake.  And you know the promissory

9    note was a bogus document, not only because it reflected a

10   different deal than everyone was actually talking about, but

11   because it's a document that actually doesn't make a ton of

12   sense.

13          Mr. Ross, 2413 at page seven, please.  You can zoom in

14   on the text.  You can start with Dear Dwight to make it a

15   little more readable.  So let's look at the investor line.  It

16   talks about Dwight Howard and other investors.  There were no

17   other investors.  Let's look at the use of proceeds, and let's

18   do some math because the math here, it doesn't add up.  The use

19   of proceeds it adds up to $6 million a year; $2.5 million; $2.5

20   million a year, $1 million a year, $6 million.  Each per year

21   over three years.  That's $18 million.  But the actual amount

22   in here is only $7 million.  The math doesn't work.  It doesn't

23   add up.

24          And you go to page nine of this document, please,

25   Mr. Ross.  And you could zoom in on board representative

1    please, Mr. Ross.  Now, look who the defendant put on the board

2    of the company as Howard's representative to help him out with

3    this deal.  Charles Briscoe, his co-conspirator.  You can take

4    this down, Mr. Ross.  You heard Dwight Howard and Jeff Schmidt

5    testify what about the actual deal was.  The money was for the

6    Atlanta Dream.  But even if we take this document at face

7    value, even if that was actually the deal, that promissory

8    note, it was still a lie. This was a promise to pay Dwight

9    Howard $7 million back.  That was a lie.  He didn't get the

10   money back.  And you know the defendant never planned to give

11   him the money back, because he spent all the money and didn't

12   have any other money.  You saw the bank accounts.  It was a

13   promise to pay interest.  That was a lie.  Not a penny of

14   interest was paid to Dwight Howard.  It was a promise to use

15   money on "operating expenses" the addition of a production

16   company.  That was a lie.  The defendant took the money and

17   spent millions of dollars of it on stuff for himself.

18        Now, the defendant not only stole all this money, but

19   he also laundered it.  He moved that money into an account in

20   the name of Legacy AC.  That was his company, but he

21   deliberately kept his name off that account.  He wanted to hide

22   that he controlled the account with the stolen money, and

23   that's money laundering, but he went further.  Government

24   Exhibit 1101, please, Mr. Ross.  This is what I called the

25   money laundering chart.  This is the money going from account

OA3BDAR3                          Rebuttal - Mr. Mead

1    to account to account to keep hiding the money.  This is money

2    laundering.  The defense talked about money laundering in their

3    closing.  They said, well, look, all the accounts are in his

4    name, so this would be a dumb way to hide the money.  But the

5    first account, the one that gets the fraud money, not in his

6    name, that's the Legacy AC account.  That account is from 2017,

7    and he set it up to hide his money after his last conviction.

8    Remember that the defendant --

9              MR. DONALDSON:  Objection.

10             THE COURT:  Ladies and gentlemen, again this is the

11    government's argument.  It's up to you to decide whether it

12    makes sense to you.

13             MR. MEAD:  Remember that the defendant was on

14    supervised release and he had to give his probation officer

15    information about his bank account if the probation officer

16    asked.  The defendant wanted to stash his money in an account

17    that his probation officer wouldn't know about, an account that

18    wasn't in his name.  And let's look at just for a minute,

19    ladies and gentlemen, how he actually moves the money from an

20    account not in his name into an account in his name.

21    Government Exhibit 602C-3 please Mr. Ross.

22             Now I'm not going to bore you with this too much,

23    ladies and gentlemen.  This is a wire transfer from Legacy AC

24    into the Darden Enterprises account which has his name on it,

25    and it's for $5.5 million.  And when you send money like this,

OA3BDAR3                          Rebuttal – Mr. Mead

1    you sometime explain to the bank why you're sending the money.

2              (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           MR. MEAD:  And that's what he did here.  Zoom in on

2      where it says details, purchase agreement licensing deal.

3      There was no purchase agreement licensing deal.  This was a

4      lie.  When the defendant transferred this money, he was trying

5      to make it look like the money came from a legitimate source, a

6      purchase agreement licensing deal, but it was a lie.  He's

7      trying to make this money look like clean money.  He's trying

8      to launder it.

9           Okay.  I'm going to sit down soon, ladies and

10      gentlemen.  I promise, but let's talk for just a minute about

11      beyond a reasonable doubt.  I think you're going to hear a lot

12      about that from the judge.  We embrace that burden.  The

13      government must prove that someone is guilty beyond a

14      reasonable doubt in order for them to be convicted of a crime,

15      but it's not some magic or insurmountable standard.  It is the

16      standard that is applied every day in every criminal case

17      across the country.  It's been the standard as long as this

18      country has existed for more than 200 years.  It does not

19      require you to leave your common sense at the door.

20           The government has met that standard here.  There is

21      no reasonable doubt that the defendant defrauded Dwight Howard

22      and Chandler Parsons out of $8 million and then laundered the

23      money that he stole.  When you look past all the distractions,

24      misdirections, and the unsupported arguments from the defense

25      and when you focus on your common sense and the evidence, you

OA3JDAR4

1    can have no such doubt.  The defendant, that man, stole from

2    two professional basketball players.  He got caught.  He got

3    charged.  He went to trial.  And he's guilty.

4              THE COURT:  Okay.  Thank you, Mr. Mead.  So ladies and

5    gentlemen, we're going to take a brief break.  Go back, relax.

6    You don't have the case yet, but when you come back you'll have

7    a copy of the jury instructions on your chairs and a copy of

8    the verdict sheet, and we'll go through and I'll read the jury

9    charge to you.

10             So go back.  It will be about ten minutes or so, okay?

11   Thank you very much.  Remember do not discuss the case.

12   Hopefully there are snacks back there.  Have a snack.  We'll

13   see you in a bit.  Thank you.

14             (In open court; jury not present)

15             MR. RICCO:  Your Honor, I want to bring to the Court's

16   attention the following that Mr. Donaldson objected to, and

17   that is that Calvin Darden, Jr.'s case, the judgment that was

18   put in, supervised release on that case was terminated on

19   August 28, 2020.

20             At the time Mr. Darden received the money, the first

21   and/or the second, November 13, 2020 and December 1, 2020, he

22   was not on supervised release, and it is improper for a

23   government prosecutor to make an argument that he put those

24   moneys in that account to hide it from his probation officer

25   because he was under supervised release, because he was not.

OA3JDAR4

1    That's a patently improper argument for a prosecutor to make.

2           THE COURT:  Here again, there were arguments made by

3    both sides that could be made that weren't necessarily tethered

4    to the evidence.  And I don't remember exactly what Mr. Mead

5    said, and I don't remember whether it was directly tied to it

6    or not.  So again, it's up to the jury to decide whether the

7    argument makes sense and whether it's based upon the evidence

8    that's been presented.

9           MR. RICCO:  Judge, I think that arguments -- my view,

10   Judge, arguments should be made in good faith, and prosecutors

11   are held to a higher standard with respect to court documents.

12          THE COURT:  But so are -- I mean, if we go down this

13   road, Mr. Ricco -- and again, I'll hear from the government in

14   a moment, but if we go down this road where -- and I'm not sure

15   what the ask is here, but where you're asking me to parse

16   through arguments that were made that perhaps weren't

17   necessarily based on evidence -- so let me actually ask what is

18   the ask here?

19          MR. RICCO:  The ask is for this jury to be instructed

20   at the time Mr.  -- there's no evidence in this case that at

21   the time Mr. Darden received any of the payments that he was

22   under any judicial supervised release.  And Judge, I'm not

23   trying to say it's a tit for tat.  There were many other

24   statements that were made that I thought were outside of the

25   evidence.  I didn't object to them because I agree there's a

OA3JDAR4

1    lot of latitude that both sides get, and that's appreciated.

2            But I don't think a prosecutor can argue that the

3    defendant was under supervised release and at the time he

4    received those moneys and put them in the account, that he was

5    doing them to avoid his responsibility with supervised release

6    when it was a judicial fact -- a judicial fact that the

7    defendant was not.  And I'm asking the Court to take judicial

8    recognition of that and instruct the jury as softly as

9    possible -- I mean, the Court may say, look, both sides -- I

10   don't have a problem with that.  I just have a problem when

11   that kind of argument is made.  And I'm looking right at the

12   record, Judge.  It is not supported in the judicial record of

13   that case.

14           THE COURT:  Okay.

15           MR. RICCO:  And Judge, I have no objection to the

16   Court crafting something -- both -- whatever, I don't have a

17   problem with that, Judge.  I just have a difficulty with that

18   specific argument.

19           THE COURT:  Okay.  Let me hear from the government.

20           MR. MEAD:  A couple responses, your Honor.

21           One is money from -- Mr. Ricco's right about the

22   timing, right, he is in fact.  Supervised release ends, I

23   think, some time in 2020 before the Dwight Howard money gets

24   in.  But he's on supervised release when the Chandler Parsons

25   money comes in, which goes right into the Legacy AC account as

OA3JDAR4

1    well.

2          It was also responsive to a defense argument that,

3    while the account was set up back in 2017 — and what I think I

4    said was why did he set up this account?  Because he was on

5    supervised release when he set up the shell company account.

6    So I don't think I said anything improper at all.  That being

7    said, in a super abundance of caution, I'm open to some sort of

8    very neutral statement from the Court about supervised release

9    ended on this date.  I would want it to be clear that there's

10   no allegation of misconduct or anything like that, but I don't

11   have an objection to that plain fact.

12          MR. RICCO:  And Judge, just to be clear, I'm not

13   suggesting that anybody did anything purposeful.  I mean, there

14   are so many dates and circumstances in this case, and I'm

15   really asking for something that is extremely neutral without

16   casting any aspersions on the government or the prosecutors in

17   this case.

18          THE COURT:  Well, I think what I need is the parties

19   need to come together and provide some language.  I think there

20   is the argument, as Mr. Mead has said, that in 2017, when this

21   account is created in the name of --

22          MR. RICCO:  Legacy.

23          MR. DONALDSON:  Trevor Baldwin.

24          THE COURT:  Trevor Baldwin that the defendant had a

25   reporting obligation, if asked, and that when the Chandler

OA3JDAR4

1    Parsons money came in, that same obligation was there.  I don't

2    remember if there was a specific argument about the Dwight

3    Howard money.

4           But having said that, I have no problem if the parties

5    can reach an agreement, or even if there's a dispute, in

6    deciding what sort of thing to add to the jury charge.  And I

7    guess it would be in the part about arguments made by the

8    parties or something like that.

9           MR. RICCO:  Okay.

10           THE COURT:  So why don't you take the time and see if

11    you can come up with language and let me know when you're ready

12    for either me to decide, if there's a dispute about the

13    language, what language would be appropriate or not.  I take

14    it, though, that you don't -- what I'm not going to do, which I

15    theoretically could do is -- well, I'm not going to marshal the

16    evidence the way I just did, in other words, to say, well,

17    okay, with regard to 2017, you know, we had this, that, and the

18    other thing.  So I'm not going to --

19           MR. RICCO:  Judge, I think we'll work something out.

20           THE COURT:  That's fine.

21           MR. RICCO:  I think we both have the same interest on

22    this issue.

23           THE COURT:  Why don't the parties do that, and just

24    let me know when you're ready to have me come out, okay.  All

25    right.  Thank you very much.

OA3JDAR4

1      (Recess)

2          THE COURT:  I've received from the parties the

3  suggested language, and I just have a few questions.  So is

4  there evidence in the record of Mr. Darden's release date,

5  which is the August 29, 2017 date?

6          MR. MEAD:  I don't think so, your Honor.  What's in

7  the record is the judgment.

8          THE COURT:  And the three years of supervised release

9  and the judgment was -- he was sentenced on July 18 of 2016.

10  Three years from then would be -- and he didn't surrender at

11  that time, so the back date seems like it's -- the jury can

12  sort of -- in other words, there's evidence in the record that

13  says, especially since I'm going to instruct them that dates

14  are about whatever, but there's no -- I guess because I'm -- I

15  would -- in essence, if I read this, I will be injecting a fact

16  that isn't in the record.

17          MR. MEAD:  I think that's exactly right, your Honor.

18          My understanding of the defense objection is in part

19  that they think there's a helpful fact for them that was not in

20  the record that contradicts something that I said.  So I think

21  that injecting this fact in makes -- is the way to solve their

22  problem without conceding that we did anything wrong, we

23  thought this was a very unobtrusive place to do it.  There's no

24  suggestion here that anyone did anything wrong, and it makes

25  sense because we're already talking about the prior scheme.

1          THE COURT:  So just to be clear, it's an insertion,

2     instruction nine, and it's after the first sentence, so it's

3     after the sentence "now you've also heard."  And I may just

4     mention that, ladies and gentlemen, there is a sentence that I

5     had neglected or that was not included in the printout that I'm

6     going to read I want to add just for purposes of the record.

7     My recollection is at the time that there was a back and forth

8     about the admission of the judgment and whether or not it

9     should be admitted.

10         The objections, my recollection, were based upon what

11    the actual conditions said, but not necessarily based upon that

12    it wasn't relevant because for a certain period of time

13    Mr. Darden was not on supervised release.  Having said that, I

14    don't -- and let me just confirm that the defense has no

15    objection to me indicating that, although not in the record --

16    although not literally taking judicial notice of it, so my

17    saying that the defendant was on supervised release for those

18    prior fraud schemes from August 29, 2017 until August 28, 2020,

19    I take it that the parties having agreed to this, you don't

20    have an objection to that, even though there's no evidence in

21    the record as to Mr. Darden's release date?

22         MR. RICCO:  I think, Judge, that solves it.  I like

23    the language for his prior conviction, but sometimes you can't

24    have it all the way you want.  So I understand that.

25         THE COURT:  So you're not objecting to --

1          MR. RICCO:  Because he was convicted of wire fraud,

2     your Honor.  So I just want to be as tight as possible because

3     they got the judgment, the judgment says -- so I think it's

4     safer to say for his prior conviction.

5          THE COURT:  No, no.  I guess my point is -- and I just

6     want to confirm that there isn't an objection.  I know the

7     language has been agreed upon, but I was pointing out that

8     there is not evidence in the record that if the jury were to

9     ask, well, where in the record does it indicate that on

10    August 29, 2017 -- there's no evidence in the record of when

11    Mr. Darden was released from prison.

12          I know that that is, in fact, the date because I went

13    back to the inmate lookup, and it's the date of that.  And

14    there would be a method by which I could have, if asked during

15    the trial, have taken judicial notice of that fact or there

16    could have been evidence submitted as a certified copy of a BOP

17    record.  But I just want to make sure that there's not an

18    objection to including that.  Because basically it is not

19    something that, at least from my understanding, is in the

20    record.

21          MR. RICCO:  One second.

22          THE COURT:  Yes.  And I apologize, counsel, but you

23    should consider this because if there -- I think that the jury

24    can parse through, based upon the arguments that were made and

25    the simple fact that the argument that -- 2017, so Mr. Darden

OA3JDAR4

1  was sentenced on July 18, 2016, that's part of the judgment.

2  The judgment also indicates three years of supervised release.

3  So you know, the jury -- there's a month -- there's some lag

4  time there.

5       He was sentenced to a year, which is part of the

6  judgment.  So the jury could put together that he was

7  released -- that he was on supervised release from sometime in

8  the summer of July or August 2017, and then three years after

9  that there's -- 2020 is the basis.  The arguments that were

10  made in summation -- and again, putting aside whether there was

11  an explicit argument about the Dwight Howard funds, the

12  argument that was made or my recollection related to when

13  Mr. Darden was on supervised release, and the motivation at

14  that time, because he was on supervised release, to create this

15  other entity.  And I don't know if it was explicitly made with

16  regard to the Parsons money, but the dates, the jury can figure

17  out those dates.

18       So the reason why I'm asking about whether there's an

19  objection to that is I think the jury otherwise will be able to

20  figure that out from the evidence in the record.  And I just

21  don't want to -- so that's why I need to have understanding

22  that the parties agree.

23       MR. RICCO:  So Judge, because the jury can parse out

24  when he was on supervised release, the only thing they can't

25  parse out is that it ended on August 28, 2020.  So if there is

OA3JDAR4

 1     a date that needs to be injected, that's the date because the

 2     rest of it, the jury can parse it out.

 3               THE COURT:  Well, but again, I mean, the question is

 4     is there an objection to me including the dates that can't

 5     be -- that aren't in the record, which would be -- I think it's

 6     the August 29, 2017 date, which is the date of Mr. Darden's

 7     release.  Because I guess what I'm saying is --

 8               MR. RICCO:  I understand.

 9               THE COURT:  -- unless there's no objection, I'm just

10     going to leave it to the jury, and I'm not going to give the

11     instruction.  Because I think that there isn't an argument that

12     there was no basis to -- it would be one thing if he was off

13     supervised release at the time he created the company and at

14     the time the Parsons money came in.

15               MR. RICCO:  And Judge --

16               THE COURT:  And then I would completely understand --

17               MR. RICCO:  But Judge, actually, as to the argument

18     with respect to Parsons, we have no objection.  Our objection

19     was to Dwight Howard, when he received the payments, because

20     that's what Mr. Mead said to the jury.  That's what we objected

21     to.  We didn't object to the part about it was created with

22     respect -- Parsons, there's no objection to that.  That's

23     accurate.  What this jury does not know is a judicial fact,

24     which is that at the time he received Dwight Howard's -- the

25     payments, he was no longer on supervised release.  That's the

1    objection.

2            THE COURT:  Yes.

3            MR. MEAD:  Can I make a proposal I think may solve

4    this problem?  What if we just cut "from August 29, 2017" so it

5    just says he was on supervised release for these prior fraud

6    schemes until August 28, 2020.  Then it gets in the fact that

7    the defense wants in, and it avoids the issue of a fact that

8    there's no basis in the record.

9            THE COURT:  Yes.

10            MR. RICCO:  No objection to Mr. Mead's suggestion.

11            THE COURT:  Then I don't get whipsawed here that

12    there's an appellate issue that I'm in essence creating, and

13    that's the only reason why I was asking.

14            So what I will read to the jury is as follows:  "The

15    defendant was on supervised release for those prior fraud

16    schemes until August 28, 2020."  Okay?  Any objection to that?

17            MR. MEAD:  No, your Honor.

18            MR. RICCO:  That's fine, your Honor.

19            THE COURT:  Okay.  I'll take that as no objection.

20            MR. RICCO:  No objection, your Honor.  Thank you.

21            THE COURT:  All right.  Okay.  Is there anything else

22    that we need to take up before we get the jury?

23            MR. MEAD:  No.

24            MR. RICCO:  No.  I'm just curious how long does the

25    Court anticipate keeping the jury today?

OA3JDAR4                    Charge

1        THE COURT:  I need to speak to the folks.  I would see

2   what the jury -- well, I will read the summation.  I will then

3   ask -- the jury will go back, and I'll say they're going to get

4   the exhibits and I'll say they're obviously going to vote on a

5   foreperson.  And I'll say that they should indicate to the

6   court security officer how late they wish to stay tonight.

7        MR. RICCO:  That's fine, Judge.

8        THE COURT:  And so we'll see.  Again, I think an hour

9   and change probably for the instructions, although I haven't --

10  sat down to say I think it's about a minute or 90 seconds per

11  page, something like that, so we'll see.  But that's what I

12  would intend to ask them.  All right?  So we'll take our cue

13  from them.

14        (In open court; jury present)

15        THE COURT:  Ladies and gentlemen, as I mentioned

16  before the break, each of you should have a copy of the

17  instructions, as well as a copy of the verdict sheet.  So we're

18  going I'm going to begin with reading the jury charge, and the

19  actual remarks begin on page 4.

20        Introductory remarks.

21        Members of the jury, you have now heard all of the

22  evidence in the case as well as the final arguments of the

23  parties.  It is clear to me that you have paid careful

24  attention to the evidence, and I am confident that you will act

25  together with fairness and impartiality reach a just verdict in

OA3JDAR4                    Charge

1    this case.

2         Now it is time for me to instruct you as to the law

3    that governs the case.  There are three parts to these

4    instructions.  First, I'm going to give you some general

5    instructions about your role and about how you are to go about

6    deciding the facts of the case.  These instructions really

7    would apply to just about any trial.

8         Second, I will give you some specific instructions

9    about the legal rules that apply to this particular case.

10        Third, I will give you some final instructions about

11   procedures you will follow in discussing the case and reaching

12   a verdict.

13        Listening to these instructions may not be easy.  It

14   is important, however, that you listen carefully and

15   concentrate.  I ask you for patience, cooperation, and

16   attention.  You will notice that I am reading these

17   instructions from a prepared text.  It would be more lively, no

18   doubt, if I just improvised, but it's important that I not do

19   that.  The law is made up of words, and those words are very

20   carefully chosen.  So when I tell you the law, it's critical

21   that I use exactly the right words.

22        Because my instructions cover many points, I have

23   given each of you a copy of my instructions to follow along.

24   In addition, you may take your copy of the instructions with

25   you for reference during your deliberations.  You should not

OA3JDAR4                          Charge

1    single out any instruction as alone stating the law, but you

2    should consider my instructions as a whole when you retire to

3    deliberate in the jury room.  Please listen carefully and

4    concentrate on what I am saying.

5                General introductory instructions.

6                Instruction No. 1, role of the Court.

7                My duty at this point is to instruct you as to the

8    law.  It is your duty to accept these instructions of law and

9    to apply them to the facts as you determine them.  With respect

10   to legal matters, you must take the law as I give it to you.

11   If any attorney has stated a legal principle different from any

12   that I state to you in my instructions, it is my instructions

13   that you must follow.  You must not substitute your own notions

14   or opinions of what the law is or ought to be.

15               Instruction No. 2, role of the jury.

16               As members of the jury, you are the sole and exclusive

17   judges of the facts.  You pass judgment upon the evidence.  You

18   determine the credibility of the witnesses.  You resolve such

19   conflicts as there may be in the testimony.  You draw whatever

20   reasonable inferences you decide to draw from the facts as you

21   have determined them, and you determine the weight of the

22   evidence.

23               Do not conclude from any of my questions or any of my

24   rulings on objections or anything else I have done during this

25   trial that I have any view as to the credibility of the

OA3JDAR4                    Charge

1    witnesses or how you should decide the case.

2           It is your sworn duty, and you have taken the oath as

3    jurors, to determine the facts.  Any opinion I might have

4    regarding the facts is of absolutely no consequence.

5           Instruction No. 3, role of counsel.

6           It is the duty of the attorneys to object when the

7    other side offers testimony or other evidence that the attorney

8    believes is not properly admissible.  It is my job to rule on

9    those objections.  Therefore, why an objection was made or why

10   I rule on it the way I did is not your concern.  You should

11   draw no inference from the fact that an attorney objects to any

12   evidence.  Nor should you draw any inference from the fact that

13   I might have sustained or overruled an objection.

14          The personalities and conduct of counsel in the

15   courtroom are not in any way at issue.  If you formed reactions

16   of any kind to any of the lawyers in the case, favorable or

17   unfavorable, whether you approved or disapproved of their

18   behavior as advocates, those reactions should not enter into

19   your deliberations.

20          From time to time, the lawyers and I had conferences

21   out of your hearing referred to as sidebars.  These conferences

22   involved procedural and other matters, and none of the events

23   relating to these conferences should enter into your

24   deliberations at all.

25          Instruction No. 4, sympathy or bias.

1          Under your oath as jurors, you are not to be swayed by
2   sympathy or prejudice.  You are to be guided solely by the
3   evidence in this case, and the crucial bottom-line question
4   that you must ask yourselves as you sift through the evidence
5   is:  Has the government proven the guilt of the defendant
6   beyond a reasonable doubt?
7          It is for you alone to decide whether the government
8   has proven that the defendant is guilty of the crimes charged
9   solely on the basis of the evidence presented in court and
10  subject to the law as I explain it to you.  It must be clear to
11  you that once you let fear or prejudice or bias or sympathy —
12  whether explicit or implicit — interfere with your thinking,
13  there is a risk that you will not arrive at a true and just
14  verdict.
15         If you have a reasonable doubt as to the defendant's
16  guilt, you should not hesitate for any reason to find a verdict
17  of acquittal for the defendant.  But on the other hand, if you
18  find that the government has met its burden of proving the
19  defendant's guilt beyond a reasonable doubt, you should not
20  hesitate because of sympathy or any other reason to render a
21  verdict of guilty for the defendant.
22         In determining whether the government has proven the
23  charges beyond a reasonable doubt, you should not consider the
24  question of possible punishment in the event you are to find
25  the defendant guilty as charged.  It is not your concern, and

1    you should not give any consideration to that issue in

2    determining what your verdict will be.  Therefore, I instruct

3    you not to consider punishment or possible punishment at all in

4    your deliberations concerning whether the government has proved

5    the charges beyond a reasonable doubt.  Similarly, it would be

6    improper for to you allow any feelings you might have about the

7    nature of the crimes charged to interfere with your

8    decision-making process.  Your verdict must be based

9    exclusively upon the evidence or lack of evidence in the case.

10            Instruction No. 5, all persons equal before the law.

11            In reaching your verdict, you must remember that all

12   parties stand equal before a jury in the courts of the United

13   States.  The fact that the government is a party and the

14   prosecution is brought in the name of the United States does

15   not entitle the government or its witnesses to any greater

16   consideration than that accorded to any other party.  By the

17   same token, you must give it no less deference.  The government

18   and the defendant stand on equal footing before you.

19            It would be improper for you to consider, in reaching

20   your decision as to whether the government sustained its burden

21   of proof, any personal feelings you may have about the

22   defendant's race, religion, national origin, sex, age, or

23   political views.  Similarly, it would be improper for you to

24   consider any personal feelings you may have about the race,

25   religion, national origin, sex, age, or political views of any

1    witness or anyone else involved in this case.  All persons are

2    entitled to the same presumption of innocence, and the

3    government has the same burden of proof with respect to all

4    persons.  Your verdict must be based solely on the evidence or

5    the lack of evidence.

6              Instruction number six, what is and is not evidence.

7              In determining the facts, you must rely upon your own

8    recollection of the evidence.  The evidence in this case is the

9    sworn testimony of the witnesses and the exhibits received in

10   evidence.  However, testimony that I have stricken or excluded

11   is not evidence and may not be considered by you in rendering

12   your verdict.

13             The only exhibits that are evidence in this case are

14   those that were received in evidence.  Exhibits marked for

15   identification but not admitted are not evidence, nor are

16   materials that were used only to refresh a witness's

17   recollection.

18             As I told you at the start of this case, statements

19   and arguments by lawyers are not evidence because the lawyers

20   are not witnesses.  Similarly, demonstratives used by the

21   lawyers during the summations are not evidence.  What they have

22   said to you in their opening statements and in their summations

23   is intended to help you understand the evidence to reach your

24   verdict.  However, if your recollection of the facts differs

25   from the lawyers' statements, it is your recollection that

1    controls.

2            For the same reasons, you are not to consider a

3    lawyer's questions as evidence.  It is the witnesses' answers

4    that are evidence, not the questions.

5            Finally, any statements that I may have made do not

6    constitute evidence.  It is for you alone to decide the weight,

7    if any, to be given to the testimony you have heard and the

8    exhibits you have seen.

9            Instruction No. 7, direct and circumstantial evidence.

10           Generally, there are two types of evidence that you

11   may consider in reaching your verdict.  One type of evidence is

12   direct evidence.  Direct evidence is testimony by a witness

13   about something he or she knows by virtue of his or her own

14   senses — something he or she has seen, felt, touched, or heard.

15   For example, if a witness testified that when she left her

16   house this morning, it was raining, that would be direct

17   evidence about the weather.

18           Circumstantial evidence is evidence from which you may

19   infer the existence of certain facts.  For example, assume that

20   when you came into the house this morning, the sun was shining

21   and it was a nice day.  Assume that the courtroom blinds were

22   drawn and that you could not look outside.  As you were sitting

23   here, someone walked in with an umbrella, which was dripping

24   wet.  Then a few minutes later, another person entered with a

25   wet raincoat.  Now, you cannot look outside of the courtroom,

OA3JDAR4                          Charge

1    and you cannot see whether or not it is raining, so you have no

2    direct evidence of that fact.  But on the combination of facts

3    that I have asked you to assume, it would be reasonable and

4    logical for you to conclude that it had been raining.

5              That is all there is to circumstantial evidence.  You

6    infer on the basis of reason and experience and common sense

7    from one established fact the existence or nonexistence of some

8    other fact.

9              As you can see, the matter of drawing inferences from

10   facts in evidence is not a matter of guesswork or speculation.

11   An inference is a logical factual conclusion which you might

12   reasonably draw from other facts that have been proven.  Many

13   material facts — such as what a person was thinking or

14   intending — can rarely be proven by direct evidence.

15             Circumstantial evidence is as valuable as direct

16   evidence.  The law makes no distinction between direct and

17   circumstantial evidence, but simply requires that before

18   convicting a defendant, the jury must be satisfied of the

19   defendant's guilt beyond a reasonable doubt based on all the

20   evidence in the case, circumstantial and direct.

21             There are times when different inferences may be drawn

22   from the evidence.  The government asks you to draw one set of

23   inferences.  The defendant asks to you draw another.  It is for

24   you and for you alone to decide what inferences you will draw.

25             Instruction No. 8, evidence not admitted for the

OA3JDAR4                         Charge

1    truth.

2            During this trial, you have heard that certain

3    evidence was admitted for a limited purpose, namely, not as

4    evidence of the truth of the matters asserted in that evidence.

5    This means that you cannot use the statements contained in that

6    evidence as proof of the facts asserted in that evidence.  You

7    may only consider this evidence for the purpose for which this

8    evidence was admitted, for example, but not limited to, bias,

9    motive, state of mind, or knowledge of another person.

10           Instruction No. 9, other acts evidence.

11           Now, you also heard that the defendant engaged in

12   misconduct that is not charged in this indictment, including

13   prior fraud schemes engaged in by the defendant.

14           Now, ladies and gentlemen, the next sentence was

15   omitted from the instruction, but I'm going to read it to you.

16           The defendant was on supervised release for those

17   prior fraud schemes until August 28, 2020.  The defendant is

18   not on trial for committing those acts.  Accordingly, you may

19   not consider the evidence of other uncharged bad acts as a

20   substitute for proof that the defendant committed the crimes

21   with which he is charged here.  Nor may you consider that

22   evidence as proof that the defendant has a criminal personality

23   or bad character.  The evidence was admitted for limited

24   purposes, and you may consider it for those purposes alone.

25           More specifically, you may consider the evidence you

1    have heard regarding the defendant's fraud schemes as relevant

2    to the defendant's intent, knowledge, identity, *modus operandi*,

3    and absence of mistake. *Modus operandi* means method of

4    operating or doing things.

5        Instruction No. 10, burden of proof and presumption of

6    innocence.

7        Now I will instruct you on the presumption of

8    innocence and the government's burden of proof in this case.

9    Mr. Darden has pleaded not guilty. By doing so, he denies the

10   charges in the indictment. Thus, the government has the burden

11   of proving the charges against him beyond a reasonable doubt.

12   It is for you, the jury, to decide if the prosecution has met

13   that burden. If the government fails, your verdict must be not

14   guilty.

15       This burden of proof never shifts to Mr. Darden. A

16   defendant does not have to prove his or her innocence. On the

17   contrary, he or she is presumed to be innocent of the charges

18   contained in the indictment. This presumption of innocence was

19   in the defendant's favor at the start of the trial, continued

20   in his favor throughout the entire trial, is in his favor even

21   as I instruct you now, and continues in his favor during the

22   course of your deliberations in the jury room. It is removed

23   if and only if you, as members of the jury, are satisfied that

24   the government has sustained its burden of proving the

25   defendant's guilt beyond a reasonable doubt.

OA3JDAR4                          Charge

Instruction No. 11, reasonable doubt.

The question that naturally comes up is what is a reasonable doubt?  The words almost define themselves.  It is a doubt founded in reason and arising out of the evidence in the case or lack of evidence.  It is a doubt that a reasonable person would have after carefully weighing all of the evidence.

Reasonable doubt is a doubt that appeals to your reason, your judgment, your experience, your common sense.  It is not caprice, whim, or speculation.  It is not sympathy for the defendant or any witness or any party in the case.  It is not an excuse to avoid an unpleasant duty.

If, after a fair and impartial consideration of all the evidence, you can candidly and honestly say that you are not satisfied of the defendant's guilt as to any charge, that you do not have an abiding conviction of the defendant's guilt as to that charge, in sum, if you have such a doubt as would cause you as a prudent person to hesitate before acting in matters of importance to yourself, then you have a reasonable doubt.  In that circumstance, it is your duty to find the defendant not guilty of that charge.

If, on the other hand, after fair and impartial consideration of all the evidence, you can candidly and honestly say that you are satisfied of the defendant's guilt as to any crime charged in this case, that you do have an abiding belief of the defendant's guilt as to that charge, (in other

1  words, a belief that you would be willing to act upon without

2  hesitation in important matters in the personal affairs of your

3  own life), then you have no reasonable doubt, and under such

4  circumstances, it is your duty to convict the defendant.

5      One final word on the subject:  Reasonable doubt does

6  not mean beyond all possible doubt.  It is practically

7  impossible for a person to be absolutely and completely

8  convinced of any disputed fact which by its nature is not

9  susceptible to mathematical certainty.  In a criminal case, the

10  law is that it is sufficient that the defendant's guilt be

11  established beyond a reasonable doubt, not beyond all possible

12  doubt.

13      Instruction No. 12, credibility of witnesses.

14      You have had the opportunity to observe the witnesses.

15  It is your job to decide how believable each witness was in his

16  or her testimony.  You are the sole determiners of the

17  credibility of each witness and of the importance of witness

18  testimony.  How do you evaluate the credibility or

19  believability of the witnesses?  The answer is that you use

20  your common sense, judgment, and experience.

21      You watched the witnesses testify.  You should ask

22  yourselves did the witness impress you as honest, open, and

23  candid?  Or did the witness appear evasive, as though the

24  witness was trying to hide something?

25      If you find that a witness is intentionally telling a

OA3JDAR4                        Charge

1    falsehood, that is always a matter of importance that you

2    should weigh carefully.  If you find any witness has lied under

3    oath at this trial, you should view the testimony of such a

4    witness cautiously and weigh it with great care.  You may

5    reject the entirety of the witness testimony, part of it, or

6    none of it.  It is for you to decide how much of any witness's

7    testimony, if any, you wish to credit.

8           A witness may be inaccurate, contradictory, or even

9    untruthful in some aspects and yet entirely believable and

10   truthful in other aspects.  It is for to you determine whether

11   such untruths or inconsistencies are significant or

12   inconsequential, and whether to accept or reject all or to

13   accept some and to reject the balance of the testimony of any

14   witness.

15          In evaluating the credibility of the witnesses, you

16   should take into account any evidence that the witness who

17   testified may benefit in some way from the outcome of this

18   case.  If you find that any witness whose testimony you are

19   considering may have an interest in the outcome of this trial,

20   then you should bear that factor in mind when evaluating the

21   credibility of his or her testimony and accept it with great

22   care.  This is not to suggest that any witness who has an

23   interest in the outcome of a case would testify falsely.  It is

24   for you to decide to what extent, if at all, the witness's

25   interest has affected or colored his or her testimony.

OA3JDAR4                         Charge

1          You are not required to accept testimony even though

2    the testimony is not contradicted and the witness's testimony

3    is not challenged. You may decide because of the witness's

4    bearing or demeanor, or because of the inherent improbability

5    of the testimony, or for other reasons sufficient to satisfy

6    yourselves that the testimony is not worthy of belief. On the

7    other hand, you may find, because of a witness's bearing and

8    demeanor and based upon your consideration of all the other

9    evidence in the case, that the witness is truthful.

10          In deciding whether to believe a witness, keep in mind

11   that people sometimes forget things. You need to consider,

12   therefore, whether in such a situation the witness' testimony

13   reflects an innocent lapse of memory or an intentional

14   falsehood, and that may depend on whether it has to do with an

15   important fact or with only a small detail. It is not the

16   number of witnesses called in a case but rather their

17   credibility when called to the witness stand that is directly

18   at issue.

19          There is no magic formula by which you can evaluate

20   testimony. You bring to this courtroom all your experience and

21   common sense. You determine for yourselves in many

22   circumstances the reliability of statements that are made by

23   others to you and upon which you are asked to rely and act. You

24   may use the same tests here that you use in your everyday

25   lives.

OA3JDAR4                    Charge

Instruction No. 13, uncalled witnesses equally available to both sides.

There are people whose names you have heard during the course of trial, but who did not appear here to testify. I instruct you that each party had an equal opportunity, or lack of opportunity, to call any of these witnesses. Therefore, you should not draw any inferences or reach any conclusions as to what they would have testified to had they been called. Their absence should not affect your judgment in any way.

You should, however, remember my instruction that the law does not impose on a defendant in a criminal case the burden or duty of calling any witness or producing any evidence.  The burden of proof remains at all times with the government.

Instruction No. 14, law enforcement and government witnesses.

You have heard the testimony of law enforcement witnesses and other government employees.  The fact that a witness may be employed by the federal government as a law enforcement agent or employee does not mean that his or her testimony is deserving of more or less consideration or greater or lesser weight than that of other witnesses.  As with all witnesses, it is up to you to decide, after reviewing all the evidence, what weight to give the testimony of law enforcement and federal employee witnesses.

OA3JDAR4                              Charge

1              Instruction No. 15, defendant's right not to testify.

2              The defendant did not testify in this case.  Under our

3    Constitution, a defendant has no obligation to testify or to

4    present any evidence because it is the government's burden to

5    prove a defendant guilty beyond a reasonable doubt.  That

6    burden remains with the government throughout the entire trial

7    and never shifts to a defendant.  A defendant is never required

8    to prove that he is innocent.

9              You may not attach any significance to the fact that

10   the defendant did not testify.  No adverse inference against

11   him may be drawn by you because the defendant did not take the

12   witness stand.  You may not consider this against the defendant

13   in any way in your deliberations in the jury room.

14             Instruction No. 16, other individuals not on trial.

15             Some of the people who may have been involved in the

16   events leading to this trial are not on trial.  There is no

17   requirement that all members of a conspiracy charged are

18   prosecuted or tried together in the same proceeding.

19             You may not draw any inference, favorable or

20   unfavorable, toward the government or the defendant from the

21   fact that any person was not named as a defendant in this case,

22   and you may not speculate as to the reasons why other people

23   are not on trial before you now.  Those matters are wholly

24   outside your concern and have no bearing on your function as

25   jurors in deciding the case before you.

1          Instruction No. 17, preparation of witnesses.

2          You have heard evidence during the trial that some

3     witnesses have discussed the facts of the case and their

4     testimony with lawyers before the witnesses appeared in court.

5     Although you may consider that fact when you evaluate a

6     witness's credibility, I should tell you that there is nothing

7     unusual or improper about a witness meeting with lawyers before

8     testifying so that the witness can be aware of the subjects he

9     or she will be questioned about, focus on those subjects, and

10    have the opportunity to review relevant exhibits before being

11    questioned about them.  Such consultation helps conserve your

12    time and the Court's time.

13          In fact, it would be unusual for a lawyer to call a

14    witness without such consultation.  Again, the weight you give

15    to the fact or the nature of the witness's preparation for his

16    or her testimony and what inferences you draw from such

17    preparation are matters completely within your discretion.

18          Instruction No. 18, use of evidence obtained pursuant

19    to searches.

20          You have heard testimony about evidence seized

21    pursuant to search warrants signed by a judge from email

22    accounts, electronic devices, and a home.  Evidence obtained

23    from these searches was properly admitted in this case and may

24    properly be considered by you.  Searches of online accounts,

25    electronic devices, and homes are entirely appropriate law

OA3JDAR4                        Charge

1    enforcement actions.  Whether you approve or disapprove of how

2    such evidence was obtained should not enter into your

3    deliberations because I now instruct you that the government's

4    use of this evidence is entirely lawful.  You must, therefore,

5    regardless of your personal opinions, give this evidence full

6    consideration along with all the other evidence in the case in

7    determining whether the government has proven the defendant's

8    guilt beyond a reasonable doubt.  Once again, however, it is

9    for you to decide what weight, if any, to give to this

10   evidence.

11            Instruction No. 19, particular investigative

12   techniques not required.

13            There is no legal requirement that the government

14   prove its case through any particular means.  While you are to

15   carefully consider the evidence adduced by the government, you

16   are not to speculate as to why the government used the

17   techniques that it did or why it did not use other techniques.

18   The government is not on trial, and the law enforcement

19   techniques are not your concern.

20            Your concern is to determine whether or not, based

21   upon the evidence or lack of evidence, the guilt of the

22   defendant has been proven beyond a reasonable doubt.

23            Instruction No. 20, inferences.

24            During the trial you have heard the attorneys use the

25   term "inference" or "infer."  In their arguments, they have

OA3JDAR4                         Charge

1    asked you to infer on the basis of your reason, experience, and

2    common sense, from one or more established facts, the existence

3    of some other fact.

4           An inference is not a suspicion or a guess.  It is a

5    logical factual conclusion that you might reasonably view from

6    other facts that have been proven.  In drawing inferences, you

7    should exercise your common sense.

8           So while you are considering the evidence presented to

9    you, you are permitted to draw from the facts that you find to

10   be proven such reasonable inferences as would be justified in

11   light of your experience.

12          There are occasions when particular established facts,

13   whether proved circumstantially or directly, might yield an

14   inference in one direction or in the opposite direction.  The

15   government might ask you to draw one inference.  A defendant

16   may say, well, the same facts point in the opposite direction,

17   so you should draw the opposite inference.  However, you are

18   the ones who make up your mind about what, if any, inferences

19   to draw, nobody else, not me, not the lawyers.

20          Here again, let me remind you that, whether based upon

21   direct or circumstantial evidence or on the logical, reasonable

22   inferences drawn from such evidence, you must be satisfied of

23   the guilt of the defendant beyond a reasonable doubt before you

24   may convict him.

25          Instruction No. 21, all available evidence need not be

OA3JDAR4                    Charge

1    introduced.

2         The law does not require any party to call as

3    witnesses all persons who may have been present at any time or

4    place involved in the case or who may appear to have some

5    knowledge of the matter in issue at this trial.  Nor does the

6    law require any party to produce as exhibits all relevant

7    papers and things available to either party during the course

8    of the trial.

9         Instruction No. 22, charts and summaries.

10        There is evidence before you in the form of charts and

11   summaries.  Those exhibits purport to summarize the underlying

12   evidence that was used to prepare them.  I admitted these

13   charts and summaries into evidence in place of or in addition

14   to the underlying documents that they represent in order to

15   save time and avoid unnecessary inconvenience.  They are no

16   better than the documents upon which they are based.

17   Therefore, you are to give no greater consideration to these

18   charts or summaries than you would give to the evidence upon

19   which they are based.  It is for you to decide whether they

20   correctly present the information contained in the testimony

21   and in the exhibits on which they were based.

22        Instruction No. 23, redactions.

23        There are, among the exhibits received in evidence,

24   some documents that are redacted.  "Redacted" means that part

25   of the document or recording was taken out.  You are to concern

OA3JDAR4                    Charge

1    yourself only with the part of the item that has been admitted

2    into evidence.  You should not consider any possible reason why

3    the other part of it has been deleted.

4                Substantive charges.

5                Instruction No. 24, the indictment.

6                The defendant, who I may refer to by name as Calvin

7    Darden, Jr. or as "defendant" has been charged in what is

8    called an indictment.  An indictment is simply an accusation.

9    It is no more than the means by which a criminal case is

10   started.  It is not evidence.  It is not proof of the

11   defendant's guilt.  It creates no presumption, and it permits

12   no inference that the defendant is guilty.  You are to give no

13   weight to the fact that an indictment has been returned against

14   the defendant.

15               I will first summarize the offenses charged in the

16   indictment and then explain in detail the elements of each

17   charged offense.

18               Instruction No. 25, summary of indictment.

19               Count One of the indictment charges that from at least

20   in or about 2019 through at least in or about 2021, in the

21   Southern District of New York and elsewhere, the defendant

22   conspired and agreed with other people to commit wire fraud and

23   bank fraud.

24               Count Two of the indictment charges that from at least

25   in or about 2019 through at least in or about 2021, in the

OA3JDAR4                    Charge

1    Southern District of New York and elsewhere, the defendant

2    committed wire fraud.

3            Count Three of the indictment charged that from at

4    least in or about 2020 through at least in or about 2021, in

5    the Southern District of New York and elsewhere, the defendant

6    committed bank fraud.

7            Count Four of the indictment charges that from at

8    least in or about 2019 through in or about 2021, in the

9    Southern District of New York and elsewhere, the defendant

10   conspired and agreed with others to commit money laundering.

11           Count Five of the indictment charges that from at

12   least in or about 2019 through at least in or about 2021, in

13   the Southern District of New York and elsewhere, the defendant

14   committed money laundering.

15           Instruction No. 26, multiple counts.

16           First, as I mentioned, the indictment contains five

17   counts.  Each count charges the defendant with a different

18   crime.  You must, as a matter of law, consider each count of

19   the indictment separately, and you must return a separate

20   verdict of guilty or not guilty for each count in which the

21   defendant is charged.  Whether you find the defendant guilty or

22   not guilty as to one offense should not affect your verdict as

23   to any other offense charged unless you are instructed

24   otherwise.

25           Instruction No. 27, variance in dates.

1        As I've described the indictment, you may have noticed

2   that it refers to various dates or times.  It does not matter

3   if the evidence you heard at trial indicates that a particular

4   act occurred on a different date, and it is not essential that

5   the government prove that the charged offenses started and

6   ended on any specific dates.  The law requires only a

7   substantial similarity between the dates alleged in the

8   indictment and the dates established by the evidence.

9        Instruction No. 28, conspiracy and substantive counts.

10       As I have told you, Count One and Four of the

11  indictment charge the defendant with different crimes of

12  conspiracy.  The other counts, Counts Two, Three, and Five,

13  charge what are called substantive crimes.

14       A conspiracy count is different from a substantive

15  count.  A conspiracy charge, generally speaking, alleges that

16  two or more persons agreed together to accomplish an unlawful

17  objective.  The focus of a conspiracy count, therefore, is on

18  whether there was an unlawful agreement.

19       A substantive count, on the other hand, charges a

20  defendant with responsibility for the actual commission of an

21  offense.  A substantive offense, therefore, may be committed by

22  a single person, and it need not involve any agreement with

23  anyone else.

24       A conspiracy to commit a crime is an entirely separate

25  and different offense from a substantive crime, the commission

OA3JDAR4                    Charge

1    of which may be an object of the conspiracy.  And since the

2    essence of the crime of conspiracy is an agreement or

3    understanding to commit a crime, it does not matter if the

4    crime, the commission of which was an objective of the

5    conspiracy, ever was committed or accomplished.

6            In other words, if a conspiracy exists and certain

7    other requirements are met, it is punishable as a crime, even

8    if its purpose is not accomplished.  Consequently, in a

9    conspiracy charge, there is no need to prove that the crime or

10   crimes that were the objective or objectives of the conspiracy

11   actually were committed or accomplished.

12           By contrast, conviction on a substantive count

13   requires proof that the crime charged actually was committed,

14   but does not require proof of an agreement.  With respect to

15   the substantive counts, you should be aware also that there are

16   alternative theories on the basis of which you may find a

17   defendant guilty.  While I am going to explain these theories

18   in more detail, I want to take a moment to outline them

19   briefly.

20           The first theory is that the defendant committed a

21   substantive crime charged in the indictment.

22           The second theory is that the defendant, with criminal

23   intent, willfully caused someone else to engage in certain

24   actions that resulted in the commission of a substantive crime

25   charged in the indictment.  I am going to refer to both of

OA3JDAR4                          Charge

those two theories that I just outlined for you as involving a
claim that a defendant is guilty of a crime as a principal.

The third theory is that a person other than the
defendant committed the crime charged in the indictment and the
defendant aided and abetted the commission of that crime. I
will refer to that theory as a claim that the defendant is
guilty of a crime as an aider and abettor.

For the same of convenience, in ordering my
instructions to you, I am going to instruct you first with
respect to the counts that charge substantive crimes, Counts
Two, Three, and Five. I will instruct you initially on the
first two theories of liability, namely, that the defendant is
guilty as a principal of the substantive crimes charged in the
indictment either because he committed the substantive crimes
or because he, with criminal intent, caused someone else to
commit the substantive crimes.

I will then instruct you on the third theory of
liability — that is, the alternative theory that the defendant
is guilty as an aider and abettor. Finally, I will instruct
you on the conspiracy counts.

Instruction No. 29, Count Two: Wire fraud — elements.

Count Two charges the defendant with wire fraud.

To sustain its burden of proof with respect to the
offense charged in Count Two, the government must prove beyond
a reasonable doubt the following three elements:

OA3JDAR4                        Charge

1              First, that there was a scheme or artifice to defraud

2     or to obtain or retain money or property by materially false

3     and fraudulent pretenses, representations, or promises.

4              Second, that the defendant knowingly and willfully

5     participated in the scheme or artifice to defraud, with

6     knowledge of its fraudulent nature and with specific intent to

7     defraud.

8              Third, that in execution of that scheme, the defendant

9     used or caused the use of interstate wires.

10             I will discuss each in turn.

11             Instruction No. 30, Count Two:  Wire fraud — first

12    element.

13             The first element the government must prove beyond a

14    reasonable doubt is that there was a scheme or artifice to

15    defraud the victims of money or property by false or fraudulent

16    pretenses, representations, or promises.

17             A scheme or artifice to defraud is a plan, device, or

18    course of action to obtain or retain money or property by means

19    of false or fraudulent statements, representations, promises,

20    or pretenses.

21             A statement or representation is false if it is untrue

22    when made and was then known to be untrue by the person making

23    it or causing it to be made.  A statement may also be false if

24    it contains half truths, conceals material facts, or is

25    ambiguous or incomplete in a manner that makes what is said or

1    represented misleading or deceptive.

2           The deception need not be based upon spoken or written

3    words alone.  The arrangement of the words, the circumstances

4    in which they are used, or the defendant's conduct may convey

5    the false and deceptive appearance.  If there is deception, the

6    manner in which it is accomplished does not matter.

7           Statements, representations, promises, or pretenses

8    are fraudulent if they were made falsely and with intent to

9    deceive.

10          A scheme to defraud need not be shown by direct

11   evidence, but may be established by all the circumstances and

12   facts in the case.

13          The false or fraudulent statement, representation,

14   promise, or pretense, must relate to a material fact or matter.

15   A material fact is one that would be expected to influence or

16   that is capable of influencing the decision of a reasonable

17   person.

18          It is not necessary for the government to prove that a

19   false or fraudulent representation or statement was made prior

20   to a person's decision to part with money or property.  Rather,

21   if after having obtained money or property, the defendant

22   devised or participated in a fraudulent scheme to deprive the

23   alleged victim of that money or property by keeping the money

24   or property through making a subsequent false or fraudulent

25   representation as to a material fact, that is sufficient to

OA3JDAR4                          Charge

1    establish the existence of a scheme to defraud.

2                (Continued on next page)

OA3BDAR5                    Charge

1          THE COURT:  It is not necessary for the Government to

2    prove that the scheme to defraud actually succeeded, that any

3    particular person actually relied upon a statement or

4    representation, or that any victim actually suffered damages as

5    a consequence of any false or fraudulent representations

6    promises, or pretenses. Nor do you need to find that the

7    defendant profited from the fraud or realized any gain. You

8    must concentrate on whether there was such a scheme, not the

9    consequences of the scheme, although proof concerning

10   accomplishment of the goals of the scheme may be persuasive

11   evidence of the existence of the scheme itself. In determining

12   whether a scheme to defraud existed, it is irrelevant whether a

13   victim might have discovered the fraud if he, she, or it had

14   looked more closely or probed more extensively. A victim's

15   negligence or gullibility in failing to discover a fraudulent

16   scheme is not a defense to wire fraud.  As noted above, to

17   convict on the wire fraud charge, the Government must prove

18   beyond a reasonable doubt that the false or fraudulent

19   statements or representations were material, and that the

20   defendant acted with fraudulent intent. You have seen evidence

21   of a promissory note between Dwight Howard and the Darden

22   Sports Group. Language in a contract, such as a promissory note

23   may be relevant in considering whether false or fraudulent

24   statements or representations outside the contract were

25   material and whether the defendant acted with fraudulent

OA3BDAR5                    Charge

intent. But I instruct you that language in a contract, such as
a promissory note, does not render false or fraudulent
statements or representations made outside the contract
immaterial as a matter of law, and a defendant cannot use
contractual limitations to avoid criminal liability for
otherwise material misrepresentations made with intent to
defraud.  If you find the Government has sustained its burden
of proof that a scheme to defraud existed, you should next
consider the second element.

Count Two: Wire Fraud—Second Element

The second element that the Government must prove
beyond a reasonable doubt is that the defendant participated in
the scheme to defraud knowingly, willfully, and with specific
intent to defraud.  To act "knowingly" means to act
intentionally and voluntarily, and not because of ignorance,
mistake, accident, or carelessness.  To act "willfully" means
to act voluntarily and with wrongful purpose.  To prove that
the defendant acted with specific intent to defraud, the
Government must prove that he acted with intent to deceive for
the purpose of depriving the relevant victim of money or
property. The Government need not prove that the victim
actually was harmed, only that the defendant contemplated some
actual harm or injury to the victim in question. In addition,
the Government need not prove that the intent to defraud was
the only intent of the defendant. A defendant may have the

OA3BDAR5                    Charge

requisite intent to defraud even if the defendant was motivated
by other lawful purposes as well.  To participate in a scheme
means to engage in it by taking some affirmative step to help
it succeed. Merely associating with people who are
participating in a scheme is not participation.  It is not
necessary that the defendant originated the scheme to defraud.
It is sufficient if you find that a scheme to defraud existed,
even if someone else originated it, and that the defendant
while aware of the scheme's existence, knowingly and willfully
participated in it with intent to defraud.

        Nor is it required that the defendant participated in
or had knowledge of all of the operations of the scheme. The
responsibility of the defendant is not governed by the extent
of his participation. It is not necessary that the defendant
have participated in the alleged scheme from the beginning. A
person who comes in at a later point with knowledge of the
scheme's general operation, although not necessarily all of its
details, and who knowingly acts in a way to further its goals,
becomes a participant in the scheme and is legally responsible
for all that may have been done in the past in furtherance of
the criminal objective and all that is done subsequently.  Even
if the defendant participated in the scheme to a degree less
than others, he nevertheless is equally guilty as long as the
defendant knowingly participated in the scheme to defraud with
knowledge of its general scope and purpose and with specific

OA3BDAR5                    Charge

intent to defraud.  Because an essential element of the crime

charged is intent to defraud, it follows that good faith on the

part of a defendant is a complete defense to the charge of wire

fraud. An honest belief in the truth of the representations

made or caused to be made by a defendant is a complete defense

however inaccurate the statements may turn out to be. Moreover,

a defendant has no burden to establish a defense of good faith;

it remains the Government's burden to prove fraudulent intent

and the consequent lack of good faith beyond a reasonable

doubt. However, in considering whether or not a defendant acted

in good faith, you are instructed that an honest belief on the

part of the defendant, if such a belief existed, that

ultimately everything would work out to the benefit of the

alleged victims does not necessarily mean that the defendant

acted in good faith. If the defendant knowingly and willfully

participated in the scheme with the intent to deceive the

victim in question for the purpose of depriving the victim of

money or property, even if only for a period of time, then no

amount of honest belief on the part of the defendant that the

victim ultimately would be benefited will excuse false

representations that a defendant knowingly and willfully made

or caused to be made.  Likewise, a venture commenced in good

faith may become fraudulent if it is continued after a

fraudulent intent has been formed. Therefore, good faith is no

defense when the defendant first made representations in good

OA3BDAR5                    Charge

faith but later, during the time charged in the Indictment, the

defendant realized that the representations were false and

nevertheless deliberately continued to make them. You must

review and put together all the circumstances in deciding

whether the Government has established beyond a reasonable

doubt that the defendant devised or participated in a scheme to

defraud knowingly, willfully and with the intent to defraud, or

whether he acted in good faith.  Direct proof of knowledge,

willfulness, and fraudulent intent is almost never available.

It would be a rare case where it could be shown that a person

wrote or stated that as of a given time in the past, he

committed an act with fraudulent intent. Such direct proof is

not required. Instead the ultimate facts of knowledge,

willfulness, and intent, though subjective, may be established

by circumstantial evidence, based upon a person's words, his

conduct, his acts, and all the surrounding circumstances

disclosed by the evidence and the rational or logical

inferences that may be drawn from them. You may also infer, but

are not required to infer, that people intend the natural and

probable consequences of their actions. Accordingly, when the

necessary result of a scheme is to injure others, fraudulent

intent may be inferred from the scheme itself. As I instructed

you earlier circumstantial evidence, if believed, is of no less

value than direct evidence.

            Count Two: Wire Fraud—Third Element

OA3BDAR5                    Charge

1          The third and final element that the Government must

2     establish beyond a reasonable doubt is that one or more

3     interstate or foreign wires were used in furtherance of the

4     scheme to defraud.  An "interstate wire" means a wire that

5     passes between two or more states. A "foreign" wire means a

6     wire that travels internationally. Examples of wires include

7     telephone calls and messages communications over the internet,

8     commercials on television, and financial wires between bank

9     accounts.  A wire communication need not itself be fraudulent.

10    Indeed, it may be completely innocent, as long as it was made

11    in furtherance of the fraudulent scheme. To be in furtherance

12    of the scheme, the wire communication must further or assist in

13    some way in carrying out the scheme to defraud. A wire

14    communication can also include a communication made after a

15    victim's funds were obtained if the communication was designed

16    to lull the victim into a false sense of security to postpone

17    his or her complaint to the authorities, or to keep the money

18    obtained from the scheme.  It is not necessary for the

19    defendant to have been directly or personally involved in a

20    wire communication, as long as the wire was reasonably

21    foreseeable in the execution of the alleged scheme to defraud

22    in which the defendant is accused of participating. In this

23    regard, it is sufficient to establish this element of the crime

24    if the evidence justifies a finding that the defendant caused

25    the wires to be used by others. The wire communication

OA3BDAR5                    Charge

requirement can be satisfied even if the wire communication was
done by the person being defrauded or some other innocent
party. When one does an act with knowledge that the use of the
wires will follow in the ordinary course of business or where
such use of the wires reasonably can be foreseen, even though
not actually intended, then he causes the wires to be used.
Thus, there is no requirement that the defendant specifically
authorize others to make a communication by wire.

         Finally, if you find that a wire communication was
reasonably foreseeable and that the interstate or foreign wire
communication charged in the indictment took place, then this
element is satisfied even if it was not foreseeable that the
wire communication would cross state lines.

         Count Three: Bank Fraud—Elements

         Count Three charges the defendant with bank fraud.  To
sustain its burden of proof with respect to the offense charged
in Count Three, the Government must prove beyond a doubt the
following three elements:  First, a scheme to obtain money or
property that was under the custody or control of a bank by
means of materially false or fraudulent pretenses,
representations, or promises; Second, the defendant acted
knowingly, willfully, and with a specific intent to obtain
money or property that was under the control of a bank; and;
Third, at the time of the scheme, the bank that was the target
of the scheme was insured by the Federal Deposit Insurance

OA3BDAR5                    Charge

Corporation.   The Government must prove each element beyond a
reasonable doubt.

        Count Three: Bank Fraud—First Element

        The first element of bank fraud is that that there was
a scheme to obtain money or property that was under the custody
or control of a bank by means of materially false or fraudulent
representations.  A "scheme" is simply a plan, device, or
course of conduct to accomplish an objective.  A representation
is false if it was untrue when it was made and was known to be
untrue by the person making the representation. Deceitful
statements and half-truths or the concealment of material facts
also constitute false representations. A fact is material if it
is a fact that a reasonably prudent person would consider to be
important.  The Government does not have to prove that the bank
actually relied on the false or fraudulent representation. It
is sufficient if the misrepresentation is one that is capable
of influencing a decision maker's decision.  Similarly, it does
not matter whether the bank might have discovered the fraud had
it probed further. If you find that a scheme existed, it is
irrelevant whether the victim of the fraud was careless or
negligent or whether the victim actually suffered any monetary
loss.  As noted above, to convict on the bank fraud charge, the
Government must prove beyond a reasonable doubt that the false
or fraudulent statements or representations were material, and
that the defendant acted with fraudulent intent. You have seen

OA3BDAR5                    Charge

1  evidence of a promissory note between Dwight Howard and the

2  Darden Sports Group. Language in a contract, such as a

3  promissory note may be relevant in considering whether false or

4  fraudulent statements or representations outside the contract

5  were material and whether the defendant acted with fraudulent

6  intent. But I instruct you that language in a contract, such as

7  a promissory note, does not render false or fraudulent

8  statements or representations made outside the contract

9  immaterial as a matter of law, and a defendant cannot use

10  contractual limitations to avoid criminal liability for

11  otherwise material misrepresentations made with intent to

12  defraud.

13           Count Three: Bank Fraud—Second Element

14           The second element the Government must prove beyond a

15  reasonable doubt is that the defendant executed the scheme

16  knowingly and willfully and with the intent to defraud the bank

17  or to obtain money or funds owned or under the custody or

18  control of the bank.  I have already instructed you on the

19  meanings of knowingly, willfully, and intent to defraud, and

20  those instructions apply here as well.  My prior instructions

21  concerning good faith apply here as well.  It is not necessary

22  for the Government to prove that the defendant was motivated

23  solely by improper considerations. The Government will have

24  satisfied its burden of proof on this element if you find that

25  the defendant had an intent to obtain money or property that

OA3BDAR5                    Charge

was under the control of a bank, even if the defendant also had

other proper or neutral intents for his actions.

Count Three: Bank Fraud—Third Element

The third element that the Government must prove

beyond a reasonable doubt is that at the

time of the scheme, the bank that was the target of

the scheme was federally insured. I instruct you as a matter of

law that banks insured by the Federal Deposit Insurance

Corporation, or "FDIC" are federally insured. It is not

necessary for the Government to prove that the defendant knew

the identity of the particular financial institution or that

the defendant knew that the deposits of the financial

institution were federally insured.

Count Five: Money Laundering—Elements

Count Five charges the defendant with committing money

laundering by engaging in financial transactions that involved

the proceeds of the wire and bank fraud offenses, in order to

conceal or disguise the nature, location, source, ownership, or

control of proceeds of the wire fraud and bank fraud. I will

refer to this as "concealment" money laundering.  To sustain

its burden of proof with respect to the concealment money

laundering offense charged in Count Five, the Government must

prove beyond a doubt the following four elements:

First, the defendant conducted or attempted to conduct

a "financial transaction" second, the financial transaction at

OA3BDAR5                    Charge

issue involved the proceeds of specified unlawful activity,

which here is alleged to be wire fraud and bank fraud; Third,

the defendant knew that the funds in the agreed-upon

transaction would involve the proceeds of some form of unlawful

activity; and Fourth, the defendant knew that the agreed-upon

transaction was designed in whole or in part to conceal or

disguise the nature, location, source, ownership, or control of

the proceeds of the unlawful activity.  The Government must

prove each element beyond a reasonable doubt.

Count Five: Money Laundering—First Element

The first element of concealment money laundering is

that the defendant conducted a financial transaction.  The term

"conducted" includes the action of initiating, concluding, or

participating in initiating or concluding a transaction.  A

"financial transaction" is (1) a transaction that affects

interstate or foreign commerce by moving funds by wire or other

means or by use of one or more "monetary instruments"; or (2) a

transaction involving the use of a financial institution that

is engaged in, or the activities of which affect, interstate or

foreign commerce.  A "monetary instrument" is anything that

represents money, such as coins or currency personal checks,

cashier's checks, bank checks, or money orders.  A "financial

institution" includes a bank that is insured by the Federal

Deposit Insurance Corporation, or "FDIC," a commercial bank, a

foreign bank, or an issuer, redeemer, or cashier of checks or

OA3BDAR5                    Charge

money orders.  The term "interstate or foreign commerce" means

commerce between states, territories, or possessions of the

United States, or between the United States and a foreign

country. The Government must prove that the agreed-upon

transaction would have affected interstate or foreign commerce

in some way, however minimal.  The term "funds" includes any

currency, money, or other medium of exchange that can be used

to pay for goods and services, including digital or

cryptocurrency.  There are several ways a transaction can

affect interstate or foreign commerce.  First, any transaction

by or through a financial institution insured by the FDIC

affects interstate commerce. Therefore, if any financial

institution that was or would have been involved in the

agreed-upon transaction was insured by the FDIC, that aspect of

this element will have been met.

        Second, if the source of the funds in the agreed-upon

transaction would affect interstate or foreign commerce, that

is also sufficient to satisfy this aspect of this element.

Finally, if the agreed-upon transaction itself would involve an

interstate or international transfer of funds, that would also

be sufficient.  In addition, it is not necessary for the

Government to show that the defendant actually intended or

anticipated an effect on interstate or foreign commerce by his

actions or that commerce was actually affected. All that is

necessary is that the natural and probable consequences of the

OA3BDAR5                    Charge

1    acts the defendant agreed to take would affect interstate or

2    foreign commerce.

3          Count Five: Money Laundering—Second and Third Elements

4          The second and third elements of concealment money

5    laundering are (2) the defendant knew that the agreed-upon

6    transaction would involve funds that were the proceeds of some

7    form of unlawful activity, and (3) the agreed-upon transaction

8    would involve funds that were, in fact proceeds of "specified

9    unlawful activity." The defendant need not specifically know

10   that the property involved in the transactions in which he

11   participated represented the proceeds of wire fraud, bank

12   fraud, or any other specific offense; the Government has to

13   prove only that the defendant knew that the monies being

14   transferred represented the proceeds of some illegal activity.

15         The Government must, however, prove that the

16   agreed-upon transaction would involve funds that were, in fact,

17   the proceeds of "specified unlawful activity." In this case,

18   the Government charges that the funds at issue in the

19   agreed-upon transaction were derived from the wire fraud and

20   bank fraud charged in Counts Two and Three. I instruct you

21   that, as a matter of law, wire fraud and bank fraud meet the

22   definition of "specified unlawful activity." I have already

23   instructed you on the elements of wire fraud and bank fraud,

24   and those instructions apply here as well.

25         Count Five: Money Laundering—Fourth Element

OA3BDAR5                    Charge

1          The fourth element of concealment money laundering is

2     that the defendant knew that the agreed-upon transaction was

3     designed, in whole or in part, to conceal or disguise the

4     nature location, source, ownership, or control of the proceeds

5     of specified unlawful activity, namely, the wire fraud and bank

6     fraud charged in the Indictment.  If the defendant knew that

7     the agreed-upon transaction was designed to conceal or disguise

8     the true origin of the property in question, then this element

9     is satisfied. On the other hand, if the Government has not

10    proven beyond a reasonable doubt that the defendant knew that

11    the agreed upon transaction was designed to conceal or disguise

12    the true origin of the property, then this element will not

13    have been proven.

14          Willful Causation.

15          If you unanimously find that the Government has proven

16    the defendant guilty of Count Two, Three, and Five under the

17    Government's first theory of liability—in other words, if you

18    unanimously find that the Government has proven that the

19    defendant committed the substantive crimes charged in the

20    Indictment—then you do not need to consider the Government's

21    second or third theories of liability on those counts.  If, on

22    the other hand, you do not so find as to Counts Two, Three, and

23    Five, then you must consider the Government's second theory of

24    liability on those counts—that is, that the defendant is guilty

25    of the relevant count or counts because he allegedly possessed

OA3BDAR5                    Charge

1    the requisite criminal intent and willfully caused someone else

2    to engage in actions necessary to commit the crimes. I now will

3    take a moment to discuss what it means for a defendant to be

4    guilty as a principal through "willful causation" in the

5    context of this case.

6            Whoever willfully causes an act to be done which, if

7    directly performed by that person would be an offense against

8    the United States, is punishable as a principal. What does the

9    term "willfully caused" mean? It does not mean that the

10   defendant needs to have physically committed the crime or

11   supervised or participated in the actual criminal conduct

12   charged in the Indictment.  Rather, anyone who causes the doing

13   of an act which if done by him directly would render him guilty

14   of an offense against the United States is guilty as a

15   principal.  For example, one who intentionally causes another

16   person to make a material false statement in connection with

17   depriving a victim of money or property is guilty as a

18   principal if the Government proves that the person who causes

19   the making of that false statement acted knowingly, willfully,

20   and with the specific intent to defraud the victim in question,

21   and satisfies the other elements of the substantive wire fraud

22   and bank fraud counts that I have described to you. This is so

23   even if the individual who was caused to make that false

24   statement had no criminal intent.

25            Similarly, one who intentionally causes another person

OA3BDAR5                    Charge

to conduct a financial transaction involving the proceeds of

specified unlawful activity, is guilty as a principal if the

Government proves that the person who caused the other person

to conduct a financial transaction acted knowingly and

willfully and satisfies the other elements of the substantive

money laundering count I described to you.

          Aiding and Abetting

          If you unanimously find that the Government has proven

the defendant guilty beyond a reasonable doubt of Counts Two,

Three, and Five under either the Government's first theory of

liability or second theory of liability, then you do not need

to consider the Government's third theory of liability. But if

you do not convict the defendant of Count Two, Count Three, or

Count Five under either of the Government's first and second

theories of liability, then you must consider whether the

Government has proved him guilty of the relevant count or

counts based on the Government's third theory of liability,

which is called "aiding and abetting."

          I will explain this third theory in greater detail

now. It is unlawful for a person to aid, abet counsel, command,

induce, or procure another to commit an offense. A person who

does so is just as guilty of the offense as someone who

actually commits it. Accordingly, for any substantive count in

the Indictment, you may find the defendant guilty on that count

if you find that the Government has proved beyond a reasonable

OA3BDAR5                    Charge

1    doubt that another person actually committed the crime and that

2    the defendant aided, abetted, counseled, commanded, induced, or

3    procured the commission of that crime.  In order to convict the

4    defendant as an aider and abettor, the Government must prove

5    beyond a reasonable doubt two elements.

6          First, it must prove that a person other than the

7    defendant committed the crime charged.  Obviously, no one can

8    be convicted of aiding or abetting the criminal acts of another

9    person if no crime was committed by the other person.

10   Accordingly, if the Government has not proven beyond a

11   reasonable doubt that a person other than the defendant

12   committed the substantive crimes charged in the Indictment,

13   then you need not consider the second element under this

14   theory. But if you do find that a crime was committed by

15   someone other than the defendant, then you must consider

16   whether the defendant aided or abetted the commission of that

17   crime.  Second, in order to convict on an aiding and abetting

18   theory, the Government must prove that the defendant willfully

19   and knowingly associated himself in some way with the crime,

20   and that he willfully and knowingly engaged in some affirmative

21   conduct or some overt act for the specific purpose of bringing

22   about that crime. Participation in a crime is willful if done

23   voluntarily and intentionally, and with the specific intent to

24   do something which the law forbids.  The mere presence of the

25   defendant in a place where a crime is being committed, or the

OA3BDAR5                    Charge

1    mere association by the defendant with another, even coupled

2    with knowledge that a crime is being committed, is not enough

3    to make the defendant an aider and abettor. A person may know,

4    or be friendly with, a criminal, without being a criminal

5    himself. Similarly, a defendant's acquiescence in the criminal

6    conduct of others, even with guilty knowledge, is not enough to

7    establish aiding and abetting.

8            An aider and abettor must know that the crime is being

9    committed and act in a way which is intended to bring about the

10   success of the criminal venture.  Depending on your view of

11   the evidence, there may be a subtle distinction with respect to

12   whether a defendant is guilty, if at all, as a principal on a

13   willful causation theory or as an aider and abettor. The

14   question is what is the difference between a defendant

15   willfully causing someone else to take actions necessary for

16   the commission of a crime as opposed to aiding and abetting

17   someone else to commit a crime. If this question comes up in

18   your deliberations, you should think of it in terms of the

19   difference between causing someone to do something versus

20   facilitating or helping someone to do it. If you are persuaded

21   beyond a reasonable doubt that the defendant willfully caused

22   someone else to take actions necessary for the commission of

23   either of the substantive crimes charged in the Indictment, as

24           I have described willful causation, you should convict

25   him as a principal on that count. If, on the other hand, you

OA3BDAR5                          Charge

are persuaded beyond a reasonable doubt that the defendant,

with the knowledge and intent that I described, sought by his

actions to facilitate or assist that other person in committing

the crime, then he is guilty as an aider and abettor.   One

important difference between willfully causing, and aiding and

abetting another person to commit a crime—as I instructed you

earlier—is that with respect to willful causation the

Government need not prove that the defendant acted through a

guilty person. With respect to aiding and abetting, however,

the Government must prove beyond a reasonable doubt that

someone else committed the crime charged with the requisite

criminal intent. If you find beyond a reasonable doubt that the

Government has proven that another person actually committed

one or more of the substantive crimes charged in the Indictment

and that the defendant aided or abetted that person in the

commission of that offense, you should find the defendant

guilty of that substantive crime on an aiding and abetting

theory. If, however, you do not so find, you may not find the

defendant guilty of that substantive crime on an aiding and

abetting theory.

          Counts One and Four: Conspiracy—Elements

          Earlier in these instructions, I explained to you that

a conspiracy to commit a crime is a separate and different

offense from the substantive crime which may have been the

object of the conspiracy. Now that I have discussed the

OA3BDAR5                     Charge

substantive counts charged in the Indictment, I will discuss
the elements of the conspiracy counts.  Count One charges that,
from at least in or about 2019 through at least in or about
2021 the defendant conspired and agreed with other people to
commit wire fraud and bank fraud.  Count Four charges that,
from at least in or about 2019 through at least in or about
2021 the defendant conspired and agreed with others to commit
money laundering.  In order to sustain its burden of proof with
respect to the conspiracies charged in Counts One and Four, the
Government must prove beyond a reasonable doubt each of the
following elements as to each count:  First, it must prove the
existence of the conspiracy charged in the count of the
Indictment second, it must prove that the defendant knowingly
and willfully became a member of, and joined in, the
conspiracy.

    Counts One and Four: Conspiracy—First Element

    A conspiracy is an agreement or an understanding of
two or more people to accomplish by concerted action a criminal
or unlawful purpose. In this instance, there are two alleged
criminal or unlawful purposes of the conspiracy charged in
Count One: to commit wire fraud and to commit bank fraud. There
is one alleged criminal or unlawful purpose of the conspiracy
charged in Count Four: to commit money laundering.

    To establish a conspiracy, the Government is not
required to show that two or more persons sat around a table

OA3BDAR5                    Charge

and entered into a solemn compact stating that they have formed

a conspiracy to violate the law and setting forth details of

the plans and the means by which the unlawful project is to be

carried out, or the part to be played by each conspirator. It

is sufficient if two or more persons come to a common

understanding to violate the law. Since conspiracy, by its very

nature is characterized by secrecy, it is rare that a

conspiracy can be proven by direct evidence of that explicit

agreement. You may infer the existence of a conspiracy from the

circumstances of this case and the conduct of the parties

involved.

The saying "actions speak louder than words" may be

applicable here. Usually, the only evidence available with

respect to the existence of a conspiracy is that of

disconnected acts on the part of the alleged individual

co-conspirators. When taken together and considered as a whole

however, such acts may show a conspiracy or agreement as

conclusively as would direct proof. In determining whether the

conspiracy charged in Counts One and Four actually existed, you

may consider all the evidence of the acts, conduct, and

statements of the alleged co-conspirators and the reasonable

inferences to be drawn therefrom.  As I instructed you earlier,

since the essence of the crime of conspiracy is an agreement or

understanding to commit a crime, it does not matter if the

crime, the commission of which was an objective of the

OA3BDAR5                    Charge

conspiracy, ever was committed. A conspiracy to commit a crime

is an entirely separate and different offense from the actual

commission of the illegal act that is the object of the

conspiracy. The success or failure of a conspiracy is not

material to the question of guilt or innocence of an alleged

conspirator.  The conspiracy charged in Count One allegedly had

two objects—that is, the conspiracy had two illegal purposes

that the co-conspirators allegedly hoped to accomplish: to

commit wire fraud and to commit bank fraud. I explained the

elements of both wire fraud and bank fraud to you when I

instructed you on the substantive wire fraud charged in Count

Two of the Indictment and the substantive bank fraud charged in

Count Three of the Indictment. You should apply those

instructions when you consider whether the Government has

proved beyond a reasonable doubt that the conspiracy charged in

Count One existed. However, because Count One charges a

conspiracy, the Government does not have to prove that anyone

committed the substantive crime of wire fraud or bank fraud. It

need prove beyond a reasonable doubt only that there was an

agreement or understanding to commit at least one of the two

illegal purposes: either wire fraud or bank fraud.

        In addition, it is not necessary for the Government to

prove that the defendant conspired to commit both objects of

the conspiracy. You must, however, be unanimous as to which

object or objects of the conspiracy, if any, you find was

OA3BDAR5                    Charge

proven.  The conspiracy charged in Count Four has one object:
to commit concealment money laundering. I explained the
elements of concealment money laundering when I instructed you
on the substantive money laundering charged in Count Five of
the Indictment. Similarly, you should apply those instructions
when you consider whether the Government has proved beyond a
reasonable doubt that the conspiracy charged in Count Four
existed. However, because Count Four charges a conspiracy, the
Government does not have to prove that anyone committed the
substantive crime of money laundering. It need prove beyond a
reasonable doubt only that there was an agreement or
understanding to commit concealment money laundering.  The
Indictment charges that the conspiracies charged in Count One
and Count Four lasted from at least in or about 2019 through at
least in or about 2021. It is not necessary for the Government
to prove that the conspiracies lasted throughout the entire
period alleged, but only that they existed for some period
within that time frame.

          In sum, in order to find that the conspiracies charged
in Count One and Count Four existed the Government must prove
beyond a reasonable doubt that there was a mutual understanding
either spoken or unspoken, between two or more people to commit
wire or bank fraud for Count One, and money laundering for
Count Four.

          Counts One and Four: Conspiracy—Second Element

OA3BDAR5                     Charge

1           If you conclude that the Government has proven beyond

2    a reasonable doubt that the conspiracy charged in Count One or

3    Count Four existed, you next must determine whether the

4    defendant willfully joined and participated in the conspiracy

5    you are considering with knowledge of its unlawful purpose, and

6    with an intent to aid in the accomplishment of its unlawful

7    objective—that is, the commission of wire fraud or bank fraud

8    or both wire and bank fraud for Count One and the commission of

9    money laundering for Count Four.  The Government must prove

10   beyond a reasonable doubt that the defendant unlawfully

11   willfully, knowingly, and with specific intent to defraud

12   entered into the conspiracy. I have already instructed you when

13   discussing the substantive offenses on the meanings of

14   knowingly, willfully and intent to defraud, and those

15   instructions apply here as well.  The defendant's participation

16   in the conspiracy must be established by evidence of his own

17   acts or statements, as well as those of the other alleged

18   co-conspirators, and the reasonable inferences that may be

19   drawn from them.

20           Now, science has not yet devised a manner of looking

21   into a person's mind and knowing what the person is thinking.

22   To make that determination, you may look to the evidence of

23   certain acts alleged to have taken place by or with the

24   defendant or in his presence. As I instructed you earlier with

25   respect to determining a defendant's knowledge and intent, you

OA3BDAR5                    Charge

may consider circumstantial evidence based upon the defendant's

outward manifestations, his words, his conduct, his acts, and

all of the surrounding circumstances disclosed by the evidence

and the rational or logical inferences that may be drawn

therefrom.  To become a member of the conspiracy, the defendant

need not have known the identities of each and every other

member, nor need he have known of all of their activities. In

fact, a defendant may know only one other member of the

conspiracy and still be a co-conspirator.  Moreover, the

defendant need not have been fully informed as to all of the

details, or the scope, of the conspiracy in order to justify an

inference of knowledge on his part. Proof of a financial

interest in the outcome or other motive is not essential, but

if you find that the defendant had such an interest or other

motive, that is a factor you may consider in determining

whether the defendant was a member of the conspiracy. The

presence or absence of motive is, however, a circumstance which

you may consider as bearing on the intent of the defendant.

The duration and extent of a defendant's participation has no

bearing on the issue of a defendant's guilt. Each member of a

conspiracy may perform separate and distinct acts and may

perform them at different times. Some conspirators play major

roles, while others play only minor parts in the conspiracy. An

equal role is not what the law requires. In fact, even a single

act may be sufficient to draw a defendant within the ambit of

OA3BDAR5                    Charge

the conspiracy. Moreover, the defendant need not have joined
the conspiracy at the outset. He may have joined at any time
and, if he joined still will be held responsible for the acts
done before or after he joined.

I want to caution you, however, that the mere
association by one person with another does not make that
person a member of the conspiracy even when coupled with
knowledge that a conspiracy is taking place. Similarly, mere
presence at the scene of a crime, even coupled with knowledge
that a crime is taking place, is not sufficient to support a
conviction. A person may know, or be friendly with, a criminal,
without being a criminal himself. Mere similarity of conduct or
the fact that they may have assembled together and discussed
common aims and interests does not necessarily establish
membership in the conspiracy.  I further instruct you that mere
knowledge of or acquiescence without participation in an
unlawful plan is also not sufficient. The fact that the acts of
a defendant, without knowledge merely happen to further the
purposes or objectives of the conspiracy, does not make the
defendant a member. What is necessary is that the defendant
must have participated with knowledge of the unlawful purpose
of the conspiracy, in this case, to commit wire and bank fraud
for Count One; and to commit money laundering for Count Four.
My prior instructions concerning good faith apply here as well.
If you find that the defendant acted in good faith, he cannot

OA3BDAR5                    Charge

1    be convicted on Counts One or Four.

2            In sum, the Government must prove, beyond a reasonable

3    doubt, that the defendant, with an understanding of the

4    unlawful nature of the conspiracy, intentionally engaged,

5    advised, or assisted the conspiracy in order knowingly and

6    willfully to promote its unlawful goal. The defendant thereby

7    becomes a conspirator. A conspiracy, once formed, is presumed

8    to continue until either its objectives are accomplished or

9    there is some affirmative act of termination by its members.

10   So, too, once a person is found to be a member of a conspiracy,

11   that person is presumed to continue being a member in the

12   venture until the venture is terminated, unless it is shown by

13   some affirmative proof that the person withdrew and

14   disassociated himself from it.

15           Coconspirator Statements

16           Certain evidence was admitted during trial concerning

17   acts and statements of others because such acts were committed

18   and such statements were made by a person who, the Government

19   claims, was also a co-conspirator of the defendant. The reason

20   for allowing this evidence to be received against the defendant

21   has to do with the nature of the crime of conspiracy.  A

22   conspiracy is often referred to as a partnership in crime.

23   Thus, as in other types of partnerships when people enter into

24   a conspiracy to accomplish an unlawful end, each and every

25   member becomes an agent of the other conspirators in carrying

OA3BDAR5                    Charge

1  out the conspiracy. In determining the factual issues before

2  you, you may consider against the defendant any acts or

3  statements made by any of the people you find, under the

4  standards I have already described, to have been

5  coconspirators, even though such acts or statements were not

6  made in their presence, or were made without their knowledge.

7          Venue

8          In addition to all of the elements that I have

9  described for you, in order to convict the defendant on any

10  count of the Indictment, you must also decide whether any act

11  in furtherance of that crime occurred within the Southern

12  District of New York. This requirement is called "venue."

13          I instruct you that the Southern District of New York

14  includes Manhattan, the Bronx, and Westchester, Rockland,

15  Putnam, Dutchess, Orange, and Sullivan counties.  Venue is

16  proven if any act in furtherance of the crime you are

17  considering occurred in any of those counties. The act need not

18  have been taken by the defendant, so long as the act was part

19  of the crime that you find he committed.  As to the venue

20  requirement alone, the Government's burden is to show that

21  venue is proper by a preponderance of the evidence. That is,

22  the Government must show simply that it is more likely than not

23  that venue is proper here.

24          CONCLUDING INSTRUCTIONS

25          Right to See Exhibits and Hear Testimony:

OA3BDAR5                    Charge

1    Communication with the Court.

2          Ladies and gentlemen of the jury, that concludes the

3    substantive portion of my instructions to you. You are about to

4    go into the jury room and begin your deliberations. I will send

5    most of the exhibits into the jury room with you. However, if

6    during your deliberations you want to see any of the exhibits

7    that were not sent back to the jury room, you may request that

8    you be brought into the courtroom to see or hear those

9    exhibits. If you want any of the testimony read, you may also

10   request that. Please remember that it is not always easy to

11   locate what you might want, so be as specific as you possibly

12   can in requesting exhibits or portions of the testimony. If you

13   want any further explanation of the law as I have explained it

14   to you, you may also request that.

15          Your requests for exhibits or testimony—in fact any

16   communications with the Court should be made to me in writing,

17   signed by your foreperson, and given to one of the court

18   security officers. In any event, do not tell me or anyone else

19   how the jury stands on any issue until after a unanimous

20   verdict is reached as to each count.

21          Notes

22          Some of you have taken notes periodically throughout

23   this trial. I want to emphasize to you, as you are about to

24   begin your deliberations, that notes are simply an aid to

25   memory. Notes that any of you may have made may not be given

OA3BDAR5                    Charge

1    any greater weight or influence than the recollections or

2    impressions of other jurors, whether from notes or memory, with

3    respect to the evidence presented or what conclusions, if any,

4    should be drawn from such evidence. All jurors' recollections

5    are equal. If you cannot agree on what you remember the

6    testimony was, you can ask to have the transcript read back.

7                Duty to Deliberate: Unanimous Verdict

8                Shortly, you will retire to decide the case. The

9    Government, to prevail, must prove the elements by the required

10   degree of proof, as already explained in these instructions. If

11   it succeeds your verdict should be guilty; if it fails, it

12   should be not guilty. To report a verdict, it must be unanimous

13   as to each element you are considering.  I instruct you that

14   you are not to discuss the case unless all jurors are present.

15   Four or five or ten jurors together are only a gathering of

16   individuals.

17                Only when all jurors are present do you constitute a

18   jury, and only then may you deliberate. Therefore, if you take

19   a break for any reason you must stop your deliberations until

20   all twelve jurors are present to deliberate.  Your function is

21   to weigh the evidence in the case and determine whether or not

22   the defendant is guilty, solely upon the basis of such

23   evidence.  Each juror is entitled to his or her opinion; each

24   should, however, exchange views with his or her fellow jurors.

25   That is the very purpose of jury deliberation—to discuss and

OA3BDAR5                    Charge

1    consider the evidence; to listen to the arguments of fellow

2    jurors; to present your individual views; to consult with one

3    another; and to reach an agreement based solely and wholly on

4    the evidence. But you are not to surrender a view of the case

5    that you conscientiously believe, merely because you are

6    outnumbered or because other jurors appear firmly committed to

7    their views.

8                    (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           THE COURT:  You should vote with the others only if

2   you are convinced on the evidence, the facts, and the law that

3   it is the correct way to decide the case.

4           Each of you must decide the case for yourself after

5   consideration with your fellow jurors of the evidence in the

6   case.  Your final vote must reflect your conscientious

7   conviction as to how the issue should be decided.  Your

8   verdict, whether guilty or not guilty, must be unanimous.

9           If you are divided, do not report how the vote stands.

10   Simply state that you are divided.  If you have reached a

11   verdict, do not report what it is until you are asked in open

12   court.  Simply inform me that you have reached a verdict.

13           Instruction No. 51, verdict form.

14           I have prepared a verdict form for you to use in

15   recording your decision.  Please use that form to report your

16   verdict.

17           Instruction No. 52, duty of foreperson.

18           Finally, I referred a moment ago to a foreperson.  You

19   should by your own vote select one of you to sit as your

20   foreperson.  The foreperson does not have any more power or

21   authority than any other juror, and his or her vote or opinion

22   does not count for any more than any other juror's vote or

23   opinion.  The foreperson is merely your spokesperson to the

24   Court.  He or she will send out any notes, and when the jury

25   has reached a verdict, he or she will notify the court security

OA3JDAR6                        Charge

1   officer that the jury has reached a verdict, and you will come

2   into open court and give the verdict.  When sending out a note,

3   any note should be signed using the foreperson's juror number.

4          Instruction No. 53, verdict form and return of

5   verdict.

6          After you have reached a verdict, your foreperson will

7   fill in the form that has been given to you.  Well, the next

8   instruction, each of you will sign and date it, ladies and

9   gentlemen, it's only necessary that the foreperson sign and

10  date the verdict form, and then you will advise the court

11  security officer outside your door that you are ready to return

12  to the courtroom.

13         I will stress that each you must be in agreement with

14  the verdict which is announced in Court.  Once your verdict is

15  announced by your foreperson in open court and officially

16  recorded, it cannot ordinarily be revoked.

17         In conclusion, ladies and gentlemen, I'm sure that if

18  you listen to the views of your fellow jurors and if you apply

19  your common sense, you will reach a fair verdict here.

20         Concluding remarks.

21         Members of the jury, that concludes my instructions to

22  you.  I will ask that you remain seated while I confer with the

23  attorneys to see if there are any additional instructions that

24  they would like to have me give to you or anything I may not

25  have covered in my previous statements.

1          Now, before you retire into the jury room, I must

2    inform you that the law provides for a jury of 12 people in

3    this case.  Therefore, jurors in seats 13, 14, and 15 are

4    alternates.  You are not yet excused as jurors in this case.

5    You will not deliberate with the 12 jurors, and you may leave

6    the courthouse.

7          However, in the event that one of the non-alternate

8    jurors can no longer deliberate, you will be called to continue

9    your service in numerical order.  You have been very attentive

10   and very patient.  I'm sorry that you will in all likelihood

11   miss the experience of deliberating with the jury, but the law

12   provides for a jury of 12 people in this case.

13         Before the rest of the jury retires to the jury room,

14   if you have any clothing or objects there, you are asked to

15   pick them up and withdraw before any deliberations start.  I

16   ask that you hold off a moment on that.  You have not been

17   formally excused.  So my instruction about not discussing the

18   case — even with your fellow alternate jurors — still applies.

19   In other words, please do not discuss the case with one another

20   or anyone else while the non-alternate jurors are deliberating.

21   My staff will contact you when your jury service has concluded.

22         Now, if I could see counsel at sidebar.

23         (At sidebar)

24         THE COURT:  Let me ask are there any corrections or

25   anything else that I should add to the jury instructions?

1          MR. MEAD:  Not from the government.

2          THE COURT:  From the defense?

3          MR. DONALDSON:  No.

4          THE COURT:  All right.  Thank you.

5          (In open court; jury present)

6          THE COURT:  Members of the jury, you may now retire.

7    The court security officer will be sworn before you retire.  I

8    ask that the three alternate jurors return to the jury room and

9    retrieve your belongings and return to the jury box.

10          Ms. Disla, if you could swear the court security

11   officer.

12          (Officer sworn)

13          THE COURT:  Okay.  Thank you.

14          So I would ask, ladies and gentlemen, you can now

15   retire to the jury room.  The first order of business -- it is

16   obviously 5:54 now.  It's up to you whether you want to begin

17   your deliberations now or return tomorrow morning at 10:00 for

18   your deliberations.  The alternates can gather your belongings.

19   The jury is going to remain.  And you are excused, but remember

20   do not discuss the case because you could be called upon if one

21   of the 12 jurors is unable to continue deliberations.  You may

22   now retire to the jury room.

23          (Jury not present)

24          THE COURT:  What I intend to do is give them a few

25   moments — I think some of the jurors needed to use the

OA3JDAR6

1   facilities — and then have the court security officer ask

2   whether they intend to deliberate this evening or go home and

3   start deliberating tomorrow morning.  And then once we hear

4   that, I'll bring them out.

5            I'll bring the 12 out and say I understand that you

6   wish to deliberate tomorrow morning and then give them the

7   final instruction about not discussing the case, no research,

8   and things like that.  Even though they do now have the case,

9   they must await until when they arrive in the morning, till all

10  12 are there, all 12 are ready to participate in deliberations,

11  and then they can deliberate.

12           All right.  So why don't we give them a few -- is

13  there anything else that you believe I should -- if they decide

14  to deliberate or even if they don't decide to deliberate, that

15  I should take up with them?

16           MR. MEAD:  Just logistically we have the clean laptop

17  with exhibits.  Should we hold onto that?

18           THE COURT:  Let's hold onto it and wait and see.

19  Because if they decide to go home, the government should retain

20  that.  I take it the defense has reviewed the exhibits on the

21  laptop?

22           MR. DONALDSON:  Yes.

23           THE COURT:  Okay.  All right.  And there are no

24  objections the contents of the laptop?

25           MR. DONALDSON:  No.

OA3JDAR6

1          THE COURT:  And am I correct that the laptop is

2     internet access disabled?

3          MR. DONALDSON:  Yes.  He's saying yes.

4          THE COURT:  All right.  Okay.  So let's wait a moment.

5          Ms. Disla, could you ask the court security officer to

6     inquire whether the jury intends to deliberate tonight or

7     whether they wish to retire for the evening, and also if the

8     three alternates are still in there, they are obviously

9     excused.  And if they need some additional time because there

10    are people using the facilities, just let me know.

11         If you guys need to use the restroom, why don't you go

12    ahead and do that now.  But please at least one member of your

13    team try and return as quickly as you can.

14         (Recess)

15         THE COURT:  So they're going to come back tomorrow.

16    You want folks to be here, that's fine.  Otherwise, I'm going

17    to dismiss them.  I'm going to have them come back in.  You

18    want to get your client?  Yeah.

19         (In open court; jury present)

20         THE COURT:  You can be seated.

21         So ladies and gentlemen, I understand you want to

22    retire for the evening, which is fine.  So I'd ask you to come

23    back tomorrow with the exception of the alternates, tomorrow at

24    10:00 to begin your deliberations.

25         At 10:00, or as soon as everyone is assembled, we will

OA3JDAR6

1    send back the exhibits which will be on a laptop for you to be

2    able to access during your deliberations.  So the alternate

3    jurors do not have to come in tomorrow, but you're sort of on

4    standby.

5            So this instruction still applies to everyone, do not

6    discuss the case, no research or anything of the sort until

7    you're advised -- for the alternates, until you're advised by

8    probably Ms. Disla that a verdict has been reached.

9            Now, when you come in in the morning, as I said during

10   my instructions, all 12 of you have to be there before you

11   begin your deliberations.  So if someone is still getting

12   situated or eating something, I mean, obviously you can eat and

13   deliberate, but if you're not ready to go, all 12 have to be

14   ready to go, all right?

15           And I won't bring you out here in the morning.  You

16   can begin your deliberations when all 12 of you are back there.

17   If you haven't yet selected a foreperson, I'd ask that you do

18   that.  And when you're here, we'll get the laptop back to you

19   with the exhibits.  All right.

20           The folks who are going to be deliberating, you can

21   leave your notes and jury charge and verdict sheets in the jury

22   room.  Okay.  Thank you very much.  I might not see you first

23   thing at 10:00, but please return at 10:00, and I will be here

24   if there are any issues, okay?  Thank you very much.  Have a

25   good evening.  Safe travels home.

OA3JDAR6

1          (In open court; jury not present)

2          THE COURT:  Does Ms. Disla have one or more of the

3    cell phone numbers for the counsel for each of the parties?  I

4    guess what I would ask is that the parties be here at 10:00 and

5    for a period thereafter just to make sure there isn't a quick

6    note from the jurors.

7          Obviously I'd ask for the government to be here with

8    the laptop at 10:00, and I probably will wait until I hear

9    everyone is here before we send the laptop back just to have

10   the jury avoid the temptation to start deliberating when all 12

11   aren't there, and they're less likely to do that if they don't

12   have the exhibits.

13         And if you haven't given Ms. Disla your contact

14   information, you can do that tomorrow morning, but it's just so

15   that we can get in touch with you once the jury starts

16   deliberating.  And folks are free to roam about, just so we can

17   call you back if there's a note.  All right.

18         Let me ask is there anything that we need to deal with

19   right now before we adjourn for the evening?

20         MR. MEAD:  Not from the government, your Honor.

21         MR. DONALDSON:  No, your Honor.  Thank you very much.

22         THE COURT:  Okay.  So I will see everybody, and I will

23   be here at 10:00, and we can wait for 15 minutes or so or after

24   the jury starts deliberating before anyone leaves, I guess,

25   okay?  And obviously, Mr. Darden should be here and at least

OA3JDAR6

1    one attorney from the defense and one counsel from the

2    government.  And Mr. Darden, that's so if there is a note or

3    something comes up so you're aware of it and you can speak with

4    your attorney or attorneys about that, okay?

5            THE DEFENDANT:  Yes, sir.

6            THE COURT:  We'll stand adjourned.  Thank you very

7    much.  We'll see everybody tomorrow at 10:00.

8            (Adjourned to October 4, 2024, at 10:00 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25