

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

January 21, 2025

**BY ECF**

The Honorable Vernon S. Broderick
United States District Court Judge
Southern District of New York
40 Foley Square
New York, New York 10007

      Re:    *United States v. Calvin Darden, Jr.*, 23 Cr. 134 (VSB)

Dear Judge Broderick:

The Government respectfully submits this letter in advance of the January 27, 2025 sentencing of Calvin Darden, Jr., after his conviction at trial.

The correct Guidelines calculation yields a Guidelines range of 135 to 168 months' imprisonment. The defendant is a repeat fraudster who has failed to accept responsibility and committed misconduct even after his conviction. A sentence at the top of the Guidelines range is sufficient but not greater than necessary to serve the purposes of sentencing.

    **I.**    **Offense Conduct**

The defendant defrauded NBA player Dwight Howard of approximately $7 million and NBA player Chandler Parsons of approximately $1 million.

    **A. The Fraud Against Dwight Howard**

In the fraud against Howard, the defendant deceived Howard into sending him $7 million, purportedly for the purpose of buying the Atlanta Dream (the "Dream"), a team in the Women's National Basketball Association ("WNBA"). The defendant conspired with Charles Briscoe, Howard's agent, to perpetrate the fraud, and the defendant took advantage of the trust that Howard had in his agent and in those his agent introduced to him, including the defendant, to perpetrate the fraud.

To further the fraud, the defendant created a "Vision Plan" about the purported purchase of the Dream. The Vision Plan falsely claimed that a number of celebrities and companies—including Tyler Perry, Issa Rae, Naomi Osaka, Aflac, and Starbucks—had agreed to be advisors to the Dream or to sponsor the Dream after Howard purchased it. In fact, those individuals and companies had never agreed to be advisors to or corporate sponsors of the Dream and many had

never even heard of the defendant or the plan to purchase the Dream. The defendant sent the Vision Plan to Howard and others in an attempt to facilitate the fraud.

At the urging of the defendant and Briscoe, Howard funded the purported purchase of the Dream through a line of credit he obtained at a bank called BMO.

The defendant's father, Calvin Darden, Sr. ("Senior") was a prominent retired businessman during the relevant time period. The defendant repeatedly impersonated Senior in an attempt to add credibility to his fraud scheme, including to Briscoe and to employees of BMO in order to further the fraud.

The conspirators directed Howard to send the $7 million to a shell company the defendant controlled, purportedly to effectuate the purchase of the Dream. The defendant spent the funds for his own benefit and did not use any of the funds to purchase the Dream.

Howard learned that he did not in fact own the Dream only when ESPN reported that the Dream had been sold to others. Around the same time, the defendant created a false document purporting to show that the new owners of the Dream intended to sell a partial ownership interest in the Dream to the defendant's company, Senior, and a former mayor of Atlanta in order to attempt to delay detection of the scheme.

### B. The Fraud Against Chandler Parsons

In the fraud against Parsons, the defendant and his co-conspirator Briscoe deceived Parsons into sending to them $1 million, purportedly for the purpose of loaning the money to James Wiseman, a prospect in the 2020 NBA draft. The defendant and Briscoe falsely claimed to know Wiseman, and forged a document stating that Wiseman had agreed that Briscoe would be his agent in order to convince Parsons to send the money. In fact, the defendant and Briscoe did not know Wiseman and did not send any of Parson's money to Wiseman. Instead, the defendant spent his cut of the fraud proceeds on watches, a Mercedes, and other personal expenses.

### C. Use and Laundering of Stolen Funds

The defendant instructed Parsons to wire money to a bank account in the name of Legacy AC LLC, a shell company the defendant secretly controlled. The defendant also laundered the money he stole from Dwight Howard through a number of different bank accounts he controlled, including the Legacy AC bank account. A chart showing his laundering of Howard's funds through seven different bank accounts is below:



GX 1101.

The defendant did not spend any of the money on the purchase of the Dream or on a loan to Wiseman. Instead, he spent the money on a $3.7 million mansion, a Rolls-Royce, a Lamborghini, a Porsche, Basquiat screenprints, and other luxury goods for himself. A chart showing his use of stolen funds for his own benefit is below:[1]

| Recipient | Amount | Victim Source of Funds |
| --- | --- | --- |
| Purchase of Mercedes and Rolls-Royce from SZ Motorcars and Jeffrey Acosta | $499,582 | Howard/Parsons |
| Purchase of Porsche from Town Motor Cars | $284,151.19 | Howard |
| Purchase of Lamborghini from Tactical Fleet | $343,293.94 | Howard |
| Payment to Conspirator Charles Briscoe | $1,146,174.30 | Howard |
| Payment to Patricia Darden (defendant's mother) | $519,172.00 | Howard |
| Personal Loan Repayments | $60,000.00 | Howard |
| Purchase of Two Basquiat Screen Prints from Pop International Art | $307,906.00 | Howard |
| Purchase of Two Basquiat Screen Prints First Third Capital | $285,000.00 | Howard |
| Purchase of Steinway Piano | $110,650.00 | Howard |
| Purchase of Cryptocurrency | $492,069.00 | Howard |
| Installation of Koi Pond | $29,450.00 | Howard |
| Purchase of ATVs from MMS Motorsports | $54,108.72 | Howard |
| Purchase of Smart Home Appliances from Mindful Home | $380,940.68 | Howard |
| Payments to Landscaper Jesus Carillo | $89,440.00 | Howard |
| Down Payment for House at 2716 Ridgewood Road | $765,696.04 | Howard |
| Miscellaneous Luxury Goods | $123,500.01 | Howard |
| Miscellaneous Home Expenses | $242,464.89 | Howard |
| Payments to Miscellaneous Individuals | $732,520.20 | Howard/Parsons |
| Purchase of Watches from JD Watches | $88,500.00 | Parsons |
| Payment of Debt to Darrow Consulting | $55,095.58 | Parsons |
| Payment of Rent to Randall Manor Properties | $41,900.00 | Parsons |
| **TOTAL** | **$6,651,615** | |

## II.   Criminal History

The defendant is 50 years old, and is a lifelong fraudster.

---

[1] This chart combines GX 1131 and 1121.

3

In 2004, when he was 30, the defendant was arrested in New York state, convicted of several counts of larceny and fraud, and sentenced to four to 12 years' imprisonment. PSR ¶ 65. The defendant had worked as a financial advisor for several different investment firms, and stole millions of dollars from those firms and from his clients.[2]

In 2014, when he was 39, the defendant was arrested in this District on multiple counts of wire fraud. The defendant was involved in three separate fraud schemes. First, he induced a particular lender/investor to provide funds for a purported boxing match between Floyd Mayweather and another professional boxer for a total of $450,000. Second, he tricked a company into paying him $500,000 by falsely and fraudulently representing that an entertainment company would arrange an NBA exhibition game in Asia. Third, he made materially false misrepresentations to at least four lenders to induce those lenders to provide funding toward the purchase of Maxim magazine, and a victim lost $3.1 million. PSR ¶ 66; *see also* GX 1001 (defendant's testimony summarizing his prior fraud schemes). As part of those frauds, the defendant impersonated his father.

The defendant entered into a cooperation agreement with the Government and pleaded guilty to three counts of wire fraud. *United States v. Calvin Darden, Jr.*, 14 Cr. 534 (JSR). At sentencing, the defendant explained that:

> Your Honor, to say that, you know, I'm sorry is an understatement. More than sorry, I'm embarrassed and ashamed. My father worked his entire life, you know, to— and really built up the Darden name. It's—I can't even begin to explain what this has done, you know, not—not just to my father individually, not just to my entire family, but just our family name. It's beyond embarrassing for having, you know— to have that play out publicly is—is one thing, but it's just, you know, the past two and a half years have been, you know, the worst experience of my life, you know, tore my—tore my family apart. You know, we've been—I've been trying my best to kind of put it back together, as it is solely my fault.
>
> I don't really know what else to say outside of the fact that I'm sorry, embarrassed, ashamed, to such a degree that I'm just—I just don't know the words. Thank you.

Dkt. 150 at 12-13.

Judge Rakoff imposed a sentence of one year, and noted that the sentence was much lower than it would have been because of the defendant's cooperation. Judge Rakoff explained that:

> The first factor is that Mr. Darden is a recidivist, and indeed, though he has, as his own eloquent statement shows, great intelligence, great abilities, he has spent too

---

[2] After being charged in that case, the defendant was the subject of a New York Times article titled "Catch Him if You Can," which explained that his stolen money was used for, "besides his $2.85 million mansion, [a] a Lamborghini Murciélago, a Mercedes-Benz 600 and a Porsche Turbo," as well as a 5,600 gallon aquarium full of sharks that cost $3,200 per month for food and service. https://www.nytimes.com/2005/01/16/business/yourmoney/catch-him-if-you-can.html.

4

much of his life engaged in fraud, and other misconduct. And were that the entire story, I would not hesitate to impose a five-year sentence or so in this case, because while I share defense counsel's hopes for the future, the past is not a pretty picture.

*Id.* at 13-14.  The defendant was also sentenced to a term of supervised release, and committed part of the instant fraud while on that supervised release.[3]

The defendant also has a number of arrests that did not lead to convictions:

- In 1994, he was charged with shoplifting;
- In 1996, he was charged with simple battery;
- In 2002, he was charged with simple assault for assault against an ex-girlfriend;
- Later in 2002, he was charged with contempt of court and harassment for violating a restraining order against the same ex-girlfriend;
- In 2022, he was charged with driving with a suspended license.  PSR ¶¶ 72-76.

### III. Procedural History

The defendant was arrested on March 23, 2023 and charged in three counts of the initial indictment.  On July 18, 2024, the defendant was charged in a superseding indictment with (1) wire and bank fraud conspiracy; (2) wire fraud; (3) bank fraud; (4) money laundering conspiracy; and (5) money laundering.  Trial began on September 23, 2024, and a jury convicted the defendant on all counts on October 4.  On December 23, 2024, this Court revoked the defendant's bail and ordered him remanded.

The defendant's codefendant in the fraud scheme, Charles Briscoe, pleaded guilty on November 8, 2023 to a superseding information charging him with conspiracy to commit wire fraud in violation of 18 U.S.C. § 371.  In his plea agreement, Briscoe was held responsible only for the smaller fraud against Parsons, and his Guidelines range was 18 to 24 months.  This Court sentenced Briscoe to time served.

Darryl Cohen and Brian Gilder were charged in a separate scheme in the original indictment.  Gilder also pleaded guilty and was sentenced to time served, and trial against Cohen is scheduled to begin on September 23, 2025.

The defendant requests a sentence of no more than 108 months.  Probation recommends a sentence of 121 months.  The defendant is a U.S. citizen.

### IV. Guidelines Range

The defendant's offense level is 31.  On the fraud counts, the base offense level is seven; the offense level is increased by 18 levels because the loss is between $3.5 million and $9.5

---

[3] After that conviction, the defendant was the subject of a New York magazine article referring to him as a "veteran scam artist."  https://nymag.com/intelligencer/2014/02/calvin-darden-jr-maxim-knicks-scams.html.

million; the offense level is increased by two levels because the offense involved sophisticated means; and the offense level is increased by two levels because the defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense. On the laundering counts, the base offense level is 29 because that is the offense level on the fraud counts, and the offense level is increased by two levels because the defendant was convicted under 18 U.S.C. § 1956. The total offense level therefore is 31.

The defendant received five criminal history points for his two prior convictions, placing him in criminal history category III. The resulting Guidelines range is 135 to 168 months.

There are two Guidelines issues in dispute.

***First***, the parties disagree as to whether a two-point enhancement applies because the fraud "involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated mean," pursuant to U.S.S.G. § 2B1.1(b)(10). The relevant application note states: "For purposes of subsection (b)(10)(C), 'sophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. For example, in a tele-marketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means." U.S.S.G. § 2B1.1 n.9(B).

The Second Circuit has further explained that, "even where each step in a scheme was not elaborate, a scheme as a whole may be sophisticated where all the steps were linked together to exploit different vulnerabilities in different systems in a coordinated way," and that the enhancement applies when defendants create a "complex web of fraud." *United States v. Ojemen*, 465 F. App'x 69, 72 (2d Cir. 2012) (cleaned up). It also applies based on, "the creation and use of false documents, and other tactics to conceal offense conduct," *United States v. Fofanah*, 765 F.3d 141, 146 (2d Cir. 2014), or when a defendant "moved money between several bank accounts and used his businesses as 'fronts' to hide his activity," *United States v. Bailey*, 820 F. App'x 57, 62 (2d Cir. 2020).

The Probation Office was plainly correct when it concluded that the defendant's conduct involved sophisticated means. PSR ¶ 43. The defendant used a number of shell companies to perpetrate his fraud; moved stolen funds between multiple bank accounts; faked and forged documents; impersonated his own father to further the fraud; created a fraudulent pitch deck that was able to trick a large international bank; and used Briscoe (Howard's agent) to gain Howard's trust. The scheme lasted for over a year, defrauded multiple victims, and resulted in the theft of $8 million. It was sophisticated, as defined by the Guidelines.

***Second***, the parties disagree as to the calculation of the base offense level on the money laundering count, which has a one-point impact on the total offense level. U.S.S.G § 2S1.1(a)(1) states that the base offense level for money laundering is, "The offense level for the underlying offense from which the laundered funds were derived, if (A) the defendant committed the underlying offense (or would be accountable for the underlying offense under subsection (a)(1)(A)

6

of §1B1.3 (Relevant Conduct)); and (B) the offense level for that offense can be determined." Here, the defendant committed the underlying offense (wire and bank fraud), so the base offense level is "the offense level for the underlying offense from which the laundered funds were derived."

The "underlying offense[s]" are wire fraud and bank fraud. The defendant was convicted of those wire and bank frauds, and the relevant Guideline for them is U.S.S.G. § 2B1.1. Under U.S.S.G. § 2B1.1(a)(1), the base offense level for bank fraud and wire fraud is seven because the defendant was convicted of an offense referenced to that Guideline (the bank and wire fraud), and those offenses have statutory maximums of 20 years or more.

Probation's view is that the relevant offense is in fact the money laundering count, and because the money laundering count is not specifically referenced in U.S.S.G. § 2B1.1(a)(1), the base offense level is six. PSR p. 28. The Government has not identified any cases addressing this issue, and it understands from communications with Probation that this reflects a new view by the Probation Office, and that the Probation Office had in prior cases agreed with the Government's analysis.[4]

### V. Post-Conviction Misconduct

On October 4, 2024, after an eleven-day trial, a jury found the defendant guilty on all five counts in the Indictment. The Government moved for the defendant's remand pending sentencing. *See* Tr. 1301-04. The Court denied the Government's motion to remand the defendant and allowed the defendant to remain on bail pending his January 27, 2025 sentencing, pursuant to the following conditions:

- **Bond.** $750,000 personal recognizance bond signed by three financially responsible people.

- **Secured Bond.** Bond secured by property worth approximately $1 million owned by the defendant's mother.

- **Travel Documents.** Surrender of travel documents and bar on new applications.

- **Pretrial Supervision & Mental Health Evaluation.** Pretrial supervision and mental health evaluation as directed by Pretrial Services.

- **No Contact.** No contact with known co-defendants or alleged victims.

- **House Arrest.** Defendant ordered to remain under house arrest with electronic monitoring pending sentencing. Defendant not permitted to travel or otherwise leave the home, with the exception of medical visits for defendant and his

---

[4] Because this is a technical Guidelines issue with limited relevant caselaw, if the Court agrees with the Government, the Government respectfully requests that the Court state on the record when imposing sentence that its sentence would be the same regardless of this Guidelines issue.

immediate family that have been preapproved by Pretrial Services. The only circumstances under which Defendant is permitted to leave the home without prior permission from Pretrial Services is in the event of a medical emergency.

- **No Employment.** Defendant not permitted to seek any employment or to engage in any work, including from home.

- **No Internet.** Defendant not permitted to use the internet, including conducting internet searches, with the exception of email and text correspondence with his immediate family and with his counsel.

- **No Opening of New Accounts.** Defendant not permitted to open any new financial, business, or personal bank accounts, debit or credit card accounts, lines of credit, or loans without prior approval from Pretrial Services.

- **Monitoring of Bank Accounts.** Defendant required to provide Pretrial Services with the ability to access and monitor all bank accounts that Defendant controls, either directly or indirectly.

- **Handling of Funds.** Defendant not permitted to manage, take possession of, or invest funds belonging to any person.

- **Transfer of Assets.** Defendant not permitted to sell, transfer, or give away any assets under Defendant's name or that Defendant controls, either directly or indirectly, valued at $1,000 or more without notifying and obtaining permission from Pretrial Services, except for fees to an attorney retained to represent him in this criminal case.

ECF Nos. 30, 193, 224.[5]

The defendant has violated several conditions of his continued bail pending sentencing and engaged in other misconduct over the past several months.

---

[5] The Court granted the defendant's requests for limited adjustments to the terms of the defendant's bail conditions and temporary travel permission on October 17, 2024, October 29, 2024, and December 6, 2024. Specifically, on October 17, 2024, the Court modified the defendant's bail conditions to allow him to use mobile applications to schedule medical appointments and use electronics within his home, to leave his home to transport his daughter to school, and to communicate with certain family members and associates via text. ECF No. 224. On October 29, 2024, the Court granted the defendant's motion to travel to New York from October 31, 2024, through November 3, 2024. ECF No. 226. On December 6, 2024, the Court granted the defendant's motion to travel to New York from December 8, 2024, through December 11, 2024. ECF No. 236.

8

*Attempted Multi-Million Dollar Real Estate Transactions
and Efforts to Obtain Multi-Million Dollar Mortgage*

First, the defendant attempted to engage in two separate multi-million-dollar real estate transactions and to procure a mortgage worth approximately $3.1 million. In so doing, the defendant violated several conditions of his bail, including the condition precluding him from engaging in transactions involving the transfer of assets valued at over $1,000, the house arrest condition, and the condition prohibiting him from using the internet to text with individuals aside from immediate family and counsel. In addition, the defendant continued to impersonate his father in the course of these attempted transactions and directed others to misrepresent facts so as to minimize the odds that defendant's bail violations and other misconduct would come to light.

The defendant attempted to sell the house located at 2716 Ridgewood Road, Atlanta, Georgia (the "Ridgewood Road House"), which he purchased with the proceeds of his frauds. When he purchased that house, the defendant made sure that his name was kept off the purchasing documents. *See* GX 713A at 3 (purchase agreement listing Senior as the buyer, but providing a phone number belonging to the defendant); *see also id.* at 2 ("All parties recognize removal of Calvin Darden Jr from Contract. Calvin Darden [Senior] shall replace and henceforth be recognized as buyer."). The defendant currently resides at the Ridgewood Road House with his wife and child. On or about December 2, 2024, the Ridgewood Road House was listed for sale on, among other places, the website Zillow. Below is a screen capture of the Zillow page showing the house listed for sale for $5.8 million, reflecting an approximately $2.1 million premium over what the defendant paid for it:[6]

---

[6] https://www.zillow.com/homedetails/2716-Ridgewood-Rd-NW-Atlanta-GA-30327/35921836_zpid/. The screen capture was taken on or about December 12, 2024.



While attempting to sell his home, the defendant also attempted to purchase another residence.  On December 5, 2024, the defendant texted with a real estate company located in or around Atlanta, Georgia.  In his messages to the real estate company, the defendant introduced himself as "Calvin," explained that he was interested in purchasing a house on West Paces Ferry Road, in Atlanta, Georgia (the "West Paces House"), and asked if it was possible to put in an offer

10

to purchase the property.[7]  Representatives from the real estate company informed the defendant that he could make an offer if he provided proof of funds.  On or about December 5, 2024, the defendant's real estate agent (the "Agent") sent to an employee of the real estate company ("Real Estate Broker-1") a document on the defendant's behalf to satisfy the proof of funds requirement.  This document was a screenshot of the Synovus Bank mobile application reflecting an account with balances greater than $4.2 million; the screenshot did not provide any identifiers about the account holders aside from the name "Calvin" (the "Proof of Funds").  As explained in greater detail below, the defendant attempted to obtain a mortgage worth approximately $3.1 million to purchase the West Paces Ferry House.

The defendant visited the West Paces House without first obtaining permission from his Pretrial Services officer (the "Pretrial Services Officer"), in violation of the house arrest condition of his bail.  It is clear that the defendant visited the West Paces House and that he intended to purchase it for himself.  First, a second real estate broker ("Real Estate Broker-2") informed the Government that he showed the property to an African American man in his 40s who said that his name was "Calvin".  Real Estate Broker-2 stated that the potential buyer would not share his last name, but told Real Estate Broker-2 that he lived on Ridgewood Road.  "Calvin" arrived at the showing in a Ferrari.  Real Estate Broker-2 also informed the Government that Calvin's wife, who Calvin referred to as Sue, also attended the showing.  The defendant's wife is named Suhaine Pedroso (i.e. "Sue").  PSR ¶ 84.  Sue arrived at the showing in a Lamborghini.  The Agent also attended the showing.  Real Estate Broker-2 stated that no one aside from Calvin, Sue, and the Agent attended the showing.  During the showing, Real Estate Broker-2 heard Calvin and Sue identify a room in the house as ideal for their daughter, and Calvin said the first name of his teenage daughter.  PSR ¶ 84 (identifying the daughter's first name).  In addition, Real Estate Broker-2 explained to the Government that he and Calvin discussed the price of the property during the showing.  Real Estate Broker-2 informed Calvin that the owner of the West Paces House would be willing to sell it for roughly $4.5 million.  From Calvin's focus on the price and his statement that a particular room in the home was well-suited for his daughter, Real Estate Broker-2 understood that Calvin intended to purchase the property for himself.  Second, it is also clear that the defendant attended the West Paces House showing because the defendant, through counsel, conceded that he attended the showing without first obtaining permission from his Pretrial Services officer.  *See* ECF No. 240 at 5.

*Additional Violations of the House Arrest
Condition and Lies to Pretrial Services*

Before the Court revoked the defendant's bail, he was on house arrest with electronic monitoring and was not allowed to leave the house except for limited, specific reasons.  The defendant obtained permission from the Pretrial Services Officer to attend a dentist appointment on December 5, 2024.  On December 5, 2024, the defendant's GPS monitor repeatedly pinged at

---

[7] The defendant used a phone number ending in 5686.  At trial, the Government proved that this phone number was subscribed to in the defendant's name and associated with his address, Tr. 688-89, and that he used this phone number to carry out his frauds.  *See, e.g.*, Tr. 617, 758-59; GX 404.  In addition, the defendant must be the individual sending these messages if the defendant's description of Senior's mental capacity when he wrote to the Court is accurate.

11

a location in the vicinity of the West Paces House, which is not a dentist's office. On December 12, 2024, the Pretrial Services Officer asked the defendant why his GPS monitor had pinged in the vicinity of the West Paces House on December 5, 2024. In response, the defendant told the Pretrial Services Officer that he had, in fact, attended his dentist appointment on December 5, 2024, and that he did not understand why his GPS monitor had pinged near the West Paces House. Later that same day, the defendant called the Pretrial Services Officer and offered a different explanation. The defendant claimed that, on December 5, 2024, his parents took an Uber to his residence because they were supposed to accompany him to the dentist. According to the defendant, the dentist told him that his December 5, 2024, appointment had been canceled. The defendant further claimed that his parents are looking to sell their residence and had scheduled tours of other properties—including the West Paces House —for December 5, 2024, following the defendant's dentist appointment. The defendant told the Pretrial Services Officer that he accompanied his parents to view the properties on December 5, 2024, since his dentist appointment had been canceled. The Defendant explicitly told his Pretrial Services Officer that his parents attended a showing of the West Paces House on December 5, 2024; this directly conflicts with Real Estate Broker-2's recounting of who attended the showing of the West Paces Ferry House. *See* page 11, *supra*.

*Attempted Concealment of Misconduct*
*and Continued Impersonation of Senior*

The defendant employed his familiar techniques of fraud and took active steps to conceal his misconduct and avoid being caught for violating the terms of his bail. First, the defendant impersonated his father—a tactic of deception he used in his most recent fraud for which he stands to be sentenced as well as in his 2015 fraud conviction in this District—in his attempt to execute the sale of the Ridgewood Road House and to obtain the West Paces House. As explained above, the defendant provided the Proof of Funds in his effort to purchase the West Paces House. The Proof of Funds is ambiguous as to who owns the account with these funds—the defendant or Senior. After Real Estate Broker-1 informed the defendant and the Agent that the Proof of Funds that the Agent provided was insufficient, the defendant obtained a preapproval letter for a mortgage in the amount of $3,150,000 for an entity called the "K. Amber Family Trust" (the "Preapproval Letter").[8] On or about December 12, 2024, the Government spoke with an employee of the entity listed on the Preapproval Letter as providing the mortgage (the "Mortgage Provider Employee"). The Mortgage Provider Employee explained that an individual who identified himself as Calvin Darden—without specifying junior or senior—called him. The Mortgage Provider Employee believed that he was speaking with an individual named Calvin Darden who had been born in the year 1950. The Mortgage Provider Employee had this understanding because, in previous dealings with Calvin Darden, he had been provided with documents that listed a date of birth in the year 1950, which is the year Senior was born. During the call, the individual with whom the Mortgage Provider Employee spoke asked about obtaining an investor loan in relation to the West Paces House. The Mortgage Provider Employee believed that he was speaking with Senior and that the individual with whom he was speaking had a net worth of $17 million.[9] In text messages that the

---

[8] The Government has not identified any evidence that this trust exists.
[9] The defendant has repeatedly represented that Senior suffers from health issues that preclude his cognitive and other functions. *See, e.g.*, August 8, 2024 Mot. (filed under seal); ECF No. 240 at

12

defendant exchanged with the Agent, the defendant tells her that he is "approved for $3.15 million," and references the Mortgage Provider Employee by name; this proves that it was the defendant who attempted to obtain this mortgage while leading the Mortgage Provider Employee to believe that he was engaging with Senior. *See* Ex. A. (text messages between the defendant and the Agent, filed under seal) at 79-80.

Finally, the defendant misrepresented his relationship with the Agent to create the impression that the Agent solely represented Senior and the defendant's mother. In reality, however, text messages exchanged between the defendant and the Agent make clear that the defendant was instructing the Agent with respect to the sale of the Ridgewood Road House and the attempted purchase of the West Paces House (and other properties of interest). *See* Ex. A. The defendant also directed the Agent to include specific language in a letter the Agent wrote (the "Agent Letter") stating that the Agent did not represent the defendant and directed her to remove language establishing that the defendant owned the Ridgewood Road House. *See id.* at 92-95. The Agent Letter, which the defense furnished to the Court during the December 23, 2024 bail revocation hearing, is attached hereto as Exhibit B (filed under seal). There is no question that it was the defendant who exchanged these text messages with the Agent. In these messages, the defendant explicitly tells the Agent that she is texting with the defendant—Calvin Darden Jr.— and not Senior. Ex. A at 13 ("My dad and I have the same name. I'm Calvin Darden Jr."). There is also no question why the defendant took these actions: the defendant instructed the Agent to misrepresent the nature of their relationship and remove language from the Agent Letter establishing that the owned the Ridgewood Road House to attempt to avoid being caught for violating clear conditions of his bail.

As these facts make clear, at the same time the defendant was attempting to sell the Ridgewood Road House for $5.9 million, he was also trying to buy the West Paces House for approximately $4.5 million and to obtain a mortgage for that property. If successful, the defendant would have committed a federal crime by violating 18 U.S.C. § 1957. In trying to execute these real estate transactions, the defendant violated his bail condition prohibiting him from engaging in transactions involving assets worth more than $1,000, violated his house arrest condition, impersonated his father, and instructed the Agent to misrepresent their relationship in hopes of being caught for his misconduct. The transaction he was contemplating also would have likely made it more difficult to recover the fraud proceeds he used to buy the Ridgewood Road House.

### VI. The Court Should Impose a Sentence at the Top of the Guidelines Range

A sentence at the top of the Guidelines range is sufficient but not greater than necessary to provide just punishment, afford adequate deterrence to this defendant and others, and protect the public from additional crimes by the defendant.

The defendant committed a serious fraud: he stole $8 million from two professional basketball players. The fraud took place over more than a year, and the defendant lied about every

---

25, 35. Accordingly, it stands to reason that Senior did not place the call to the Mortgage Provider Employee requesting the investor loan for the West Paces Home and, instead, that it was the defendant impersonating Senior.

13

aspect of the alleged transactions. He and Briscoe lied that they were dealing with James Wiseman. The defendant lied that the various companies and celebrities were involved in the Dream transaction. He lied by impersonating his own father. The defendant and Briscoe forged Wiseman's signature to lie to Parsons. And most importantly, the defendant lied about what the money was for. This was not the type of fraud where a defendant lies about just part of a transaction. The transactions here were entirely fraudulent. Not a dollar went to buy the Dream or as a loan to Wiseman; instead, the defendant simply stole all the money and spent it on himself.

The defendant then tried to hide his fraud and his assets. He used shell companies and laundered the money he received. He created a fake document to try to convince Howard that his money had actually been spent on the Dream. After his conviction, he tried to sell some of his assets before the Government could seize them.

His crime harmed real people. Howard lost $7 million, and Parsons $1 million. The Government is submitting under seal a victim impact statement from Parsons detailing the harm he suffered from the defendant's fraud. See Ex. C. There are other victims, too. The defendant falsely claimed that a number of individuals were associated with his fraud scheme. He impersonated his own father—again—damaging his father's reputation.

Moreover, professional athletes are, in many ways, particularly vulnerable to this sort of fraud. Due to the amount of money they earn, their frequent lack of financial experience, their frequent reliance on others to handle their business affairs, and their grueling schedules, professional athletes are more vulnerable than many others. *See, e.g.*, https://www.justice.gov/opa/pr/father-and-son-convicted-multimillion-dollar-investment-fraud-scheme (investment fraud scheme that victimized multiple former professional athletes); https://www.justice.gov/opa/pr/north-carolina-businessman-sentenced-prison-stealing-approximately-29-million-nfl-players (investment fraud that victimized multiple form NFL players); https://www.sec.gov/news/press-release/2017-147 (investment fraud involving professional athlete and his wife); https://www.sec.gov/news/press-release/2016-124 (investment fraud scheme targeting multiple professional athletes); https://www.ey.com/en_us/forensic-integrity-services/how-can-athletes-fight-the-growing-risk-of-being-targeted-by-fraud (professional athletes victims reported nearly $600 million in known fraud over 15 years). General deterrence is therefore also a key consideration in this case. Substantial sentences of imprisonment send a message to individuals considering taking advantage of professional athletes that they view as particularly vulnerable that such criminal activity will result in serious penalties.

The defendant is a recidivist fraudster. He is 50 years old, and this is his ***third*** conviction for a multimillion-dollar fraud scheme. His prior sentences did not deter him, nor did the damage to his family that a conviction can cause. In his last conviction, he took advantage of the benefits of cooperation to receive a much-reduced sentence, and then turned around and committed the instant offense while he was still on supervised release.

Even after his conviction, the defendant repeatedly violated the trust that the Court placed in him by allowing him to remain on bail pending sentencing, engaged in misconduct, and continued to break the law. The defendant engaged in flagrant violations of his bail conditions, lied to his Pretrial Services Officer, ignored his house arrest condition, attempted to sell his residence—which he purchased with fraud proceeds—tried to purchase another multi-million-

dollar residence, and sought to take out a mortgage worth roughly $3.1 million—all while he was ordered not to engage in transactions transferring assets worth more than $1,000 without permission from his Pretrial Services Officer. The defendant's attempt to launder and conceal the proceeds of the crimes for which he will be sentenced through the sale of the Ridgewood Road House and the purchase of the West Paces House would likely have made forfeiture and the Government's attempts to make the defendant's victims whole more difficult. Consistent with his *modus operandi*, the defendant intentionally created and fostered the impression that the counterparties in the real estate transactions that he was attempting to execute were dealing with Senior—just as he has in previous frauds that he has carried out. What's more, the defendant directed the Agent to misrepresent the defendant's involvement in the real estate transactions and the defendants' relationship with the Agent so as to obstruct the Government from understanding the nature of the real estate transactions and the defendant's role in it, and to prevent the Court from learning of the defendant's continued misconduct.

The defendant's convictions in this case—like his convictions in his previous cases—were driven entirely by greed. The defendant likes expensive cars, fancy artwork, luxury goods, and mansions. His entire adult life, he has been willing to defraud innocent victims to get the money to buy those things. Here, the defendant used the money he stole to buy a multi-million-dollar mansion in Atlanta, a fleet of expensive cars, hundreds of thousands of dollars of art, and a number of other luxury goods.

In this case, protecting the public from further crimes of the defendant is critical. The defendant has spent his entire career committing fraud, and there is no indication that he will stop. In fact, he continued breaking the law even after he was convicted. There is no basis for the Court to conclude, as the defense argues, that the defendant will soon age out of his criminal conduct. The defendant was engaged in criminal conduct at age 50, long past the point when many young people stop committing crimes. His criminal conduct is of the type that could easily continue even when the defendant begins to age. And it is clear that the destruction of the defendant's reputation has not prevented him from committing fraud—he committed the instant fraud even though there were a number of articles online detailing his history of fraud.

Deterrence is also critical. Specific deterrence will be achieved only by a very substantial sentence given the failures of the prior sentences to deter the defendant. Such a sentence will also further general deterrence. Sophisticated defendants who engage in frauds like the defendant's are rational actors. The cost-benefit calculus must be such that that white collar criminals are deterred from committing such crimes, even after taking into account the chances that their crimes may evade detection altogether, and the only way to do that is by imposition of serious sentences. *See, e.g., United States v. Johnson*, No. 16-CR-457-1 (NGG), 2018 WL 1997975, at *5 (E.D.N.Y. Apr. 27, 2018) ("The need for general deterrence is particularly acute in the context of white-collar crime."); *United States v. Peppel*, 707 F.3d 627, 637 (6th Cir. 2013) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence."); *United States v. Stein*, No. 09-CR-377, 2010 WL 678122, at *3 (E.D.N.Y. Feb. 25, 2010) ("Persons who commit white-collar crimes like defendant's are capable of calculating the costs and benefits of their illegal activities relative to the severity of the punishments that may be imposed.")

The defendant argues for a reduced sentence based on his family responsibilities. A criminal conviction almost always has tragic consequences for a defendant's family, but here it is no reason for the Court to impose a lower sentence. The defendant was well aware of the devastating impact his fraud would have on his family—at his last sentencing, he explained that the criminal case "tore my family apart." *United States v. Calvin Darden, Jr.*, 14 Cr. 534 (JSR) Dkt. 150 at 12-13. That didn't stop him from committing another fraud shortly after he was released from prison, or from impersonating his own father to commit fraud yet again. Moreover, the defendant's livelihood for his entire career has been based on fraud. There is no evidence that the defendant will provide financial support of a non-criminal nature to his family upon his release. And finally, even if the Court imposes only the nine-year sentence the defendant requests, his family responsibilities will be much diminished by the time he is released. The defense submission represents, sadly, that the defendant's father is likely to pass away within a year, and the defendant's youngest child will be in her mid-twenties nine years from now.

In order to provide just punishment, protect the public, and afford adequate deterrence, a sentence at the top of the Guidelines range is therefore necessary.

## VII.  Restitution and Forfeiture

### A. Forfeiture

The Government bears the burden of proving the amount of proceeds by a preponderance of the evidence. *United States v. Capoccia*, 503 F.3d 103, 116 & n. 18 (2d Cir. 2007). "District courts are afforded broad discretion in calculating illicit gains based on the circumstances of a case." *United States v. Walters*, 910 F.3d 11, 31 (2d Cir. 2018). "The calculation of forfeiture amounts is not an exact science," *United States v. Treacy*, 639 F.3d 32, 48 (2d Cir. 2011), so "district courts may use general points of reference as a starting point for a forfeiture calculation and make reasonable extrapolations supported by a preponderance of the evidence," *United States v. Roberts*, 660 F.3d 149, 166 (2d Cir. 2011). The Second Circuit "will not disturb a district court's reasonable estimate of the [amount], given the available information." *Walters*, 910 F.3d at 31 (internal quotation marks omitted).

The Court should impose a forfeiture money judgment in the amount of $8,000,000, which constitutes the amount that the defendant stole from Howard and Parsons in his fraud scheme. The Court should also enter an order forfeiting the defendant's interest in the entities he used in the fraud and in the real and personal property he purchased with stolen funds. Many of those stolen funds were traced in detail by FBI Forensic Accountant Jillian Bronson, who testified at trial, and through the various exhibits referenced during her testimony. Tr. at 497-514, 523-649; GX 601-608, 616-617, 701-702, 704-709, 711-713, 1101-1107, 1111-1117, 1121-1124, 1131-1134.[10] Other property described below was purchased by the defendant after the period of the conspiracy, but still constitutes either the proceeds of the fraud or substitute assets. A full list of the property

---

[10] Additional evidence of the use of stolen funds was shown by (1) the testimony of FBI Special Agent William Cromer, who executed a search on the defendant's house and took a number of photos of the items the defendant purchased with his stolen funds, Tr. 324-348, GX 801-899; and (2) the testimony of Jeffrey Acosta, who sold the defendant several vehicles, Tr. 664-670.

with respect to which the Government is seeking forfeiture of the defendant's interest is below, and a forfeiture order is attached as Exhibit D.

1. Entities
    a. Legacy AC LLC;
    b. Darden Enterprises LLC;
    c. Darden Sports Group.

2. Real Property
    a. The real property known as 2716 Ridgewood Road NW, Atlanta, Georgia, 30327, in the City of Atlanta, Fulton County, GA, which is further described as: All that tract or parcel of land lying and being in Land Lot 232 of the 17th District of Fulton County, Georgia, being Lot 1, Block A, Unit One, of Ridgewood Estates, according to plat recorded in Plat Book 54, Page 46, Fulton County, Georgia, Records, which plat is hereby referred to and made a part of this description; said property being known as 2716 Ridgewood Road, according to the present system of numbering property together with all fixtures and appurtenances attached to (the "Atlanta Property").

3. Vehicles
    a. A 2021 Rolls-Royce Cullinan, bearing VIN SLATV4C04MU206557; and
    b. A 2019, Black Lamborghini SUV, GA License Plate number TEE9853, bearing VIN: ZPBUA1ZL0KLA01905.

4. Other Property
    a. A screenprint titled "Untitled (Rinso)" by Jean-Michel Basquiat purchased from Pop International Galleries, Inc.;
    b. A screenprint titled "Untitled (Per Capita)" by Jean-Michel Basquiat purchased from Pop International Galleries, Inc.;
    c. A screenprint titled "Untitled (Head)" by Jean-Michel Basquiat purchased from First Third Capital, Inc.;
    d. A screenprint titled "Untitled (Ernok)" by Jean-Michel Basquiat purchased from First Third Capital, Inc.;
    e. A Ebony Diamondgloss Steinway piano with serial number 601861 purchased from Steinway & Sons;
    f. The pool table located at the Atlanta Property; and
    g. Two (2) crystal chandeliers located at the Atlanta Property.

**B. Restitution**

The defendant stole $7 million from Dwight Howard and $1 million from Chandler Parsons. A copy of a proposed restitution order in those amounts is attached here as Exhibit E.

**Conclusion**

  The Government respectfully requests that the Court impose a sentence of imprisonment at the top of the Guidelines range and enter the attached forfeiture and restitution orders.

               Respectfully submitted,

               DANIELLE R. SASSOON
               United States Attorney for the
               Southern District of New York

             By: /s/_____
               Kevin Mead
               Brandon C. Thompson
               William C. Kinder
               Assistant United States Attorneys
               (212) 637-2211/2444/2394

cc:  all counsel of record (by ECF)