

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

March 19, 2025

**BY ECF**

The Honorable Vernon S. Broderick
United States District Court Judge
Southern District of New York
40 Foley Square
New York, New York 10007

      Re:    *United States v. Calvin Darden, Jr.*, 23 Cr. 134 (VSB)

Dear Judge Broderick:

      The Government respectfully submits this letter in response to the Court's questions relating to the March 26, 2025 sentencing of Calvin Darden, Jr.

      **Question 1**:

      The reference to Darden Jr.'s "guilty plea" in paragraph 9 of the PSR should be replaced with "conviction." Darden Jr. did not plead guilty.

      **Question 2 (Texts Deceiving Briscoe)**:

      Darden Jr. deceived Briscoe in numerous text messages by impersonating his own father. These text messages were introduced at trial as GX-404, a text thread between Darden and Briscoe, in which Darden purports to be his father, Calvin Darden Senior ("Senior"). The messages were sent to Briscoe from the phone number 347-850-5686, which is registered to "Calvin Darden" at his residence located at 2716 Ridgewood Road, Atlanta, Georgia 30327 (the "Ridgewood Road House"). Darden Jr. purported to be his father in these communications. For example, early in the text thread, on July 5, 2018, Darden Jr., using the 5686 number, texted Briscoe, "Hi Charles. I'm no longer on Coke's board. I'm on Target, Cardinal Health, Aramark" (all companies with which Darden Sr., and not Darden Jr., was affiliated). *See* GX-404 at 4.

      As reflected in GX-404, Darden Jr. continued to impersonate his father to Briscoe through at least 2021, including in texts about the Atlanta Dream deal. For example, on January 27, 2021, Darden Jr., impersonating his father, texted Briscoe:

> Hi Charles. Good hearing from you. All is well. A bit disappointed by the WNBA deal, but I understand that you guys [*i.e.*, Darden Jr. and Briscoe] are up to much bigger and better things! So, that's great. Looking forward to great things from you guys.

GX-404 at 69. As the Government argued in its summation, Darden Jr. impersonated his father to Briscoe because he believed Briscoe could provide him access to individuals, like Dwight Howard, who Darden Jr. believed he could defraud. GX-404 is included with today's submission.

**Question 3**:

The reference to "2022" in paragraph 76 appears to be a typographical error that should be replaced with "2002."

**Question 4 (Production Company)**:

During trial, the defense provided the Government with three videos as potential defense exhibits which refer to "Darden Enterprises Studios," which are included with today's submission as GX-A, GX-B, and GX-C. The videos depict the Ridgewood Road House and advertise the content production and movie filming services of Darden Enterprises Studios, including the availability of the Ridgewood Road House for filming. The videos further state that the movie "Bad Boys: Ride or Die" was filmed at the Ridgewood Road House, along with two music videos. The Government has confirmed that parts of "Bad Boys: Ride or Die" were filmed at the Ridgewood Road House, and included with today's submission is GX-D, a location services agreement to film part of that movie at the Ridgewood Road House. This agreement was entered into after Darden was indicted and arrested. The agreement was entered into on behalf of Calvin Darden personally, not on behalf of any entity. In addition, we have confirmed that one of the music videos, "Concrete" by Teyana Taylor, was filmed at the Ridgewood Road House. However, the video was filmed in 2020, before Darden owned the house. *See* https://www.youtube.com/watch?v=DU7hz2j3Qs4 (reflecting an upload date of October 1, 2020).

Based on the information available to the Government, it is unclear whether the production company in fact exists. To the extent it does exist, it appears to be fully owned and controlled by Darden Jr. The only "project" arguably completed by the production company, as far as the Government is aware, is the filming of part of "Bad Boys: Ride or Die." But as noted above, that agreement was entered into by Darden personally. The Government is not aware of any real estate holdings of the production company, except to the extent that Darden may claim that it owns the Ridgewood Road House.

**Question 5 (Darden Enterprises)**:

Darden Enterprises LLC was incorporated in August 2020, along with an entity named "Darden Holdings LLC." The incorporation documents for each entity, which were introduced at trial as GX-701A through 701Z, are included with today's submission. At trial, the Government presented substantial evidence that Darden Jr. ran his frauds through the Darden Enterprises entity. *See, e.g.*, GX-1101 (showing that Darden Jr. laundered fraud proceeds through a Darden Enterprises Morgan Stanley account). However, the Government is not aware of any evidence that Darden Jr. performed legitimate work for Darden Enterprises since 2011.

Enclosed as Exhibits GX-E and GX-F are documents referring to "Darden Development Group."[1] GX-E is a fact sheet produced in discovery from Reign Entertainment Group, advertising an opportunity for investors to invest in a series of international NBA exhibition games in 2011. Reign Entertainment Group was the entity Darden Jr. used to run the NBA exhibition game fraud that was a subject of his 2014 cooperation against defendant Harvey Newkirk (*see* 14 Cr. 534 (JSR)). The fact sheet states that Calvin Darden Sr. is "the Chairman and CEO of Darden Development Group."

GX-F is a copy of the 2018 individual tax returns of Darden Sr. and his wife, which identify Darden Development Group LLC as one of Darden Sr.'s business entities.[2] The tax returns indicate that Darden Development Group LLC owned and received rent payments from a property located at 7112 Greystone Drive in Riverdale, Georgia (approximately $12,000 in rent income per year). The Government is not aware of any evidence that Darden Jr. performed work for Darden Development Group.

**Question 6 (Darden Petroleum & Energy Solutions)**:

Enclosed as Exhibits GX-G and GX-H are two documents produced in discovery referencing Darden Petroleum & Energy Solutions.

GX-G is a "WNBA Background Information Form" that was submitted to the WNBA in the name of Calvin Darden Sr. in connection with the Darden Sports Group's bid to purchase the Atlanta Dream. Schedule A of the document states that Darden Sr. was the "Founder and CEO of Darden Petroleum & Energy Solutions," which was "Founded in 2015 and retired in 2018." The company is described as a "fuel and logistics services company" with clients including the U.S. government, UPS, and Delta Airlines.

GX-H is a narrative description of Darden Petroleum & Energy Solutions sent in an email from "calvinrdarden@icloud.com" to "calvin@dardenenterprises.com," which states that the company is a "state and federally Certified Minority Business Enterprise (CMBE)."

In addition, GX-F, the 2018 tax return of Darden Sr. and his wife, identifies Darden Petroleum & Energy Solutions one of Darden Sr.'s businesses.

The Government is not in possession of Darden Petroleum's incorporation documents or other evidence that the entity exists. However, according to the public corporate database OpenCorporates, a Georgia-incorporated entity named Darden Petroleum & Energy Solutions, LLC was formed in 2009 and dissolved in 2020. *See* https://opencorporates.com/companies/us_ga/09085633 (last accessed March 19, 2025). The

---

[1] Due to the volume of exhibits and the confidential nature of certain of the documents, the Government will submit the exhibits to Chambers by email.

[2] Darden Sr.'s individual tax returns were contained in search warrant returns for certain Google email accounts at issue in Darden Jr.'s trial, including "calvin@dardenenterprises.com" and "cal@dardenenterprises.com."

3

Government is not aware of any evidence that Darden Jr. performed actual work for Darden Petroleum & Energy Solutions.

### **Question 7 (Financial Advisor Employment History)**:

Enclosed are three exhibits referring to Darden Jr.'s prior employment as a financial advisor: GX-I, a New York Times article, dated January 16, 2005, regarding Darden Jr.'s indictment by the Manhattan District Attorney's Office for embezzling millions of dollars from multiple of his former employers; GX-J, the transcript of Darden Jr.'s 2005 guilty plea in that case; and GX-K, the full transcript of Darden Jr.'s cooperator testimony from *U.S. v. Harvey Newkirk*, 14 Cr. 534 (JSR), which refers to his prior employers. When Darden Jr. testified as a cooperating witness against Harvey Newkirk, he stated that after leaving college in 1997, he worked for five financial firms: Salomon Brothers, Merrill Lynch, Smith Barney, Wachovia, and AIC. *See* GX-G at 836.

### **Question 8 (Failure to Provide Financial Statements)**:

In the context of a sentencing, there is little authority regarding the actions a district court can take where a defendant fails to provide a financial statement. The Court certainly would have the discretion to accord the defendant's assertions as to his financial status little or no weight, in the absence of providing a financial statement.

The consequences of failing to submit financial statements to probation arises most frequently in the context of supervised release. The available case law suggests that courts have not hesitated to revoke supervised release for such violations, although the failure to provide financial statements is frequently one among multiple violations addressed at the same time. For example:

- In *United States v. DePack*, No. Cr. 2:18-133 (WJM), 2022 WL 17994007, at *1 (D.N.J. Dec. 29, 2022), the defendant was arrested and remanded after failing to disclose financial records to probation, failing to make restitution payments, failing to obtain permission to leave the district, and being arrested for fraud.

- In *United States v. Smith*, 121 F.3d 701 (4th Cir. 1997), the Fourth Circuit affirmed the district court's revocation of supervised release where, in addition to failing to pay restitution and notify probation of an employment change, the defendant also failed to submit financial statements as directed by the probation officer.

- In *United States v. Holcomb*, No. 16 Cr. 1408 (WQH), 2025 WL 510690, at *2 (S.D. Cal. Jan. 13, 2025), the Court revoked the defendant's supervised release and sentenced him to nine months in prison where the defendant failed to provide requested financial records to probation and failed to pay his $600,000 fine.

4

**Question 9 (Violations of Pre-trial Release Conditions)**:

Yes, courts have varied upward as a result of a defendant's violations of pretrial release. For example:

- In *United States v. Jaiman*, 596 F. App'x 42 (2d Cir. 2015), the Second Circuit affirmed an above-Guidelines sentenced for a defendant who had been arrested in connection with a shooting while on bail pending sentencing. The defendant pled guilty to one count of possessing a firearm after having been convicted of a felony being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g) and was sentenced to 44 months' imprisonment—an upward variance of seven months from the Guidelines range of 30-37 months. *Id.* at 42. The court observed that in imposing the sentence, Judge Engelmayer had "carefully considered a wide range of factors," including among others, the defendant's "substantial criminal history" and his "conduct while on bail pending sentencing." *Id.* It affirmed that the upward variance was "well within the range of permissible decisions." *Id.* at 43.

- In *United States v. Daniel Darden*, 253 F. App'x 568 (6th Cir. 2007), the Sixth Circuit affirmed an upward variance where the district court, in imposing a 60-month sentence where the defendant's Guidelines range was 46-57 months, had considered the defendant's post-plea arrest for driving under the influence. The court observed that the 3-month upward variance was proportionately "modest," that the violation pending sentencing was "clearly relevant to the § 3553(a) analysis," and that the court had, on the record, "specifically linked this incident to [the defendant's] pattern of criminal activity and 'high likelihood of recidivism.'" *Id.* at 572.

- In *United States v. Cordero-Velazquez*, 124 F.4th 44, 54 (1st Cir. 2024), the district court sentenced a defendant in a narcotics case with a 30-37 month Guidelines range to 48 months' imprisonment. The First Circuit affirmed the upward variance because the district court made individualized findings regarding the defendant and his offense, including the defendant's "repeated violations of the conditions of his pretrial release" arising from the defendant's marijuana use.

In addition, courts in this district frequently impose higher sentences based in part on violations of pretrial release conditions, even if those sentences are not above Guidelines. *See, e.g.*, *United States v. Moayedi*, 22 Cr. 188 (JSR) (defendant committed obstruction of justice shortly after arrest while released on bail); *United States. v. Credidio*, 19 Cr. 111 (PAE) (defendant committed numerous petty thefts while released on bail); *United States v. Stephen Bellamy*, 16 Cr. 303 (VEC) (defendant possessed loaded firearm after plea to bank fraud).

**Question 10 (Ridgewood Road House)**:

The Government understands that Senior and the defendant's mother lived at a high-rise apartment located at 2950 Mount Wilkinson Parkway Southeast, Atlanta, GA, 30339 until at least as recently as November 2024. The Government has no information regarding where Senior and

5

the defendant's mother presently reside, including whether they live with the defendant at the residence located at the Ridgewood Road House.

### Question 11 (Tax Issues):

The Government has no information pertaining to any tax-related issues that Senior or the defendant's mother faced. The Government respectfully submits that questions pertaining to defense counsel's representations that Senior and the defendant's mother had "significant tax issues" and that the Internal Revenue Service asked Senior and the defendant's mother to "liquidate the home" are best addressed by defense counsel.

### Question 12 (Texts with Broker):

In the course of reviewing documents and records associated with the Ridgewood Road House available in law enforcement, real estate, and forfeiture databases, the Government did not encounter any documents or records stating that the Ridgewood Road House was in foreclosure. However, the Broker informed the Government that she observed that the Ridgewood Road House was listed as in "pre-foreclosure" status in tax records that she reviewed in preparing to list the home in or about September 2024 at the defendant's request. In addition, the Broker also represented to the Government that, after running a title search in or about October 2024, she saw that the Ridgewood Road House was listed as in foreclosure.

The Broker informed the Government that she understood that the defendant had legal issues, but maintains that she only began to understand that they were criminal in or about November 2024 as she was listing the Ridgewood Road House. Although the Broker admitted that an individual sent her an article about the defendant in or about October 2024—presumably about his conviction at trial—the Broker claimed that she knew very little about the defendant's legal issues and represented that she did not understand specifics pertaining to his case. The Broker explained that she understood that the defendant's legal issues were criminal in nature in or around December 2024 when the defendant told her that the defendant was on house arrest and later informed her that he had a court appearance in New York City at which he might be detained.

The Government does not know with certainty to whom the defendant references when he writes "one of my attorneys" in his text to the Broker regarding the removal of the Steinway from the Ridgewood Road House. Similarly, the Government does not know whether defense counsel knew that the defendant was attempting to sell the Ridgewood Road House.

### Question 13 (Disposition of Fraud Proceeds):

The Government does not understand why the defendant sent $519,172 to Patricia Darden. The table below lists the individuals to whom the defendant sent funds amounting to $732,520.20 and, in cases where the Government has the information, the relationship between the defendant and the recipient of the money. The Government does not know the reason for these payments.

6

| Recipient of Funds | Relationship to Defendant |
|---|---|
| Trevor Baldwin | Friend/Business associate |
| Suhaine Pedroo | Wife/Mother of daughter |
| LN Paulk | Sister |
| Medina Jenise | |
| Jessy Rivera | |
| Osman Kocic | Mother of Christian Darden |
| Selim Rusi | Staten Island landlord |
| Christian Darden | Son |
| Lea Lea Brown | Real estate broker |
| Melanie Hall | |
| Kenyatta Slade | Friend/Business associate |
| H Tony 1944 | |
| Jeff Jaffe | |
| Frances Kelly | |
| TB Baldwin | Trevor Baldwin |

**Question 14 (Darden's Family)**:

The Government's position is that the record is devoid of evidence suggesting that the defendant will not recidivate. The Government firmly believes that the defendant's criminal history and conduct post-conviction demonstrate that he will recidivate.

The Government is not aware of any evidence of lawful employment by the defendant. Based on the Government's review of the bank accounts and financial records that it reviewed in connection with the investigation and trial, the Government did not observe direct deposits associated with a company that would evidence typical, legitimate employment or any other indicia of legitimate of employment. The vast majority of the funds in these accounts derived from the frauds for which the defendant was convicted.

**Question 15 (Sophisticated Means)**:

Yes, the Court can consider each of the facts identified in its question—(1) the use of multiple corporate entities; (2) the use of multiple bank accounts; (3) the transfer of fraud proceeds through multiple accounts; (4) the deception of Dwight Howard and his representatives; (5) the deception of the WNBA and Atlanta dream; (6) the impersonation of Darden sr.; and (7) the creation of documents to conceal the frauds—in determining whether the sophisticated means enhancement applies. As the Government argued in its sentencing submission, these facts support the application of the sophisticated means enhancement. (Dkt. 246 at 6). This conclusion is consistent with the relevant Guidelines commentary and Second Circuit case law regarding the enhancement. (*Id.*).

**Question 16 (Darden's Bond)**:

The Government does not know what property the defendant used to secure his bond. On or about March 10, 2025, the Government asked defense counsel which property the defendant posted to secure his bond. On or about March 11 and March 12, 2025, Defense counsel responded that the defendant posted a commercial property, but defense counsel was not certain which property the defendant had posted. The Government did not file a lien or take any other steps to encumber the property that the defendant may have posted to secure his bond. In consultation with the Government's forfeiture unit, we do intend to forfeit the defendant's bail.

**Question 17 (Purchase and Efforts to Sell Ridgewood Road)**:

The Government is not aware of any correspondence pertaining to why the defendant's name was kept off of the purchase documents for the Ridgewood Road House.

At the time that the defendant arranged to keep his name off of the purchasing documents for the Ridgewood Road House, a mortgage for $2.96 million from Hyperion Bank was in place for the property. The mortgage was in the name of Darden Enterprises, LLC and Calvin Darden. Calvin Darden signed on behalf of Darden Enterprises, LLC. The mortgage agreement includes neither "senior" nor "junior" after the name Calvin Darden. The mortgage agreement states that the borrower "will pay this loan in 119 regular payments of $16,040.70 and one irregular last payment estimated at $2,147.722.99."

The bank records do not make entirely clear who paid the mortgage payments. It appears however, that the defendant deposited money into a Hyperion account in his parents name' (the "Hyperion Account") and that the Hyperion Account was used to make the mortgage payments. In December 2021, the Hyperion Account records show a deposit in the amount of $96,000 from an account in the name of "Calvin Darden". In April 2022, the Hyperion Account records show an incoming wire from an account in the name "Calvin R. Darden"[3] for $97,226. The memo line for this wire is "mortgage payment". Similarly, in December 2022, a bank account in the name "Calvin Darden" sends a check to Darden Enterprises LLC in the amount of $96,000. The memo line on this check is "mortgage". Records for the Hyperion Account show routine withdrawals in the amount of $16,138.79—that is, roughly the monthly mortgage payment amount specified by the mortgage agreement—from the account. Based on this record, the Government believes that the defendant arranged to have the mortgage payments made from an account that was not in his name so as to distance himself from both the mortgage and the Ridgewood Road House.

Based on representations from the Broker, the Government understands that the Broker did not have a contract with the defendant for the sale of the Ridgewood Road House. The Broker represented that she asked the defendant to sign a buyer agreement, but he refused. The documents that the Broker sent the defendant in response to his asking her to send the listing agreement are included with today's submission as GX-L.

It is possible that communications between the Broker and the defendant beyond those that the Government attached to its sentencing submission exist. The Government requested

---

[3] The defendant's middle name is "Ramarro". *See* GX-608C.

8

communications that the Broker and the defendant exchanged within a particular time period—from September 1, 2024 to on or about December 31, 2024. Based on representations from the Broker, the Government understands that the Broker and the defendant's relationship predated the time period for which the Government requested communications. The Government is not in possession of communications between the Broker and the defendant that precede September 1, 2024 and, therefore, cannot speak to their contents.

Other than the letter from the Broker, the Government is not aware of any other evidence that Senior and the defendant's mother were the Broker's clients. The Government is not aware of any evidence establishing who signed the DocuSign document that the defendant and the Broker discuss in their text exchange and the Government does not know how quickly it was returned after the request for signature.

### **Question 18 (West Paces Road House)**:

The Government is not aware of any evidence that the defendant had a contract with a real estate broker or real estate firm related to the West Paces Road House.

### **Question 19 (Real Estate Transactions as Violations of Federal Law)**:

The Government's position is that the defendant's attempt to sell the Ridgewood Road House and attempt to purchase the West Paces Road House may constitute money laundering, in violation of Title 18, United States Code, Section 1957. The Government does not currently intend to charge the defendant with this offense.

### **Question 20 (Synovus Bank Account)**:

The Government is not aware of any evidence establishing that the defendant had an interest in the Synovus bank account referenced in the defendant's text messages with the Broker. Documents and records associated with this account list the defendant's parents as the owners of this account.

### **Question 21 (Darden's Dentist)**:

Based on information provided by Krystal Batchelor, Darden Jr.'s pretrial services officer in Georgia, the dentist referenced in the Government's sentencing submission is Snodental, located at 2424 Roswell Rd. in Marietta, Georgia. The Government has not been able to confirm whether Darden Jr. had a dentist appointment on December 5, 2024. According to Officer Batchelor, Darden Jr. would typically inform her of appointments in advance, which he did not do for his December 5, 2024 appointment (he notified her on the same day). He also would typically provide a note from the office to confirm his appointment, which he did not do for the December 5 dentist appointment. When Officer Batchelor confronted Darden Jr. on December 12, 2024 regarding his December 5 whereabouts, he contacted the dentist in her presence, and the receptionist confirmed he appeared for an appointment for himself. Officer Batchelor then explained that Darden Jr.'s GPS data showed he was not at the dentist on December 5, 2024. Darden Jr. later called Officer

Batchelor, and stated the dentist had called him back and advised his December 5, 2024 appointment had been cancelled by the office.

**Question 22 (K. Amber Family Trust)**:

The Government does not have evidence that the K. Amber Family Trust exists. However, the Government notes that the name of the purported trust resembles matches first initial and suspected middle name of Darden Jr.'s daughter.

**Questions 23 (Darden Jr.'s Disposition of Assets)**:

The Government does not know whether Darden Jr. has directed others to dispose of any assets, but it does not have evidence that such conduct has occurred.

**Question 24 (Others' Disposition of Assets)**:

The Government does not know whether anyone other than Darden Jr. has disposed or attempted to dispose of assets listed in the Government's proposed forfeiture order, but it does not have evidence that such conduct has occurred.

**Question 25 (Payments Related to Assets in Forfeiture Order)**:

The Government does have evidence regarding continued payments by Darden Jr. or others on assets listed in the Government's proposed forfeiture order.

Respectfully submitted,

MATTHEW PODOLSKY
Acting United States Attorney for the
Southern District of New York

By: /s/_____
   Kevin Mead
   Brandon C. Thompson
   William C. Kinder
   Assistant United States Attorneys
   (212) 637-2211/2444/2394

cc: all counsel of record (by ECF)