```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X
                                                         :
UNITED STATES OF AMERICA,                                :
                                                         :
                                                         :
              -against-                                  :    S3 23-CR-134 (VSB)
                                                         :
CALVIN DARDEN, JR.,                                      :    OPINION & ORDER
                                                         :
                              Defendant.                 :
                                                         :
---------------------------------------------------------X
```

VERNON S. BRODERICK, United States District Judge:

      Before me is the motion of Calvin Darden, Jr. ("Defendant" or "Darden") for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 or, in the alternative, for a new trial under Federal Rule of Criminal Procedure 33. (Doc. 231, the "Motion.") Because Defendant has failed to raise grounds that would justify a judgment of acquittal or a new trial, Defendant's Motion is DENIED.

### I. Background

      On March 23, 2023, the indictment against Defendant, among others, was unsealed. (Doc. 3.) The indictment contained five counts. On July 18, 2024, a five-count superseding indictment was filed against Defendant ("Indictment"). (Doc. 142.) Count One of the Indictment charges that, from at least 2019 through in or about 2021, Defendant conspired and agreed with other people to commit wire fraud and bank fraud. (*Id*. ¶¶ 16–19.) Count Two of the Indictment charges that during that same period Defendant committed wire fraud. (*Id*. ¶¶ 20–21.) Count Three of the Indictment charges that, from in or about 2020 through in or about 2021, Defendant committed bank fraud. (*Id*. ¶¶ 22–23.) Counts Four and Five of the Indictment charge that, from in or about 2019 through in or about 2021, Defendant conspired and agreed with others to commit money laundering and committed money laundering, respectively. (*Id*.

¶¶ 24–28.)

On September 18, 2024, trial began with jury selection.[1] After the parties gave their opening statements, witness testimony began during the afternoon of September 24, 2024. The Government called 19 witnesses at trial. At the conclusion of the Government's case, Darden moved for a judgment of acquittal pursuant to Rule 29 arguing that the evidence with regard to knowledge and intent was insufficient to sustain convictions on each count. (Tr. 959–60.)[2] I denied the motion, stating: "I think at this stage, the evidence presented is more than ample for this case to go to the jury for the reasons the government mentioned." (*Id*. 962.) I then mentioned the email, texts, and testimony demonstrating Dwight Howard's desire to own a Women's National Basketball Association ("WNBA") team. (*Id*.) I described the vision plan as being used "to entice Mr. Howard, Mr. Brock, Mr. Schmidt, and others that this was a deal that was heavily supported in a way that — I think Mr. Brock testified in a way that was sort of unique in terms the sort of the WNBA team." (*Id*. 963.) With regard to the scheme to defraud Chandler Parsons, I commented that allowing the case to go to the jury was supported by the email and texts admitted in evidence. (*Id*.)

Darden called two witnesses in his case on October 1 and October 2, 2024. The Government did not call any witnesses in rebuttal. At the conclusion of his witnesses' testimony, Darden renewed his oral Rule 29 motion. Specifically, Defense counsel stated that with "respect to each of the five counts, . . . that the government has presented insufficient evidence on the elements of knowledge and intent as it relates to each count to sustain a conviction under those individual counts." (Tr. 1093.) The defense did not make any additional

---

[1] Because I tested positive for COVID, jury selection was paused midday on September 17, and was resumed and completed on September 23–24, 2024.

[2] "Tr." refers to the transcript of the trial.

2

arguments with regard to the motion. The Government, referenced its prior remarks related to the Rule 29 motion made after the close of its case, and then stated that "there's an abundance of evidence demonstrating that the jury could find the defendant guilty." (*Id*.) I commented that my statements at the close of the Government's case concerning Darden's Rule 29 motion were "equally applicable here, so they should be considered as reiterated in connection with my denial at that time," and I went on to say that "my views have not changed concerning the evidence, and I do believe there's more than sufficient evidence to present the case to the jury with regard to each of the counts and the elements of those counts, and that nothing that has been presented in the defense case would cause me to change that view concerning the Rule 29 application." (*Id*.)

After summations on October 3, 2024, the jury began deliberations. On October 4, 2024, the jury convicted Darden on all five counts of the Indictment. Darden filed his motion pursuant to Rules 29 and 33 on November 13, 2024. (Doc. 231.) The Government filed its opposition on December 6, 2024. (Doc. 237.)

## II.  Legal Standards

### A.  *Rule 29*

Federal Rule of Criminal Procedure 29(c)(2) provides, in part, that "[i]f the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal." A district court may enter a judgment of acquittal under Rule 29 "only if, after viewing the evidence in the light most favorable to the prosecution and drawing all reasonable inferences in the government's favor, it concludes no rational trier of fact could have found the defendant guilty beyond a reasonable doubt." *United States v. Reyes*, 302 F.3d 48, 52 (2d Cir. 2002) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In other words, the "evidence that the defendant committed the crime alleged [must be] nonexistent or so meager that no reasonable jury could

find guilt beyond a reasonable doubt" for a court to acquit. *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (internal quotation marks omitted). When making this determination a court cannot usurp the role of the jury or "substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *Id.* at 129 (quoting *United States v. Mariani*, 725 F.2d 862, 865 (2d Cir. 1984)). The court must "consider the evidence in its totality, not in isolation, and the government need not negate every theory of innocence." *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000) (citation omitted). If "the court concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter." *Guadagna*, 183 F.3d at 129 (alteration in original) (internal quotation marks omitted). A defendant faces a "heavy burden" in meeting this standard. *United States v. Bullock*, 550 F.3d 247, 251 (2d Cir. 2008).

### B.   *Rule 33*

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). A district court has "broad discretion . . . to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992). However, the court must "strike a balance between weighing the evidence and credibility of witnesses and not wholly usurping the role of the jury." *United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir. 2001) (internal quotation marks omitted). It is the jury's role to weigh the evidence and assess a witness's credibility, and a district court generally "must defer to the jury's resolution" of those issues. *United States* v. *Bell*, 584 F.3d 478, 483 (2d Cir. 2009) (per curiam) (quoting *Sanchez*, 969 F.2d at 1414). "Matters of the choice between competing inferences, the credibility of the witnesses, and the weight of the evidence are within the province of the jury, and [a court is] not

entitled to second-guess the jury's assessments." *United States v. Rea*, 958 F.2d 1206, 1221–22 (2d Cir. 1992) (collecting cases); *see also United States v. Temple*, 447 F.3d 130, 136 (2d Cir. 2006) (explaining that a court may not "substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury" (internal quotation marks omitted)). Indeed, only in "exceptional circumstances" may a trial judge "intrude upon the jury function of credibility assessment." *Sanchez*, 969 F.2d at 1414.

"The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice. The trial court must be satisfied that competent, satisfactory and sufficient evidence in the record supports the jury verdict." *Ferguson*, 246 F.3d at 134 (internal quotation marks omitted). "There must be a real concern that an innocent person may have been convicted. It is only when it appears that an injustice has been done that there is a need for a new trial in the interest of justice." *Bell*, 584 F.3d at 483 (internal quotation marks omitted). "The defendant bears the burden of proving that he is entitled to a new trial." *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009). Where a defendant fails to demonstrate that an erroneous evidentiary ruling resulted in "manifest injustice" he has not met his burden under Rule 33 and is not entitled to a new trial. *See McCourty*, 562 F.3d at 477.

### III. Discussion

Darden seeks a judgment of acquittal, or, in the alternative, for an order granting him a new trial. With regard to his argument for a judgment of acquittal, Darden claims that the evidence related to materiality was insufficient to sustain convictions on Counts One (conspiracy to commit wire fraud and bank fraud), Two (wire fraud), and Three (bank fraud). With regard to Counts Four (conspiracy to commit money laundering) and Count Five (money laundering), Darden does not assert an independent legal basis for acquittal but attempts to bootstrap these

charges based on the fact that the "specified unlawful activity" referenced in these counts is the wire fraud and bank fraud charged in Counts Two and Three.[3] In the alternative, Darden seeks a new trial based on the purported bias of a witness called by the Government.

Because there is more than ample evidence in the record of Darden's material, false statements related to Dwight Howard and Chandler Parsons, the fraud victims from whom Darden stole $7 million and $1 million, respectively, Darden's motion for judgment of acquittal is DENIED. With regard to Darden's motion for a new trial, because the evidence upon which Darden bases his motion for a new trial does not raise a concern that Darden was convicted despite being innocent, Darden's motion for a new trial is DENIED.

Below, I set forth the basis for my decision first with regard to Darden's motion for a judgment of acquittal and then turn to the motion for a new trial.

### A.   *Motion for a Judgment of Acquittal*

#### 1. Applicable Law

The elements of wire fraud are: (1) "a scheme or artifice to defraud or to obtain or retain money or property by materially false and fraudulent pretenses, representations, or promises"; (2) "that the defendant knowingly and willfully participated in the scheme or artifice to defraud, with knowledge of its fraudulent nature and with specific intent to defraud"; and (3) "that in execution of that scheme, the defendant used or caused the use of interstate wires." (Tr. 1244.) Similarly, the elements of bank fraud are: (1) "a scheme to obtain money or property that was under the custody or control of a bank by means of materially false or fraudulent pretenses,

---

[3] The defense argues that the money laundering charges, which accuse Darden of laundering the proceeds of criminal activity—in this case wire and mail fraud—must fail because of the alleged lack of evidence supporting one of the elements of wire and mail fraud. Although the defense is correct that the Government must prove beyond a reasonable doubt that Darden committed all elements of the underlying offense, *see United States v. Silver*, 948 F.3d 538, 576 (2d Cir. 2020), I find that there is ample evidence in the record supporting the jury's verdict as to wire fraud and mail fraud and therefore the defense's arguments as to the money laundering charges necessarily fail.

6

representations, or promises"; (2) "the defendant acted knowingly, willfully, and with a specific intent to obtain money or property that was under the control of a bank"; and (3) "at the time of the scheme, the bank that was the target of the scheme was insured by the Federal Deposit Insurance Corporation." (*Id*. 1253–54.)

"[M]ateriality is an element of the federal . . . wire fraud[] and bank fraud statutes." *Neder v. United States*, 527 U.S. 1, 4 (1999). "In general, a false statement is material if it has 'a natural tendency to influence, or is capable of influencing, the decision of the decision-making body to which it was addressed.'" *Id*. at 16 (quoting *United States v. Gaudin*, 515 U.S. 506, 509 (1995)). Whether a statement is material is analyzed using an objective test. *See United States v. Frenkel*, 682 F. App'x 20, 22 (2d Cir. 2017) (summary order) ("[A] matter is material if 'a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question'" (emphasis omitted)); *see also Lee v. Union Mut. Fire Ins. Co.*, No. 22-3142-CV, 2023 WL 7014138, at *3 (2d Cir. Oct. 25, 2023) (summary order) ("The 'reasonable person' standard is an objective one." (citations omitted)).

> As I instructed the jury,
>
> A statement or representation is false if it is untrue when made and was then known to be untrue by the person making it or causing it to be made. A statement may also be false if it contains half truths, conceals material facts, or is ambiguous or incomplete in a manner that makes what is said or represented misleading or deceptive.
>
> The deception need not be based upon spoken or written words alone. The arrangement of the words, the circumstances in which they are used, or the defendant's conduct may convey the false and deceptive appearance. If there is deception, the manner in which it is accomplished does not matter.

(Tr. 1244–45.) A "false or fraudulent 'statement need not have exerted actual influence, so long as it was intended to do so and had the capacity to do so.'" *United States v. Madakor*, 29 F. App'x 636, 638 (2d Cir. 2002) (quoting *United States v. Gregg*, 179 F.3d 1312, 1315 (11th Cir.

7

1999)); *see also United States v. Weaver*, 860 F.3d 90, 96 (2d Cir. 2017) ("[R]eliance is not an element of criminal fraud, while materiality is." (citing *Neder*, 527 U.S. 24–25 (1999))); *cf. United States v. Cleary*, 565 F.2d 43, 46 (2d Cir. 1977) ("The essence of the crime was the making of false statements with intent to influence [defendant], and whether or not [defendant] was actually induced to rely upon them is irrelevant." (citations omitted)).  A jury finding as to the materiality of a misrepresentation will only be overturned if no rational jury could make that finding.  *See United States v. Litvak*, 808 F.3d 160, 175 (2d Cir. 2015).

### 2. Application

#### a. The Scheme to Defraud Dwight Howard

With regard to the wire fraud and bank fraud charges, Darden argues that "the Government did not prove beyond a reasonable doubt that any alleged misrepresentations . . . were 'material'", and therefore such misrepresentations "w[ere] insufficient to warrant conviction in this matter."  (Doc. 231 at 2.)  Darden is wrong, and ignores or improperly dismisses the impact of the misrepresentations he and his co-conspirator Charles Briscoe communicated to Howard, individuals affiliated with Howard, and individuals affiliated with the Atlanta Dream ("Dream"), related to the purchase of the Dream, including in the Vision Plan.[4]  It was more than reasonable for the jury to come to the conclusion that these misrepresentations were all intended to convince Howard to send money to purchase the Dream.

Darden ignores the fact that the jury was entitled to draw inferences concerning what the intended consequences of the misrepresentations were from the unrebutted fact that Howard sent $7 million to Darden and Briscoe and he received nothing in return.  Darden also fails to address the fact that the money trail unequivocally demonstrated that rather than spend the money to

---

[4] Darden refers to the vision plan as the vision board throughout his motion papers.  (*See generally* Doc. 231.)

8

purchase the Dream or to finance Darden Sports Group—as Darden claimed at trial and in his brief—he went on an almost $6 million personal spending spree shortly after taking possession of Howard's $7 million.

Darden argues that the Government failed to prove beyond a reasonable doubt that the alleged misrepresentations were material, and therefore were insufficient to warrant conviction in this matter. (Doc. 231 at 2.) Darden claims that "the only possible 'material representation' that could be attributed to Mr. Darden regarding [Dwight Howard], relates to the 'vision' board." (*Id*. at 7.) Darden then asserts that there is no credible evidence that "[Dwight Howard] (or anyone else) in this case relied on the vision board to provide any amount of money to Mr. Darden or his alleged co-conspirator in this matter." (*Id*.) Darden is wrong.

The Vision Plan was prepared by Darden, (GXs 2401, 2402, 2404), and paid for by Howard according to an invoice from Legacy Consulting Corporation[5] ("Legacy"), (GX 2303, Tr. 374, 547). Darden provided the Vision Plan to Briscoe. (GX 2402.) Briscoe then provided a copy of the Vision Plan to Howard. (Tr. 375.) Darden also provided a copy of the Vision Plan to John Brock, (Tr. 88–90; GX 2119), the husband of one of the prior owners of the Dream, and "the primary contact to sell the Atlanta Dream." (Tr. 75.)

In general, the Vision Plan served as a representation that the Darden Sports Group would be used as a vehicle to purchase the Dream. (*See*, *e.g.*, GX 2119A at 2 ("Darden Sports Group ('DSG'), led by prominent Atlanta businessman, Cal Darden, Sr., is proud to have an opportunity to become the next owner of the WNBA's Atlanta Dream."); GX 2404A at 2 (same).) This representation and most of the other representations in the Vision Plan were false.

The Vision Plan contains a slide that purports to depict the members of an advisory board

---

[5] The account name is Legacy AC, LLC.

9

to Darden Sports Group, the entity that was seeking to purchase the Dream.  The advisory board slide lists eight purported members of the advisory board.  The members of the advisory board were prominent business executives, including executives in the fields of music, film, and coffeehouses; famous and accomplished sports athletes; artists, including an actor, an actress, writers, directors, and producers; and a former politician. (Doc. 237 at 8.)  This slide asserts that "[e]ach board member has committed to using their ideas, voices, platforms, resources, relationships and influence to support the Atlanta Dream and its various initiatives." (GX 2144A at 8).  These representations were untrue.

Another slide of the Vision Plan lists 16 companies—identified by their corporate logos on the slide—as corporate partners of the Darden Sports Group.  Some of these purported corporate partners are multinational corporations, some headquartered in or with ties to Atlanta, Georgia, the home of the Dream.  This slide asserts that each company was "committed to investing in and across the Dream's various platforms and properties immediately upon the closing of DSG's proposed acquisition." (GX 2144A at 18).  These representations, like those about the advisory board, were untrue.

As the Government details in its opposition, numerous witnesses testified to the falsity of the statements in the Vision Plan concerning the relationship of advisory board members and the corporate sponsors to the Darden Sports Group, Darden, Briscoe, and the Dream.

- • Issa Rae.  The Vision Plan identified actress and writer Issa Rae as a member of the advisory board.  GX 2144A at 8.  Rae testified that she knew neither Darden nor Briscoe and that she never agreed to serve on the advisory board.  Tr. at 221-25.

- • Aflac.  The Vision Plan identified Aflac as a corporate sponsor.  GX 2144A at 18.  Jennifer McMullin, a senior brand manager at Aflac, testified that Aflac had never, to her knowledge, even had preliminary discussions about any such sponsorship, and that she would likely have known about any such sponsorship if it existed.  Tr. 213-20.

10

- Tyler Perry and Tyler Perry Studios. The Vision Plan identified filmmaker Tyler Perry as a member of the advisory board, and it listed Perry's company, Tyler Perry Studios, as a corporate sponsor. GX 2144A at 8, 18. The Vision Plan also claimed that Darden Sports Group and Tyler Perry Studios had 'agreed to form a joint venture production company' that would promote the Atlanta Dream. *Id.* at 22. Brannon Anthony, the general counsel for Tyler Perry Studios, testified that he was not aware of either Tyler Perry or Tyler Perry Studios having any conversations about these issues or agreeing to do any of the things the Vision Plan claimed. Tr. 853-62[.]

- Naomi Osaka. The Vision Plan identified professional tennis player Naomi Osaka as a member of the advisory board. Stuart Duguid, Osaka's agent, testified that Osaka had never agreed to serve on the advisory board. Tr. at 845-51.

- Rosalind Brewer and Starbucks Coffee. The Vision Plan identified corporate executive Rosalind Brewer as a member of the advisory board, and listed Starbucks Coffee as a corporate sponsor. GX 2144A at 8, 18. Brewer, the former Chief Operating Officer of Starbucks Coffee, testified that she never agreed to serve on the advisory board, and that Starbucks Coffee was not to her knowledge a corporate sponsor. Tr. at 925-35.

- Jennifer Baltimore. The Vision Plan identified music industry executive Jennifer Baltimore as a member of the advisory board, and also as one of the owners of the Darden Sports Group. GX 2144A at 2, 8. Baltimore testified that, while she knew Darden and discussed the acquisition of the Dream with him, she did not agree to serve on an advisory board and was not one of the owners of the Darden Sports Group. Tr. at 269-78[.]

(Doc. 237 at 9–10.) Although Darden had no obligation to put on a defense case or to cross examine any witnesses, (Tr. 1234), he called two witnesses in his own defense and his counsel cross-examined some of the Government's witnesses, including some of the above witnesses. During the cross-examination of these witnesses, Darden did not challenge the substance of their testimony that neither they nor their companies had any knowledge of or affiliation with the advisory board or Darden Sports Group. With regard to other witnesses, Darden did not ask a single question. Thus, the falsity of the statements outlined above from the Vision Plan were unrebutted.

Darden lied to Brock by providing him with the Vision Plan and by responding to a direct

11

question posed by Brock confirming that each of the advisory board members had committed to being on the advisory board, (Tr. 92–93), and he also falsely told Brock that he had discussions with each of the purported corporate sponsors, (*id*. 93–94). Darden also provided the Vision Plan to Christopher Sienko, the General Manager of the Dream between 2018 and April 2021. Based upon the Vision Plan, Sienko believed that the advisory board and the corporate sponsors were real, (*id.* 1078–79), and he advised Darden that any presentation to the WNBA "should not be pie in the sky", (*id*. 1080).

The Vision Plan was also provided to Jeffrey Schmidt and Serge Ecityan, who were banking professionals affiliated with Dwight Howard working at BMO Bank N.A. ("BMO"). (Tr. 769–70, 775–76.) Darden also deceived others about the nature of his father's involvement in the process to purchase the Dream, including by impersonating his father in emails and on the phone to Howard's bankers at BMO, and Briscoe. (Doc. 237 at 18–19.)

Although these representations were not made directly to Howard, they were made to individuals or entities affiliated with Howard and/or related to the purchase or sale of the Dream. It was critical to Darden's plan that these individuals believe the representations that he was making. It was reasonable for the jury to infer that the lies told to representatives of Howard were intended to ensure that Howard's advisors were either duped into believing the lies or that the lies placated them enough that they would not raise concerns with Howard concerning relinquishing his $7 million. With regard to representatives of the Dream, the lies were intended to ensure that the Darden Sports Group was taken as a legitimate potential purchaser for the Dream. Here again, it was reasonable for the jury to infer that the lies told to representatives of the Dream were intended to keep the Darden Sports Group as a contender for the purchase of the Dream, so that Darden would be able to convince Howard that for $7 million he was going to

12

purchase the Dream. The law is clear a "false or fraudulent 'statement need not have exerted actual influence, so long as it was intended to do so and had the capacity to do so.'" *Madakor*, 29 F. App'x at 638. Not only did the Government meet its burden but the evidence also demonstrated that false statements actually caused Howard to send $7 million to Darden and Briscoe for which he got nothing. Therefore, Darden's motion for a judgement of acquittal on the basis that the Government failed to prove the materiality of the false representations made in connection with the scheme to defraud Dwight Howard is DENIED.

b. The Scheme to Defraud Chandler Parsons

Similarly, with regard to the fraud committed against Chandler Parsons, "Darden and Briscoe defrauded Parsons of $1 million by employing . . . material falsehoods" by soliciting Parsons for money "based on the false claim that the money would be used as a loan to NBA prospect James Wiseman." (Doc. 237 at 2.) Darden ignores or improperly dismisses the misrepresentations he and his co-conspirator Charles Briscoe made to Parsons related to James Wiseman, including, as noted, that the money was to be a loan to Wiseman, creating and using a forged contract purportedly showing that Wiseman had signed with Briscoe's sports agency, and that Parson's money was guaranteed by two promissory notes. (*Id.*) Darden also ignores the fact that Parsons wired $1 million to Briscoe and the next day Briscoe wired $544,000 to Darden's Legacy AC, LLC account. As with the money sent by Dwight Howard, the money Parsons wired was not used for the represented purpose. None of Parsons's money was given to Wiseman, and Wiseman in fact had no knowledge of the purported loan despite the fact that Parsons was told he would be the recipient. Nor did Parsons get any money back.

With regard to the two promissory notes, one "promissory note dated the day of Parsons's wire said that Chandler Parsons had loaned Briscoe Sports Group (an entity controlled

13

by Briscoe) $1 million, and that Briscoe Sports Group would repay it with interest (the 'Parsons/Briscoe Note')," and the "second promissory note said that Briscoe Sports Group had loaned Darden Enterprises, LLC (an entity controlled by Darden) $1 million, and that Darden Enterprises, LLC would repay it with interest (the "Briscoe/Darden Note")." (*Id*. at 11.) The promissory notes were intended to convince Parsons to send the $1 million by assuring him of repayment from two entities. (*Id*. at 2, 11–12, 36–38.) It was reasonable for the jury to infer from these facts that Briscoe and Darden intended that the false representations, including creating two promissory notes that amounted to guarantees, were made to get Parsons to wire the money.

Darden's claim that "there is no evidence in the record that Mr. Darden said or did anything related to [Parsons] that had a 'natural tendency to influence' his decision and importantly Athlete 2 did not say that he did," (Doc. 231 at 10), is belied by the record. With regard to the two promissory notes, Darden's role in the fraud against Parsons was in part established through the electronic communications between Briscoe and Darden. (Doc. 237 at 11–13.) Those communications established that "it was Darden's idea to create the Parsons/Briscoe Note and the Briscoe/Darden Note to paper the fraud and provide false assurance to Parsons that he would be paid back." (*Id*. at 12.) Indeed, more generally, the emails, summarized in the Government's opposition brief, document Darden pressing Briscoe to apply pressure on Parsons to send the money. (*Id*. at 12 ("On November 16 and 17, 2019, Darden sent Briscoe a number of messages pressing him to confirm Parsons's agreement." (citing GX 401-267 at 5–10); "On November 18, 2019, Darden messaged Briscoe, 'I think having BSG [Briscoe Sports Group] guarantee the money (with Darden Enterprises backing BSG) could work also. Just a thought.'" (citing GX 401-283); "Also on November 19, 2019,

14

Darden pushed Briscoe to convince Parsons to wire the funds, writing, 'you should speak to CP. Let him know you got the loan agreement signed with a personal guaranty in the event of default . . . CP trusts you.  So if he knows you have an agreement signed and guaranteed, and he wants to do the deal, he just needs to authorize it.  He left it up to you to do the diligence, so now he just needs to know everything is done and there's no risk of him not getting his money back.'" (citing GX 401-295 at 1); "On November 20, 2019, the day of the wire, Darden again pushed Briscoe to convince Parsons to send the wire, writing, '[w]e need to get this done for a multitude of reasons.  Mainly, to have the # 1 draft pick, but to also get Jonathan off our backs.' . . . Later that day, Darden wrote, 'even if it [sic] 750, we're good.  That gets them the 450 they owe, plus 300 to J Blue.'" (citing GX 401-308 at 1, 4)).)  Therefore, contrary to Darden's claim, he was fully engaged in the scheme to defraud Parsons, including by coming up with specific ways intended to convince Parsons to wire the $1 million.  Darden provided Briscoe with the Briscoe/Darden Note the day before Parsons wired the $1 million to Briscoe Sports Group, provided wire instructions for his Legacy AC, LLC account, and the day after Parsons wired the $1 million Briscoe wired $544,000 to Darden's Legacy AC, LLC account.  Darden used his share of the fraud proceeds on personal items, including the purchase of a Mercedes G63, a Rolls-Royce, and watches totaling $88,500.  The evidence before the jury demonstrated explicit false representations made to Parsons by Briscoe and Darden as well as evidence upon which the jury could draw a reasonable inference that Briscoe and Darden intended to defraud Parsons by getting him to wire them $1 million.  Therefore, Darden's motion for a judgement of acquittal on the basis that the Government failed to prove the materiality of the false representations made in connection with the scheme to defraud Chandler Parsons is DENIED.

B.      *Motion for a New Trial*

With regard to the second argument, Darden claims that Jennifer Baltimore, a Government witness, "may have testified in a specific fashion" so that she and/or a friend could benefit financially. (Doc. 231 at 3.) Specifically, according to the Government, Baltimore sent an email to the Government a day after the jury returned its guilty verdict stating:

> Congratulations on your tireless efforts in securing the guilty verdict in the Darden trial. A friend and NY real estate developer . . . is interested in purchasing the Darden residence if that will been to be sold [The friend] is originally from Atlanta and why she is interested. Please let me know if there's a point of contact or site for her to follow. Many thanks!"

(Doc. 237 at 39.)[6] As an initial matter, Darden's new trial motion is not based on Baltimore's trial testimony or anything she did during trial. I also note that Baltimore was making an inquiry on behalf of a friend, and that she did not express a personal interest in the home that Darden purchased with some of the proceeds from defrauding Howard. Therefore, Baltimore's statement/inquiry is too attenuated from the matters litigated during the trial and the jury's guilty verdict to warrant a new trial.

Darden argues that Baltimore's "almost immediate communication to the Government indicated that she likely harbored bias toward Mr. Darden during her testimony specifically so that he could be convicted thus allowing her the opportunity to participate in the purchase of his home." (Doc. 231 at 3.) This is nothing but speculation. There is no basis to believe that Baltimore harbored bias towards Darden in a way that would have impacted her essentially unrebutted testimony. Finally, the evidence against Darden was overwhelming. Having presided over the trial and heard all of the testimony, including from Baltimore, I do not believe that there has been a "manifest injustice", and I am more than satisfied that "competent,

---

[6] On October 10, 2024, the Government provided a copy of the email to the defense.

16

satisfactory and sufficient evidence in the record supports the jury verdict." *Ferguson*, 246 F.3d at 134 (internal quotation marks omitted). I have no concern that "an innocent person may have been convicted." *Bell*, 584 F.3d at 483 (internal quotation marks omitted). Because Darden fails to meet the burden of proving that he is entitled to a new trial, his motion for a new trial is DENIED.

### IV. Conclusion

For the foregoing reasons, Defendant's motion for a judgment of acquittal or in the alternative for a new trial is DENIED.

SO ORDERED.

Dated: March 25, 2025
      New York, New York

                                            Vernon S. Broderick
                                            United States District Judge